# EXHIBIT C

ASPEN TREATISE SERIES

# PATENT LAW

Fourth Edition

## JANICE M. MUELLER

Instructor and Co-Founder
Chisum Patent Academy



Wolters Kluwer
Law & Business

Copyright © 2013 CCH Incorporated.

Published by Wolters Kluwer Law & Business in New York.

Wolters Kluwer Law & Business serves customers worldwide with CCH, Aspen Publishers, and Kluwer Law International products. (www.wolterskluwerlb.com)

No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or utilized by any information storage or retrieval system, without written permission from the publisher. For information about permissions or to request permissions online, visit us at www.wolterskluwerlb.com, or a written request may be faxed to our permissions department at 212-771-0803.

To contact Customer Service, e-mail customer.service@wolterskluwer.com, call 1-800-234-1660, fax 1-800-901-9075, or mail correspondence to:

    Wolters Kluwer Law & Business
    Attn: Order Department
    PO Box 990
    Frederick, MD 21705

Printed in the United States of America.

1 2 3 4 5 6 7 8 9 0

ISBN 978-1-4548-2244-8

**Library of Congress Cataloging-in-Publication Data**

Mueller, Janice M., 1963-
  Patent law / Janice M. Mueller.—4th ed.
    p. cm.
  ISBN 978-1-4548-2244-8
1. Patent laws and legislation—United States. I. Title.

KF3114.M84 2013

346.7304'86—dc23
                                              2012034434



SFI Certified Chain of Custody
Product Line Contains At Least 20% Certified Forest Content
www.sfiprogram.org
SFI-00756

C. What Is a Patent?

## 6. The Negative Right to Exclude

A patent, in one sense, is an official government document like the one reproduced at Figure 1.1. More importantly, the patent represents a property right. The paper document is merely a tangible representation of the boundaries of a time-limited property right granted by the U.S. federal government. Importantly, this property right is a *negative* right; that is, a right to exclude others from making, using, selling, offering to sell, or importing the patented invention in the United States during the term of the patent.[33] Much as the owner of real property generally has a right to prevent others from entering onto her land,[34] the owner of a patent can ask a court to enjoin those who make, use, sell, offer to sell, or import her invention into this country without authorization. The patent owner also can grant **licenses** to third parties, authorizing them to make, use, sell, offer to sell, or import the patented invention without fear of being sued for infringement. Licenses are contracts, typically requiring financial payments to the patentee called *royalties*.[35]

Notably, a patent does not convey any *positive* or affirmative right to make, use, sell, offer to sell, or import an invention.[36] Any such positive right to exploit one's own creations arises from the common law, not federal patent law.[37] In fact, there are any number of reasons why one

---

[33] 35 U.S.C. §154(a)(1); 35 U.S.C. §271(a).

[34] *See* RESTATEMENT (FIRST) OF PROPERTY §1 cmt. a, illus. 1 (1936) (definition of *right*) (stating that A, the owner of Blackacre, "normally has a right that B [any other person] shall not walk across Blackacre," and that B "normally has a duty not to walk across Blackacre").

[35] *See generally* MICHAEL A. EPSTEIN & FRANK L. POLITANO, DRAFTING LICENSE AGREEMENTS (4th ed. 2011); ROBERT W. GOMULKIEWICZ ET AL., LICENSING INTELLECTUAL PROPERTY: LAW AND APPLICATION (2d ed. 2011).

[36] *See* Leatherman Tool Group Inc. v. Cooper Indus., Inc., 131 F.3d 1011, 1015 (Fed. Cir. 1997) (explaining that "the federal patent laws do not create any affirmative right to make, use, or sell anything. As the Supreme Court has stated, '[t]he franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that he obtains by the patent.'") (quoting Bloomer v. McQuewan, 55 U.S. 539, 548 (1852)).

[37] *See* Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U.S. 24, 36 (1923) (noting that "[i]t is the fact that the patentee has invented or discovered something useful[,] and thus has the common-law right to make, use, and vend it himself[,] which induces the government to clothe him with power to exclude every one else from making, using[,] or vending it."). The common law did not provide the inventor with any right to exclude *others*, however. *See* Deepsouth Packing Co. v. Laitram Corp., 406 U.S. 518, 525-526 (1972). The negative right to exclude is provided only through the Patent Act. *See* 406 U.S. at 526 n.8 ("But the right of property which a patentee has in his invention, and his right to its exclusive use, is derived altogether from these statutory provisions; and this court [has] always held that an inventor has no right of property in his invention, upon which he can maintain a suit, unless he obtains a patent for it,

**17**

might own a patent and yet not be able to practice (i.e., make or sell) her patented invention. For example, criminal laws may forbid the manufacture of certain patented weapons banned by the government. If the patent is directed to a new medicine or method of treatment, the Food and Drug Administration (FDA) may not yet have granted approval for the sale of the item to U.S. consumers. Under certain narrow circumstances, moreover, the practice of a patent in an anticompetitive manner may result in liability under the antitrust laws.[38]

Yet another situation that may prohibit the practice of a patent involves the issuance of a **blocking patent** to another entity. In this scenario, Inventor A's subservient patent is blocked by a dominant patent owned by Inventor B, even though both A and B independently qualified for patent protection on their respective inventions. Consider an example from the time of cave dwellers, before furniture, at least as we know it today, existed. Assume that the cave dwellers' society has implemented a primitive patent system, and that Inventor A has been issued the first patent claiming a "chair." In her patent, Inventor A discloses only a single embodiment (i.e., one specific example) of a chair, the design of which is a simple straight-backed, four-legged chair of the type seen (in modern times) in classrooms or offices. Because Inventor A is considered a "pioneer," her patent should be entitled to a relatively broad interpretation, so as to offer incentives for the creation of basic inventions such as the first "chair."[39]

