# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ABC Corporation I et al, <br><br> *Plaintiff*, <br><br> v. <br><br> THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A", <br><br> *Defendants*. | **CASE NO.** 1:20-cv-04806 <br><br> **Judge:** Honorable Thomas M. Durkin |

## DEFENDANT GYROOR'S
## AMENDED COUNTERCLAIMS

**NOW COME** Defendant Gyroor, by and through its attorney, submits its amended counterclaims against Plaintiffs and states as follows:

## COUNTERCLAIMS

### JURISDICTION AND VENUE

1.  These are Counterclaims brought by Defendant/Counterclaimant Gyroor ("Counter-Claimant"), against Plaintiffs/Counter-Defendants Hangzhou Chic Intelligent Technology Co., Ltd., and Unicorn Global, Inc. (collectively "Counter-Defendants") for declaratory judgment that U.S. Patent Nos. D737,723, D738,256, D785,112, and D784,195 (collectively "the Patents-in-Suit") are not infringed, either directly or indirectly by inducement, by Counter-Claimant's use, manufacture, sale, and offer for sale of products as identified in the Third Amended Complaint and for violation of Section 2 of the Sherman Act (15 U.S.C §2).

2.  Court II of the Counterclaims arises under the antitrust laws of the United States, specifically Section 4 and 16 of the Clayton Act (15 U.S.C §§ 15, 26) for violation of Section of the Sherman Act (15 U.S.C § 2) in that the Counter-Defendants attempted to monopolize the market for hoverboard through: (a) Counter-Defendant wrongful enforcement of patents from the U.S. Patent and Trademark Office

("USPTO" or "PTO") against Counter-Claimant and other competitors of Counter-Defendant; (b) Counter-Defendants' sham litigation against Counterclaimant and other competitors, asserting objectively baseless claims to enforce patents known to be not infringed with the intent to directly interfere with and adversely affect the business operations of Counterclaimants and other competitors and thereby monopolize the U.S. and world markets for hoverboard.

3. This Court has jurisdiction over these Counterclaims under the federal question jurisdiction of this Court, 28 U.S.C. § 1331, 28 U.S.C. § 1338(a), 28 U.S.C. § 1367(a), the Declaratory Judgment Act, 28 U.S.C. § 2201-2202, the patent laws, 35 U.S.C. § 1, et seq., 15 U.S.C §22; 28 U.S.C §§ 1391(b), (c), and (d), and under Rule 13 of the Federal Rules of Civil Procedure. Counter-Defendants have also committed acts violating the U.S. antitrust laws in this state and district, and the impact of those violations will have substantial lessening of competition in the relevant market for hoverboard in this district. Moreover, Counter-Defendants' acts both within and without this district, have result in injury to Counter-Claimant's business and property in this state and district and have inflicted substantial and irreparable damages to Counter-Claimant's business, revenues, and profits arising from activities within this district.

4. Venue in this district is proper pursuant to 28 U.S.C. § 1400(b), in that this case is an action for patent infringement arising under the patent laws of the United States and pursuant to 28 U.S.C. § 1391(b) and (c), as Counter-Defendants are subject to personal jurisdiction of this Court having commenced their action in this Court.

**THE PARTIES**

5. Defendant/Counter-Claimant is Shenzhen Chetaidou Keji Youxian Gongsi ("Chetaidou"), a Chinese company with its principal place of business in China.

6. Defendant/Counter-Claimant owns an internet storefront and website that its uses to sell its Gyroor Brand hoverboards, incorporated with its own intellectual properties, including but not limited to U.S. Design Patents.

2

7. One of the Plaintiffs/Counter-Defendants Hangzhou Chic Intelligent Technology Co., Ltd. ("Chic") is a Chinese company that manufactures and licenses hoverboard products for sale in the United States. Chic is located in the Liangzhu University Science and Technology Park, Yuhang District, Hangzhou, China.

8. One of the Plaintiffs/Counter-Defendants Unicorn is a corporation organized and existing under the laws of the State of California, having its principal place of business in the Ontario, California. Unicorn is the exclusive U.S. distributor of Plaintiffs' Products.

## COUNT I
### Declaratory Judgment of Noninfringement

9. The hoverboard market is a rapidly growing industry. Both Counter-Defendants Hangzhou Chic Intelligent Technology Co. Ltd. ("Chic") and Unicorn Global, Inc ("Unicorn," together "Counter-Defendants") and Counter-Claimant are in the business of selling hoverboards.

10. Counter-Defendants are notoriously known for bringing baseless infringement claims against competitors to gain market monopoly.

11. Counter-Defendants have made numerous attempts to enforce meritless patent infringement claims against their competitors. For instance, in one of Counter-Defendants' attempt to enforce meritless patent infringement claims against their competitors, the defendant/competitor contended that "Plaintiffs have taken an 'any means necessary' approach to ensure their competitors are off the market." (Introduction Statement by another hoverboard seller - GoLabs, Inc. *Case No.* 3:19-cv-00754 (TXND*), Dkt. No.* 39*,* p. 1.)

12. Shenzhen Chetaidou Keji Youxian Gongsi ("Chetaidou" or "Counter-Claimant"), the owner of the Gyroor Brand, takes intellectual property protection very seriously. It has dedicated significant resources to developing its products, branding, proprietary designs, and inventions. As will be demonstrated, every Gyroor product involved here is based on a valid U.S. patent.

