# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |
|---|---|
| Hangzhou Chic Intelligent Technology Co. and Unicorn Global Inc., <br><br> Plaintiffs <br><br> v. <br><br> THE PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE A, <br><br> Defendants. | **Case No.: 20-cv-04806** <br> **Judge Thomas M. Durkin** <br><br> **Magistrate Judge Jeffery Cole** |

## EXPERT DECLARATION OF PAUL HATCH
## REGARDING INFRINGEMENT OF U.S. PATENTS D737,723 and D738,256

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................... 1

II.  EXECUTIVE SUMMARY ....................................................................................... 1

III.  SCOPE OF OPINIONS .......................................................................................... 2

    A.  Background and Qualifications ...................................................................... 2

    B.  Compensation and Prior Testimony ............................................................. 3

    C.  Materials and Information Considered .......................................................... 3

IV.  LEGAL STANDARDS ............................................................................................ 3

    A.  The Limiting Purpose of a Design Patent .................................................... 3

    B.  Legal Principles in Analysis of Design Patent Infringement ...................... 4

    C.  Claim Construction in Design Patents .......................................................... 5

    D.  The Ordinary Observer Test .......................................................................... 7

    E.  The Significance of Prior Art ......................................................................... 8

    F.  Definition of the Ordinary Observer ............................................................ 8

    G.  Functionality in Design Patents .................................................................. 10

V.  ANALYSIS OF THE PATENTS-IN-SUIT AND THE PRIOR ART ................... 11

    A.  The Patents-In-Suit ..................................................................................... 11

    B.  Examination of the D'723 Patent ................................................................ 11

    C.  Examination of the D'256 Patent ................................................................ 14

    D.  The Cited Prior Art Show The Patents-In-Suit Have A Broad Scope .......... 16

VI.  ANALYSIS OF FUNCTIONALITY .................................................................... 18

VII.  OVERVIEW OF THE ACCUSED PRODUCTS .................................................. 21

VIII.  THE ACCUSED PRODUCTS INFRINGES THE PATENTS-IN-SUIT .............. 26

    A.  The Accused Product Gyroor A Infringes on the D'723 Patent ................. 27

    B.  The Accused Product Gyroor A Infringes on the D'256 Patent ................. 30

    C.  The Accused Product Gyroor C Infringes on the D'723 Patent ................. 32

D.      The Accused Product Gyroor C Infringes on the D'256 Patent..................................... 34

E.      The Accused Product Gyroor E Infringes on the D'723 Patent......................................... 36

F.      The Accused Product Gyroor E Infringes on the D'256 Patent......................................... 38

IX.      CONCLUSION.......................................................................................................... 41

X.      RESERVATION OF RIGHTS ................................................................................. 42

## I.    INTRODUCTION

1.    I have been retained by counsel as an independent expert witness to provide my opinion regarding the above litigation matter, and matters related to the U.S. Patents D737,723, and D738,256 ("the Patents-In-Suit"). This Declaration is in support of Plaintiffs Hangzhou Chic Intelligent Technology Co. and Unicorn Global Inc.'s (collectively "Hangzhou") motion for a preliminary injunction against Defendants The Partnerships And Unincorporated Associations Identified On Schedule A ("Gyroor").

2.    Hangzhou requested that I opine on the similarities between the design claimed in each of the Patents-In-Suit and Defendant's accused hoverboard products "Gyroor A", "Gyroor C" and "Gyroor E" ("the Accused Products").

3.    I understand my task is to review materials and offer my opinion, perspective and insights regarding this subject. I hold the opinions expressed in this declaration, but as my study of the case continues, I may acquire additional information that leads to new insights relevant to these opinions. With that in mind, I reserve the right to supplement this declaration if and when such additional information becomes known to me. I may also provide supplemental and rebuttal declarations in response to arguments which may be proposed by the Defendants.

## II.    EXECUTIVE SUMMARY

4.    I have considered the appearance of the Accused Products and the claimed designs of each of the Patents-In-Suit ("the Claimed Designs") and from the viewpoint of the ordinary observer who is familiar with the relevant prior art. Having performed this analysis and evaluation, it is my opinion that:

- The overall appearance of each of the Accused Products is not "plainly dissimilar" to one or more of the claimed designs of the Patents-In-Suit, as I understand that term to be understood in Patent Law.

- An ordinary observer familiar with the prior art, giving such attention as a purchaser usually gives, would find the overall appearance of the Accused Products to be substantially the same as the overall appearance of one or more of the Claimed Designs in

1

light of the prior art, inducing him or her to purchase the each of the Accused Products supposing it to be one or more of the Claimed Designs.

## III.   SCOPE OF OPINIONS

### A.   Background and Qualifications

5.   I am the recently retired CEO of TEAMS Design USA, a global product design consultancy. I have over 25 years of product design and industrial design experience and have designed many mass-produced products, including consumer electronics, personal mobility equipment such as Segways, and electric bicycles. In my company, I was actively involved in all phases of the development process, including the user research, idea conceptualization, styling, visual brand language, development, engineering and overseeing the final production stages.

6.   I reside at 718 S. Oakley Blvd, Chicago, Illinois. I hold a Bachelor of Arts degree with honors (BA (Hons)) in Design for Industry (Industrial Design) from the University of Northumbria at Newcastle, United Kingdom. While studying to obtain my honors degree in Industrial Design, I took courses covering subjects including technical drawing, computer aided drawing, product styling and brand language, ergonomics, product evaluation, usability testing, production techniques, prototyping, mechanical engineering, and production techniques.

7.   In the course of my work as a designer and managing teams of designers, I have gained an understanding of the training, knowledge, skills, and abilities of a person skilled in the art of product design and industrial design. Through this work, I have also gained an understanding of how a person who purchases a particular product perceives and appreciates the visual appearance and or functional merits of a product's design, and I use this understanding to opine on how the purchaser or ordinary observer would answer questions raised in the examination of design patents, utility patents, trademarks, and trade dress claims.

8.   I am the named inventor in over 45 design and utility patents. I have written papers and spoken at many universities across the U.S. on the subject of visual perception, where I share information from psychological and neurological studies into how humans perceive

things such as physical products, what physical attributes we notice (if any), and how meaning is attached to what we see. I am currently teaching a graduate course on this subject matter at the University of Illinois at Chicago.

9. I was recently nominated into the prestigious IDSA Academy of Fellows. I have also been awarded many design awards, including the "Design of the Decade Award" from Business Week, and the IDEA "Juror's Award" in 2020.  In 2016 I was elected to the board of IDSA as Director-at-Large. Further information on my professional experience is detailed in my curriculum vitae, which is set forth in Appendix A.  I have previously provided expert testimony in many other patent-related matters, a detailed list of cases for which I have provided expert testimony is attached as Appendix B.

## B.  Compensation and Prior Testimony

10. I am being compensated at a rate of $450 per hour to provide analysis and testimony in this proceeding. My compensation is not contingent on the outcome of any matter or the specifics of my testimony. I have no financial interest in the outcome of this matter.

## C.  Materials and Information Considered

11. In forming my opinions, I have reviewed the claimed design of the Patents-In-Suit; their file history; the prior art cited on the face of the patent; and the Accused Product. The list of materials I reviewed in my analysis is included in Appendix C.

## IV.  LEGAL STANDARDS

12. I am not a lawyer. Rather, I am an industrial designer and base my analysis on the legal guidelines provided to me as outlined below.

