## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ABC Corporation I et al,<br><br>    *Plaintiff*,<br><br>  v.<br><br>THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",<br><br>    *Defendants*. | **CASE NO.** 1:20-cv-04806<br><br>**Judge:** Honorable Thomas M. Durkin |

## THIRD PARTY RESPONDENTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPRORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

i

## <u>TABLE OF CONTENTS</u>

INTRODUCTION.................................................................................................1

BACKGROUND .................................................................................................3

    A.  FACTUAL BACKGROUND ........................................................3

    B.  PROCEDURAL HISTORY ........................................................10

LEGAL STANDARD .......................................................................................11

ARGUMENT.....................................................................................................12

    A.  **Plaintiff's Frivolous Motion for Preliminary Injunction Against Nonparties Should Be Denied**..............................................................................12

    B.  **Plaintiffs' Third Bite of Apple is Simply One for Reconsideration and Should Be Denied.**.....................................................................................15

    C.  **Plaintiffs' Newly Submitted Expert Declaration Should Be Excluded**...................18

    D.  **Even If the Third Party Respondents Are Still Defendants in This Case, Plaintiffs Are Not Likely to Prevail on the Merits of Patent Infringement Claim**.................27

    E.  **Plaintiffs Have Not Shown That It Will Suffer Irreparable Harm**........................59

    F.  **Plaintiffs Have not Shown Equitable Relief Sought Is Appropriate**.....................65

    G.  **Public Interest Does Not Favor an Entry of An Injunction**....................................65

CONCLUSION ..................................................................................................67

CERTIFICATE OF SERVICE .........................................................................69

## Table of Authority

**Cases**

*Abbott Labs. v. Andrx Pharms., Inc,*
    452 F.3d 1331 (Fed. Cir. 2006)…………...…………….….……….…...…………...…….…...65

*Altana Pharma AG v. Teva Pharm. USA, Inc.,*
    566 F.3d 999 (Fed. Cir. 2009)…………...………..……….….……...……………………12, 28, 62

*Amazon.com Inc v. Barnesandnoble.com, Inc.,*
    239 F.3d 1343 (fed. Cir. 2001) …………...……………….….……….......................12,28,59,63

*Apple, Inc. v. Samsung Elecs. Co,*
    678 F.3d 1314 (Fed. Cir. 2012)…………...……………….….……...………………….....59

*Atari Games Corp. v. Nintendo of America Inc,*
    897 F.2d 1572 (Fed. Cir. 1990)…………...……………….….……...……………….….…...61

*Automated Merchandising Sys v. Crane Co.,*
    357 F. App'x 297 (Fed. Cir. 2009)...……….……...…………….…...……...…………...…..61,62,63

*Bank of Waunakee v. Rochester Cheese Sales, Inc.,*
    906 F.2d 1185 (7th Cir. 1990)…………...…………….….………......………………….....16

*Callpod, Inc. v. GN Netcom, Inc,*
    703 F. Supp. 2d 815 (N.D. Ill. 2010)…………...…………..…….…….…...……………...21

*Cf. Centagon, Inc. v. Bd. of Dirs. of 1212 Lake Shore Drive Consominium Ass'n,*
    No. 00 C 1110, 2002 WL 356483 (N.D. Ill. Mar. 5, 2002)…………...…………….….…...23

*Council 31 v. Ward,*
    No. 87 C 356, 1995 WL 549022 (N.D. Ill. Sept. 12, 1995)…………...……………….…...22

*Council 31, Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Doherty,*
    169 F.3d 1068 (7th Cir. 1999)…………...……………….….……...……………….......22

*Contessa Food Prods., Inc. v. Conagra, Inc,*
    282 F.3d 1370 (Fed. Cir. 2002)…………...……………….….……...……………….…...29

*Consumers Gas & Oil, Inc. v. Farmland Indus., Inc,*
    84 F.3d 367 (10th Cir.1996)…………...……………….….……...………………….....14

*Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l Inc,*
    246 F.3d 1336 (Fed. Cir. 2001)…………...……………….….……...……………………..61

*David v. Caterpillar, Inc,*
    324 F.3d 851 (7th Cir. 2003)…………...……………….….……...……….…...…………...23

*Daubert v. Merrell Dow Pharms., Inc,*
    509 U.S. 579 (1993)…………...……………….………...……………….…..………...18

*Dobson v. Dornan,*
    118 U.S. 10 (1886)…………...……………….………...……………….………....30

*Domingo ex rel. Domingo v. T.K,*
    289 F.3d 600 (9th Cir. 2002)…………...……………….………...…………….…....19

*Douglas Dynamics, LLC v. Buyers Products. Co,*
    717 F.3d 1336 (Fed. Cir. 2013)…………...……………….………...………….…....64

*Egyptian Goddess, Inc. v. Swisa, Inc,*
    543 F.3d 678 (Fed. Cir. 2008)…………...……………….………...……..……...25,27,29,30,31

*Entegris, Inc. v. Pall Corp.,*
    490 F.3d 1340 (Fed. Cir. 2007)…………...……………….………...….…………...28

*eBay Inc. v. MercExchange, L.L.C,*
    547 U.S. 388 (2006)…………...……………….…….…...……………….……...59,62

*Eli Lilly & Co. v. Am. Cyanamid Co.,*
    896 F. Supp. 851 (S.D. Ind. 1995)…………...……………….………...…………...62

*Finwall v. City of Chicago,*
    239 F.R.D. 494 (N.D.Ill.2006)…………...……………….………...…………...21

*FTC v. Bay Area Business Council, Inc,*
    423 F.3d 627 (7th Cir.2005)…………...……………….………...……………......21

*Genentech Inc. v. Novo Nordisk, A/S,*
    108 F.3d 1361 (Fed. Cir. 1997)…………...……………….………...……………...28

*Generac Power Systems v. Kohler Co.*
    807 F. Supp 2d 791 (E.D. Wis. 2011)…………...……………….………...……..64

*Packaging Corp. of Am., Inc. v. Croner,*
    419 F. Supp. 3d 1059 (N.D. Ill. 2020)………...…………….……….......……………...11

*Hammel v. Eau Galle Cheese Factory,*
    407 F.3d 852 (7th Cir.2005)…………...……………….………...…….………...…....17

*H.H. Roberston Co. v. United Steel Deck, Inc,*
    820 F.2d 384 (Fed. Cir. 1987)…………...……………….………...……………....12

*Hispanics United of DuPage County v. Village of Addison,*
    248 F.3d 617 (7th Cir.2001)…………...……………….………...………………......14

*Hoffman v. Impact Confections, Inc,*
No. 08CV1597, 2010 WL 99072 (S.D. Cal. Jan. 6, 2010)…………...…………….….…..…29

*Hoskins v. Swisher,*
No. 3:20-CV-00302-SMY, 2020 WL 4933655(S.D. Ill. Aug. 24, 2020)……….…….…....13

*In re Oil Spill by "Amoco Cadiz" Off Coast of France,*
794 F. Supp. 261 (N.D.Ill. 1992)…………....………….….…..…….…..……..……...…..16

*In re Sulfuric Acid Antitrust Litigation,*
231 F.R.D. 320 (N.D.Ill.2005)…………...………….….………...……...……………....21

*Illinois Tool Works, Inc. v. Grip-Pak, Inc,*
906 F.2d 679 (Fed. Cir. 1990)…………..………….….……….…....………………60,61,65

*In re Mann,*
861 F.2d 1581 (Fed. Cir. 1988)…………...………….….…..…….…....…………………....28

*Karum Holdings LLC v. Lowe's Cos., Inc,*
No. 15 C 380, 2017 WL 55933183 (N.D. Ill. Nov. 21, 2017)…………...…………….....22, 23

*Keach v. U.S. Trust Co,*
419 F.3d 626 (7th Cir.2005)…………...………….….…..…….…....………..……....…...20

*Keene Corp. v. Int'l Fid. Ins. Co,*
561 F.Supp. 656 (N.D. Ill. 1982)…………...………….….…..…….…...…………….....15

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999)…………..………….….…..…….…...……….…..….............18,19

*Lanard Toys Ltd. v. Dolgencorp LLC,*
958 F.3d 1337 (Fed. Cir. 2020)…………...…………….….….…...…………..25,27,29,30,31

*Lear, Inc. v. Adkins,*
395 U.S. 653 (1969)…………...………….….…..…….…...………………….………..66

*Lee v. Clinton,*
209 F.3d 1025, 1026 (7th Cir.2000)…………...………….….…..…….…...…………..…12

*Litton Sys. Inc. v. Sundstrand Corp,*
750 F.2d 952 (Fed. Cir. 1984)…………...………….….…..…….…...………………..….65

*Maxwell v. KPMG LLP,*
520 F.3d 713 (7th Cir.2008)…………...………….….…..…….…...……………….…..12

*Marseilles Hydro Power, LLC v. Marseilles Land and Water Co,*
299 F.3d 643 (7th Cir.2002)…………...………….….…..…….…...…………………..14

*McDavid Knee Guard, Inc v. Nike USA, Inc,*
    683 F. Supp. 2d 740 (N.D. Ill. 2010)…………...……………..….……….....……………...61

*MRC Innovations, Inc. v. Hunter Mfg,*
    747 F.3d 1326 (Fed. Cir. 2014)…………...……………..….……………………….....28

*Minka Lighting, Inc. v. Craftmade Int'l, Inc,*
    93 F. App'x 214 (Fed. Cir. 2004)…………...……………..….…….…...……….……...28

*Musser v. Gentiva Health Servs,*
    356 F.3d 751 (7th Cir. 2004)…………...……………..….……….……………...…..24

*Mukhtar v. Cal. State Univ,*
    299 F.3d 1053 (9th Cir. 2002)…………...……………..….……………….....19

*Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd,*
    357 F.3d 1319 (Fed. Cir. 2004) …………….…….…...……………..……….......11

*Neal v. Honeywell, Inc.,*
    1996 U.S. Dist. LEXIS 15954, 1996 WL 627616 (N.D. Ill. Oct. 25, 1996)…………...…...16

*Nutrition 21 v. U.S,*
    930 F.2d 867,(Fed. Cir. 1991)…………...……………..….………....……………...60,62

*NutraSweet Co. v. X-L Engineering Co,*
    227 F.3d 776 (7th Cir.2000)…………...……………..….……..….……………...20

*OddzOn Prods., Inc. v. Just Toys, Inc,*
    122 F.3d 1396 (Fed. Cir. 1997)…………...……………..….……………….29,30

*Ortiz v. Kilquist,*
    No. 03-cv-11-DRH, 2006 WL 2583713 (S.D. Ill. Sept. 7, 2006)…………...…….………...13

*Patriot Homes, Inc. v. Forest River Hous.*, Inc,
    512 F.3d 412 (7th Cir. 2008)…………...……………..….……...…….……………...15

*PMC, Inc. v. Sherwin–Williams Co,*
    151 F.3d 610 (7th Cir.1998)…………...……………..….…….…...……….……...14

*Presidio Components, Inc. v. Am. Technical Ceramics Corp,*
    702 F.3d 1351 (Fed. Cir. 2012)…………...……………..….……………….....64

*Publishers Res., Inc. v. Walker-Davis Publ'ns, Inc,*
    762 F.2d 557 (7th Cir. 1985)…………...……………..….…...……………...15

*Quaker Alloy Casting Co. v. Gulfco Industries, Inc,*
    123 F.R.D. 282 (N.D. Ill. 1988)…………...……………..….…………...……….16

*Robert Bosch, LLC v. Pylon Manufacturing Corp.*
    No. 02 C 0681, 2003 WL 22317373 (N.D. Ill. Oct. 8, 2013)……..……….…..………...63

*Rowell v. Voortman Cookies, Ltd.,*
    659 F.3d 1142, 1148-4……………...…….….………..……………….….………...13

*Richardson v. Stanley Works, Inc,*
    597 F.3d 1288 (Fed. Cir. 2010)…………...…………….…….….…..….…………...28,29

*Salgado by Salgado v. General Motors Corp,*
    150 F.3d 735 (7th Cir.1998)…………...……………….………….……..…………20, 27

