# EXHIBIT 4

Paul Hatch - October 21, 2022

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF ILLINOIS

 3                        EASTERN DIVISION

 4       _____
         ABC Corporation I, et al.,          )
 5                                           )
                        Plaintiffs,          )    CASE NO.
 6                                           )    1:20-cv-04806
         v.                                  )
 7                                           )
         The Partnerships and Unincorporated )
 8       Associations Identified on Schedule "A" )
                                             )
 9                      Defendants.          )
         _____ )

10

11

12

13

14

15

16

17

18        REMOTE DEPOSITION UNDER ORAL EXAMINATION OF

19                         PAUL HATCH

20               DATE:  October 21, 2022

21

22

23

24      REPORTED BY:  CHARLENE FRIEDMAN, CCR, RPR, CRR

25
```

Paul Hatch - October 21, 2022

1
2
3
4
5
6
7          TRANSCRIPT of the deposition of the
8     witness, called for Oral Examination in the
9     above-captioned matter, said deposition being taken by
10    and before CHARLENE FRIEDMAN, a Notary Public and
11    Certified Court Reporter of the State of New Jersey, a
12    Registered Professional Reporter, and a Certified
13    Realtime Reporter, via video teleconference, by Zoom, on
14    October 21, 2022, commencing at approximately 9:58 in
15    the morning, Eastern Standard Time.
16
17
18
19
20
21
22
23
24
25

Paul Hatch - October 21, 2022

Page 3

```
 1      A P P E A R A N C E S:

 2

 3

 4      TARTER, KRINSKY & DROGAN, LLP
        1350 Broadway
 5      New York, New York  10018
        (212) 216-8000
 6      BY:   MARK BERKOWITZ, ESQ.
              CHANDLER STURM, ESQ.
 7      Attorneys for Plaintiffs

 8

 9

10      GLACIER LAW, LLP
        506 Second Avenue
11      Suite 1516
        Seattle, Washington  98104
12      (206) 397-8633
        BY:   ROBIN CHENG, ESQ.
13      Attorneys for Defendant

14

15

16       ALSO PRESENT:  YIYI LIU

17

18                      *   *   *   *   *

19

20

21

22

23

24

25
```

Paul Hatch - October 21, 2022

```
 1                      I N D E X

 2    WITNESS NAME                        PAGE

 3    PAUL HATCH

 4            By Mr. Cheng                  7

 5

 6

 7                *   *   *   *   *

 8

 9

10                   E X H I B I T S

11    EXHIBIT NO.    DESCRIPTION           PAGE

12    Exhibit 1      Declaration            42

13    Exhibit 2      Declaration            44

14    Exhibit 3      Expert witness report  62

15    Exhibit 4      Rebuttal report        78

16    Exhibit 5      Exhibit to rebuttal    79

17    Exhibit 6      Report                 81

18    Exhibit 7      U.S. D 737,723 Patent  144

19

20

21                *   *   *   *   *

22

23

24

25
```

Paul Hatch - October 21, 2022

```
1                          - - -

2                 Deposition Support Index

3                          - - -

4

5      Direction to witness not to answer

6      Page                Line

7      None

8

9      Request for production of documents

10     Page                Line

11     None

12

13     Questions marked

14     Page                Line

15     None

16

17

18

19

20

21

22

23

24

25
```

Paul Hatch - October 21, 2022

1              CERTIFIED SHORTHAND REPORTER:   My

2       name is Charlene Friedman, a Certified

3       Shorthand Reporter and Notary Public of the

4       State of New Jersey.   This deposition is

5       being held via videoconference equipment.

6              The witness and reporter are not in

7       the same room.   The witness will be sworn in

8       remotely, pursuant to agreement of all

9       parties.   The parties stipulate that the

10      testimony is being given as if the witness

11      was sworn in person.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Paul Hatch - October 21, 2022

1    P A U L   H A T C H,

2              called as a witness, having been first duly

3    sworn according to law, testifies as follows:

4

5    EXAMINATION BY MR. CHENG:

6         Q    Good morning, Mr. Hatch.

7              Thank you for attending this

8    deposition.

9         A    Good morning.

10        Q    My name is Robin Cheng, and I'll be

11   conducting this deposition.   I'll be asking

12   questions related to the case in front of the

13   Northern District of Illinois, Case No.

14   120-cv-04806.

15             Are you familiar with that case?

16        A    Yes, I am.

17        Q    So is there any reason that you

18   could not testify honestly or confidently or

19   competently?

20        A    No.

21        Q    Did you take any drugs or

22   medication, or do you have any mental illness

23   that would prevent you from testifying

24   honestly?

25        A    No.

Paul Hatch - October 21, 2022

Page 8

```
 1          Q     Okay.  Mr. Hatch, how many expert
 2   witness reports did you provide in this case?
 3          A     In this part of the case, I
 4   provided one expert report, an initial report
 5   plus two rebuttals.
 6                I should also, if I may, point out,
 7   I have printouts in front of me here, I just
 8   want you to know now, that are unmarked of
 9   all three documents.
10          Q     All three documents?
11          A     Yes.
12          Q     Did you provide any other reports
13   in this case?
14          A     Here in this case I provided
15   reports as well, and -- yes, that were of a
16   similar matter.
17          Q     How many reports did you produce
18   previously before the three expert witness
19   reports that you just mentioned?
20          A     There was a matching three that was
21   also an initial report and two rebuttal
22   reports, and those were provided in 2001.
23          Q     Did you provide any reports in
24   response -- 2001, you said?
25          A     I believe so, yes.  That's 2001.
```

Paul Hatch - October 21, 2022

```
 1          Q     2001 was 20 years ago.

 2          A     Oh, I'm sorry.  2021.

 3          Q     2021?

 4          A     Yes.

 5          Q     Did you provide any report in 2020?

 6          A     I don't think so.  I think the

 7     first reports were in '21.

 8          Q     Let's -- so first, I will ask you a

 9     few questions regarding your, you know, past

10     experience.

11                So Mr. Hatch, where do you live?

12          A     I live in Chicago.

13          Q     In Chicago.

14                And what's your highest education?

15          A     Currently, I'm doing a Ph.D., but

16     prior to that, I had a -- I studied

17     industrial design.  That was my

18     undergraduate.

19          Q     And from where?

20          A     Northumbria University.

21          Q     In which country?

22          A     In the U.K.

23          Q     In the U.K.

24                And how long did you study for

25     that?
```

Paul Hatch - October 21, 2022

```
 1         A    That was -- it was -- well, I guess
 2    five years.  It was a four-year course, but I
 3    took a one-year sabbatical.
 4         Q    And that is equivalent of a
 5    Master's degree in the United States or --
 6         A    I'm sorry, no.  It's an
 7    undergraduate degree, a Bachelor's.
 8         Q    So that's a Bachelor's degree?
 9         A    Yes.
10         Q    Did you -- after completing that
11    degree, did you pursue any further education?
12         A    Not until my Ph.D.
13         Q    And which Ph.D. program are you --
14    are you involved in?
15         A    It's called Learning Sciences.
16         Q    And which university?
17         A    It's at the University of Illinois
18    at Chicago.
19         Q    Have you passed your qualification
20    yet?
21              MR. BERKOWITZ:  Objection to the
22    form.
23         A    Do you mean in the Ph.D.?
24         Q    For the Ph.D. program, yes.
25         A    I'm halfway through the Ph.D.  So
```

Paul Hatch - October 21, 2022

1    I've passed several things so far.

2        Q    That's great.

3             And before the Learning Science

4    program -- is that the title of the Ph.D.

5    program or what does the program involve?

6        A    Yes, that is the title.  It's

7    called the Learning Sciences.

8             It's a multidisciplinary course

9    that is based on psychology, technology and

10   learning.  So it's related to education.

11       Q    It's related to education.

12            Is there any portion of the program

13   dedicated to industrial design?

14       A    Not specifically.

15       Q    And have you served as an expert

16   witness in similar cases before?

17       A    Yes, I have.

18       Q    How many?

19       A    I have provided testimony.  I think

20   it's 14, possibly 15 times.

21       Q    How many cases did you provide --

22   in how many cases did you provide this 14 to

23   15 testimony?

24       A    So, I think that would be 11 or 12

25   cases in which I've been deposed.

Paul Hatch - October 21, 2022

```
 1          Q    Have you ever served as an expert
 2    witness at trial?
 3          A    Yes, I have.
 4          Q    How many times?
 5          A    That would be three times.  The
 6    three trials included a Jams hearing, I think
 7    it's called.
 8          Q    And within that 11 to 12 cases,
 9    what type of cases or what type of products
10    do those cases involve?
11          A    A number of consumer and commercial
12    manmade products, quite a range of things,
13    based on my experience as an industrial
14    designer.
15          Q    Can you give me some examples?
16          A    One was regarding some
17    microphones --
18               (Brief pause in proceedings.)
19          A    One previous case that I provided
20    testimony for was regarding microphones,
21    which were Array microphones.
22          Q    And you mentioned microphone Array?
23          A    Array.  It's a particular type of
24    microphone.
25          Q    What other types of consumer
```

1    electronic products have you -- have you

2    testified for?

3        A    The -- there was a case regarding

4    power tools.  I guess that falls in that

5    category as well.

6            Also, a case regarding personal

7    care equipment, hair shaving.

8        Q    Anything related to electronic

9    vehicles or traditional conventional

10   vehicles?

11       A    I've got experience working in that

12   area, but I think not testifying in

13   infringement in that area.

14       Q    When you say that you have

15   experience working in that area, what

16   experience are you referring to?

17       A    I worked as an industrial designer

18   at a consultancy for -- well, as an

19   industrial designer for over 25 years, mostly

20   at a consultancy.

21           During that time, I designed a lot

22   of consumer products, which included, for

23   instance, a Segway.

24           There was a certain type of Segway

25   that I think was related to this particular

Paul Hatch - October 21, 2022

1    case.

2        Q    I'm not familiar with Segway.

3            Can you tell me more about that

4    product, Segway?

5        A    Yes, sure.

6            The Segway product came out at

7    around 2005, I think, approximately.  And the

8    invention allowed us, like a hoverboard, to

9    stand on it and use it as a mobility device.

10           The Segways are different from the

11    hoverboard.  It also has a stand going up to

12    a handlebar that the person could then hold,

13    but it used a very, very similar technology.

14        Q    How many wheels did the Segway

15    have?

16        A    Two wheels.

17        Q    Two wheels.

18            And is there any connection portion

19    between the two wheels?

20        MR. BERKOWITZ:  Objection to form.

21        A    On the Segways, it did have a -- it

22    has the portion between the wheels, yes, that

23    the user would stand on.

24        Q    That the user would stand on.

25            And did you design the industrial

Paul Hatch - October 21, 2022

1    portion of that product or did you design --

2    what portion of that product did you focus

3    your design on?

4         A    So the Segways were designed as

5    commercial products or personal vehicles

6    launched, I guess, before I started working

7    on the version I did.

8              And my company was requested to

9    design a version of that based on that

10   technology that would change the industrial

11   design, that is, the look and feel, the

12   styling towards a particular use and a

13   particular demographic.

14        Q    And what would that demographic be?

15        A    Without divulging any confidential

16   information, it was for a particular sport

17   that this would be used in and the

18   demographic being the people who do the

19   sport.

20             And it was seen that the Segway

21   would be a very good -- a very good

22   technology to use that. However, I would

23   need some certain changes to make it

24   appropriate for that particular application.

25        Q    And for the eleven trial cases that

Paul Hatch - October 21, 2022

1    you testified in, are they all design patent

2    infringement cases?

3         A    They are infringement -- I'm sorry,

4    they are intellectual property cases

5    involving utility patents and design patents.

6         Q    Were you involved in utility

7    patent -- so, how many of them involved

8    utility patents and how many of them involved

9    design patents?

10        A    I don't know the numbers off the

11   top of my head, but I think half -- about

12   half or maybe slightly more than half

13   involved design patents.

14        Q    And the -- sorry, go ahead.

15        A    And the others involved utility

16   patents.  Some involved both.

17        Q    Some involved both.

18             So you're saying you're about five

19   to six cases that you -- where to which you

20   served as an expert witness involving design

21   patent issues?

22        A    Approximately that number for how

23   many I have provided deposition for.

24             I've also worked on some other

25   design patent cases that I've only provided

Paul Hatch - October 21, 2022

1    analysis and reports to support the

2    particular case, but it didn't necessarily go

3    to deposition.

4         Q    And how many of those cases in

5    which that you served analysis but not

6    deposition?

7         A    Off the top of my head, I'm not

8    sure.  I would say a few, which would be

9    several, I guess.  Three to five, maybe more.

10        Q    Do you know the outcome of those

11   cases, the five to six cases of design patent

12   that you served as being deposed, that you

13   were deposed in those cases and the three to

14   five cases that you provided analysis but you

15   were not deposed in those cases?

16             MR. BERKOWITZ:  Objection to the

17   form, vague, compound.

18        A    I know that some of the cases,

19   certainly the majority of the cases I worked

20   on had a positive outcome.  Maybe it was

21   settled before they went to court.

22             But I -- I haven't followed up to

23   know about how all of my cases ended.

24        Q    Is there any case that your

25   analysis was -- are there any cases that your

Paul Hatch - October 21, 2022

1    analysis was rejected by the court for the

2    infringement analysis?

3              MR. BERKOWITZ:  Objection to form.

4        A    I'm not very sure about what may

5    have happened with some of my testimony

6    after -- afterwards, but I -- I'm not aware

7    of, you know, a successful Daubert motion,

8    that is, for instance, I think I would be

9    aware if there was a successful Daubert

10   motion to block me as an expert witness.

11       Q    I guess that's what I was asking.

12             What I meant is, was there any

13   analysis that you provided that eventually

14   was not -- was not -- let me rephrase it.

15             Is there any analysis to which you

16   provided your opinions were not -- were not

17   taken by the court, meaning the court sided

18   with the other party and considered, although

19   you provided your expert report, the position

20   is -- the positions were not taken by the

21   court?

22             MR. BERKOWITZ:  Objection to form.

23       A    Yeah, I don't entirely understand

24   the question, but I --

25       Q    Let me -- let me rephrase it.

Paul Hatch - October 21, 2022

1            If you provided your opinion, were

2      they all considered by the court?

3            MR. BERKOWITZ:  Objection to form.

4       A    I believe all of the reports that

5      I've provided were considered and I have not

6      had a report struck, if that's what your

7      question is.

8       Q    And in those cases, did the court

9      all rule in your client's favor or did they

10     side with the other party?

11           MR. BERKOWITZ:  Objection to the

12     form.  Asked and answered.

13           You can answer.

14      A    Just to clarify, when you say in

15     those cases --

16      Q    In those cases you provided your

17     analysis and testified as witnesses.

18           MR. BERKOWITZ:  Same objection.

19      A    Yes, sorry.

20           Can you either repeat or rephrase

21     the question?

22      Q    Sure.

23           In those cases that you provided

24     your analysis and you served as an expert

25     witness, did the court all rule in your

Paul Hatch - October 21, 2022

Page 20

1     client's favor or did they side with the

2     other party?

3          MR. BERKOWITZ:  Objection to the

4     form.  Asked and answered.

5          A    I'm not sure.  I know that in -- I

6     believe in the majority of the cases it has

7     ended up in the favor of -- or in my favor,

8     so to speak, but I really haven't kept track

9     of all the cases.

10         Q    So when you say the majority of the

11    cases, the rest of the cases, do you know

12    that the court ruled against your client or

13    you just don't know about the outcome of the

14    cases?

15         A    I believe there's one or two --

16    there's certainly one I know of that didn't

17    go in favor of my client, but there's

18    several -- I guess I really didn't keep tabs

19    on to know whether it went one way or the

20    other -- or another.

21         Q    And for that one case that didn't

22    go in favor of your client, do you know the

23    case caption or the case number?

24         A    Yes.  Specifically, that's one that

25    went to trial.

Paul Hatch - October 21, 2022

Page 21

```
 1              I don't know the case number, but I
 2     do have it in my appendix.
 3              The case is Clearone versus Shure.
 4     Q    Okay.   Thank you.
 5              Mr. Hatch, who approached you
 6     initially regarding this case?
 7              MR. BERKOWITZ:  Objection to the
 8     form.
 9     Q    Who approached you initially
10     regarding providing opinions in this case?
11     A    In this part of the case, the
12     attorneys present contacted me.
13     Q    Which portion are you referring to?
14     A    I'm sorry, this year, the case that
15     we're looking at this year.
16     Q    Oh, this year.
17              For the entire case, who approached
18     you and asked whether or not you can provide
19     your opinion in this case?
20     A    I don't actually recall, but it
21     would very likely have been one of the
22     attorneys that were previously involved on
23     this case in 2021.
24     Q    And you don't remember the name of
25     that attorney?
```

Paul Hatch - October 21, 2022

```
 1          A    I don't right now, no.
 2          Q    Do you remember which law firm that
 3   attorney worked for?
 4          A    Sorry.  Off the top of my head, I
 5   don't know.  I've not worked with that law
 6   firm before.
 7          Q    And have you worked with the named
 8   plaintiffs or defendants before?
 9          A    Not before this case, no.
10          Q    And after this case?
11               MR. BERKOWITZ:  Objection to the
12   form.  Calls for speculation.
13          A    Do you mean have I worked with
14   them --
15          Q    In other cases.
16          A    In other cases since the start of
17   this case, is that what you mean?
18          Q    Since the start of the case.
19          A    No, I haven't.  I only worked on
20   this particular case for that particular
21   client.
22          Q    Do you know the name of the
23   plaintiffs in this case?
24          A    Yes, I do.
25          Q    Who are they?
```

Paul Hatch - October 21, 2022