Assume further that during the period of time while Inventor A's chair patent is still in force, unrelated Inventor B independently invents a rocking chair. Inventor B obtains what patent attorneys refer to as an "improvement patent" that claims the rocking chair. Inventor B's rocking chair is sufficiently new and nonobvious, as compared to the chair disclosed in A's patent, that B is independently entitled to his own patent. If Inventor B makes or sells his rocking chair in the patent-granting country, however, he will literally infringe Inventor A's patent, which broadly covers all types of chairs.[40]

Note that [ novel and n[ B did not rec[ same token, to exclude ot[ is now blocke[ broadly cove[ words, if Inv[ must obtain liability.[41]

In practic[ is sometime[ each other.[42] the public is ment.[43] Alter[ sory licensin[ the blocked i[ advance of c[ has not imple[

---

according to the acts of Congress; and that his rights are to be regulated and measured by these laws, and cannot go beyond them.") (quoting Brown v. Duchesne, 60 U.S. (19 How.) 183, 195 (1857)).

[38]See infra Chapter 10 ("Defenses to Patent Infringement"), discussing potential antitrust liability for enforcement of patent rights.

[39]See In re Hogan, 559 F.2d 595, 606 (CCPA 1977) (Markey, C.J.) (contending that if applicants were in fact "pioneers," "they would deserve broad claims to the broad concept," and that to restrict them to claim scope no broader than single disclosed embodiment "is merely to state a policy against broad protection for pioneer inventions, a policy both shortsighted and unsound from the standpoint of promoting progress in the useful arts, the constitutional purpose of the patent laws").

[40]Professor Mark Lemley has noted that "this infringement determination does not take into account the value of the improvement made by the accused infringer," citing as an example Hughes Aircraft Co. v. United States, 717 F.2d 1351 (Fed. Cir. 1983)

(holding that gov[ computers, infrin[ The Economics o[ (1997).

[41]A license is s[ party (licensee) t[ offering to sell, or[ promise not to su[ the level of the lic[ L. POLITANO, DRAF[ AL., LICENSING INTE[ Chapter 10 ("Defe[

[42]See generally[ Breakdown: The C[

[43]See Mark A. [ 75 TEX. L. REV. 98[ "reverse doctrine [ the doctrine has [ For a more optimi[ blocking patents Bargaining Break[ concepts of literal[ the reverse doctri[ ("Patent Infringem[

[44]See Agreemen[ Marrakesh Agreer[ 31(l), Apr. 15, 199[ criteria for compul[

### C. What Is a Patent?

Note that although Inventor B obtained his own patent based on his novel and nonobvious improvement invention, nevertheless Inventor B did not receive any *affirmative* right to practice his invention. By the same token, because his patent did give Inventor B a negative right to exclude others from making and selling a rocking chair, Inventor A is now blocked from producing rocking chairs, even though her patent broadly covers any type of chair (including a rocking chair). In other words, if Inventor A wants to manufacture and sell a rocking chair, she must obtain a **license** from Inventor B in order to avoid infringement liability.[41]

In practice, the dilemma of blocking patents in the United States is sometimes resolved by contract; that is, the parties cross-license each other.[42] If the parties are unable to negotiate a solution, however, the public is harmed because no one gets the benefit of the improvement.[43] Alternatively, some foreign patent systems authorize compulsory licensing of a blocking basic patent where the subject matter of the blocked improvement patent qualifies as an "important technical advance of considerable economic significance."[44] The United States has not implemented this type of compulsory licensing.

---

(holding that government's accused satellite control system, implemented by onboard computers, infringed patent on ground-based analog control system). Mark A. Lemley, *The Economics of Improvement in Intellectual Property Law*, 75 TEX. L. REV. 989, 1006 (1997).

[41]A license is simply an agreement between the patent owner (licensor) and another party (licensee) that the licensor will not sue the licensee for making, using, selling, offering to sell, or importing the patented invention. The consideration for the licensor's promise not to sue is typically a payment called a royalty, which is computed based on the level of the licensee's use of the invention. *See generally* MICHAEL A. EPSTEIN & FRANK L. POLITANO, DRAFTING LICENSE AGREEMENTS (4th ed. 2011); ROBERT W. GOMULKIEWICZ ET AL., LICENSING INTELLECTUAL PROPERTY: LAW AND APPLICATION (2d ed. 2011); *See also infra* Chapter 10 ("Defenses to Patent Infringement"), discussing license defenses.

[42]*See generally* Robert P. Merges, *Intellectual Property Rights and Bargaining Breakdown: The Case of Blocking Patents*, 62 TENN. L. REV. 75 (1994).

[43]*See* Mark A. Lemley, *The Economics of Improvement in Intellectual Property Law*, 75 TEX. L. REV. 989, 1010 (1997). Lemley also notes that, although the defense of the "reverse doctrine of equivalents" is theoretically available to excuse B's infringement, the doctrine has rarely been applied to excuse literal infringement. *See id.* at 1011. For a more optimistic view of the reverse doctrine of equivalents as a solution to the blocking patents problem, *see* Robert P. Merges, *Intellectual Property Rights and Bargaining Breakdown: The Case of Blocking Patents*, 62 TENN. L. REV. 75 (1994). The concepts of literal infringement, infringement under the doctrine of equivalents, and the reverse doctrine of equivalents are addressed in further detail *infra* Chapter 9 ("Patent Infringement").

[44]*See* Agreement on Trade-Related Aspects of Intellectual Property Rights [TRIPS], Marrakesh Agreement Establishing the World Trade Organization, Annex 1C, art. 31(l), Apr. 15, 1994, 1869 U.N.T.S. 299; 33 I.L.M. 1197 (1994) (setting forth special criteria for compulsory licensing in the case of blocking patents).