13. ***Initially***, Counter-Defendants allege that ASIN - B07S4KXRQR sold by Counter-Claimant Gyroor has infringed Counter-Defendants' design patents [Dkt. No. 227; 227-1, ¶15; 227-3]. The accused product is also identified by Counter-Defendants as "Gyroor B." ("Gyroor Product B") [Dkt. No. 385, pp. 19-20, Dkt. No. 385, pp. 19-20]. Chetaidou, the owner of Defendant, ceased selling the Gyroor Product B immediately after it was added as a defendant pursuant to the Court Order on May 24, 2021. [Dkt. No. 253].

| | | |
|---|---|---|
| **Gyroor Product B (Multiple colors)**<br><br>ASIN - B07S4KXRQR [Dkt. No. 227; 227-3; 227-1, p.47/92] |  |  |

14. ***However, at the time of applying for the Second Preliminary Injunction,*** Counter-Defendants added new allegations against Counter-Claimant, without amending their Complaint, and claim that three other products – identified as "Gyroor A," "Gyroor C" and "Gyroor D" [Dkt. No. 385, pp. 19-20, Dkt. No. 385, pp. 19-20] (collectively, "Gyroor Products").

15. This lawsuit is objectively baseless and subjectively motivated by bad faith. Counter-Defendants have filed and maintained the lawsuit not because they have a reasonable chance of prevailing on the merits, but because they hope to use the lawsuit as an anticompetitive weapon against Gyroor brand.

16. Evidence provided by Counter-Defendants identifies the alleged infringing products ("Gyroor Product B") as "*Gyroor G2 Hoverboard 8.5" Off Road All Terrain Off Road Hoverboard with Bluethooth Speakers and LED Lights, UL2272 Certified Self Balancing Scooter*" [Dkt. No. 227-1, p. 47 of 92]. The Gyroor B has a unique ASIN number B07S4KXRQR. [Dkt. No. 227-1, p. 49 of 92; 227-3, p. 4 of 4].

17. In the most recent landmark case *Lanard Toys, Ltd. v. Dolgencorp LLC*, 958 F.3d 1337 (Fed. Cir 2020), The Feder Circuit prescribe that:

> [T]he ordinary observer is deemed to view the differences between the patented design and the accused product ***in the context of the prior art***. When the differences

between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary observer will be drawn to those aspects of the claimed design that differ from the prior art. And when the claimed design is close to the prior art designs, small differences between the accused design and the claimed design are likely to be important to the eye of the hypothetical ordinary observer." *Id*. (quoting *Egyptian Goddess*, 543 F.3d at 676).

18. **Gyroor Product B** Here, because the Patents-in-Suit and the U.S. Design Patent D937,906 Patent ("D'906 Patent") are very close in their overall hourglass shape, the differences between the Gyroor Product B and the Patents-in-Suit are important to the ordinary observer. In light of the prior art D'906 Patent, an ordinary observer will not find the Gyroor Product B and the Patents-in-Suit have substantially similar overall "hourglass" shape.

19. This "hourglass" peripheral shape was first disclosed and claimed in the prior art — the U.S. Design Patent D739,906 Patent ("D'906 Patent" attached hereto as Exhibit 5). As shown below in Table 1, page 7, the Patents-in-Suit all have an hourglass shape with smooth curves similar to the D'906 patent. [Dkt. No. 376, Decl. of Rake, ¶¶53-56, 92, 98; Dkt. No. 377, Decl. of Gandy, ¶¶47, 53, 59, 64]. In contrast, Gyroor B has a more "angular body shape with sharp edges." *Id*.

20. The "revolutionary design" was already claimed in the prior art D'906 Patent. Plaintiffs did not invent the hourglass shape of hoverboards. Therefore, in light of the D'906 Patent, an ordinary observer will find the Gyroor B has a substantially different overall shape from the Patents-in-Suit.

| Table 1 — Comparison of Overall Hourglass Shape | |
|---|---|
| Patents-in-Suit D'723 Patent |  |
| Patents-in-Suit D'256 Patent |  |



| Patents-in-Suit<br>D'195 Patent | |
| --- | --- |
| Patents-in-Suit<br>D'112 Patent | |
| **Prior Aart**<br>**D'906 Patent** | |
| Gyroor Product B | |
| Substantially Similar Patent<br>D'856 Patent | |
| **Table. 2 — Comparison of Overall Shape – Front View** | |
| Patents-in-Suit<br>D'723 Patent | |
| Patents-in-Suit<br>D'256 Patent | |
| Patents-in-Suit<br>D'195 Patent | |



21. Table 2 compares the front view of the prior art D'906 Patent, the Patents-in-Suit and the Gyroor Product B. Both the prior art D'906 Patent and the Patents-in-Suit have "a slightly raised convex contour, while the corresponding center portion of the top surface of the design of Gyroor "B" hoverboard is substantially flat and slightly recessed down below the opposing outer foot surfaces." [Dkt. No. 377, Decl. of Gandy, ¶¶ 42, 47, 53, 64].