## A.  The Limiting Purpose of a Design Patent

13. I understand that a U.S. patent does not grant the owner the right to use the invention, rather, the owner is granted the right, for a limited period of time, to prevent others from making, using, offering for sale, or selling the patented invention in the United States or importing the patented invention into the United States.  In other words, the government grants the patent owner the right to limit other people's use of the invention. To construe the scope of a design patent, I understand that one must also consider the prosecution

history of the patent application. *See Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co. Inc.*, 162 F.3d 1113, 1116 (Fed. Cir. 1998).

**B.    Legal Principles in Analysis of Design Patent Infringement**

14.    It is my understanding that "[w]hether a design patent is infringed is determined by first construing the claim to the design, when appropriate, and then comparing it to the design of the accused device." *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1404 (Fed. Cir. 1997) (citing *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995)).

15.    I understand that, under precedent from the U.S. Court of Appeals for the Federal Circuit ("the Federal Circuit"), "trial courts have a duty to conduct claim construction in design patent cases, as in utility patent cases[.]" *Egyptian Goddess, Inc. v. Swisa, Inc*., 543 F.3d 665, 679 (Fed. Cir. 2008) (en banc). "[T]he court has recognized that design patents 'typically are claimed as shown in drawings,' and that claim construction 'is adapted accordingly.'" *Id*. (quoting *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc*., 501 F.3d 1314, 1319 (Fed. Cir. 2007)). Given the "difficulties entailed in trying to describe a design in words, the preferable course . . . [is] not to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design." *Egyptian Goddess*, 543 F.3d at 679.

16.    As I understand, after a design patent's claim is construed, the claim "must be compared to the accused design to determine whether there has been infringement." *Elmer*, 67 F.3d at 1577. I understand that infringement occurs when an ordinary observer "giving such attention as a purchaser usually gives, [deems] two designs are substantially the same" meaning "the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other.[]" *Egyptian Goddess*, 543 F.3d at 670 (quoting *Gorham Co. v. White*, 81 U.S. 511, 528 (1872)).

17.    I am also aware that infringement is determined "in light of the prior art" by "applying the ordinary observer test through the eyes of an observer familiar with the prior art." *Egyptian Goddess*, 543 F.3d at 677. Thus, the hypothetical ordinary observer is presumed to have a complete knowledge of all relevant prior art.

18.    I understand that a design patent infringement analysis is a two-step process. The first step is to consider whether the Claimed Design and Accused Products are "sufficiently distinct"

4

also known as "plainly dissimilar." *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1335 (Fed. Cir. 2015) (citing *Egyptian Goddess*, 543 F. 3d at 678). If the Claimed Design and the Accused Products are found to be plainly dissimilar, there is no patent infringement. *Id*.

19.   But, "if the claimed and accused designs are not plainly dissimilar," I understand that the second step in an infringement analysis involves a three-way comparison to compare "the patented and accused designs in the context of similar designs found in the prior art." *Egyptian Goddess*, 543 F.3d at 674. "[I]f the accused design has copied a particular feature of the claimed design that departs conspicuously from the prior art, the accused design is naturally more likely to be regarded as deceptively similar to the claimed design, and thus infringing." *Id*. at 677.

20.   As I understand, these "[d]ifferences, however, must be evaluated in the context of the Claimed Design as a whole, and not in the context of separate elements in isolation. Where, as here, the Claimed Design includes several elements, the fact finder must apply the ordinary observer test by comparing similarities in overall designs, not similarities of ornamental features in isolation." *Ethicon*, 796 F.3d at 1335 (citing *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1295 (Fed. Cir. 2010). *See also Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1303-1304 (Fed. Cir. 2010). "[T]he mandated overall comparison is a comparison taking into account significant differences between the two designs, not minor or trivial differences that necessarily exist between any two designs that are not exact copies of one another." *Int'l Seaway Trading Co. v. Walgreens Corp.*, 589 F.3d 1233, 1243 (Fed. Cir. 2009).

21.   I understand that the fact that an infringing product is marked with a trademark or logo designating the product's source does not, as a matter of law, negate design patent infringement. Design patent infringement relates solely to the patented design and does not allow of avoidance of infringement by labelling. *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1126 (Fed. Cir. 1993).

## C.   Claim Construction in Design Patents

22.   It is my understanding that "[w]hether a design patent is infringed is determined by first construing the claim to the design, when appropriate, and then comparing it to the design

of the accused device." *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1404 (Fed. Cir. 1997) (emphasis added) (citing *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995)). To construe the scope of a design patent, I understand that one must consider whether the figures identify unclaimed subject matter (e.g., features depicted in broken lines); and whether the prosecution history of the application shows if the applicant disclaimed subject matter or distinguished the Claimed Design from other ornamental designs. *See Goodyear Tire*, 162 F.3d at 1116.

23. As I understand, courts construe claims for a design patent just as for a utility patent. *Goodyear Tire*, 162 F.3d at 1116. That said, I understand that the Federal Circuit has cautioned against a detailed, verbal construction of the features in the patent drawings. *Egyptian Goddess*, 543 F.3d at 679. This is because a written claim construction focused on individual features may lead the factfinder away from "consideration of the design as a whole." *Crocs*, 598 F.3d at 1303. However, while the claimed design of a design patent is better represented by an illustration, it is helpful to the finder of fact to be provided with guidance on the overall impression of the claimed design on the ordinary observer. *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002).

24. To construe the scope of a design patent, I understand that one must consider (1) the language of the specification to determine whether the written description disclaims, characterizes, or limits any features; (2) whether the figures identify unclaimed subject matter (e.g., features depicted in broken lines); and (3) whether the prosecution history of the application shows if the applicant disclaimed subject matter or distinguished the Claimed Design from the prior art based on certain features present or absent in the graphics. *See Goodyear Tire*, 162 F.3d at 1116.

25. I also understand that while the claimed design of a design patent is better represented by an illustration, it is helpful to the finder of fact to be provided with **guidance on the overall impression** of the claimed design on the ordinary observer. *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002).

26. I am also informed that the Manual of Patent Examining Procedure ("MPEP") provides guidance on how broken lines are to be used in design patent drawings. U.S. Pat. & Trademark Office, Manual of Patent Examining Procedure § 1503.02 (9th ed. 2018).

Section 1503.02.III notes that broken lines include "[s]tructure that is not part of the claimed design but is considered necessary to show the environment in which the design is associated" and that structure "may be represented in the drawing by broken lines." *Id*. Such unclaimed subject matter represented by broken lines forms no part of the claimed design.

27. I am also informed that "in analyzing infringement, the fact finder must **compare the claimed portion** of the design—i.e., whatever is shown in solid lines in the patent drawings—to the corresponding portion of the accused design." (emphasis added) Sarah Burstein, *The "Article of Manufacture" in 1887*, 32:1 Berkeley Tech. L.J. 11 (2017) (first citing *Hutzler Mfg. Co. v. Bradshaw Int'l, Inc.*, No. 1:11-cv-07211, 2012 WL 3031150, at *9–10 (S.D.N.Y. July 24, 2012); and then citing *Egyptian Goddess. Inc. v. Swisa, Inc.*, 543 F.3d 665, 672 (Fed. Cir. 2008)).