*Scaggs v. Consolidated Rail Corp,*
    6 F.3d 1290 (7th Cir. 1993)…………....……………………………………….……...21

*S.E.C. v. Nutmeg Grp., LLC,*
    No. 09 C 1775, 2017 WL 4925503 (N.D. Ill. Oct. 31, 2017)…………...…….…..….…22

*SFG, Inc. v. Musk,*
    No. 19-CV-02198, 2021 WL 972887 (N.D. Ill. Feb. 10, 2021)…………...…….………...15

*Smith v. Whitman Saddle Co,*
    148 U.S. 674, (1893)…………...……………….……..….…………….………....30

*SmithKline Beecham Corp. v. Apotex Corp,*
    403 F.3d 1331 (Fed. Cir.2005)……………....……………………...………….……...65

*Steen v. Myers,*
    486 F.3d 1017 (7th Cir.2007)…………...….…………………………...….…………...17

*Summit 6, LLC v. Samsung Elecs. Co., Ltd,*
    802 F.3d 1283 (Fed. Cir. 2015)…………...…….……………………...….…………...18

*Support Systems Intern., Inc. v. Mack,*
    45 F.3d 185 (7th Cir. 1995)…………....…………….……..…………….………...12

*Super-Sparkly Safety Stuff, LLC v. Skyline USA, Inc,*
    836 F. App'x 895 (Fed. Cir. 2020)…………...……………….…………..….………...25

*Titan Tire Corp. v. Case New Holland, Inc,*
    904 F.3d 7 (7th Cir. 1990)…………...……………….……………….......…….13,28

*Thornton v. McGhee,*
    No. 3:19-CV-01371-SMY, 2021 WL 824948 (S.D. Ill. Mar. 4, 2021)………...……......…13

*United States v. Williams,*
    566 F.2d 1372 (Fed. Cir. 2009)………...….…………….……………………….…...13

*Valencia v. City of Springfield, Illinois,*
    883 F.3d 959 (7th Cir. 2018)…...……………...……………………...…….……...11

*Villa v. City of Chicago,*
    924 F.2d 629 (7th Cir.1991)…...…………………...……………………...….……....13

*Winter v. Natural Res. Def. Council, Inc,*
    555 U.S. 7, 22 (2008) ……………………………….……………...……..……11,12

*Winters v. Fru-Con Inc,*
    498 F.3d 734 (7th Cir. 2007)………...……………….……...…….……..……….....17

*Wallace v. Ideavillage Prods. Corp,*
    640 Fed. Appx. 970 (Fed. Cir, 2016)…………...……………...…..……………..……30

**Statutes**

    35 U.S.C. §102(a)(2) …………...……………...………………………...……….…...4

**Rules**

    Fed. R. Evid. 702 …………...…………...…………...……………………….....18,24

    Fed. R. Civ. P. 37(c)(1) …………...……………………...…………………….....19,22

    Fed. R. Civ. P. 15(a) …………...……………...……………………………….....13

    Fed. R. Civ. P. 26(a) …………...……………….……...……………………...19,20,27

    Local Rules of the Northern District of Illinois Rule 16.1……………………….……....21

    Fed. R. Civ. P. 26(e) ……………………………….....................................................20,21,22

    Fed. R. Civ. P. 65(d) …………...………………….…...……………………….....13

    M.P.E.P. § 1503.02, subsection III (8th ed. 2010) .................................................................29

Third Party Respondents Gyroor, Urbanmax, Fengchi-US, HGSM, Gaodeshang-US, and Gyroshoes (collectively "Third Party Respondents"), respectfully submits their response in opposition to Plaintiffs' motion for temporary restraining order and preliminary injunction. [Dkt. 592-593].

## INTRODUCTION

This litigation has been going on for over two years, and Third Party Respondents had been restrained by the wrongfully issued preliminary injunction orders since almost the beginning of the litigation. This is the third attempt of the temporary preliminary injunction and temporary restraining order for the sole purpose of eliminating Third Party Respondents from competition as well as wasting the Court's precious judicial resources. The Court should deny Plaintiffs' motion for temporary restraining order and preliminary injunction for filing a frivolous motion against nonparties of this case. On May 6, 2021, Plaintiffs filed a motion to amend their Schedule A to include Third Party Respondents [Dkt. 227], which the Court granted on May 24, 2021. [Dkt. 253]. However, Federal Circuit vacated the May 24 Order on October 28, 2022. [Dkt. 590]. Therefore, Third Party Respondents are no longer Defendants in this case since October 28, 2022.

Even if Third Party Respondents are still Defendants in this case, the Court should deny Plaintiffs' motion since Plaintiffs have no likelihood of success on the merits or satisfied other factors for preliminary injunction. As illustrated below, the two design patents asserted in this Motion have extremely narrow scope, and, when properly construed, have virtually no ornamental aspects that are the proper subject of design patent protection. Plaintiffs also cannot prove that they will suffer irreparable injury absent an injunction as a result of the alleged infringement. Plaintiffs make dire predictions about the harm they will suffer if Third Party Respondents are not enjoined,

yet Plaintiffs' alleged harms contravene black letter law governing irreparable harm. In addition, both the balance of equities and public interest factors favor Third Party Respondents.

In addition, Plaintiffs purposefully include non-accused products in this motion for preliminary injunction, such as "Accused Product Gyroor C" (i.e., Gyroor T580 series and variants), and "Accused Product Gyroor E" (i.e., Gyroor G11 series and variants). [Dkt. 593]. The "Accused Product Gyroor C" was first included in Plaintiffs' motion to amend Schedule A. [Dkt. 227]. However, the motion was vacated by the Federal Circuit on October 28, 2022. [Dkt. 587]. Further, the "Accused Product Gyroor E" was first included in the chart "Exhibit B" of the proposed order [Dkt. 456, p. 15], which is even not mentioned in Plaintiffs' motion papers. On June 24, 2022, Third Party Respondent Gyroor filed a motion for clarification as to whether the "G-11 model" hoverboard (B08RYMXRWM) was referenced in the preliminary injunction order due to an error. [Dkt. 560]. As the Court denied motion for clarification as moot on November 15, 2022, in light of the Federal Circuit decision vacating the preliminary injunction order previously entered by the Court, the "Accused Product Gyroor E" should not be considered as accused product in this case. [Dkt. 603]. Moreover, Third Party Respondent Gaodeshang-US has not even sold any of the Plaintiffs' alleged accused products in their motion. [Dkt. 473, pp3-4]. Therefore, in light of the Federal Circuit's decision vacating the preliminary injunction and the motion to amend Schedule A, "Accused Product Gyroor C" and "Accused Product Gyroor E" are not accused products in this current litigation. In spite of that, Third Party Respondents' hoverboard products do not infringe Plaintiffs' asserted U.S. Design Patent D'737, 732 and D'738,256.

Given Federal Circuit's strong disfavor of granting preliminary injunctive relief and because Plaintiffs failed to establish any of the factors required for the granting of a preliminary injunction and temporary restraining order, Plaintiffs' motion should be denied. The motion is

simply frivolous and indicative of Plaintiffs' vile tactics of eliminating any competitors form the market.

## BACKGROUND

### A.    FACTUAL BACKGROUND

1. <u>Patents-in-Suit</u>

Plaintiffs and the Third Party Respondents are in the business of selling hoverboards. Plaintiffs allege that the Third Party Respondents' Accused Group A Product, Group C Product, Group E Product infringed on their U.S. Design Patent Nos. D737,723 ("the 'D723 patent"), D738,256 ("the 'D256 patent") (collectively, "Patents-in-Suit").

The following table illustrates the figures in the Patents-in-Suit. [Dkt. 101-13].



| D'723 Patent | D'256 Patent |



FIG.5

FIG.6

FIG.5

FIG.6

2. Prior Art

Under 35 U.S.C. §102(a)(2), prior art includes "a patent issued under section 151, or in an application for patent published or deemed published under section 122(b), in which the patent or application, as the case may be, names another inventor and was effectively filed before the effective filing date of the claimed invention."

The U.S. Design Patent D739,906 ("D'906 Patent") was filed on March 12, 2013, earlier than any Patents-in-Suit. Therefore, D'906 Patent is prior art to all Patents-in-Suit. [Dkt. 414-1].

| D'906 Patent - Top View | |
|---|---|
| |  |



| D'906 Patent - Bottom View | |
| D'906 Patent - Front View | |
| D'906 Patent - Side View | |
| D'906 Patent - Perspective View | |

3. Defendant Gyroor-US's Patent - U.S. Design Patent D808,857

The Third Party Respondents' products are based on the unique design of Defendant Gyroor-US's U.S. Design Patent D808,857 (the "D'857 Patent"). [Dkt. 309-1]. The D'857 Patent was examined against all four Patents-in-suit. *Id*.



| D'857 Patent - Top View | |

| D'857 Patent - Bottom View |  |
| D'857 Patent - Front View |  |
| D'857 Patent - Side View |  |
| D'857 Patent - Perspective View |  |

4.   Who are the Defendants?

On November 19, 2020, Plaintiffs amended their Complaint for the third time. [Dkt. 101].

However, Plaintiffs did not include any of the Third Party Respondents in their list of defendants.

On May 6, 2021, Plaintiffs filed a motion to amend their Schedule A to include the Third Party

Respondents as defendants [Dkt. 227], which is granted by the Court on May 24, 2021. [Dkt. 253].

After the Third Party Respondents filed an appeal on this Order, the Federal Circuit vacated the

Court granted Plaintiffs' motion to amend the Schedule A on October 28, 2022. [Dkt. 590].

Therefore, the Third Party Respondents are not defendants in this case since October 28, 2022.

Moreover, the Third Party Respondent Gaodeshang-US has never sold any of accused products

listed in Plaintiffs' new preliminary injunction motion, it should not be the Defendant in this case. [Dkt. 473].

5.   <u>What are the Accused Products?</u>

Plaintiffs alleged that the Third Party Respondents' hoverboard products infringed on the Patents-in-suit, and the accused products were grouped and identified as "Gyroor A", "Gyroor C", and "Gyroor E". [Dkt.593]. Plaintiffs amended their complaint on November 19, 2020 and listed the specific accused products, which are Accused Group A Product, T581, (ASIN: B07PHFP8GB) in their Schedule A. [Dkt. 101-14]. On May 6, 2021, Plaintiffs filed a motion to amend their Schedule A to add the Third Party Respondents as defendants [Dkt. 227], which was later vacated by the Federal Circuit on October 28, 2022. [Dkt. 587].

On August 24, 2021, Plaintiffs filed their second motion for preliminary injunction to add Group C Product, T580, to this case [Dkt. 385], which was granted by the Court on October 13, 2021. [Dkt. 456]. In addition, Plaintiffs added the Group E Product, G11, to the "Exhibit B" of the proposed order associated with the second preliminary injunction. *Id*. However, in light of the order granting Plaintiff's second preliminary injunction was reversed by the Federal Circuit on October 28, 2022, the Group C and Group E Products are no more accused products in this case.

Therefore, even if the Third Party Respondents are still defendants in this case, the Accused Group A Product, T581, is the only accused products left in this litigation.