```
 1          A    You're referring to Hangzhou Chic,
 2    H-A-N-G-Z-H-O-U, and Chic is C-H-I-C.
 3          Q    Is that the only party you're
 4    working for in this case?
 5          A    There's -- I believe there are also
 6    the company called Unicorn, Unicorn
 7    technology.
 8               No, I'm sorry, it's Unicorn Global,
 9    who are also plaintiffs in this case.
10          Q    And aside from this case, you have
11    not worked with them in other cases?
12          A    I have not worked with Hangzhou
13    Chic and Unicorn outside of this case.
14          Q    Mr. Hatch, what's your hourly rate
15    for doing work in this case?
16          A    It's $450.
17          Q    Per hour?
18          A    Per hour, yes.  I believe that's in
19    my report.
20          Q    Is that the amount that you usually
21    charge your clients?
22          A    Yes, it is.  It's a standard rate,
23    and it's always the -- you know, not
24    contingent upon the outcome of this case in
25    any way.
```

Paul Hatch - October 21, 2022

Page 24

1          Q     And that's the same rate for
2     providing your analysis and attending
3     deposition?
4          A     Yes.  However -- actually, I'm not
5     sure if I have a different rate for
6     depositions specifically.
7                With some of my work I have a
8     slightly higher rate for deposition, which
9     may or may not be the case with this case.
10         Q     Have you talked about your rate for
11    attending deposition in this case?
12         A     I have -- it would have been agreed
13    when I started to work with the attorneys,
14    yes.
15         Q     I'm sorry, I'm not quite
16    understanding you.
17               So you said for some work there may
18    or may not be a higher rate.
19               Are you charging a higher rate for
20    attending deposition in this case?
21         A     I would have to check.
22               With some clients I do charge --
23    generally, I do charge a higher rate for
24    deposition and trial, and that depends upon
25    the agreement, that particular agreement that

Paul Hatch - October 21, 2022

1    has been made with the attorney.

2         Q    Has there been an agreement made

3    with an attorney?

4         A    There has, and I would have to

5    double check what that is.  It's -- likely,

6    it's slightly higher for a deposition.

7         Q    How many hours have you spent --

8    have you spent preparing and drafting your

9    declarations in this case?

10             MR. BERKOWITZ:  Objection to form.

11        A    Last year there was a lot of

12   analysis of a lot of different hoverboards

13   outside of the hoverboards that are in this

14   case.

15             There were a significant number of

16   hours involved in that part of the analysis.

17             This year I created three reports

18   and also conducted an analysis on five

19   hoverboards, but more specifically, the

20   current defendants, and therefore, there was

21   less time.

22             It's hard to estimate the hours,

23   but this year may be somewhere in 80 to 150

24   in that work.

25        Q    Can you tell us about TEAMS Design

Paul Hatch - October 21, 2022

```
1      USA?
2           A     Sure, yes.
3                 It's a design consultancy that I --
4      I founded the Chicago branch of in 1998 and
5      continued to -- to lead up until two years
6      ago.
7           Q     What happened two years ago?
8           A     I decided to -- to do my Ph.D., and
9      it's a full-time program and I dedicated
10     myself towards that.
11          Q     Are you still with TEAMS Design
12     USA?
13          A     I'm not.  I am, however, on the
14     board and have partial ownership still.
15          Q     Is that a -- what is the formality
16     of this company; is that a partnership or is
17     it a limited corporation or is it an
18     incorporated business?
19          A     It's a -- I believe it's called a C
20     Corp.  So it's not -- it's not public, if
21     that's what you mean.  It's privately held.
22          Q     And when you're saying the Chicago
23     branch, what's the headquarter of this
24     organization?  Where's the headquarters?
25          A     The headquarters is in Germany, and
```

Paul Hatch - October 21, 2022

1      they were founded in 1956.

2           Q    When you were working there, how

3      many staff employees did you supervise?

4           A    It ranged through the years.  At

5      the very start, I just had one employee and

6      we went up to about 28, I believe, and as an

7      average, usually around 15 to 20, I guess.

8           Q    Do you know any person who worked

9      for plaintiff, Hangzhou Chic, at Intelligent

10     Technology Corporation?

11               MR. BERKOWITZ:  Objection to the

12     form.

13          A    I don't personally know them, any

14     person that works there, no.

15          Q    Have you talked with anyone who

16     worked for them -- not them, for it, just one

17     company?

18               MR. BERKOWITZ:  Objection to form.

19          A    I've not spoken directly with

20     someone who works with Hangzhou Chic.

21          Q    Do you know any person who works

22     for Unicorn Global, Inc.?

23          A    I don't personally know anyone who

24     works for Unicorn Global, Inc.

25          Q    Have you talked to anyone who works

Paul Hatch - October 21, 2022

1     for Unicorn -- who works at Unicorn Global,

2     Inc.?

3          A    I've not spoken with anyone who

4     works at Unicorn Global, Inc.

5          Q    Do you know the person named Jing

6     Cui?

7               And I'll spell that for you.

8     J-I-N-G, and C-U-I, last name.

9               MR. BERKOWITZ:  Objection to the

10    form.

11         A    I don't know personally that

12    person.

13         Q    Have you seen any documents drafted

14    by this person?

15              MR. BERKOWITZ:  Objection to the

16    form.

17         A    I'm sorry, who is the person, a

18    manager of one of the companies?

19         Q    They are the accolades with the

20    company, yes.

21         A    I don't think I've seen any

22    documents drafted by them.

23         Q    Have you seen any reports submitted

24    by them in court?

25              MR. BERKOWITZ:  Objection to the

Paul Hatch - October 21, 2022

```
1      form.
2              MR. CHENG:  Can you be more
3      specific so I understand your objections
4      better?
5              MR. BERKOWITZ:  Sure.
6              It's outside the scope.  It's
7      unclear who you're referring to, what reports
8      you're referring to.  It's unclear what court
9      you're referring to --
10             MR. CHENG:  I will be more
11     specific.
12             MR. BERKOWITZ:  -- or when.
13        Q    Mr. Hatch, do you know if Jing Cui
14     submitted any declarations in this case?
15             MR. BERKOWITZ:  Objection to the
16     form.  Asked and answered.
17        A    I'm not aware of reading any of
18     those -- any of those declarations.
19        Q    Do you know a person with the name
20     of Yia Wei Ying, Y-I-A, W-E-I, first name and
21     last name is Y-I-N-G.
22        A    No, I'm not familiar with that name
23     right now.
24        Q    Do you know whether or not this
25     person submitted any declarations in this --
```

Paul Hatch - October 21, 2022

```
 1     in this case?
 2          A    I'm not familiar with this person's
 3     declarations.
 4          Q    Do you know a person with the name
 5     Arthur Yuan, Y-U-A-N?
 6          A    Is Arthur an attorney?
 7          Q    I ask questions here.
 8          A    Oh, I'm sorry.
 9               I believe there was an Arthur who
10     was an attorney on the case last year, but
11     again, I'm -- I'm not sure.
12          Q    And do you know if Arthur Yuan ever
13     submitted any declarations in this case?
14          A    If he was the attorney on my
15     client's side, the only declarations that I
16     know of are the declarations that I wrote.
17          Q    I'm sorry, can you -- can you
18     repeat your answer?  I don't think I quite
19     got it.
20          A    I'm not sure if -- if Arthur is the
21     attorney.
22          Q    Arthur is the attorney with a firm
23     Loeb & Loeb.
24          A    Okay, great.
25               So I'm not familiar with
```

Paul Hatch - October 21, 2022

1    declarations that they submitted other than

2    my declarations.

3         Q    You don't know whether or not he

4    submitted declarations in this case?

5         A    I -- I believe they -- they did

6    submit opinions to this case.  I'm fairly

7    sure of that.

8              I only provided my declarations.

9    I'm only aware of the declarations that I

10   provided.

11        Q    Did you read any of his

12   declarations?

13             MR. BERKOWITZ:  Objection to the

14   form.  Asked and answered multiple times.

15        A    I'm sorry, can you repeat it?

16        Q    Did you read any of his

17   declarations?

18        A    Any of what declarations?

19        Q    Any of Arthur Yuan's declarations

20   submitted in this case.

21        A    No, I -- the only declarations I'm

22   aware of submitted from our side were from

23   me, that I know of.

24        Q    Do you have any financial interest

25   depending on the outcome of this case?

Paul Hatch - October 21, 2022

```
1          A    I believe I have answered that
2      already, but no, the outcome does not affect
3      my -- anything financially for me.
4          Q    Did you actually solicitate
5      business from either the firm Loeb & Loeb or
6      from the client?
7               MR. BERKOWITZ:  Objection to form.
8          A    No, I was approached by them.  I
9      would not have approached them about this
10     case.
11         Q    Do you know if TEAMS Design USA
12     actively advertised their business and
13     solicitate business from the law firm of Loeb
14     & Loeb or from the plaintiffs in this case?
15         A    No, TEAMS doesn't directly
16     solicitate business from them beyond having a
17     website, but it is not directed at those
18     companies.
19         Q    Do you use any agent, advertising
20     companies, online platforms, to advertise
21     their business?
22         A    There -- there is a marketing group
23     that does look after social media posts, but
24     they don't do cold calling or direct calling
25     on potential clients.
```

Paul Hatch - October 21, 2022

```
 1        Q    Out of the declarations and the --
 2   out of the declarations you submitted in this
 3   case and the expert witness report and the
 4   rebuttal report you provided, did you
 5   prepare -- did you prepare those documents by
 6   yourself or with the assistance of another
 7   party?
 8        A    I did a high majority of the work,
 9   certainly all the analysis and the writing,
10   and I conferred with the attorneys for their
11   opinion, or rather, you know, on grammatical
12   errors and things like that.
13             So there was some help, but the
14   high majority of the opinions are all mine.
15        Q    What documents did you review to
16   complete the declarations that you provided
17   before you -- before you provided the expert
18   witness reports?
19             MR. BERKOWITZ:  Objection to the
20   form.
21        A    I believe I've -- I've documented
22   that in Appendix C.
23             I reviewed the -- you're asking
24   which documents I reviewed.
25             I reviewed the patents and the --
```

Paul Hatch - October 21, 2022

1      in this case, and the file histories, but I

2      also reviewed the accused products

3      themselves.

4           Q    By "accused products," what

5      products were you referring to?

6           A    The -- you know, more specifically

7      in the infringement report this year, my

8      focus was to look at the accused products

9      that I have termed Gyroor A through E.

10          Q    Okay.  So you're referring to the

11     expert witness report you provided this year.

12               Did you review -- are those the

13     only products that you reviewed in this case?

14               MR. BERKOWITZ:  Objection to the

15     form.

16          A    In the previous part of this case,

17     there were a lot more accused products.  So

18     I -- I reviewed, as I mentioned before, a lot

19     more products last year.

20          Q    How many products did you review?

21          A    I'm not sure of the number.  There

22     were very many.

23               I probably reviewed 10 or 12

24     physical products in person and maybe just as

25     many through other detailed information that

Paul Hatch - October 21, 2022

1    was outside of the Gyroor products.

2         Q    By other detailed information, do

3    you mean photos?

4         A    Yes.  Outside of the Gyroor

5    products, there were products that were not

6    obtainable by the counsel last year and so

7    I -- I reviewed them via photos of different

8    angles of those products, but the Gyroor

9    products in this case I've reviewed in

10   person.

11        Q    Who provided the products to you?

12        A    I -- I believe one of them I did

13   purchase myself online, but the other Gyroor

14   products were provided to me on my request by

15   the previous counsel.

16        Q    Aside from the Gyroor products, did

17   you review any other accused products in

18   person or did you obtain any other -- did you

19   obtain any other accused products in their

20   physical form?

21             MR. BERKOWITZ:  Objection to form.

22   Outside the scope of the reports.

23        A    I -- I did review some other

24   products that were not manufactured or I

25   believe they were not manufactured by Gyroor

Paul Hatch - October 21, 2022

1       in person last year, yes.

2           Q    And for those products that you did

3       not receive a physical form, how did you

4       compare the products with -- with the

5       patents?

6               MR. BERKOWITZ:  Objection to form.

7       Outside the scope.

8           A    In some of the products where I or

9       all the attorneys were not able to get

10      physical products, partly because they had

11      been pulled off of the market, they provided

12      me with substantial photos of them and that's

13      what I used for my analysis, but that was

14      only for non-Gyroor products.

15          Q    Do you think the substantial photos

16      are sufficient for you to form your opinion?

17              MR. BERKOWITZ:  Objection to form.

18      Calls for speculation.

19          A    I think in that particular case for

20      those non-Gyroor products, I was able to

21      provide some opinion based on the limited

22      information that I could get from the photos,

23      but I also acknowledge that I would need to

24      examine the physical product to finish that

25      analysis.

Paul Hatch - October 21, 2022

Page 37

1                However, the Gyroor products, I --
2    I had in person.
3        Q    Is there a substantial difference
4    between the Gyroor products and the
5    non-Gyroor products?
6            MR. BERKOWITZ:  Objection to form.
7    Calls for speculation.
8        A    That was not necessarily part of my
9    analysis.  That is, I wasn't comparing the
10   Gyroor products to the non-Gyroor products,
11   however, the Gyroor products I did have in
12   person and some of the non-Gyroor I didn't.
13       Q    For the non-Gyroor products that
14   you did not obtain, the product that you only
15   viewed the photos, did you conclude that they
16   were infringing or do you think they were not
17   infringing products?
18           MR. BERKOWITZ:  Objection to the
19   form.  Outside the scope.
20           I just caution the witness to the
21   extent this is not a -- not referring to a
22   report that was issued.  Just be aware of
23   that.  It could be privileged communications
24   that you shouldn't disclose.
25           MR. CHENG:  I'm not solicitating

Paul Hatch - October 21, 2022

1      any privileged information.

2              If there's any question related to

3      any privilege, please assert it clearly so I

4      know that question should be avoided.

5              However, if it's not privileged

6      information, I'm free to ask.

7              MR. BERKOWITZ:  Sure.  So I'm

8      cautioning the witness.

9              MR. CHENG:  Okay.

10             MR. BERKOWITZ:  I don't fully

11     understand the question, so it's hard to give

12     a precise instruction.

13             I'm telling the witness to the

14     extent that his answer may reveal privileged

15     communications, you be aware of that.

16             Go ahead.

17         A   For clarification, can you repeat

18     the question?

19         Q   Of course.

20             You mentioned -- so let's do this

21     step by step.

22         A   Yes.

23         Q   For some of the products that you

24     reviewed, you did not review the physical

25     product?

Paul Hatch - October 21, 2022

Page 39

```
 1        A     For some of the non-Gyroor

 2   products, I was unable to examine the

 3   physical product which would have been

 4   optimal.

 5        Q     Did you form -- and for those

 6   products you only examined the image or the

 7   photos provided to you?

 8        A     For those specific non -- for a few

 9   of the non-Gyroor products, I was only able

10   to analyze some photos.

11        Q     And after analyzing those photos,

12   did you form your opinion as to the

13   infringement nature of those products?

14             MR. BERKOWITZ:  Objection to form.

15        A     I was -- after analysis of the

16   non-Gyroor products, I was able to provide an

17   opinion on that basis, on the limited

18   information that I had, but also requested to

19   have the physical product for a more thorough

20   analysis.

21        Q     Did you ever receive what you

22   requested?

23             MR. BERKOWITZ:  Objection to form.

24   Calls for speculation.

25        A     I did request a number of
```

Paul Hatch - October 21, 2022

1  hoverboards that I didn't originally have,

2  non-Gyroor hoverboards, and did eventually

3  receive some that helped my analysis, yes.

4    Q  But not all of those non-Gyroor

5  products?

6     MR. BERKOWITZ: Objection to form.

7  Mischaracterizes testimony.

8    A  Some of the non-Gyroor products

9  last year had been pulled from the market and

10  the attorneys and myself were unable to get a

11  hold of physical samples.

12    Q  Did you provide any opinion on

13  those products that you did not receive?

14    A  I did provide --

15     MR. BERKOWITZ: Objection.

16     Just note my objection to the form.

17  It's been asked and answered multiple times.

18     You can answer.

19    A  For the non-Gyroor products that

20  I -- I didn't have a physical product on, I

21  did provide analysis and also opinions, but

22  also asked for further physical products so

23  that I could create a more detailed analysis.

24    Q  That's not the question I asked.

25     And I will repeat my question, and

Paul Hatch - October 21, 2022

1    I want you to answer specifically to the

2    question I asked.

3              For the products, you never

4    received a physical product, for the accused

5    products that you never received the physical

6    products, did you provide your opinions on

7    those products?

8              MR. BERKOWITZ:  Objection to form.

9    Asked and answered.

10        A    I did provide an opinion, also an

11   initial analysis as detailed in my

12   declaration and made it clear that a better,

13   more detailed analysis would be through a

14   physical product.

15             I hope that answers your question.

16        Q    How many patents -- how many design

17   patents did you review?

18        A    I reviewed the four patents and

19   their file histories, the ones that are

20   relevant for this case, and I believe last

21   year I also reviewed -- I would have to

22   check.

23             I think there was a utility patent

24   that I reviewed but I did not base my

25   opinions on.

Paul Hatch - October 21, 2022

```
 1              MR. CHENG:  Ms. Court Reporter, can
 2     we take a break?  Ten minutes.
 3              (Brief recess taken.)
 4        Q    Let me introduce into evidence --
 5     let me introduce Exhibit 1, and I will share
 6     that with everyone in the chat.
 7              (Above-mentioned document marked
 8     for Identification.)
 9        Q    Mr. Hatch, can you download this
10     file or do you want me to share that with
11     you?
12        A    I've downloaded it and I can view
13     it.  Thank you.
14        Q    Okay.  You previously mentioned
15     that you provided declarations in this case,
16     starting in 2021.
17              Do you recognize this document?
18        A    I do, yes.
19              And thinking of the timing of this,
20     this might even be 2020 when I started in
21     this case.  It's all COVID years, but yes, I
22     do recognize this document.
23        Q    So do you recognize this document
24     was provided by you?
25        A    Yes.  And I'm sorry, I don't know.
```

Paul Hatch - October 21, 2022

Page 43

1    I think it might be at the end of 2020, but

2    yes, this is from me.

3         Q    Meaning the last page has your

4    signature.

5              Can you confirm that you signed

6    that document?

7         A    Yes.  I see the date as well.  It

8    is the end of 2020.

9         Q    So you did provide expert

10   declarations in the year of 2020?

11        A    Yes, I believe so.

12        Q    Okay.

13        A    And I think when I was referring to

14   2021 and whether there were non-Gyroor

15   products, that was at around this time, which

16   was the end of 2020.

17        Q    So you're saying this declaration

18   does not implicate Gyroor products?

19             MR. BERKOWITZ:  Objection to the

20   form.

21        A    That's not what I said, no.

22        Q    I'm sorry, what did you say?

23        A    That this declaration written at

24   the time, towards the end of 2020, included

25   some non-Gyroor products.

Paul Hatch - October 21, 2022

```
 1          Q     Included non-Gyroor products?