22. Therefore, in light of the D'906 Patent, an ordinary observer will find the Gyroor Product B has a substantially different overall shape from the Patents-in-Suit.

23. Under the "ordinary observer" test, a court must consider the ornamental features [of each element] and analyze how they impact the overall design." *Lanard*, 958 F.3d at 1343-44 (citing *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, at 1295 (Fed. Cir. 2010)).

24. "While the 'ordinary observer' test is not an element-by-element comparison," it also does not ignore the reality that designs can, and often do, have both functional and ornamental aspects. *Id.* (citing *Amini Innovation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1372 (Fed. Cir. 2006)). Analyzing the ornamental

features is necessary to determine how the ornamental differences in each element would impact the ordinary observer's perception of the overall designs. *Id*.

25. The ornamental features of each element in the Gyroor Product B are based on the claimed design of the U.S. D808,856 Patent.

26. An ordinary observer would consider the Gyroor Product B to be substantially similar to the D'856 Patent. [Dkt. No. 376, Decl. of Rake, ¶188]. In contrast, no ordinary observer would consider Gyroor Product B is substantially similar to the Patents-in-Suit because none of the Patent-in-Suit claimed any ornamental features of the Accused Product.

27. **First**, none of the Patents-in-Suit claimed foot pad design of the Gyroor Product B. The shape and design of the foot pads of the Gyroor Product B are plainly different from the Patents-in-Suit. [Dkt. No. 377, Decl. of Gandy, ¶¶71, 77; Dkt. No. 376, Decl. of Rake, ¶¶117,125].

28. Here, D'723 and D'256 Patents both claim the design of straight divergent lines on the foot pads. Neither D'195 nor D'112 claims any designs of the foot pads.

29. The D'856 Patent claimed unique patterns on the foot pads, which are plainly dissimilar from the designs of the Patents-in-Suit. The Gyroor Product B has identical foot pad design as D'856 Patent.



| | | |
|---|---|---|
| Patents-in-Suit D'723 Patent | Patents-in-Suit D'256 Patent | Patents-in-Suit D'195 Patent |
| Patents-in-Suit | Substantially Similar Patent | Gyroor Product B |

| D'112 Patent | D'856 Patent | |
|---|---|---|

30. **Second**, none of the Patents-in-Suit claimed the wheel covers design of the Gyroor Product B. The wheel covers of the Gyroor Product B are plainly different from the Patents-in-Suit.

31. The Patents-in-Suit all have semi-circular wheel covers and extend over and cover the entire wheel. None of the Patent-in-Suit claimed the wheel covers design of the Gyroor Product B.

32. The shape of the wheel covers in the Patent-in-Suit and the prior art D'906 patent are both semi-circular, "while the wheel covers on the design of Gyroor 'B' hoverboard have opposing diagonally straight side edges a substantially flat top edge which curves outwardly. [Dkt. No. 377, Decl. of Gandy, ¶¶48, 60, 65]. Therefore, "even to the most casual observer, the differences are significant." [Dkt. No. 376, Decl. of Rake, ¶¶122, 129, 135, 141].



| Patents-in-Suit D'723 Patent | Patents-in-Suit D'256 Patent | Patents-in-Suit D'195 Patent |
|---|---|---|
| Patents-in-Suit | Substantially Similar Patent | Gyroor Product B |

| D'112 Patent | D'856 Patent | |
|---|---|---|

33. **Third**, none of the Patents-in-Suit claimed the light design of the Gyroor Product B. The position, shape, and size of the lights of the Gyroor Product B are also plainly different from the Patents-in-Suit. None of the Patent-in-Suit claimed the light design of the Gyroor Product B.

34. Highlighted, the Patents-in-Suit all have different size and shape and are positioned differently on the front panel of the hoverboard. [Dkt. No. 376, Decl. of Rake, ¶¶ 93, 99, 105, 111].

35. The light design of the Gyroor Product B features thin narrow strips that curves up to the fenders, which is identical to the claimed design in the D'856 Patent.





| Substantially Similar Patent D'856 Patent | | |

36. "The *Gestalt principles* of visual perception teaches us that the eye is attracted to areas of high contrast." [Dkt. No. 376, Decl. of Rake, ¶25]. Under the *Figure-Ground principles*, "some shapes or contours take a prominent role (figure) while others recede into the background (ground)." *Id*. at 26.

37. Certain designs would be perceived as more dramatic and obvious. Here, the size, shape, and character of the lights, size and shape of the wheel covers, and the patterns of the foot pads would significantly impact the ordinary observer's visual perception of the overall designs. [Dkt. No. 376, Decl. of Rake, ¶¶ ¶¶93, 99, 105, 111, 175-178]. As a result, the differences between the Patents-in-Suit and accused design take on greater significance to an ordinary observer.

38. Consequently, an ordinary observer, taking into account the prior art, would not believe the accused design to be the same as the patented design.

39. Because the Patents-in-Suit and the D'906 Patent are very close in their overall hourglass shape, the differences between the Gyroor Product B and the Patents-in-Suit are important to the ordinary observer. In light of the prior art D'906 Patent, an ordinary observer will not find the Gyroor Product B and the Patents-in-Suit have substantially similar overall "hourglass" shape.