**D.    The Ordinary Observer Test**

28. I understand that a design patent infringement analysis is a two-step process. The first step, after a design patent's claim is construed is to consider whether the claimed design and infringing products are "sufficiently distinct" also known as "plainly dissimilar." *Ethicon*, 796 F.3d at 1335 (citing *Egyptian Goddess*, 543 F. 3d at 678). If the Claimed Design and the infringing products are found to be plainly dissimilar, there is no patent infringement. *Id*.

29. I also understand that while the claimed design of a design patent is better represented by an illustration, it is helpful to the finder of fact to be provided with guidance on the overall impression of the claimed design on the ordinary observer. *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002).

30. As I understand, "the fact finder must apply the ordinary observer test by comparing similarities in overall designs, not similarities of ornamental features in isolation," *Ethicon*, 796 F.3d at 1335 (citing *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1296 (Fed. Cir. 2010)), and "not minor or trivial differences that necessarily exist between any two designs that are not exact copies of one another." *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1243 (Fed. Cir. 2009) (emphasis added).

31. But "if the claimed and accused designs are not plainly dissimilar," I understand that the second step in an infringement analysis involves a three-way comparison to compare "the patented and accused designs in the context of similar designs found in the prior art." *Egyptian Goddess*, 543 F.3d at 674. "If the accused design has copied a particular feature of the claimed design that departs conspicuously from the prior art, the accused design is naturally more likely to be regarded as deceptively similar to the claimed design, and thus infringing." *Id*. at 677. .

**E.     The Significance of Prior Art**

32. As I understand, the role of prior art is to help the finder of fact consider seemingly small or minor details that differentiate the patented design from the prior art. "Where there are many examples of similar prior art designs . . ., differences between the claimed and accused designs that might not be noticeable in the abstract can become significant to the hypothetical ordinary observer who is conversant with the prior art." *Egyptian Goddess*, 543 F.3d at 678.

33. For the purposes of my opinion, I considered prior art to define the scope of the hoverboard market at the time the Claimed Designs were filed. In so doing, I was able to better discern the similarities and differences (or lack thereof) between the Claimed Designs and the Accused Products in the eyes of the ordinary observer.

34. I am informed that the *Egyptian Goddess* case makes clear, the ultimate burden of proving infringement is on the patent owner. Accordingly, the failure of the accused infringer to bring forward prior art is not an admission of infringement, but rather only a concession that knowledge of the prior art would not make infringement less likely.  *See Egyptian Goddess*, 543 F.3d at 678-79.

**F.     Definition of the Ordinary Observer**

35. As I understand, "[t]he measure of infringement of a design patent is deception of the ordinary observer, when such person gives the design the attention usually given by a purchaser of the item bearing the design[.]" *Goodyear Tire*, 162 F.3d at 1117.  Accordingly, I understand that the hypothetical ordinary observer must be identified before applying the ordinary observer test by focusing on the "actual product that is presented for purchase, and the ordinary purchaser of that product."  *Id*.

36. I understand that the hypothetical ordinary observer must be identified before applying the ordinary observer test by focusing on the actual product that is presented for purchase, and the ordinary purchaser of that product. The hypothetical ordinary observer is different for each case, based on the type of product at issue. The determination of the substantial similarity is based on the viewpoint of the ordinary observer who is "not an expert in the claimed designs" but rather one of ordinary acuteness who is a principal purchaser of the product. The hypothetical ordinary observer is also one who is aware of the number of closely similar prior art designs and conversant with the prior art.

37. Further, I understand that some courts have held that the ordinary observer is one who is "not an expert in the claimed designs", but rather "one of ordinary acuteness who is a principal purchaser[]" of the product. Ethicon, 796 F.3d at 1337 (internal quotations and citation omitted). That said, the ordinary observer is one who is "aware of the great number of closely similar prior art designs" and "conversant with the prior art". *Egyptian Goddess*, 543 F.3d at 676, 678.

38. Further, I understand that the viewpoint of the hypothetical ordinary observer is through the "eyes of men generally" and not individuals "versed in designs in the particular trade in question" or "engaged in the manufacture or sale of articles containing such designs". Gorham Co. v. White, 81 U.S. 511, 527-528 (1871). I am also informed that some courts have held that the ordinary observer is one who is "not an expert in the claimed designs", but rather "one of ordinary acuteness who is a principal purchaser []" of the product. *Ethicon*, 796 F.3d at 1337 (emphasis added) (internal quotations and citation omitted).

39. I am also informed that the "[l]ikelihood of confusion as to the source of the goods is not a necessary or appropriate factor for determining infringement of a design patent." *Unette Corp. v. Unit Pack Co.*, 785 F.2d 1026, 1029 (Fed. Cir. 1986) (emphasis added).

40. Based on my experience as an Industrial Designer of commercial products, including electronic mobility products and consumer electronics, it is my opinion that an ordinary observer in this case is the principal purchaser of hoverboards, i.e., a consumer user or the parent of a user, each having little or no experience purchasing hoverboards. The ordinary observer encounters products like the Claimed Designs via online stores, television and

entertainment media, and social media, and purchases them using online stores or from 'brick and mortar' stores like Best Buy or Walmart.

**G.    Functionality in Design Patents**

41.    As was explained to me, to be afforded patent protection, "a design must present an aesthetically pleasing appearance that is not dictated by function alone." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 148 (1989) (emphasis added).  "[W]hether a design is primarily functional or primarily ornamental requires viewing the claimed design 'in its entirety.'" *Ethicon*, 796 F.3d at 1329 (quoting *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 977 F.2d 988, 1123 (Fed. Cr. 1993)).  I further understand that to "entirely eliminate a structural element from the claimed ornamental design, even though that element also served a functional purpose" is not permitted.  *Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1321 (Fed. Cir. 2016).

42.    To determine the scope of the claim, I understand that the court considers the distinction between features of the claimed design that are "ornamental" and those that are "purely functional." *Ethicon Endo-Surgery*, 796 F.3d at 1333.  I understand that a design element is "purely functional" where its basic design is "dictated" by its functional purpose or is otherwise serves a utilitarian purpose. *Sport Dimension*, 820 F.3d at 1320.  I also understand that several factors suggest that a feature is functional, including whether (1) the protected design represents the best design, (2) alternative designs would adversely affect the utility of the specified article, (3) there are any concomitant utility patents, (4) the advertising touts particular features of the design as having specific utility, and (5) whether the feature is clearly dictated by function. *PHG Techs., LLC v. St. John Cos.*, 469 F.3d 1361, 1366 (Fed. Cir. 2002).

43.    It is well established that patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue. *Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000) *See also* MPEP § 2125 "When the reference does not disclose that the drawings are to scale and is silent as to dimensions, arguments based on measurement of the drawing features are of little value."

10

## V.    ANALYSIS OF THE PATENTS-IN-SUIT AND THE PRIOR ART

### A.    The Patents-In-Suit

44.    The Patents-In-Suit are the U.S. Patents D737,723 ("the D'723 Patent"), and the D738,256 ("the D'256 Patent"), for Self-Balancing Vehicles.  Such self-balancing vehicles are commonly referred to as "hoverboards".

45.    As mentioned above, the scope of the claim of a patented design encompasses its visual appearance as a whole, and in particular the visual impression it creates to the hypothetical ordinary observer.

### B.    Examination of the D'723 Patent

46.    The D'723 Patent is titled "Self-Balancing Vehicle" and has a filing date of Dec 15, 2014. It claims priority to a foreign application CN 201430180556.4 dated 6/13/2014.