***a.  Accused Group A Product***

Initially, only one product "Gyroor-A" (B07PHFP8GB "Accused Group A Product") was identified in the accompany Schedule A to the Third Amended Complaint. [Dkt. 101-14].



| Group A Product - Top View | |
| Group A Product - Bottom View | |
| Group A Product - Front View | |
| Group A Product - Side View / Side View with lights on | |
| Group A Product - Perspective View | |

**b.** *Non-accused Group C Product*

The alleged "Accused Product Gyroor C" (hereafter, "Group C Product") was identified when Plaintiffs applied for the Second Preliminary Injunction. [Dkt. 385].



| Group C Product - Top View | |

| | |
|---|---|
| Group C Product - Bottom View | |
| Group C Product - Front View | |
| Group C Product - Side View / Side View with lights on | |
| Group C Product - Perspective View | |



### c. Non-accused Group E Product

The alleged "Accused Product Gyroor E" (hereafter, "Group E Product") was first identified in the "Exhibit B" of the proposed order of the second Preliminary Injunction Order [Dkt. 456, p. 15].

| | |
|---|---|
| Group E Product - Top View | |





| | |
|---|---|
| Group E Product - Bottom View | |
| Group E Product - Front View | |
| Group E Product - Side View / Side View with lights on | |
| Group E Product - Perspective View | |

## B. PROCEDURAL HISTORY

Plaintiffs first filed for a motion for temporary restraining order against Defendants on September 10, 2020 and filed the motion for preliminary injunction against Defendants on November 20, 2020. [Dkt. 40, 105] The Court granted both the temporary restraining order and preliminary injunction in September and November 2020. [Dkt. 41, 113]. On December 23, 2020, the Court modified the preliminary injunction entered on November 2020 to include more e-commerce sellers to be subject to the preliminary injunction. On May 6, 2021, Plaintiffs filed a

motion to amend their Schedule A to include the Third Party Respondents. [Dkt. 227]. On August 24, 2021, Plaintiffs filed for a second preliminary injunction against the Third Party Respondents [Dkt. 384]. The Court granted Plaintiffs' second preliminary injunction on October 13, 2021. [Dkt. 456]. Third Party Respondents filed their appeal of the Court's Order granting the preliminary injunctions on October 8, 2021. [Dkt. 450]. On October 28, 2022, Federal Circuit issued an opinion and vacated the Order granting Plaintiffs' motion to amend Schedule A and the two preliminary injunction orders issued by this Court and remanded to this Court for further proceedings. [Dkt. 590]. In the issued opinion, Federal Circuit has already addressed that Plaintiffs did not have likelihood of success on the merits of their claims, yet they continue to bring baseless motions. [Dkt. 587]. Plaintiffs cannot get a third bite of the apple without causing severe prejudice to the Third Party Respondents.

## **LEGAL STANDARD**

The Seventh Circuit has been clear about the correct standard to apply in deciding a motion for preliminary injunction: "[A] preliminary injunction is an exercise of a very far-reaching power, *never* to be indulged in except in a case *clearly* demanding it. It is *never* awarded as a matter of right." *See Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059 (N.D. Ill. 2020)(quoting *Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 956-66 (7th Cir. 2018)). A preliminary injunction is a "drastic and extraordinary remedy that is not to be routinely granted." *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.,* 357 F.3d 1319, 124 (Fed. Cir. 2004); *see also Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008).

To obtain a preliminary injunction, the movant must establish: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public

11

interest. *Titan Tire Corp. v. Case New Holland, Inc.,* 566 F.3d 1372, 1375-1376 (Fed. Cir. 2009) (citing *Winter*, 555 U.S. at 20). A movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.,* likelihood of success on the merits and irreparable harm. *Amazon.com Inc v. Barnesandnoble.com, Inc*., 239 F.3d 1343 1350 (fed. Cir. 2001); *Al tanta Pharma AG v. Teva Pharm. USA, Inc.,* 566 F.3d999, 1005 (fed. Cir. 2009). Furthermore, the burden is always on the movant to show its entitlement to a preliminary injunction. *H.H. Roberston Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 388 (Fed. Cir. 1987). As set forth below, Plaintiffs fail to satisfy any of these factors and their motion for temporary restraining order and preliminary injunction should be denied.

## **ARGUMENT**

### **A. Plaintiff's Frivolous Motion for Preliminary Injunction Against Nonparties Should Be Denied**

Meritless motion practice has a significant cumulative effect of clogging the process of the court and in burdening judges and staff to the detriment of other litigants. *Support Systems Intern., Inc. v. Mack*, 45 F.3d 185 (7th Cir. 1995). A claim is frivolous if the probability of success is very low, *Maxwell v. KPMG LLP*, 520 F.3d 713, 719 (7th Cir.2008), or one "that no reasonable person could suppose to have any merit," *Lee v. Clinton*, 209 F.3d 1025, 1026 (7th Cir.2000). Plaintiffs' motion for preliminary injunction is frivolous, because Plaintiffs are seeking injunction relief against nonparties and the non-accused products.

1. The Third Party Respondents are nonparties of this case.

"[A] preliminary injunction is appropriate only if it seeks relief of the same character sought in the underlying suit, and deals with a matter presented in that underlying suit." *Hoskins v. Swisher*, No. 3:20-CV-00302-SMY, 2020 WL 4933655, at *3 (S.D. Ill. Aug. 24, 2020). "A plaintiff cannot seek injunctive relief on a claim that is not properly before the Court." *Rowell v.*

*Voortman Cookies, Ltd*., No. 02 C 0681, 2003 WL 22317373, at *4 (N.D. Ill. Oct. 8, 2013); see also. *Ortiz v. Kilquist*, No. 03-cv-11-DRH, 2006 WL 2583713, at *1 (S.D. Ill. Sept. 7, 2006) ("If Plaintiff believes he has suffered injury by this nonparty, he must file a separate suit against this nonparty, as he cannot merely bootstrap this request for injunctive relief to the instant case.")

On October 28, 2022, Federal Circuit vacated the Court's Order granting Plaintiffs' motion to amend Schedule A [Dkt. 253], which means the Order granting Plaintiffs' motion to amend Schedule A is of no further force or effect. *United States v. Williams*, 904 F.2d 7, 8 (7th Cir. 1990). Therefore, the Third Party Respondents are nonparties of this current case. Although, it is already undue delay for Plaintiff to amend their complaint to add new defendants at this stage, and it will be a futility of amendment and undue prejudice to opposing parties, Plaintiffs even did not move for leave to file a motion to amend their complaint to add these Third Party Respondents, but directly included these Third Party Respondents in their motion for preliminary injunction without any arguments. Fed.R.Civ.P. 15(a); *Villa v. City of Chicago*, 924 F.2d 629, 632 (7th Cir.1991). It is clear that the Third Party Respondents are nonparties in this case and Plaintiffs cannot seek injunction relief against the nonparties. *Hoskins,* at 3. It is well established that seeking injunction relief against non-parties for matters outside the scope of the Complaint would be considered a frivolous pleading and may subject him to sanction. *Thornton v. McGhee*, No. 3:19-CV-01371-SMY, 2021 WL 824948, at *2 (S.D. Ill. Mar. 4, 2021).

Therefore, Plaintiffs' motion for preliminary injunction should be denied directly.

2. <u>Plaintiffs' motion for preliminary injunction lacks specificity as required by Rule65(d).</u>

Rule 65(d) of the Federal Rules of Civil Procedure requires that the injunction set "forth the reasons for its issuance; ... be specific in terms; ... [and] describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." *See also Marseilles Hydro Power, LLC v. Marseilles Land and Water Co*., 299 F.3d 643, 646 (7th Cir.2002)

13

(stating that any injunction issued by a federal district court must be detailed and specific to ensure proper enforcement through contempt proceedings or otherwise); *PMC, Inc. v. Sherwin–Williams Co.*, 151 F.3d 610, 619 (7th Cir.1998) (finding that an injunction must "be precise and self-contained, so that a person subject to it who reads it and nothing else has a sufficiently clear and exact knowledge of the duties it imposes on him that if he violates it he can be adjudged guilty of criminal contempt"). This requirement of specificity spares courts and litigants from struggling over an injunction's scope and meaning by informing those who are enjoined of "the specific conduct regulated by the injunction and subject to contempt." *Marseilles Hydro Power*, 299 F.3d at 647 (citing *Consumers Gas & Oil, Inc. v. Farmland Indus., Inc*., 84 F.3d 367, 371 (10th Cir.1996)); *Hispanics United of DuPage County v. Village of Addison*, 248 F.3d 617, 620 (7th Cir.2001).

After the Federal Circuit clearly pointed out that the previous preliminary injunctions do not meet the specificity requirement of Rule 65(d), Plaintiffs still failed to meet the requirement in this pending motion for preliminary injunction. [Dkt. 588]. Plaintiffs simply include all the Third Party Respondents collectively in their motion and request the Court to issue a new temporary restrain order and a new preliminary injunction enjoining these Third Party Respondents from the sale of the accused products and restraining the transfer of assets associated with such sales. [Dkt. 593, p. 8]. Plaintiffs failed to specifically point out that the alleged infringing activities of each Third Party Respondent. As clearly showed on the record, Gaodeshang-US has not even sold any of the Plaintiffs' alleged accused products in their motion. [Dkt. 473, p. 3-4]. Specifically, the Third Party Respondent Gaodeshang-US has never sold the alleged "Gyroor A", "Gyroor C" and "Gyroor E" products. Also, The Third Party Respondent Fenchi-US has never sold any of the "Gyroor C" and "Gyroor E" products, and the Third Party Respondents Urbanmax, HGSM, and

14

Gyroshoes has never sold any of the "Gyroor E" product. *Id*. However, Plaintiffs still blindly filed the motion for preliminary injunction against the Third Party Respondents for all of the "accused products" seeking injunction relief against them. [Dkt. 593, p. 3].

Therefore, Plaintiffs' frivolous motion for preliminary injunction that failed to meet the specificity requirement of Rule 65(d) should be denied. *Patriot Homes, Inc. v. Forest River Hous.*, Inc., 512 F.3d 412, 414–15 (7th Cir. 2008).

### B. Plaintiffs' Third Bite of Apple is Simply One for Reconsideration and Should Be Denied.

"While district courts are not strictly barred from reconsidering their interlocutory orders, there is a presumption against revisiting previously decided issues: '[u]nder the law of the case doctrine, a court generally should not reopen issues decided in earlier stages of the same litigation.'" *SFG, Inc. v. Musk*, No. 19-CV-02198, 2021 WL 972887, at *1 (N.D. Ill. Feb. 10, 2021). The Seventh Circuit has described motions for reconsideration as particularly disfavored when they raise facts or evidence that could have been previously presented. *See Publishers Res., Inc. v. Walker-Davis Publ'ns, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985) (in the context of summary judgment motions, "motions [to reconsider] cannot in any case be employed as a vehicle to introduce new evidence that could have been [contemporaneously] adduced." (quoting *Keene Corp. v. Int'l Fid. Ins. Co.*, 561 F.Supp. 656, 665–66 (N.D. Ill. 1982))).

The Court then went on to outline the rare circumstances in which a motion to reconsider an interlocutory order might be justified, namely, where:

(1) the court has patently misunderstood a party;

(2) the court has made a decision outside the adversarial issues presented to the court by the parties;

(3) the court has made an error not of reasoning but of apprehension;

(4) there has been a controlling or significant change in the law since the submission of the issue to the court; or

(5) there has been a controlling or significant change in the facts since the submission of the issue to the court.

*Bank of Waunakee v. Rochester Cheese Sales, Inc*., 906 F.2d 1185, 1191 (7th Cir. 1990); *See also Neal v. Honeywell, Inc*., 1996 U.S. Dist. LEXIS 15954, 1996 WL 627616, at *2 (N.D. Ill. Oct. 25, 1996)). Motions to reconsider are not at the disposal of parties who want to "rehash" the same arguments that were originally presented to the court. *In re Oil Spill by "Amoco Cadiz" Off Coast of France* on March 16, 1978, 794 F. Supp. 261, 267 (N.D.Ill. 1992). Indeed, the court's orders are not "mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *Quaker Alloy Casting Co. v. Gulfco Industries, Inc*., 123 F.R.D. 282, 288 (N.D. Ill. 1988).

Here, Plaintiffs first filed for a motion for preliminary injunction on November 20, 2020 [Dkt. 105], and was granted by the Court on November 24, 2020 [Dkt. 113]. Plaintiffs filed their second preliminary injunction on August 24, 2021[Dkt. 384], and the Court granted the second motion on October 6, 2021. [Dkt. 447]. Soon after, the Third Party Respondents filed their appeal on October 8, 2021. [Dkt. 450]. On October 28, 2022, Federal Circuit issued an opinion and vacated the preliminary injunction issued by this Court and remanded to this Court for further proceedings. [Dkt. 587]. On November 9, 2022, Plaintiffs filed their third motion for preliminary injunction [Dkt. 593]. This is Plaintiffs' third bite at the apple. In the issued opinion, the Federal Circuit clearly ***criticized and reversed*** that Plaintiffs failed to show the likelihood of success on the merits and the deficiencies of expert report. [Dkt. 587]. Plaintiffs still relitigated that an ordinary observer would find the overall impression of the Accused Products to be substantially similar to the Patents-in-Suit under the wrong "principal purchaser" standard [Dkt. 593, p. 5].