 2          A     Yes.

 3          Q     I see.

 4                MR. CHENG:  I'm going to introduce

 5     to you in the chat the second document, which

 6     is marked as Exhibit No. 2.

 7                (Above-mentioned document marked

 8     for Identification.)

 9                MR. CHENG:  Can you all see this

10     document?

11                MR. BERKOWITZ:  I downloaded it.

12                Paul, have you been able to

13     download it?

14                THE WITNESS:  Yes, and I've opened

15     it.

16                MR. BERKOWITZ:  Okay.

17          Q     Mr. Hatch, do you recognize this

18     document?

19          A     I do, yes.

20          Q     And can you confirm that the

21     document was prepared and signed by you?

22          A     Yes, it is signed by me.  I believe

23     the case number is different from the current

24     case here.

25          Q     Exactly.  That's what I'm trying to
```

Paul Hatch - October 21, 2022

1     understand.

2            You said you have not worked with

3     plaintiffs in other cases aside from the

4     current case that you're being deposed for.

5            Did you prepare this document?

6            MR. BERKOWITZ:  Objection to the

7     form.

8        A    I did provide -- prepare this

9     document, yes, and I see this is probably the

10    same or very similar to the other document

11    that I also prepared, Exhibit 1, but I also

12    see the case number is different.

13           I was not aware that there were two

14    different case numbers for this case.

15       Q    Did you authorize your report to be

16    used in this case?

17           MR. BERKOWITZ:  Objection to the

18    form.

19       A    I did authorize the attorneys to

20    use my document.  I was not aware that this

21    would be a separate case because it involves

22    the same material.

23       Q    I don't know if it involved the

24    same material.

25           What I'm trying to understand is,

Paul Hatch - October 21, 2022

1    if this report is prepared by you, then you

2    should have known that your opinions provided

3    in the case 20-cv-05905 is this document

4    prepared by you.

5              MR. BERKOWITZ:  Objection to the

6    form.  Argumentative.  Asked and answered.

7         A    This document is provided by me,

8    but I was not aware of the time that -- at

9    the time that this may be used in a different

10   case, but it -- it's regarding the -- the

11   same material.

12        Q    On the first page of Exhibit No. 2,

13   there is a case number, which is 20-cv-05905.

14             Can you see that case number?

15        A    Yes, I do see that.  Yes.

16        Q    Did you put in the case number on

17   the first page?

18             MR. BERKOWITZ:  Objection to the

19   form.

20        A    I'm not sure if I actually put that

21   case number or if possibly the attorneys had

22   corrected what I had there before.

23        Q    So it's possible that the attorney

24   used your report and changed the case number?

25             MR. BERKOWITZ:  Objection to the

Paul Hatch - October 21, 2022

1    form.

2         A    It's possible that they did minor

3    edits like that and, obviously, I would have

4    trusted them with a case number.  It's not

5    something I would have known about.

6         Q    Did you sign for this document?

7         A    I believe you've asked that, but

8    yes, I did sign this document and I did write

9    this document.  This is my analysis.

10        Q    And do you know what your analysis

11   was used for in the case 05905?

12             MR. BERKOWITZ:  Objection to form.

13        A    I see now, obviously, that it has a

14   different case number, but the -- my opinions

15   is what counted here and I -- I knew those --

16   how those were being used.

17             I was not aware that it had a

18   different case number, though.

19        Q    But you did provide this report

20   separately or it's just one report being used

21   in different cases?

22             MR. BERKOWITZ:  Objection to form.

23        A    No, I did provide this separately.

24   It was -- for me, it was part of the

25   continuing -- continuing analysis of the very

Paul Hatch - October 21, 2022

Page 48

1      many infringing products.

2           Q    Do you know what are the accused

3      products in the case 05905?

4                MR. BERKOWITZ:  Objection to form.

5      Outside the scope.

6           A    This is obviously, as you've

7      explained, a case outside of this case, but

8      the report does show the accused products in

9      this case, yes.  There are very many.

10          Q    And do you remember when this

11     report was executed or signed by you?

12          A    I do see the date is included

13     there, which I don't question.  It -- it was

14     filed on November the 30th, 2020.

15          Q    So you've worked with plaintiffs in

16     multiple cases?

17          A    I -- at the time I was under the

18     impression this was the same case, but I see

19     it has a different case number now, but my

20     analysis and my opinions were, as we can see,

21     the same and consistent.

22          Q    Have you worked with plaintiffs in

23     any other cases?

24          A    I am not aware of any cases outside

25     of these ones we're looking at that I worked

Paul Hatch - October 21, 2022

Page 49

1       with them on.

2           Q    Back to Exhibit No. 1, and if you

3       can take a look at page number 21. and

4       there's a Table 8, "Accused Products of

5       Species I."

6               Can you see that table?

7           A    Yes, I see this table.

8           Q    And there are nine pictures on this

9       page and the bottom metal picture is a

10      hoverboard with the name or the brand name

11      SYLUS, S-Y-L-U-S.

12              Can you see that one?

13          A    Yes, I see that one.

14          Q    Did you receive a physical product

15      of this SYLUS hoverboard?

16              MR. BERKOWITZ:  Objection to form.

17      Outside the scope.

18          A    I'm not sure.  I think it's quite

19      possible for this particular one.  You see

20      this is one of very many and obviously it

21      looks very familiar.

22          Q    Okay. and your declaration, Exhibit

23      1, the picture of the SYLUS hoverboard was

24      used as evidence to prove its infringing

25      product?

Paul Hatch - October 21, 2022

Page 50

1              MR. BERKOWITZ:  Objection to form.

2      Mischaracterizes documents.

3          A    This particular hoverboard was one

4      of very many that I analyzed and did conclude

5      they were substantially the same in the eyes

6      of the ordinary observer to the infringed

7      patent.

8          Q    Aside from the picture included

9      here, did you review any other image or the

10     physical products related to this SYLUS

11     hoverboard?

12             MR. BERKOWITZ:  Objection to form.

13     Outside the scope.

14         A    It's very likely that I looked at

15     other views of this particular product, one

16     of many here, and I think I may have seen the

17     physical product for this one as well.

18             It's obviously very familiar

19     because it's -- it's the same shape and form

20     or very similar shape and form to many of the

21     hoverboards here.

22         Q    Aside from this perspective view of

23     the SYLUS hoverboard, did you include any

24     other images for this SYLUS hoverboard in

25     this report?

Paul Hatch - October 21, 2022

Page 51

1         A    In this particular report, I

2    believe I only show one of the images in one

3    particular view, but my analysis was -- was

4    broader.

5         Q    Did you view other images in other

6    reports but you only particularly mentioned

7    this particular report?

8              MR. BERKOWITZ:  Objection to the

9    form.

10        A    I don't know, for instance, if in

11   that other case that you brought forward, if

12   it was included there.  I may have included a

13   different view.  It's possible, but certainly

14   my analysis beyond just looking at one

15   particular view.

16        Q    Even though there's only one view

17   included in this report?

18             MR. BERKOWITZ:  Is there a

19   question?

20             MR. CHENG:  Yes.

21        Q    So based on this report, based on

22   this one image, you conclude that, according

23   to your report, this product is infringing on

24   the patent in suit?

25             MR. BERKOWITZ:  Objection to form.

Paul Hatch - October 21, 2022

1     Mischaracterizes testimony.

2          A     No, that's not what I said.

3               I've only -- in this particular

4     report, I've only included this one view.

5               Because there are so many similar

6     infringing images for the conciseness of this

7     report, I only showed one image; however,

8     there were very many other views and other

9     images that I analyzed among these products

10    as well as analyzed physical products.

11         Q     And why did you not include other

12    views in this report?

13         A     They -- the -- for the conciseness

14    of the report itself, to report the opinion,

15    it was not necessary to show all of the views

16    of all of the products because there were, in

17    this case, so very many.  However, later

18    reports where I was analyzing just four or

19    five products, I -- I did then provide more

20    images.

21         Q     When you say -- when you said not

22    necessary, do you think this one image is

23    sufficient to prove that this is an

24    infringing product?

25               MR. BERKOWITZ:  Objection to the

Paul Hatch - October 21, 2022

1    form.  Asked and answered multiple times.

2         A    This image only -- does not provide

3    all of the evidence of the analysis

4    necessary.  This image represents one product

5    just for this report.  The analysis was done

6    on very many images and physical products.

7         Q    So based on this one image, it's

8    not conclusive this product is infringing?

9    Without other images, this conclusion is

10   insufficient from this one image?

11             MR. BERKOWITZ:  Objection to form.

12   Mischaracterizes testimony.

13        A    That's not what I'm saying, but

14   what I'm saying is, I've included one view as

15   part of this document.  However, the analysis

16   of the infringement itself was done using

17   many years.

18        Q    If the views are not included in

19   this report, how can we conclude that you

20   actually viewed other angles of this product?

21        A    I believe it would be stated in the

22   report that I analyzed many views and

23   physical products as part of my analysis.

24        Q    So although the images were not

25   included, your words that you viewed other

Paul Hatch - October 21, 2022

1    images to be sufficient to conclude that the

2    products is infringing?

3         A    The report is a reflection of my

4    analysis and it is the -- the aim of the

5    report is not to provide every possible piece

6    of evidence, but to provide my opinion, based

7    upon an analysis of the evidence and

8    therefore, that's what it does.

9         Q    And in preparing this document --

10   in preparing this declaration marked as

11   Exhibit 1, what documents did you review?

12        A    I reviewed the relevant patents,

13   filing histories, very many images of the

14   accused products and a number of physical

15   products as part of the analysis to prepare

16   this document.

17        Q    And do you know what this document

18   was used for?

19             MR. BERKOWITZ:  Objection to form.

20        A    I'm sorry, what do you mean?

21        Q    What document was used to support?

22             MR. BERKOWITZ:  Same objection to

23   form.

24        A    The -- my analysis of this

25   document -- my declaration provided my

Paul Hatch - October 21, 2022

1    opinion on this case and it was used in this

2    case.

3         Q    To support a motion?

4         A    That is correct.  I -- I stated

5    that I think in the -- yes, in the opening

6    paragraph, that this declaration is in

7    support of a preliminary injunction that was

8    going on at the time.

9         Q    Did you review the motion for

10   preliminary injunction?

11        A    I'm not sure.  I don't think I -- I

12   don't think I did at the time.  I was focused

13   on my own report.  I don't think I saw

14   information like that.

15        Q    And who provided you with a list of

16   accused products?

17             MR. BERKOWITZ:  Objection to the

18   form.

19        A    The attorneys, the counsel at the

20   time would have provided me with a list of

21   the potentially infringing reports when they

22   asked for my opinion on them.

23        Q    Do you know how many potential

24   infringing products were identified?

25             MR. BERKOWITZ:  Objection to the

Paul Hatch - October 21, 2022

Page 56

1    form.  Outside the scope.

2         A    In -- in this particular report,

3    there were very many that were part of the

4    analysis.  I'm not aware of the exact number.

5         Q    Were there any products identified

6    that -- identified by the attorney as

7    potentially infringing but deemed as not

8    infringing by you?

9              MR. BERKOWITZ:  So I would

10   instruct -- to the extent -- I would instruct

11   the witness not to answer on the grounds of

12   privilege.

13        A    Yeah, I believe I did have

14   discussions with the attorney --

15             MR. BERKOWITZ:  Just to be clear,

16   I'm instructing you --

17             THE WITNESS:  Okay.

18             MR. BERKOWITZ:  -- again, at this

19   point, to the extent it involves

20   attorney-client communication, I'm

21   instructing you not to answer.

22             THE WITNESS:  Okay, yep.

23             MR. BERKOWITZ:  Just to be clear,

24   if you can answer without revealing any

25   privileged communications or work product,

Paul Hatch - October 21, 2022

1    you can do so.

2            But to the extent that it involves

3    any communications with your attorney and

4    anything else outside the scope of this

5    declaration report, I instruct you not to

6    answer.

7            THE WITNESS:  Okay, good.  I was

8    kind of going there.

9        A    But yes, we had conversations and,

10   obviously, you know, this -- I would not have

11   provided an opinion on something infringing

12   if I didn't believe it was infringing.

13       Q    Mr. Hatch, are you familiar with

14   the patents-in-suit -- and when I use the

15   term "patents-in-suit," do you know what

16   patents I'm referring to?

17       A    I believe you're referring to the

18   four patents that I referred to in my

19   declaration this year.  I also refer to them

20   as the patents-in-suit.

21       Q    Are you familiar with those four

22   patents?

23       A    Yes, I am familiar with those four

24   patents.

25       Q    Are you familiar with all the prior

Paul Hatch - October 21, 2022

1    art referenced in those four patents?

2         A    I did gain familiarity by looking

3    at the prior arts that is referenced in those

4    four patents.

5         Q    Are there any prior arts that you

6    think should be viewed for infringement or

7    not infringement analysis in this case?

8              MR. BERKOWITZ:  I'm sorry, I didn't

9    hear the first part of your question.

10             MR. CHENG:  Ms. Reporter, if you

11   got it, can you read it back.

12             (Whereupon, the record was read

13   back by the reporter.)

14             MR. BERKOWITZ:  Objection to the

15   form.

16        A    Yes.  I'm not sure of your

17   question, but my initial analysis was of the

18   prior art that was -- that was listed on the

19   patents themselves, which is the normal

20   approach for the initial analysis, pending

21   the defendant, bringing any additional prior

22   art that they may think is relevant.

23        Q    Did you search for other prior

24   art -- did you search for additional prior

25   art other than the ones referenced in the

Paul Hatch - October 21, 2022

1       patents-in-suit?

2           A    At the start of this analysis, no.

3       I focused on the prior art that was listed on

4       the four patents.

5           Q    Are you familiar with patent -- the

6       design patent number -- the design Patent No.

7       US D739,906?

8           A    Yes, I am familiar with that.

9           Q    Is that -- is that a prior art to

10      the four patents-in-suit?

11              MR. BERKOWITZ:  Objection to the

12      form.

13          A    It is listed on two of the patents

14      as being prior art and was, therefore, part

15      of my analysis.

16          Q    Is this, in your opinion, a prior

17      art for all four patents-in-suit?

18              MR. BERKOWITZ:  Objection to form.

19          A    I believe its filing date was early

20      enough to be part of the consideration.  I'm

21      not sure if there are other things that

22      impede it from it being considered prior art,

23      however, it was a part of my analysis.

24          Q    Do you know the definition of prior

25      art?

Paul Hatch - October 21, 2022

```
 1          A    I have an understanding of prior
 2    art, yes.
 3          Q    Did you consider this 739,906
 4    patent -- and we'll refer to this one as the
 5    '906 patent.
 6               Did you consider this '906 patent
 7    only for analysis regarding two -- two of the
 8    patents-in-suit or for all four
 9    patents-in-suit?
10          A    In my analysis, I provided a full
11    comparison of the '906 to all four patents,
12    which I provided in detail.
13          Q    Mr. Hatch, do you understand the
14    legal standard for design patent infringement
15    analysis?
16          A    I have an understanding enough to
17    be able to create an analysis.  I'm not a
18    lawyer, but I do rely upon my understanding
19    of the law in my analysis.
20          Q    And can you tell us, what's your
21    understanding of the law?
22          A    I think my report says it probably
23    most succinctly.  I did provide some summary
24    there and obviously there are many aspects to
25    the law.
```

Paul Hatch - October 21, 2022

Page 61

```
1              If you have something quite
2    specific, I can attempt to answer it.
3         Q    I'd like to understand your
4    understanding regarding the legal standard
5    applied by you for your report.
6              MR. BERKOWITZ:  Objection to form.
7    Asked and answered.
8         A    There's just a number of --
9         Q    In short, you have to answer the
10   questions instead of directing me to a
11   document.
12             MR. BERKOWITZ:  No, I disagree with
13   that statement.
14             He answered your question.
15             MR. CHENG:  No.  He referred me to
16   a document.  That's not what I asked for.
17             MR. BERKOWITZ:  I disagree with
18   you.
19             The witness should answer the
20   question however he feels is appropriate.
21             Continue.
22        A    I have included an outline in my
23   report of the legal standards that help me in
24   doing this analysis and I've relied upon my
25   understanding of them.
```

Paul Hatch - October 21, 2022

```
 1                    It's not one standard.  There are
 2       legal standards that are -- that I presented
 3       there.
 4            Q    Did you do the search yourself or
 5       the legal standards was provided to you?
 6                    MR. BERKOWITZ:  Objection to the
 7       form.
 8            A    The attorneys -- are you referring
 9       to the --
10            Q    I'm referring to Section 2, "Legal
11       Standards," in your expert witness report.
12            A    Of 2022?
13            Q    Of 2022.
14                    MR. CHENG:  Let me mark that as
15       Exhibit 3, and I will drop that in the chat
16       so we know we're clear.
17                    MR. BERKOWITZ:  Thank you.
18                    (Above-mentioned document marked
19       for Identification.)
20            A    Yes, I wanted to refer to an
21       exhibit, and I realized there wasn't one.
22            Q    So this is Exhibit No. 3, and I'm
23       putting that in the chat.
24            A    Okay, I have it in front of me.
25            Q    If you can take a look at Section
```

Paul Hatch - October 21, 2022

Page 63

```
1       2, "Legal Standards," which is on page 3.

2               And as you can see, your case is

3       cited in subsections related to the Legal

4       Standards.

5               Is that correct?

6       A    That's correct, yes.  It stretches

7       until page 6, yes.

8       Q    Did you search for the cases

9       yourself?

10      A    Some, if not a lot, of this

11      language would have -- I would have used in

12      previous cases that I've been involved in,

13      and so I think a lot of this came from me and

14      at some point the past, either from

15      information I was provided by attorneys or

16      information that I searched myself.