40. The application of the D'906 Patent was effectively filed before the effective filing date of the Patents-in-Suit. Therefore, D'906 Patent is prior art to all Patents-in-Suit.

41. The "revolutionary design" was already claimed in the prior art D'906 Patent. Plaintiffs did not invent the hourglass shape of hoverboards. Therefore, in light of the D'906 Patent, an ordinary observer will find the Gyroor Product B has a substantially different overall shape from the Patents-in-Suit.

42. Furthermore, in light of the D'906 Patent, an ordinary observer will find the Gyroor Product B has a substantially different overall shape from the Patents-in-Suit.

43. **Gyoor Product A** The ornamental features of each element in the Gyroor Product A are based on the claimed design of the U.S. D808,857 Patent. An ordinary observer would consider the Gyroor Product A to be substantially similar to the D'857 Patent. [Dkt. No. 376, Decl. of Rake, ¶187].

44. In contrast, no ordinary observer would consider Gyroor Product A is substantially similar to the Patents-in-Suit because none of the Patent-in-Suit claimed any ornamental features of the Gyroor Product A.

45. *First*, none of the Patents-in-Suit claimed foot pad design of the Gyroor Product A. The shape and design of the foot pads of the Gyroor Product A are plainly different from the Patents-in-Suit. [Dkt. No. 377, Decl. of Gandy, ¶¶27, 33; Dkt. No. 376, Decl. of Rake, ¶¶63,77].

46. Here, D'723 and D'256 Patents both claim the design of straight divergent lines on the foot pads. Neither D'195 nor D'112 claims any designs of the foot pads.

47. The D'857 Patent claimed unique curved lines on the foot pads, which are plainly dissimilar from the designs of the Patents-in-Suit. The Accused Product has identical foot pad design as D'857 Patent.



| | | |
|---|---|---|
| Patents-in-Suit D'723 Patent | Patents-in-Suit D'256 Patent | Patents-in-Suit D'195 Patent |
| Patents-in-Suit D'112 Patent | Substantially Similar Patent D'857 Patent | Gyroor Product A |

48. *Second*, none of the Patents-in-Suit claimed the wheel covers design of the Gyroor Product A. The wheel covers of the Gyroor Product A are plainly different from the Patents-in-Suit.

49. The Patents-in-Suit all have semi-circular wheel covers and extend over and cover the entire wheel. None of the Patent-in-Suit claimed the wheel covers design of the Gyroor Product A.

50. The shape of the wheel covers in the Patens-in-Suit and the prior art D'906 patent are both semi-circular, "while the wheel covers on the design of the Gyroor "A" hoverboard are somewhat squared off." [Dkt. No. 377, Decl. of Gandy, ¶¶26, 32, 38, 43].

51. Therefore, "even to the most casual observer, the differences are significant." [Dkt. No. 376, Decl. of Rake, ¶¶68, 75, 81, 87]



| Patents-in-Suit D'723 Patent | Patents-in-Suit D'256 Patent | Patents-in-Suit D'195 Patent |
| Patents-in-Suit D'112 Patent | **Prior Aart** **D'906 Patent** | Gyroor Product A |

52. **_Third_**, none of the Patents-in-Suit claimed the light design of the Gyroor Product A. The position, shape, and size of the lights of the Gyroor Product A are also plainly different from the Patents-in-Suit. None of the Patent-in-Suit claimed the wheel covers design of the Gyroor Product A.

53. Highlighted, the Patents-in-Suit all have different size and shape and are positioned differently on the front panel of the hoverboard. [Dkt. No. 376, Decl. of Rake, ¶¶ 66, 72, 78, 84].

54. The light design of the Gyroor Product A features thin narrow straight strips lights, which is identical to the claimed design in the D'856 Patent.



55. **Gyroor Product C** The ornamental features of each element in the Gyroor Product Care based on the claimed design of the U.S. D808,857 Patent. An ordinary observer would consider the Gyroor Product Cto be substantially similar to the D'857 Patent. [Dkt. No. 376, Decl. of Rake, ¶187].

14

56. In contrast, no ordinary observer would consider Gyroor Product C is substantially similar to the Patents-in-Suit because none of the Patent-in-Suit claimed any ornamental features of the Gyroor Product C.

57. ***First***, none of the Patents-in-Suit claimed foot pad design of the Gyroor Product C. The shape and design of the foot pads of the Gyroor Product Care plainly different from the Patents-in-Suit. [Dkt. No. 377, Decl. of Gandy, ¶¶71, 77; Dkt. No. 376, Decl. of Rake, ¶¶117,125].

58. Here, D'723 and D'256 Patents both claim the design of straight divergent lines on the foot pads. Neither D'195 nor D'112 claims any designs of the foot pads.

59. The D'857 Patent claimed unique curved lines on the foot pads, which are plainly dissimilar from the designs of the Patents-in-Suit. The Gyroor Product Chas identical foot pad design as D'857 Patent.



60. ***Second***, none of the Patents-in-Suit claimed the wheel covers design of the Gyroor Product C. The wheel covers of the Gyroor Product C are plainly different from the Patents-in-Suit.

61. The Patents-in-Suit all have semi-circular wheel covers and extend over and cover the entire wheel. None of the Patent-in-Suit claimed the wheel covers design of the Gyroor Product C.