47.    The patent has 8 figures, and states "the broken line showing is for the purpose of illustrating portions of the self-balancing vehicle and environment structure which form no part of the claimed design".

| Table 1: The Claimed Design of the D'723 Patent | |
|---|---|
| Fig.1 is a top plan view of a self-balancing vehicle showing our new design |  FIG.1 |

| | |
|---|---|
| Fig.2 is a bottom plan view thereof | |
| Fig 3 is a rear elevational view thereof | |
| Fig. 4 is a front elevation view thereof | |
| Fig 5. Is a left side view thereof, the right side view being a mirror image thereof. | |



FIG.2

FIG.3

FIG.4

| | |
|---|---|
| Fig.6 is a rear, top, right perspective view thereof |  |
| Fig. 7 is a front, top, left perspective view thereof | |
| Fig 8 is a rear, bottom, left perspective view thereof | |

48.   What is claimed is the overall ornamental design of a Self-Balancing Vehicle as described in the patent and shown in the figures.  The claimed design does not include the areas shown in broken lines, such as the wheels, the holes on the underside, the "O I" pattern, and the on/off graphics.

13

49. I have reviewed the prosecution history of the D'723 Patent, and it consistent with my opinion of the claim scope. The claimed design was allowed over all the prior art that was cited in the file history.

## C. Examination of the D'256 Patent

50. The D'256 Patent is also titled "Self Balancing Vehicle" and has a filing date of Dec 15, 2014. The patent has 8 figures, and states "the broken line showing is for the purpose of illustrating portions of the self-balancing vehicle and environment structure which form no part of the claimed design".

| Table 2: The Claimed Design of the D'256 Patent | |
| --- | --- |
| Fig.1 is a top plan view of a self-balancing vehicle showing our new design |  |
| Fig.2 is a bottom plan view thereof | |
| Fig 3 is a rear elevational view thereof | |

14

| | |
|---|---|
| Fig. 4 is a front elevation view thereof | |
| Fig 5. Is a left side view thereof, the right side view being a mirror image thereof | |
| Fig.6 is a rear, top, right perspective view thereof | |



FIG.4

FIG.6

| Fig. 7 is a front, top, left perspective view thereof |  |
| --- | --- |
| Fig 8 is a rear, bottom, left perspective view thereof | |

51. What is claimed is the overall ornamental design of a Self-Balancing Vehicle as described in the patent and shown in the figures. The claimed design does not include the areas shown in broken lines, such as the wheels, holes on the underside, and the "O I" pattern.

52. I have reviewed the prosecution history of the D'256 Patent, and it consistent with my opinion of the claim scope. The claimed design was allowed over all the prior art that was cited in the file history.

**D.  The Cited Prior Art Show The Patents-In-Suit Have A Broad Scope**

53. Prior art is used to compare to the claimed design of a patent to find the scope of the design in the ordinary observer test. It is also used to compare the Accused Products to the claimed designs to evaluate if the Accused Products is closer to the claimed design than the prior art.

54. I have analyzed all the cited prior art of the Patents-In-Suit. Below I present one selected view from each of the cited prior art to provide an overview of the state-of-the-art at the

time of the filing of each patent. As can be seen in the table below, the D'723 and the D'256 cited the same prior art.

| Table 3: The Cited Prior Art Cited on the Face of the D'723 and D'256 Patents | | |
|---|---|---|
|  US 8,118,319 |  US 8,469,376 |  US 8,414,000 |
|  Appl. 2007-0273118 |  US 8,500,145 |  US D647,991 |
|  US D739,906[1] | | |

55.  While some of the individual components of the D'723 and D'256 Patents are represented in some of the prior art, the overall impression of the claimed design of the D'723 and D'256 Patents is entirely unique. The prior art is vastly different in many ways and therefore the D'723 and D'256 Patents enjoy a very broad scope.

56.  Some of the prior art feature a generally hourglass outer form. However, none of the relevant prior art create the visual impression of an integrated hourglass body with a

---

[1] The US Patent D739,906 was not cited on the face of either the '723 or '256 Patents but I understand that its filing date slightly preceded that of these patents and is therefore part of my analysis.

relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area.

## VI.    ANALYSIS OF FUNCTIONALITY

57.  I understand that several factors may suggest that a feature is primarily functional, including whether the protected design represents the best design, and whether alternative designs would adversely affect the utility of the specified article.[2]

58.  The Claimed Designs feature many ornamental elements that contribute to the overall impression. Here I will briefly describe the analysis of three visually dominant elements of the overall visual impression to analyze whether they could have been designed with substantially different ornamentation and still provide the same functionality.

59.  First, in looking at the overall 'hour glass' shape of the **main body**, we need look no further than the prior art to find alternative ways to provide similar or the same functionality of providing adequate space for footing and allow for a central pivoting motion. Importantly, these alternative ornamental designs have distinctly different ornamental designs from the Claimed Designs.

---

[2] The Federal Circuit listed a number of considerations for assessing whether a patented design as a whole was dictated by functional considerations such as: "Whether the protected design represents the best design; whether alternative designs would adversely affect the utility of the specified article; whether there are any concomitant utility patents; whether the advertising touts particular features of the design as having specific utility and whether there are any elements in the design or an overall appearance clearly not dictated by function." *Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 1456 (Fed. Cir. 1997).

| Table 4: The prior art provides alternative ornamental examples for the same utility. | |
|---|---|
| <br>US 8,469,376 | These prior art provide the same spacing for feet but create distinctly different visual impressions from that of the Patents-in-Suit. |
| <br>US 6,834,867 | They also provide a similarly pivoting center that creates distinctly different visual impressions from that of the Patents-in-Suit. |
| <br>Appl. 2007-0273118 | |

60. Second, the **fenders** of the Claimed Designs may prevent accidentally access to the top of the wheel, for which alternative ornamental designs are also found within the prior art (see table below).

61. Third, the **pronounced footing areas** may communicate where to position feet, and possibly provide grip, and alternative ornamental designs for these same functions are also found within the prior art.

| Table 5: The prior art provides alternative ornamental examples for the same fender and footing area utility. | | |
|---|---|---|
|  US D739,906 | US D647,991 | These prior art provide the same utility of the **fenders** of the Patents-In-Suit but create distinctly different visual impressions. |
| US 8,118,319 | Appl. 2007-0273118 | These prior art provide the same utility of the **pronounced footing areas** of the Patents-In-Suit but create distinctly different visual impressions. |

62. I have examined not only the three examples above but also other, less visually dominant parts of the ornamental design. Based on my analysis of the overall outer shape and other main elements of the Claimed Designs, it is clear that the same functionality can be achieved with distinctly different ornamental designs. Although the above outlined analysis demonstrates only part of the *Berry Sterling* considerations, this finding is sufficient for me to opine that none of the ornamental designs claimed in the Patents-In-Suit are dictated by function, or otherwise purely functional.

## VII.  OVERVIEW OF THE ACCUSED PRODUCTS

63.  As noted above, there are three products accused of infringement in this case, the 'Gyroor A', 'C' and 'E'.

64.  Each of the Accused Products creates the visual impression to the hypothetical ordinary observer of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area.