16

Plaintiffs did not provide any new evidence to support its previously failed arguments, but merely incorporated with an untimely new expert report. The only difference between the Plaintiffs' new motion for preliminary injunction and the previously preliminary injunction motions is that Plaintiffs voluntarily remove two Asserted Patents (U.S. Patent Nos. D784,195 and D 785,112) and two alleged accused products (Accused Product Gyroor B and Accused Product Gyroor D) from their third preliminary injunction motion. Therefore, the reason why Plaintiffs filed its third motion for preliminary injunction with new expert report is just trying to cure the deficiencies and mistakes in their arguments and supporting documents. However, the litigation process does not include "a dress rehearsal or practice run" for the parties. *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir.2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir.2005)). It has been over two years since Plaintiffs filed their first motion for preliminary injunction. Plaintiffs had ample time to develop their case and arguments, and Plaintiffs' expert also had ample time to establish his testimony during this long period. Their failure to establish the allegation of likelihood of success on the merits is due to their own actions. *Winters v. Fru-Con Inc*., 498 F.3d 734, 743 (7th Cir. 2007). If this Court granted Plaintiffs' third motion for preliminary injunction after the previous motions were vacated by the Federal Circuit, simply to cure the deficiencies pointed out by the Federal Circuit, after the Federal Circuit clearly overruled Plaintiffs' identical arguments in their previous motion for preliminary injunction, the Third Party Respondents will be extremely prejudiced.

Moreover, Plaintiffs did not provide any "new" evidence with their third preliminary injunction but merely drop two Asserted Patents (U.S. Patent Nos. D784,195 and D 785,112) and two alleged accused products, and provide a new expert report of Mr. Hatch, which is clearly unpermitted after the cut-off of expert discovery. [Dkt. 593, p.1]. Therefore, Plaintiffs' third

17

motion for preliminary injunction is simply motion for reconsideration. Plaintiffs did not even argue that they failed in any rare circumstances in which a motion to reconsider an interlocutory might be justified but simply filed a new expert report and relitigated the motion for preliminary injunction. Therefore, Plaintiff's third bite at the apple should be denied.

### C. Plaintiffs' Newly Submitted Expert Declaration Should Be Excluded

When reviewing the admissibility of expert testimony in a patent case, the Federal Circuit applies the law of the regional circuit. *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1294 (Fed. Cir. 2015) ("Whether proffered evidence is admissible at trial is a procedural issue not unique to patent law ....").

Expert testimony is admissible if the party offering such evidence shows that the testimony is both reliable and relevant. Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590–91 (1993). Federal Rule of Evidence 702 permits expert testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. An expert can be qualified "by knowledge, skill, experience, training, or education." *Id*.

A trial court has a "gatekeeping" obligation to admit expert testimony only when it is both reliable and relevant. *Daubert*, 509 U.S. at 589; *Kumho Tire Co.*, 526 U.S. at 147–149. "In Daubert, the Supreme Court gave a non-exhaustive list of factors for determining whether scientific testimony is sufficiently reliable to be admitted into evidence, including: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and

(4) whether the theory or technique is generally accepted in the relevant scientific community." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002). The Supreme Court later held that "a trial court may consider one or more" of the Daubert factors in determining the reliability of nonscientific expert testimony. *Kumho Tire Co.*, 526 U.S. at 141. Further, the court has "broad latitude" to decide how to determine the reliability of the testimony and whether the testimony is in fact reliable. *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1064 (9th Cir. 2002); *see Kumho Tire Co.*, 526 U.S. at 141. The "test of reliability is flexible, and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id*. (internal citations omitted).

1.    <u>Plaintiffs' Untimely Newly Submitted Expert Declaration Should Be Excluded</u>

Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The obligation to disclose expert witnesses is governed by Rule 26(a).

Under Rule 37(c)(1), "[a] party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Thus, where a party does not timely file expert reports, the district court may exclude the party's expert from testifying at trial on the matters the party was required to disclose. *NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 785 (7th Cir.2000). The sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless. *Keach v. U.S. Trust Co.*, 419 F.3d 626, 639 (7th Cir.2005); *Salgado by Salgado v.*

*General Motors Corp.*, 150 F.3d 735, 742 (7th Cir.1998).

Under Rule 26(a)(2), a party must disclose by the court-ordered time a written report of a retained expert that includes "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i), (D). Rule 26(a)(2) further requires that parties disclose rebuttal reports—that is, "evidence [that] is intended solely to contradict or rebut evidence on the same subject matter identified by another" expert—by the court-ordered time, or if no such time is set, 30 days after the other expert's disclosure. Fed. R. Civ. P. 26(a)(2)(D) (ii). Apart from initial expert reports and rebuttal expert reports, Rule 26 also contemplates supplemental expert filings. Rule 26(e) requires that, if an expert "learns that in some material respect the disclosure ... is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during discovery," he must supplement his disclosure by the time pretrial disclosures are due. Fed. R. Civ. P. 26(e)(1)(A), (2).

> ***a.*** *The newly submitted expert declaration of Paul Hatch is untimely as directed by the Court*

It is clearly set by the Court that parties must serve expert reports on all issues for which they bear the burden of proof on August 15, 2022, and expert discovery closes by October 23, 2022. [Dkt. 575]. However, approximately 20 days after expert discovery closes, in support of their Motion for Entry of a Temporary Restraining Order and Preliminary Injunction, Plaintiffs submitted a brand-new expert report of Paul Hatch regarding infringement of U.S. Patents D737,723 and D738,256. [Dkt. 594].

The Local Rules of the Northern District of Illinois provide with exacting specificity that a deadline for discovery means that discovery must be completed by that date. Local Rule 16.1, Standing Order Establishing Pretrial Procedure; *See also FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627 (7th Cir.2005) (stressing importance of compliance with the Local Rules). Thus, it

would be inappropriate and untimely under the local rules to serve a new expert report after the close of discovery that the other side could neither depose the expert nor engage a rebuttal expert of its own. *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 320, 327 (N.D.Ill.2005). Recognizing that courts must have the authority to enforce discovery deadlines, numerous cases have approved exclusion orders by district courts where expert reports were not provided until nearly the close of discovery. *Finwall v. City of Chicago*, 239 F.R.D. 494, 499 (N.D. Ill.), objections overruled, 239 F.R.D. 504 (N.D. Ill. 2006). For example, the Seventh Circuit upheld the district court's barring of the testimony of an expert witness identified just two days before the deadline. *Id*; *See also Scaggs v. Consolidated Rail Corp.*, 6 F.3d 1290, 1295-96 (7th Cir. 1993).

Thus, the new expert testimony of Paul Hatch must be barred. The expert discovery closes on October 23, 2022, and this new expert report was not provided until November 9, 2022. It is beyond debate that this left no time for depositions or discovery regarding this report, or engaging rebuttal experts.

Further, the new expert testimony is not supplemental within the meaning of Rule 26(e). *See Callpod, Inc. v. GN Netcom, Inc.*, 703 F. Supp. 2d 815, 823 (N.D. Ill. 2010) ("Supplemental expert reports are permitted if they are based upon information discovered after the initial disclosure or upon the realization that the original disclosure was incorrect or incomplete."). Apparently, the new expert report is not based upon information discovered after the initial disclosure or upon the realization that the original disclosure was incorrect or incomplete. Plaintiffs' purpose of submitting the expert report is to cure the deficiencies and mistakes of the previous reports submitted by the same expert after the expert's opinions in the previous reports were ***criticized and reversed*** by the Federal Circuit. [Dkt. 587].

However, even if the Court finds that Plaintiffs' new expert report is supplemental to their

original reports, this report should also be excluded. According to the Rule 26(e) of the Federal Rules of Civil Procedure, a party's obligation to supplement or correct a discovery disclosure (including expert reports) is limited to information thereafter acquired. *Council 31 v. Ward*, No. 87 C 356, 1995 WL 549022, at *1 (N.D. Ill. Sept. 12, 1995), aff'd sub nom. *Council 31, Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Doherty*, 169 F.3d 1068 (7th Cir. 1999). By its plain language, the rule refers to information not in the possession of the party when the original disclosure was made, and it does not contemplate the submission of a new expert report re-analyzing information which the party possessed when the original report was filed. *Id*. Here, we know that Plaintiffs' newly submitted expert report only contains information obtained prior to the initial disclosure, and Plaintiffs have not identified any newly acquired information. Hence, Plaintiffs also failed to show that their new expert report falls within the ambit of Rule 26(e).

> **b.** *Plaintiffs' failure to timely serve the expert report was not substantially justified or harmless*

Federal Rule of Civil Procedure 37 governs the consequences of failures to comply with Rule 26. Under Rule 37(c), a party "is not allowed to use" an untimely disclosure "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The party seeking to excuse its delay bears the burden of showing justification and harmlessness. See, e.g., *S.E.C. v. Nutmeg Grp., LLC*, No. 09 C 1775, 2017 WL 4925503, at *1 (N.D. Ill. Oct. 31, 2017). In deciding whether a party's failure was justified or harmless, courts "consider and weigh the following factors: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Karum Holdings LLC v. Lowe's Cos., Inc.*, No. 15 C 380, 2017 WL 5593318, at *3 (N.D. Ill. Nov. 21, 2017) (citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)).

Plaintiffs' actions were neither substantially justified nor harmless. The deadlines were negotiated and stipulated between the parties and primarily set by the Court. The parties originally proposed the last day to file motions for summary judgment is by November 23, 2022, which to be set and approved by the Court. [Dkt. 575]. Delaying summary judgment proceeding in this case will certainly result in significant delay of this case's resolution. *Cf. Centagon, Inc. v. Bd. of Dirs. of 1212 Lake Shore Drive Consominium Ass'n*, No. 00 C 1110, 2002 WL 356483, at *4 (N.D. Ill. Mar. 5, 2002) ("The fundamental purpose of Rule 37 is to ensure that the merits of the case can be addressed at trial (or on summary judgment), without any party suffering prejudice"). Plaintiffs even did not include any new evidence in their new report, they just revised their arguments to cure the defects and mistakes in their previous report that ***criticized and reversed*** by the Federal Circuit Court. Plaintiffs should have had plenty of opportunities and reason to submit expert reports before expert discovery closed. Thus, Plaintiffs cannot carry their burden to show that their failures to serve the new expert report by deadline was substantially justified.

Further, neither Plaintiffs can establish that their late service of expert report was harmless. The Third Party Respondents have been harmed because they are not the Defendants in this case and even if they are, they missed the opportunity to file motions directed at the opinions in Plaintiffs' new expert report. In addition, Plaintiffs' untimely service prejudiced the Third Party Respondents because the summary-judgment briefing has to be reset, and the Third Party Respondents were preparing to file its motion for summary judgment based on the agreed schedules and previous reports provided by Plaintiffs. The prejudice to the Third Party Respondents if the untimely expert report was allowed would be caused by significant burdens and undue delay in summary judgment briefing and the ultimate resolution of this case. *See e.g., Bowman v. International Business Mach. Corp*, 2012 WL 6596933, at 3–4 (concluding that the

23

plaintiffs' untimely expert rebuttal reports were not harmless because "reopening discovery to re depose Plaintiffs' experts would create significant costs and would delay the resolution of the motion"); *see also Musser v. Gentiva Health Servs.*, 356 F.3d 751, 759 (7th Cir. 2004) ("[I]t is not an abuse of discretion to conclude that the additional costs to Gentiva of preparing a new summary judgment motion and further delay in extending the trial date are not harmless.").