17      Q    And which attorney provided you

18      assistance?

19              MR. BERKOWITZ:  Objection to the

20      form.

21      A    So for this document, I believe the

22      majority of this I had already -- I provided,

23      I put in here and I sourced it from the

24      previous two that I worked on.

25              It's also customary for me to ask
```

Paul Hatch - October 21, 2022

```
1      the attorneys that I'm working for to check

2      and to correct anything that I may have

3      misstated here.

4           Q    Which attorney did you ask to check

5      this section?

6           A    I would have asked the -- the

7      current attorneys, such as Mark, to check

8      over this section.

9           Q    Did they give you any feedback on

10     this section?

11               MR. BERKOWITZ:  Objection.

12               And I instruct the witness not to

13     answer.

14          A    We spoke about it.  I obviously

15     can't divulge exactly what we said.

16          Q    So can you, in your own words,

17     describe the Legal Standards that is used for

18     design patent infringement analysis?

19               MR. BERKOWITZ:  Objection to the

20     form.  The report speaks for itself.

21          A    I couldn't do it much justice, not

22     being a lawyer, but I am -- you know, I do

23     rely upon the information that I've read in

24     here and I do have a good understanding of

25     it, but I would refer to the writing.
```

Paul Hatch - October 21, 2022

1              Even if I were to do the analysis,
2     I would refer back to the writing upon which
3     I relied upon.
4          Q    You can read the relevant portion,
5     if you want.
6          A    Which of these pages are you
7     referring to as being relevant?
8          Q    I mean, that's your call.
9              I'm asking which portion do you
10    think is relevant to your understanding of
11    the Legal Standards used for design patent
12    infringement analysis.
13         A    I believe it's all quite relevant
14    for this case.
15         Q    You can read it.
16         A    It's 14 pages long.
17              MR. BERKOWITZ:  Again, the witness
18    is welcome to do that.  I'm not sure that's
19    productive use of the parties' time.  If
20    that's really what you want, you can have him
21    read from his report.
22              I'm just putting it out there that
23    it might not -- it's your choice, but
24    alternatively, you can have him read through
25    it and you can ask questions you want to ask.

1          MR. CHENG:  I want to understand

2     which portion that he thinks is most relevant

3     for the design patent infringement analysis.

4          I mean, the whole section is

5     devoted to Legal Standards but a lot of them

6     are not -- they're Legal Standards for

7     analysis.

8          MR. BERKOWITZ:  I'm not sure I

9     follow what you're asking, but it's your

10    deposition.

11         I'm not looking to interrupt you.

12    I'm just trying to make use of the time we

13    have.  However you would like to proceed.

14    Q    Mr. Hatch, you can go ahead and

15    read the portion that you think is relevant

16    for design patent infringement analysis.

17    A    Just for clarification, I believe

18    this is all relevant for the analysis.  I

19    don't -- you mentioned just now but not

20    before that you were looking for the most

21    relevant parts.  I think that's a different

22    question.

23    Q    Then the most relevant part is

24    fine.

25    A    It's all equally relevant.  I

Paul Hatch - October 21, 2022

Page 67

```
 1    wouldn't -- I wouldn't --
 2         Q    That's good.
 3              Then you can read all portions that
 4    you think is most relevant.
 5         A    If you're sure you want to use your
 6    time this way, because there's four pages of
 7    it that I would be reading here.
 8              I'm not quite sure why, but I'm
 9    happy to read it.  So -- and stop me at any
10    time.
11         Q    Sure.  Of course.
12         A    Section 2, Legal Standards.
13              "I am not a lawyer.  Rather, I'm an
14    industrial designer" -- and this is obviously
15    just explaining, "Section A, the limiting
16    purpose of a design patent.  I understand
17    that a U.S. patent does not grant the owner
18    the right to use the invention.  Rather, the
19    owner is granted the right for a limited
20    period of time to prevent others from making,
21    using, offering for sale or selling the
22    patented invention in the United States or
23    importing the patented invention into the
24    United States."
25         Q    I'm going to stop you here.
```

1           Do you know the limited period of

2    time?  Do you know how long that is?

3        A    Oh, I'm sorry, yes.  It's mentioned

4    here.  It's the limited time that is given to

5    design patents, which currently is -- or at

6    least for the patents involved in this case,

7    15 years.  I believe -- yes, 15 years I think

8    is relevant for this.

9        Q    Okay.  And --

10       A    Go ahead.

11       Q    You can start from the second

12   paragraph of Section B and let's read from

13   there.

14       A    The second paragraph of Section B

15   reads, "I understand that under precedent

16   from the U.S. Court of Appeals for the

17   Federal Circuit, the Federal Circuit, trial

18   courts have a duty to conduct claim

19   construction in design patent cases as in

20   utility patent cases," and that comes from

21   Egyptian Goddess.

22           "The court has recognized the

23   design patents typically are claimed as shown

24   in drawings, and the claim instruction is

25   adapted accordingly."

Paul Hatch - October 21, 2022

1          It refers to --

2          Q    You can skip all the cases, just

3    the substantial portion.

4          A    "Given the difficulties entailed in

5    trying to describe the design in words, the

6    preferable cost is not to attempt to construe

7    a design patent by providing a detailed

8    verbal description of the claimed design.  As

9    I understand, after a design patent claim is

10   construed, the claim must be compared to

11   accused design to determine whether there has

12   been infringement.  I also understand

13   infringement occurs when an ordinary observer

14   giving such attention as a purchaser usually

15   gives deems two designs are substantially the

16   same, meaning the resemblance is such as to

17   deceive an observer inducing him to purchase

18   one supposing it to the other."

19          "I am also aware that infringement

20   is determined in the light of prior art by

21   applying the ordinary observer test through

22   the eyes of an observer familiar with the

23   prior art.  Thus, the hypothetical ordinary

24   observer is presumed to have a complete

25   knowledge of all relevant prior art."

Paul Hatch - October 21, 2022

```
 1          Q    Good.  Let's stop here.
 2          A    Okay.
 3          Q    So have you decided the scope of
 4    all the patents-in-suit in this case?
 5               MR. BERKOWITZ:  Objection to the
 6    form.  Lack of foundation.
 7          A    I reviewed the prior art as
 8    mentioned before that was --
 9          Q    Sorry, not the prior arts.  Sorry,
10    not the prior arts.  I mean the scope of the
11    patents-in-suit.
12               MR. BERKOWITZ:  Same objections.
13          A    Yes, I believe I was answering that
14    question.
15               I understand you're not referring
16    to the prior art, but the prior art helps us
17    inform, but yes, I did develop an
18    understanding of the scope of the patents,
19    the four patents-in-suit.
20          Q    I'm sorry, did you just say that
21    prior art should be considered to construe
22    the scope of the patents?
23               MR. BERKOWITZ:  I would suggest
24    restarting the question and answer.
25               MR. CHENG:  That's better.
```

Paul Hatch - October 21, 2022

1          Q     So did you mean that prior art

2    should be considered for the design patent --

3    for the design patent construction, claim

4    construction?

5          A     In the initial part of infringement

6    analysis, the claim construction or the

7    construing that one would do would be

8    analyzing the provided images, the figures of

9    the particular patents to understand whether

10   they are plainly dissimilar to the accused

11   product.

12               Prior art helps inform the -- more

13   exactly the scope in the second parts of the

14   analysis when we look to understand if they

15   are substantially the same.

16         Q     Just to be clear, you're saying

17   that accused products and prior art should be

18   considered for claim construction?

19               MR. BERKOWITZ:  Objection to form.

20   Mischaracterizes testimony.

21         A     Yeah, that's a little different.  I

22   was talking about the infringement here, the

23   first step to construe the patents.

24         Q     What should be considered for --

25               MR. BERKOWITZ:  Don't -- no, no,

Paul Hatch - October 21, 2022

1    hang on.

2         You have to let the witness finish

3    if he's in the middle.  You can't cut him

4    off.

5    A    Initially the figures themselves of

6    the patents represent what is the claimed

7    design and so those -- the first step in

8    infringement analysis to construe what is

9    claimed by those patents.

10   Q    Do you think prior art and accused

11   products should be considered for the first

12   step of scope of claim construction?

13        MR. BERKOWITZ:  Objection to form.

14   Asked and answered.

15   A    No.  The accused products do not

16   inform us of the scope of the patents in that

17   first step.

18   Q    And what are the scopes for the

19   four patents-in-suit in this case?

20   A    In infringement analysis, we

21   construe the claim by looking at the figures

22   of the patents themselves and only if we find

23   that they -- you know, in infringement

24   analysis, if we find that they are not

25   dissimilar from the accused products, we move

Paul Hatch - October 21, 2022

1      forward to compare them directly to the prior

2      art.

3              I think that answers your question.

4      Q    It didn't.  I think you're mixing

5      claim construction with infringement in that

6      analysis.

7              Do you understand that those are

8      two distinct steps for infringement analysis?

9              MR. BERKOWITZ:  Objection to form.

10     A    I do understand that there are

11     distinct steps in infringement analysis, as

12     I've outlined in my report, and I noticed the

13     experts on the other side did not conduct,

14     which I remarked in my rebuttal.

15     Q    So do you know -- so what are the

16     scopes?

17     A    The scopes?

18             MR. BERKOWITZ:  Objection to the

19     form.

20     Q    For the four patents-in-suit.

21             MR. BERKOWITZ:  Objection to the

22     form.  Compound.

23     A    If you're referring to

24     understanding the scope based on construing

25     for infringement analysis, then the figures

Paul Hatch - October 21, 2022

1      themselves provide us with what that scope is

2      by analyzing those.

3              I'm sorry, I'm confused by your

4      question.  Maybe it was too broad.

5              You said what are the scopes of the

6      patents, is that right?

7      Q    What are the scopes for the

8      patents-in-suit after your claim

9      constructions?

10             MR. BERKOWITZ:  Objection to the

11     form.

12     A    The -- the scope is defined in,

13     say, the second step of infringement

14     analysis.

15             You know, I can't talk about

16     outside of infringement analysis necessarily,

17     but here for this report, it was important to

18     understand the scope for the second part of

19     infringement analysis by analyzing the prior

20     art and its relationship or distance to the

21     patents-in-suit.

22     Q    In your opinion, should broken

23     lines be considered for claim construction?

24             MR. BERKOWITZ:  Objection to form.

25     Calls for a legal conclusion.

Paul Hatch - October 21, 2022

1      A    Yeah, it's a very open question

2   again.  I cannot answer to whether I

3   considered broken lines to be relevant in

4   this particular analysis, in infringement

5   analysis.

6           Yes, broken lines are to be

7   considered.  They represent unclaimed areas

8   of a patent, but they are to be considered as

9   part of the analysis.

10     Q    So you think unclaimed areas as

11  waiving the scope of design patent?

12          MR. BERKOWITZ:  Objection to form.

13     A    I didn't catch the middle word, was

14  it leaving?

15     Q    No.

16          So you're saying unclaimed areas

17  are waiving the scope of design patent?

18     A    I don't believe that's what I said,

19  but the unclaimed areas should be considered

20  in analysis as I have done.  You're asking

21  whether they're waiting.

22          Well, it really depends on what

23  part of analysis and where the unclaimed

24  matter is, you know.  It's a -- whether it's

25  in prior art versus the patents at hand.

Paul Hatch - October 21, 2022

Page 76

1      Q     Okay.   Does the broken line form

2   part of the claimed design for a design

3   patent?

4      A     In the designed patents, the

5   unclaimed -- I'm sorry, the broken line

6   represents unclaimed areas of the patent.

7      Q     Okay.   Do you think an unclaimed

8   area of a patent should be considered for

9   design patent infringement analysis?

10           MR. BERKOWITZ:   Objection to form.

11      A     It depends whether -- well, it

12   should be considered.   That doesn't mean that

13   it's claimed as such, but it also depends on

14   whether the particular unclaimed area is in

15   prior art or if it's in the patents at hand.

16      Q     And do you know what side-by-side

17   comparison means?

18      A     Yes.

19      Q     Can you explain that to me?

20      A     I provided side-by-side comparisons

21   in my report to show the analysis, but a

22   side-by-side is comparing one item directly

23   to another, for instance, a -- a particular

24   figure compared to a similar viewpoint of the

25   accused product, for instance.

Paul Hatch - October 21, 2022

1          Q      You mean, a figure from the

2    patents-in-suit be compared with a figure

3    from an accused product?

4          A      Almost, yes.   The -- for instance,

5    a side-by-side might be between a patent and

6    an accused product, and so you would show the

7    figure from the patent next to a similar

8    angle of -- of not a figure, but a photograph

9    of the accused product.   However, the

10   analysis would be done by viewing the product

11   as a whole.

12         Q      And do you think any prior art

13   should be compared with the accused products

14   and the patents-in-suit at the same time?

15         A      In the second part of the

16   infringement analysis of the ordinary

17   observer test, it is important to compare,

18   also, the prior art.

19         Q      Side-by-side with the accused

20   products and the patents-in-suit?

21         A      It's not a hundred percent.

22                I'm sorry, it's known as a

23   three-way analysis, and it doesn't always

24   have to be undertaken.

25                However, I did provide a thorough

Paul Hatch - October 21, 2022

Page 78

1    three-way analysis as the experts on the

2    other side have not done.  And so I did do

3    the three-way, which is like a side-by-side

4    analysis.

5         Q    Can you point to me where the

6    three-way was done?

7         A    It's not in your exhibits yet, but

8    the side-by-side -- I'm sorry, the three-way

9    analysis was done as part of both rebuttal

10   reports that I provided.

11              MR. CHENG:  We'll mark this

12   document as Exhibit 4.

13              That is the rebuttal report

14   provided by Mr. Hatch, dated September the

15   12th.

16              (Above-mentioned document marked

17   for Identification.)

18        A    Maybe for the record, this is the

19   rebuttal report to Jim Gandy and not the

20   other rebuttal report I provided?

21        Q    Right.

22              So there are two rebuttal reports.

23              This rebuttal is for Jim Gandy, and

24   this rebuttal is marked as Exhibit 4.

25              Can you download this report and

Paul Hatch - October 21, 2022

1      view the content of the report?

2            A     Yes, I do have this report.

3            Q     Okay.  Can you point out the

4      side-by-side comparison or the three-way

5      comparison portion of the report?

6            A     I see you didn't include the

7      exhibit, but it's -- the exhibit to this

8      rebuttal.

9            Q     I'm including the exhibit as

10     Exhibit 5 for this deposition.

11                 (Above-mentioned document marked

12     for Identification.)

13           Q     And I'm sharing that with you in

14     the chat.

15           A     Okay.  I do have that document.

16           Q     Are you saying those are the

17     three-way side by side analysis that you did?

18           A     Yes, I did title it that way.

19                 So it's a three-way comparison

20     between the infringing products, the patents

21     at issue and what was then the reported

22     closest prior art, the '906.

23           Q     The first time that you did this

24     comparison, three-day -- is this the first

25     time you did the three-way comparison in this

Paul Hatch - October 21, 2022