62. The shape of the wheel covers in the Patnes-in-Suit and the prior art D'906 patent are both semi-circular, "while the wheel covers on the design of Gyroor 'C' hoverboard do not extend down over the wheel" as in '723 and '195 Patent, and "are wider than those of the design" of the '256 and'112 patent. [Dkt. No. 377, Decl. of Gandy, ¶¶70, 76, 82, 87].

63. Therefore, "even to the most casual observer, the differences are significant." [Dkt. No. 376, Decl. of Rake, ¶¶122, 129, 135, 141].



| Patents-in-Suit D'723 Patent | Patents-in-Suit D'256 Patent | Patents-in-Suit D'195 Patent |
| Patents-in-Suit D'112 Patent | **Prior Aart** **D'906 Patent** | Gyroor Product C |

64. ***Third***, none of the Patents-in-Suit claimed the light design of the Gyroor Product C. The position, shape, and size of the lights of the Gyroor Product C are also plainly different from the Patents-in-Suit. None of the Patent-in-Suit claimed the light design of the Gyroor Product C.

65. Highlighted, the Patents-in-Suit all have different size and shape and are positioned differently on the front panel of the hoverboard. [Dkt. No. 376, Decl. of Rake, ¶¶ 120, 126, 132, 138].

66. The light design of the Gyroor Product C features the thin narrow straight strips lights, which is identical to the claimed design in the D'857 Patent.



67. **Gyroor Product D** The ornamental features of each element in the Gyroor Product D are based on the claimed design of the U.S. D891,297 Patent ("D'297 Patent," attached hereto as Exhibit 10). An ordinary

observer would consider the Gyroor Product D to be substantially similar to the D'297 Patent. [Dkt. No. 376, Decl. of Rake, ¶189].

68. In contrast, no ordinary observer would consider Gyroor Product D is substantially similar to the Patents-in-Suit because none of the Patent-in-Suit claimed any ornamental features of the Gyroor Product D.

69. *__First__*, none of the Patents-in-Suit claimed foot pad design of the Gyroor Product D. The shape and design of the foot pads of the Gyroor Product Are plainly different from the Patents-in-Suit. [Dkt. No. 377, Decl. of Gandy, ¶¶93, 99; Dkt. No. 376, Decl. of Rake, ¶¶146, 152, 158, 164].

70. Here, D'723 and D'256 Patents both claim the design of straight divergent lines on the food pads. Neither D'195 nor D'112 claims any designs of the foot pads.

71. The D'297 Patent claimed unique three parallel lines and other intricate patterns on the foot pads, which are plainly dissimilar from the designs of the Patents-in-Suit. The Gyroor Product D has identical foot pad design as D'297 Patent.



72. *__Second__*, none of the Patents-in-Suit claimed the wheel covers design of the Gyroor Product D. The wheel covers of the Gyroor Product Are plainly different from the Patents-in-Suit.

73. The Patents-in-Suit all have semi-circular wheel covers and extend over and cover the entire wheel. None of the Patent-in-Suit claimed the wheel covers design of the Gyroor Product D.

74. The shape of the wheel covers in the Patents-in-Suit and the prior art D'906 patent are both semi-circular, "while the wheel covers on the design of Gyroor "D" hoverboard have opposing diagonally straight side edges a substantially flat top edge which curves outwardly but does not extend over the entire wheel." [Dkt. No. 377, Decl. of Gandy, ¶¶92, 98, 103, 108].

75. Therefore, "even to the most casual observer, the differences are significant."[Dkt. No. 376, Decl. of Rake, ¶¶150, 156, 162, 168].



| Patents-in-Suit D'723 Patent | Patents-in-Suit D'256 Patent | Patents-in-Suit D'195 Patent |
| Patents-in-Suit D'112 Patent | Substantially Similar Patent D'297 Patent | Gyroor Product D |

76. **_Third_**, none of the Patents-in-Suit claimed the light design of the Gyroor Product D. The position, shape, and size of the lights of the Gyroor Product D are also plainly different from the Patents-in-Suit. None of the Patent-in-Suit claimed the light design of the Gyroor Product D.

77. Highlighted, the Patents-in-Suit all have different size and shape and are positioned differently on the front panel of the hoverboard. [Dkt. No. 376, Decl. of Rake, ¶¶147, 153, 159, 165].

78. The light design of the Gyroor Product D features thin narrow strips, which is identical to the claimed design in the D'856 Patent.



79. Under the Gestalt Test, the size, shape, and character of the lights, size and shape of the wheel covers, and the patterns of the foot pads would significantly impact the ordinary observer's visual perception of the overall designs. [Dkt. No. 376, Decl. of Rake, ¶¶66, 72, 78, 84, 171-174 for Gyroor Product A;

¶¶120, 126, 132, 138, 179-182 for Gyroor Product C; ¶¶147, 153, 159, 165, 183-186 for Gyroor Product D]. As a result, the differences between the Patents-in-Suit and accused design take on greater significance to an ordinary observer.