65.  While they are not exact duplicates, each of the Accused Products and each of the Claimed Designs share very similar visual traits in their format, proportions and main visual features, and share the same overall impression to the ordinary observer in light of the prior art.

| Table 6: Accused Product Gyroor A |
| --- |









 

**Table 7: Accused Product Gyroor C**





**Table 8: Accused Product Gyroor E**





## VIII. THE ACCUSED PRODUCTS INFRINGES THE PATENTS-IN-SUIT

66. I conducted a side-by-side comparison of the Accused Products and the Claimed Designs. My analysis was limited to the Claimed Designs as depicted by the solid lines in the figures of the Patents-In-Suit and did not include the unclaimed portions of the design depicted in broken lines.

67. The Accused Products and the claimed designs of the Patents-In-Suit are both conceptually and functionally identical in that they are all hoverboards, for recreational use by consumers.

68. As mentioned above, the scope of the claim of a patented design encompasses its visual appearance as a whole, and in particular the 'visual impression' it creates. Even if various ornamental elements which make up the whole of a design may be slightly different in isolation, infringement occurs if the overall visual impression is substantially similar.

69. In my analysis detailed below I conclude that each of the Accused Products is **not plainly dissimilar** to the Claimed Designs

70. As an additional step, I also analyzed the patents' cited prior art against the Accused Products and Patented Designs to find whether the Accused Designs are closer to the Patented Designs than the closest prior art. As it is the burden of the defendant to identify the closest prior art, I conducted a three-way comparison using the D'906 Patent as both of Defendants' experts in this case have cited this to be the closest prior art.

71. My analysis was conducted by comparing the visual impression of each Accused Product and each of the Claimed Designs to the D'906 Patent, through the eyes of an ordinary observer. Specifically, the ordinary observer test inquires whether the visual impression of an Accused Product is closer to the claimed design of a patent than to the prior art. In my analysis I find the visual impression created by each of the Accused Products is closer to each of the Claimed Designs than it is to the prior art. The Accused Products are therefore **substantially the same** as each of the Claimed Designs in the eyes of the ordinary observer as I will outline below.

## A. The Accused Product Gyroor A Infringes on the D'723 Patent

72. Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'723 are shown in Exhibit 1.

| Table 9: Three-way comparison of Gyroor A to the D'906 Patent and the claimed design of the D'723. | |
|---|---|
|  FIG.6 | FIG. 6 of the 'D723 patent |
| | Perspective view of Gyroor A |
| | FIG. 4 of the prior art 'D906 Patent |



| | Figure 1 of the D'723 Patent |
| | Top view of Gyroor A |
| | Figure 3 of the prior art D'906 Patent. |

73. Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'723 Patent and Gyroor A are **not plainly dissimilar**.

74. Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor A is closer in overall impression to the claimed design of the D'723 Patent than to the closest prior art**. Specifically, Gyroor A and the claimed design of the D'723 Patent both create a visual impression of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of

29

a very uncluttered, rounded, smooth body with no pronounced footing area and closed fender skirts[3].

75. Therefore, in light of the closest prior art, the claimed design of the D'723 is **substantially the same** as the visual impression presented by Gyroor A.

## B. The Accused Product Gyroor A Infringes on the D'256 Patent

76. Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'256 are shown in Exhibit 1.

| Table 10: Three-way comparison of the Gyroor A to the D'906 Patent and the claimed design of the D'256. | |
|---|---|
|  FIG.6 | FIG. 6 of the D'256 patent |
| | Perspective view of Gyroor A |

---

[3] Fender skirt' is a term used by the automobile industry when the wheel is almost entirely hidden, as seen in 1969 Buick Electra and the 1986 Citroen CX.



| | |
|---|---|
| | FIG. 4 of the prior art 'D906 Patent |
| | Figure 1 of the D'256 Patent |
| | Top view of Gyroor A |
| | Figure 3 of the prior art D'906 Patent. |

77. Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'256 Patent and Gyroor A are **not plainly dissimilar**.

78. Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor A is closer in overall impression to the claimed design of the D'256 Patent than to the closest prior art**. Specifically, Gyroor A and the claimed design of the D'256

31

Patent both create a visual impression of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body with no pronounced footing area and closed fender skirts.

79. Therefore, in light of the closest prior art, the claimed design of the D'256 is **substantially the same** as the visual impression presented by Gyroor A.

## C. The Accused Product Gyroor C Infringes on the D'723 Patent

80. Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'723 are shown in Exhibit 1.

| Table 11: Three-way comparison of Gyroor C to the D'906 Patent and the claimed design of the D'723. | |
|---|---|
|  | FIG. 6 of the 'D723 patent |
| | Perspective view of Gyroor C |

32



| | FIG. 4 of the prior art 'D906 Patent |
| | Figure 1 of the D'723 Patent |
| | Top view of Gyroor C |
| | Figure 3 of the prior art D'906 Patent. |

81. Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'723 Patent and Gyroor C are **not plainly dissimilar**.

82. Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor C is closer in overall impression to the claimed design of the D'723 Patent than to the closest prior art**. Specifically, Gyroor C and the claimed design of the D'723 Patent both create a visual impression of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body with no pronounced footing area and closed fender skirts.

83. Therefore, in light of the closest prior art, the claimed design of the D'723 is **substantially the same** as the visual impression presented by Gyroor C.

## D. The Accused Product Gyroor C Infringes on the D'256 Patent

84. Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'256 are shown in Exhibit 1.

| Table 12: Three-way comparison of the Gyroor C to the D'906 Patent and the claimed design of the D'256. | |
| --- | --- |
| <br>FIG.6 | FIG. 6 of the D'256 patent |

34



| | Perspective view of Gyroor C |
| | FIG. 4 of the prior art 'D906 Patent |
| | Figure 1 of the D'256 Patent |
| | Top view of Gyroor C |
| | Figure 3 of the prior art D'906 Patent. |

85. Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'256 Patent and Gyroor C are **not plainly dissimilar**.

86. Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor C is closer in overall impression to the claimed design of the D'256 Patent than to the closest prior art**. Specifically, Gyroor C and the claimed design of the D'256 Patent both create a visual impression of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body with no pronounced footing area and closed fender skirts.

87. Therefore, in light of the closest prior art, the claimed design of the D'256 is **substantially the same** as the visual impression presented by Gyroor C.

## E. The Accused Product Gyroor E Infringes on the D'723 Patent

88. Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'723 are shown in Exhibit 1.

| Table 13: Three-way comparison of Gyroor E to the D'906 Patent and the claimed design of the D'723. | |
| --- | --- |
| <br>FIG.6 | FIG. 6 of the 'D723 patent |



| | |
|---|---|
| | Perspective view of Gyroor E |
| | FIG. 4 of the prior art 'D906 Patent |
| | Figure 1 of the D'723 Patent |
| | Top view of Gyroor E |



| | Figure 3 of the prior art D'906 Patent. |

89. Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'723 Patent and the Accused Products are **not plainly dissimilar**.

90. Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor E is closer in overall impression to the claimed design of the D'723 Patent than to the closest prior art**. Specifically, Gyroor E and the claimed design of the D'723 Patent both create a visual impression of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body with no pronounced footing area and closed fender skirts.

91. Therefore, in light of the closest prior art, the claimed design of the D'723 is **substantially the same** as the visual impression presented by Gyroor E.