2.      Plaintiffs' Newly Submitted Expert Declaration Is Not Based Upon Sufficient Facts

The admissibility of expert witness testimony is governed by Rule 702 of the Federal Rules of Evidence, which permits the admission of expert testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. It also requires that the testimony must be based upon sufficient facts or data. *Id*.

When conducting his three-way comparison of the Third Party Respondents' product, prior art and the claimed design of the Patents-in-Suit, Mr. Hatch failed to conduct this comparison through different perspectives. [Decl. of Hatch, Ex. 1, ¶¶ 75-95]. Instead, Mr. Hatch only compared the Third Party Respondents' product, prior art and the claimed design of the Patents-in-Suit through perspective views and top views without fully comparing them from side views, front/back views and bottom views. If Mr. Hatch has fully compared the Third Party Respondents' product, prior art and the claimed design of the Patents-in-Suit from different angles, he should have reached different conclusion that the overall shape and appearance and identified features of the claimed design of the Patents-in-Suit are closer to the design of the prior art than the design of the Third Party Respondents' product. [Decl. of Gandy, Ex. 2].

3.    Plaintiffs' Newly Submitted Expert Declaration Is Not the Products of Reliable Principle

   *a. Plaintiffs' expert Paul Hatch applied the wrong "ordinary observer" legal standard*

   It is undisputed that "where there are many examples of similar prior art designs … differences between the claimed and accused designs that might not be noticeable in the abstract can become significant to the hypothetical ordinary observer who is conversant with the prior art." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 678 (Fed. Cir. 2008); *see also Super-Sparkly Safety Stuff, LLC v. Skyline USA, Inc.*, 836 F. App'x 895, 898 (Fed. Cir. 2020). The Federal Circuit holds that "the ordinary observer is deemed to view the differences between the patented design and the accused product *in the context of the prior art.* When the differences between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary observer *will be drawn to those aspects of the claimed design that differ from the prior art*." *Lanard Toys Ltd.*, 958 F.3d at 1344 (quoting *Egyptian Goddess*, 543 F.3d at 676).

   Mr. Hatch aver that an ordinary observer should be "the principal purchaser of hoverboards, i.e., a consumer user or the parent of a user, each having little or no experience purchasing hoverboards." [Decl. of Hatch, Ex. 1, ¶¶ 40] . Mr. Hatch further claims that those "ordinary observer would encounter products like the Claimed Designs via online stores, television and entertainment media, and social media, and purchases them using online stores or from 'brick and mortar' stores like Best Buy or Walmart." *Id*.

   A purchaser "having little or no experience purchasing hoverboards" only suggests that the purchaser lacks knowledge of hoverboards and prior art, which is the opposite to someone "who is conversant with the prior art" in *Egyptian Goddess*. Here, it is undisputed that there are many examples of similar prior art designs that are relevant to the Accused Products. Therefore, in light of the many similar prior arts, the hypothetical ordinary observer in this case should be a purchaser who is familiar with hoverboards and the prior art designs. [Decl. of Gandy, Ex.2, ¶¶20; Decl. of

Rake, Ex.3, ¶¶ 39]. Defendant's application that "the hypothetical ordinary observer in this case should be a purchaser who is familiar with hoverboards and the prior art" is consistent with the precedents and should be adopted by expert for further infringement analysis. *Id*. Thus, Mr. Hatch's design patent expert testimony should be excluded as he applies incorrect legal standard for the ordinary observer test.

It is also worthy noting that Mr. Hatch offered contradicted opinions with regard to the understanding of prior art during his deposition. During the deposition, Mr. Hatch first stated that "a typical, ordinary observer would have knowledge of the prior art, the relevant prior art". [Tr. of Hatch, Ex.4, p. 123]. Later, in the same deposition, Mr. Hatch stated "my understanding is that the consumer in real life would not have knowledge of all of the prior art or all of the competing hoverboards, that is correct". *Id*. p.124. When Mr. Hatch was challenged if he were using two different prior art standards, he further illustrated as follow: "The standard for the hypothetical ordinary observer is that we apply the level of acuteness of the purchaser. And so when I say one helps inform the other, it's knowing the level of acuteness of the purchaser. The real life purchaser helps us inform the level of acuteness that an ordinary observer would pay." *Id*. p.125. Apparently, Mr. Hatch not only applied wrong "ordinary observer" standard but also offered confused and contradicted testimonies with regard to the meaning of ordinary observer, which further proves that his newly offered report is not a product of reliable principle.

**b.** *Plaintiffs' newly submitted report failed to provide proper and thorough product-by-product analysis*

Where a patented design and an accused product are not "plainly dissimilar," the court must conduct a three-way analysis comparing the accused product, the patented design, and the prior art. *Egyptian Goddess*, 543 F.3d at 677–78. "When the differences between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary

observer will be drawn to those aspects of the claimed design that differ from the prior art." *Egyptian Goddess*, 543 F.3d at 676; *see also Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337, 1344 (Fed. Cir. 2020).

Here, when the claimed design of the Patents-in-Suit and the Third Party Respondents' products are viewed in light of the prior art, Mr. Hatch failed to draw attention to those aspects of the claimed design that differ from the prior art. Mr. Hatch's newly submitted expert report does not include any comparison between the claimed design of the Patents-in-Suit and the prior art and analyze the difference between them.

In addition, Mr. Hatch did not compare and analyze the differences among Accused product, prior art and the claimed design of the Patents-in-Suit in details. *See Id*. (If the claimed design is close to the prior art designs, small differences between the accused design and the claimed design assume more importance to the eye of the hypothetical ordinary observer). Instead, without providing any further analysis and detailed explanation, he only states that "the overall visual impression of the claimed design of the Patents-in-Suit and the Accused Products are not plainly dissimilar.... Further, when comparing to the closest prior art through the eyes of the ordinary observer, Accused Product is closer in overall impression to the claimed design of the Patents-in-Suit than to the closest prior art…". Rule 26(a) requires that the expert report contain the basis and reasons for each opinion. *Salgado*, 150 F.3d at 742, n. 6 ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions"). Thus, Mr. Hatch's report should be excluded accordingly.

### D. Even If the Third Party Respondents Are Still Defendants in This Case, Plaintiffs Are Not Likely to Prevail on the Merits of Patent Infringement Claim.

For a patentee to establish that it is likely to succeed on the merits, it "must show that it will *likely* prove infringement, and that it will *likely,* withstand any challenges, if any, the validity

of the patent." *Titan Tire*, 566 F.3d at 1376. (emphasis added). "A preliminary injunction should not issue if an alleged infringer raises a substantial question regarding either infringement or validity, i.e., the alleged infringer asserts an infringement or invalidity defense that the patentee has not shown lacks substantial merit." *Amazon.com*, 239 F.3d at 1351 (Fed. Cir. 2001); *Genentech Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997). The defendant does not face the clear and convincing evidence burden of proof applicable at trial; instead, "vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial." *Altana Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d 999, 1006 (Fed. Cir. 2009); *Entegris, Inc. v. Pall Corp.*, 490 F.3d 1340, 1351 (Fed. Cir. 2007).

In addition to its strong disfavor of preliminary injunctions, the Federal Circuit also requires that design patents such as the two asserted here, be given careful analysis to ensure that any infringement analysis is strictly limited. "[A] design patent, unlike a utility patent, limits protection to the ornamental design of the article." *Richardson v. Stanley Works, Inc*., 597 F.3d 1288, 1294 (Fed. Cir. 2010). Importantly, virtually no leeway should be given to a design patent owner when there are differences between the properly claimed patented design and the accused products. The Federal Circuit has emphasized that "design patents have almost no scope" beyond the precise images shown in the application drawings. *In re Mann*, 861 F.2d 1581, 1582 (Fed. Cir. 1988); *MRC Innovations, Inc. v. Hunter Mfg.*, 747 F.3d 1326, 1333, n. 1 (Fed. Cir. 2014); *Minka Lighting, Inc. v. Craftmade Int'l, Inc*., 93 F. App'x 214, 216–17 (Fed. Cir. 2004) (stating that "design patent scope is severely limited, essentially covering only the patent's figures and nothing more.").

1.   Plaintiffs Have Not Properly Construed its Claims and Adopted Proper Legal Standard

In order to show likelihood of success on the merits, Plaintiffs must construe their patent claims and then compare the properly construed claims to the accused device. *See Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002). Where, as here, a design contains both functional and non-functional elements, the claims must be construed in order to identify the non-functional aspects of the design as shown in the patent while excluding from claim scope the functional elements. *OddzOn Prods., Inc. v. Just Toys, Inc.,* 122 F.3d 1396, 1405 (Fed. Cir. 1997). In addition, it is black letter law that in a design patent, unclaimed subject matter may be shown in broken lines for the purpose of illustrating the environment in which the article embodying the design is used, but this unclaimed subject matter is not part of the claim scope. M.P.E.P. § 1503.02, subsection III (8th ed. 2010); *see also Hoffman v. Impact Confections, Inc*., No. 08CV1597, 2010 WL 99072, at *1 (S.D. Cal. Jan. 6, 2010) ("[t]he use of broken lines indicates that the environmental structure or the portion of the article depicted in broken lines form no part of the design, and is not to indicate the relative importance of parts of a design").

The sole test for determining whether a design patent has been infringed is the "ordinary observer" test. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008). Under the "ordinary observer" test, "a court must consider the ornamental features and analyze how they impact the overall design." *Lanard Toys Ltd.*, 958 F.3d at 1343 (citing *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1295 (Fed. Cir. 2010)."The scope of that claim, however, must be limited to the ornamental aspects of the design, and does not extend to 'the broader general design concept.'" *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1333 (Fed. Cir. 2015) (citing *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997). "Where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to

29

identify the non-functional aspects of the design as shown in the patent." *Lanard Toys Ltd.*, 958 F.3d at 1342 (citing *Sport Dimension, Inc. v. Coleman Co.,* 820 F.3d 1316, 1320 (Fed. Cir. 2016); *OddzOn Prods., Inc*., 122 F.3d at 1405).

"The Supreme Court has recognized, a design is better represented by an illustration 'than it could be by any description and a description would probably not be intelligible without the illustration.'" *Egyptian Goddess*, 543 F.3d at 679 (Fed. Cir. 2008) (quoting *Dobson v. Dornan*, 118 U.S. 10, 14 (1886)); *accord Manual of Patent Examining Procedure* ("MPEP") §1503.01 (9th ed. 2019).

"Given the recognized difficulties entailed in trying to describe a design in words, the preferable course ordinarily will be for a district court not to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design." *Id*. Furthermore, broken lines in the patent figures form no part of the claimed design. *See* MPEP §1503.02. (broken lines are used to illustrate "structure that is not part of the claimed design.").

"Where there are many examples of similar prior art designs, …, differences between the claimed and accused designs that might not be noticeable in the abstract can become significant to the ***hypothetical ordinary observer who is conversant with the prior art***." *See Egyptian Goddess*, 543 F.3d at 678 (citing *Smith v. Whitman Saddle Co.*, 148 U.S. 674, (1893)); *see also Wallace v. Ideavillage Prods. Corp*., 640 Fed. Appx. 970, 978 (Fed. Cir, 2016). The Federal Circuit holds that "the ordinary observer is deemed to view the differences between the patented design and the accused product *in the context of the prior art.* When the differences between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary observer *will be drawn to those aspects of the claimed design that differ from the prior art*." *Lanard Toys Ltd.*, 958 F.3d at 1344 (quoting *Egyptian Goddess*, 543 F.3d at 676).