```
1     case?
2              MR. BERKOWITZ:  Objection to the
3     form.
4         A    I had done this analysis prior to
5     this report but this documented and showed
6     the analysis as a three-way.
7              MR. BERKOWITZ:  I just want to note
8     the time.
9              I think we've been going about an
10    hour and 20 or so.
11             I just want to check in and see if
12    the witness needs a break or is anybody
13    thinking about lunch?
14             Do we have any thoughts?
15             MR. CHENG:  We can take a break.
16    If anyone wants to get lunch, I'm fine with
17    that.
18             How long do you think we should
19    break for?
20             MR. BERKOWITZ:  Do you want to take
21    five or ten minutes now and go for a bit and
22    take lunch later or do you want to take lunch
23    now?
24             MR. CHENG:  I'm flexible.
25             MR. BERKOWITZ:  Paul, is it okay
```

Paul Hatch - October 21, 2022

1      with you, let's take five or ten now and go

2      for another half an hour or 40 minutes and

3      take lunch.

4               How does that sound?

5               THE WITNESS:  That sounds perfectly

6      fine with me.

7               (Brief recess taken.)

8          Q    I shared a document marked as

9      Exhibit 6 in the chat.

10              (Above-mentioned document marked

11     for Identification.)

12         Q    Mr. Hatch, can you open that

13     document?

14         A    I have it open.

15         Q    I want you to look at this report

16     and confirm that it's the report that you

17     provided.

18         A    Yes, this is a report that I --

19     that I provided.

20         Q    Do you know when you provided this

21     report?

22         A    Yes, I see it was August 2021.

23         Q    Is that when you provided this

24     report to defendants?

25         A    I believe it would have been very

Paul Hatch - October 21, 2022

Page 82

1    close to this date, if not actually on that

2    date.

3            I do see, however, this report has

4    been marked up by someone and that was not in

5    the original version.

6        Q    That's marked up by the court.

7    That's the only way that we received the

8    report.

9            Did you do a three-way comparison

10   in this report?

11           MR. BERKOWITZ:  Objection to the

12   form.

13       A    I provided -- I did a three-way

14   comparison as part of my analysis at this

15   stage, but I provided that three-way

16   side-by-side, at least presented it in the

17   report that followed this.  That was the

18   rebuttal report of last year.

19       Q    I'm just asking, did you do a

20   three-way comparison in this report?

21           MR. BERKOWITZ:  Objection to form.

22       A    I did a three-way comparison, to

23   answer your question, as part of my analysis

24   as I was creating this report.

25           I did not show the three-way until

Paul Hatch - October 21, 2022

Page 83

1    the rebuttal, which followed this shortly
2    after this report.
3         Q    Why did you not show the analysis
4    that you did in this report?
5              MR. BERKOWITZ:  Objection to form.
6         A    I -- this report was about my
7    initial analysis and to provide the details
8    that were important here rather than respond
9    to information that the experts on the other
10   side had then brought up to light.
11             So as they considered the '906 to
12   be the closest prior art, I then provided the
13   three-way analysis.  However, prior to that,
14   the '906 was only one of the many prior art
15   for me to report about in this report.  I
16   hope that was very clear.
17        Q    Not entirely.
18             Can you --
19        A    Sure.
20        Q    Can you rephrase your answer,
21   because that sounds very confusing.
22        A    Okay, yes.
23             I did mention a couple of things.
24   But simply, I did do analysis on the prior
25   art, which included, for instance, the '906.

Paul Hatch - October 21, 2022

1              However, because there was many

2      pieces of prior art, I didn't include a

3      three-way comparison analysis as part of this

4      report on every one of those prior arts until

5      the closest prior art was identified by the

6      experts, and then I provide a three-way

7      analysis as part of my report, for what they

8      considered to be the closest prior art.

9          Q    Do you agree that the '906 patent

10     is the closest prior art?

11             MR. BERKOWITZ:  Objection to the

12     form.

13         A    When they put it forward, I

14     don't -- out of the choices of prior art that

15     has been put forward in this case, I don't

16     disagree necessarily.  I don't find it

17     particularly -- well, I'm sorry.

18             You know, it was important for me

19     to then analyze the '906 because they had

20     proposed it.  It certainly wasn't my role

21     to -- to question whether that's the closest

22     or not, but to analyze it according to what

23     they proposed as being the closest.

24             My understanding of the law in this

25     situation is that it is the -- the burden of

Paul Hatch - October 21, 2022

1      the defendant to provide the closest prior

2      art and they did that and I analyzed it.

3            Q     Do you think an ordinary observer

4      would know about the D '906 patent?

5                  MR. BERKOWITZ:  Objection to the

6      form.

7            A     As I stated, the understanding of

8      infringement and in the ordinary observer

9      test, the understanding of the ordinary

10     observer, an ordinary purchaser with a -- who

11     is an ordinary purchaser of products like

12     this, would have had knowledge of prior art

13     at the time of the patent.

14           Q     I'm sorry, this might come as I'm

15     asking you the same question, but because

16     your answer was not very clear, do you think

17     this ordinary observer would know about the D

18     '906 patent when looking at the products?

19                 MR. BERKOWITZ:  Objection to the

20     form.

21           A     Yes.  I'm sorry for my long

22     answers.  Sometimes you're being very broad

23     with your questions and so I have to make

24     sure you understand where I'm coming from.

25                 But the ordinary observer in this

Paul Hatch - October 21, 2022

Page 86

1       particular case would be familiar with the

2       '906 as well as other prior art.  That is my

3       understanding.

4           Q    And what are the differences?

5       Let's do the analysis one by one.  Let's

6       first focus on the D '723 patent, which is

7       one of the four patents-in-suit.

8               What are the differences between

9       the D '723 patent versus the D '906 patent?

10              MR. BERKOWITZ:  Objection to the

11      form.

12          A    So you're requesting to run through

13      the ordinary observer test, in which case we

14      now look for similarities between the product

15      and to understand whether they are not

16      dissimilar or not.

17              Is that correct?

18          Q    No, I'm asking you to compare the

19      patents-in-suit with the prior art and to

20      identify the similarity and the dissimilarity

21      between those two patents?

22              MR. BERKOWITZ:  Object to the form.

23      It's outside the scope.

24          A    Okay.  You said between those two

25      patents.

Paul Hatch - October 21, 2022

Page 87

1          Which two are you referring to?

2      Q    I was referring to the D '723

3  patent and the prior art, D '906 patent.

4      A    I see.

5          Well, that's not part of the

6  analysis.  I think you misunderstand.

7          We compared the accused product and

8  the patent to the prior art to understand

9  which may be closer.

10     Q    So you do not think a comparison

11 between the patents-in-suit and the prior art

12 is necessary?

13         MR. BERKOWITZ:  Objection to form.

14     A    The patents -- each of the

15 patents-in-suit is compared to prior art,

16 such as the '906, only when also comparing it

17 to the accused because it's relevant to

18 understand the distance of one to the other

19 and not a direct comparison in the way that

20 you're suggesting.

21     Q    So -- well, I'm not suggesting

22 anything.  I'm simply asking whether or not

23 you have done any comparison between the '723

24 patent and the prior art, D '906 patent.

25     A    Yes, I -- I have conducted -- you

Paul Hatch - October 21, 2022

1    know, I became very familiar with the '906

2    patent, to understand -- I'm not sure what

3    your question is.

4              I did analyze the patent.  I did

5    compare it -- sorry, I did compare the '906

6    to the '723 in particular regard as part of

7    the three-way analysis, which included the

8    accused product because the '906 helps us

9    understand the scope of the '723.

10   Q    Scope is the word used for claim

11   construction.

12             So are you saying the '906 patent

13   will help us understand claim constructions?

14             MR. BERKOWITZ:  Objection to the

15   form.

16   A    And again, you're being quite

17   general.

18             But at the very start of the

19   infringement analysis, we looked at the

20   patent, its patent history, you know,

21   claimed/unclaimed matter.  And the -- the

22   prior art, such as the '906, is only put into

23   direct comparison when we have already

24   decided to move into the second part of the

25   infringement analysis.  And that being said,

Paul Hatch - October 21, 2022

1    of course, because any prior art that's

2    disclosed in part of the patent, it is part

3    of the initial analysis as well.

4            I'm sorry, that was very long as

5    well, but I think your question was a little

6    bit off.

7        Q    I don't think my question was off.

8    I think you're confusing the scope analysis

9    with the infringement analysis, but let's

10   just be clear.

11           I will ask you if the '906 patent

12   was compared to the D '723 patent.

13           MR. BERKOWITZ:  Objection to form.

14           Go ahead.

15       Q    Did you compare the D '723 patent

16   with the D '906 patent to identify the

17   similarity and dissimilarity between the two

18   patents?

19       A    I did include the -- comparing the

20   '906 to the '723 when doing a three-way

21   analysis with the accused products in mind to

22   understand the similarities and

23   dissimilarities.

24       Q    I just want to give you some

25   background of why I ask this question.

Paul Hatch - October 21, 2022

1        A     Okay.

2        Q     So prior art comes into play to

3   show that there are some prior art that has

4   disclosed certain designs already.

5               So in light of this -- so in the

6   infringement analysis, when you compare the

7   accused products with the patents-in-suit, if

8   your -- if the -- if there is a prior art,

9   the difference between the prior art and the

10  patents-in-suit is constructive.

11              Because when you compare those

12  patents, when you compare the patents-in-suit

13  with this prior art, you can tell that

14  they're similar in certain aspects and

15  they're dissimilar in certain aspects, and

16  that helps you to perform this comparison

17  between the accused products and the

18  patents-in-suit.

19              So first, you have to understand

20  what are the differences between the

21  patents-in-suit and the prior art.

22              If the patents-in-suit and the

23  prior art are the same, then really there's

24  no need to do further analysis.

25              So that's why I ask you, can you

Paul Hatch - October 21, 2022

1    see the similarities and dissimilarities

2    between the D '723 patent and the D '906

3    patent.

4             MR. BERKOWITZ:  Objection to the

5    form, argumentative, asked and answered.

6        A    So to clarify, you're asking if I

7    can see the similarities and dissimilarities

8    between the '723 patent and the '906?

9        Q    Yes.

10       A    Which the answer would be yes.

11       Q    What are the similarities between

12   those two patents?

13       A    The -- again, as part of this

14   analysis -- I guess what you're saying is --

15   I'm not sure what you're saying.

16            What are the similarities?

17            What I've provided here was part of

18   a three-way analysis with the accused really

19   to see about which is clear rather than list

20   individual similarities, which is -- or

21   differences, which is not technically part of

22   the analysis, but you are correct in saying

23   that the '906 should be understood for what

24   it stands for.

25            But the analysis is more about the

Paul Hatch - October 21, 2022

1    distance between it and the '723, and there's

2    a fair amount of distance.

3          Maybe that answers your question.

4    There's a lot that they have in difference.

5          Q    Let's focus on the distance, then.

6    Let's see, what are the differences between

7    the D '723 patent and the D '906 patent?

8          A    Well, overall impression, as would

9    be seen by an ordinary observer at the time,

10    it gives a very different overall impression.

11          It's incorrect to, say, list

12    individual little details, but in viewing the

13    two images in different angles, there is a

14    very different impression given by the '906,

15    which -- which has a very, you know, smooth,

16    rounded, clear of any kind of markings or

17    hard edges.  You know, it's got this kind of

18    melted look to it, right, just for other

19    conversation to put it into words, which is

20    highly different from the impression that we

21    get from any of the other products that I

22    analyzed as part of this case.

23          Q    So I was asking you the differences

24    between the '723 patent and the prior art of

25    the '906 patent, and you said there are hard

Paul Hatch - October 21, 2022

1    edges and one is more smooth than the other

2    and those are the differences between those

3    two patents.

4              MR. BERKOWITZ:  Objection to the

5    form.

6         A    Yeah, you definitely misstated my

7    words.

8              But the important thing is that

9    it's about the overall impression.  And the

10   overall impression we have from the '906 is

11   this very kind of melted kind of feel,

12   whereas the '73 -- were you -- sorry, I'm

13   just checking.

14              Is it the '726 or '723?  '723,

15   correct.  Whereas the '723 in particular does

16   not give that overall same impression of it

17   being melted.

18        Q    Do they have similar overall shape?

19              MR. BERKOWITZ:  Objection to form.

20        A    Depends what you mean by shape.

21        Q    The hourglass shape that you

22   mentioned -- I'm sorry, I'll let you finish

23   first.

24        A    Yeah, I guess I was going to say

25   that, you know, it's not about necessarily

Paul Hatch - October 21, 2022

1    shape analysis of the product as a whole.

2    It's about the impression.

3            However, in my report, I did refer

4    to the hourglass shape, for instance, which

5    is a part of the overall impression.  It

6    helps inform the overall impression.

7            And, you know, to help answer that

8    question, yes, they do both share as part of

9    the overall impression an hourglass shape.

10       Q    If that hourglass shape -- does the

11   hourglass shape form an impression of the

12   overall shape of the product?

13           MR. BERKOWITZ:  Objection to the

14   form.

15       A    It's my opinion that the hourglass

16   shape contributes to the overall impression.

17   I think that's important.  It's not the

18   entirety of the impression.

19       Q    What other attributes do you think

20   contributes to the overall impression?

21       A    Of which one?

22       Q    Of the '723 patent.

23       A    I believe, you know, the ordinary

24   observer, the impression that the ordinary

25   observer at the time, who's never seen a

Paul Hatch - October 21, 2022

1    product like this but has knowledge of the

2    prior art that was shown, would notice, yes,

3    it has an hourglass shape, but also, a

4    generally flat surface with areas to put your

5    feet, for instance, and that it has open

6    fenders on the side above the wheels.

7              And, you know, there are a number

8    of things that make that overall impression

9    and the -- some of the feel of those forms

10   that make that impression, are hard edges,

11   defined shapes.

12             So that's the general kind of

13   impression, and it's not limited to the words

14   I used.  I'm just trying to describe the

15   image that we see in context to looking at

16   the prior art that existed before.

17        Q    So just to summarize what you said,

18   you said that they both have similar

19   hourglass shape.

20             Is that correct?

21             MR. BERKOWITZ:  Objection to form.

22        A    Yeah.  More specifically, I said

23   that they do both share an hourglass shape,

24   which is part of the overall impression.

25        Q    Which is part of the overall

Paul Hatch - October 21, 2022

1      impression.

2            And the dissimilarity between the

3      '723 patent and the '906 patent, you said,

4      comes from the flat surface, the open fenders

5      and the overall feel, you said, like the

6      feeling where you look at the products.

7        A    Yes.

8        Q    Okay.  And together with hard

9      edges, which really are the key contributors

10     that distinguish one -- distinguish the D

11     '723 patent from the D '906 patent?

12       A    That's more or less incorrect to

13     take the wording so literally, but the idea

14     is that the ordinary observer would notice

15     differences, such as that contributes to the

16     overall impression.

17           So the hourglass shape is still

18     part of the overall impression of -- of both,

19     but the overall impression is very different

20     at the end of viewing both.

21       Q    Okay.  And then you think that's

22     why an ordinary observer would not confuse

23     the D '723 patent to the D '906 patent,

24     despite that the hourglass shape contributes

25     to the overall impression or the sufficient

Paul Hatch - October 21, 2022

1    dissimilarity, including the flat surface,

2    the fenders and the edges and the overall

3    feelings when you look at the two patents,

4    and that those all together contributes to

5    the -- to the dissimilarity that the ordinary

6    observer can distinguish?

7           MR. BERKOWITZ:  Objection.

8    Objection to the form, mischaracterizes

9    testimony.

10        A    Yeah, I think that's almost

11   correct, but this was not -- you know, you

12   framed this as whether the ordinary observer

13   would be confused between these two products,

14   which was not part of the analysis here.

15           I was just explaining how the

16   ordinary observer would view these as being

17   quite different, but I did not analyze, you

18   know, the ordinary observer test as to

19   whether these are substantially different,

20   you know, using those official words.  That

21   was not part of the analysis.

22           What I was saying is, you know,

23   it's my opinion that there is a lot of

24   difference in the overall impression here.

25        Q    Are these differences substantially

Paul Hatch - October 21, 2022

1      dissimilar?

2              MR. BERKOWITZ:  Objection to the

3      form.

4      A     To conduct an official analysis, I

5      would have to look at the prior art of the

6      '906 to -- to understand it a lot better.

7              But my -- my opinion is that the

8      impression is that it is -- it is really

9      quite different, you know.  I wouldn't want

10     to use the word "substantially different"

11     because that infers that I've conducted a

12     full analysis on that specific item, whereas

13     the analysis I did was using it as the prior

14     art and not the target of the analysis.

15             I hope I wasn't too confusing

16     there.

17     Q     No, you're not confusing.

18             I think it's good that we can

19     recognize there are differences between the D

20     '723 patent and the D '906 patent because

21     that's constructive, and I won't go through

22     all the products because we have four patents

23     and we have four products with 16 different

24     analysis.

25             I won't ask you to do all 16 of

Paul Hatch - October 21, 2022

1        those analysis.

2              Let's just pick one product.  Let's

3        just pick a -- product B, let's go with

4        product B.

5              So do you think product B is

6        substantially different from the D '906

7        patent?

8        A    My analysis was actually on the

9        difference between product B or differences

10       in similarities between B and the patent, say

11       the '723, among others.

12       Q    The D '723, okay.

13             Do you find the product B is

14       substantially dissimilar from the D '723

15       patent?

16       A    No, I find it substantially the

17       same.

18       Q    Does product B have a smooth

19       hourglass shape?

20       A    The hourglass shape that it has

21       contributes to the overall impression.  It

22       does have an hourglass shape, yes.

23       Q    Does it have smooth lines or does

24       it have edgy lines?

25             MR. BERKOWITZ:  Objection to the

1    form.

2        A    The edgy lines that you referred to

3    do contribute to the overall impression of

4    the Gyroor B.

5        Q    Of the Gyroor -- of Gyroor product

6    B.

7            Well, when we look at the surface,

8    do they have different patents and design

9    lines on the standing pads, the two pads that

10   you stand on?

11       A    Are you -- so when you say the

12   difference, you're talking about between the

13   '723 and Gyroor B application?

14       Q    Yes.

15       A    They both share having a generally

16   flat, you know, pronounced flat area for

17   standing on.  That's something they share,

18   and there are individual differences when we

19   zoom in further.

20       Q    Does the D '906 patent have

21   surfaces to stand on?

22       A    The '906 patent is a much

23   smoother -- I called it a melted rounder

24   form.

25           It's presumed you may be able to

1    stand on it, but it does not have a

2    pronounced flat surface for standing on like

3    the '723 and the accused products.

4         Q    The flat surface you stand on,

5    which part is not flat?

6              If you can point that through the

7    pictures, it would be very helpful.  If we're

8    looking at Exhibit No. 5, we can just point

9    to the pictures.  So that will be easier.

10        A    Are you referring to the '906?

11        Q    No, I'm referring to the flat

12   surface that you said is present in the D

13   '723 patent but not in the D '906 patent.

14             I just want to ask you, which

15   picture you looked at and made that

16   determination.

17        A    Okay.  Obviously, the analysis is

18   done on a combination of all figures, but you

19   do see a generally flat surface and

20   pronounced standing pads on the '723.

21        Q    From which picture?

22        A    Again, the analysis was done on all

23   pictures but we can look at Figure 6, for

24   instance, of the D '723 patent.

25        Q    Which page are you referring to?

Paul Hatch - October 21, 2022

1      A    You said Exhibit 5?

2      Q    Yes.

3      A    We can look at page 4.

4      Q    Okay.

5      A    I see the rendition is a little

6   compromised, but I'm obviously very familiar

7   with the patent image itself.

8           But we see that the surface of the

9   '723 has a generally flat surface and it has

10  pronounced -- you know, when you compare it

11  here to the '906, the '723 has pronounced --

12  what did you call it? -- tread areas, I

13  think, for treads.

14          So that flatness there is

15  pronounced.  It's being made very visible,

16  and that's seen with all competitors too, but

17  not the '906.

18     Q    So you're saying the '906 patent

19  doesn't have a flat surface to stand on?

20     A    No, that's not what I said.

21     Q    I'm trying to understand what you

22  said.  You said the '723 patent has a flat

23  surface.

24          Is that flat surface also present

25  in the D '906 patent?

Paul Hatch - October 21, 2022

1      A    The '723 has a generally flat

2    surface at the top, but it has these

3    pronounced treads.

4      Q    By treads, you mean the lines, sir?

5      A    Yes.  To clarify -- that's a good

6    question.  I was trying to think of the word

7    you used, but the foot tread areas, right,

8    those areas, the footpads, let's call it, are

9    pronounced and we see exactly, you know, that

10   generally flat area with the pronounced foot

11   treads, and that is not present in the '906,

12   for instance.

13     Q    When you say it's pronounced, are

14   you saying that -- how is that more

15   pronounced in the D '906 patent, because in

16   the D '906 patent there are two flat surfaces

17   as well?

18          MR. BERKOWITZ:  Objection to the

19   form.

20     A    Yes, I think you're assuming that

21   they are flat surfaces there.  You know, I

22   would say it's generally flat, even on the

23   '906.  However, there are no pronounced, that

24   is, there's no defined areas of footpads, so

25   I have no idea.

Paul Hatch - October 21, 2022

1              For instance, the inventor at that
2    point had the inclination of having a defined
3    area to mark where the feet might go, whereas
4    the '723 does have some pronounced areas
5    where the feet might go.
6         Q    So you're saying --
7         A    I'm sorry, by pronounced, I mean
8    something like explicit, if that helps.
9         Q    And it helps.
10             And by the '906 patent, you think
11   people will not know where to stand on this
12   product?
13             MR. BERKOWITZ:   Objection to the
14   form.
15        A    That's not what I'm saying.
16             But for instance, the '906 could
17   be -- as you know, we don't know what size
18   this is.
19             It could be -- the whole thing
20   could be as big as one foot, a person's foot,
21   or it could be as big as a surfboard, but
22   there's no indication as to where one might
23   provide footpads in this invention.
24             If it were bigger, like you would
25   have smaller footpads near the middle, but we

Paul Hatch - October 21, 2022

1    don't know that.  The designers did not have

2    possession of an idea at that time of -- of

3    pronouncing or explicating of something like

4    a footpad.

5        Q    And how is that pronounced in the D

6    '723 patent?

7             MR. BERKOWITZ:  Objection to the

8    form.

9        A    We do see some form of area that

10   has been outlined that we can infer is for

11   standing on, that we're calling footpads.

12            But really, in doing the

13   comparison, we're seeing a pronounced area,

14   an explicit defined area on this and on the

15   accused products that is absolutely not

16   present in the prior art.  It's entirely new.

17       Q    So you're saying the lines on the

18   standing pad marked where people should

19   stand, and without the lines, people would

20   not know where to stand on a hoverboard?

21            MR. BERKOWITZ:  Objection to the

22   form.

23       A    That's also not what I'm saying.

24            But what I am saying is, that the

25   inventors of the '723 patent did explicate

Paul Hatch - October 21, 2022

Page 106