80. Consequently, an ordinary observer, taking into account the prior art, would not believe the Gyroor Product A, C and D to be the same as the patented design. *Id.*

81. Counter-Defendants' willingness to grant a license is apparent in this case. Aside from granting other patents to Counter-Claimant previously, Counter-Defendants' counsel has approached Counter-Claimant's prior counsel and offered to "send over a license agreement" of the Patents-in-Suit [Dkt No. 391, p. 4].

**COUNT II**
**Violation of Section 2 of the Sherman Act—Monopolization of the U.S. Market for hoverboards**

**A. The Relevant Market; Counter-Defendants' Dominate Market Share and Monopoly Power; Overview of Counter-Defendants' Anticompetitive Conducts**

**1. The Relevant Market**

82. Counter-Claimant repeats and realleges all of the allegation in 1-81 above, as though those allegations were fully set forth herein.

83. The "other elements" necessary to establish an attempted monopolization claim are: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). In determining the dangerous probability of achieving monopoly power for element (3), the courts look at "the relevant market and the defendant's ability to lessen or destroy competition in that market." *Id.*

84. The relevant market is defined by both a product market and a geographic market. *Transweb, LLC v. 3M Innovative Properties*, 812 F.3d 1295, 1625 (Fed. Cir. 2016); *See Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).

85. "The relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks." *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991) (quoting *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 745 F.2d 248, 260 (3d Cir. 1984)). "Consequently, the geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product." *Id.* at 726.

86. Hoverboard is the board electric powered and can be run using batteries, which has gained traction among young adults and teenagers across the globe. For the purpose of this counterclaim, the "relevant market" is the market in the United States for hoverboards the fact that the marketing, sales and distribution of hoverboard product occurs on a nationwide basis, establish the boundaries of the geographic market.

87. The first hoverboard was first brought in patents issued on May 27, 2014, *e.g.* U.S. Patent 8,738,278 B2 to Shane Chen, filed in 2013. Since then, different types and design of hoverboards were introduced and brought to the market.

88. North America is estimated to be the most opportunistic market due to hoverboard's growing adoption in commercial spaces. The rising demand for convenience products coupled with improved living standards is positively attributed to the hoverboard market growth in North America.

89. There are many hoverboards sold across the United States as more families increase their living standard to be able to afford hoverboards for the children. Some companies also use hoverboards as means of transportation or give them away to their employees as perks. The hoverboard has become a very popular product in the market. All the "Asserted Patents" have been abused and misused by Counter-Defendant Chic's illegal exclusive dealing scheme with anticompetitive effect, jointly and severally conducted by Unicorn, collaborating as the exclusive "authorized enforcement agent" as alleged in the complaint) in their wrongful, impermissible and illegal exclusionary conduct "to foreclose

competition, gain a competitive advantage, or to destroy legal competitors" (in the "Relevant Amazon.com Online 6.5" Hoverboard Market"), which have already violated Sherman Act, Clayton Act, and the respective state antitrust laws.

90. There are barriers to entry to any potential competitor wishing to enter the relevant market.  The U.S hoverboard industry is regulated, in multiple ways, by the USPTO office and each individual state's business affairs office and such. The USPTO regulates the issuance of the patent as well as regulation regarding the use of patents. When one applies for a patent, one needs to conduct rigorous research to ensure that his patent application will not infringe other patents as well as ensure there are enough evidence to support the patent.

91. Once the application is received by the USPTO, an examiner will examine the application and make decision thereof. The applications take a long time to be approved and are easy to be rejected if the requirements are not met. As a result of all these factors, entry into the hoverboard market is expensive, time-consuming and risky. In addition, Counter-Defendants have created additional barriers to entry by their "patent thicket" of interrelated hoverboard patents, which Counter-Defendants have historically used to keep out any and all would-be competitors, including through the use of patent fraud and sham litigation, as further detailed herein.

92. The Counter-Defendants were fully aware that there have been public use and on sale activities more than a year prior to the filing of one of the Asserted Patents U.S. '723 Patent.

93. Counter-Defendant Chic has the controlling monopoly power of approximately 90% of the total market share of the Amazon.com online 6.5" Hoverboard electric self-balancing scooter market   (hereinafter referred to as the "Relevant Amazon.com Online 6.5" Hoverboard Market" or the "Relevant Market").

94. In order to illegally control the monopoly power and further manipulate the predatory pricing scheme in the Relevant Market (which is also a violation of the U.S. antitrust and other relevant federal and state laws), using the discovery process as a tool to collect sales data and manipulate the pricing system in the Relevant Market.

### 2. Counter-Defendants' Anticompetitive Conduct, Market Share and Market Power

95. Counter-Defendants have effectively achieved the dominate market share in the relevant U.S. market and have achieved monopoly power in that market. Counter-Defendants have been mentioned as one of the leading players in the global hoverboard market. Counter-Defendants' market share and monopoly power in the relevant market have not been achieved by superior acumen, innovation, skill, foresight, or industry, or by the proper functioning of the market, or by natural market conditions. Instead, such monopoly power has been achieved as the result of Counter-Defendants' purposeful abuse of the judicial process. For recent years, Counter-Defendants have engaged in a series of sham patent infringement threats and lawsuits against every potential competitor that has marketed competitive hoverboards to the consumers in the United States.