**F. The Accused Product Gyroor E Infringes on the D'256 Patent**

92. Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'256 are shown in Exhibit 1.

| Table 14: Three-way comparison of the Gyroor E to the D'906 Patent and the claimed design of the D'256. | |
|---|---|
|  | FIG. 6 of the D'256 patent |
| | Perspective view of Gyroor E |
| | FIG. 4 of the prior art 'D906 Patent |



| | |
|---|---|
| | Figure 1 of the D'256 Patent |
| | Top view of Gyroor E |
| | Figure 3 of the prior art D'906 Patent. |

93. Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'256 Patent and the Accused Products are **not plainly dissimilar**.

94. Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor E is closer in overall impression to the claimed design of the D'256 Patent than to the closest prior art**. Specifically, Gyroor E and the claimed design of the D'256 Patent both create a visual impression of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body with no pronounced footing area and closed fender skirts.

95. Therefore, in light of the closest prior art, the claimed design of the D'256 is **substantially the same** as the visual impression presented by Gyroor E.

## IX.    CONCLUSION

96.   Based upon the application of the legal principles described in this declaration, and upon my examination, analysis and comparisons of the Patents-In-Suit, their file histories, the prior art, and the Accused Products, it is my opinion that:

- Gyroor A is not plainly dissimilar to the claimed design of the '723 Patent and is substantially the same as the claimed design of the '723 Patent in the eyes of the ordinary observer in light of the prior art.

- Gyroor A is not plainly dissimilar to the claimed design of the '256 Patent and is substantially the same as the claimed design of the '256 Patent in the eyes of the ordinary observer in light of the prior art.

- Gyroor C is not plainly dissimilar to the claimed design of the '723 Patent and is substantially the same as the claimed design of the '723 Patent in the eyes of the ordinary observer in light of the prior art.

- Gyroor C is not plainly dissimilar to the claimed design of the '256 Patent and is substantially the same as the claimed design of the '256 Patent in the eyes of the ordinary observer in light of the prior art.

- Gyroor E is not plainly dissimilar to the claimed design of the '723 Patent and is substantially the same as the claimed design of the '723 Patent in the eyes of the ordinary observer in light of the prior art.

- Gyroor E is not plainly dissimilar to the claimed design of the '256 Patent and is substantially the same as the claimed design of the '256 Patent in the eyes of the ordinary observer in light of the prior art.

97.   Therefore, an ordinary observer familiar with the prior art, giving such attention as a purchaser usually gives would find the overall appearance of each of the Accused Products to be substantially the same as the overall appearance of one or more of the claimed designs of the Patents-In-Suit in light of the prior art, inducing him or her to purchase the Accused Products supposing it to be the Claimed Design.

## X.   RESERVATION OF RIGHTS

98.   My current opinions are set forth in this Declaration. However, my analysis is continuing, and I thus reserve the right to supplement or amend my Declaration and to rely on additional documents, prior art, or discovery or testimony that may come to my attention.

99.   Moreover, I may make additions, deletions, or modifications to this Declaration and my opinions in the future that would be reflected in my testimony at the trial and/or additional Declarations that I may be asked to submit in this case. I also reserve the right to rely on all other expert Declarations submitted in this case. For the forthcoming trial, I may prepare diagrams, charts, other demonstratives, and/or demonstrations that illustrate the issues presented. I reserve the right to respond to additional arguments or analyses proffered by expert witnesses and/or the Defendant, and I understand that I may be asked to give rebuttal testimony on matters not covered in this expert Declaration.


I declare under penalty of perjury that the foregoing is true and correct.

Dated: Nov 8, 2022

Respectfully Submitted,


Paul Hatch

**Appendix A**

**RESUME OF PAUL HATCH – August 2022**

**Professional Design Experience:**

Oct 1998 – July 2020
CEO, TEAMS Design USA, Inc

May 2014 - 2018
Co-Founder, Design House LLC (Non-profit organization)

April 1993 - Oct 1998
Senior Designer, TEAMS Design GmbH, Germany.

Sept 1991- Sept 1992
Junior Industrial Designer, IDEA Design, Germany

July 1991 – Sept 1991
Junior Industrial Designer, Schroerdesign, Germany

June 1990 – Sept 1990
Junior Industrial Designer, DA Display Ltd, UK

**Education:**

Ph.D. in Learning Sciences at University of Illinois, Chicago (current).

BA (Hons) Degree 'Design For Industry' from University of Northumbria at Newcastle, Newcastle-upon-Tyne, UK.

Diploma in General Art & Design, Sutton Coldfield College of Further Education, Sutton Coldfield, West Midlands, UK.

**Books Published**

"REALIZE - Design Means Business" (Portuguese translation), 2009

"REALIZE - Design Means Business" (Chinese translation), 2008

"REALIZE – Design Means Business" (US original. Co-editor and contributor), 2006

"IMPACT, the Synergy of Technology, Business and Design" (Co-editor and contributor), 2005

**Published Articles and Papers:**

Innovation Magazine: "Immersive Design: What The Metaverse Means For Industrial Design", April 2022

Innovation Magazine: "Design Is Dead, Long Live Design", June 2018

LinkedIn Pulse: "Disruptive Innovation …For Stability", May 2017

Innovation Magazine: "The State of Design – Maintaining a Proper Vision", Summer 2016

LinkedIn Pulse: "Getting Emotional – Design, UX and Magic" – Sept 2016

LinkedIn Pulse: "The Local Revolution –How Design is Reinventing Manufacture", Mar 2016

LinkedIn Pulse: "Design Thinking Is Only Half The Story", Jan 2016

LinkedIn Pulse: "The Macintosh Moment –Why IoT Needs ID, UX and Design Thinking" Feb 2016

LinkedIn Pulse: "User Experience – Fun For All The Family", Dec 2015

Innovation magazine: "To Design Is Human", Spring 2013

Innovation magazine: "Finding The Sweet Spot", Spring 2010

Insight magazine: "Profit, By Design", April 2005

Innovation magazine "Designer In The Middle", Spring 2004

Innovation magazine: "How To Avert The Asian Shift", Fall 2004

International Housewares Association Magazine: "Brand Differentiation Through Design Details", Feb 2003


## Television, Book and Magazine Interviews

(Book) "Extended Reality: The Next Frontier of Design". Ralf O Schneider, April 2021

PRISM Podcast: "The Changing World of Design with Paul Hatch", April, 2021

Learning Sciences Research Institute – "Seeing A Way To Help", Sept 2020

DesignDrives Podcast – "Paul Hatch – Driving Innovation in Connected AI Products", March 2020

Apple podcast "Context" – "Interview with Paul Hatch" , July 2019

Appliance Design Magazine: "The Internet of Things and The Pampered User", March 2019

Appliance Design Magazine: "Connected Product Design", July 2018

Appliance Design Magazine: "Paul Hatch Discusses the Intersection of Quality Data and a Better User Experience, April 2018

Bosch Connected World: "Industrial Design in the Age of IOT", Feb 2018

Child Art /Learning From Design: "Paul Hatch" , Fall 2016

Pittsburgh Technology Council (site): "It's All In The Jam!", Feb 2016

Chicago Tribune: "How A Group of Chicago Product Designers Aims to Boost Manufacturing", June 30 2014

IDSA site: "Paul Hatch on The Changing Mechanics of the Design Business", June 2014