30

2. <u>The Accused Group A Product Does Not Infringe nor is Substantially Similar to Plaintiffs' Patents-in-Suit</u>



**Table 1-1. Initial Comparison of Patents-in-Suit, Prior Arts, Accused Group A Product and Separate Patents on Accused Products**

Patents-in-Suit D737,723 Patent | Patents-in-Suit D738,256 Patent

Prior Arts D739,906 Patent

Accused Group A Product | Separate Patents - D808,857 Patent

**Table 1-2. Initial Comparison of Patents-in-Suit, Prior Arts, Accused Group A Product and Separate Patents on Accused Products**

Patents-in-Suit D737,723 Patent | Patents-in-Suit D738,256 Patent

Prior Arts D739,906 Patent

Accused Group A Product | Separate Patents - D808,857 Patent

**Table 1-3. Comparison of Patents-in-Suit, Prior Arts, Accused Group A Product and Separate Patents on Accused Products**



*First*, the structure and design of hoverboard was first disclosed in the D'906 Patent, with an "hourglass" peripheral shape from the top view and two wheels covered by semi-circular wheel covers from the side view. Mr. Hatch's report contained deficient analysis by only considering references cited on the face of the patents when he examined the prior art of '723 and '256 patent. [Decl. of Rake, Ex. 3, ¶52]. The overall shape, proportions, and configuration of the '906 patent are strikingly similar to the'723 and '256 patents. Each of these designs plainly show an integrated hourglass body with a relatively flat surface across the top of the main body. Although Mr. Hatch cites the '906 patent, he completely ignores it when analyzing the '723 and '256 patents. *Id at* ¶53.

*Second*, from the top view, Patents-in-Suit all have the same hour glass peripheral shape. [Decl. of Gandy, Ex. 2, ¶¶24, 31, 37, 41]. In fact, the hour glass peripheral shape of the D'906 Patent appears to be closer to the claimed design of the Patents-in-Suit than the design of the Accused Group A Product. *Id.* For instance, the concavely curved recessed center portion of the top surface of the Patents-in-Suit and the design of the D'906 Patent both have a slightly raised

32

convex contour, while the corresponding center portion of the top surface of the design of the Accused Group A Product is substantially flat and slightly recessed down below the opposing outer foot surfaces. *Id.*



| Accused Group A Product — Top View Comparison | |
|---|---|
| Patents-in-suit D'723 Patent | |
| Patents-in-suit D'256 Patent | |
| <u>Prior Arts</u> D'906 Patent | |
| Accused Group A Product | |
| D'857 Patent | |

The only common feature on the top surface of the claimed design of the Patents-in-Suit and the design of the Accused Group A Product not shown on the D'906 Patent is the foot pads on the opposing foot surfaces. However, it is clear from the enlarged isolated view below that the foot pads of the claimed design of the Patents-in-Suit and the design of the Accused Group A Product

differ not only in their peripheral shape but also the decorative pattern of ribs on each. [Decl. of Gandy, Ex. 2, ¶¶27, 33].



| Accused Product A — Ornamental Design Comparison 1 | |
| --- | --- |
| Patents-in-suit D'723 Patent | Patents-in-suit D'256 Patent |
| | |
| Accused Group A Product | D'857 Patent |
| | |

***Third***, from the bottom view, the shape and appearance of the bottom surface of the Patents-in-Suit and the design of the D'906 Patent are virtually identical. [Decl. of Gandy, Ex. 2, ¶¶29, 35, 40, 45]. Specifically, both the Patents-in-Suit and the design of the D'906 Patent have opposing flat, plain outer portions and a smooth continuous concavely curved central portion. *Id*. However, the bottom surface of the design of the Accused Product A differs from both the Patents-in-Suit and the design of the D'906 Patent in that the opposing flat outer portions have a pattern of vent holes and just to the inside of the vent holes is a slight diagonally upwardly protruding arcuate edge. *Id*. In addition, the recessed central portion of the design of the Accused Group A Product is defined by opposing slight diagonally downwardly protruding arcuate edges with the center portion having six narrow longitudinal ribs. *Id*.

///



*Fourth*, from the front/back view, the front and rear surfaces of the Patents-in-Suit and the design of D'906 Patent are substantially similar in shape and appearance. [Decl. of Gandy, Ex. 2, ¶¶28, 34, 39, 44]. Specifically, both designs have a vertically flat upper portion of the front and rear surfaces and a convexly curved lower portion that merges with the flat bottom surface. *Id*. On the contrary, while the design of the Accused Group A Product has front and rear surfaces having a vertically flat upper portion and a convexly curved lower portion that merges with the bottom

35

surface as the Patents-in-Suit and the design of D'906 Patent, the central portion of the front and rear surfaces of the design of the Accused Group A Product differs significantly from the Patents-in-Suit and the design of D'906 Patent. *Id*. Specifically, directly below the vertically flat upper portion of the front and rear surfaces are recessed horizontally elongated LED lights and below the LED lights is an outwardly protruding horizontal band that extends inwardly and merges with the concavely curved recessed central portion. *Id*. Also, on the right front vertically flat upper portion of the design of the Accused Product A is the word "GYROOR". *Id*.



| Accused Group A Product — Front/Back View Comparison | |
|---|---|
| Patents-in-suit<br>D'723 Patent | |
| Patents-in-suit<br>D'256 Patent | |
| <u>Prior Arts</u><br>D'906 Patent | |
| Accused Group A Product | |
| D'857 Patent | |

In addition, from the top and front views, the differences in shape and design of the footpads are clear and can see that Plaintiffs' D'723 Patent has prominent elliptical design element in the middle and the Accused Group A Product is completely different, without any elliptical design element. [Decl. of Rake, Ex. 3, ¶¶65].



*Fifth*, it's noted that the wheel covers at each end of the claimed design of the Patents-in-Suit, the design of D'906 Patent, and the design of Accused Group A Product differ from each other as shown in the top plan view and front and rear views above as well as the side view and perspective view below. The shape and appearance of the wheel covers in the claimed design of the Patents-in-Suit are closer to the wheel covers shown in broken lines in the design of D'906 Patent than the wheel covers of the design of the Accused Group A Product. [Decl. of Gandy, Ex. 2, ¶¶26, 32, 38, 43]. Specifically, the wheel covers shown on the claimed design of the Patents-in-Suit and the design of D'906 Patent are both semi-circular in shape and extend over and cover the entire wheel, while the wheel covers on the design of the Accused Group A Product are somewhat squared off and do not extend over the entire wheel, but rather partially over the wheel. *Id*.

///

| Accused Group A Product — Perspective View Comparison | |
|---|---|
| Patents-in-suit D'723 Patent | Patents-in-suit D'256 Patent |
|  |  |
| Patents-in-suit D'195 Patent | Patents-in-suit D'112 Patent |
| Prior Arts D'906 Patent |  |
| Accused Group A Product |  |
| D'857 Patent |  |
| Accused Group A Product — Side View Comparison | |
| Patents-in-suit D'723 Patent | Patents-in-suit D'256 Patent |







Another important design feature that has a significant effect on the overall visual impression of the ordinary observer is the size and shape of the fenders. Here we can see a comparison of the fender design claimed in the Patens-in-Suit and the fender design of the Accused Group A Product. Even to the most casual observer, the differences are significant. [Decl. of Rake, Ex. 3, ¶¶68, 69].



Fender Comparison- '256 Patent/ Accused Product

In conclusion, in view of the above analysis of the claimed design of the Patents-in-Suit with the design of the Accused Group A Product and the design of the D'906 Patent, the overall shape and appearance and identified features of the claimed design of the Patents-in-Suit are closer to the design of the D'906 Patent than the design of the Accused Group A Product. Further, the shape and appearance of the surfaces and features of the design of Accused Group A Product are substantial different from the claimed design of the Patents-in-Suit that an "ordinary observer",

familiar with the prior art, would not be confused so as to purchase one thinking it to be the other. Therefore, the design of the Accused Group A Product does not infringe the claimed design of the Patents-in-Suit.

3. Noninfringement analysis of non-accused Group C Product and Group E Product

As mentioned above, the Group C Product and Group E Product were dismissed from this litigation in light of the Order issued by the Federal Circuit that vacated Plaintiffs' Motion to Amend Schedule A. [Dkt. 590]. Thus, the Third Party Respondents are of opinion that both Group C Product and Group E Product are non-accused products, which is not subject to this litigation. However, even if the Group C Product and Group E Product are the accused products in this case, they do not infringe nor are not substantial similar to the Patents-in-Suit.

a. *Even if Group C is the accused products in this case, it does not infringe nor is substantially similar to Patents-in-Suit*



| **Table 2-1. Initial Comparison of Patents-in-Suit, Prior Arts, Accused Product C and Separate Patents on Accused Products** ||
| Patents-in-Suit D737,723 Patent | Patents-in-Suit D738,256 Patent |
| Prior Arts D739,906 Patent ||
| Group C Product | Separate Patents - D808,857 Patent |
| **Table 2-2. Initial Comparison of Patents-in-Suit, Prior Arts, Group C Product and Separate Patents on Accused Products** ||
| Patents-in-Suit D737,723 Patent | Patents-in-Suit D738,256 Patent |



| Prior Arts D739,906 Patent | |
| --- | --- |
| Group C Product | Separate Patents - D808,857 Patent |

**Table 2-3. Comparison of Patents-in-Suit, Prior Arts,
Accused Product C and Separate Patents on Accused Products**

| Patents-in-Suit D737,723 Patent | Patents-in-Suit D738,256 Patent |
| --- | --- |
| Prior Arts D739,906 Patent | |
| Group C Product | Separate Patents - D808,857 Patent |

*First*, the structure and design of hoverboard was first disclosed in the D'906 Patent, with

an "hourglass" peripheral shape from the top view and two wheels covered by semi-circular wheel

covers from the side view. The overall Gestalt of the Group C Product is substantially different

from the designs of the prior art '906 Patent and that of the Patents-in-Suit , and that the Patents-in-Suit would appear more similar to the prior art '906 Patent than Group C Product. [Decl. of Rake, Ex. 3, ¶¶118].



Undercarriage Comparison- '195 Patent/ Accused Product/ '857 Patent

**Second**, from the top view, Patents-in-Suit all have the same hour glass peripheral shape. [Decl. of Gandy, Ex. 2, ¶¶69, 75, 81, 86]. In fact, the hour glass peripheral shape of the D'906 Patent appears to be closer to the claimed design of the Patents-in-Suit than the design of the Group C Product. *Id.* For instance, the concavely curved recessed center portion of the top surface of the Patents-in-Suit and the design of the D'906 Patent both have a slightly raised convex contour, while the corresponding center portion of the top surface of the design of the Group C Product is substantially flat and slightly recessed down below the opposing outer foot surfaces. *Id.*

| Group C Product — Top View Comparison | |
|---|---|
| Patents-in-suit D'723 Patent |  |



The only common feature on the top surface of the claimed design of Patents-in-Suit and the design of the Group C Product not shown on the design of the D'906 Patent is the foot pads on the opposing foot surfaces. However, it is clear from the enlarged isolated view below that the foot pads of the claimed design of the Patents-in-Suit and the design of the Group C Product differ significantly in their peripheral shape as well as the decorative pattern on each. [Decl. of Gandy, Ex. 2, ¶¶71, 77].

///

///

///

///

| Group C Product — Ornamental Design Comparison 1 | |
|---|---|
| Patents-in-suit D'723 Patent | Patents-in-suit D'256 Patent |
| Group C Product | D'857 Patent |

***Third***, from the bottom view, the shape and appearance of the bottom surface of the Patents-in-Suit and the design of the D'906 Patent are virtually identical. [Decl. of Gandy, Ex. 2, ¶¶73, 79, 84, 89]. Specifically, both the Patents-in-Suit and the design of the D'906 Patent have opposing flat, plain outer portions and a smooth continuous concavely curved central portion. *Id*. However, the bottom surface of the design of the Group C Product differs from both the claimed design of Patents-in-Suit and the design of the D'906 Patent in that the opposing flat outer portions have a pattern of vent holes and just to the inside of the vent holes is a slight diagonally downwardly protruding arcuate edge. *Id*. In addition, the recessed central portion of the design of the Group C Product is defined by opposing slight diagonally downwardly protruding arcuate edges with the center portion having six narrow longitudinal ribs. *Id*.

///

///

///

///



In addition, a bottom view would reveal substantial design differences such as a prominent central design detail at the center, two strong styling recess areas under the feet, vent hole patterns that are readily notice of the Figure-Ground gestalt, as well as Closure, Similarity, and Proximity. The size and shape of the fenders are also very different which would have a significant effect on the overall impression of the ordinary observer. [Decl. of Rake, Ex. 3, ¶¶123].