```
1      certain zones or areas that were not
2      pronounced or explicated in the prior art
3      '906.  These areas, you and I, today, are
4      inferring calling footpads.
5               They may all be something
6      different, but yes, they are visibly present
7      and contribute to the overall impression.
8          Q    And to your understanding, was that
9      the first time that this defined area for
10     standing was ever disclosed on the hoverboard
11     products?  Was that --
12               MR. BERKOWITZ:  Objection to the
13     form.
14         A    That's not what I said, but when
15     comparing to the '906, the '906 does not
16     disclose that as an idea and they have not
17     explicated that.
18               I believe in the further prior art
19     of items of other forms, there were some
20     areas that might represent explicating
21     footpads or something similar, but not on the
22     '906.
23         Q    I see.
24               So you agree, although that was not
25     included in the '906 patent, that was
```

Paul Hatch - October 21, 2022

1     disclosed in some other prior art?

2              MR. BERKOWITZ:  Objection to the

3     form, mischaracterizes testimony.

4        A    Yes, almost.  It was not part of

5     the '906 but there exists other prior art

6     that I analyzed that had areas that may be

7     defined as -- as footpads.  However, not

8     in -- not giving the same overall impression.

9        Q    Overall impression of the standing

10    footpads?

11             MR. BERKOWITZ:  Objection to the

12    form.

13       A    Overall impression of the object as

14    a whole.  Thank you for allowing me to

15    clarify.

16       Q    No problem.

17             MR. CHENG:  It's almost 1:00.

18    Let's take a lunch break.

19             MR. BERKOWITZ:  Okay.

20             (Luncheon recess taken.)

21       Q    Mr. Hatch, did you communicate with

22    your counsel during the break?

23       A    No, I did not.

24       Q    And let's get back to the report.

25             Mr. Hatch, you mentioned that the

Paul Hatch - October 21, 2022

Page 108

1    standing pad was present, the flat area of

2    the standing pad was present in the D '723

3    patent but not in the prior art.

4           Is that correct?

5       A    I said the -- one of the things

6    that contributes to the overall impression

7    are the pronounced areas that we're calling

8    standing pads that are not pronounced in the

9    '906 in such a way.

10      Q    Are you talking about appearance

11   when you're talking about pronounced?

12      A    Yes, yes.  I also use the word

13   explicated, but there's -- you know, the

14   inventor at the time was clearly marking that

15   area and designating it for something that

16   they presume is the feet, which the '906 did

17   not.

18      Q    In your opinion, an ordinary

19   observer would not know the area for feet in

20   the '906 patent?

21          MR. BERKOWITZ:  Objection to form.

22      A    The ordinary observer, viewing

23   '906, would not be called attention to a

24   particular area on that generally flat

25   surface for any specific reason.

Paul Hatch - October 21, 2022

1      Q    When we're talking about

2  appearance, what do you consider as

3  appearance?  Or let's use the more correct

4  term, the ornamental aspect.

5           What do you consider as ornamental

6  in a design patent?

7           MR. BERKOWITZ:  Objection to form.

8      A    I guess we talk about the

9  impression that the ornamental appearance

10  makes and that's important.

11          In this particular case, say in the

12  '723, the ornamental appearance is -- is

13  claimed and shown using solid lines and

14  everything on that contributes in some way to

15  the overall impression.

16     Q    I didn't ask -- I didn't ask

17  overall impression.  I asked what do you

18  consider as ornamental.

19          MR. BERKOWITZ:  Objection to form.

20     A    Yeah, I -- I was telling you about

21  what I consider ornamental to be in this

22  case, which is exactly what we're seeing as

23  the claimed design.

24          You know, the product as a whole

25  shows an ornamental design as shown.

Paul Hatch - October 21, 2022

1      Q     Do you understand -- do you
2    understand what is considered a functional
3    aspect of a design pattern?
4      A     Yes, the question about
5    functionality is quite different from what
6    you asked before, but functionality, for
7    instance, there's a certain utility that is
8    implied by an ornamental object.
9            And in infringement analysis, we do
10   try to identify whether certain aspects are
11   driven primarily by functionality or not.
12   And the functionality implies that -- I'm
13   sorry, a long-winded answer again.
14           Because functionality is a big
15   thing.  It's -- you know, if it's driven by
16   functionality, if a certain aspect of the
17   design is driven by functionality rather than
18   purely ornamental, that means, you know, if
19   it looked different, it wouldn't necessarily
20   provide the same function, therefore, it's
21   primarily functional.
22           In this case, we are looking at an
23   ornamental design.
24     Q     Do you know functionality and the
25   functional aspects of a design are two

Paul Hatch - October 21, 2022

1    different concepts?

2              MR. BERKOWITZ:  Objection to the

3    form.

4         A    It depends what you mean, whether

5    you're talking about infringement analysis or

6    invalidity.  That plays a different role in

7    there or even in trade dress, so yes, there

8    are differences.

9         Q    In the context of design patent

10   infringement analysis.

11        A    And the question being, do I

12   understand there may be a difference between

13   functional elements and functionality in

14   infringement analysis, is that your question?

15        Q    In infringement analysis context,

16   do you understand the functionality and the

17   functional aspects of a design are two

18   different concepts?

19             MR. BERKOWITZ:  Objection to the

20   form.

21        A    No, I understand there's a

22   difference, but what's -- yes, because for

23   instance, an ornamental part of a design may

24   have a function.

25             They have functionality, but

Paul Hatch - October 21, 2022

Page 112

1    functional aspects might -- might be talking

2    about certain parts that may be or may not be

3    driven by function.

4        Q    Are there any parts in a hoverboard

5    patent, let's say the D '723 patent, driven

6    by function?

7            MR. BERKOWITZ:  Object to the form.

8        A    Did you say are there any reports,

9    is that what you said.

10       Q    No.

11           Are there any parts in the D '723

12   patent driven by function?

13           MR. BERKOWITZ:  Objection to the

14   form.

15       A    My understanding is that what we

16   see is not primarily driven by function, that

17   the claimed design is ornamental.

18       Q    Is a claimed design ornamental

19   because only ornamental aspects are claimed

20   design?

21       A    Is that a question?

22       Q    What I'm asking you is, is there

23   a -- functional aspects in the -- in the

24   claimed design here?

25           MR. BERKOWITZ:  Objection to the

Paul Hatch - October 21, 2022

Page 113

```
1     form.
2          A    The claimed design is of an
3     ornamental design.  The -- it depicts
4     something that would have certain utilitarian
5     use, i.e., functional usage, however, they
6     are primarily ornamental in my analysis.
7          Q    And what are those functional
8     utility things that would be in the design
9     patent?
10              MR. BERKOWITZ:  Objection to the
11    form.
12         Q    And let's use the D '723 patent as
13    an example.
14         A    Okay.  So from the patent, it can
15    be inferred that the utility or the function
16    of this claimed design is of a self-balancing
17    vehicle of some kind because that's the title
18    of the patent.
19              There are no other descriptions to
20    call out any particular functions of the
21    claimed design.  So if you're asking about
22    the claim of the claimed design, I think
23    that's about it.
24         Q    Well, I guess you still haven't
25    been very clear as to your understanding of
```

Paul Hatch - October 21, 2022

1    ornamental aspects of this claimed design.

2              So you're saying all claim designs

3    are ornamental in the D '723 patent?

4         A    Yes, all claim parts of the design

5    of the '723 patent are primarily ornamental.

6    That is correct, yes.

7         Q    When you say "primarily

8    ornamental," are you indicating part of them

9    or not?

10        A    I'm sorry, I didn't catch the last

11   bit.  Am I indicating --

12        Q    Part of the claimed design are not

13   ornamental?

14        A    No.  Because I was talking about

15   the claimed design as a whole, which is

16   important in infringement analysis to look at

17   the object as a whole.

18             And what we see there, all of the

19   claim parts, as a whole, relate to ornamental

20   design.  They are not primarily functional,

21   for instance, because it could have a very

22   different appearance and still potentially

23   provide the same function --

24        Q    So you just mentioned --

25        A    -- on a self-balancing vehicle.

Paul Hatch - October 21, 2022

1      Q    Yes.

2           So you just mentioned function, so

3    it does serve function via on the line

4    function can be served in different design,

5    that's what you're saying?

6      A    That's correct.

7           And the function that I explained

8    before, its function as a self-balancing

9    vehicle and could have a different ornament.

10     Q    And do you think that the D '906

11   patent have different ornamental or different

12   ornaments from the D '723 patent?

13     A    The '906 also claims an ornamental

14   design that is different from the '723

15   patent, yes.

16     Q    And do you think the product B also

17   served the same function with a different

18   ornament in this design?

19          MR. BERKOWITZ:  Objection to form.

20     A    I don't know about the same

21   function.

22          What function are you referring to

23   with that particular product?

24          Because with that product, it's --

25   it's more specific about what function it

Paul Hatch - October 21, 2022

1    serves.

2         Q    What function?

3              You mentioned the function.  You

4    said the function can be served with

5    different designs.

6              So I'm asking you, how the function

7    in B -- so what's the function in the D '723

8    patent does the design serve?

9         A    The claimed design function is --

10   is shown as being for a self-balancing

11   vehicle.  So that's its overriding function.

12             Product B falls under that

13   category, but it -- it limits itself in the

14   functions it describes.  It's specifically a

15   hoverboard design.

16        Q    So is product B a hoverboard under

17   the same concept as a hoverboard as a

18   self-balancing vehicle?

19             MR. BERKOWITZ:  Objection to the

20   form.

21        A    A hoverboard could be considered a

22   self-balancing vehicle.

23        Q    And does product B have a function

24   of a hoverboard or self-balancing vehicle?

25        A    It serves as a hoverboard, which is

Paul Hatch - October 21, 2022

1        a type of a self-balancing vehicle, yes.

2                Q     And is that on the line function

3        served through the same design as the D '906

4        patent or D '723 patent or served through a

5        different design?

6                        MR. BERKOWITZ:  Objection to the

7        form.

8            A     The function of a self-balanced

9        vehicle, as we understand, can be served

10       through -- this was part of my report -- can

11       be served through other ornamental designs,

12       such as and includes product B.

13               Q     And how is product B's ornamental

14       design different from -- different from the D

15       '723 patent?

16                       MR. BERKOWITZ:  Objection to the

17       form.

18           A     It -- it's -- the ornamental design

19       is -- is very similar of scores, and I guess

20       you're asking my function before, but now

21       you're talking about ornamental design.

22                       You know, it's very similar, but

23       there are differences in smaller details.

24               Q     Can you highlight those differences

25       for me?

Paul Hatch - October 21, 2022

Page 118

1       A    As I've shown you in my report, it

2    shares a lot of commonality and we -- we look

3    at that through the eyes of an ordinary

4    observer in context of the prior art.

5       Q    If you --

6            MR. BERKOWITZ:  You have to let him

7    finish.

8            MR. CHENG:  That's fine.  I thought

9    he was finished.

10      A    So rather than looking at the

11   individual differences, which is the

12   incorrect analysis in this case, we look at

13   the design as a whole and compare them.

14      Q    So you only look at the design as a

15   whole.

16           Do you still look at the design in

17   the details?

18      A    The design in details -- you know,

19   the details of the design, the ornamental

20   details of the design do contribute to the

21   overall impression.

22           And we -- we look at, okay, what is

23   the contribution, what -- what contributes

24   substantially to that whole world impression

25   and if there are small details like screw

Paul Hatch - October 21, 2022

1    holes that we believe the ordinary observer

2    would not, that would not affect the overall

3    impression to the ordinary observer, and

4    those have a lesser effect on the overall

5    impression.

6         Q    And again, I -- well, I think the

7    defendants have been much better image in the

8    screw hole but the question is, can you

9    highlight the differences between product B

10   and the D '723 patent for me?

11        A    The differences, again, in context

12   of the '906, which is the --

13        Q    That's not the question.

14        A    We can do it the incorrect way, if

15   you want.

16        Q    That's not the question that I

17   asked.

18             I'm asking if you compare product B

19   with the D '723 patent, can you highlight the

20   differences between the product B and the D

21   '723 patent?

22             MR. BERKOWITZ:  Objection to form.

23        A    Maybe, you know, to do that, we

24   could use one of my -- my tables, right?

25             So we can look at it officially so

Paul Hatch - October 21, 2022

1    I can answer your question.

2         Q    Go ahead.

3         A    I'm thinking where -- you're

4    talking about '723 compared to B.

5              So if we look at Exhibit 5, and

6    that would be page 1 to 5.  And to zero in on

7    one page, I guess we can look at page 4

8    because we get an angle view of it.

9              We see the '723 and product B and,

10   of course, the prior art.

11             So just to clarify, before I do

12   this, you are asking about the viewpoint of

13   the ordinary observer in this.

14             Is that correct?

15        Q    Well, I guess that comes to the

16   question.  You have to define the ordinary

17   observer for me first.

18        A    Oh.  Well, the ordinary observer

19   defined, obviously, in my report, which I can

20   refer to here.

21             The ordinary observer in

22   infringement analysis, as you know, is

23   defined as the ordinary purchaser.  And we

24   look at the ordinary observer to understand

25   the level of acuteness.

Paul Hatch - October 21, 2022

1              And in this particular case, we

2      consider the ordinary observer, i.e., the

3      purchaser, to be the consumer user or, say,

4      the parent of the user, if it's a child who

5      is choosing and purchasing this product,

6      whether they're on social media or online or

7      some brick and mortar store.

8              So they come across this and choose

9      to purchase this.  I think that answers your

10     question to define an ordinary observer in

11     this case.

12     Q    Can you point to the section where

13     you define this ordinary observer in your

14     report?

15     A    Sure.

16             I believe it's -- which exhibit is

17     the initial report?

18     Q    It's Exhibit 3.

19     A    Yes, thank you.

20             So it is on page -- it's page 8.

21     There's a section -- I'm sorry, it's not page

22     8.

23     Q    Is it page 6?

24             If you go by the cover, it's page

25     8, but if by the line, the page number, it's

Paul Hatch - October 21, 2022

1      page 6.

2           A      Yes, that's correct.

3                  I have three paragraphs about a

4      definition of an ordinary observer generally.

5                  The third paragraph is where I

6      state specifically here, in my deposition, of

7      the ordinary observer.

8           Q      Thank you.

9                  If you can read that portion that

10     you defined ordinary observer in this case

11     would be very helpful.

12          A      It is my opinion that an ordinary

13     observer in this case is the typical

14     purchaser of hoverboards, i.e, a consumer

15     user or the parents of a user each having

16     little or no experience purchasing

17     hoverboards.

18                 The ordinary observer encounters

19     products like the claimed designed, online

20     stores, television and entertainment media

21     and social media and purchases them using

22     online stores or from brick and mortar

23     stores, like Best Buy or Walmart.

24          Q      So a typical, ordinary observer may

25     have knowledge of the prior art?

Paul Hatch - October 21, 2022

Page 123

1      A    Yes, a typical, ordinary observer
2   would have knowledge of the prior art, the
3   relevant prior art.
4      Q    And does a consumer have little or
5   no experience purchasing hoverboards indicate
6   that person's knowledge of hoverboards?
7           MR. BERKOWITZ:  Objection to the
8   form.
9      A    So a real life consumer, which I
10   think you're referring to, it's my opinion
11   that they would not have substantial
12   knowledge of the industry as a whole, which
13   is expected here.
14          They are an ordinary purchaser with
15   ordinary acuteness to hoverboards and don't
16   necessarily have years of experience
17   designing or understanding the differences,
18   the nuances of hoverboards.
19      Q    And why did you pick this
20   purchaser, a real life purchaser for this
21   particular case?
22      A    It's my understanding that that's
23   the majority, the high majority of people who
24   buy these products and products like this,
25   based on prior experience with this category

Paul Hatch - October 21, 2022

1    and similar categories.

2        Q    Although this real life purchaser

3    may not have other knowledge of the prior

4    arts and the products in the industry,

5    it's -- and that was the question -- even

6    though you think -- even though you know this

7    purchaser in real life may not have all the

8    knowledge about the prior arts and the

9    products in the industry?

10        MR. BERKOWITZ:  Objection to the

11    form.

12        A    Yeah, my understanding is that the

13    consumer in real life would not have

14    knowledge of all of the prior art or all of

15    the competing hoverboards, that is correct.

16        Only the hypothetical ordinary

17    observer is considered to have knowledge of

18    the prior art.

19        Q    And you think this purchaser in

20    real life, as defined in your report, fits

21    better in the situation?

22        A    Fits better than?

23        Q    Than the hypothetical ordinary

24    observer in this case.

25        A    That's not what I said.

Paul Hatch - October 21, 2022

1          We look at the purchaser in real

2    life to understand the level of acuity

3    they -- the level of attention that they pay

4    to viewing the product, but the hypothetical

5    ordinary observer is actually the operational

6    construct, if you will, that we use for the

7    analysis.

8          But we apply the level of attention

9    from the -- the purchaser to the hypothetical

10   ordinary observer.  So it's not one or the

11   other.  One helps define the other.

12       Q    Which define the other?

13            I'm a bit confused here.

14            So are you saying you're using two

15   standards or you're using one standard here?

16       A    The standard for the hypothetical

17   ordinary observer is that we apply the level

18   of acuteness of the purchaser.

19            And so when I say one helps inform

20   the other, it's knowing the level of

21   acuteness of the purchaser.  The real life

22   purchaser helps us inform the level of

23   acuteness that an ordinary observer would

24   pay.

25       Q    The hypothetical ordinary observer

Paul Hatch - October 21, 2022

1    would pay?

2         A    Yes, yes.

3         Q    And so, you agree in this case, a

4    hypothetical ordinary observer will have

5    knowledge of all the prior art?

6              MR. BERKOWITZ:  Objection to the

7    form.

8         A    Yes, unlike the purchaser in real

9    life, they have knowledge of the relevant

10   prior art.

11        Q    But however, in this case, you're

12   saying, it is my opinion that an ordinary

13   observer in this case is the typical

14   purchaser of hoverboards.

15             So should this case use the

16   standard of a hypothetical ordinary observer

17   or use the standard that you define here as

18   the typical purchaser of hoverboards in your

19   own words about purchasing in real life?

20        A    It's kind of the same thing.  You

21   may be misunderstanding this, but when we

22   define -- in these cases, when we define who

23   the ordinary observer is, it's a hypothetical

24   person, it's based upon this real life

25   purchaser.

Paul Hatch - October 21, 2022

1              And that's why it's phrased in that
2     way, that the ordinary observer in this case
3     is the typical purchaser of hoverboards.
4     That's the typical phraseology but it doesn't
5     mean that these are competing aspects.
6         Q    So you agree a hypothetical
7     ordinary observer has knowledge of all the
8     prior arts, however, here, you define this
9     ordinary observer in this case as a typical
10    purchaser who has limited knowledge of all
11    the prior arts and the products in the
12    industry, how do you reconciliate the gap
13    here?
14             MR. BERKOWITZ:  Objection to the
15    form.
16        A    I think you're twisting things a
17    little here, but as I said before, it's the
18    level of attention that we actually use from
19    the purchaser in real life to help us inform
20    the ordinary observer.
21             It's normal to phrase it this way,
22    that that purchaser is the ordinary observer.
23             But this hypothetical impression of
24    the ordinary observer that we use is not the
25    purchaser from real life, but one who has

Paul Hatch - October 21, 2022

1     that level of attention but is informed by

2     the prior art.  And that's the hypothetical

3     version of the ordinary observer.

4          Q    So what you just stated, is that

5     included in your report?

6               MR. BERKOWITZ:  Objection to the

7     form.

8          A    I do describe, for instance,

9     further up, the definition of the ordinary

10    observer, you know, in the previous

11    paragraphs, and how it's -- how it's

12    applicable when doing infringement analysis.

13    I believe it's clear.

14              I believe it is in the report, to

15    answer your question, that we are defining

16    who we think this ordinary observer

17    represents, and we use this ordinary observer

18    later in the document as a viewpoint.

19              So I think that's a yes to your

20    question.

21         Q    So I'm reading the section that you

22    tried to define the ordinary observer.

23              At the end of the paragraph you

24    mention the ordinary observer is also the one

25    who's aware of the number of closely similar

Paul Hatch - October 21, 2022

Page 129