96. As a result of Counter-Defendants' anticompetitive actions, many competitors have abandoned their plans of selling to consumers in the United States for many years, being sued by Counter-Defendants and being forced to settled with terms that the competitors will not sell the hoverboards in the United States. Counter-Defendants resultant market power has permitted it to sale prices of the hoverboard to supra-competitive levels and to achieve monopoly profits on such sales, which it has done.

97. Counter-Defendants' sham patent litigations (generally involving the assertion of invalid and not infringed patents and/or unenforceable patents) have been filed against the following manufacturers, distributors, licensees and competitors of Counter-Defendants: (1) Hillo America, Inc. (2) DGI Product Inc. (3) DGL Group, Ltd. (4) Swift Hoverboard LLC (5) E-Link Technology Co., Ltd; (6) Jetson Electronic Bikes LLC. These litigations, individually and in combination, have successfully achieved, maintained, and preserved Counter-Defendants' complete monopoly of the U.S. market for hoverboards. For instance, the other defendants of this present case ended up settling by paying a license fee to the Counter-Defendants.

98. Counter-Defendants resultant achieved monopolization of the U.S. market, when it began to sue different competitors for alleged patent infringements, obtaining preliminary injunctions against many competitors and froze their assets in their online market accounts. The Counter-Defendants had already obtained preliminary injunction to prevent the Counter-Claimant from selling their products in the market. Counter-Defendants' sham patent infringement litigation and the continued threat of such litigation against Gyroor and other competitors have preserved the complete monopoly for the past few years. This monopolistic conduct has resulted in the achievement of monopoly power and enabled the monopoly pricing engaged in by Counter-Defendants.

99. The pattern of anticompetitive conduct and practice complained of herein includes without limitation: Counter-Defendants' knowingly engaging in inequitable conduct in the prosecution of their Patent, Counter-Defendants' wrongfully and baselessly expanding the first preliminary injunction against entities or individuals who were re-selling Gyroor products.

### B. Counter-Defendants' Anticompetitive Sham Litigations

#### 3. Overview of the Sham Litigation against Gyroor

100. As a result of the threat posed to its monopoly from Gyroor, Counter-Defendants took immediate action when Gyroor began selling its hoverboards on Amazon.com by filing a complaint for patent infringement against Gyroor based on multiple patents. These patents were known by Counter-Defendants to be not infringed at the time it filed its complaint against Gyroor with the purpose of unlawfully excluding Gyroor from the market. In addition, The Counter-Defendants failed to perform a reasonable pre-filing investigation to determine whether Gyroor's hoverboard actually infringed any of the asserted patents. Counter-Defendants did not inspect Gyroor's actual hoverboard designs, which was essential to any meaningful determination of patent infringement.

101. Counter-Defendants' filling and maintenance of the sham infringement action against defendant are objectively baseless in that no reasonable person could realistically expect success on the merits of the sham infringement action knowing, as Counter-Defendants do, that Gyroor Products are not in any way

infringing the Counter-Defendants' patent. Counter-Defendants had no probable cause to commence, and they have no probable cause to prosecute or maintain, the sham infringement action.

102. As a result of Counter-Defendants' sham Complaint and other competitors' financial inability to defend U.S. patent infringement litigation, which can require millions of dollars in legal expense, other competitors were force to agree to pay Counter-Defendants a license fee for selling the hoverboard. When each and every hoverboard sold in the market will have to pay a royalty to Counter-Defendants, the consumer is paying more for the "license" and Counter-Defendants will end up gaining monopoly power.

103. As a result of Counter-Defendants' sham complaint, Counter-Claimant Gyroor and other defendants in this case, are being force to spend money in legal expense already and will continue to spend more money in litigation if this sham litigation continues.

104. Counter-Defendants' misconducts involved numerous improper actions, culminating in the filing and maintenance of sham litigation against Counter-Claimant to enforce the patents described above. The lawsuit is objectively baseless and subjectively motivated by bad baith. The Counter-Defendants have filed and maintained the lawsuit not because they have a reasonable chance of prevailing on the merits, but because they hope to use the lawsuit as an anticompetitive weapon against the Counter-Claimant.

### C. Plaintiff's Continuing Damages

105. Gyroor has entered the U.S. market with its hoverboard since at least 2017 and has made substantial preparation to continue to do so. However, the plans might have been thwarted by Counter-Defendants' anticompetitive conduct, i.e., the sham litigations described herein and Counter-Defendants' resultant monopolization of the U.S. hoverboard market.

106. By filling and serving the sham infringement action, Counter-Defendants filed TRO and PI triging the closure of Counter-Claimant's Amazon store, website, and restraint of Defendant's assets. In addition, by applying Temporary Restraining Order and Preliminary Injunction with mere conclusory allegation,

adding resellers of Gyroor products to the Temporary Restraining Order and Preliminary Injunction at will, Counter-Defendants intentionally targeted its competitor Gyroor brand because no one would dare to purchase anything from Counter-Claimant and the resellers whose assets restrained enforced indemnification in all aspect from Counter-Claimant.

107. As a result of Counter-Defendants' repeated sham litigations against the Counterclaimants and others, Gyroor and other competitors have suffered substantial damage to their business and property as a result of their exclusion from the U.S. market in the form of lost hoverboard sales and profits, as well as the frozen assets in its Amazon account, as well as lost sales and profits of other products that would have been sold by Counter-Claimant had they been allowed to sell their hoverboards in the United States.