(Book) "Breaking In" by Amina Horozic, May 2014

(Book) "Drawing For Product Designers" by Kevin Henry, Sept 2012

Taiwan "Designer" Magazine: "Teams Design To Success in Past 50 Years", Dec 2011

IDSA site: "What Paul Hatch Thinks About Contrast", Mar 2011

New York Daily News: "From 0 to 60 in the Kitchen", June 2009

(Television) "190 North", June 2006

Appliance Design Magazine: "IATC Review: Taking A World View", May 2006

Appliance Design Magazine: "Industrial Design and Human Factors", March 2004

(Television) "World Business Review with Alexander Haig", May 2003


## Conference Presentations, Proceedings and Invited Lectures:

Invited Speaker: Design & Cognitive Psychology – SCAD, Georgia, Sept 2020

Invited Speaker: Design & Cognitive Psychology – UIC Chicago, Mar 2020

Keynote Speaker: UX and IOT – Newell Congress Chicago, July 2018

Invited Speaker: Connecting the Smart Home to the Homeowner – International Housewares Show, Jan 2018

Invited Panelist: Intellectual Property and Design Rights – 13th Annual Foley IP Conference, Sept 2017

Keynote Speaker: Naked Design and Visual Perception – North Carolina State University, Nov 2017

Keynote Speaker: Communicate or Die – UIUC, Dec 2016

Keynote Speaker: The World Class Designer – Newell Summit, Kalamazoo, Oct 2016

Invited Speaker: IOT and The Macintosh Moment –Connected World Conference, Sept 2016

Keynote Speaker: Talking Loud & Clear- CSULB San Francisco, Aug 2016

Invited Speaker: UX and IOT – Windy City Things, June 2016

Keynote Speaker: Design For Local – IDSA International Conference, Atlanta, Aug 2016

Keynote Speaker: Design Like an ID-IOT – Manifest, Chicago, May 2016

Keynote Speaker: UX and the ID-IOT – IDSA Western District Conference, Denver, March 2016

Invited Speaker: Brand Personalities – DMI National Conference, Boston, Sept 2015

Keynote Speaker: Design For Local – PD+I Conference, London, May 2015

Keynote Speaker: Paul Hatch and the Evolution Of Consumer Products – Garmin Center, March 2015

Invited Speaker: The Changing Mechanics of the Design Business, IDSA International Conference, Austin, June 2014

Invited Speaker: Design as a Center Of Excellence – Bosch Global Summit May 2014

Keynote Speaker: Visual Perception and the Designer – Purdue University Oct 2013

Invited Participant: The Meaning Of Life – Ignite Talk, ORD Camp, Chicago May 2013

Keynote Speaker: Communicate Or Die – IDSA Midwest District Conference 2012

Keynote Speaker: Designing For International Markets – Stryker Summit, Kalamazoo, June 2012

Invited Speaker: Run Like A Designer – IDSA Southern District Conference, May 2011

Invited Speaker: Reinventing The Wheel - IDSA Midwest District Conference, April 2011

Keynote Speaker: Future Tech trends – IATC Engineering Conference, May 2010

Invited Panelist: The Top i-Gadgets – Consumer Electronics Show, Jan 2010

Invited Participant: Designer Mixtape– IDSA International Conference Aug 2009

Keynote Speaker: Creating A Creative Culture -ID-DNA- IDSA Midwest Conference, March 2009

Invited Speaker: Protecting Brand Equity – PDMA, 2008

Invited Panelist: Developing A Brand Identity To Grow Your Margins -Consumer Electronics Show, Jan 2006

Invited Speaker: Brand Differentiation Through Design Details – International Housewares Show, Jan 2003

Invited Speaker: Design in the USA – USA Forum, Frankfurt Germany, Feb 2000

**Professional Honors and Other Achievements:**

2022 Graduate Research Fellow, National Science Foundation

2018 Presented the IDSA Fellowship Award.

2016 was elected onto the board of the IDSA as Director-at-Large.

2015 Called to meeting at The White House by Barack Obama and Secretary of Commerce Penny Pritzger for Forum on supporting US manufacture.

2014 Founded Design House Inc, a nonprofit organization whose mission is to help revitalize local manufacture through design.

2013 Elected Chair of IDSA International Conference 'Breaking The Rules'

2009 Third design professional ever to be awarded the IDSA Midwest Honors for Outstanding Achievement.

2005-07 Elected to The Board of Directors, Industrial Designer Society of America.

2006 Elected Chair for IDSA Midwest Conference "Home, Urban Seduction & Design", Chicago, IL

2005 Elected Chair for IDSA Midwest Conference "Impact -Design Means Business" at University of Urbana-Champaign, IL.

2005 Founded and ran 'Fight Club', which NY Times called "A Designer Slugfest". It later became a pilot Reality TV show.

2004 Elected Chair for IDSA Midwest Conference "Shift Happens", Chicago, IL

2000 Received the "Design of The Decade Award" from Business Week and the IDSA for TEAMS Design's achievements.


**Awards:**

**2020**

IDEA Jury Chair Award

IDEA Medical Device Gold Award

**2011**

Appliance Design EID Silver Award : Business Machine – HoMedics Inc. Black & Decker Hanging Crosscut 6-Sheet Paper Shredder

Appliance Design EID Silver Award: Small Appliances – Robert Bosch Corp., 12" Dual-Bevel Glide Miter Saw

Appliance Design EID Silver Award: Small Appliances – HoMedics Inc., Black & Decker iShred

Appliance Design EID Bronze Award: Small Appliances – Jarden Consumer Solutions, Mr. Coffee Optimal Brew Thermal Coffeemaker

**2010**

iF Product Design Award: Mr. Coffee Optimal Brew Thermal Coffeemaker

ID Magazine Annual Design Review: Robert Bosch Full Force Pneumatic Nail Guns

Appliance Design EID Award: Federal Signal Automated Parking Products

Appliance Design EID Award: Robert Bosch Full Force Pneumatic Nail Guns

Appliance Design EID Silver Award: Federal Signal Automated Parking Products Universal One & Universal PS

Appliance Design EID Silver Award: Robert Bosch Full Force Pneumatic Nail Guns

Appliance Design EID Bronze Award: Sunbeam Products Flat Panel Heater

Appliance Design EID Award: Sunbeam Products Flat Panel Heater

**2009**

Appliance Design EID Silver Award: Robert Bosch RS35 Reciprocating Saw

Appliance Design EID Silver Award: Argus Camera Company Kid's Cameras Bean and Sprout

IHA Award: Wusthof-Trident Precision Edge Electric Knife Sharpener

IHA Award: Smith's Edge Diamond Edge Electric Knife and Scissors Sharpener

Good Design Award: Robert Bosch Pneumatic Nailers

Good Design Award: RS35 Demolition Reciprocating Saw

Good Design Award: Precise Path Robotics RG3 Robotic Greens Mower

IDEA Award:  Argus Bean Children's Digital Camera

**2008**

ADEX Award: Mansfield Reo Bathroom Suite

ADEX Award: Mansfield Essence Bathroom Suite

Good Design Award: Argus Camera Kid's Cameras Bean and Sprout

Spark Award Bronze: Precise Path RG3 Mower

**2005**

Good Design Award: LR Nelson Costco 3 Piece Nozzle Set

**2001**

iF Product Design Award: Karcher HDS 698 CSX Heated Pressure Washer

**2000**

Design of the Decade (IDSA /BusinessWeek): Karcher Full Line of Power Washers

I.D. Magazine Design Awards: Siemens Easy Control Climate Control Unit

iF Product Design Award: Siemens Easy Control Climate Control Unit


**<u>LIST OF PATENTS (Design patents, utility patents and patents pending).</u>**

| | | |
|---|---|---|
| 2021/0076929 | 2021 | Vision Measurement Device and Method of Measuring Vision Using The Same |
| 2020/0069089 | 2020 | Food Product Dispenser and Valve |
| WO 063584 | 2019 | Vision Measurement Device and Method of Measuring Vision Using the Same |
| EP3687373 | 2018 | Vision Measurement Device and Method of Measuring Vision Using the Same. |
| 10,470,597 | 2019 | Food Product Dispenser and Valve |
| 10,194,763 | 2019 | Food Product Dispenser and Valve |
| 2019/0006,862 | 2019 | Power pack vending apparatus, system and method of use for charging packs with biased locking arrangement |
| 10,084,329 | 2018 | Power pack vending apparatus, system, and method of use for charging power packs with biased locking arrangement |
| D800803 | 2017 | Table Saw |