Fender Comparison- '723 Patent/ Accused Product C

**Fourth**, from the front/back view, the front and rear surfaces of the Patents-in-Suit and the design of D'906 Patent are substantially similar in shape and appearance. [Decl. of Gandy, Ex. 2, ¶¶72, 78, 83, 88]. Specifically, both designs have a vertically flat upper portion of the front and rear surfaces and a convexly curved lower portion that merges with the flat bottom surface. *Id*. The only visual difference is the rounded parallelogram shaped LED lights at the opposing outer ends of the rear surface of the claimed design of the Patents-in-Suit and the lines on the front and rear surface of the claimed design of the Patents-in-Suit. *Id*. On the contrary, while the design of the Group C Product has front and rear surfaces having a vertically flat upper portion and a convexly curved lower portion that merges with the bottom surface as the claimed design of the Patents-in-Suit and the design of D'906 Patent, the central portion of the front and rear surfaces of the design of the Group C Product differs significantly from the claimed design of the Patents-in-Suit and the design of D'906 Patent. *Id*. Specifically, directly below the vertically flat upper portion of the front and rear surfaces are recessed horizontally elongated LED lights and below the LED lights is an outwardly protruding horizontal band that extends inwardly and merges with the recessed central portion. *Id*.

47

In addition, from the top and front views, the differences in shape and design of the footpads are clear and can see that Plaintiffs' Patents-in-Suit has prominent elliptical design element in the middle and the Group C Product is completely different, without any elliptical design element. [Decl. of Rake, Ex. 3, ¶¶119].



**Fifth**, it's noted that the wheel covers at each end of the claimed design of the Patents-in-Suit, the design of D'906 Patent, and the design of Group C Product are all semi-circular in shape.

[Decl. of Gandy, Ex. 2, ¶¶70, 76, 87, 87]. However, the wheel covers of the Patents-in-Suit and the design of D'906 Patent extend over and cover the entire wheel, while the wheel covers on the design of Group C Product do not extend down over the wheel. *Id.*

| Group C Product — Perspective View Comparison ||
|---|---|
| Patents-in-suit D'723 Patent | Patents-in-suit D'256 Patent |
|  |  |
| Prior Arts D'906 Patent |  |
| Group C Product |  |
| D'857 Patent |  |
| Group C Product — Side View Comparison ||
| Patents-in-suit D'723 Patent | Patents-in-suit D'256 Patent |



| Group C Product | Patents-in-suit D'112 Patent |



**Group C Product — Ornamental Design Comparison 2**

| Patents-in-suit D'723 Patent | Patents-in-suit D'256 Patent |
|---|---|
| Accused Product C | D'857 Patent |



In conclusion, in view of the above analysis of the claimed design of the Patents-in-Suit with the design of the Group C Product and the design of the D'906 Patent, the overall shape and appearance and identified features of the claimed design of the Patents-in-Suit are closer to the design of the D'906 Patent than the design of the Group C Product. Further, the shape and appearance of the surfaces and features of the design of Group C Product are substantial different from the claimed design of the Patents-in-Suit that an "ordinary observer", familiar with the prior art, would not be confused so as to purchase one thinking it to be the other. Therefore, the design of the Group C Product does not infringe the claimed design of the Patents-in-Suit.

     *b. Even if Group E Product is the accused products in this case, it does not infringe nor is substantially similar to Patents-in-Suit*



| Table 3-1. Initial Comparison of Patents-in-Suit, Prior Arts, Group E Product and Separate Patents on Accused Products | |
| --- | --- |
| Patents-in-Suit D737,723 Patent | Patents-in-Suit D738,256 Patent |
| Prior Arts D739,906 Patent | |
| Group E Product | Separate Patents - D808,857 Patent |



**Table 3-2. Initial Comparison of Patents-in-Suit, Prior Arts, Group E Product and Separate Patents on Accused Products**

Patents-in-Suit D737,723 Patent | Patents-in-Suit D738,256 Patent

Prior Arts D739,906 Patent

Group E Product | Separate Patents - D808,857 Patent

**Table 3-3. Comparison of Patents-in-Suit, Prior Arts, Group E Product and Separate Patents on Accused Products**

Patents-in-Suit D737,723 Patent | Patents-in-Suit D738,256 Patent

Prior Arts D739,906 Patent

Group E Product | Separate Patents - D808,857 Patent

*First*, the structure and design of hoverboard was first disclosed in the D'906 Patent, with an "hourglass" peripheral shape from the top view and two wheels covered by semi-circular wheel covers from the side view.

*Second*, from the top view, Patents-in-Suit all have the same hour glass peripheral shape. In fact, the hour glass peripheral shape of the D'906 Patent appears to be closer to the claimed design of the Patents-in-Suit than the design of the Group E Product. For instance, the concavely curved recessed center portion of the top surface of the Patents-in-Suit and the design of the D'906 Patent both have a slightly raised convex contour, while the corresponding center portion of the top surface of the design of the Group E Product is substantially flat and slightly recessed down below the opposing outer foot surfaces.





The only common feature on the top surface of the claimed design of Patents-in-Suit and the design of the Group E Product not shown on the design of the D'906 Patent is the foot pads on the opposing foot surfaces. However, it is clear from the enlarged isolated view below that the foot pads of the claimed design of the Patents-in-Suit and the design of the Group E Product differ significantly in their peripheral shape as well as the decorative pattern on each. In addition, Group E products have an automated flashing feature on the petals unlike the claimed design of the Patents-in-Suit.



*Third*, from the front and rear views, the concavely curved recessed center portion of the top surface of the claimed design of the Patents-in-Suit and the design of the D'906 Patent both

have a slightly raised convex contour, while the corresponding center portion of the top surface of the design of the Group E Product is substantially flat and slightly recessed down below the opposing outer foot surfaces. [Gandy Rebuttal, Ex. 5, ¶¶108, 114].



| Group E Product — Front/Back View Comparison | |
|---|---|
| Patents-in-suit D'723 Patent | |
| Patents-in-suit D'256 Patent | |
| Prior Arts D'906 Patent | |
| Group E Product | |
| D'857 Patent | |

**Fourth**, from the perspective view, the front and rear surfaces of the claimed design of the Patents-in-Suit and the design of the D'906 Patent are substantially similar in shape and appearance. Specifically, both designs have a vertically flat upper portion of the front and rear

surfaces and a convexly curved lower portion that merges with the flat bottom surface. [Gandy Rebuttal, Ex. 5, ¶¶111, 117]. The only visual difference is the rounded parallelogram shaped LED lights at the opposing outer ends of the rear surface of the claimed design of Patents-in-Suit and the lines on the front and rear surface of the claimed design of Patents-in-Suit. *Id*. On the contrary, while the design of the Group E Product has front and rear surfaces having a vertically flat upper portion and a convexly curved lower portion that merges with the bottom surface as the claimed design of the Patents-in-Suit and the design of the D'906 Patent, the central portion of the front and rear surfaces of the design of the Group E Product differs significantly from the claimed design of the Patents-in-Suit and the design of D'906 Patent. *Id*. Specifically, directly below the vertically flat upper portion of the front and rear surfaces are recessed horizontally elongated LED lights with quarter rounded inner ends. *Id*.



| Group E Product — Perspective View Comparison | |
|---|---|
| Patents-in-suit D'723 Patent | Patents-in-suit D'256 Patent |
| | |
| *Prior Arts* D'906 Patent | |



| | |
|---|---|
| Group E Product | |
| D'857 Patent | |

*Fifth*, from the bottom view, the shape and appearance of the bottom surface of the claimed design of the Patents-in-Suit and the design of the D'906 Patent are virtually identical. Specifically, both the claimed design of the Patents-in-Suit and the design of D'906 have opposing flat, plain outer portions and a smooth continuous concavely curved central portion which is best shown in the front and rear views above. [Gandy Rebuttal, Ex. 5, ¶¶112, 118]. However, the bottom surface of the design of the Group E Product differs from both the claimed design of claimed design of the Patents-in-Suit and the design of D'906 in that the opposing flat outer portions have a pattern of vent holes and just to the inside of the vent holes is a slight diagonally downwardly protruding arcuate edge. *Id*. *In* addition, the recessed central portion of the design of the Group E Product is defined by opposing slight diagonally downwardly protruding arcuate edges with the center portion having six narrow longitudinal ribs. *Id*.

///

///

///



**Sixth**, the shape and appearance of the wheel covers in the claimed design of the Patents-in-Suit are closer to the wheel covers shown in broken lines in the design of the D'906 than the wheel covers of the design of the Group E Product. [Gandy Rebuttal, Ex. 5, ¶¶109, 115]. Specifically, the wheel covers shown on the claimed design of the Patents-in-Suit and the design of D'906 are both semi-circular in shape and extend over and cover the entire wheel, while the

wheel covers on the design of the Group E Product are somewhat squared off and do not extend over the entire wheel, but rather partially over the wheel. *Id.*

In conclusion, in view of the above analysis of the claimed design of the Patents-in-Suit with the design of the Group E Product and the design of the D'906 Patent, the overall shape and appearance and identified features of the claimed design of the Patents-in-Suit are closer to the design of the D'906 Patent than the design of the Group E Product. Further, the shape and appearance of the surfaces and features of the design of Group E Product are substantial different from the claimed design of the Patents-in-Suit that an "ordinary observer", familiar with the prior art, would not be confused so as to purchase one thinking it to be the other. Therefore, the design of the Group E Product does not infringe the claimed design of the Patents-in-Suit.

### E. Plaintiffs Have Not Shown That It Will Suffer Irreparable Harm

1. Plaintiffs Failed to Provide Any Evidence to Prove They Will Suffer Irreparable Harm.

Failure to prove irreparable harm is an independent ground for denying a preliminary injunction. *Amazon.com*, 239 F.3d at 1350. Plaintiffs' assertion that the Court may presume irreparable harm based on showing of both validity and infringement of patent misstates the law. [Dkt. 593]. Instead, Plaintiffs must prove that they would be irreparably harmed absent an injunction. *See eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006). In *eBay*, the Supreme Court rejected the presumption of irreparable harm in patent cases. *Id.* at 393-94. Moreover, the Supreme Court cautioned against a "categorical grant" of injunctive relief even upon a finding of validity and infringement. *Id.* at 394. As a result, "a party seeking injunctive relief must make a clear showing that it is at risk of irreparable harm, …. which entails showing a likelihood of substantial and immediate irreparable injury." *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (internal citation omitted).

Here Plaintiffs hold no exclusive position in the marketplace despite its contention to the contrary. [Dkt. 593]. They have proffered no evidence that: (1) they hold an exclusive position in the marketplace in the United States; (2) that any exclusive position is a direct result of the patentable features of the claimed design; or (3) that they will lose market share to the Third Party Respondents. Instead, they provide only mere speculation. Plaintiffs also failed to provide evidence that the Patents-in-Suit could help Plaintiffs establish a market position and create business relationships in the market. Their arguments are purely and admittedly speculative even though they claimed that they have established a casual nexus between the Third Party Respondents' alleged infringement and the irreparable harm suffered. *Id.*

Plaintiffs have failed to show that money damages would be inadequate if they were to prevail at trial. It is well established that "[n]either the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial." *Nutrition 21 v. U.S.*, 930 F.2d 867, 871 (Fed. Cir. 1991). "Indeed, [a] district court's reliance on possible market share loss would apply in every patent case where the patentee practices the invention." *Id.* Plaintiffs also focuses only on sales and commitments *that it has allegedly already lost*, failing to provide any discussion or evidence regarding whether it might *continue* to lose sales and commitments and the likelihood thereof in the absence of an injunction against the Third Party Respondents.