```
1       prior art designs and conversant with the
2       prior art.
3               Just to be clear, do you think the
4       hypothetical ordinary observer should know
5       all the prior arts or just to the number of
6       closely similarly prior art designs?
7               MR. BERKOWITZ:  Objection to the
8       form.
9           A   My understanding is that they
10      have -- I can't define exactly where the line
11      is there, but my understanding is they have
12      knowledge of the relevant prior art, and
13      certainly relevant in this case would be
14      prior art that's cited on -- on the -- by the
15      patents themselves.
16              I believe it's often debated as to
17      exactly what falls under relevant and that's
18      not something for me to argue, but what is
19      very clear, though, is that everything on the
20      patents is certainly relevant to this case.
21          Q   And now, let's go back to the parts
22      that you mentioned.  Go back to the Exhibit
23      No. 5 where you compared the products,
24      accused products, the patents-in-suit and the
25      prior art.
```

Paul Hatch - October 21, 2022

1          We were trying to highlight the

2     differences between product B and the D '723

3     patent.

4          And can you go through the

5     differences with us?

6          A    Yes.

7          So if we look at just for this

8     conversation, obviously, the analysis is done

9     looking at all the views at the same time.

10          But if we look at page 4 of the

11     exhibit, five that you mentioned, you know,

12     where we see an angle view of both?

13          Q    Umm-hmm.

14          A    To define the differences and the

15     reason we went around this way is, as I said,

16     we need to be looking through the eyes of the

17     ordinary observer, and so the ordinary

18     observer at this time, if they -- if they

19     have knowledge of the '906, then that helps

20     inform them what they -- what becomes

21     prevalent to them about the impression that

22     they get, right, the ornamental design.

23          Q    Umm-hmm.

24          A    And that helps them understand,

25     okay, well, what's similar and what's

Paul Hatch - October 21, 2022

1      different, okay?

2          Q    What's different, yeah.   Okay.

3          A    Okay.   So we see lots of

4      similarities, particularly with the '906 in

5      mind.   We do see some smaller details, when

6      we zoom in a little bit.

7              For instance, the '906 has a fender

8      skirt, like a sort of closed area around the

9      wheels.   Whereas, in the '723 and product B,

10     we see that they both have an open fender.

11             But there are differences in the

12     way that they have that open fender that are

13     both different and quite far away from the

14     '906, but there are differences in the way

15     that they have that.

16             Product B, for instance, has a

17     little less material in the way that it's an

18     open fender.

19             The '723 has a little bit more

20     material as it wraps around, but it's still

21     above the wheel.   So it's still open and

22     giving visibility to the wheel.   So there's a

23     difference when we drill down into a smaller

24     level there.

25             Again, with the context of the

Paul Hatch - October 21, 2022

Page 132

1      '906, one of the biggest differences they
2      both have, from the '906, is that they have
3      these pronounced areas of the foot tread
4      areas and they have different approaches.
5      They both have foot -- pronounced foot
6      treads, but they have differences in the way
7      that they address that.
8              Product B has angled lines in
9      different sort of angled lines that the '723
10     has in the way that it pronounces those
11     things, but they're very similar because the
12     '906 doesn't even have any pronounced at all.
13             So again, there are differences at
14     a much lower level of -- of detail.  These
15     differences, you know, do contribute to the
16     overall impression.
17             Staring at the two things, an
18     ordinary observer will notice differences,
19     but of course, this test is not about whether
20     we know just differences.  It's about whether
21     we believe the product B, the D '723, are
22     closer to each other than the '906, you know,
23     with view of the '906, and they are.
24             Sorry for the long answer, but you
25     wanted a list of differences.

Paul Hatch - October 21, 2022

1          Q    That's perfect.

2               I mean, I want you to show me the

3     differences or highlight the differences, and

4     I do thank you, almost got it right, except

5     from -- you know, when you compare A to B,

6     you notice the differences, anyone does,

7     where A is different from B, you certainly

8     know the differences.

9               And I think the prior art comes

10    into play that will enhance the differences

11    between A and B.

12              Do you agree?  I mean --

13         A    No, I think --

14              MR. BERKOWITZ:  Objection to the

15    form.

16         A    -- in this particular case, the

17    '906 does inform us, help understand what are

18    the differences.  The '906 says, okay, this

19    is the world that happened before the

20    invention of the '723.

21              You are saying that this is the

22    closest prior art.

23              So if '906 happens and some time

24    after that the '723 happens, then -- then

25    yes, I understand what got invented at the

Paul Hatch - October 21, 2022

1     time of the '723.

2            And then, of course, I ask myself,

3     well, if product A now comes along, is that a

4     huge step from '723 or not considering the

5     big step that -- the big differences between

6     '906 and the '723.

7            And it's really quite clear, you

8     know, and that's the analysis that's going on

9     here.

10           I cannot see how someone can think

11    that the melted form of the '906 can

12    somehow -- somehow come between the '723 and

13    product A or product B.

14    Q     Product A and product B, what do

15    you mean by product A and product B?

16    A     I'm referring to the accused

17    products, Gyroor product A and Gyroor product

18    B.

19    Q     But you're not comparing product A

20    to product B?

21    A     No.  I was comparing them to the D

22    '723 and comparing them to the '906 and

23    seeing the substantial gap.  I guess, between

24    the '723 and the '906, but that sort of size

25    gap, those huge differences are much bigger

Paul Hatch - October 21, 2022

Page 135

1    than the gap that '723 has to product A.

2         Q    Well, let's just focus on one

3    product, and let's use product B as an

4    example.

5         A    Sure.

6              I could repeat the same for that.

7    You brought up product A, so I was just

8    answering that question.

9         Q    I didn't, but I think you first

10   mentioned product A, but let's use product B

11   as an example here.

12        A    Sure.

13        Q    First, I would like to ask you

14   about the -- let's take a look at page 1.  I

15   think that is the top view of the products,

16   accused products of the patents-in-suit, D

17   '723 and the prior art D '906.

18        A    Yes, I'm looking.

19        Q    Let me share my screen with

20   everyone so when I refer to certain aspects

21   you understand what I'm saying here.

22             Can you see my screen?

23        A    Not yet.

24             Oh, yes, I can.

25        Q    And can you see the little mouse

Paul Hatch - October 21, 2022

1     I'm using?

2          A     Yes.

3          Q     Okay.  So this is product -- this

4     is the D '723 patent.  This is product B and

5     this is the '906 patent?

6          A     Yes, from one particular view.

7          Q     From the top view, you're correct.

8                Let's see.  This product A --

9     sorry, this top view of D '723 patent have an

10    hourglass shape.

11               Do you agree?

12         A     Yes, it -- you know, yes, it does

13    have a generally hourglass shape.

14         Q     And do you think it's a similar

15    shape as the D '906 patent?

16         A     The '906 in this view has an

17    hourglass shape as well and there are

18    similarities in its hourglass shape.

19         Q     And do you see that the connecting

20    portion for product B, which I'm pointing

21    here, has a more straight or edging curve

22    than both of them?

23               Let me enlarge it a little bit.

24         A     You may need to zoom in.  I know

25    the area you're talking about, straight or

Paul Hatch - October 21, 2022

1      edgy?

2              Q      Umm-hmm.

3              A      Can you define what you mean by

4      straight or edgy?

5                     I see there is a straight part in

6      the area.

7              Q      In the middle, exactly.

8              A      On all three, right, the '906 and

9      Figure 1, too?

10             Q      I would say '906 is more smooth.

11     There's no clear --

12             A      Are you talking about the straight

13     you're alluding to?

14                    You used the word "straight."  So

15     there's a straight portion in the middle,

16     which I see when we move this.

17             Q      For product B?

18             A      The '906, right.

19             Q      And can you see that the cover

20     covers, you know, less than half of the

21     wheels here on both sides?

22             A      On the top view of the --

23             Q      For product B.

24             A      Yeah, you're talking about the

25     fender, right?

Paul Hatch - October 21, 2022

1          Q     I'm talking about the fender or the

2     wheel cover, if that's easier.

3                And can you see -- you cannot say

4     the same for D '723 patent.

5                Is that correct?

6                MR. BERKOWITZ:  Objection to the

7     form.

8          A     We see in this particular view, in

9     Figure 1, we only see some of the wheel, and

10    in product B we see a little bit more of the

11    wheel.

12               So there's a difference which I

13    described earlier.  They both have open

14    fenders but there's a little less material on

15    product B.

16         Q     I would say a lot less material.

17               Do you agree?

18               MR. BERKOWITZ:  Objection to the

19    form.

20         A     In the light of the '906, which

21    almost completely covers the wheel --

22         Q     Not from the top view.  You can't

23    tell that.  I mean, the top view is similar.

24               MR. BERKOWITZ:  Objection to the

25    form.

Paul Hatch - October 21, 2022

1        A    Yeah, sure.

2             In the top view, we only see some

3     of the wheel, but we see it only partially

4     covers the wheel, however, the analysis is

5     not done in singular views.

6        Q    Well, we're going to -- we're going

7     through them one by one.  So right now, we're

8     just looking at the top view.  As you

9     mentioned before, the design for the standing

10    pads are different.

11            Can you see that there are a lot of

12    different angles and shapes for the product

13    B?

14       A    To the '906?

15       Q    To the '906 and to the D '723

16    patent.  You can't possibly argue that they

17    are similar design.

18            MR. BERKOWITZ:  Objection to form.

19       A    Yes, the -- you know, the '906 has

20    no pronounced pads.  And on B, we do see

21    pronounced pads and it is different.  It has

22    differences to the '723 pronounced pads in

23    that it has what you call angular forms.

24            Yes, absolutely.  When we zoom in

25    like this, we can identify the differences,

Paul Hatch - October 21, 2022

1      yes.

2          Q    Okay.  Are they different in

3      shapes?

4          A    What shapes?  Like the -- you're

5      talking about the pronounced --

6          Q    I'm looking at that here.

7          A    Yes.

8          Q    So we were talking about the

9      appearance.

10              What is the appearance of the pads

11      here?

12         A    They're generally flat shape with a

13      pronounced area that we're calling footpads,

14      which is what we see on product B and not on

15      the '906.

16              So there are differences.  You

17      know, to your point, there are definitely

18      differences, particularly when we look at the

19      inner lines, you know, the inner details of

20      those printouts for footpads.

21         Q    And --

22         A    And the prior art -- I'm sorry,

23      Robin.  I was delayed with my continuation.

24              You know, the point being that the

25      '906 doesn't even have -- it's not even in

Paul Hatch - October 21, 2022

1      the ballpark.  It's not at the table of

2      pronounced footpads.

3              So the details in between those,

4      it's only making the '906, you know, run out

5      the door.  It's highlighting the bigger

6      differences that these have to the '906.

7      Q    But we're talking about the

8      ornamental aspect.

9      A    Umm-hmm.

10     Q    So when you're talking about

11     ornamental, it's not -- you know, you have to

12     be specific.

13             Are these --

14     A    Yes.

15     Q    There are lines, shapes, shades,

16     curves.

17             So what part of the appearance

18     you're referring to?

19             MR. BERKOWITZ:  Objection to form.

20     A    I'm referring to the impression of

21     the product as a whole, and here we were

22     talking about the pronounced footpads and the

23     ornamental way that they are described as --

24     you know, as being pronounced on the design.

25             So you're correct, you know, we are

Paul Hatch - October 21, 2022

1      talking about the ornamental.  I certainly

2      wasn't talking about the function.

3          Q    Well, I think -- it sounds like

4      you're talking about function.

5              You're saying it's here, it's not

6      here.  It's more the concept rather than the

7      appearance.

8              So are you talking about the

9      concept of having lines, having shapes or are

10     you talking about the actual ornamental

11     features such as the shape, the curve?

12         A    I don't understand what you're

13     saying.

14             I'm talking about the impression

15     that the visual gives us, which is, of

16     course, about the ornamental impression

17     rather than the concept.

18         Q    And --

19         A    Go ahead.

20         Q    And now I'm moving to page number 2

21     of the report.

22             And as we were discussing the '723

23     patent and the product B and the '906 patent,

24     and can you tell that in the middle of the

25     hoverboard, the '906 patent is more raised

Paul Hatch - October 21, 2022

Page 143