108. As part and parcel of Counter-Defendants' unlawful scheme to monopolize the U.S. and world hoverboard markets, the court in China are reluctant to maintain the actions filed by Counter-Defendants.

109. Counterclaimants continue to suffer damages to their business and property as a result of the coercive, intimidating and chilling effect of Defendants' massive "patent thicket" of interrelated suffer patents and continuing practice of initiating sham litigations against any and all competitors and against any and all competitive products that are introduced into the U.S. hoverboard market. Based on Defendant's repeated misuse of the judicial system to date, based on one or more of the patents in Counter-Defendants' "patent thicket," Counter-Defendants' strategy in this regard has proven to be a very affective barrier to entry into the U.S. (and other) markets and has effectively excluded Plaintiffs from the U.S. market.

110. Absent a court judgment in Counter-Claimant's favor, the preliminary injunction would have remained in place, which would result that Counter-Claimant's bankruptcy, and hoverboard consumers would have less choices.

### D. Specific Instances of Chic's Use of Sham Litigation to Monopolize the Relevant Hoverboard Market

111. Counter-Defendants have filed twenty-two litigations against other competitors. *See* Exhibit 1.

27

### E. Counter-Claimant's Antitrust Standing and Injury, Competitive Harm to the Market

112. As discussed in detail herein, Counter-Defendants' sham litigations against other competitors and Gyroor were part and parcel of Counter-Defendants' overall sham patent infringement litigation strategy, the purpose and result of which were to maintain their monopoly power and ability to raise prices to supra-competitive levels and to exclude all competitors, including Gyroor, and to exclude all competitive products, including specifically the hoverboard.

113. As a result of those sham litigations, including specifically the litigation against other competitors, Counter-Defendants have in fact acquired, maintained, and enhanced their monopoly power in the relevant market and now dominate the U.S. market for hoverboards, having virtually 90% of the market.

114. As a direct and proximate result of Counter-Defendants' anticompetitive activities, each of the competitors have been damage in their business and property by being having to pay a license fee or being excluded from the U.S. market for hoverboard. Counter-Defendants' purposeful elimination of all competitive manufactures and distributors of hoverboards, including Gyroor, has directly resulted in higher prices, decrease competition in quality of products, and less innovation in the market, to the detriment of all market participants, including the consumers who purchase the hoverboards and employers who purchase hoverboards and their employees.

### F. The Statutory Remedies Sought by Counter-Claimant

115. Counter-Claimant is entitled to treble damages and to injunctive relief under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) because of Plaintiffs/Counter-Defendant's violations of Section 2 of the Sherman Act (15 U.S.C. § 2) and to prevent and further restrain the expansion, maintenance, or continuation of Counter-Defendants' illegal monopolization of the relevant market.

116. Counter-Claimant is also entitled to the costs incurred from this action, including its reasonable attorneys' fees, under Section 4 of the Clayton Act (15 U.S.C. §§ 15).

## DEFENDANT/COUNTER-CLAIMANT'S PRAYER FOR RELIEF

**WHEREFORE**, Defendant/Counter-Claimant prays that

1. Plaintiffs/Counter-Defendants be denied all relief against Defendant/Counter-Claimant;

2. The Gyroor Products does not infringe the Patents-in-Suit;

3. Plaintiffs/Counter-Defendants' Third Amended Complaint be dismissed with prejudice and judgment entered in favor of Defendant/Counter-Claimant;

4. Plaintiffs/Counter-Defendants take nothing by way of this action;

5. Plaintiffs/Counter-Defendants have violated Section 2 of the Sherman Antitrust Act by monopolizing the U.S. Market for hoverboard by engaging in repeated sham litigations against Defendant/Counter-Claimant and other competitors and by enforcing and attempting to enforce multiple patents against Defendant/Counter-Claimant and other market participants.

6. Defendant/Counter-Claimant (as well as competition in the relevant market) have been injured in its businesses and property.

7. Defendant/Counter-Claimant has been injured in its property and business in an amount to be determined at trial.

8. Defendant/Counter-Claimant be awarded compensatory and punitive damages;

9. Defendant/Counter-Claimant be awarded costs of suit, attorneys' fees and such injunctive and any other relief which the Court deems proper.

## DEMAND FOR JURY TRIAL

Defendant/Counter-Claimant demands a jury trial on any issue triable of right by jury.

Date: 12/02/2021      /s/ Tianyu Ju

Tianyu Ju,
Iris.Ju@glacier.law
Glacier Law PLLC
200 E. Randolph Dr., Ste. 5100
Chicago, IL 60601
Tao Liu,
Tao.Liu@glacier.law
He Cheng,
Robin.Cheng@glacier.law
Glacier Law PLLC
200 Park Avenue, Suite1703
New York, NY 10166
***Attorney for Defendant***

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this December 3, 2021, I electronically filed the foregoing file with the Clerk of Court using the CM/ECF system, and service was perfected on all counsel of record and interested parties through this system, which will deliver a true and correct copy of the foregoing documents via CM/ECF.

Date: 12/03/2021        /s/ Tianyu Ju

Tianyu Ju, Esq.