| D794407 | 2017 | Power tool |
| 9,717,354 | 2017 | Food product dispenser and valve |
| 2017/0251846 | 2017 | Food Product Dispenser and Valve |
| D761337 | 2016 | Saw |
| DE10 209490 | 2016 | Werkzeugaufbewahrungsvorrichtung (Tool Storage Device) |
| 9,132,559 | 2015 | Cutlery having improved gripping ergonomics |
| 2014/0214,518 | 2014 | System and method for price matching and comparison |
| D689252 | 2013 | Portion of floor cleaning machine |
| D686791 | 2013 | Vacuum cleaner handle |
| D674371 | 2013 | Portable audio device |
| 2012/0159793 | 2012 | Slidable chopping attachment for kitchen knives |
| D646935 | 2011 | Cutlery block |
| D645715 | 2011 | Pull saw |
| D639616 | 2011 | Cutlery handle |
| D639615 | 2011 | Cutlery handle |
| D639614 | 2011 | Cutlery handle |
| JP005278 | 2011 | IV Pole |
| 7,703,750 | 2010 | Storage apparatus |
| WO 019238 | 2010 | Rotary food cutter with removable blade assembly |
| 2010/0037,787 | 2010 | Rotary food cutter with removable blade assembly |
| 7,708,167 | 2010 | Dispensing Apparatus |
| D607024 | 2009 | Hinge boring bit |
| D594292 | 2009 | Pizza cutter |
| D593817 | 2009 | Box grater |
| D591118 | 2009 | Bottle opener |
| D584111 | 2009 | Colander |
| D583207 | 2008 | Can opener |
| 2008/0093,489 | 2008 | Spice Grinder Assembly with Grind Adjusting Wheel |
| 7,325,785 | 2008 | Storage apparatus |
| D565164 | 2008 | Volatile Dispenser |
| D559640 | 2008 | Palm Grip Sander |
| D555435 | 2007 | Spice grinder |

| D550027 | 2007 | Pan handle |
|---------|------|------------|
| D555902 | 2007 | Case for tool accessories |
| D553857 | 2007 | Case for tool accessories |
| 2007/0023455 | 2007 | Dispensing Apparatus |
| D553233 | 2007 | Volatile Dispenser |
| 2007/0197152 | 2007 | Powered paint removal tool |
| 7,270,496 | 2007 | Ring Mechanism for a ring binder |
| D533041 | 2006 | Drilling and driving tool |
| D523634 | 2006 | Insert bit dispenser |
| D518893 | 2006 | IV Pole |
| D525096 | 2006 | Tuck pointer |
| 6,983,930 | 2006 | Clamping device with flexible arm |
| WO 027702 | 2005 | Dispensing apparatus |
| CA 2469977 | 2005 | Ring mechanism for a ring binder |
| 2005/0265775 | 2005 | Ring mechanism for a ring binder |
| 6,969,031 | 2005 | Adjustable moveable IV stand |
| 2004/0151,531 | 2004 | Sound deadening mechanism for a ring binder |
| EP 1,706,010 | 2004 | IV Pole |
| 6,754,935 | 2004 | Power tool handle |
| EP 1,509,366 | 2003 | Power Tool Handle |
| 2003/0221292 | 2003 | Power tool handle |
| D470871 | 2003 | Mobile oil dispenser |
| CA 2488612 | 2003 | Power tool handle |
| D475595 | 2003 | Circular saw with top handle |
| D475265 | 2003 | Circular saw with rear handle |
| D441342 | 2001 | Power station with corded backup |

**Appendix B**

**PRIOR TESTIMONY**

The following is a list of all cases I have served as an expert witness and testified either at trial or by deposition in the last 4 years:

| Year | Case | Type |
|------|------|------|
| 2022 | Hangzhou Chic Intelligent Technology Co. and Unicorn Global Inc. v. Hangzhou Chic Intelligent Technology Co. et al. v. The Partnership and Unincorporated Associations (20-cv-04806) | Design Patent Infringement |
| 2022 | Cambria Company LLC v. Lakeside Surfaces Inc | Design Patent Infringement |
| 2020 | Shure Inc., and Shure Acquisition Holdings, Inc., v. ClearOne, Inc | Design Patent Infringement |
| 2020 | Skull Shaver, LLC v. Ideavillage Products Corporation | Design Patent Infringement |
| 2020 | Cixi City Liyuan Auto Parts Co. Ltd., Tyger Auto, Inc., And Hong Kong Car Start Industrial Co. Ltd v. Laurmark Enterprises, Inc | (ITC) Utility Patent Infringement |
| 2019 | Simpson Strong-Tie Company v. Oz-Post International | Design Patent Infringement, Utility Patent Infringement |
| 2019 | Black & Decker Corporation v. Harbor Freight Tools | JAMS Arbitration, Design Patent Infringement, Utility Patent Infringement, Trade Dress Infringement |
| 2019 | Focus Products Grp, Int'l & Zahner Design & Hookless Systems & Sure Fit Home v. Kartri Sales, Co. & Marqui Mills Int'l | Trade Dress and Trademark Infringement, Design Patent Infringement, Utility Patent Infringement |

**Appendix C**

**Materials Considered**

The following is a list of materials I considered in preparing this Report:

| |
|---|
| U.S. Patent D737,723 and its filing history |
| U.S. Patent D738,256 and its filing history |
| Prior Art cited on the face of each of the above patents. |
| U.S. Patent No. D739,906 (filed March 12, 2013; issued September 29, 2015) |
| The Accused Products "Gyroor A", "Gyroor C", and "Gyroor E" |

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2022, a true and correct copy of the foregoing

document was filed with the Clerk of the Court using CM/ECF which will generate and serve a

Notice of Electronic Filing to all parties to this action.

Dated: November 9, 2022

PALMERSHEIM & MATHEW LLP

Robert J. Palmersheim
Anand C. Mathew
Timothy G. Parilla
401 N. Franklin Street, Suite 4S
Chicago, IL 60654
Tel.: (312) 319-1791
E-mail: acm@thepmlawfirm.com
E-mail: rjp@thepmlawfirm.com
E-mail: tgp@thepmlawfirm.com

TARTER KRINSKY & DROGIN LLP

By: */s/ Richard J.L. Lomuscio*
Richard J.L. Lomuscio
Mark Berkowitz
1350 Broadway
New York, NY 10018
Tel.: (212) 216-8000
Fax: (212) 216-8001
E-mail: rlomuscio@tarterkrinsky.com
E-mail: mberkowitz@tarterkrinsky.com

*Attorneys for Plaintiffs*