Nonetheless, Plaintiffs' motion provided no actual evidence that would establish Plaintiffs has lost *any* sales or commitments, much less that any of those purported lost sales or commitments were in any way a result of Plaintiffs' alleged infringement. Lost sales do not constitute irreparable harm. *See Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990). Even if it were true that the Third Party Respondents' alleged infringement caused Plaintiffs to lose

significant sales and commitments, Plaintiffs has wholly failed to establish that it will lose any further sales and/or commitments in the absence of an injunction. Plaintiffs' failure to define the market - one that includes multitudes of competitors and non-accused substitute products - reveals the speculative nature of Plaintiff's claim. *See Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l Inc.,* 246 F.3d 1336, 1356 (Fed. Cir. 2001) ("to determine [the Plaintiff's] market share, the record must accurately identify the market.").

Claims of lost sales and price erosion are insufficient since they rely on mere speculation rather than evidence. *See, e.g., Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990) (Holding that "[p]otential lost sales" alone are not sufficient to demonstrate irreparable harm because "acceptance of that position would require a finding of irreparable harm to every manufacturer/patentee, regardless of circumstances."); *Automated Merch.*, 357 Fed. Appx. at 301 (Finding that mere conclusory statements that price erosion is possible are not sufficient to support a preliminary injunction.); *McDavid Knee Guard, Inc v. Nike USA, Inc.*, 683 F. Supp. 2d 740, 749 (N.D. Ill. 2010) ("Notably, [movant] has not presented this court with evidence of any actual loss of market share or overall sales, but instead offers conclusory affidavits based on speculation to prove these losses. In this case, the court finds that such speculation is insufficient to justify injunctive relief prior to a trial on the merits."); *Atari Games Corp. v. Nintendo of America Inc.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990) ("[A] district court should be wary of issuing an injunction based solely upon allegations and conclusory affidavits submitted by plaintiff.")

Plaintiffs' assertions of harm due to lost sales and market share are unfounded and inaccurate. They have failed to sufficiently demonstrate a nexus between sales of the Third Party Respondents' accused products, the claims of Patents-in-Suit and any alleged harm. In fact, Plaintiffs' own brief demonstrates that such a nexus does not exist. Plaintiffs' damage expert's

report also contains minimal to no analysis as to loss of profits and market share due to the Third Party Respondents' alleged infringing products. As a result, Plaintiffs failed to provide any support of irreparable harm.

> 2. Plaintiffs Failed to Demonstrate That Any of The Alleged Harm Could Not Be Fully Compensated With Damages.

Courts have been clear with regard to this requirement. In order to justify a preliminary injunction, the movant has the burden not only to provide actual evidence of harm, but it must also show that "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *eBay v. MercExchange*, LLC, 547 US 388, 391 (2006); *Automated Merch.*, 357 Fed. Appx. at 301 ("The burden is now on the patentee to demonstrate that its potential losses cannot be compensated by monetary damages."). Since an injunction is only appropriate when it is "necessary to prevent the kinds of harms that could not be compensated or measured if the matter proceeded in the normal course to a full trial," (*Kimberly-Clark*, 635 F. Supp. 2d at 879) the question therefore is not whether the damages are difficult to determine, but whether the harm is "impossible to measure in monetary terms." *Eli Lilly & Co. v. Am. Cyanamid Co.*, 896 F. Supp. 851 (S.D. Ind. 1995).

The Third Party Respondents have been selling these products for a long time prior to Plaintiffs' previous preliminary injunctions. Plaintiffs' claims of immediate, irreparable harm due to lost sales, loss of market share, and price erosion fall flat because it has not demonstrated why it waited so long and why such harm cannot be compensated with monetary damages. As explained by the Federal Circuit, "there is no presumption that money damages will be inadequate in connection with a motion for an injunction pendente lite. Some evidence and reasoned analysis for that inadequacy should be proffered." *Nutrition 21 v. United States*, 930 F.2d 867, 872 (Fed. Cir. 1991); *see also, Altana*, 566 F.3d at 1010-1011 (Finding that harms such as "price erosion, loss of

market share, loss of profits, loss of research opportunities, and possible layoffs" are not necessarily irreparable.).

In fact, "[l]ost sales (without more) are presumed to be compensable through damages, so they do not require injunctive relief." *Automated Merch.*, 357 Fed. Appx. at 301. In denying a preliminary injunction due to lack of irreparable harm, the Court in *Automated Merchandising Systems* explained that "lost sales standing alone are insufficient to prove irreparable harm; if they were, irreparable harm would be found in every case involving a manufacturer/patentee, regardless of circumstances." *Id. at 300-301*. The Court further concluded that "no matter how much evidence of lost revenue [plaintiff] presented, this evidence by itself could not support a finding of irreparable injury." *Id*. at 301.

If mere competition with an alleged infringer was sufficient to demonstrate irreparable harm, a preliminary would have to be granted in every case where the patentee practiced the invention and a likelihood of success on the merits was found. Under this logic, there would be no need for the irreparable harm prong of the analysis, as it would be redundant. As the Federal Circuit has stated "[a] movant cannot be granted preliminary injunction unless it establishes both of the first two factors, i.e., likelihood of success on the merits *and irreparable harm*" *Amazon.com*, 239 F.3d at 1350 (emphasis added). Thus, the irreparable harm prong is clearly its own requirement, and not merely duplicative of the likelihood of success analysis, which Plaintiffs' motion also fails. It would similarly undermine the Federal Circuit's clear direction that irreparable harm can no longer be presumed regardless of the strength of the likelihood of success on the merits, and instead must be proven on its own. *Robert Bosch LLC v. Pylon Manufacturing Corp.*, 659 F.3d 1142, 1148-49.

Plaintiffs cite two cases as allegedly providing support for its argument, but both of those cases involved *permanent* injunctions, where infringement and validity had already been established on the merits. *Douglas Dynamics, LLC v. Buyers Products. Co.*, 717 F.3d 1336 (Fed. Cir. 2013); *See also, Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d 1351 (Fed. Cir. 2012). The Third Party Respondents have not had the opportunity to challenge the validity of Plaintiffs' patent, and there has been no finding of liability. Thus, these cases are not applicable to the current situation where Plaintiffs are seeking a preliminary injunction.

Further, neither case states that competition between a patentee and an alleged infringer necessarily causes irreparable harm. They note the *potential* for irreparable harm when there is direct competition, but not that it necessarily occurs. *Douglas Dynamics*, 717 F.3d at 1345; *Presidio*, 702 F.3d at 1363 (noting that direct competition is "one factor" suggesting "the potential for harm"). And they certainly made no mention of harm being caused by competition with an *accused* infringer as opposed to an adjudicated infringer.

In fact, when analyzing the need for a preliminary injunction, this District has held the exact opposite of the approach Plaintiffs seem to be advocating. In *Generac Power Systems, Inc. v. Kohler Co.*, the Court denied a motion for preliminary injunction based on lack of irreparable harm because the patentee relied "only upon its status as a direct competitor," rather than providing actual evidence. *Generac Power Systems v. Kohler Co.* 807 F. Supp 2d 791, 805 (E.D. Wis. 2011). Since the moving party must provide evidence of actual irreparable harm, rather than a mere possibility of harm, the fact that the Third Party Respondents and Plaintiffs are competitors is insufficient to justify a preliminary injunction. As a result, Plaintiffs' motion should therefore be denied.

### F. Plaintiffs Have not Shown Equitable Relief Sought Is Appropriate

"An injunction should not be granted if its impact on the enjoined party would be more severe than the injury the moving party would suffer if it is not granted." *Litton Sys. Inc. v. Sundstrand Corp.*, 750 F.2d 952, 959 (Fed. Cir. 1984). "The hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating." *Ill. Tool Works, Inc. v. Grip-Pak, Inc*., 906 F.2d 679, 683 (Fed. Cir. 1990)."

The balance of equities tips in Third Party Respondents' favor, not Plaintiffs. An injunction will cause significant harm on Third Party Respondents because it will be unable to fill order under contracts already in place and will be forced to store any remaining hoverboards in inventory for the duration of this action, during which time it will lose its value and will lead to Third Party Respondents becoming insolvent. Further, Third Party Respondents will also be unable to maintain sales and its relationships and reputation with its consumers and in the marketplace. These effects will likely ripple into Third Party Respondents' sales of its other products and harm its business as a whole. The Third Party Respondents have already been wrongfully enjoined for the past two years, which it has lost incalculable amount of profits as well as suffered irreparable harm to its reputation. Third Party Respondents' relationships with its suppliers will also be severely impacted. By contrast, Plaintiffs have not shown that it is likely to succeed on the merits. Even in the unlikely event that Plaintiffs ultimately prevail, they have not provided any evidence that any of the alleged harms they may suffer amounts to anything other than lost sales compensable by money damages.

### G. Public Interest Does Not Favor an Entry of An Injunction

The public interest is served by enforcing patents that are likely valid and infringed. Where, as is the case here, Plaintiffs have "not establish[ed] a likelihood of success on the merits," the "public interest is best served by denying the preliminary injunction." *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006); see also *SmithKline Beecham Corp. v. Apotex*

*Corp.*, 403 F.3d 1331, 1354-55 (Fed. Cir.2005) (there is "a significant public policy interest in removing invalid patents from the public arena," and that interest is "stronger" than the public's interest "in the affirmation of a patent as valid.").

Denying an injunction in this case also favors the public interest by allowing consumers to choose among multiple products from different competitors. It is well established that "the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain." *Lear, Inc. v. Adkins*, 395 U.S. 653, 670 (1969).

Further, there is a clear public interest in promoting competition in the marketplace, which would be undermined if a preliminary injunction is granted. *Lear, Inc. v. Adkins*, 395 U.S. 653, 670 (1969) ("[T]he equities of the licensor do not weigh very heavily when they are balanced against the important public interest permitting full and free competition in the use of ideas which are in reality a part of the public domain."). In *Illinois Tool Works v. Grip-Pak*, the Federal Circuit recognized that at the preliminary injunction phase, public interest in the protection of patent rights is counterbalanced by a defendant's "continuing right to compete, which must be seen as legitimate at this motion stage." *Illinois Tool Works*, 906 F.2d at 684.

In addition, Plaintiffs are frivolously wasting Court and parties' resources by filling the renewed motion as the Court in Federal Circuit had already concluded that Plaintiffs' expert Paul Hatch's infringement analysis is not reliable. If Third Party Respondents are still considered as defendants in this case, they will planning to file a motion to exclude and strike Plaintiffs' newly submitted expert report. Plaintiffs are one of the most powerful and leading hoverboard companies around the world and have been continuously forcing other hoverboard business out of competition with their baseless litigations and settlements. Public Policy does not favor anti-trust competition

66

nor allows precious resources to be wasted. As noted in the previous briefings, Plaintiffs even

brough a motion for preliminary injunction against a small business who sells hover shoes which

have no connection to hoverboards whatsoever. The only objective of that the lawsuit is to exclude

any competitors from the market so that Plaintiffs can continue to be the leader who controls the

market. Public policy does not favor such measure. As a result, public interest does not favor the

issuance of an injunction.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiffs' frivolous Motion for Preliminary Injunction and

Temporary Restraining Order should be denied.


Date: 11/28/2022        /s/ Yu Hao Yao

Yu Hao Yao, Esq.
GLACIER LAW LLP
9660 Flair Dr., Ste 328
El Monte, CA 91731
mickey.yao@glacier.law
312-448-7772

Glacier Law LLP
506 Second Ave., Ste 1516
Seattle, WA 98104
Na Zhang, Esq.
queena.zhang@glacier.law
206-397-8633

GLACIER LAW LLP
200 E. Randolph Dr., Ste. 5100
Chicago, IL 60601
Ruoting Men, Esq.
ruoting.men@glacier.law
Tianyu Ju, Esq.
Iris.ju@glacier.law
312-270-0413

GLACIER LAW LLP

41 Madison Avenue, Ste 2529
New York, NY 10010
Tao Liu, Esq.
Wei Wang, Esq.
Tao.liu@glacier.law
wei.wang@glacier.law
332-777-7315

***Attorneys for the Third Party Respondents***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this November 28, 2022, I electronically filed the foregoing file with the Clerk of Court using the CM/ECF system, and service was perfected on all counsel of record and interested parties through this system, which will deliver a true and correct copy of the foregoing documents via CM/ECF.

Date: 11/28/2022                    /s/ Yu Hao Yao