```
1    slightly in the middle of the hoverboard, as
2    I'm pointing back with my mouse here?
3         A    Yes.
4              Can you zoom in a little just to be
5    sure?
6         Q    Yes.
7              So as the mousing is pointing, can
8    you see this part that's slightly raised in
9    the middle?
10        A    Yes, that's right.
11             I do see that the top surface of
12   that hoverboard, the '906, is generally flat,
13   but it does raise a little in the middle that
14   you were pointing out, yes.
15        Q    And the '723 also has the slightly
16   raised in the middle portion?
17        A    It looks like it might be the same
18   sort of level as the footpads on the left and
19   right, but, you know, it's generally pretty
20   flat there.
21        Q    Yeah, I think maybe because the --
22   I think because --
23        A    I don't know if you want to look at
24   that level of detail.
25        Q    But no, it mentions a poor quality,
```

Paul Hatch - October 21, 2022

1      I think, in your report.  Let me see if I can

2      pull the actual patent out.

3              MR. CHENG:  We'll mark this as

4      Exhibit No. 7.

5              (Above-mentioned document marked

6      for Identification.)

7          Q    Mr. Hatch, can you open that

8      document?

9          A    Yes.

10             Do you want me to screen share

11     or --

12         Q    No, I will do the screen share.

13         A    Okay.

14         Q    Can you see my screen?

15         A    Yes.

16         Q    And can you see that's Figure 3 of

17     the '723 patent?

18         A    Yes, that's correct.

19         Q    And can you see that the middle of

20     this '723 patent is raised slightly in the

21     middle?

22             MR. BERKOWITZ:  Objection to the

23     form.

24         A    It ends up being about the same

25     height as the footpads on the sides.

Paul Hatch - October 21, 2022

1      Q    So you disagree with me?

2      A    I think we see it -- if you

3   actually draw a line there between the

4   footpads, you'll see it's the same height,

5   but not this level of scrutiny.

6           Not only is it correct, but we

7   shouldn't be analyzing one particular view

8   for something that is a matter of millimeters

9   between the footpads, the distance between

10  the footpads, you'll see it's the same

11  height.

12     Q    Of course, it's easier just to

13  attribute everything to the overall

14  impression, but to understand how this

15  overall impression formed, we have to go

16  through some of the details.

17          Let's also take a look at the

18  thickness of the wheels.

19          Do you agree that the wheels of

20  product B are significantly thicker than in

21  the D '723 patent?

22     A    So comparing the wheels, my

23  understanding is that the wheels are

24  unclaimed and so in this analysis, we're not

25  comparing the thickness of wheels.

Paul Hatch - October 21, 2022

1          If you zoom in, you'll see that

2     there's a lot of breaking lines there.  That

3     being said, of course, you know, they --

4     they're pretty thick wheels especially when

5     compared to the '906.

6          Q    Oh, I'm looking at the Exhibit 7.

7               I think that broken thing is just

8     the design of the wheel.

9               So you're saying the wheels are not

10    claimed in the D '723 patent?

11         A    I believe your experts alluded to

12    that as well, but we see that there are

13    broken lines there, if you want to look.  The

14    patent is there, but there's lots and lots of

15    broken lines.

16         Q    I'm enlarging the picture here.

17              Are you referring to the cover of

18    the wheels -- not the cover, but how do you

19    say that, the most outside portion of the

20    wheels with the dotted line or are you

21    talking about the entire wheel in broken

22    line?

23         A    Specifically, the wheel tread,

24    which I think is what you're referring to.

25              The hub is certainly also

Paul Hatch - October 21, 2022

1    unclaimed, but you can see the tread is also

2    made up of broken lines, the view you have on

3    the screen right now.

4        Q    I see.

5            So you're saying the entire tire or

6    the wheel does not form part of the claimed

7    design?

8            MR. BERKOWITZ:  Objection to the

9    form.

10       A    In the '723, it's shown as

11   unclaimed.

12       Q    As unclaimed?

13       A    Yeah.

14       Q    Okay.

15       A    However, the '906 has very skinny

16   wheels.

17       Q    It's also unclaimed, I think.

18       A    And what we see in the '723 and all

19   the other products here, product A through E,

20   are thick tires, not skinny, like on the

21   '906.

22           However, it is unclaimed anyway, so

23   that's not necessarily a moot argument.

24       Q    Can you tell from the side view the

25   fender are pointing up, which is

Paul Hatch - October 21, 2022

Page 148

1      significantly different from the fender or

2      the wheel cover that was in the D '723

3      patent?

4          A    Yeah, not only in this view, but in

5      other views you do see differences between

6      the open fenders, certainly and, you're

7      correct.  On B, it looks like they go up.

8      And on the '723, the fender, in the same

9      area, the same type of fender also goes up.

10             The difference being on B that it

11     doesn't return back down again, so it's the

12     last bit of the fender that reveals a bit

13     more wheel.

14             Do you see that?

15         Q    Yes.  I think the angle was also

16     different.

17         A    My understanding is that the style

18     of that curve is very, very similar, but of

19     course, on B it cuts off.

20             Again, we're looking at the nuance

21     differences when the '906 there has a closed

22     fender.  There's this fender skirt that goes

23     way down.

24         Q    Well, from the front view, which is

25     what we're looking at, that looks more

Paul Hatch - October 21, 2022

Page 149

```
1    similar than the fender in product B that

2    goes up with a different angle.

3         A     If it were a correct analysis to

4    identify differences in singular views only,

5    I think you're correct, however the analysis

6    that was done is the design as a whole, and

7    we know that the '906 has a substantially

8    different looking fender, you know.

9         Q     I mean, we are identifying them as

10   a whole, but you can't take the whole thing.

11   I mean, one thing from my meditation

12   practice, I -- again, at one point you can

13   only focus on one aspect of a matter.  So

14   that's why we're going through them page by

15   page to get a better understanding of that.

16          Now I'm moving to the third page,

17   which shows the bottom view of the item.  And

18   again, if I enlarge it, I don't know if

19   it's -- the quality of the picture is good,

20   can you see that there are -- well, first, I

21   think compared with the D '723 patent and the

22   D '906 patent, they both have hourglass shape

23   from the bottom view.

24          Do you agree?

25        A    Yes, all items on this page have a
```

Paul Hatch - October 21, 2022

1    general hourglass shape, yes.

2        Q    Which is first disclosed in the D

3    '906 patent?

4            MR. BERKOWITZ:  Objection to form.

5        A    The '906 did disclose an hourglass

6    shape, yes, as part of it in its overall

7    appearance.

8        Q    From the bottom view, can you tell

9    me the difference between the D '723 patent

10   and the D '906 patent?

11       A    Well, obviously, the analysis is

12   done on the product as a whole because just

13   looking at isolated views may be misleading.

14           However, to answer your question,

15   when we're comparing these images, yes, we

16   see, you know, there's a different -- you

17   know, in this particular view, we are seeing

18   the hourglass shape and there are a lot of

19   similarities between product B, the '723 and

20   the '906.

21           The wheels, as we know, are

22   unclaimed.  They all share a fair number

23   of -- of parts of this, this overall

24   impression in this particular view.

25       Q    So the overall impression of the

Paul Hatch - October 21, 2022

1    bottom view is quite similar, all three of --

2    all three of them, the patents-in-suit, the

3    accused product B and the '906 patent?

4              MR. BERKOWITZ:  Objection to the

5    form.

6         A    In this particular view, they are

7    fairly close, yes.

8         Q    And I guess page number 4 we had

9    looked at already.  This is also a very --

10        A    I'm not sure why those are so

11   pixilated, but we're familiar with the

12   originals at least.

13             Do you not want to look at the side

14   views?

15        Q    I'm trying to see if I can get a

16   clear view of the side view.

17             Let me take a look at the other

18   pattern, which may have a better view.  It's

19   right here.

20             So as shown here -- that is figure

21   5 of the D '723 patent, which shows a side

22   view of the claimed design.

23             Can you see that?

24        A    Yes.

25        Q    And where the fender covers

Paul Hatch - October 21, 2022

Page 152

1      significantly, especially the top --

2      especially the top of the wheel.

3              Do you agree?

4      A    Yes.

5              The open fender here sits on top of

6      the wheel.  The wheel is unclaimed but we

7      know it's there and reveals the hub on the

8      side of the wheel.

9      Q    And if we take a look at the

10     product B, as you can see, none of the wheel

11     is covered by the fender and the side view

12     clearly showed that the whole fender does not

13     cover the wheel from the side view.

14             MR. BERKOWITZ:  Objection to the

15     form.

16     A    That's not how -- you made a

17     statement.

18             Is that a question?

19     Q    It's a question.

20     A    The fender here is also above the

21     wheel and it does reveal the side of the

22     wheel.

23             In this case, we see a lot more of

24     the tread of the wheel, but of course,

25     that's, you know, unclaimed in the patent

Paul Hatch - October 21, 2022

Page 153

1      we're looking at.

2          Q     Okay.

3          A     And in the '906, we only can see

4      the hub or anything.  So it's an entirely

5      closed one, and so, you know, when we say

6      which one is closer to each other, it's very

7      clear that this fender on top of the wheel is

8      revealing most of the wheel is common between

9      the '723 and product B, and the '906 has a

10     completely different direction.

11         Q     How did you determine what is

12     closed or what is further?

13         A     Based on what we're seeing here,

14     for instance, that the -- that we have a --

15     what's called a fender skirt, you know, like

16     a closed wheel, picture those cars from the

17     '50s and '60s, they used to have that, a

18     fender skirt, a cover over its wheels.  I'm

19     not sure why.

20             And today, we have the approach

21     that's product B in '723, why there's a

22     fender on cars that reveals the wheel and

23     people like to show off their hubs and do

24     fancy designs.

25             Product B does a good job of that

Paul Hatch - October 21, 2022

1    as well, so I feel, in closing the wheel,

2    like '906 does and closing the hub entirely.

3         Q    Not entirely -- sorry, I'll let you

4    finish.

5         A    Correct.  Not entirely.

6              We do see probably the bottom of

7    the tread, but the way it's enclosed there

8    gives it a whole different feel.

9              So to answer your question, you

10   know, what makes that so different, you know,

11   why is that further away, it's because it's

12   giving it quite a different impression.

13        Q    Let me --

14        A    Because with a car with a fender

15   skirt, it would certainly catch my eye.

16        Q    I understand that.

17             Well, you mentioned the word

18   "feel."

19             You could easily argue that an

20   ordinary observer can have the feel that

21   product B has a more edgy, more futuristic

22   design, so the fender goes up, and the -- on

23   the '906 patent, and the '723 patent has some

24   more traditional covering of the wheel

25   design.

Paul Hatch - October 21, 2022

1           How do you define the feel that an

2    ordinary observer feels?

3         A    I guess the feel is -- you know,

4    look and feel as being the way we perceive

5    the object, so we look at it and we get a

6    certain sense of it.  And we, in doing so, we

7    think about prior references we had to

8    objects like that.

9              And I guess I was bringing up cars.

10             I mean, it doesn't mean you have to

11   be car experts, but certainly if I saw a car

12   with covered wheels, that would stand out to

13   me.

14             Whereas, the difference between

15   '723 and product B, if I saw those on cars,

16   that would not stand out to me, so I would

17   not have a different feel, whereas I would to

18   the '906.

19        Q    So by "feel," you're referring to

20   the emotional perception that the ordinary

21   observer received from seeing the products

22   and then seeing the patent?

23        A    Yeah.  "Impression" is probably a

24   better word, but we -- I was using the terms

25   look and feel to describe, you know, that

Paul Hatch - October 21, 2022

Page 156

1    we're observing the design, not necessarily

2    say an emotional attachment to the product.

3    It's about the ornamental styling.

4         Q    Is that from your own perspective

5    or from the perspective of the ordinary

6    observer that you defined in your report?

7         A    It's from the perspective of the

8    ordinary observer.

9         Q    And by feel, you're referring to

10   the -- to your own word, the ornamental

11   styling?

12        A    Yes.  You're asking about that, and

13   look and feel is a phrase, by itself, that's

14   used to refer to styling as opposed to, say,

15   functionality.

16             So I was using that to -- to help

17   describe what we're looking at here, but

18   obviously in my report, I use the word

19   "impression," which is the -- the official

20   term that we're using here.

21        Q    Is that objectively or subjectively

22   when you're referring to the impression?

23        A    I'm doing so to represent what the

24   ordinary observer would be looking at.  So I

25   think I'm being objective in this case.

Paul Hatch - October 21, 2022

```
1          Q     Okay.

2                MR. CHENG:  We're almost finished.

3                Let me just -- let's just do -- I

4    think I can wrap up everything within 30

5    minutes.  I just have a few more questions

6    related to product E that was included here.

7                MR. BERKOWITZ:  Why don't we take

8    five or ten minutes because we've been going

9    now about an hour and 15.

10               MR. CHENG:  Sure, yeah.  Let's take

11   five or ten.  I have no preference.

12               (Brief recess taken.)

13         Q     Mr. Hatch, just a few more

14   questions regarding the product E included in

15   your expert witness report.

16               First, why did you include

17   Exhibit -- why did you include product E, the

18   Gyroor product E in your report?

19               MR. BERKOWITZ:  Objection to the

20   form.

21         A     Well, I believe it -- it also

22   infringes on the patent.

23         Q     How did you know that ink

24   fringed -- how did you know about this

25   product?
```

Paul Hatch - October 21, 2022

Page 158

```
 1        A    The -- the attorneys informed me
 2   about product E and asked me to analyze it.
 3        Q    When did they inform you about
 4   product E?
 5        A    I'm not sure.  Obviously, some time
 6   before I wrote the document up.
 7             Let me pull up the exhibit here.
 8             Yeah, I'm not sure exactly of the
 9   timing because product E was a later analysis
10   that I did and I got ahold of the product
11   itself, the sample, and looked at it and then
12   added it to my infringement report.
13        Q    Was product E -- was product E
14   included -- I'll ask was the analysis of
15   product E included in your prior reports?
16        A    I -- I'm just trying to recall.
17             I think -- let me see.
18             You sent in Exhibit 1, is it -- I
19   think it might have been in the 2021, if I
20   can check.
21        Q    Oh, take your time.  You can check
22   it.
23        A    Okay, thank you.
24             I don't want to misstate that,
25   because I know it came later.
```

Paul Hatch - October 21, 2022

```
 1          Q    Of course.

 2          A    I'm just not sure of the timing.

 3               Yes.  So I think it was -- I think

 4      it came -- I included it for the first time

 5      in my first infringement report of 2022.

 6          Q    Can you tell me the date for the

 7      2022 report?

 8          A    I believe that's Exhibit 3, and

 9      what date, I think the date is -- it's

10      August, possibly August the 15th I think it

11      was filed.

12          Q    And is there any reason that was

13      not included in your prior reports?

14               MR. BERKOWITZ:  Objection to the

15      form.

16          A    I was not aware of it in prior

17      reports that it wasn't included in.  So as

18      soon as my attention was brought towards it,

19      I analyzed it and included it in my

20      infringement report.

21          Q    And I'm looking at the Exhibit No.

22      6, which is dated August 24, 2021.

23               Can you take a look at that,

24      Exhibit No. 6?

25          A    Yes.
```

Paul Hatch - October 21, 2022

Page 160

```
 1        Q    Can you confirm that product E is
 2   not included in this report?
 3             MR. BERKOWITZ:  Objection to the
 4   form.
 5        A    It -- it's -- there are no images
 6   of Gyroor product E included in Exhibit 6.
 7        Q    Did you know about product E when
 8   you submitted this report?
 9             MR. BERKOWITZ:  Objection to form.
10   Asked and answered.
11        A    I don't think I was aware of it as
12   a -- as a separate product of Gyroor's at
13   that time.
14        Q    Okay.
15             MR. CHENG:  I have no further
16   questions.
17             Thank you.
18             MR. BERKOWITZ:  Okay.  I have no
19   questions for the witness.
20             MR. CHENG:  Great.
21             And thank you, Mr. Hatch, so much
22   for attending the deposition today.  I know
23   it took a while.
24             And I thank you, Ms. Reporter, for
25   helping us with this process.
```

Paul Hatch — October 21, 2022

Page 161

1               (Whereupon, the deposition was

2       concluded at 3:10 p.m.)

3               (Witness was excused.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Paul Hatch - October 21, 2022

Page 162

```
 1                  C E R T I F I C A T E

 2              I, CHARLENE FRIEDMAN, a Certified Court

 3   Reporter and Notary Public, qualified in and for

 4   the State of New Jersey do hereby certify that

 5   prior to the commencement of the examination PAUL

 6   HATCH was duly sworn by me to testify to the truth

 7   the whole truth and nothing but the truth.

 8              I DO FURTHER CERTIFY that the foregoing

 9   is a true and accurate transcript of the testimony

10   as taken stenographically by and before me at the

11   time, place and on the date hereinbefore set forth.

12              I DO FURTHER certify that I am neither a

13   relative of nor employee nor attorney nor counsel

14   for any of the parties to this action, and that I

15   am neither a relative nor employee of such attorney

16   or counsel, and that I am not financially

17   interested in the action.

18

19

20              _____

21              CHARLENE FRIEDMAN, RPR, CRR, CCR of the

22              State of New Jersey

23              License No:  30XI00204900

24              Date:  October 21, 2022

25
```

Paul Hatch — October 21, 2022

Page 163

```
1                          LAWYER'S NOTES
2        PAGE  LINE
3        ____  ____      _____
4        ____  ____      _____
5        ____  ____      _____
6        ____  ____      _____
7        ____  ____      _____
8        ____  ____      _____
9        ____  ____      _____
10       ____  ____      _____
11       ____  ____      _____
12       ____  ____      _____
13       ____  ____      _____
14       ____  ____      _____
15       ____  ____      _____
16       ____  ____      _____
17       ____  ____      _____
18       ____  ____      _____
19       ____  ____      _____
20       ____  ____      _____
21       ____  ____      _____
22       ____  ____      _____
23       ____  ____      _____
24       ____  ____      _____
25       ____  ____      _____
```

1             DEPOSITION ERRATA SHEET
2
3
4
5
6        DECLARATION UNDER PENALTY OF PERJURY
7             I declare under penalty of perjury
8        that I have read the entire transcript of
9        my Deposition taken in the captioned matter
10       or the same has been read to me, and
11       the same is true and accurate, save and
12       except for changes and/or corrections, if
13       any, as indicated by me on the DEPOSITION
14       ERRATA SHEET hereof, with the understanding
15       that I offer these changes as if still under
16       oath.
17
18
19
20
21           Signed on the _____ day of
22           _____, 20____
23
24       _____
25                PAUL HATCH

Paul Hatch - October 21, 2022

Page 165

```
1                 DEPOSITION ERRATA SHEET
2      Page No. _____Line No. _____Change to:_____
3      _____
4      Reason for change:_____
5      Page No. _____Line No. _____Change to:_____
6      _____
7      Reason for change:_____
8      Page No. _____Line No. _____Change to:_____
9      _____
10     Reason for change:_____
11     Page No. _____Line No. _____Change to:_____
12     _____
13     Reason for change:_____
14     Page No. _____Line No. _____Change to:_____
15     _____
16     Reason for change:_____
17     Page No. _____Line No. _____Change to:_____
18     _____
19     Reason for change:_____
20     Page No. _____Line No. _____Change to:_____
21     _____
22     Reason for change:_____
23
24     SIGNATURE:_____DATE:_____
25                PAUL HATCH
```

Paul Hatch - October 21, 2022

Page 166

```
1              DEPOSITION ERRATA SHEET
2      Page No. _____Line No. _____Change to:_____
3      _____
4      Reason for change:_____
5      Page No. _____Line No. _____Change to:_____
6      _____
7      Reason for change:_____
8      Page No. _____Line No. _____Change to:_____
9      _____
10     Reason for change:_____
11     Page No. _____Line No. _____Change to:_____
12     _____
13     Reason for change:_____
14     Page No. _____Line No. _____Change to:_____
15     _____
16     Reason for change:_____
17     Page No. _____Line No. _____Change to:_____
18     _____
19     Reason for change:_____
20     Page No. _____Line No. _____Change to:_____
21     _____
22     Reason for change:_____
23
24     SIGNATURE:_____DATE:_____
25                  PAUL HATCH
```