```
1                  IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
2                          EASTERN DIVISION

3
    HANGZHOU CHIC INTELLIGENT and     )
4   UNICORN GLOBAL, INC.,             )
                                      )
5                     Plaintiffs,     )
    -vs-                              )
6                                     )  Case No. 20 C 4806
    THE PARTNERSHIPS AND              )
7   UNINCORPORATED ASSOCIATIONS       )  Chicago, Illinois
    IDENTIFIED ON SCHEDULE "A,"       )  December 2, 2022
8                                     )  10:00 a.m.
                      Defendants.     )
9

10     TRANSCRIPT OF PROCEEDINGS - PRELIMINARY INJUNCTION HEARING
                 BEFORE THE HONORABLE THOMAS M. DURKIN
11
       APPEARANCES:
12
       For the Plaintiffs:    TARTER KRINSKY & DROGIN LLP
13                            BY:  MR. RICHARD JOSEPH LAMAR LOMUSCIO
                                   MS. CHANDLER ELIZABETH STURM
14                                 MR. MARK BERKOWITZ
                              1350 Broadway
15                            11th Floor
                              New York, NY 10018
16
                              PALMERSHEIM & MATHEW
17                            BY:  MR. ANAND C. MATHEW
                              401 N. Franklin Street
18                            Suite 4S
                              Chicago, IL 60654
19

20

21

22
       Court Reporter:        KELLY M. FITZGERALD, CSR, RMR, CRR
23                            Official Court Reporter
                              United States District Court
24                            219 South Dearborn Street, Room 1420
                              Chicago, Illinois  60604
25                            Telephone:  (312) 818-6626
                              kmftranscripts@gmail.com
```

```
 1   APPEARANCES:   (Continued)

 2
     For the Defendants:        GLACIER LAW LLP
 3                              BY:  MR. YU-HAO YAO
                                9660 Flair Drive
 4                              Suite 328
                                El Monte, CA 91731
 5
                                GLACIER LAW LLP
 6                              BY:  MR. HE CHENG
                                     MR. TAO LIU
 7                              41 Madison Avenue
                                Suite 2529
 8                              New York, NY 10010

 9                              GLACIER LAW LLP
                                BY:  MR. WEI WANG
10                              200 Park Avenue
                                Suite 1703
11                              New York, NY 10166

12
13   ALSO PRESENT:            Mr. Peter Phaneuf

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Proceedings heard in open court:)

2        THE CLERK:  This is case number 20 CV 4806, ABC

3  Corporation v. The Defendants Identified on Schedule A.

4        Could I please have the attorneys present on behalf

5  of the plaintiffs state their names?

6        MR. LOMUSCIO:  Richard Lomuscio on behalf of the

7  plaintiffs.

8        MR. BERKOWITZ:  Mark Berkowitz also on behalf of

9  plaintiffs.

10        THE COURT:  All right.

11        MS. STURM:  And Chandler Sturm on behalf of

12  plaintiffs.

13        THE COURT:  Okay.

14        MR. MATHEW:  Anand Mathew on behalf of the

15  plaintiffs.

16        THE COURT:  Okay.  All right.

17        And for defendants?

18        MR. CHENG:  Good morning, Your Honor.  He Cheng on

19  behalf of defendants.

20        MR. YAO:  Good morning, Your Honor.  This is attorney

21  Yu-Hao Yao on behalf of defendant third-party respondents.

22        THE COURT:  Okay.

23        MR. WANG:  This is Wei Wang on behalf of the

24  defendants.

25        MR. LIU:  This is Tao Liu on behalf of defendants.

1          THE COURT:  Okay.  Let's go through a few -- nice to

2    see all of you.  I've never seen any attorneys on this case

3    yet.  You've all been over the phone so it's nice to see all

4    of you.  Let's go through a few ground rules.

5          You could all generally, unless you're examining a

6    witness, you can object or argue from the tables.  No need to

7    come up here, but it's absolutely essential you use the

8    microphone.  My court reporter can't hear you unless you're

9    using a microphone so make sure the mic is in front of you.

10   They're all adjustable.  The base is moveable so just make

11   sure it's there.

12         We're here on plaintiffs' motion for preliminary

13   injunction.  I have a couple of preliminary questions.

14         My understanding is that you had completed discovery

15   before Judge Cole; is that correct?

16         MR. LOMUSCIO:  Yes, Your Honor.

17         THE COURT:  You can stay seated.

18         MR. LOMUSCIO:  Oh, I'm sorry.

19         THE COURT:  That's fine.  That way the mic is right

20   there.

21         MR. LOMUSCIO:  Yes, Your Honor.

22         THE COURT:  Okay.

23         Defense agrees?

24         MR. YAO:  Yes, Your Honor.

25         THE COURT:  Okay.  Are all efforts to settle this

5

1   case exhausted?

2           MR. LOMUSCIO:  There's always a possibility,

3   Your Honor; but as of the conference, there was no interest in

4   settlement as far as I'm aware.

5           THE COURT:  All right.

6           Defendants agree?

7           MR. YAO:  Yes, Your Honor.  We are open to

8   settlements.  However, as Mr. Lomuscio has indicated, there

9   hasn't been any fruitful settlement discussion, I would say.

10          THE COURT:  All right.  Let's go off the record.

11     (Off the record.)

12          THE COURT:  All right.  Does either side wish to make

13  an opening statement, brief opening statement, but make an

14  opening statement?

15          MR. LOMUSCIO:  We do not, Your Honor.  We'd prefer to

16  just go right to witnesses.

17          THE COURT:  All right.

18          And defense?

19          MR. YAO:  Yes, Your Honor, if I may present my

20  opening statements.

21          THE COURT:  Sure.  And if you want to do that from

22  the podium, you're free to do so.

23          You want to change your mind?

24          MR. LOMUSCIO:  I would like to change my mind if --

25          THE COURT:  All right.

opening - plaintiff

6

1          Well, hang on.  It's their motion so you scared them

2     into it.

3          All right.  Proceed.  You can do it -- if you're more

4     comfortable standing, just make sure you're at the podium near

5     the microphone.

6          And, again, you're Mr. --

7          MR. LOMUSCIO:  Lomuscio, Your Honor.

8          THE COURT:  Lomuscio.  Got it.

9          OPENING STATEMENT ON BEHALF OF THE PLAINTIFFS

10         MR. LOMUSCIO:  And thank you, Your Honor, for

11    scheduling this on such a tight time frame.  We appreciate it.

12         Plaintiffs Hangzhou Chic and Unicorn have renewed

13    their preliminary injunction motions to prevent further

14    infringement by defendants Gyroor, Gyroor-US, Urbanmax,

15    Fengchi-US, HGSM, Gaodeshang-US, and Gyroshoes.  There's no

16    dispute that the Federal Circuit's decisions vacated the prior

17    preliminary injunctions entered by this Court.  It is

18    important to note, however, that the Federal Circuit did not

19    hold that there's no basis for the prior injunctions, only

20    that the form of the order provided by the Court lacked a

21    product-by-product analysis of how the accused products

22    infringed the patents at issue.

23         While plaintiffs believe the record established for

24    the prior preliminary injunction sufficiently established

25    likelihood of success on the merits and irreparable harm and

**opening - plaintiff**

1    the Federal Circuit did not hold otherwise, the renewed motion

2    follows the roadmap for issuance of a renewed preliminary

3    injunction now sought by plaintiffs.

4            First, plaintiffs illustrate and will illustrate

5    today how each product infringes the two patents in issue, the

6    '723 and the '256 patent.  Mr. Hatch, a patent design expert

7    whom you will hear testimony from today, details how each of

8    the accused products infringe on the patents in issue.  You

9    will further hear from Mr. Hatch how the minor details, such

10   as drill holes relied upon by defendants to argue

11   non-infringement, do not insulate the accused products from

12   infringement liability.

13           Second, you will hear testimony today from Richard

14   Bero, a damages expert, regarding the irreparable harm --

15           THE COURT:  Let me interrupt you, which I'll do

16   frequently so don't be --

17           MR. LOMUSCIO:  Yeah, I'm sure.

18           THE COURT:  It's more than the drill holes.  It's the

19   shape of the wheel covers.  It's the pattern across the pads.

20   I mean, there's a lot of differences that defendants point

21   out, and, you know, the '906 patent seems to indicate, the

22   Fed Circuit seems to indicate, not seems, they held, that's

23   important prior art and it should really focus the analysis on

24   everything other than the hourglass shape which was a big part

25   of Mr. Hatch's report.  And, you know, that's how I read the

1   Fed Circuit decision.  We ought to be looking at the

2   hoverboard absent the hourglass shape and all the other

3   features that are in your patents and in their five products.

4   I'll get to whether it's five products or three.

5           MR. LOMUSCIO:  Mm-hmm.

6           THE COURT:  And that the '906 patent plays a central

7   role in what an ordinary observer is going to have to look at.

8   Look at it absent the hourglass shape and see what the

9   difference is.

10          MR. LOMUSCIO:  And you will hear the testimony today

11  that Mr. Hatch describes how you have to look at the entire

12  product, the entire impression for the observer standard.

13          THE COURT:  You do.

14          MR. LOMUSCIO:  Okay.

15          THE COURT:  But you've got to include, in essence,

16  the prior art and take that out of your observation, at least

17  as a distinguishing feature, or a feature that is similar to

18  the accused products because that is prior art.  And I read

19  the Fed Circuit case as making it pretty clear that's -- it's

20  highly -- here's what they said:  "The '906 patent is highly

21  relevant to the question of infringement because it discloses

22  an hourglass shape, a prominent feature common to the asserted

23  patents and most of the accused products and a feature relied

24  upon by the plaintiff to establish substantial similarity."

25  And then they note:  "The Hatch report is far from recognizing

opening - plaintiff

9

1    that the hourglass figure of the asserted patents could not be

2    relied on to establish substantial similarity improperly

3    relied upon that feature to show substantial similarity.  The

4    Hatch reports did not support a finding of substantial

5    similarity."  The Court even continued:  "Even a cursory

6    review of the four accused products shows that they are

7    different from each other, display features not found in the

8    asserted patents and lacked features shown in the asserted

9    patents."

10         So it really I think the Fed Circuit certainly seems

11   to indicate the hourglass shape is a background feature that

12   should be disregarded in analyzing infringement in this case.

13         Now, I know Mr. Hatch has a revised report, and he's

14   going to testify.  But I hope that -- I'm sure he's read the

15   Fed Circuit opinion, and I hope that is something he addresses

16   in his testimony.

17         MR. LOMUSCIO:  That will be, Your Honor.  And that is

18   one of the -- there are two points really, Your Honor.  One is

19   we think the Federal Circuit misread part of Mr. Hatch's prior

20   reports; but even the current report which builds upon the

21   prior report and he'll go through today points out how there

22   can be confusion with regard to these particular products.

23         THE COURT:  Okay.  Proceed.

24         MR. LOMUSCIO:  Thank you.

25         You will also hear in addition to Mr. Hatch, you will

opening - plaintiff

1  hear testimony from Mr. Richard Bero regarding the irreparable

2  harm suffered by defendants and that will be suffered by

3  defendants through the pendency of this litigation if there's

4  not an injunction entered.  And this is a point apparently

5  conceded by defendants in their opposition papers given their

6  failure to even reference Mr. Bero's report.

7          THE COURT:  I'm not sure -- well, perhaps.

8          MR. LOMUSCIO:  Right.

9          THE COURT:  It's still your burden of proof.

10         MR. LOMUSCIO:  Yeah, I totally understand,

11 Your Honor.

12         THE COURT:  And whether they contest it in their

13 response brief or not, I have to be satisfied by a

14 preponderance standard you've met that particular element --

15         MR. LOMUSCIO:  Of course, Your Honor.

16         THE COURT:  -- seeking a preliminary injunction.

17         MR. LOMUSCIO:  Of course, Your Honor.  That's why

18 you'll hear from Mr. Bero today.

19         THE COURT:  All right.

20         MR. LOMUSCIO:  Third, it's apparent from defendants'

21 papers that they have no viable rhetoric to plaintiff's

22 *prima facie* showing of infringement.  The two experts

23 defendants proffer with their opposition papers provide

24 contradictory testimony regarding infringement and concede

25 that they never reviewed the accused products prior to issuing

**opening - plaintiff**

1    their reports.  In fact, defendants make no factual showing at

2    all, either through affidavits or testimony, and improperly

3    rely on attorney supposition in their papers.  Such

4    speculation does not and cannot overcome what plaintiffs have

5    demonstrated through their preliminary injunction motion.

6            Finally, defendants gloss over the infringement

7    analysis in favor of presenting a series of procedural attacks

8    they claim undercut the renewed motion.  These contentions are

9    directly undercut by the extended record in this case.

10    Contrary to defendants' claims, all parties that plaintiffs

11    seek to enjoin with this motion remain party to this action.

12    Mr. Hatch's supporting declaration for this motion is proper,

13    and the Federal Circuit decisions do not preclude this motion.

14            In sum, plaintiffs are entitled to a preliminary

15    injunction in this case that prevents defendants from selling

16    their infringing products as demonstrated in the moving papers

17    and the testimony the Court will hear today.

18            Thank you very much.

19            THE COURT:  All right.  Just so before you sit down.

20            MR. LOMUSCIO:  Yeah.

21            THE COURT:  The parties you are seeking an injunction

22    against --

23            MR. LOMUSCIO:  Yes.

24            THE COURT:  -- are Gyroor.

25            MR. LOMUSCIO:  Yes.

opening - plaintiff

12

```
 1            THE COURT:  Urbanmax.

 2            MR. LOMUSCIO:  Yes.

 3            THE COURT:  U-r-b-a-n-m-a-x.  I'm spelling these for

 4   my court reporter.

 5            MR. LOMUSCIO:  Sure.  Sure.

 6            THE COURT:  Fengchi-US, F-e-n-g-c-h-i-U-S, correct?

 7            MR. LOMUSCIO:  Yes, Your Honor.

 8            THE COURT:  HGSM?

 9            MR. LOMUSCIO:  Yes.

10            THE COURT:  Gaodeshang, G-a-o-d-e-s-h-a-n-g-U-S?

11            MR. LOMUSCIO:  Yes, Your Honor.

12            THE COURT:  And Gyroshoes, G-y-r-o-s-h-o-e-s,

13   correct?

14            MR. LOMUSCIO:  That's correct, Your Honor.

15            THE COURT:  Are those the only defendants you're

16   seeking an injunction against?

17            MR. LOMUSCIO:  The only defendants we're seeking an

18   injunction against.

19            THE COURT:  All right.

20            MR. LOMUSCIO:  I just want to make sure I didn't

21   miss -- I have -- I just -- so your list is the same as mine,

22   Gyroor, Gyroor-US, Urbanmax --

23            THE COURT:  I didn't mention -- I didn't hear

24   Gyroor-US.

25            MR. LOMUSCIO:  Okay.
```

opening - plaintiff

1          THE COURT:  Gyroor-US?

2          MR. LOMUSCIO:  Gyroor-US, Urbanmax, Fengchi-US, HGSM,

3   Gaodeshang-US, and Gyroshoes.

4          THE COURT:  All right.  And which products, if we go

5   on the products being listed as Gyroor A through E, I believe.

6          MR. LOMUSCIO:  Yep.

7          THE COURT:  Which products are you seeking an

8   injunction on?

9          MR. LOMUSCIO:  Gyroor A, Gyroor C, and Gyroor E.

10         THE COURT:  Okay.  Not B or D?

11         MR. LOMUSCIO:  Not B or D.  B and D remain in the

12  case but are not the subject of this particular motion.

13         THE COURT:  Okay.  All right.  Because I would like

14  defense counsel to address this issue first.  Make sure we

15  have the right parties.

16         MR. YAO:  Yes.

17         THE COURT:  We're not going to do this twice.  We

18  have the right parties, the right products and that proper

19  notice is given to the parties that are being sought to be

20  enjoined.

21         MR. YAO:  Yes, Your Honor.

22         THE COURT:  Anything else?

23         MR. LOMUSCIO:  Nothing else, Your Honor.  Thank you

24  very much.

25         THE COURT:  All right.  I'll hear from defense

1    counsel.

2           Are you going to use the -- you can -- oh, I see.

3    You have a PowerPoint.

4           MR. YAO:  We have a PowerPoint as well.  Can you see

5    that, Your Honor?

6           THE COURT:  I have.  Have you given this to defense

7    counsel?

8           MR. LOMUSCIO:  I have not received it, no.

9           THE COURT:  Well, you will see it at the same time I

10   do then.

11          MR. LOMUSCIO:  Okay.

12          THE COURT:  All right.

13          Please introduce yourself again.

14          MR. YAO:  Good morning, Your Honor.  This is attorney

15   Yu-Hao Yao appearing on behalf of defendant Gyroor-US.

16          THE COURT:  Okay.

17          MR. YAO:  Third-party respondents Gyroor, Urbanmax,

18   Fengchi-US, HGSM, Gaodeshang-US, and Gyroshoes.

19          THE COURT:  Okay.  So with that, I believe every

20   entity plaintiff mentioned you are representing?

21          MR. YAO:  Yes, we represent defendant Gyroor-US as

22   well as third-party respondents the other Gyroor, Fengchi-US,

23   Urbanmax, HGSM, Gaodeshang-US, and Gyroshoes.

24          THE COURT:  All right.  So I count the same

25   defendants they've said are the subject of their potential

1    preliminary injunction.  You agree?

2         MR. YAO:  Yes, Your Honor.

3         THE COURT:  Okay.

4         MR. YAO:  The number of defendants and third-party

5    respondents are the same, yes.

6         THE COURT:  And the names.

7         MR. YAO:  Yes, and the name is also the same as well,

8    yes.

9         THE COURT:  All right.  And you represent them?

10        MR. YAO:  Yes, I do.  Yes.

11        THE COURT:  And you've had notice of the preliminary

12   injunction?

13        MR. YAO:  Yes, Your Honor.

14        THE COURT:  And you've responded in writing to that

15   preliminary injunction?

16        MR. YAO:  Yes, Your Honor.

17        THE COURT:  And you're prepared to respond to their

18   motion today?

19        MR. YAO:  Yes, Your Honor.

20        THE COURT:  Okay.  And then as to the products,

21   Gyroor, we'll call it Gyroor A, C, and E.

22        MR. YAO:  Yes, Your Honor.

23        THE COURT:  Do you agree those are the products that

24   the plaintiffs are seeking to enjoin?

25        MR. YAO:  Yes, Your Honor.  And I would also like to

opening - defendant

16

1   point out that Group B, or Gyroor B and Gyroor D are not

2   subject to this preliminary injunction.

3          THE COURT:  Correct.  And that's what plaintiff has

4   acknowledged.

5          MR. YAO:  Yes.

6          THE COURT:  Okay.  Perfect.  I think we're on the

7   same page.

8          Proceed.

9          MR. YAO:  All right.  Thank you, Your Honor.

10          OPENING STATEMENT OF BEHALF OF DEFENDANTS

11          MR. YAO:  So let's -- today we are here because

12   plaintiffs have decided once again to file their frivolous and

13   baseless motion for preliminary injunction and temporary

14   restraining order against defendant and third-party

15   respondents.  And so before we start, I would like to just

16   look a little bit at the factual background of this case.

17          So who are the defendants in this case?  As I

18   mentioned earlier, I represent defendant Gyroor-US who is the

19   only sole defendant in this case which we also have indicated

20   in our brief.  We have third-party respondents who are now

21   subject to this PI motion.  We have Gyroor, Urbanmax,

22   Fengchi-US, HGSM, Gaodeshang-US, and Gyroshoes.  And as we

23   just confirmed, the accused products, we have Group A product

24   as the only accused product in this case, but nonaccused

25   product which plaintiffs have blindly all lumped together are

opening - defendant

1   Group C and Group E products, and as we also mentioned earlier

2   that plaintiffs dropped Group B and Group D products in this

3   proceeding, or they indicated that they are not subject to

4   this motion for a preliminary injunction.

5           THE COURT:  Well, you mentioned -- there's nothing in

6   the Fed Circuit decision that rejected the third-party

7   respondents as not being properly before the Court.  Whether

8   we technically call them defendants or third-party respondents

9   there's nothing in the Fed Circuit decision that means -- that

10  says they can't be bound by any injunction I grant.  Do you

11  agree?

12          MR. YAO:  Well, Your Honor, I disagree with you.  If

13  we take a look at -- look at the case here we have, so we also

14  filed a motion for clarification which this Court denied as

15  moot after the issuance of the Federal Circuit order.  And

16  based on what we've read -- based on our understanding of the

17  Federal Circuit court -- I'm sorry -- Federal Circuit order,

18  the only defendant we have left in this case is Gyroor-US

19  which I can go into details why we believe defendant --

20  Gyroor-US is the only defendant in this case.  And in

21  addition, Gyroor -- I'm sorry -- Gaodeshang-US never sold

22  any -- never sold any accused products.

23          So if the Court would want to clarify maybe on the

24  spot as to why our -- since we never had a chance to deal with

25  our motion for clarification, if the Court would like to

opening - defendant

1   clarify or give us clarification as to --

2           THE COURT:  I don't think it's going to change the

3   scope of what we do today or next week.  I think I'll

4   reexamine your motion to clarify.  I'll look again at the --

5   how they got into the case as third-party respondents, but I

6   don't think it's going to change in any material way what each

7   of the parties present as evidence.

8           MR. YAO:  Okay then.

9           THE COURT:  I'm not conceding that an injunction in

10  this case is not going to bind those other parties.  And if

11  it's a party that hasn't sold the product, so be it, but that

12  doesn't mean if the injunction is granted that they somehow

13  can sell it.

14          So go ahead.

15          MR. YAO:  All right, Your Honor.  I would like to

16  give you a little bit as to -- background as to why we are

17  third-party respondents and there's only one defendant in this

18  case.  We also provide it in our brief, but I'll give you a

19  little bit more overview as to our view of why there are

20  third-party respondents and only Gyroor-US in this case.  So

21  let me go ahead and skip through the slides real quick.

22          THE COURT:  You know, and I don't want to interrupt

23  what you have, but the fact is the question of whether these

24  third-party respondents are bound by an injunction or

25  whether -- it's not going to affect the scope of the -- I

opening - defendant

1  don't believe at least of the plaintiffs' witnesses as I read

2  the reports.  They don't really deal with that, unless I

3  misread them.

4        MR. LOMUSCIO:  No, Your Honor.

5        THE COURT:  And I'd rather, for the sake of

6  witnesses, get them into court on the stand, direct, cross,

7  and get that over with because none of my questions of them,

8  to the extent the questions aren't asked by the lawyers, are

9  going to impact the question of the third-party respondent

10 versus defendants.  I'll give you a chance to argue it, and

11 maybe we end up briefing it further, but I don't think that is

12 going to be a key factor for today.  I would rather get to

13 witnesses.

14        Now, what I would like you to address is some of the

15 questions I had for plaintiff which is the -- you know, the

16 '906 patent and how that ought to be read in conjunction with

17 an ordinary observer's view of the accused products.

18        MR. YAO:  Your Honor, when we get to that, I'll

19 address the questions you asked to plaintiff about the '906

20 patent and --

21        THE COURT:  All right.

22        MR. YAO:  -- their patent said.

23        Before we also move on, just to see if you could

24 clarify, as I had mentioned, whether Gaodeshang-US never sold

25 the accused products in this case and plaintiffs failed to

opening - defendant

1    provide any evidence as so, and that's -- wondering if the

2    Court would clarify for both parties at this moment as to why,

3    you know, Gaodeshang is still considered a defendant even

4    though it isn't.

5             THE COURT:  I'm not clarifying anything on the spot.

6             MR. YAO:  Oh.

7             THE COURT:  If anything I learned from the procedural

8    history of this case is I need to be careful how I make

9    findings, the absolutely correct instruction from the

10   Fed Circuit on that.  And so there will be no decision on the

11   spot about the third-party respondents because it doesn't

12   impact our -- the gist of the witness testimony today which is

13   what I want to get to.

14            So please address --

15            MR. YAO:  Okay.

16            THE COURT:  -- the issue that I raised with

17   plaintiff.  I interrupted him to address that.  I'm

18   interrupting you to address that.

19            MR. YAO:  All right.  So, Your Honor, let's go

20   through -- let me go back to the slide again real quick.

21            So today we -- the patents -- patent-in-suit for this

22   preliminary injunction are as we see here plaintiffs' '723

23   patent and the '256 patent.  Those are the only two

24   patents-in-suit for this preliminary injunction.  The

25   plaintiffs have voluntarily dropped the other two patents

opening - defendant

1    which were included in the previous motion for preliminary

2    injunction which they did not include in this case.

3            THE COURT:  Plaintiffs agree with that?

4            MR. LOMUSCIO:  We did not drop them from the case,

5    Your Honor, no.  We dropped them --

6            THE COURT:  You dropped them from the preliminary

7    injunction motion.

8            MR. LOMUSCIO:  From the injunction motion, yes, Your

9    Honor.

10           THE COURT:  Okay.  Understood.

11           Go ahead.

12           MR. YAO:  Okay.  And as we see here, we also have the

13   prior art, the '906 patent, which plaintiffs' patent claimed

14   designer art based on.  So if we could -- let's go ahead and

15   take a view of this model we did.

16           So, Your Honor, could you see the screen?

17           THE COURT:  Yes, I can.

18           MR. YAO:  All right.  So, Your Honor, if you just

19   look at this from the top view, you could see the -- if you

20   could see the fenders on the -- on both the left and the

21   right.  You could both see the fenders of the '256 patent as

22   well as the '723 patent are very similar if not the same

23   design as the '906 prior art.  And if we just look at the

24   overall impression of the hoverboards, you could clearly see

25   the '256 patent and the '723 patent are substantially similar

opening - defendant

22

1  if not even the same based on the prior art.  And if we look

2  at the --

3           THE COURT:  Let me interrupt you real quick.  The

4  '906 prior art, I thought the fenders were drawn with dotted

5  lines which means they are not claimed.  Am I misunderstanding

6  the '906 patent?  I thought the key part of the '906 patent

7  that was patentable and therefore is something we should

8  consider as prior art was the hourglass shape, not the

9  fenders.

10          MR. YAO:  All right.  Yes, Your Honor.  You are

11  correct about that.  I will also point out the overall

12  impression which we will get into later.

13          THE COURT:  Sure.  Okay.

14          MR. YAO:  But if you look at the hour -- I'm sorry --

15  hourglass shape, it is very substantially similar, if not --

16  but the plaintiffs' '256 patent and '723 patent are very

17  substantially similar if not the same as the '906 prior art.

18          Okay.  Paul, if you want to -- I'm sorry -- Peter, if

19  you want to kind of move it around.

20          Your Honor, so if we take a view from this

21  perspective, you could also see the hourglass shape is also

22  very similar between the '256 patent and '723 patent and the

23  prior art.

24          And I'll address the fender issue.  The fender was

25  merely disclosed in the '906 patent.  But if we just, based on

opening - defendant

23

1   the overall impression and as an ordinary observer which we'll

2   get into later, as an ordinary observer, they would see that

3   the fenders and just the overall shape, as well as the

4   hourglass shape of the '256 patent and the '723 patent are

5   very substantially similar to the '906 prior art which the

6   patents-in-suit, that's what they're based on.

7          THE COURT:  Slow down a little bit too, okay?

8          MR. YAO:  Oh, sorry.

9          THE COURT:  Thank you.

10         So those are lights in the front; is that correct?

11         MR. YAO:  Yes, Your Honor.  Those are lights on the

12   plaintiffs' hoverboards.

13         THE COURT:  Well, those the two patents.

14         MR. YAO:  The two patents, but they also have the

15   actual light on their hoverboards, but this is just a 3D

16   drawing.

17         THE COURT:  Right.

18         MR. YAO:  Yes.  So if we look from the bottom view,

19   you could also see the hourglass shape is -- excuse me.

20   Peter, for the '906 patent, could you -- yeah, there we go.

21         So if we look from the bottom perspective, you could

22   also clearly see the substantial similarities here between the

23   '256 patent and the '723 patent as well, as the prior art we

24   could see the shape is very substantially similar which it is

25   clear you can clearly see that, the '256 patent and the '723

opening - defendant

24

1  patent is based on the prior art, '906 prior art.

2          THE COURT:  Was '906 disclosed in the '256 and '723

3  patents?

4          MR. YAO:  Yes, Your Honor.

5          THE COURT:  So this was patented over the prior art?

6          MR. YAO:  Yes, Your Honor.

7          THE COURT:  Okay.  Good.  Go ahead.

8          MR. YAO:  Yes, Your Honor.

9          Peter, if we could go back to the original.

10          Your Honor, this is our -- this is our patent, the

11  '857 patent, and this is what our accused products, the

12  design, is based on.  If you just take a look -- if we take a

13  look at this, I believe just based on this top view and bottom

14  view you could see the hourglass shape differences, very

15  substantially -- it's substantially different from the

16  patents-in-suit, the '256 patent as well as the '723 patent.

17  And --

18          THE COURT:  So your products, whether it's the three

19  products that defendants are seeking to enjoin, each one of

20  them practices this '856 patent?  Because is the '857 patent

21  really relevant?  It's really your product versus their

22  patent.  Isn't that the comparison?

23          MR. YAO:  Yes, Your Honor.  I think it is very

24  relevant because this is what we -- the accused products are

25  based on.  Just based on the design, we base our products on

opening - defendant

1   our own design.  We deny our design does not infringe the

2   patents-in-suit which the plaintiffs claim in this case.  And

3   if we go to the next slide, we have --

4           THE COURT:  Was your patent -- it looks like it was

5   granted after the two plaintiff patents.  Were their patents

6   listed as prior art in your patent application?

7           MR. YAO:  I believe so, yes.

8           THE COURT:  And the '906 was also listed as prior

9   art.

10          MR. YAO:  Yes.

11          THE COURT:  Okay.  Go ahead.

12          MR. YAO:  Okay.  Peter, if we could take a look at

13  this.

14          So as we see here, we have the '906 patent with a

15  '256 -- the patents-in-suit, '256.  If you just take a look at

16  it, if we want to play real quick, if you just see, they're

17  almost exactly the same similarly to what plaintiffs base

18  their design on as the prior art.  If you want, I could replay

19  it for you, Your Honor.

20          THE COURT:  No.  Well, what is Figure 1?  Is that

21  from --

22          MR. YAO:  Figure 1 is the -- this is the -- so

23  Figure 1 is the '906 patent, the prior art -- I'm sorry.  I'm

24  sorry.  This is the '256, and the one on the top is the '906

25  patent.

opening - defendant

26

1              THE COURT:  Well, the one on the top is '906.

2              MR. YAO:  Yes.

3              THE COURT:  But the one on the bottom is --

4              MR. YAO:  The Figure 1 is '256.

5              THE COURT:  '256.

6              MR. YAO:  Yes.

7              THE COURT:  Okay.

8              MR. YAO:  So if you just look -- look at the

9    substantial similarity between the two, if we kind of combine

10   the two -- Peter, if you want to play again -- you could see

11   how almost exactly the same way the '256 patent is based on

12   the prior art.  It's so similar it almost fits perfectly into

13   the design of the '906 prior art.

14             THE COURT:  Well, one of the key differences is that

15   '906 does not cover the fenders, the ends, and the '256 which

16   covers it -- and it also doesn't cover any design for the

17   pads.  But the '256 has part of its design, the fenders --

18             MR. YAO:  If you look at the hourglass shape, that is

19   almost exactly the same.

20             THE COURT:  No, I understand.  I understand your

21   point.  I'm just saying what's the difference in what is

22   patented in '256 that is different from the '906 is the ends,

23   the pads and possibly some other features.

24             MR. YAO:  Yes, Your Honor.

25             If we could then -- so before we move on, I would

opening - defendant

1   like to make a correction.  The '906 patent was filed earlier,

2   but it was not referenced in the two patents-in-suit.

3   However, '906 is still a prior art to the patents.

4           THE COURT:  All right.  So '906 was not referenced in

5   '723 and '256?

6           MR. YAO:  Yes.  But it is still prior art to the two

7   patents.

8           THE COURT:  Yeah.  Referencing it doesn't change --

9   you know, it's prior art if it came out before.  Whether it's

10  relevant prior art is an issue for me or a jury if we got to

11  it, but I understand.  But it's not in the -- those two

12  patents.  Was it in your patent, any or all three of those?

13          MR. YAO:  Yes, Your Honor.  Yes.

14          THE COURT:  '723, '256, and '906 --

15          MR. YAO:  Yes.

16          THE COURT:  -- were all in the '857 patent?

17          MR. YAO:  Yes, Your Honor.

18          THE COURT:  Okay.  Very good.

19          MR. YAO:  So, Your Honor, what we have here is,

20  again, on the top right here which I just point the second

21  black dot is, again, the '906 patent, and on the bottom right

22  here is the '723 patent.  So if we -- as we did, we'll show

23  you the similarity which is almost exactly the same.  You

24  could see the hourglass shape of the '723 patent and the '906

25  prior art patent, it's very substantially similar if not the

opening - defendant

1    same as well which clearly plaintiffs base their '723 patent's

2    design on the '906 prior art which was -- which is still a

3    prior art to the two patents.

4         And here we also have -- this is the '906 patent.

5    This is the design.  And if we have -- if we want to take a

6    look, if we -- as we can see just basically before we put

7    them -- if we put them together, you can also see how the

8    fenders are almost exactly -- are very similar if not the

9    same.  They are kind of enclosed.  And if we took it -- just

10   look at the two little lines as well as the front view, it's

11   almost exactly the same as well as just given overall shape as

12   well.  It clearly can be seen that the '723 patent -- I'm

13   sorry -- the '256 patent is based on the '906 prior art.

14        THE COURT:  Well, lower it again where you started.

15        MR. YAO:  Oh.

16        THE COURT:  As I understand the design patent law,

17   and tell me if I'm incorrect on this, the dotted lines on both

18   ends just don't count.  They're not being claimed in '906.  So

19   the similarity, I think I raised this point earlier, the

20   similarity may be in the hourglass shape, but the difference

21   is the fenders.

22        MR. YAO:  Well, Your Honor --

23        THE COURT:  Then we have to compare what is claimed

24   in the '723 and '256 patents as the fenders and other features

25   with the accused products.  I don't think '906 really deals

**opening - defendant**

1   with prior art as to the ends of these hoverboards, not when

2   they have dotted lines out there.  If I'm wrong on that,

3   correct me; I'm happy to hear it.  But --

4           MR. YAO:  Well, Your Honor, as I mentioned earlier,

5   the '906 was filed earlier, and it's -- even though it was not

6   referenced in the '256 and '723 patent, it is still a prior

7   art to the two patents which plaintiffs most likely if not

8   they have contemplated at least look at this prior art of --

9   '906 prior art before.

10          THE COURT:  I think we're misunderstanding each

11  other.  '906 doesn't have to be disclosed in the '723 or '256

12  to be considered as prior art.  All I'm saying is '906 doesn't

13  claim the ends of this hoverboard which means that the real

14  focus of today's inquiry ought to be, if there is --

15  plaintiffs think the hourglass shape is something that is

16  different than '906, I think the Fed Circuit said otherwise.

17  But I'm happy to hear argument on that, but I think the key

18  area is --

19          MR. CHENG:  Your Honor, if I --

20          THE COURT:  Well, let me just finish my thought.

21          I think the key area is what -- what's different.

22  And what's different from '906 in both their patents and then

23  in your products are the coverings on the -- of the wheels,

24  possibly some other features in the body of the hoverboard,

25  but that's my belief as to what the key inquiry is.  If that's

opening - defendant

1  wrong, I'm happy to hear argument.  If your colleague wants to

2  say something -- I'd rather we not double team.  Why don't you

3  talk to your colleague and see what he wants to say and then

4  you can come back.

5        MR. YAO:  All right.  I'll be right back, Your Honor.

6        THE COURT:  Sure.

7    (Off the record.)

8        MR. YAO:  Well, Your Honor, going back to the fenders

9  point.  As you mentioned earlier about the dotted lines on the

10  wheels and the fenders, they're not claiming design.  Even

11  though the fenders were not claimed in the '906 patent, it is

12  still considered prior art.  It was disclosed and which -- as

13  I indicated, the plaintiffs, when they filed this, their

14  application for the '723 patent, the '256 patent, they had

15  probably, you know, considered this design -- well, at least

16  they looked at it and it was referenced in the '906 prior art

17  and this is what they based it on.  But, Your Honor, you have

18  a different reading of what we read from.  Each if you just

19  take a look at the hourglass shape, that is very similar, if

20  not the same.  The '256 patent is based on the '906 prior art.

21        THE COURT:  I understand your argument, and I think

22  the Fed Circuit addressed that too.  Go ahead.

23        MR. YAO:  Again, if we take a look at the '723 patent

24  as well as the '906 prior art, again, you know, the hourglass

25  shape is very similar if not the same compared to the '906

opening - defendant

1   prior art which we could see the hourglass shape.  So it is

2   clearly -- it could be clearly seen that plaintiffs, when they

3   filed their patent, the '723 patent as well as the 9 -- the

4   '256 patent, they have definitely looked at this '906 patent.

5   They contemplated about it.  And when they filed their

6   application, it can be seen that this -- they base their

7   patents and patenting design on the '906 prior art.

8          So, again, this is the accused products, Group A

9   products, Your Honor.  This is -- we also have -- we also

10  brought in an actual hoverboard if we may present it to you,

11  Your Honor, an actual hoverboard.

12         THE COURT:  I have one.  I'm not sure.  I think it's

13  A, down in chambers.  Somebody gave it to us early on in this

14  case.  But I'm happy to --

15         MR. YAO:  May I approach with the hoverboard,

16  Your Honor?

17         THE COURT:  The whole thing?  Sure.

18         Just put it up here.  You could put it up on the

19  bench.

20         And this is product A?

21         MR. YAO:  Yes, Your Honor.

22         THE COURT:  Okay.

23         MR. YAO:  This is Gyroor -- yes, that is group

24  product A.  Yes.

25         Your Honor, if we take a look at it which you have in

opening - defendant

1    front of your screen as well as next to you the actual accused

2    products in this case.  And just -- if we just take a look

3    from -- as an ordinary observer in this case or just overall

4    impression, we could take a look at it, we could see how the

5    hourglass shape are very substantially different from

6    either -- from the top view, the front view, the bottom view,

7    as well as the back view.  And it's just so substantially

8    similar that plaintiffs cannot claim infringement if we -- of

9    the '723 and '256 patent of accused product A.

10          And here we have accused product C which we are -- if

11   I could also approach you with it.

12          THE COURT:  And is the color difference --

13          MR. YAO:  (Unintelligible.)

14          THE COURT REPORTER:  I'm sorry.  I couldn't hear

15   anything you said.

16          THE COURT:  Yeah, go back to the mic.

17          My question was there's the PowerPoint for what is

18   product C, it has a pink color.  The one you -- that the

19   demonstrative you gave me, or the example you gave me is black

20   color.  But I take it the colors are irrelevant to any

21   considerations we have?

22          MR. YAO:  You are correct, Your Honor.  The color

23   does not have any difference.  The only thing is we don't have

24   any pink in stock so we brought a black one; but other than

25   that, there are no relevance.

opening - defendant

1          THE COURT:  Fair enough.

2          MR. LOMUSCIO:  Your Honor, we do have a pink one if

3     the time comes.

4          THE COURT:  If it's the same product, the color is

5     not anything that's the subject of controversy in this case.

6          MR. YAO:  Your Honor, if you want I could show

7     plaintiffs an actual product which we brought today if they

8     think that the color difference might make a difference.

9          THE COURT:  Is anyone contending the color difference

10    is part of any claim that is a basis for infringement?

11         MR. LOMUSCIO:  No, Your Honor.  I was just simply

12    noting that if you did want to see a pink one, we have one.

13         THE COURT:  I don't.

14         All right.

15         MR. YAO:  As you can see on the screen, Your Honor,

16    we have the accused product C which is called Gyroor T580

17    which you also have next to you, you can see -- as you can

18    also clearly see that from the top, front, bottom, back view,

19    the hourglass shape is very substantially -- I'm sorry -- is

20    very substantially different compared to the patents-in-suit.

21    Even with the back we have the little microphones as well as

22    the ventilation holes.  It's so substantially different which

23    as an ordinary observer it is -- they could clearly see that

24    our accused product, Group C, does not infringe the '723 and

25    the '256 patent.

opening - defendant

1       THE COURT:  Well, your point is -- as I understand it

2  is that if we essentially look at these products, take away

3  from them or disregard the hourglass shape because it's prior

4  art, '906 prior art, the differences I ought to be looking

5  at -- I may have asked this question four or five different

6  ways but I'm asking it again.  The differences I ought to be

7  looking at is how is your product different than the '723 and

8  '256 patents if I disregard the hourglass shape?

9       MR. YAO:  Yep.  Well, it's also clear you can see the

10  fenders are much different.

11       THE COURT:  Well, that's my point.  Yeah.

12       MR. YAO:  You see --

13       THE COURT:  I mean, that's what I ought to be looking

14  at.  Now, plaintiffs may disagree, and I'm going to hear from

15  Mr. Hatch.  But I'm trying to get a handle on what the key

16  contested issues are.

17       MR. YAO:  You will also hear from one of our experts,

18  Mr. Gandy, later about how the accused products' design

19  infringe any of the two patents-in-suit.

20       We have the third nonaccused products is the Gyroor

21  G11, or as we call it, the Group E products which we also

22  have -- which we brought one today which if I may approach?

23       THE COURT:  Yes.  What was the number on the first

24  one, the A product, by the way?

25       MR. YAO:  It's T581.

opening - defendant

1          THE COURT:  581?

2          MR. YAO:  Yes.

3          THE COURT:  Okay.  All right.

4          MR. YAO:  And this one, the G11, is the Group E

5    products.

6          THE COURT:  All right.  Thank you.

7          Okay.

8          MR. YAO:  Your Honor, as you can see in front of you,

9    next to you, we have the Group E accused products, the Gyroor

10   G11.  Again, from the top, front, bottom and back view, we

11   could clearly see that the hourglass shape are substantially

12   different.  Again, also we don't have the ribs toward here in

13   the which I'll circle here.  You can see the ribs different

14   when you compare it with the plaintiff's patents-in-suit, the

15   '256 patent as well as the '723 patent.  And if you look at

16   this design of the hourglass shape, we also have different

17   line designs which we'll go into later which is very

18   substantially different from the patents-in-suit as well.

19         THE COURT:  Okay.

20         MR. YAO:  So to give you a little bit of overview of

21   procedural history as to why we are here today again and why

22   there are third-party respondents and only defendant

23   Gyroor-US.

24         THE COURT:  Let's deal with that later.

25         MR. YAO:  Oh.

opening - defendant

1          THE COURT:  I'm happy to see your PowerPoints on that

2     one, but I think we need to start hearing from witnesses.  I

3     don't want to have a closing argument before we start hearing

4     evidence.

5          MR. YAO:  There's one thing that I would like to

6     point out.  There's a factual mistake in the plaintiffs'

7     motion on page 12 of their -- it's Docket 592.  Plaintiffs

8     said that none of the relevant prior art creates the same

9     visual impression of the patents, namely the integrated

10    hourglass body with a relatively flat surface across the top

11    of the main body.  This is actually -- both features were

12    disclosed in the '906 patent.

13         THE COURT:  Okay.

14         MR. YAO:  And, Your Honor, I'll close my opening

15    statement with this.  As we all know, we are here today for a

16    preliminary injunction hearing.  The burden of proof is on

17    plaintiffs, or the movant, to prove that they will be -- they

18    have a likelihood of success on the merits as well as they

19    will be irreparably -- I'm sorry -- irreparably harmed if the

20    injunction would not be in place.  As plaintiffs have pointed

21    out, their expert, Mr. Bero who will testify later, his report

22    is deficient, contains no analysis whatsoever of any casual

23    nexus that is required or any lost sales that plaintiffs

24    contend.  And even if plaintiffs did claim.  A lost sales

25    injunction does not remedy lost sales.  It's clearly

opening - defendant

37

1    compensatable with monetary damages.

2           In addition, the irreparable harm to defendant would

3    be much greater if the injunction would be in place compared

4    to the plaintiff.

5           In addition, plaintiffs also in their reply brief

6    does not address any of the oppositions -- opposition in

7    response that we put in our brief regarding the loss of

8    harms -- the loss of sales as well as any -- loss of market

9    share which is required to prove this patent -- to prove --

10   for injunction.

11          In addition, having an injunction in place just

12   because defendants and third-party respondents are direct

13   competitors goes against public policy and goes against the

14   heart of free market and capitalism and as you will hear later

15   today with our expert, Mr. Gandy, as to why there are no -- no

16   claims of likely -- no claims of infringement in this case.

17          THE COURT:  All right.  Thank you.

18          MR. YAO:  Thank you.

19          THE COURT:  All right.  Plaintiffs may call their

20   first witness.

21          MR. BERKOWITZ:  Plaintiffs would like to call

22   Mr. Paul Hatch.

23          THE COURT:  All right.

24          Mr. Hatch.

25     (Witness sworn.)

Hatch - direct by Berkowitz

38

1          THE COURT:  You may begin.

2          PAUL HATCH, PLAINTIFFS' WITNESS, DULY SWORN,

3                 DIRECT EXAMINATION

4   BY MR. BERKOWITZ:

5   Q.  Good morning, Mr. Hatch.

6   A.  Good morning.

7   Q.  Could you state your full name for the record.

8   A.  Yes.  I am Paul Hatch.  I reside here in Chicago.

9   Q.  Okay.

10         THE COURT:  Is the microphone on?  Is there a green

11  light there on the bottom?

12         THE CLERK:  It's on now.

13         THE COURT:  It's on now.  Okay.  All right.

14         Okay.  Go ahead.

15  BY MR. BERKOWITZ:

16  Q.  Could you tell us what has been your role in this case up

17  through now?

18  A.  Yes.  I've been engaged by plaintiffs to review the

19  patents and to analyze this case of design patent

20  infringement.

21  Q.  And what is your understanding as to who the plaintiffs

22  are?

23  A.  The plaintiffs are Hangzhou Chic and Unicorn Global.

24  Q.  Okay.  And do you understand the relationship between

25  those two parties?

**Hatch - direct by Berkowitz**

39

1   A.  Yes.  I believe Hangzhou Chic is the manufacturer and the

2   owner of the patents in question, and Unicorn Global is a

3   licensee and has the license to distribute the product here in

4   the U.S.

5   Q.  And when did you first start working on this case?

6   A.  I started in 2020.

7   Q.  And since that time, have you provided any other testimony

8   in this case?

9   A.  Yes, I have.  I provided testimony for the first

10  preliminary injunction in 2020.  I also wrote a declaration in

11  2021 for the second preliminary injunction.  I also provided

12  testimony and reports during discovery which was summer this

13  year and of course have provided a declaration in this current

14  preliminary injunction.

15  Q.  Okay.  Thank you.

16          Could you tell us about your current employment?

17  A.  Yes.  I am currently undertaking a Ph.D. in the learning

18  sciences at the University of Illinois at Chicago.

19  Q.  Okay.  So are you not currently employed?

20  A.  I'm not.  I recently retired from my employment.

21  Q.  Okay.  So before we go to the employment, could you tell

22  us a little bit about your current Ph.D. work?

23  A.  Yes.  So learning sciences involves looking at psychology,

24  technology, and education.  It's essentially about how people

25  perceive things and how people learn.  And it's been an area

**Hatch - direct by Berkowitz**

40

1  of interest of mine for many years, so I decided to go the

2  full route with this for the next six years.

3  Q.  Okay.  And when did you start that program?

4  A.  I started in 2020.

5  Q.  Okay.  And prior to 2020, were you employed?

6  A.  Yes.  I was the CEO of Teams Design.

7  Q.  Okay.  Can you take us back to your education post high

8  school?

9  A.  Yes.  My undergraduate degree was in industrial design

10  which was at the University of Northumbria in the UK.

11  Q.  And what kind of coursework did you engage in while you

12  were doing your undergrad?

13  A.  Within industrial design, we learned a range of things,

14  obviously drawing techniques, understanding about manufacture,

15  engineering, a lot about how to design and how people perceive

16  those designs.  And ergonomics, for instance, is a very big

17  part of it.

18  Q.  Okay.  And when did you complete your undergraduate

19  training?

20  A.  That was 1993.

21  Q.  Okay.  And after 1993, did you begin working?

22  A.  Yes.  I began at -- I moved from Germany from the UK, and

23  I began employment at Teams Design in Germany.

24  Q.  What was your role at Teams Design, at least initially?

25  A.  So I started as a junior designer and became senior

**Hatch - direct by Berkowitz**

1    designer after a number of years.  And at the point of about

2    five years, the company wanted to open up a branch in the U.S.

3    and selected me to open it up for them which I did in 1998

4    here in Chicago.

5    Q.   Okay.  And before we get into your specific role, can you

6    tell us a little bit about what Teams Design does in general?

7    A.   Yes.  So Teams Design is an industrial design consultant.

8    So by that role, they consult with manufacturing companies

9    that make consumer products, make industrial products, who

10   have brands, and essentially provide industrial design

11   services.  So that covers undertaking research to understand

12   consumer needs, ideation, creating new ideas, problem solving,

13   and then designing the products, that is the look and feel of

14   the products, to -- all the way from sketch, through

15   computer-aided design, through into engineering, and very

16   often we would follow it through manufacture.  We wouldn't do

17   the actual manufacture ourselves, but we would walk the shop

18   floor to make sure things are working out.

19   Q.   Okay.  Could you give us some examples of some of the

20   companies that Teams Design works with?

21   A.   Yes.  So we became one of the largest design

22   consultancies, industrial design consultancies in the world,

23   so we were lucky to be able to work with some of the largest

24   corporations as well.  So we designed a lot with Bosch and

25   with Samsung; with Chrysler, the automobile company, for

Hatch - direct by Berkowitz

42

1    instance; with Siemens.

2    Q.  And did you yourself work with those particular companies?

3    A.  Yes.  Yes.

4    Q.  And could you tell us a little bit more about your role I

5    guess in working with those companies?

6    A.  So I was engaged from start to finish on all of the work

7    we did.  Obviously I had a number of staff.  We reached almost

8    30 people at one point, in Chicago that is, and of course had

9    multiple branches.  However, I was involved right to the end

10   until I retired in going out into user research and to

11   people's homes, understanding their needs, in guiding the

12   design and guiding the ideas and the development, essentially

13   all the stages.

14            THE COURT:  Hang on.  Let's go off the record for a

15   moment.

16      (Off the record.)

17            THE COURT:  All right.  Are we still missing some

18   people?

19            MR. YAO:  We're missing my colleagues.

20            THE COURT:  We'll wait until they're back.

21      (Off the record.)

22            THE COURT:  All right.  Okay to begin?

23            MR. YAO:  Yes.

24            THE COURT:  Here we go.  It looks like we have

25   everyone here.

**Hatch - direct by Berkowitz**

1      All right.  You may continue your direct examination.

2      MR. BERKOWITZ:  Thank you.

3  BY MR. BERKOWITZ:

4  Q.  So when we left off, Mr. Hatch, you had told us a little

5  bit about your -- some of the types of work that you had done

6  while at Teams Design.

7      Could you tell us a little bit more about the

8  specific products that you worked on while at Teams Design,

9  and in the interest of time, some of the -- as they relate to

10  the types of products at issue here in this case.

11  A.  Yes, of course.  And I did work on a number of consumer

12  products.  That was about 50 percent of our business.  And

13  related to the products in this case, I also worked on a

14  number of self-balancing vehicles, that is one of our clients,

15  for instance, had an entire department that was dedicated

16  towards devices of mobility as they called it.  And so we

17  worked on redesigning some segway devices.  And segways, for

18  those who might not know, came out --

19      THE COURT:  I know what they are.

20      THE WITNESS:  Yes, thank you.

21      And essentially we were redesigning it for use in

22  certain spots in other areas.  So we were creating a different

23  look and feel and making it more applicable to the target

24  area.

25      And we also worked on some electronic bikes, for

**Hatch - direct by Berkowitz**

1    instance, even some single-wheeled self-balancing devices as

2    well.

3    BY MR. BERKOWITZ:

4    Q.   Okay.  Thank you.

5         So let's jump in.  I know you said earlier that you

6    were retained in this case to provide opinions.  Could you

7    tell us what types of opinions that you've been asked to

8    provide here?

9    A.   Yes.  I was asked to analyze the patents and the accused

10   products, and so looking to -- at the area of infringement.

11   Q.   Okay.  And what is your understanding of a patent?

12   A.   So there are two main types of patent, utility and design

13   patent of course.  And as I understand, it offers protection

14   for the inventor, that is it precludes someone from infringing

15   on their invention.

16   Q.   And what types of patents are at issue in this case?

17   A.   So in this case, we have four design patents that we're

18   looking at.

19   Q.   Okay.  And today, how many patents are we here to talk

20   about?

21   A.   So in the preliminary injunction here today, we're looking

22   at just two of those four patents.

23   Q.   Okay.  And which two of those patents are we here to talk

24   about?

25   A.   It's -- I do have some slides, but the patents themselves

**Hatch - direct by Berkowitz**

45

1   are the -- what we've called the '723 and the '256.

2   Q.  Okay.

3          MR. BERKOWITZ:  We do have some slides that Mr. Hatch

4   prepared.  Can we bring them up on the screen?

5          THE COURT:  Yes.  And have you shared these with the

6   defense?

7          MR. BERKOWITZ:  Not yet, but we do have paper copies

8   that we can mark.

9          THE COURT:  Yeah.  Why don't you give a paper copy to

10  my law clerk if you've got -- and me, and then defense, of

11  course.

12         MR. BERKOWITZ:  May I approach?

13         THE COURT:  Yeah, through my courtroom deputy,

14  please.  Thank you.

15         All right.  You may proceed.

16         MR. BERKOWITZ:  I'm just going to bring it up on the

17  screen.

18         THE COURT:  All right.

19         Is it properly connected at your table?

20         MR. LOMUSCIO:  It appears to be connected, yes.

21         THE COURT:  All right.  Did you test it out before

22  the hearing?  Was it working then, or do you know?

23         MS. STURM:  Do you know?

24         MR. LOMUSCIO:  We weren't able to.

25         THE COURT:  Okay.  Then here's what we'll do.  We'll

**Hatch - direct by Berkowitz**

46

1  call the IT department to come up and work on it, but in the

2  meantime, we all have paper copies.  Does the witness have

3  one?

4          MR. BERKOWITZ:  No.

5          THE COURT:  Let's give him one, and then we can work

6  off of the same -- it's numbered pages.  We'll work off the

7  same documents.

8          And then, Emily, will you ask somebody to come up?

9          THE CLERK:  Yes.

10          THE COURT:  Thank you.

11          We'll have someone come up and solve that, but in the

12  meantime, we'll all work off the paper copies.  Alternatively,

13  I think you can do a hookup off your computer on the deck here

14  might work.

15          MR. BERKOWITZ:  I can try that.

16          There we go.

17          THE COURT:  All right.  Very good.  So you're going

18  to ask the questions and push the slides, but I'm sure you can

19  do that.

20          MR. BERKOWITZ:  I'll give it a shot if I can get it

21  to work.  Let's just move forward.

22          THE COURT:  I think your colleague may put another

23  laptop up there.

24          THE WITNESS:  Yes, there we go.  Third time's a

25  charm.

**Hatch - direct by Berkowitz**

1        MR. BERKOWITZ:  Thank you.

2        THE COURT:  You may proceed.

3        MR. BERKOWITZ:  Yes.

4   BY MR. BERKOWITZ:

5   Q.   Okay.  So before that little glitch, we were talking about

6   the two patents that are asserted in this case?

7   A.   Yes, that's correct.  So on this slide, we see the two

8   patents which I will continue to refer to as the '723 and the

9   '256.  We see they are both from the same inventor, and they

10  were filed at the -- I'm sorry.  They were -- the date of the

11  patent -- I'm sorry.  They were filed at the same time.

12  Q.   Okay.  By the same time, what do you mean?

13  A.   On the same date.  They were literally filed on the same

14  date even though the date of the patents, it differs between

15  them.

16  Q.   Can you tell us a little bit about the type of information

17  that's shown on the cover of the patent?

18  A.   So we see, first of all, the title of the patent; in this

19  case, the self-balancing vehicle.

20        On the -- towards the bottom right, we also see the

21  claim and the description which we've got on the next slide

22  highlighted.  So, for instance, on the '723 here, we can see

23  the title, the self-balancing vehicle, the filing date and the

24  issue date.  Importantly, it was filed in 2014.

25        On the next slide, we can see the claim and

**Hatch - direct by Berkowitz**

1    description.  And being a design patent, the claim here refers

2    directly to the figures.

3    Q.   Okay.  And how many figures are claimed and disclosed in

4    the '723 patent?

5    A.   There are eight figures.  And in the description, it

6    provides a description of exactly which angle each of those

7    figures represents.

8         Towards the bottom, we can see highlighted in yellow

9    pointing out that the broken lines are shown for purposes of

10   illustrating, that is environmental, it provides context, and

11   those are items that are not part of the claimed design.

12   Q.   Was there a reason that you highlighted that for us?

13   A.   Yes, it's just important to know that as we look at the

14   figures that there are certain elements that are unclaimed as

15   part of that patent.

16   Q.   Okay.

17   A.   And so the next few slides we show some detailed images of

18   the patent.  I'll only go through those briefly for brevity.

19        But essentially we see in Figure 1, there are some

20   areas that are unclaimed.  There we see the O and the I that's

21   part of the foot tread area.  Also towards the very middle of

22   the product there's some dotted lines showing some unclaimed

23   markings on the buttons.

24        And we also see on both drawings, Figure 1 and 2, the

25   hubs of the wheels are unclaimed.  And on Figure 2 we see the

**Hatch - direct by Berkowitz**

1  tread of the wheels, that is the wheels as a whole are shown

2  with broken line, and, therefore, are unclaimed.

3  Q.  Could you tell us a little bit about how you take into

4  account what's claimed and unclaimed when performing a design

5  patent analysis?

6  A.  Yeah.  The unclaimed matter, it is important to understand

7  the context that it's providing so that's why it's included in

8  drawings like this.

9        However, if it's unclaimed, that is shown through the

10  dotted lines, this is not part of the claim of the design.

11  That is the protected part of the design.

12  Q.  Okay.

13  A.  We can go to the next figures maybe on the next slide.

14  We've got Figure 3 and 4.  And there we're seeing the rear

15  view, straight on, and the front elevation, as is typical with

16  patents with seeing very specific views.

17        We also see some unclaimed matter here, what appeared

18  to be screw buses.  We see the hubs and the wheels are

19  unclaimed.  And of course there's some -- on the front

20  elevational drawing there's a button and probably a charging

21  port that are marked in dotted lines as well.

22  Q.  Okay.  And, again, those claimed versus unclaimed

23  features, are those taken into account during the analysis?

24  A.  They're part of the consideration of the design as a whole

25  because it's giving us context, but it is not part of the

**Hatch - direct by Berkowitz**

1   claimed part, the protected part of the design.

2   Q.  Okay.

3   A.  On the next slide we've got Figure 5 and 6, 5 showing an

4   end view, or left-side view, I should say, and it does point

5   out in the description that the right side is a mirror image

6   of the same.  And there we do see obviously the open fender

7   that we see wrapping over the top of the wheel.  And the wheel

8   itself and the hub cap are all marked as unclaimed.

9           And Figure 6 we see a nice angled view.  In this case

10  it's the rear top right perspective of the design, and we see

11  the same elements that we've covered in the other views that

12  are marked as unclaimed.

13  Q.  Okay.

14  A.  Then finally, on the next slide where we see Figure 7 and

15  8, excuse me, two more angled views.  On the left there,

16  Figure 7, we're seeing a front top/left perspective, and,

17  again, we're seeing the unclaimed matter that aligns with what

18  we're seeing on the other images.

19          And Figure 8, we're looking from an angled view from

20  below.

21  Q.  Before we move on to the second patent, are there

22  particular views that are more important than others?

23  A.  No.  When analyzing or understanding what's claimed here,

24  it's important to look at all of the views to understand the

25  design as a whole.  It would be wrong to look at one specific

**Hatch - direct by Berkowitz**

51

1     view and make inferences based on one view alone.

2     Q.   Okay.  And could you sort of run through the same analysis

3     for -- the same description for the '256 patent?

4     A.   Yeah, absolutely.  I'll be a little bit more brief as well

5     in the interest of time, but we also see here as the same

6     title, as self-balancing vehicle.  It was also filed on the

7     same date here in 2014 which it lays claim to and -- I'm

8     sorry -- priority to.

9          And on the next slide, we see also zoomed in to the

10    claim and description, the claim again and description

11    referring directly to the figures.  We also have eight

12    figures, and the descriptions are very similar here.  And it

13    also calls out that the broken lines form no part of the

14    claimed design.

15         THE COURT:  What is the essential difference between

16    those two patents?  Is there something you can point to in a

17    particular figure that is different from one to the other?

18         THE WITNESS:  Yes.  Maybe if we go to the third

19    slide, the angled view, we get a good view.

20         THE COURT:  What page would that be?  Go ahead.

21         THE WITNESS:  I'm sorry.  I think it's the scene we

22    could look at there.  So there are a lot of similarities

23    between the two patents.  There are some differences we can

24    see in even the unclaimed areas here.  The design of -- there

25    are some differences around the design of the form as it comes

**Hatch - direct by Berkowitz**

1    to the -- towards the fenders and the treatment of the fenders

2    themselves.

3          The unclaimed wheels appear a little different here

4    and some differences in the treatment of the -- of the

5    pronounced footing areas.

6          But all in all, there's a lot of similarities.  They

7    were both filed on the same date, and they were both granted a

8    patent independently from each other.

9    Q.  And just to clarify, you were looking at Figure 6 as you

10   were providing that description?

11   A.  Yes.  Thank you.

12         And so.  Yes, we have similar angles for the rest of

13   the patent here.  We have Figure 7 and Figure 8 as well.

14   Q.  Are there any other differences that you would like to

15   call out between the '256 and the '723?

16   A.  Yeah, there are some differences in smaller details when

17   we look at the lighting areas, for instance, which we see on

18   Figure 7 and Figure 8.  There are some differences in the

19   center of the body as a whole.  But these are design

20   differences.  They do contribute to the overall impression,

21   but the -- they -- well, yes.  That's it.  Thank you.

22   Q.  Okay.  And we've now covered the two patents that are

23   asserted in this case.  I would like to move on to the accused

24   products.

25         Would you -- in general in this case, how many

**Hatch - direct by Berkowitz**

53

1   different accused products are there?

2   A.   So there are five accused products, but here for the

3   preliminary injunction we're looking at just three of those,

4   as was mentioned earlier today.   There is the -- what I show

5   on the slide here, the Gyroor A, C, and E.   And we already

6   have physical samples, I believe, to the left of the bench

7   here.

8   Q.   Okay.   And did you bring your own samples with you today?

9   A.   I did, yes.   And actually these are the samples I used

10  when I was analyzing the products itself.   It was very useful

11  to be able to look at the products in person rather than

12  through photos.

13  Q.   Okay.

14  A.   It's a little less deceiving that way.

15  Q.   Okay.

16          THE COURT:   Do you practice the patent on the -- this

17  is more to the attorneys, and if the witness can answer, fine,

18  but does the plaintiff practice the patents?   In other words

19  do you have products that are identical to the patents so I

20  can actually do a -- rather than comparing a drawing to the

21  Gyroor products, I could compare a plaintiff product to the

22  Gyroor product as long as the product for the plaintiff is

23  identical to the patent?

24          MR. BERKOWITZ:   We don't have a sample of our product

25  with us.   We do --

**Hatch - direct by Berkowitz**

54

1          THE COURT:  All right.  And it's irrelevant unless

2    you actually practice the patent.

3          MR. BERKOWITZ:  I believe we do.  But, yeah, the

4    analysis is the drawings against the accused product.

5          THE COURT:  All right.  Well, you've got my question.

6    We'll address it later.  But it's an easier side-by-side

7    comparison if you're looking at two hoverboards as long as

8    the -- and it's not the analysis unless your hoverboard, the

9    plaintiffs' hoverboard, is identical to the claimed drawings

10   in the patent.

11         MR. BERKOWITZ:  Okay.

12         THE COURT:  So anyway, go ahead.

13         MR. BERKOWITZ:  I would like to mark each of the

14   three hoverboards as exhibits, if that's all right.

15         THE COURT:  Sure.  Why don't you -- just call them

16   plaintiffs' --

17         MR. BERKOWITZ:  I was going to do 1, 2, and 3.

18         THE COURT:  That's fine.  Plaintiffs' 1, 2, and 3,

19   and I will consider these ones, the ones provided to me by

20   defendants, Defendants' 1, 2, 3, 1 being Gyroor A, 2 being

21   Gyroor C, and 3 being Gyroor E.

22         MR. BERKOWITZ:  Okay.

23   BY MR. BERKOWITZ:

24   Q.  So, Mr. Hatch, could you just give us an overview of the

25   accused products?

**Hatch - direct by Berkowitz**

1   A.  Yes.  As we can tell, they are very, very similar to each

2   other, and they are all self-balancing vehicles, as is the

3   patent description.  And they are marked as hoverboards.

4   Q.  Okay.  So we've talked about the asserted patents.  We've

5   identified the three accused products.  Can you in general

6   walk us through your methodology in making an infringement or

7   non-infringement analysis for design patents?

8   A.  Yes.  So very briefly, the stages that I would go through,

9   first of all, would be claim construction.  That is by looking

10  at the design patents themselves, looking at what's claimed,

11  understanding what's unclaimed, and getting a good sense of

12  the design as a whole which is the important first step.

13  Excuse me.

14          Following that, it's important to identify who the

15  ordinary observer would be for this particular case which I'll

16  get on to shortly, and is essentially our understanding of the

17  ordinary observer is informed in part by understanding the

18  actual purchaser of the accused product.

19          The next stage I would go through, one should go

20  through is to understand the prior art, to look at the prior

21  art of the invention at the time, at the specific time.  And

22  that gives some understanding as to how novel the design was

23  at the time, what existed before it and the real context of

24  the design that we're looking at through the figures.

25          Following that, conducting two stages of infringement

**Hatch - direct by Berkowitz**

56

1    analysis or the ordinary observer test, the first of which

2    we -- we do a direct comparison between the accused products

3    and the patent to the drawings of the patent and the design as

4    a whole.  And the second -- in that first stage, we look

5    broadly to see if they are plainly dissimilar or not.

6            Given that then we move on to the second stage where

7    we then bring in the prior art and view it through the eyes of

8    the ordinary observer to understand if the accused products in

9    the patent are closer than they are to the -- closer to each

10   other than they are to the prior art.

11   Q.   Okay.  So now let's take the next step and apply that

12   methodology to the particular patents and products in this

13   case.

14           So you said the first step was construing the claims.

15   Could you tell us how you went about doing that in this

16   particular case with respect to each of the patents?

17   A.   Yes.  So essentially looking at the claimed design and

18   understanding what's unclaimed; as we kind of walked through

19   before, looking at the patents and also as part of my analysis

20   looking at the file history to see if there's any other

21   signals there that may give us further indication.

22   Q.   In this particular case, was there anything of note in the

23   file histories?

24   A.   No, there wasn't.  The designs were accepted for the

25   patent.

**Hatch - direct by Berkowitz**

1  Q.  Is that the case for each of the asserted patents?

2  A.  That's correct, yes.

3  Q.  Okay.  So step 1 is construe the claims.  You said that

4  step 2 was to define the ordinary observer; is that correct?

5  A.  Yes, that's correct.

6       And so I believe the next slide, I -- yes, we can

7  talk briefly about the ordinary observer.  This is important

8  to understand because the viewpoint in looking at the figures

9  has to go through understanding the viewpoint of the ordinary

10 observer.  This is a hypothetical person.  So to read the top

11 lines here and not all of it, but the ordinary observer is one

12 who is not an expert in the claimed designs but rather one of

13 ordinary acuteness who is a principal purchaser of the

14 product.

15       And so first of all, as part of the process, we look

16 to, okay, who is the purchaser of the accused product.  And

17 based on my experience in this case, I defined that that would

18 be a consumer user or the parents of the user, each having

19 little or no experience purchasing hoverboards.

20       We use that information about the purchaser to

21 understand the level of acuity or attention that that person

22 pays to the design and the details of the product itself.

23       THE COURT:  What is the basis of your conclusion that

24 the consumer user would have little or no experience

25 purchasing hoverboards?  And if you're coming to that in your

**Hatch - direct by Berkowitz**

58

1  outline, you can wait until you get to it; if that's not in

2  your outline --

3          MR. BERKOWITZ:  Now is a good time.

4          THE COURT:  All right.  Go ahead.

5          THE WITNESS:  No, it's a good question.  Based on my

6  experience, it's clearly a consumer product.  And seeing how

7  it's retailed, for instance, chiefly online in stores like

8  Amazon, there are some brick-and-mortar stores where it's

9  retailed like Best Buy and Walmart, and the way it's presented

10  certainly speaks to their attracting attention to the

11  consumer.  And price point and features seem to be the

12  prominent items that are being presented.

13          So in many years I've worked with consumers,

14  conducted user research to get an understanding of how they go

15  about purchase habits and how they look at products.  And so

16  based on that experience and seeing everything that I have

17  here, it looks like the purchaser is not going to have an

18  intricate knowledge of all the nooks and crannies and styling

19  details of the particular designs.

20  BY MR. BERKOWITZ:

21  Q.  And I think you touched on this before, but can you

22  explain a little bit more about the interplay between this

23  principal purchaser and how you use that in connection with

24  the ordinary observer?

25  A.  Yeah.  I think that's very good to explain.  Actually I've

**Hatch - direct by Berkowitz**

1    created a diagram on the next slide because it's often

2    misunderstood.

3            The hypothetical ordinary observer we understand to

4    have knowledge of all the relevant prior art.  So in this

5    case, they have knowledge of the prior art that's cited.  They

6    would have knowledge of the '906, of course, because it was

7    invented at around the same time.

8            And so this hypothetical ordinary observer has

9    knowledge that those exist but the question remains how much

10   attention do they pay when they're looking at those designs,

11   if -- whether they, for instance, have intricate detail

12   inspection of the designs or whether it's more of a fleeting

13   glance.

14           And so to find that out, that's where we use and

15   refer to the principal purchaser.  We understand the level of

16   attention that they apply and use that to construct our

17   hypothetical ordinary observer.

18           THE COURT:  Is there evidence that both the -- again,

19   if -- that these products are sold in brick-and-mortar stores

20   at the same time?  In other words, there's a Gyroor product

21   and a plaintiff product in a Walmart or in a Best Buy where a

22   person, an ordinary observer, could actually physically

23   compare the two, and whether they're boxed so that all they

24   would see is a picture anyway, they couldn't even hold up each

25   one to do a comparison?  Are you aware of that fact or that

1    factor being present here?

2            THE WITNESS:  That was not part of my analysis as I

3    strictly have to look at how the patent is representing the

4    design as a product and its packaging may actually infer other

5    qualities that the patent doesn't have.

6            THE COURT:  Okay.  No, I understand.  And it goes

7    back to my question of whether there's actually a physical

8    product of the plaintiff that practices the patent that would

9    be something that a person online would look at, look at both

10   products, and an ordinary observer could see if there were

11   differences or they're confusingly similar, or if they are

12   physically present at a brick-and-mortar store, whether

13   they're packaged in a way where a person could actually

14   observe differences or not.

15           Not a criticism of Mr. Hatch.  You know, that's not

16   what he was asked to do, but I'm raising that with the

17   parties.  You can answer it at some point in the future.

18           Go ahead.

19           MR. BERKOWITZ:  Sure.

20   BY MR. BERKOWITZ:

21   Q.  Mr. Hatch, I see on the website of this slide that you

22   prepared below the principal purchaser, you've identified what

23   you say here is a low level of attention.  Can you explain

24   what you mean by that?

25   A.  Yes, and that sort of goes back to after understanding

**Hatch - direct by Berkowitz**

61

1   that the purchaser might be someone who is quickly looking

2   through Amazon.com or walking through the shelves in Walmart,

3   that their attention is going to be drawn towards things like

4   the price point or how long does the battery last and things

5   that the -- the actual features on these pages and on the

6   boxes call out.  And, therefore, they have a low level of

7   attention, not in life in general, but towards the styling

8   details.

9   Q.   Okay.  So we've covered first I believe the first two

10  steps of your methodology: construing the claims, defining the

11  ordinary observer.  You said that the next step would be to

12  understand the prior art.  So we have -- we have talked a

13  little bit about the prior art.  Can you tell us what you

14  would do particularly in this case as applied to these patents

15  to understand the prior art?

16  A.   Yes.  And it's a very important part of the analysis to

17  understand the prior art.

18          What we see I think on the next slide here, we see

19  the six items, only six items of prior art, and these were

20  cited -- excuse me -- the six items that were cited on both

21  patents, on the '723 and '256, that had exactly the same prior

22  art.  And we get an understanding then of the ordinary

23  observer, what they saw out in the world and how different

24  this new design was.

25          Now, if we go to the next slide, my understanding is

1   also that the '906 was invented at or around the same time, or

2   this was filed at or around the same time.  And so even though

3   it wasn't -- the inventors did not include it or this hadn't

4   been made public at the time that the patents in issue were

5   filed, this is considered prior art in this case.

6           And so the '906 adds to our understanding of what

7   existed at that time.

8   Q.  Okay.  And can you characterize the '906 patent for us?

9   A.  Yes.  So we see from the '906 that it is also for a

10  similar-type vehicle, a self-balancing vehicle is our

11  understanding, and we see a very slick race move body.

12  Obviously we are seeing an hourglass shape which we saw in a

13  number of the other prior art as well.  That itself was not

14  unique to the '906 when it was filed.  Hourglasses have been

15  around for a while.

16          However, what we're seeing here is their

17  interpretation of that form in the way that it's so smooth and

18  so rounded, and I believe in my deposition I used the word

19  melted.  It doesn't have those sort of hardened edges that we

20  see in some of the other prior art at the time.

21  Q.  Okay.  So we've now established the universe of prior art.

22  Can you tell us how that sort of plays into your analysis in

23  connection with these particular patents for each of the '256

24  and '723?

25  A.  Yes.  And I think maybe going back to the last side, I

**Hatch - direct by Berkowitz**

1  think it's important to see that, you know, with our

2  understanding of what existed at the time, the '723 and '256

3  patents provided something that was really quite different,

4  quite radically different, and hadn't existed before it.  So

5  in doing so, we see that the prior art is really quite far

6  away from the patents at issue, and, therefore, you would

7  understand that it has very broad scope.

8  Q.  Okay.  So we've now covered the first three steps of the

9  analysis.  We've construed the claims, defined the ordinary

10  observer.  We've gone through your understanding of the prior

11  art.  What's the next step?

12  A.  So the next step, if you go forward -- thank you.

13          THE COURT:  Do you need some water?

14          THE WITNESS:  Thank you.

15          THE COURT:  Oh, you've got some.  Okay.

16  BY THE WITNESS:

17  A.  So in the next step, as I had mentioned before, first of

18  all, we do a direct comparison between the patent, the design

19  as a whole of the claimed part of the patent to the accused

20  product.  And, again, of course my analysis was to the

21  physical product that I had at hand.

22          Here, as specifically, we're looking at a more sort

23  of broader look in this direct comparison to understand if are

24  they plainly dissimilar, are we looking at an apple and a

25  banana, or are we looking at similar products here.

**Hatch - direct by Berkowitz**

1    The conclusion, as can be clearly seen, these are not

2  plainly dissimilar.

3  Q.  And when you say "these," specifically what are you

4  referring to?

5  A.  The -- yes, thank you.  The accused product and the -- in

6  this case, the '723 design patent were not plainly dissimilar.

7  Q.  So if you made the determination that the design claimed

8  in the '723 and the accused products, Gyroor A, are not

9  plainly dissimilar, what's the next step?

10 A.  So when that has been confirmed, then we move on to the

11 next step of the analysis, the next step of the ordinary

12 observer test, which is where we now view this through the

13 eyes of the ordinary observer and we compare the patent, the

14 claimed design of the patent to the accused product and to see

15 whether they are closer to each other than they are to the

16 prior art.

17    Here on the slide we're seeing all three elements; in

18 this case, the '723 patent and the Gyroor A product, and the

19 prior art, including the '906 that was part of my analysis.

20 Q.  And when you're performing this analysis, which views are

21 you focusing on as you compare -- do this three-way analysis?

22 A.  It's very important to understand the design as a whole

23 because as we understand from this type of infringement

24 analysis and from *Egyptian Goddess*, the case that lays out

25 this process, we need to understand the design as a whole and

**Hatch - direct by Berkowitz**

1   the impression that it makes, rather than take it apart into

2   individual isolated parts that you view through individual

3   viewpoints.

4   Q.   Okay.  I see here you have a particular perspective view,

5   for example, from Figure 6 of the '723 and comparing with

6   similar views.  Is there a reason you chose that particular

7   view?

8   A.   Well, the analysis was done looking at all the views of --

9   and of course the actual physical sample here, but for this

10  slide at least, this is a representative view showing an

11  angle.  I think if I showed one of the more what's called

12  isometric angles like straight down or straight from the

13  front, that's not how people view products.  It's very rare

14  that you would see it so directly.  And so the ordinary

15  observer gets -- or us looking at this, we get a better

16  representation of the design at this angled view.  But of

17  course the analysis was done with all views in mind.

18  Q.   Okay.  And could you walk us through how you would

19  apply -- how you would walk through that analysis with all

20  these different views?

21  A.   Yes.  Excuse me.

22        And so importantly here is to understand the design,

23  the impression of the design of the patent and then looking at

24  the accused product to understand the impression it's making.

25  In this case, we found, or I found that the impression that

**Hatch - direct by Berkowitz**

1    they're making through the eyes of the ordinary observer would

2    be very much the same in light of the prior art.  And so when

3    we're looking at the prior art, we get an understanding of how

4    far or how close that might be.

5    Q.  Okay.  So can you tell us a little bit more about how you

6    did that analysis, particularly with respect to the '906

7    patent?

8    A.  Yes.  So, for instance, with the '906 patent, maybe the

9    next slide may be -- thank you.  So here we've got Figure 4

10   from the '906.  Again, we're looking at it in all directions.

11   But we do see this very smooth, uncluttered, rounded body, and

12   there's no sort of pronounced areas around it.  And I

13   understand, you know, I'm an industrial designer and not a

14   lawyer, but in my understanding, while it doesn't claim the

15   fenders as such in its own protection, when used in the

16   three-way analysis like this, we do consider them because it

17   has been disclaimed.  It's something that was invented in the

18   past.  And so we -- in looking at the '906 in this context, we

19   do see these closed fenders that cover the wheels, including

20   covering the hub.

21   Q.  Okay.  So --

22        THE COURT:  You construe that, those dotted lines as

23   being fenders that cover the hub?

24        THE WITNESS:  Yes.  Yes, I would.  It is not titled

25   as such in the patent, but knowing the context, that this is a

**Hatch - direct by Berkowitz**

1  self-balancing vehicle or similar, I think it's fair to call

2  fenders.  There may be other names that we can use, but what's

3  important here I think is the look that those give and the

4  impression.  I wouldn't want to limit it to a particular word.

5          THE COURT:  All right.  But the upper oval you would

6  view as the fender, and the bottom half circle would be the

7  wheel?

8          THE WITNESS:  Yes, that's my understanding.

9          THE COURT:  Okay.

10  BY MR. BERKOWITZ:

11  Q.  Now, you used the word "impression" several times.  What

12  is that impression here when you're comparing these three

13  different products or references?

14  A.  Yeah.  So, again, obviously it's incorrect in this

15  analysis to translate everything directly into words and only

16  use the words as the claim.  However, in this analysis, it's

17  kind of useful for me to explain how I think an ordinary

18  observer would be looking at this in light of the prior art.

19          So, for instance, the wording that I've included at

20  the bottom of this slide which is from my report describes how

21  the ordinary observer would see both the '723 patent and the

22  Gyroor A design when viewing them which I will briefly read

23  out here.  They both create a visual impression of an

24  integrated hourglass body with a relatively flat surface

25  across the top of the main body, pronounced footing areas and

**Hatch - direct by Berkowitz**

68

1   open-arched fenders over the top of the wheel area.

2           And so in a sense, it's a combination of those

3   features that we -- that give the overall impression and not

4   one of those features in isolation.

5   Q.  Okay.  And how did those features compare to those of the

6   '906 patent?

7   A.  And so I do have a description for that which I'll cover

8   first and maybe explain a little bit further.  But the

9   description here, again, describing how the ordinary observer

10  may see this, this creates an impression of very uncluttered,

11  rounded, smooth body with no pronounced footing area, and it

12  has closed fender skirts.

13          Maybe to clarify as well in using the term "fender

14  skirts" is from automotive and other areas where in the '50s

15  and '60s they used to hide the wheels, tucked away, that way

16  you'd just see the wheel popping out the bottom which is kind

17  of what we're seeing here.

18          But also important part of this analysis is not

19  individual features.  For instance, the hourglass, we can't

20  help but see that there is an hourglass shape that all three

21  of these have.  So we don't think the hourglass away, and I

22  believe it's incorrect to remove it from this type of analysis

23  because it's about the overall impression.

24          However, the hourglasses, the designs we see on the

25  left are more than just an hourglass representation.  It's

**Hatch - direct by Berkowitz**

1   also my opinion that the '906 at the time it was filed was

2   also protecting more than just an hourglass shape which has

3   existed for probably thousands of years.

4   Q.  And so now that you've sort of explained what your

5   impression is of these different designs, what's the next step

6   in the infringement analysis?

7   A.  And so here, having understood that overall impression and

8   seeing the different impression that we have, in this case the

9   Gyroor A and the '723 patent generally having -- giving the

10  same overall impression and understanding also that there are

11  differences.  There are many intricate differences between the

12  two products.  They are not identical.  And that is important

13  to know.  And that's why we look to prior art to understand

14  and have somewhat of a measuring stick to understand how close

15  they truly are.

16          My conclusion here, of course, that they look, when

17  referring to the prior art of the '906 here which has been

18  identified as the closest prior art, the Gyroor A and the '723

19  claimed design look very much the same, substantially the

20  same.

21  Q.  And based on that, do you have an opinion with respect to

22  the issue of infringement with respect to the '723 and the

23  Gyroor A product?

24  A.  Yes.  And so that tells me that the Gyroor A infringes on

25  the '723 patent.

**Hatch - direct by Berkowitz**

1   Q.   Okay.  And did you repeat that analysis for the second

2   patent, the '256 patent?

3   A.   Yes, I did.  And we can very briefly go through that.  I

4   have some slides here, of course.

5           This is also comparing directly to the Gyroor A to

6   the claimed design of the '256 patent.  Here in the first

7   step, again, looking to see if they are plainly dissimilar, I

8   concluded that they are not plainly dissimilar and therefore

9   moved on to the second step on the next slide, where I also

10  conducted the three-way analysis, comparing the patent and the

11  Gyroor A to each other in light of the prior art to understand

12  how close they are.

13          And on the next slide as well, we see there that, you

14  know, my concluding opinion coming from this is that the

15  Gyroor A and the claimed design of the '256 patent are

16  substantially the same in light of the '906 closest prior art

17  in the eyes of the ordinary observer.

18  Q.   Okay.  And did you then repeat this process for the other

19  accused products?

20  A.   Yes, I did.  And so after conducting this for the '723 and

21  Gyroor A, I also conducted the same for Gyroor C.

22          THE COURT:  Can I interrupt?  On Gyroor A, what -- I

23  know you're talking about overall impressions, but what

24  particular details do you believe are different or you found

25  to be different between the '256 patent and Gyroor A?

**Hatch - direct by Berkowitz**

1   Understanding your opinion is the impression is they're the

2   same, but are there particular features of it that you would

3   acknowledge are different?

4           THE WITNESS:  Yes, absolutely.  There are

5   differences.  And I think it's important to understand how

6   different those are, obviously in the three-way analysis

7   compared to the '906.

8           So, for instance, the fenders that we've spoken about

9   today, here we're looking at the '256 patent.  We see the

10  fenders, cover, almost all of the very top of the wheel, and

11  the Gyroor A, for instance, cover a little bit less.  The

12  wheel in this case of course is much wider so it's popping out

13  from the fender itself, but the fender is approximately the

14  same sort of proportions, but there are differences.  It sort

15  of trims off a little sooner.

16          So certainly differences between the two, but to

17  understand how important those differences are, that's where

18  we go to prior art that existed prior to it, and there we're

19  seeing something entirely different.  And so in this

20  particular case, we're seeing very minor differences that make

21  them not the same but very close to each other.  And the '906

22  is clearly in a different ball park, if I can use that

23  expression.

24          THE COURT:  What other small differences did you

25  observe between the '256 patent and the Gyroor A?

**Hatch - direct by Berkowitz**

1    THE WITNESS:  So I did obviously note that the

2  footing areas on both of them, they both have these pronounced

3  footing areas that the '906 doesn't have.  And so within those

4  footings areas, we see the sort of angled grooves that they

5  both have, but those grooves are different shapes.  So when we

6  zoom in to compare directly one to the other, we see, you

7  know, it's not the same shape.  However, they both got those

8  pronounced footing areas in generally the same sort of shape.

9  And so glancing over to the '906 we see, again, it's not in

10  the same ball park.

11    There are some other differences.  I would say the

12  shape of the lights, for instance.  But these differences

13  contribute to the overall impression and shouldn't be ignored,

14  but the question is how significant are they to the overall

15  impression, particularly in light of the '906.

16    THE COURT:  Okay.

17  BY MR. BERKOWITZ:

18  Q.  Okay.  So we've now covered the Gyroor A product with

19  respect to both of the asserted patents, so we were I think

20  about to move on to the Gyroor C product.  Can you walk us

21  through your analysis with respect to Gyroor C?

22  A.  Yes.  I'll try and keep it brief in the interest of time,

23  but obviously step 1, I found they were not plainly

24  dissimilar.

25    In the second step of the ordinary observer test, I

**Hatch - direct by Berkowitz**

73

1   found that the '723 patent and the Gyroor C were closer in

2   design than to the '906 prior art; and, therefore, the Gyroor

3   C infringes on the patent.

4   Q.   Okay.  And with respect to the '256 patent, did you also

5   do an analysis against the Gyroor C product?

6   A.   That's correct.  And so the same was applied independently

7   here, looking -- directly comparing Gyroor C to the

8   '256 patent which -- and they are not plainly dissimilar.  And

9   so in the second step of the analysis on the next slide,

10  comparing the Gyroor C to the claimed design of the '256, I

11  found them to be closer to each other than to the prior art;

12  and, therefore, Gyroor C infringes on the '256 patent.

13  Q.   In terms of the analysis, is there any notable differences

14  between the Gyroor A and Gyroor C?

15  A.   There are; again, small differences, but those are very

16  minor in this regard.  They -- Gyroor A and C are virtually

17  the same product.

18          I did note, again, some differences in the fender,

19  some small differences.  But, again, in this analysis where

20  we're considering the size of differences based upon how far

21  away the prior art is, even those differences between the

22  Gyroor A and C do not have substantial impact on the overall

23  impression.

24          THE COURT:  Well, it looks like Gyroor C, the fenders

25  cover the majority or all of the wheel, at least on the

1    example I have, compared to Gyroor A, which covers about half

2    the wheel.

3              THE WITNESS:  Yes, that's correct.  And so the Gyroor

4    C fender goes down a little bit further, and the wheel is

5    different too.  I think Gyroor A has a much thicker wheel and

6    it would take a much bigger fender to cover it.  So it's --

7    these are proportions that we take into respect, but, again,

8    it's -- it doesn't seem a significant difference between

9    Gyroor A and C.

10             THE COURT:  It looks like the foot paddings, the

11   design of the foot paddings on A and C are the same.  They're

12   different in E.  But you'll get to that.

13             THE WITNESS:  Yes.

14             THE COURT:  But the design looks the same of the two

15   products anyway.

16             THE WITNESS:  Yes.  And in -- at least in this

17   infringement analysis, I wasn't doing a direct comparison

18   between, say, A, C, and E.  However, obviously in

19   understanding their design and comparing it to the patent, I

20   found they played exactly the same role.

21   BY MR. BERKOWITZ:

22   Q.  Okay.  So we've now covered the accused product Gyroor A,

23   Gyroor C.  Did you repeat this analysis for the final product,

24   the Gyroor E?

25   A.  Yes, I did, so we can briefly go through that as well,

**Hatch - direct by Berkowitz**

1   where I compared in the first step Gyroor E to the '723 patent

2   and found they are not plainly dissimilar, and then comparing

3   to the prior art to understand how much effects the

4   differences have between the two products.  I also found that

5   Gyroor E and the '723 are much closer together, not identical,

6   but much closer together than the prior art.

7   Q.   To the judge's question, are there any notable differences

8   between the A, C, and now looking at E?

9   A.   Yes.  And, again, in the fender area, we see that it has a

10  somewhat shorter fender than Gyroor B, for instance.  It may

11  be a little closer to A if we were looking at that part in

12  isolation.  We see some differences around the lighting area

13  and the grooves are generally the same sort of feel; but when

14  we compare, we do see differences.

15  Q.   Okay.  As far as your infringement analysis, what is the

16  impact of those differences?

17  A.   Because of how far away the '906 is, the impacts of those

18  is relatively insignificant on the overall impression.  They

19  do -- they are part of the overall impression, and if we were

20  comparing only A, B, and E together, we would then be seeing a

21  narrowing down on those slight differences as being very

22  important.  However, of course, when comparing directly to the

23  '906, we see how insignificant small differences are in

24  particular between the accused products and the patent.

25  Q.   Okay.  I just want to -- so with respect to the Gyroor E

**Hatch - direct by Berkowitz**

1    product, are there differences with respect to these footpads

2    as compared to the A and the C?

3    A.  Yes, there are.  Beyond obviously the color or material

4    differences, I believe there's one or two grooves less, but it

5    has the same what we would call a fleur-de-lis type

6    impression.  It's the angled length.  So very similar, and,

7    again, that would just be analyzing those particular

8    differences on that particular part.

9    Q.  Okay.  And did that -- did these differences have any

10   impact on your determination as to infringement or

11   non-infringement?

12   A.  Well, I guess I wasn't looking directly at differences

13   between the products.  It was always, as I understand it

14   should be, to the patent itself.  And so yes, of course I

15   understood and saw those differences.  I do not believe that

16   an ordinary observer would -- would not see those differences

17   if faced with one design next to the other.  However, it

18   doesn't have an impact on the overall impression when

19   comparing these designs.

20   Q.  Okay.  And just to close the loop on the '723 patent as

21   compared to the Gyroor E, what is your opinion with respect to

22   the issue of infringement?

23   A.  That Gyroor E infringes on the '723 patent.

24   Q.  Okay.  And moving on to the '256 patent, could you just

25   quickly walk us through your infringement analysis?

**Hatch - cross by Cheng**

1   A.   Yes.   I also found that Gyroor A was not plainly

2   dissimilar from the '256 patent; therefore conducted the next

3   step where I also concluded after the analysis that the

4   Gyroor E is closer to the '256 patent than the closest prior

5   art, and, therefore, that it infringes on the '256 patent.

6   Q.   Okay.

7            MR. BERKOWITZ:   So we don't have any more questions

8   for Mr. Hatch.

9            THE COURT:   All right.

10           Cross-examination.

11           MR. CHENG:   Shall we start?

12           THE COURT:   Yes, you may proceed.

13                          CROSS-EXAMINATION

14  BY MR. CHENG:

15  Q.   Hi, Mr. Hatch.   As instructed -- hi.   As instructed by the

16  Federal Circuit, we should look through the infringement issue

17  through the lens of  prior art.

18           THE COURT:   You're a little soft spoken.

19           MR. CHENG:   Right.

20           THE COURT:   So move the mic a little closer or raise

21  your voice.

22           MR. CHENG:   Yes, sorry.

23  BY MR. CHENG:

24  Q.   As instructed by the Federal Circuit, we have to look at

25  the infringement issue through the lens of the prior art.   Do

**Hatch - cross by Cheng**

1  you agree that the '906 patent is a prior art in this case to

2  the patents-in-suit here?

3  A.  I don't know all the legal structure, but my understanding

4  is that it should, as far as my analysis is concerned, be

5  considered prior art.

6  Q.  Okay.  And do you agree that the comparison between the

7  D '906 patent and the two patents-in-suit is necessary to

8  determine the infringement issues here?

9  A.  As part of the analysis, as I showed, it plays a role when

10 we do the three-way analysis to understand which is closer and

11 which is further apart.

12 Q.  So let me ask you, when you compare the D '906 patent with

13 the two patents-in-suit, what are the similarities between the

14 D '906 patent and the two patents-in-suit?

15        MR. CHENG:  And, Peter, if you can bring the '906

16 patent with the '723 patent side by side so --

17        MR. PHANEUF:  '906 and '723?

18        MR. CHENG:  Yes.  Just do the overlay so it will be

19 easier for us to understand.

20        THE COURT:  Here we go.

21        MR. CHENG:  Great.

22 BY MR. CHENG:

23 Q.  So, Mr. Hatch, was the hourglass body shape disclosed in

24 the '906 patent?

25 A.  The '906 includes an hourglass body, a version of it that

**Hatch - cross by Cheng**

1    is, but that's not all it includes.

2    Q.   Right.   And was a flat surface on top of the hoverboard

3    also disclosed in the '906 patent?

4    A.   It appears to feature a generally flat upper surface as

5    part of its claimed design.

6    Q.   Yeah.   So I'm going to read a part of the plaintiffs'

7    motion, and that is page -- that is on page 12 of

8    Docket No. 593.   It says, "None of the relevant prior art

9    creates the same visual impression of the patent-in-suit,

10   namely the integrated hourglass body with a relatively flat

11   surface across the top of the main body."

12          So as you just admitted, '906 have disclosed the

13   hourglass shape with a flat surface, does that change your

14   opinion knowing that --

15   A.   Could you read the rest of the sentence?   I think you cut

16   it off.

17   Q.   Okay.

18          THE COURT:   This is from a brief, not from his

19   report?

20          MR. CHENG:   That is from the motion brief, yes.

21          THE COURT:   Okay.   Well, go ahead, but that's of what

22   limited utility.   That's what the lawyer said.   His own

23   affidavit is, of course, fair game for cross.

24          MR. CHENG:   Oh, that portion was quoted from his --

25          THE COURT:   It's quoted from his --

**Hatch - cross by Cheng**

1           MR. CHENG:  From his report.

2           THE COURT:  Okay.  Fair enough.  Go ahead.

3    BY MR. CHENG:

4    Q.  So, "Namely, the integrated hourglass body with a

5    relatively flat surface across the top of the main body,

6    pronounced footing area, and open-arched fenders over the top

7    of the wheel area."

8    A.  So you understand why I wanted the rest of the sentence

9    read out.

10   Q.  Mm-hmm.

11   A.  Because taken out of context it could mean something quite

12   different.

13   Q.  But you do agree that both the flat surface and the

14   hourglass body shape were disclosed in the '906 patent?

15   A.  The '906 patent which shows obviously a very different

16   design does include those particular attributes.  However,

17   that sentence in full is making a different statement.

18           MR. CHENG:  Peter, can we do the overlay of the top

19   view of '906 and the '723?

20   BY MR. CHENG:

21   Q.  By comparison, the hourglass peripheral shape looks very

22   identical between the '906 patent and the '723 patent.  Do you

23   agree?

24   A.  Obviously you're just showing this one particular view.

25   There are --

**Hatch - cross by Cheng**

1    Q.  That's one of the views I'm showing, yes.

2    A.  Yes.  There are differences, and there's a lot of

3    similarities.

4    Q.  Can you --

5    A.  Conceptually speaking, they both have an hourglass as does

6    the accused product, which I think is important in this

7    comparison.  But we don't rule out the hourglass.  We have

8    different interpretations of something that's an hourglass

9    form.

10   Q.  So you are saying even if the hourglass shape was

11   disclosed in the '906 patent it should still be factored into

12   infringement analysis?

13   A.  It should not -- my understanding of the procedure in the

14   three-way comparison is that we don't factor out or remove

15   specific elements.  We need to consider them as part of the

16   overall impression.  And important in this particular case

17   that has been raised is the question of the hourglass shape.

18   On the '906 as well as the '723, the hourglass shape was not

19   the reason either of them were awarded a patent.  It was not

20   novel at the time.  What was novel was the overall impression

21   that the '906 has provided as shown in the figures.

22   Q.  Right.  But you do know that your previous report was

23   criticized by the Federal Circuit for lack of specific

24   comparison because if we're using the overall impression

25   without getting into details, then there's virtually no

**Hatch - cross by Cheng**

1    analysis.  You are just using the phrase to cover the

2    comparison or the detailed analysis that's supposed to be done

3    here.

4           So what I'm showing you here is should the hourglass

5    shape be -- if it's disclosed in the '906 patent, why should

6    that be considered for the infringement analysis since every

7    hoverboard basically on the market followed the '906 patent in

8    that they all have similar hourglass shape?

9    A.   And your question is whether it should be considered?

10   Q.   Why it should -- why shouldn't -- yes, why it should be

11   considered if it's disclosed in your prior art already?

12   A.   Chiefly because *Egyptian Goddess* tells us what the

13   infringement analysis should include, and my understanding of

14   the three-way analysis is that we do look to the overall

15   impression through the eyes of the ordinary observer.  I'm not

16   using that as a blanket, you know, in the way that you are

17   putting forward.  The overall impression is created by looking

18   at individual features of the overall design.  But it is a sum

19   of those features.  So we don't extract the hourglass and then

20   say, oh, the hourglass existed already, we ignore it.  That's

21   my understanding of the law is it still is an important part

22   of the overall impression.

23   Q.   I'm glad that you mentioned different features, and I

24   think we are just trying to identify which features were

25   disclosed on and which feature were new to the products.  So

**Hatch - cross by Cheng**

1  in that way, I think we'll have a better understanding when

2  the ordinary observer looks at the products how the

3  impression, the overall impression was formed by different

4  features, right.  If two products have similar features, then,

5  I mean, it's hard to tell the difference, and that's exactly

6  why we have to look through the lens of prior art.  Was the

7  fender also disclosed in the '906 patent in your opinion?

8  A.  The '906 patent has -- shows an unclaimed fender so it

9  does not protect a design of a fender.

10  Q.  That's not what I asked.  I asked was the fender disclosed

11  in the '906 patent?

12  A.  I'm sorry.  I misunderstood.

13         So when it comes to infringement analysis, in a

14  three-way analysis as we conducted, yes, we consider it to be

15  disclosed.

16  Q.  And when you were talking about the footing area to the

17  '723 patent, does the claim protect the idea of the footing

18  area on the hoverboard, or does the claim protect the design

19  of that footing area?

20  A.  The claim of the '723 is to the ornamental design of the

21  pronounced footing area, that is, you know, just using words,

22  that we have a footing area that is somewhat pronounced in

23  that area.

24  Q.  So when you say "pronounced," are you talking about

25  because the '723 patent has the footing area as pronounced, or

**Hatch - cross by Cheng**

1  because you had the design that is different from the '906

2  patent so it's pronounced?

3  A.  No, we're not talking about conceptually whether it has,

4  you know, an item or not.  Pronounced is offering an

5  attribute, you know, that it's not just a footing area but

6  this has been pronounced in some way, that that is a decision

7  that has been made by the designer as opposed to, say, on the

8  '906, there was a decision to not pronounce what might be a

9  footing area.

10  Q.  When you say might be footing area, do you agree that '906

11  patent has a flat top surface?

12  A.  I believe you asked that before, but yes, it's a generally

13  flattop surface, but it is -- it may or may not be a footing

14  area.

15  Q.  So if we compare the '906 patent to the '723 patent, just

16  a top view, the defense is the '723 has the footing area, but

17  the idea of having this footing area is not protected, but the

18  design of the straight lines on the footing area is what's

19  protected by the claim?

20  A.  Which straight lines are you referring to that are

21  protected by the claim?

22          MR. CHENG:  Can we take a look at the '723 patent?

23  Here it is.

24  BY MR. CHENG:

25  Q.  Yes.

**Hatch - cross by Cheng**

1  A.  Mm-hmm.

2  Q.  So what's being protected, as you just admitted, is not

3  the idea that it has a foot padding but the actual design of

4  this foot padding?

5  A.  Yes, the solid lines show what is claimed.  However, to

6  understand infringement, then we look to the prior art to

7  understand how much scope elements like that have.

8  Q.  Meaning that the prior art doesn't have any design on the

9  top, so here what's being protected is really just, you know,

10  the straight line of this design; is that correct?

11  A.  What do you mean by the straight line of the design?

12  Q.  The straight line as --

13  A.  Are you referring to the ribbed detail?

14  Q.  Yes.  I'm talking about the lines on top of the padding.

15  A.  Okay.  Yes.

16         MR. CHENG:  Can I just use one of these?

17  BY MR. CHENG:

18  Q.  Can you tell that the lines --

19         THE COURT:  You need to be in front of a microphone.

20         MR. CHENG:  Oh.

21         THE COURT:  Just make sure that you're there.

22  BY MR. CHENG:

23  Q.  But can you tell -- can you see the lines here on this

24  foot padding, those are not straight lines?  They're bended in

25  two different directions?

**Hatch - cross by Cheng**

1   A.   Yes, they are -- those ribs, and I am familiar with it.

2   They have angles, yes.

3   Q.   And this is one of the features that you mentioned that is

4   different from the patent; is that correct?

5   A.   Which patent are you referring to?

6   Q.   '723.  Let us just use '723 as a patent so it will be

7   easier to avoid any confusion.

8        So the lines here, they are bended lines, and they

9   are different from the straight lines on that '723 patent.  Do

10  you agree?

11  A.   Yes.  When we are looking at this, comparing those exact

12  details, there are differences, as I have pointed out and

13  acknowledged, but of course that's not the analysis here.

14  Q.   Right.  We are just trying -- I'm just trying to

15  understand the different elements as you put the different

16  designs into elements.  So this element is different.  Is this

17  element noticeable to an ordinary observer in your opinion?

18  A.   In the three-way analysis, we understand -- we use that as

19  a structure to understand what would be noticeable in your

20  words.

21  Q.   Uh-huh.

22  A.   And of course in the overall look and feel, it doesn't

23  have a significant effect on the overall impression.  For

24  instance, if those lines were slightly different, it would not

25  have a significant difference on the overall impression --

**Hatch - cross by Cheng**

1    Q.   Yeah.

2    A.   -- and make it suddenly closer to the '906.

3    Q.   Well, I wouldn't call this slightly different.  I mean,

4    the lines are drastically different as they are bended, it's

5    not straight, and that they are going two different

6    directions, and the bended, you know, direction is not towards

7    the wheel but towards the metal.  So do you think this is

8    noticeable to an ordinary observer?

9    A.   When looking at the product as a whole, the ordinary

10   observer would see those differences.

11   Q.   Okay.

12   A.   But it does not change the overall impression.

13   Q.   And what about the fender --

14           MR. CHENG:  If you can just show the '906 -- the '906

15   side -- front view versus the '723 front view.

16   BY MR. CHENG:

17   Q.   So as we can see here as you acknowledged, the fender was

18   disclosed in the '906 patent.  And the fender in the '723

19   covers the whole wheel, right?  Take a look from --

20           THE COURT:  Let me interrupt.  It was disclosed but

21   not claimed in the '906 patent.

22           THE WITNESS:  Yes, that's my understanding,

23   Your Honor.

24           THE COURT:  What is the difference between something

25   that's been disclosed and claimed?  You can answer.

**Hatch - cross by Cheng**

1          THE WITNESS:  As a nonlawyer, my understanding in

2     this analysis is it -- the patent shows the unclaimed matter.

3     It is not offered protection of that design.  However, when

4     we're looking back at it as prior art in this analysis, we

5     understand that the inventor had that shape in mind, and it

6     was disclosed to the public.  So, therefore, that design,

7     there is already public knowledge of that design even though

8     that patent does not offer protection for that inventor.

9          THE COURT:  And how does that impact your analysis

10    of -- as it relates to the comparison between the --

11         THE WITNESS:  Yeah.

12         THE COURT:  -- allegedly infringing products and the

13    two patents?

14         THE WITNESS:  And so here what the 9 -- the

15    protection of the '906 is almost irrelevant for me because the

16    '906 is used as prior art, and, therefore, my analysis

17    included the fenders, the closed fenders, that that design has

18    as part of the consideration.

19         THE COURT:  Okay.

20         You can continue your questions.

21         MR. CHENG:  Yes.

22         THE COURT:  How much more do you have?  Because we're

23    at 12:30.  If you got a ways to go, we'll break.

24         MR. CHENG:  I have three-quarters --

25         THE COURT:  All right.

**Hatch - cross by Cheng**

89

1          MR. CHENG:  -- left.  We can take a break if

2    Your Honor --

3          THE COURT:  Why don't we take a -- and you're local;

4    is that correct?

5          THE WITNESS:  Yes.

6          THE COURT:  You're not going to miss a flight if we

7    break for lunch.  So let's break for lunch.  You can continue

8    your cross-examination.

9          The witness is on cross-examination so you can't

10   discuss his testimony with him during the break.

11         We'll break for an hour.  Come back at 1:30.

12         Thank you.

13         MR. LOMUSCIO:  Thank you, Your Honor.

14      (Lunch recess had from 12:31 p.m. to 1:30 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3  HANGZHOU CHIC INTELLIGENT        )
   TECHNOLOGY CO., and UNICORN      )
4  GLOBAL, INC.,                    )  Case No. 20 CV 4806
                                    )
5                   Plaintiffs,     )  Chicago, Illinois
   -vs-                             )  December 2, 2022
6                                   )  1:31 p.m.
   THE PARTNERSHIPS AND             )
7  UNINCORPORATED ASSOCIATIONS      )
   IDENTIFIED ON SCHEDULE "A,"      )
8                                   )
                    Defendants.     )
9

     TRANSCRIPT OF PROCEEDINGS - PRELIMINARY INJUNCTION HEARING
10             BEFORE THE HONORABLE THOMAS M. DURKIN

11  APPEARANCES:

12  For the Plaintiffs:    MR. RICHARD J.L. LOMUSCIO
                           MR. MARK BERKOWITZ
13                         MS. CHANDLER ELIZABETH STURM
                           Tarter Krinsky & Drogin
14                         1350 Broadway
                           New York, NY 10018
15
                           MR. ANAND C. MATHEW
16                         PALMERSHEIM & MATHEW
                           401 N. Franklin Street, Suite 4S
17                         Chicago, Illinois  60654

18  Court Reporter:

19          KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                     Official Court Reporter
20              United States District Court
             219 South Dearborn Street, Suite 1426
21               Chicago, Illinois  60604
                 Telephone:  (312) 435-5569
22          Kathleen_Fennell@ilnd.uscourts.gov

23        * * * * * * * * * * * * * * * * * *

24      PROCEEDINGS REPORTED BY CERTIFIED STENOGRAPHER
             TRANSCRIPT PRODUCED WITH A COMPUTER
25

```
1   APPEARANCES:   (Continued)

2   For Defendants Gyroor
    US, et al.:              MR. HE CHENG
3                            MR. TAO LIU
                             Glacier Law LLP
4                            41 Madison Avenue, Suite 2529
                             New York, NY 10010
5
                             MR. YU-HAO YAO
6                            Glacier Law LLP
                             9660 Flair Dr., Suite 328
7                            El Monte, CA 91731

8                            MR. MR. WEI WANG
                             Glacier Law LLP
9                            200 Park Avenue, Suite 1703
                             New York, NY 10166
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Hatch - cross by Cheng**

92

1    (Proceedings heard in open court:)

2        THE COURT:  Just need defense counsel, and then we'll

3 get going.

4        MR. CHENG:  Your Honor, we just --

5        THE COURT:  We'll go off the record.  Is this

6 scheduling?

7        MR. CHENG:  Yes.

8    (Discussion held off the record.)

9        THE COURT:  Back on the record.

10       Sir, you're still under oath.

11       THE WITNESS:  Yes.

12       MR. CHENG:  Peter, if you can just put on the slide,

13 the side edge of the product.  I think I was --

14       THE COURT:  Kathy, when he's speaking to his

15 colleague, you don't have to transcribe it.

16    PAUL HATCH, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN,

17          CROSS-EXAMINATION (RESUMED)

18 BY MR. CHENG:

19 Q.  Mr. Hatch, we were talking about the fenders which is one

20 of the main feature mentioned in the Federal Circuit opinion.

21       Do you think -- you can see from the front view and

22 also in the screen in front of you, do you think the fender,

23 the shape of the fender, the structure, the concept of design,

24 are those all different from -- from the two patents

25 significantly or noticeable to an ordinary observer?

1   A.  To clarify, you said the shape and the concept of the

2   fender?

3   Q.  Well, let's do that one by one.  Do you think the shape is

4   different?

5   A.  There are differences that we can notice of the fender in

6   particular, yes.

7   Q.  And do you think you can elaborate the differences between

8   this fender here and the two patents?  Let's just stick with

9   one.  '723, can you tell -- ask what the differences are?

10  A.  Yes.  If we -- if we are focusing solely on the fender, we

11  do see differences.  The difference is that the accused

12  product that you're holding up, that's Gyroor A, has a fender

13  that goes over the wheel but then cuts back a little bit

14  sooner as it comes down to the platform, but it kind of joins

15  the platform.

16          The wheels on it, of course, are wider, so that sort

17  of has an effect on how we're seeing the fender as well.  But,

18  yes, it -- it goes over the top of the wheel, but then it cuts

19  back as it goes towards the platform.

20  Q.  Does the fender cover the wheel?

21  A.  It covers at least some of the wheel.

22  Q.  From this side, does the fender cover the wheel from the

23  side view?

24  A.  In all views, it covers only side of the -- I mean, we can

25  see it's above the wheel still.  It's still covering some of

**Hatch - cross by Cheng**

94

1 | the wheel.  It doesn't change if you turn it around.

2 | Q.  Yeah, can you see the whole wheel from this side?

3 | A.  I can see -- I can see the whole wheel.

4 | Q.  As you mentioned, there are so many features in the

5 | hoverboard design.  Do you give equal weight to every design

6 | element?

7 | THE COURT:  You're going to have to stay in front of

8 | the microphone.

9 | BY MR. CHENG:

10 | Q.  As you said, there are so many features in a hoverboard

11 | design.  Do you give equal weight to every design feature?

12 | A.  Viewing it through the eyes of the ordinary observer, all

13 | the features are -- do contribute to the overall impression,

14 | so they do not get taken away, but they do have different

15 | effects on that impression.

16 | Q.  So you value some features more than the others?

17 | A.  Some features have a bigger contribution to the

18 | impression.  It's not, you know, how I view it, it's through

19 | the eyes of the ordinary observer.

20 | Q.  And as the Federal Circuit mentioned, since the hourglass

21 | was disclosed in the prior art, it becomes a minor feature and

22 | it's kind of retreated to the background.

23 | Do you agree with Federal Circuit's analysis here?

24 | A.  I don't disagree with Federal Circuit's analysis, although

25 | you seem to have interpreted it quite differently.

**Hatch - cross by Cheng**

1   Q.  Oh, how would you interpret the Federal Circuit's decision

2   on this issue?

3   A.  Well, my understanding of what we need to do here is to

4   include the hourglass shape as part of what's giving us the

5   overall impression.  I agree with the Federal Circuit that the

6   hourglass shape is not something that was novel to any of

7   these, including the '906 before that existed, and so these

8   patents don't rely solely on that.

9   Q.  And as you can see in front of you the comparison, can you

10  tell us what feature brought you to make the conclusion that

11  the accused products is not substantially dissimilar to

12  the '723 patent?

13  A.  Are you referring to the first stage of the analysis where

14  we are not comparing to prior art?

15  Q.  That was a double negative.  Let me rephrase it.

16          What features made you conclude that the accused

17  product is substantially similar to the D '723 patent?

18  A.  All of the features are included because they all,

19  including the hourglass shape, they all contribute to the

20  overall impression.  So, you know, I'm not ruling out features

21  because of that.

22  Q.  Oh, I'm not asking to be ruling out features, but you just

23  admitted that the fender looked different, the design of the

24  foot padding looked different, and the hourglass, as the

25  Federal Circuit is a minor feature, even we don't, you know,

**Hatch - cross by Cheng**

96

1  exclude that feature, but since that was disclosed in the

2  prior art, it becomes a minor feature.

3          So, and as you said, all features put together form

4  this overall impression.  But that's conclusive.  That's same

5  as saying their detailed analysis is not required, as long as

6  I use the word overall impression.  The overall --

7          THE COURT:  I think you're giving a closing argument.

8          MR. CHENG:  Sorry, your Honor.

9          THE COURT:  Simply ask questions.

10 BY MR. CHENG:

11 Q.  So the overall impressions viewed on the features, do you

12 agree with that?

13 A.  It includes viewing the features, all of the features that

14 we see here, absolutely.

15 Q.  And I noticed on your analysis you didn't do a comparison

16 of the bottom view.

17          Is that why that was not included in your analysis or

18 in your report to support the preliminary injunction motion?

19 A.  No, I included all of the product as a whole, and the

20 bottom was certainly part of that analysis.

21 Q.  I'm looking at the report that you provided, document

22 number 594, and I don't see any reference to the bottom view.

23 A.  You'll find I did the full, all of the views in -- the

24 applicable views of the patents in Exhibit 1 that was

25 attached.

**Hatch - cross by Cheng**

1    Q.  No, no.  Exhibit 1 is your CV, I think.

2    A.  I'm sorry, Appendix 1.  It's where the three-way

3    comparisons are.

4    Q.  The Appendix 1 is your CV.

5    A.  Oh, then it's Exhibit 1.

6    Q.  I don't see any exhibit attached to this report.

7    A.  There is a full -- there should be an attachment, which

8    has been referred to in the past, you brought it up in

9    deposition, that includes all of the three-way analyses.

10          MR. CHENG:  Peter, do you mind putting on the bottom

11   view comparison?

12          THE COURT:  Well, show him his expert report.  You're

13   saying there's something missing from his expert report.  Just

14   show it to him, and he can identify it or disagree with you.

15          MR. CHENG:  Oh, I'm doing it now.  It's not in the

16   expert witness report, so I don't know -- I don't want to

17   reference to any other documents.

18          THE COURT:  Do you have the report up there with you?

19          THE WITNESS:  I don't, but I believe counsel --

20          THE COURT:  Any objection to him having the report up

21   there?

22          MR. CHENG:  Well, they can bring up the report.

23          THE COURT:  Yeah, if you've got one without notes,

24   you can give it to him.

25          What I can see is Exhibit 1 is a three-way comparison

**Hatch - cross by Cheng**

98

1    between the accused products and the patents-in-suit.  There

2    is a CV attached as Appendix A, and then there's the

3    affidavit, the declaration.

4    BY MR. CHENG:

5    Q.   Anyway, we're going to put the bottom view on the screen

6    so we can look at the pictures unless you don't think they

7    clearly represent the bottom view of the products.

8         So I think it shows the top view, the front view, and

9    the bottom view of the accused product, the prior art, and

10   the -- one of the accused patent.

11        Can we just stick with '723 for all cases?  I think

12   that's the next page.

13        Oh, never mind.  That works.

14        If we're only focused on the bottom view, there are

15   three pictures at the bottom line of this slide?

16   A.   Only the bottom three, ignoring the rest.

17   Q.   So you can see that there's a bottom view of the accused

18   product, a bottom view of the prior art, and a bottom view of

19   one of the patents-in-suit.

20        In your opinion, are they look substantially similar

21   to each other?

22   A.   The opinion that I gave was through the eyes of an

23   ordinary observer --

24   Q.   Uh-huh.

25   A.   -- and, importantly, it was of the product as a whole, and

**Hatch - cross by Cheng**

1   as I explained, they are substantially similar.  If we were

2   incorrectly to focus only on one view at a time, yes, we

3   notice differences.

4   Q.  So do you see the ribs in the middle of the accused

5   product?

6   A.  Yes, I see it on the product and also in this view, yes.

7   Q.  And are you aware there is a built-in speaker to this

8   product?

9   A.  Say that again?

10  Q.  Are you aware there are built-in speaker in this

11  hoverboard product?

12  A.  I --

13  Q.  Speaker.

14  A.  I heard speaker.  The word before that?

15          THE COURT:  Built-in.

16  BY THE WITNESS:

17  A.  Built-in, sorry.

18  BY MR. CHENG:

19  Q.  Yes.

20  A.  Yes, I'm aware.  But, of course, that's not part of

21  looking at the patent analysis here.

22  Q.  Can you see the holes on the bottom of this product?

23  A.  I see the fine holes, yes, the perforation, yes.

24  Q.  And this speaker ventilation hole present in the prior

25  art, in the accused -- in the one of the patents-in-suit, the

1    D '723 patent?

2    A.   No, it doesn't have holes in that location.

3    Q.   Do you think this is a noticeable difference?

4    A.   In the overall impression, it does not have a significant

5    effect.  If it were there or not, the patent would still

6    infringe.  Sorry, the accused product would still infringe of

7    the patent.

8    Q.   Yes.  Let's also compare the pads here, and the pads has

9    been isolated in the picture showing on the screen.

10           Can you see that the shape and the lines and the

11   designs, do you think they are substantially similar?

12   A.   Well, what's shown is not the patent, for one thing.

13   Q.   It's one feature, yes, I agree with you.

14   A.   No, still it's an interpretation of the patent that's gone

15   a certain direction.  You've made some certain calls to change

16   it in a certain way.

17           My analysis was not -- it was based upon the patent

18   and what the patent covers, and the analysis would be

19   incorrect to compare it to an interpretation of that patent.

20   Q.   Uh-huh.

21   A.   And also the prior art is missing in this picture.

22   Q.   So I think what confuses me is if all the features are

23   different as acknowledged by you and the hourglass shape and

24   the flat surface are minor features decided by the Federal

25   Circuit, then how can the overall impression viewed on those

**Hatch - cross by Cheng**

1   features substantially different -- substantially similar?

2          MR. BERKOWITZ:  I'm just going to note my objection.

3   This mischaracterizes his testimony.

4          THE COURT:  The witness can correct it if he thinks

5   he mischaracterizes it.

6   BY THE WITNESS:

7   A.  Yes, there were a number of things there, but I certainly

8   didn't say that all of the features are substantially

9   different, and I -- sorry, can you unpack that question,

10  rephrase it?

11  BY MR. CHENG:

12  Q.  Sure, I guess that question has two parts.

13         First is that the Federal Circuit noticed that the

14  hourglass shape and the flat surface were disclosed in the

15  prior art, so they become minor features.  And then all the

16  other features you also acknowledged they are different from

17  the accused products.  Then how can the overall impression

18  viewed on those features substantially similar?

19  A.  Because when -- again, you packed a number of somewhat

20  untruths in there.  The Federal Circuit did not say that it

21  was minor, is my understanding, but they did point out that --

22  sorry, I'll move forward to your question.

23         The overall impression is still substantially similar

24  especially when we look to the prior art because we combine

25  all of those details as you're referring to of the designs

**Hatch - cross by Cheng**

1    together to gain the overall impression, and when we look at

2    the '906, it's devoid of such details, like the perforations

3    that you're pointing out very nicely right now.  The '906

4    doesn't have them.

5             So it's important that we use the '906 as the basis

6    for the comparison within infringement analysis.

7             MR. CHENG:  Can I have the two patents-in-suit side

8    by side, the '723 and the '256.

9    BY MR. CHENG:

10   Q.  Mr. Hatch, you just mentioned previously during the direct

11   examination that you were saying those two patents are very

12   similar to each other.

13   A.  They were filed at the same time, and they have many

14   similarities, yes.

15   Q.  And somehow separate patents were granted to both of them?

16   A.  Yes.  One doesn't act as prior art to the other.  They

17   came from the same inventor.

18   Q.  So do you think the examiner acknowledged there are

19   sufficient differences between those two patents, so separate

20   patents were granted to both of them?

21   A.  Yes.

22   Q.  So --

23   A.  Other --

24   Q.  Sorry.  I'll let you finish.

25   A.  But, of course, they acknowledge that one can't be prior

**Hatch - cross by Cheng**

1    art to the other because it's from the same inventor.  So I

2    understand that would be different if they were looking at two

3    patents from two different inventors.

4    Q.   So if the minor difference between those two is sufficient

5    to support the issuance of two separate patents, do you think

6    the differences between this accused product is

7    substantially -- is substantial and noticeable to an ordinary

8    observer to the two patents-in-suit?

9    A.   My understanding that's not a legal comparison, but the

10   comparison, of course, for infringement is between the accused

11   product in light of the prior art.

12          These were also examined in light of the prior art

13   and found to be substantially dissimilar, so the comparison

14   goes back to the prior art.  We should not ignore that when

15   conducting infringement analysis.

16   Q.   Just a few more questions.

17   A.   They are quite heavy.

18   Q.   Just a few more questions.

19          One of your prior report, and in your previous report

20   and, you know, one example of them in Document 388 that you

21   included four products, A, B, C, D, against the -- against

22   four patents-in-suit, and obviously product B and product D

23   were dropped from your most recent report.

24          Has your mind changed considering the infringement

25   nature that you previously included against product B and

Hatch - cross by Cheng

1  product D?

2  A.  No, it has not.

3  Q.  And can you tell us why they were not included in your

4  most recent report?

5  A.  Because in this preliminary -- in this particular

6  preliminary injunction, the focus is on A, C and E, and that

7  does not include B and D, which I have included in other

8  reports.

9  Q.  Uh-huh.  And a little bit more on the legal standard that

10  you proposed regarding the ordinary observer, that you

11  mentioned that that has to be a real life purchaser with

12  little or no experience purchasing hoverboards.

13        Do you think that is consistent with the legal

14  standard purported by Federal Circuit?

15  A.  I don't see a fault with my understanding that the

16  purchaser in this particular case would be as I described in

17  the report.  I'm not sure where you're pointing out there's a

18  gap.

19  Q.  Because this hypothetical ordinary observer supposed to be

20  conversant with all the prior arts.  Do you disagree with

21  that?

22  A.  That is correct.  As I showed in my diagram, we understand

23  who the purchaser is to understand the level of acuity that a

24  hypothetical ordinary observer would apply to their knowledge

25  of the prior art.

**Hatch - cross by Cheng**

1    Q.  If that purchaser has little or no experience purchasing

2    hoverboards, how can you expect that purchaser to be

3    conversant with all the prior arts?

4    A.  The purchaser is not conversant, sorry, conversant with

5    the entire prior art.  The purchaser is not looked at for

6    their knowledge of prior art, but they are looked at for the

7    acuity that they pay towards that in order to form the

8    construct of a hypothetical ordinary observer.

9           You were referring only to the purchaser there.

10   Q.  So you disagree with the legal standard that the

11   hypothetical purchaser should be conversant with the prior

12   art?

13   A.  The hypothetical ordinary observer in this test is the

14   construct we use to represent someone who is conversant with

15   the entire relevant prior art, whereas we only look at the

16   purchaser as an example to understand the level of acuity.

17   Q.  I still don't get it.  Are you mixing a real live

18   purchaser with this hypothetical ordinary observer?

19   A.  No.  I understand the confusion.  It's quite common, but

20   the purchaser we only look at to understand, okay, how

21   quickly, do they give a fleeting glance to these products, or

22   do they really tear it apart and understand things?  I've

23   worked in both areas, and I understand there's a big

24   difference.  You don't want to hear my tales about that.

25           But the hypothetical ordinary observer is not a real

**Hatch - cross by Cheng**

1    person.  It is a hypothetical person that's used as a

2    construct in this type of analysis.  The only thing that we

3    take from the purchaser is their level of acuity.  That is my

4    understanding.  So I'm not confusing the two.

5    Q.   Well, my understanding -- but you do agree an ordinary

6    observer with little or no experience purchasing a hoverboard

7    cannot be conversant with all the prior arts?

8    A.   No.  You are mixing the two.  So the hypothetical ordinary

9    observer has knowledge of the prior art.  That is the

10   construct that we use here.

11          And the purchaser we base on real life to understand

12   how that person goes about purchasing and what level of

13   attention do they pay in that situation.

14   Q.   And you're saying a low level of attention is sufficient

15   to support this ordinary observer's knowledge of all prior

16   arts?

17   A.   Again, you're mixing the two things there.  The knowledge

18   of prior art is the ordinary observer, which is a hypothetical

19   person.

20          You could bring up my diagram if you want.  I've gone

21   to lengths to explain this.

22   Q.   I've seen the diagram and that's what confused me, but

23   thank you for your explanation.

24          Do you understand the differences between the outline

25   of a drawing and the shading of a drawing?

**Hatch - cross by Cheng**

1    A.   As a designer, yes, I do.

2    Q.   Okay.  I'm just going to -- this is Figure 3 of the '906

3    patent.  I just got it printed, so it looks bigger.

4         Does that represent a curved bottom, the drawing?

5    A.   It is somewhat curved, yes.  We understand that by looking

6    at all the views.

7    Q.   And to look at this, this is Figure 1 of the '906 patent.

8    Do you agree this represent a flat surface from the shading of

9    the drawing?

10   A.   When you're pointing, you're referring to the whole body?

11   Q.   No.  I mean this is the outline, right, and there are

12   lines in the middle --

13   A.   Ah, right.

14   Q.   -- that the shading of the drawing represent a flat

15   surface for this particular design?

16   A.   The shading on the edges there represents that it curves

17   on that top surface, so the top surface is not entirely flat.

18   Q.   You're saying the top surface is not entirely flat?

19   A.   Point to the shading that you're referring to.  Around the

20   edges, right?

21   Q.   No, like this is a shading.  See this straight line?

22   A.   Yes.

23   Q.   This is shading.

24   A.   Yes.

25   Q.   This is also a shading.  Does that represent a flat

**Hatch - cross by Cheng**

1    surface of this drawing?

2    A.   It -- the shading does show that there is a surface there,

3    and we know based on the other views that it is a somewhat

4    flat surface.  There is and can be curvature there.

5    Q.   Sorry, can you repeat the last part?  I didn't --

6    A.   It's a somewhat flat surface.

7    Q.   Okay.

8    A.   And, you know, we see shading being used here to designate

9    curvature, where it's certainly not flat, such as at the very

10   top of that image.

11        You were talking about the shading, right?

12   Q.   I'm talking about shading, like this part.

13   A.   Those particular lines, right.

14   Q.   Are you saying this is flat or this is curved?

15   A.   In looking at all the views, we know that it is, say,

16   substantially flat --

17   Q.   Okay.

18   A.   -- but not entirely flat.  It's partially flat with

19   rounded edges.

20        MR. CHENG:  Your Honor, I've finished my cross, but

21   my colleague, Mr. Yao, wanted to continue the cross.  Would

22   that be allowed?

23        THE COURT:  Why?  It's really -- the usual procedure

24   is one attorney asks questions on direct, one on cross.  Why

25   do you need to have two attorneys asking questions on cross?

**Hatch - cross by Yao**

1    MR. YAO:  I could hand him the questions if you

2  prefer, your Honor.  I could just hand him my questions so he

3  can finish.

4    THE COURT:  What, did you divide the subject areas?

5    MR. YAO:  I'm sorry?

6    THE COURT:  Did you divide the subject areas?

7    MR. YAO:  Sort of, yes.

8    THE COURT:  How long is your cross going to be?

9    MR. YAO:  Probably like ten minutes max.

10    THE COURT:  Go ahead and do it.  No, you can do it.

11  If these are your questions, go ahead and ask them.  But try

12  and restrict it to one attorney on direct, one attorney on

13  cross.

14    MR. YAO:  All right.  Thank you, your Honor.  I do

15  apologize.

16                    CROSS-EXAMINATION

17  BY MR. YAO:

18  Q.  Mr. Hatch, earlier during your direct examination, you

19  examined defendants' accused product, correct?

20  A.  I've examined the accused products, yes.

21  Q.  Have you examined plaintiffs' own products?

22  A.  That was not part of my analysis.  That would -- that

23  should not be part of my analysis.

24  Q.  Okay.  Have you -- but you did examine plaintiffs' claimed

25  design and patents-in-suit, correct?

**Hatch - cross by Yao**

1   A.   I examined the claimed design in all of the

2   patents-in-suit, yes.

3   Q.   And you were -- have you examined Defendants' '857 patent?

4   Have you examined that?

5   A.   The '857 was not part of the design infringement, as I

6   understand.

7   Q.   And earlier, you indicated the ordinary observer test, it

8   has a low -- low -- sort of low level attention, correct?

9   A.   The hypothetical ordinary observer would apply a low level

10  of attention to details.

11  Q.   And in that, you also included that they would consider

12  the price, maybe location or other different factors when they

13  considered the products, correct?

14  A.   No.  The purchaser would consider other factors, not the

15  hypothetical ordinary observer as a construct.

16  Q.   Well, aren't you confusing the ordinary purchaser with the

17  hypothetical ordinary observer in this case?

18  A.   No.

19  Q.   What is your basis?

20  A.   I --

21  Q.   Well, because -- let me rephrase that because you did

22  mention about if we go back to your PowerPoint real quick.

23          Let's talk about the low level attention you were

24  talking about.  How -- why is your understanding of a

25  hypothetical ordinary observer different from what the Federal

**Hatch - cross by Yao**

1  Circuit has laid out in the *Egyptian Goddess* case?

2  A.  My understanding aligns with the correct interpretation of

3  that.  It's not in conflict.

4  Q.  In your report, you quoted -- I'm sorry, not in your

5  report.  It says:  The ordinary observer is one who is not an

6  expert in the claimed design but rather one of ordinary -- I'm

7  sorry -- a consumer use or the parent user each having little

8  or no experience purchasing hoverboards.

9       You did write that in your declaration, correct?

10  A.  Yes.  I think you just quoted from two separate parts.

11  Some of that was --

12  Q.  The second part where I said the consumer -- a consumer

13  user or the parent of a user, each having little or no

14  experience of purchasing hoverboards, that's your

15  understanding of the hypothetical ordinary observer, correct?

16  A.  That's describing the purchaser who we use to inform us of

17  the acuity that an ordinary observer would apply.  I think

18  that's outlined there.

19  Q.  And then you also said that you said the ordinary observer

20  encounters products --

21    (Court reporter interruption.)

22  BY MR. YAO:

23  Q.  So in your report, you also talk about the ordinary

24  observer also encounters products in brick-and-mortar stores

25  like Wal-Mart, Best Buy or online stores, correct?

**Hatch - cross by Yao**

1    A.   Yes, the purchaser in real life would encounter the

2    product in question in those situations, yes.

3    Q.   So wouldn't you consider -- what you're saying is you're

4    considering ordinary purchaser is the same thing as a

5    hypothetical ordinary observer, correct?

6    A.   That's not what I said, no.

7    Q.   But based on -- based on this what you wrote in your

8    declaration, you're confusing an ordinary purchaser with a

9    hypothetical ordinary observer, correct?

10   A.   No, I'm not confusing them.

11   Q.   Well, you did said that they would encounter products at

12   the, you know, brick-and-mortar stores and they would take

13   into consideration of the price and other stuff while they

14   were looking at the products.

15          Doesn't that deal with more of consumer behavior and

16   their purchasing habits, rather than looking at a product as

17   an ordinary observer?

18   A.   It's important to understand how the purchaser looks at

19   the accused product.  That's not about trying to find out the

20   habits as such but to find out with what level attention do

21   they pay when they're looking at the products.  We seem to be

22   stuck on the same point.

23   Q.   Well, let's talk about the new report you submitted for

24   this motion for preliminary injunction.

25          You read the Federal Circuit decision, correct?

**Hatch - cross by Yao**

1    A.   Correct, yes.

2    Q.   And you attempted to cure your deficiencies criticized by

3    the Federal Circuit, correct?

4    A.   In what way do you mean?

5    Q.   Well, you did -- for example, if we go back to your

6    previous reports for the federal injunction, all you did at

7    least -- you grouped all the accused products together with

8    the patents-in-suit and you called that a comparison, but,

9    however, in this one you put -- you did Group A products with

10   the patents-in-suit and the prior art, correct?

11   A.   The analysis was previously done, looking at every product

12   individually.  However, to be clear in the report, it was

13   important to respond to the request by the Federal Circuit to

14   clearly demonstrate each separately.  So I did that, but there

15   was no opinion change or change of analysis.

16   Q.   But what you did essentially is to cure the deficient or

17   inconclusory analysis laid out by the Federal Circuit,

18   correct?

19   A.   No.

20   Q.   Why would you say that?

21   A.   I did not change my opinion.  My analysis did not change.

22   Only the format of how I presented the work, but the exact

23   same pictures were presented in my previous declarations.

24   There was no curing of something that was missing.  It was

25   more reformatting.

**Hatch - cross by Yao**

1  Q.  Well, certainly in this report, you did one comparison of

2  Group A products with the patents-in-suit and the prior art

3  compared to your first report, you simply group all of them

4  together and in addition -- well, why was there a sudden

5  change?

6  A.  I believe we covered that.  So the analysis was exactly

7  the same.  The format changed because in respect to the

8  Federal Circuit, they would like to see it more clearly

9  itemized separately or presented separately, so that's what I

10  did.  I changed the presentation layout, but the content was

11  all there.  The analysis was all there in the original.

12  Q.  But in your report, you only included top and perspective

13  view, correct, in your most recent submitted report?

14  A.  That's also incorrect.

15  Q.  Were you aware that expert discovery closed on

16  October 23rd, 2022?

17          THE COURT:  That's an argument for -- I'm sorry.

18          That's an argument for me, not for the witness.  If

19  you want to raise issues about whether the expert report

20  was -- the revised expert report was timely, we can address

21  that, but -- with the lawyers, but not with the witness.  It's

22  not his issue.

23          MR. YAO:  Okay.  I don't have any further questions,

24  your Honor.

25          THE COURT:  All right.  Any redirect?

**Gandy - direct by Cheng**

1          MR. BERKOWITZ:  No, your Honor.  Thank you.

2          THE COURT:  Okay.  The witness is excused.  Thank

3   you, sir.

4          THE WITNESS:  Thank you, your Honor.

5          THE COURT:  I'll let defendants call their witness to

6   allow him to get on and off the stand and travel back to North

7   Carolina.

8          MR. CHENG:  Sure, your Honor.

9          THE COURT:  Sir, please raise your right hand.

10     (Witness sworn.)

11         THE WITNESS:  I do.

12         THE COURT:  All right, have a seat, please.

13         JAMES GANDY, DEFENDANTS' WITNESS, DULY SWORN,

14                     DIRECT EXAMINATION

15   BY MR. CHENG:

16   Q.  Hi, Mr. Gandy.  Can you give us a brief introduction about

17   yourself and your experience as a patent examiner at the USPTO

18   and the other relevant work experience?

19   A.  Yes.  My name is James Gandy.  I worked at the United

20   States Patent Office from 1972 until 2005 as a design patent

21   examiner, as a supervisor, and as the practice specialist for

22   the design patent technology center.

23         Since retiring, I have been an advisor to attorneys

24   at times on the filing of design patent applications, and I

25   have done expert witness work in a number of cases.

**Gandy - direct by Cheng**

1   Q.   And, Mr. Gandy, let's just cut into the prior art, the

2   '906 patent here.

3        Why do you think the D '906 patent is important for

4   the infringement analysis in this case?

5   A.   Mainly, I think it's because it has the overall hourglass

6   shape.  It has the relatively flat top surface that extends

7   over -- a relatively flat surface that extends over the main

8   body of the top of the design, and also it shows the same

9   substantial contour to the front and rear surfaces of the

10  hoverboard that is claimed in the two design patents.

11  Q.   And what about the wheels, the fenders, the things the

12  Court asked -- is there any difference between a feature that

13  was claimed by a design patent and a feature that was

14  disclosed in a design patent as the wheel cover in this case?

15  A.   It's always been my understanding that a design patent can

16  be used for everything that it discloses, not only the subject

17  matter that's claimed, but also whatever might be shown in

18  broken lines as part of the article in which the design is

19  embodied.

20  Q.   So in other words, the -- what the effects of this wheel

21  cover that was disclosed in the '906 patent, how is that

22  relevant to the infringement analysis?

23  A.   Well, it's relevant in that it does show that you can have

24  a wheel cover, an arcuate-shaped wheel cover over the wheels

25  of the hoverboard.

**Gandy - direct by Cheng**

1    THE COURT:  What's an arcuate-shaped wheel cover?

2    Speak into the microphone.

3    BY THE WITNESS:

4    A.  It would be like a semicircular shape or curved shape, a

5    rounded shape.

6            THE COURT:  Arcuate I have never heard before.

7            THE WITNESS:  I've used the term arcuate many times

8    in my career at the Patent Office.

9            THE COURT:  I've used it never in my career.

10           Go ahead.

11   BY MR. CHENG:

12   Q.  And from comparing the '906 patent to the two

13   patents-in-suit, what can we -- why should we even compare

14   those two, the prior art with the two patents-in-suit?

15   A.  Well, I think it's because the prior art, the '906 patent

16   basically shows substantially all of the general features that

17   are in the two design patents that are in this case, that is,

18   the hourglass shape, the relatively flat top surface across

19   the main body, as well as the contour of the front and rear

20   surfaces and also wheel covers over the wheels.

21   Q.  And to your opinion, are those features relevant to

22   infringement analysis?

23   A.  I think based on what the recent CAFC decision said is

24   that they become background information, but then once they're

25   shown in the prior art, you have to look at other features for

**Gandy - direct by Cheng**

1   the purpose of determining whether the claimed design and the

2   alleged infringing products are not similar.

3   Q.   So essentially you're saying different features should be

4   given different weight or value in infringement analysis?

5   A.   Well, I think the features that are shown in the prior art

6   no longer become the primary features for the purpose of

7   determining infringement.

8           Again, I think, you know, the CAFC clearly set that

9   out that they become more background features and that now you

10  have to look at other features of the claimed design and the

11  alleged infringing products to determine whether they are

12  sufficiently close to be considered infringing.

13  Q.   Is there any comparison you wanted to show us that will

14  demonstrate the other feature that you just mentioned?

15  A.   Yeah, sure.  I think if you want to pull up the -- one of

16  the two design patents, as well as the three Gyroor products

17  that are alleged to be infringing, we can look at them and

18  compare them.

19  Q.   Do you want to -- an overlay?  What slides do you want?

20  A.   Well, we can start with the top plane views.

21  Q.   Of the --

22  A.   Of the -- one of the two design patents.  It doesn't

23  matter.  It can be either one.  And then the three Gyroor A, C

24  and E.

25  Q.   Yes, so let's just do -- like the picture in front of you?

**Gandy - direct by Cheng**

1   A.   Yeah, yeah.  I mean if we want to look at the top plan of

2   what would be the Gyroor A in the prior art and the D '723

3   patent, if the hourglass shape and the relatively flat surface

4   across the top of the main body of the design become more of

5   background, you have to look at what the other features are in

6   that view that would show that they were either substantially

7   similar or substantially different over the -- over the

8   claimed design, the '723 design patent.

9        In this instance, I think what you would have to look

10  at is the foot pads and the difference in the shape and the

11  surface treatment.  The surface pattern on the foot pads I

12  think become more important in determining whether they're

13  substantially similar or substantially different.

14       Also, if we look at the front views of those three of

15  the prior art, '906 prior art with D '723 patent, what I was

16  saying about the front view, that the contour, the shape and

17  contour of the front surface in the prior art and D '723

18  patent are substantially the same, whereas in the Gyroor A

19  hoverboard, it actually is different because the center

20  portion of the top surface actually drops down below the foot

21  pads on each end, which creates a different visual impression.

22  Q.   You're talking about the middle here --

23  A.   Yes.

24  Q.   -- for the contour?

25  A.   Yes, and because of that recess, when you look at the '906

**Gandy - direct by Cheng**

1   prior art and you look at the D '723 design in the top view,

2   the surfaces across the entire hoverboard appear to be

3   continuous, appear to be just a continuous surface, whereas in

4   the Gyroor A hoverboard, because the center portion is

5   recessed, you get a distinct visual impression of the foot

6   pads, the opposing foot pads, which are raised up above it.

7   You don't get this continuous smooth transition from one side

8   to the other like you do in the '906 prior art and the D '723

9   patent.

10         As we go along here, what I want to go ahead and

11   indicate because, you know, you might start thinking, well,

12   you're picking out, you know, different features.

13         Well, when you're looking at the -- comparing the

14   overall appearance of an alleged infringing product and the

15   claimed design, it's all of the features on all of the

16   surfaces that are being claimed that have to be looked at and

17   considered as a whole in making a determination as to whether

18   they have a similar appearance or a dissimilar appearance.

19         So if I'm pointing out features on one surface or

20   another surface, what I'm looking at is combining them

21   all together is what you consider when determining whether

22   there's infringement.

23   Q.  So you do think analysis between different features is

24   important to form the overall impression of --

25   A.  Yes, I do.  I don't think the infringement analysis is

**Gandy - direct by Cheng**

1    that much different than the patentability determination

2    analysis.

3         When you're determining patentability of a claimed

4    design in an application, you're looking at all of the

5    features that make up that overall appearance and compare them

6    to the prior art to determine whether that overall appearance

7    is distinct over the prior art.  You have to consider all of

8    the features that make up the claimed design.

9    Q.   And as you previously mentioned, some features should be

10   given more weight and some features should be given less

11   weight depend on whether or not they were disclosed in the

12   prior art?

13   A.   Yeah.  I think if it's disclosed -- if features are

14   disclosed in the prior art, they become less relevant with

15   regards to the question of infringement.  At least that's what

16   the CAFC certainly seemed to be saying, and they did say then

17   you have to start looking at other features as to whether they

18   distinguish one over the other.

19   Q.   And two more questions on this slide.

20        Why should the bottom view matter?  Because, you

21   know, when people stand on this hoverboard, they don't usually

22   see the bottom of the hoverboard.

23   A.   Yeah, well, that's normally the case, but in this fact or

24   in this case, the design, the claimed design in the '723

25   patent was claiming the bottom as part of the ornamental

**Gandy - direct by Cheng**

1    design.

2            And whatever you're showing in solid lines and you're

3    claiming as part of your design, you have to consider them for

4    the purpose of, you know, infringement.

5            So in this instance, even though the bottom might not

6    normally be visible, clearly the bottom of the Gyroor A

7    hoverboard has features on it that are different than the

8    prior art and the D '723 patent.

9            The prior art and the D '723 patent are substantially

10   plain, they have like a rounded surface, but they have no any

11   kind of ornamentation on them, whereas the Gyroor and A

12   hoverboard does.

13           THE COURT:  Does any of your analysis deal with

14   functionality?  Does that have any role from this injunction

15   hearing?

16           THE WITNESS:  No, no.  If what's being claimed in

17   solid lines as the ornamental design, that would have to be

18   considered ornamental and not functional.

19           THE COURT:  That would be considered that or is part

20   of the analysis whether that acts as a -- in a functional way

21   and has to be disregarded?

22           THE WITNESS:  No, I don't -- I don't agree with that.

23   I think that when you're dealing with potentially the issue of

24   functionality in design patent, if you can show that something

25   can be done in different ways and have a different appearance

1    and still perform the same function, then it would have to be

2    considered clearly primarily ornamental rather than primarily

3    functional.

4         THE COURT:  All right.  Thank you.

5    BY MR. CHENG:

6    Q.  And Mr. Hatch also mentioned that D '906 patent doesn't

7    have foot padding.  However, the D '723 patent had the foot

8    padding, and because '723 has the foot padding and the accused

9    product A have the foot padding, they are somehow closer to

10   each other.

11        Do you agree with that analysis?

12   A.  No.  I don't agree with that because what we have to look

13   at in this instance is the '906 prior art design patent was

14   the first hoverboard ever invented.  So hoverboards that would

15   be designed after that may have additional features on them

16   that are not in the prior art, and if it's not in the prior

17   art, what's considered the best prior art reference, that

18   doesn't mean that the alleged infringing product is -- is

19   infringing the claimed design, in this instance '723.

20        You have to look.  Once you see that there are

21   features that are not in the prior art, then you have to start

22   evaluating those features between the alleged infringing

23   product with the claimed design, in this instance, the '723

24   patent.

25   Q.  So you're saying the idea of adding the foot pad is not

**Gandy - direct by Cheng**

1    protected by the D '723 patent?

2    A.   Could you rephrase that?

3    Q.   Sorry.  So you're saying the concept of putting a standing

4    pad on the D '23 patent as an improvement from the '906 patent

5    is not protected by the D '723 patent?

6    A.   Well, I mean, it's not protected in the sense by itself.

7    It's part of the overall design of the '723 hoverboard, so

8    it's part of the ornamental design that's being claimed.

9    Q.   Is the idea being claimed?

10   A.   No, no, it's the -- it's the appearance, the shape and

11   appearance.

12         What's being claimed in a design patent is the shape

13   and appearance of a design embodied in an article of

14   manufacture.  So all of the features that would be shown in

15   the design in solid lines are considered part of the

16   ornamental design being claimed for an article of manufacture.

17   Q.   And the D '723 patent have a different design with the --

18   compared with accused product A on the top surface?

19   A.   Yes.  As I indicated before, visually when you look at

20   the '723 design patent and the prior art, '906 patent, they

21   have what appears to be from right to left a continuous

22   surface that is uniform, whereas in the Gyroor A hoverboard

23   because the center portion is recessed, it creates this visual

24   distinction of two opposing foot pads that are not continuous

25   with the center portion.

**Gandy - direct by Cheng**

1   Q.   And is that noticeable to an ordinary observer?

2   A.   I think it would be.

3   Q.   And the front view, aside from that what you mentioned has

4   the contour of the accused products is different, is there

5   anything else that would separate the accused product A from

6   the D '723 patent?

7   A.   Yeah, yeah.  I mean, the lights on the front surface

8   clearly have a distinct appearance over the lights that are

9   shown on the '723 patent.

10          And, again, because the contour of the front and rear

11  surfaces in the '723 patent are shown in the '906 prior art

12  patent, they become more background features, and so you have

13  to look at the other features that might be on that surface as

14  having relevance to the question of infringement.

15          And in this instance, the lights on the Gyroor A

16  hoverboard are very narrow, elongated, rectangular-type shape,

17  whereas the lights on the '723 patent are more almost like a

18  parallelogram shape.

19          THE COURT:  The lights on the '723 --

20          THE WITNESS:  The '723 are more like a parallelogram

21  shape.

22          THE COURT:  You're looking at Figure 3.

23          THE WITNESS:  Figure 3, yes.

24          THE COURT:  It's the -- looks like an oval with a

25  line bisecting or at an angle across it; is that correct?

**Gandy - direct by Cheng**

1          THE WITNESS:  Right.

2          THE COURT:  Okay.  That's what the lights are

3    represented as in the '723?

4          THE WITNESS:  Right, yes.

5          THE COURT:  All right.

6    BY MR. CHENG:

7    Q.  And this one shows kind of half of the hoverboard top

8    design together with the fender.  How significant do you think

9    the shape of the fender affects the overall perception of an

10   ordinary observer?

11   A.  Oh, I think it has a significant impact on the overall

12   appearance.  I don't think -- I don't see how, in my opinion,

13   when you look at these two, I think the difference in the

14   shape of the fenders just jumps right out at you.  I don't see

15   how you can say that they're insignificant.

16   Q.  Okay.  And so to the extent, I think Mr. Hatch used the

17   term overall appearance without getting to the detailed

18   analysis, do you think that is consistent with the Federal

19   Circuit's opinion?

20   A.  No, I don't.  Mr. Hatch's statement that just broadly

21   stating that the overall appearance between the claimed

22   hoverboard and the accused products are not clearly dissimilar

23   is just a -- I don't see where he has any support for making

24   that statement.  He hasn't identified what it is that makes

25   them not dissimilar.

**Gandy - direct by Cheng**

1    Q.   Isn't the overall perception sufficient to support the

2    finding of the differences?

3    A.   Yeah, I mean, you're making the determination based on the

4    overall appearance, but you're making that based on -- the

5    overall appearance based on all of the features that make up

6    the entire design.

7    Q.   So in your opinion, just to the term overall experience

8    without getting into the features is insufficient to support a

9    finding of substantial similar or substantial dissimilar?

10   A.   Yeah, I think it's just a subjective, you know, statement

11   without having any support as to what are the features that

12   you're relying on to say that they're dissimilar.

13            MR. CHENG:  Can we look at the pink one, the product

14   C?

15   BY MR. CHENG:

16   Q.   And the reason I brought up this one is because opposing

17   party, plaintiffs have mentioned that this product looks more

18   similar since -- this is product C -- the cover is kind of

19   extended over the wheel; but in your opinion, is this

20   substantially similar to the D '723 patent?

21   A.   No.  Again, I think, you know, you have to take more than

22   just the wheel covers.  I mean, yes, the wheel covers on the

23   Gyroor C are more rounded, but they actually are wider and

24   they have a flatter appearance on the top, whereas the '723

25   design patent, the wheel covers actually have a curvature to

**Gandy - direct by Cheng**

1    them.  So there are some differences between the wheel cover

2    in the Gyroor C and the D '723 design patent.

3           And, again, when you're looking at all of the

4    features that are on the Gyroor C and the D '723, particularly

5    again in the top view.  As I said, the '723 kind of has this

6    continuous, what appears to be just this continuous surface

7    from right to left, whereas the -- in the Gyroor C, you again

8    have a recessed center area so that the opposing pads appear

9    to be separate from the center portion.  It's not a continuous

10   flow to it.

11          And also in the center area on the top surface of the

12   Gyroor C, you have these almost boomerang-shaped features that

13   are not shown in the D '723 patent that contribute to the

14   appearance of as you're looking at it.

15   Q.   When you say the recessed area, are you referring to this

16   portion of the neck, kind of the hourglass?

17   A.   You mean the recess?

18   Q.   Yeah.

19   A.   Yeah, yeah.

20   Q.   From which angle?

21   A.   I'm sorry?

22   Q.   From which angle you were referring to?

23   A.   From the top view.

24   Q.   From the top view.

25   A.   From the top view.  Also from the side view, from the

**Gandy - direct by Cheng**

1   front view, you can see the recess.

2   Q.  So you're saying that the metal is curved inside instead

3   of bulged like in the prior art?

4   A.  Yeah, the '906 prior art and the D '723 patent show a

5   convex contour in the center area, whereas the Gyroor C

6   hoverboard has a recessed surface, and this creates a distinct

7   appearance not only in the top but also when you look at it

8   from the front or the rear.

9          Again, you can see that the two end portions, the

10  foot pads, are separate from the center portions.  There's no

11  continuous flow to them.

12  Q.  And I think from the same slides, the bottom view, you

13  will have the same view as the product A that --

14  A.  Yes.

15  Q.  -- the ventilation, the speaker holes and the metal ribs

16  are also different from the --

17  A.  Yeah, yeah, I mean, you have the ribs on them, and you

18  also have this just on the outside of where the center rib

19  portion, you have this arc, this rounded, this rounded

20  recessed edge that then defines the outer surfaces where you

21  have the perforated openings.

22          So whereas the '906 prior art and the D '723 design

23  patent, they have no ornamentation to them at all as far as

24  any details that -- like ribs or perforations.  They're just

25  basically a plain surface.

**Gandy - direct by Cheng**

1   Q.   Okay.  And is there anything else within this product C

2   that you think a feature might separate the product from --

3   A.   Well, same thing in the front you have the lights.  The

4   lights, again, have a completely different appearance in the D

5   '273 design patent, and they actually are recessed in so you

6   kind of get this -- this separation between the upper surface

7   and the lower surface that's created by these recessed lights.

8   Again, that has a visual impact on the overall appearance.

9            THE COURT:  The ribs you're talking about are on the

10   underside on either side of the center perforation?

11            THE WITNESS:  On the bottom.

12            THE COURT:  On the bottom, right.

13            THE WITNESS:  Yes, yes.

14            THE COURT:  And on each side of that little --

15            THE WITNESS:  Yes, yes.

16            THE COURT:  -- separation --

17            THE WITNESS:  Right, right.

18            THE COURT:  -- that's on the picture?

19            Okay.

20   BY MR. CHENG:

21   Q.   Let's do the other part, and we'll just go through this

22   very quickly.  They're kind of similar.

23            As we have the slides here, do you -- yes, just go

24   through the similarity and differences in your opinions.

25   A.   Okay, yeah.

Case: 1:20-cv-04806 Document #: 620 Filed: 12/07/22 Page 131 of 180 PageID #:15650
**Gandy - direct by Cheng**
131

1      Again, pretty much the same type of situation.  The

2  top plan view, the Gyroor E, the center area is recessed.

3  Again, when you look at it, you can see it more when you're

4  looking at it in front, the front view, just below the top

5  plan view, you can see where it's recessed.  And, again, it

6  creates this visual distinction of not being a continuous top

7  surface like the prior art, the '906 prior art and the D '723

8  design patent.

9      But, again, also the foot pads have a different

10  shape.  They have a different surface pattern to them that

11  creates a different visual appearance along with the recessed

12  center area.  When you take all of these together, you get --

13  you create this different visual impression.

14  Q.  It has like a more round edge towards the center.  Does it

15  matter for your analysis?  Like the foot padding, it's not as

16  pointy as product A or --

17  A.  Right, right, but it still has a different contour than

18  the foot pads in the D '723 patent.  Along with the surface

19  pattern on it and the different shape in the peripheral shape

20  of the pads, that, to me, has a significant visual

21  distinction.

22  Q.  And the front lighting is not recessed as product A or

23  product C and looks thicker.  Does that change your analysis?

24  A.  No.  It doesn't change my analysis as far as, again,

25  creating a different visual appearance from the front and the

**Gandy - direct by Cheng**

1    D '723 design patent, the lights on the front surface in the

2    Gyroor E are clearly different in their shape and appearance

3    than the lights shown in the D '723 patent.

4    Q.   And the light is on one side of this product instead of

5    the other products, the light is on both sides, but this one's

6    only on one side.  Does that change -- does that change your

7    analysis?

8    A.   No.  It doesn't change my analysis from an overall

9    standpoint.  It's just that in this particular product, the

10   Gyroor E, the front rear surfaces are not identical as they

11   were in the A and C hoverboards.

12   Q.   Then the bottom, I mean, the ventilation or the speaker

13   holes are significantly smaller than the other two products.

14   Also have ribs.  Do you still consider the bottom view as

15   significantly different from the D '27 patent?

16   A.   Yeah, I mean, if you just look at the bottom surface, it

17   certainly last a different look to it when you're considering

18   the ribs and the center part and the recessed ridge that

19   defines the outer edge of them, along with the perforations.

20   Clearly, you know, these are all features.

21        And what you're talking about as part as

22   functionality, they could be considered to be -- to have a

23   function, but they can be done in many different ways, and so

24   I would have to consider them more primarily ornamental rather

25   than primarily functional, and I think they have -- you have

**Gandy - direct by Cheng**

1    to consider, since the bottom is claimed in the D '723 design

2    patent, you have to consider that as part of the analysis of

3    infringement.  So you have to look at the bottom surface of

4    the alleged accused infringing product.

5    Q.   Kind of catch the switch.

6    A.   I guess the other thing is, again, the wheel covers on

7    these are different than the wheel covers on the D '723.

8    They're almost a pentagon -- not pentagon shape, trapezoidal

9    shape with a flat top surface, then they flare out on each

10   side, whereas the wheel covers on the D '723 patent are

11   rounded.

12   Q.   Okay.  And that is the way the D '723 patent.  Although

13   they're very similar, the D '723 patent with the other one,

14   the A 25 -- is it A 25?  Can we show the slides of the other

15   patent-in-suit?

16           THE COURT:  Off the record.

17       (Discussion held off the record.)

18           THE COURT:  Back on the record.

19   BY THE WITNESS:

20   A.   That's the '256.  Yeah, that's the one you want, isn't it?

21   That's the other design patent?

22   BY MR. CHENG:

23   Q.   The other design patent.  We can just use this one.

24           I mean, you do see the '723 and the '256 patent, they

25   have slightly different design.  Does that change your

1  opinion, the overall analysis that you did?  When we're

2  switching the '723 patent to the '256 patent, does that change

3  your analysis?

4  A.  I don't quite understand what you're asking.

5  Q.  Sorry.  What we just did was compared the accused products

6  with '723 patent in light of the '906 patent.  If we're

7  switching the '723 patent-in-suit to this '256 patent, does

8  that change your analysis?

9  A.  No.  I would consider the analysis to be virtually the

10  same.

11  Q.  And one last question.  When you did your analysis, you

12  didn't see the actual products but based your analysis on the

13  pictures of the products and the patents; is that correct?

14  A.  Yes, that's correct.

15  Q.  And does that affect your opinion --

16  A.  No.

17  Q.  -- without seeing the actual product?

18  A.  What I kind of felt strange about being criticized about

19  that in my report is I thought that we don't see actual

20  products that are submitted to the Patent Office in design

21  patent applications.  All our determinations on patentability

22  of a design patent are based on drawings or photographs

23  compared to the prior art, which are usually patents or

24  publication photographs.

25          So I don't see where having to have the actual

**Gandy - cross by Sturm**

1    product is going to preclude you from being able to make a

2    proper analysis.  We do that -- we did that or I did that and

3    the Patent Office does that every day in design patents.

4    Q.  Just look at the pictures?

5    A.  Just looking at pictures.

6              MR. CHENG:  I have no further questions, your Honor.

7              THE COURT:  All right, cross-examination.

8              Before you start though, I had made a comment earlier

9    about does plaintiff practice their patent so they have a

10   hoverboard that looks just like the patent.

11             I realize on reflection, that's not really the

12   analysis.  The analysis is whether or not the defendants'

13   products infringe your patents, not whether your product

14   matches their product or there's a difference because that's

15   really not the infringement analysis we're supposed to engage

16   in.

17             So I mused earlier, but I probably should have done

18   it off the record, but it's not an important -- it's not even

19   a factor I can consider because that's not the analysis I have

20   to engage in.

21             Cross-examination.

22                         CROSS-EXAMINATION

23   BY MS. STURM:

24   Q.  Good afternoon, Mr. Gandy.

25   A.  Good afternoon.

**Gandy - cross by Sturm**

1    Q.   So can you -- in your over 30 years of experience in the

2    Patent Office, did you conduct any infringement analyses?

3    A.   No, no, that's not what -- that's not what you do at the

4    Patent Office.

5            However, as a patent examiner, as a supervisor and a

6    practice specialist, I always was looking at what decisions

7    were coming down based on patentability or infringement by the

8    district courts or the Federal Circuit.

9    Q.   So you would say the legal standard for patentability that

10   you applied in the Patent Office is different than the legal

11   standard that you would apply here in your analysis of

12   infringement?

13   A.   Yeah, there is a difference.  Yeah, there's a difference.

14   What I would go ahead and indicate to you though is that when

15   you're determining patentability under 35 U.S.C. 102

16   anticipation, the standard is the ordinary observer, same as

17   what it is in infringement, but the difference in infringement

18   is the ordinary observer is familiar with the prior art.

19   Q.   Right, and --

20   A.   So there is some similarity when you're coming to -- when

21   you're determining the patentability on anticipation.

22   Q.   Correct, and back just to the ordinary observer point, you

23   would say that the ordinary observer in this case is a

24   potential purchaser of hoverboards, correct?

25   A.   That's correct.

**Gandy - cross by Sturm**

1  Q.  And you have no experience as a product designer; is that

2  correct?

3  A.  I don't have any experience as a product designer, but I

4  do have experience as an architectural designer.  I've

5  designed two houses and had them built since I've retired, and

6  I've designed furniture for my house.  So I have done a lot of

7  designing.

8  Q.  So does any of that design work, did that help you in your

9  analysis for the design of hoverboards?

10  A.  Well, again, my background is an architectural design

11  person, so I clearly have a lot of design experience just from

12  my education.

13  Q.  And your experience in infringement analysis is -- has

14  been solely been as a testifying expert; is that correct?

15  A.  I'm sorry, could you repeat that?

16  Q.  Yeah, let me rephrase that.  Sorry.

17      So you have no experience in conducting infringement

18  analyses other than as a testifying expert; is that correct?

19  A.  Yes, that's correct.  Yeah, I've testified in the past on

20  infringement issues, but not when I was a patent examiner.

21  Q.  All right.  So let's turn -- just going to ask -- so you

22  did not review any physical examples of the accused products

23  prior to preparing your report --

24  A.  That's correct.

25  Q.  -- in this case; that's correct?

**Gandy - cross by Sturm**

1    And all of the photos that you included in your

2  report were provided by defendants' counsel; is that correct?

3  A.  That's correct.

4  Q.  So looking at the patents, I guess the '723, you would say

5  that the '723 patent has raised foot pads; is that correct?

6  A.  I'm sorry, has what?

7  Q.  Has raised foot pads?

8  A.  Yes.

9  Q.  Yes.  And you would say the same for the '256 patent?

10  A.  Yes.

11  Q.  Are you aware of any other prior art patents with raised

12  foot pads?

13  A.  I haven't looked at any.  I mean, there may be, but I

14  haven't looked at any as far as pointing out whether this has

15  been done maybe in patents or hoverboards that were patented

16  prior to these two.

17        THE COURT:  By raised foot pads, do you mean the foot

18  pads have grooves in them, or do you mean they're higher than

19  the center of the -- you testified earlier the foot pads

20  appear higher than the center, at least on the --

21        THE WITNESS:  On the accused products.

22        THE COURT:  -- on the accused products.

23        THE WITNESS:  Right.

24        THE COURT:  And you just said there are raised foot

25  pads in these patents.  Are you referring to the grooves on

**Gandy - cross by Sturm**

1  the foot pads?

2          THE WITNESS:  No, the foot pads themselves are

3  actually raised, and then you have a pattern of ribs on the

4  top surface of the foot pads.

5          THE COURT:  Okay.  Maybe we'll get to that with

6  pictures, side-by-side pictures.

7  BY MS. STURM:

8  Q.  And so you didn't consider any other prior art that had

9  raised foot pads in your analysis; is that correct?

10  A.  That's correct, yeah.

11  Q.  And did you want to just take a look at those?  Let's look

12  at the front view of the '256.

13          So you're --

14          THE COURT:  I see.  I'm sorry to interrupt you.

15          MS. STURM:  No, you're good.

16          THE COURT:  Are you talking about the slightly

17  elevated foot pads as you look at it from the cross -- from

18  the side view?

19          MS. STURM:  Correct.

20          THE COURT:  And that's what your testimony related

21  to.

22          THE WITNESS:  Yeah, yeah, right.

23          THE COURT:  Just want to make sure I understand.

24          THE WITNESS:  I think with the Gyroor products, when

25  I'm referring to the foot pads being raised, the center area

**Gandy - cross by Sturm**

1    is recessed, but not only is the foot pad raised, but the

2    actual pads themselves are also raised --

3              THE COURT:  Okay.

4              THE WITNESS:  -- on those surfaces.

5              THE COURT:  Thanks.  Thanks for clarifying that.

6    BY MS. STURM:

7    Q.  And you would say that the '723 patent has fenders over

8    the wheels; is that correct?

9    A.  Yeah, I don't have the '723 up here.

10             Okay.  Yeah, go ahead.

11   Q.  So you would say that the '723 patent has raised -- sorry,

12   has fenders; is that correct?

13   A.  Yes.

14   Q.  And the same for the '256; is that correct?

15   A.  Yes.

16   Q.  Are you aware of any prior art patents that have fenders?

17   A.  Other than what's showed disclosed in the '906, I haven't

18   looked -- I mean, as far as my -- what I was retained for

19   here, I have not done any searching to see whether there's

20   other prior art patents out there that may have this.  I'm

21   just looking at what was presented to me and the '906 prior

22   art.

23   Q.  So you would say that none of the prior art patents that

24   were cited on the face of both the '256 and the '723, none of

25   those patents had fenders; is that correct?

**Gandy - cross by Sturm**

1  A.  I'd have to look at them again.  I couldn't recall right

2  offhand whether they did or not.

3          Okay.  Actually, the '991 does, the D 647,991.

4  Q.  And you could tell that from a perspective view?

5  A.  Sure.

6  Q.  And would you say that the '723 patent has lights on the

7  front -- or what we could say is the front of -- front figure

8  of the patent?  I think it's Figure 6 -- yeah, if you want to

9  go -- sorry.

10 A.  Does it have lights on it?

11 Q.  Yes.

12 A.  Yeah.  Yes.

13 Q.  And you would say the same for the '256?

14 A.  If you can pull it up.

15         Okay.  Yeah.

16 Q.  And, again, are you aware of any prior art patents with

17 lights, including lights on them?

18 A.  Not that I'm aware of.

19 Q.  And did you consider the '857 patent in your analysis,

20 defendants' patent?

21 A.  No.  No, I didn't.

22 Q.  And did you consider any other later-filed patents in your

23 analysis?

24 A.  No.

25 Q.  So do you agree that later-filed patents are irrelevant to

Gandy - cross by Sturm

1    your infringement analysis?

2    A.   Later-filed patents, you mean after the issue date of

3    the '256 and the '723?

4    Q.   That's correct.

5    A.   Well, they wouldn't be considered prior art to theirs.

6    Q.   So in a sense, they wouldn't be relevant to your

7    infringement analysis; is that correct?

8    A.   I would have to say that's correct because they wouldn't

9    be prior art.

10   Q.   You're aware that defendants have engaged multiple

11   infringement experts in this case, correct?

12   A.   You mean multiple cases?

13   Q.   No, in this case, are you aware that -- or you are aware

14   that defendants have engaged multiple infringement experts,

15   correct?

16   A.   Yes, I am.  I'm sorry, I didn't quite understand what you

17   were asking.  Yes, I am.

18   Q.   All right.  And you were not aware of that prior to your

19   deposition of October 2022 earlier, correct, when --

20   A.   That's right.  I -- I know that they have another expert,

21   but I've never had any contact with that person.

22   Q.   Correct.  And just to clarify, that was plaintiffs'

23   deposition of you in October of 2022 that you first learned of

24   the other expert defendants have retained?

25   A.   I think I knew that they had one, but, like I say, I've

**Gandy - cross by Sturm**

1    never had any contact with him.  I've never discussed him with

2    the attorneys for the defendant.

3              MS. STURM:  I would like to admit into evidence the

4    deposition transcript from October 26, 2022, as Plaintiffs'

5    Exhibit 4.

6              THE COURT:  Any objection?

7              MR. CHENG:  No objections.

8              THE COURT:  Admitted.  Admitted without objection.

9      (Plaintiffs' Exhibit No. 4 was received in evidence.)

10        (Document tendered to the Court.)

11             THE COURT:  Thank you.

12   BY MS. STURM:

13   Q.  So if you could please turn to page 16, line 16.

14   A.  Page 16, line 16?

15   Q.  That's correct.

16   A.  Okay.

17   Q.  And when asked if you knew whether defendants had retained

18   any other experts in this case, you testified that:  "I'm not

19   aware of that"?

20   A.  I said that.

21   Q.  "I have not been told that."  Is that correct?

22   A.  That may be the case.  I just don't remember.  I thought I

23   had learned about it before then.  Maybe it was after that.

24   Q.  So you have not reviewed any expert reports from

25   defendants' other expert; is that correct?

**Gandy - cross by Sturm**

1  A.  No, I have not.  As I said, I've had no contact.  I've

2  never seen anything from the other expert.

3  Q.  So you were previously testifying up here that the foot

4  pads make the most impression of -- have the most -- the foot

5  pads have more of an impact on the overall visual impression;

6  is that correct?

7        Let me rephrase that.  Sorry.

8        When you said -- you had previously testified that

9  the foot pads make more of an impression on the overall visual

10  appearance of the hoverboards; is that correct?

11  A.  I said that in light of what the prior art shows with

12  respect to the hourglass, and, again, based on what the CAFC

13  said when you have the prior art shows what would be a

14  dominant feature like the hourglass and it's in the prior art,

15  it becomes more of a background.  So then you have to start

16  looking at other features, and what I said is I think the foot

17  pads then become a very dominant feature.

18  Q.  So you would say that you're looking at these features in

19  isolation; is that correct?

20  A.  No, no.  I'm always looking at them based on the overall

21  appearance.

22        As I indicated earlier when I started out, when I

23  talk about all these individuals, individual features, that's

24  part of the whole analysis from an overall appearance

25  standpoint.  You have to look at all of the features as a

**Gandy - redirect by Cheng**

1   whole.  That's what determines what the overall appearance

2   looks like.

3            MS. STURM:  Thank you, Mr. Gandy.

4            Thank you, your Honor.  I have no further questions.

5            THE COURT:  Any redirect?

6            MR. CHENG:  Yes, your Honor.  Just a few questions.

7            THE COURT:  All right.

8                          REDIRECT EXAMINATION

9   BY MR. CHENG:

10  Q.  One thing I want to clarify, the D '906 patent was filed

11  before the other two patents-in-suit but was granted

12  afterwards.

13           Does that change the fact the D '906 patent is still

14  a prior art to those two patents-in-suit?

15  A.  Yes, having an earlier filing date, so it would be

16  considered prior art.

17  Q.  So '906 is still the prior art?

18  A.  Yes.

19  Q.  And if -- I mean, without looking into other potentially

20  relevant patents, if the two patents, '723 and '256, if they

21  were the first design patent to have foot padding on them, was

22  that idea of adding foot padding protected by those two design

23  patents?

24  A.  Well, the claim to a design patent goes to the overall

25  appearance of design, not to any individual elements.  So, I

1  mean, if you put foot pads, since they were the first ones to

2  put foot pads on a hoverboard, that would be, you know, a

3  potentially new feature on the hoverboard.

4       But the claim again would be directed to the overall

5  appearance of the hoverboard. You don't get protection on

6  individual parts in a design patent.

7  Q.  So the idea of whether or not there is a foot padding

8  added into later products are not protected, we are really

9  looking at the design or the shape or the lines or the figures

10 of those foot paddings?

11 A.  I'm sorry, could you rephrase that?

12 Q.  Sorry.

13      So I guess the design concept of having a foot pad is

14 not protected by the design patent, but really the look, the

15 appearance of those foot padding should be considered --

16 A.  Yes.

17 Q.  -- in infringement analysis?

18 A.  Sure, sure.

19 Q.  And it's the same for whether or not there were lighting

20 added to a later design patent. The idea of having a light to

21 the new patent is not protected. We should really look at the

22 shape or the position or the size of the light instead of the

23 concept of having a light?

24 A.  Yeah, that's right. In those two patents, they had lights

25 on them, but when you've got later filed -- you got later

**Gandy - redirect by Cheng**

1   designs, not necessarily filed for patent, but you have later

2   designs that also may include lights, if those lights have a

3   different appearance, shape to them, then, you know, that

4   would be a difference.

5   Q.  And just to summarize that, can you, in a very plain term,

6   explain the difference between the appearance and the concept,

7   the design concept, which --

8   A.  Well --

9   Q.  Okay.

10  A.  -- you don't get design patents on a concept.  You get

11  design patents on the actual specific shape and appearance to

12  an article of manufacture.

13          So when you're making a reference to design concept,

14  you don't -- design patents don't cover design concepts.  They

15  cover specific shapes and appearance to a new design embodied

16  in an article of manufacture.

17  Q.  And when we're talking about shape and appearance, we're

18  talking about, like, what would constitute as the shapes and

19  appearance?

20  A.  Well, in this instance, if you're claiming as in the two

21  patents basically the overall appearance of the hoverboard,

22  obviously some of the features were in broken lines, but all

23  of the parts that are in full lines were what would be

24  considered the claimed design.

25          So you're looking at patentability based on just that

**Gandy - redirect by Cheng**

148

1   overall appearance, not on any individual elements.  Same with

2   respect to infringement.

3          MR. CHENG:  Thank you, your Honor.

4          Thank you, Mr. Gandy.  No further questions.

5          THE COURT:  Any additional cross-examination based on

6   the last questions?

7          MS. STURM:  No, your Honor.

8          THE COURT:  All right, sir, you're excused.  Thank

9   you.

10         THE WITNESS:  Thank you.

11         THE COURT:  Okay.  What do we have left on witnesses,

12  and can we finish them today?

13         MR. LOMUSCIO:  We have Mr. Bero, your Honor.

14         THE COURT:  All right.  And he's where, in Wisconsin?

15         MR. LOMUSCIO:  He's in Wisconsin.  He's available

16  remotely.

17         THE COURT:  And where is your -- you have another

18  witness, too, correct?

19         MR. CHENG:  Oh, no, your Honor.

20         THE COURT:  You're not.

21         MR. CHENG:  Mr. Rake was scheduled next week.

22         THE COURT:  Okay.

23         MR. YAO:  Is scheduled next week.

24         THE COURT:  Okay.  Mr. Rake is your other -- why

25  don't you sit down so you're in front of the mic.

**Gandy - redirect by Cheng**

1          What is he going to testify to?

2          MR. CHENG:  He's going to testify to the

3     non-infringement nature of the products.

4          THE COURT:  Okay.  All right.  And he's going to

5     testify remotely or come into court?

6          MR. CHENG:  He's going to come to the court.

7          THE COURT:  All right.  Where is he from?

8          MR. CHENG:  He's based in Kentucky?

9          THE COURT:  All right.

10          MR. CHENG:  Sorry, Kansas.

11          THE COURT:  That's fine then.  Let's hear from the

12     remote witness now.

13          How long do you expect his direct examination to be?

14          MR. LOMUSCIO:  Twenty minutes, your Honor.

15          THE COURT:  Oh, good.  Let's -- why don't we take a

16     ten-minute break right now so we can get him set up, but we'll

17     take a ten-minute break.

18          MR. LOMUSCIO:  Thank you, your Honor.

19          MR. CHENG:  Thank you, your Honor.

20       (Recess from 3:04 to 3:13 p.m.)

21          THE COURT:  All right.  Looks like -- we're off the

22     record.

23       (Discussion held off the record.)

24          THE COURT:  We can go back on the record, and please

25     call your next witness.

**Bero - direct by Lomuscio**

1          MR. LOMUSCIO:  Plaintiffs call Richard Bero.

2          THE COURT:  Okay.  Mr. Bero, can you hear me?

3          THE WITNESS:  Yes, I can.

4          THE COURT:  You're on mute.  I can't hear you.

5          THE WITNESS:  Can you hear me?  I can hear you.

6          THE COURT:  All right.  We can hear you, too.  You

7    have to speak up a little, but we can hear you.

8          Please swear in the witness.

9     (Witness sworn.)

10          MR. LOMUSCIO:  May I proceed, your Honor?

11          THE COURT:  You may.

12          RICHARD BERO, PLAINTIFFS' WITNESS, DULY SWORN,

13                    DIRECT EXAMINATION

14    BY MR. LOMUSCIO:

15    Q.  Good afternoon, Mr. Bero.  Could you please introduce

16    yourself for the record.

17    A.  Sure.  My name is Richard Bero, and I have a company

18    called The Bero Group, and we provide financial and damages

19    and valuation services, generally speaking.

20          THE COURT:  Is there a way to up the volume here?

21          MR. YAO:  It's tough for us to hear.

22          THE COURT:  We're going to try it from our end,

23    Mr. Bero.  Maybe you just have to speak up, but see if we can

24    raise the volume at our end here.

25          THE WITNESS:  How about now, is that okay?

**Bero - direct by Lomuscio**

1          THE COURT:  A little better.

2          THE WITNESS:  Can you hear me?

3          THE COURT:  I think you're right though.  It's only

4    going through the TV and not through the court mics.  Why

5    don't you say your name again?  Let's see if it gets any

6    louder.

7          THE WITNESS:  My name is Richard Bero.

8          THE COURT:  All right.  That's as good as we're going

9    to get.  I think everyone just needs to listen carefully.  So

10   go ahead.

11   BY MR. LOMUSCIO:

12   Q.  Mr. Bero, what type of company do you work for?

13   A.  I have a company called The Bero Group, and we provide

14   litigation consulting, financial valuation types of services

15   in cases such as this one.

16   Q.  And so have you testified in patent cases before?

17   A.  Yeah.  I've testified on probably close to a hundred

18   patent cases.

19   Q.  And who retained you for this case?

20   A.  I was retained initially on behalf of the plaintiffs by a

21   law firm by the name of Loeb & Loeb.

22   Q.  Who are the plaintiffs?  When I say retained, who are the

23   plaintiffs who are the plaintiffs in this case?

24   A.  Hangzhou Chic.

25   Q.  And were you also retained by Unicorn Global?

**Bero - direct by Lomuscio**

1   A.   Correct, correct.

2   Q.   And what is Hangzhou Chic?

3   A.   So my understanding of Hangzhou Chic is it's a

4   manufacturer and developer of hoverboards and hoverboard

5   technology and has 400-plus patents and so forth on

6   hoverboards.

7   Q.   And what is your understanding of Unicorn?

8   A.   Unicorn, as I understand, is an exclusive licensee of

9   Hangzhou Chic for sales and distribution of hoverboards in the

10  United States.

11  Q.   And you'd testified earlier you've done work in patent

12  cases.  What is the value in your experience of having a

13  patent?

14  A.   Well, just generally speaking, the value, it can take form

15  in lots of different fashions certainly, but it essentially

16  provides a monopoly, a patent owner has a monopoly over that

17  particular technology, that particular patent to disallow

18  others from using it in the marketplace.

19  Q.   Does a patent holder also have the ability to license that

20  patent?

21  A.   Certainly, yes.

22  Q.   What is the impact of infringement on the value of a

23  patent?

24  A.   Well, again, it depends on the facts and circumstances of

25  the type of infringement, but when you have, as we have here,

**Bero - direct by Lomuscio**

1  direct competitors, it tends to diminish the value of that

2  particular patent, and it can take -- it can take shape in a

3  variety of different forms.  It can take shape in the form of

4  lost royalties, lost sales, lost profits, additional pricing

5  pressure that otherwise wouldn't exist.

6        You know, it really can -- you know, again, it

7  depends on the facts and the circumstances of the particular

8  patent and type of infringement and relationship between the

9  patent owner and the infringer.

10 Q.  And did you provide, in connection with the pending

11 preliminary injunction motion, a declaration?

12 A.  Yes, I did.  I've prepared a number of declarations in

13 this matter.

14 Q.  And focusing on the most recent declaration that you

15 prepared, did you provide any opinions in that declaration?

16 A.  Yes.  Essentially, I provided two what I would describe as

17 high-level opinions, and one has to do with the issue of

18 nexus, the causal nexus, and the other one has to do with the

19 issue of irreparable harm.

20 Q.  And focusing on the causal nexus point first, what did you

21 conclude based upon your analysis as to the causal nexus in

22 this particular case?

23 A.  Well, I concluded based on -- I was asked to look at two

24 issues.  One is the issue of direct competition, and the other

25 was the issue of commercial success.  My understanding is that

1   to the extent those exist in a case, that tends to suggest a

2   more likely causal connection between the infringement and

3   the -- and the demand for the patented products, or

4   vice-versa, I guess I should say.

5        And so essentially at a high level, those are the two

6   issues I looked at with regard to the causal nexus.

7   Q.  And so with regard to competition, who are the competitors

8   you reviewed in connection with this particular case?

9   A.  Well, it's Hangzhou Chic, but as I understand it, Unicorn

10  Global is the primary U.S. distributor, as the exclusive

11  licensee of products in the U.S., but Hangzhou Chic certainly

12  has sold products into the U.S. as well.

13       So on the one hand, you have those two parties that

14  are selling the patented products, the plaintiffs' products;

15  and then on the other hand, you have the accused infringers in

16  this case.  My understanding, I know we went through it

17  earlier today the list of the entities, but we've been

18  referring to those entities as the Gyroor defendants and their

19  products.

20  Q.  And what are the products that plaintiffs Hangzhou Chic

21  and Unicorn and the defendants, the Gyroor defendants, what

22  products do they compete with regard to?

23  A.  Well, as I indicated, certainly the hoverboards, and

24  we've -- I think your Honor mentioned it right in the opening,

25  we have direct competitors, and that's my understanding and

**Bero - direct by Lomuscio**

1    that's what I've seen from the information on the plaintiffs'

2    side in declarations they've provided sort of the approach

3    they've taken in this case and being concerned about the

4    alleged infringement that's taken place.

5          And then we also see that the companies are selling

6    through similar kinds of distribution and primarily on that

7    note, selling through Amazon.  And the majority of the sales,

8    as I understand it again, that the defendants have been

9    selling through is online and largely Amazon, which is also

10   where the plaintiffs sell their products.

11   Q.  And in terms of looking and determining the existence of

12   competition between the parties, what did you analyze with

13   regard to that?

14   A.  Well, certainly, you know, I've reviewed the legal

15   filings, and it's evident that -- and part of those

16   declarations of -- there are a couple of different

17   declarations of some of the Unicorn people.  I believe there

18   are -- and, again, the names changed over time, but the focus

19   was or the declarations were that these companies compete with

20   each other.

21         That's part of the information.  I've looked at

22   websites.  I'm not a technical expert, so I don't know what

23   infringes versus doesn't infringe, but I understand some of

24   the products that are accused of infringement.  Both companies

25   sell hoverboards, and Hangzhou Chic is one of the largest

**Bero - direct by Lomuscio**

1   market participants selling hoverboards in the United States.

2   Q.  With regard to your declaration, you also said you looked

3   at commercial success.  What does that mean?

4   A.  Well, commercial success is -- I suppose it's somewhat of

5   a vague term, but what we look at in patent cases, we look at

6   it, there's different ways to look at it, but, you know,

7   generally speaking if a product is selling and it's successful

8   in the market, that would demonstrate commercial success.

9   That would certainly indicate commercial success.

10  Q.  And with regard to the sales in this case, did you see an

11  indication of commercial success with regard to the patented

12  products?

13  A.  Certainly.  The data that we have was leading up to I

14  believe the -- there were different hearings and so forth and

15  injunction hearings and so forth as I understand.

16          Initially, we looked at data that went up from 2019

17  through September of 2020, so a little less than two years.

18  And during that period of time, Hangzhou and Unicorn sold I

19  believe it was 230,000 hoverboards, and they were selling --

20  they sold over $50 million worth of hoverboards, which in and

21  of itself -- patented hoverboards, I should say, what I

22  understand to be patented hoverboards.

23          So there alone, that's certainly an indication that

24  these products have been commercially successful.

25  Q.  And based upon your analysis of both the competitive

**Bero - direct by Lomuscio**

1  elements and the commercial elements, what was your first

2  opinion with regard to the patented products in this case?

3  A.  Well, again, it's my understanding that an indication of

4  direct competition, such as we have here, and commercial

5  success, such as what we have here, is an indicator of the

6  nexus and -- the causal nexus.  And so looking at it through

7  that lens, that has certainly been the case.

8  Q.  And you testified earlier that you provided a second

9  opinion with regard to the declaration provided in this case.

10  What was that second opinion?

11  A.  Yeah, the second opinion has to do with whether there is

12  likely irreparable harm.  And, you know, given what I've seen

13  and what I'm aware of, which is, quite frankly, some limited

14  information that's based on what the defendants have produced

15  or haven't produced, provided, that's not for me to determine

16  whether that's proper or not certainly, but it would appear

17  based on the limited information I have that irreparable harm

18  is likely.

19  Q.  And what, in coming to that conclusion, what did you focus

20  on in connection with your analysis?

21  A.  Well, it really boils down to one piece of information.

22  One of the things that I would like to look at is the number

23  of sales that the defendants have made of the accused products

24  and how much money it was making and so forth and really kind

25  of work our way towards a damages analysis and get in

**Bero - direct by Lomuscio**

1    effect -- a sense for the effect in the market from a

2    quantitative perspective.

3         We don't have that in this case.  Obviously it's

4    early from that sort of a viewpoint.  But one of the pieces of

5    information I thought was telling and really underlies this is

6    a few weeks before the August 2021 hearing, the Gyroor US

7    defendants indicated, somebody had -- I believe had a

8    declaration or maybe it was in the motion, but said that they

9    were going to go out of business by the end of the month,

10   which was August of 2021, if the protective order or the

11   injunction, excuse me, was not dissolved, and that suggested a

12   couple of things to me.

13        First of all, based on the other available

14   information, which is the amount of frozen assets that was

15   provided to the plaintiffs through -- by Amazon, Gyroor USA

16   was far and away the largest or had the largest amount of

17   frozen assets.

18        And then if they were so dependent on these products,

19   that suggests that there's not much else they are selling,

20   which calls into question whether or not they have a solid

21   foundation, financial foundation.  And to the extent they

22   don't have a solid financial foundation, that calls into

23   question whether or not they'd be able to pay, capable of

24   paying any damages to the extent we went that far, we got that

25   far in this particular case.

**Bero - cross by Yao**

1          And if you can establish damages but you can't

2    collect damages as a plaintiff, then you're certainly going to

3    be irreparably harmed.

4          MR. LOMUSCIO:  Nothing further, your Honor.

5          THE COURT:  All right.  Cross-examination.

6          MR. YAO:  Yes, your Honor.

7                        CROSS-EXAMINATION

8    BY MR. YAO:

9    Q.   Good afternoon, Mr. Bero.

10   A.   Good afternoon.

11   Q.   Okay.  So first question, so you indicated in your report

12   that there needs to be a casual nexus in addition to

13   irreparable harm for an injunction, correct?

14   A.   I'm not sure I followed that.

15   Q.   Okay.  Let's start with in your report, you wrote that

16   there appears to be some casual nexus between the '723

17   and '256 patents and the demand for the patented products,

18   correct?

19   A.   Yeah, yeah.  It's causal nexus.

20   Q.   Causal.

21   A.   Correct, rather than casual.  Yes.

22   Q.   And you just testified earlier that direct competition

23   between competitors suggests causal connection as well,

24   correct?

25   A.   That's an indicator as I understand it, which makes sense.

1    That's one of the indicators, yes.

2    Q.   Okay.  In your -- in your expert report on page 21, I

3    would say paragraph 85, you give examples of what the Federal

4    Circuit indicates for a causal nexus.

5         So, first, let's take a look at you quoted:  Evidence

6    that a patented feature is one of several features that cause

7    consumers to make their purchasing decisions; second, evidence

8    that inclusion of a patented feature makes a product

9    significantly more desirable; and, third, evidence that the

10   absence of a patented feature would make a product

11   significantly less desirable.

12        Do you remember writing those?

13   A.   Yes.

14   Q.   So, however, in your report, have you included any

15   evidence of any patented feature that causes consumer to make

16   their purchasing decisions?

17   A.   Are you referring to the first bullet point, cause

18   consumers to make their purchasing decisions?

19   Q.   Yes.

20   A.   I have not analyzed that, no.

21   Q.   Have you included evidence that the inclusion of a

22   patented feature makes a product significantly more desirable?

23   A.   I've referenced somewhere in my report, and I haven't

24   analyzed that issue specifically with regard to all the

25   features and competition, but I would note that somewhere in

**Bero - cross by Yao**

1    my report, I address one of the -- one of the declarations

2    that plaintiffs presented were that the designs were

3    revolutionary, which certainly -- now, I haven't gone out to,

4    set out to establish that or prove that, but certainly to the

5    extent that's the case, then that would certainly fit that

6    bullet point there.

7    Q.   But the information you provided in this report of

8    patentable feature that you just described, those were

9    provided by plaintiffs, correct?

10   A.   I'm sorry, I'm not sure I followed that.

11   Q.   So in your report, you just described that you might have

12   talked about evidence of the inclusion of a patented feature

13   that makes a product significantly more desirable, you just

14   indicated that your report might have referenced that.

15         Are those information based on what plaintiffs have

16   given you?

17   A.   That information I referenced?  Yeah, that comes from, I

18   believe, a declaration.  I can't remember the name of the

19   individual.  I think it's spelled C-I-U is the last name, but,

20   yes, that -- and as I said, I didn't set out to establish that

21   particular bullet point, if you will.

22   Q.   Well, have you done your own independent analysis?

23   A.   That's what's contained in my -- my declaration, yes.  As

24   I said, I -- I analyzed, I was asked to analyze the issue of

25   direct competition and commercial success as it relates to

1    this issue, this nexus issue.

2    Q.   So --

3    A.   That's what I was asked, that's what I analyzed.

4    Q.   So is it your opinion that direct competition between

5    different businesses would essentially mean that there is some

6    causal nexus that would be established, that all we need is

7    direct competition?

8    A.   No, that's -- that's not my opinion.  As I said, as I say

9    in my report, if you look at paragraph 86, I understand it

10   considers these issues and I understand the nexus considers

11   the issue of whether there is direct competition and whether

12   the patented products have had commercial success.  I have

13   been asked to address these two issues.

14   Q.   So let's take a look at direct competition.

15          In your report, in that section, you wrote -- you

16   indicate that plaintiffs are one of the biggest competitors in

17   the hoverboard market, which is a competitive market.  That's

18   on paragraph 88.  And on paragraph 90, you also indicated that

19   Unicorn considered Gyroor defendants to be direct competitors

20   in the U.S. hoverboard market, correct?

21   A.   Correct.

22   Q.   Are there -- are there any data to support that, that

23   would support the notion that Unicorn considers Gyroor

24   defendants to be direct competitors in the U.S. market?

25   A.   Is there data?

**Bero - cross by Yao**

1    Q.   Yes.  Is there data?

2    A.   Yeah.  I mean, this whole case is about -- this whole case

3    is about the defendants offering these accused products for

4    sale through Amazon and through various online websites, which

5    are hoverboards, and that's not -- that's not complicated.

6    That's pretty obvious.

7             And we know the plaintiffs also sell these similar

8    types of hoverboards.  So I think it's very obvious that

9    they're direct competitors.

10   Q.   Are you aware that there are also other direct competitors

11   in this hoverboard market?

12   A.   Absolutely.

13   Q.   So how would that affect your -- your opinion or analysis,

14   knowing that there are other competitors, direct competitors,

15   out there in the market?

16   A.   It doesn't -- it doesn't matter.  I mean, the fact is

17   these two companies sell similar looking hoverboards and

18   they're direct competitors.  There may be other competitors as

19   well, but when we're looking at the issue of direct

20   competition, I mean, it's pretty obvious, I think.

21   Q.   Well, are you aware that there are other substitute

22   products in the market as well?

23   A.   I'm aware there's other hoverboard products, certainly.  I

24   haven't made any attempt at this point to analyze all the

25   different hoverboards that are available and, you know, the

1  different features and so forth and so on.

2        I do note in here some of the market data which

3  indicates some of the bigger competitors in the market.

4  Q.  So in your -- you also indicated, let's go to the

5  commercial success portion.  You indicated that on

6  paragraph -- on paragraph 98, you indicated that from

7  September 2020 through approximately August 2021 -- sorry --

8  2021, I understand Unicorn's monthly sales of patented

9  hoverboards were approximately 50 percent less than they were

10  in comparable months in 2019 and 2020.

11        Do you have any data of most recent sales or, I'm

12  sorry, do you have any most recent data?

13  A.  I don't have any other -- any subsequent data from

14  plaintiffs, and as I noted before, I don't have any of the

15  defendants' data.  It hasn't been provided.

16  Q.  So you didn't include any most recent data in this -- in

17  this third supplemental report for plaintiffs' motion for a

18  preliminary injunction, correct?

19  A.  Right.  That took us up to I believe it was the -- there

20  was a hearing in August of 2021, but I don't have any updated

21  data since then.

22  Q.  So you don't have any data of commercial success of this

23  year, 2022, correct?

24  A.  I don't have any sales data in 2022, that's correct.

25  Q.  So you only include sales data of 2019 in this report,

**Bero - cross by Yao**

1   correct?

2   A.   No.  I have sales data from 2019 up through September of

3   2020, and just those periods, as I indicated, are over 50

4   million in sales.

5          And my understanding is that after that period of

6   time, the monthly sales dropped, and it had to do with the

7   function of a couple of different factors.  One was there was

8   a big sales bump due to COVID in 2020 that diminished sales,

9   and subsequent to September of 2020, it was experienced not

10  only by the plaintiffs but by other large manufacturers of

11  hoverboards.

12         There were some -- part of that was issues associated

13  with supply chain, trying to get parts, as we all know that

14  that was a challenge.

15         And then plaintiffs also believe, I can't speak to

16  this, but they believe that the defendants' sales were cutting

17  into their own sales.

18  Q.   So you're basically basing off of what plaintiffs have

19  told you at least for they have less -- approximately less

20  than 50 percent of the sales of 2020 and 2021 without any

21  actual data that you received from plaintiffs, correct?

22  A.   No, I -- no, your question didn't make sense.  It's not

23  consistent with what I've just said.  Their sales based on

24  information that maybe help -- based on information the

25  plaintiffs told me or provided to me, I believe it was again

**Bero - cross by Yao**

1   in a declaration, is that after September of 2020 for the next

2   year approximately, their sales were about half of what they

3   were during the previous 12-month period.

4   Q.  And in your report, you haven't established any exclusive

5   market share for plaintiffs, correct?

6   A.  I don't know what you mean by exclusive market share.  I

7   talk about the issue of market share in the hoverboard market

8   broadly in my report, but I'm not -- I don't know what you

9   mean by exclusive market share.

10   Q.  Well, let me interface it.  Do you think the plaintiffs

11   own the majority of the market share in the hoverboard market?

12   A.  No.

13   Q.  Even with the sales --

14   A.  Just to be clear, just to be clear, when I'm answering

15   these questions, I'm focusing only on the U.S. market.

16   Q.  Yes.  I'm also only focusing on the U.S. market as well.

17         But even after you've seen all the data and sales

18   report of -- provided to you by plaintiffs, that's your

19   opinion, that the plaintiffs did not hold a good amount or a

20   substantial amount of market share in the hoverboard market?

21   A.  That's not correct.  As I talk about in my report, I

22   looked at -- there was, I believe, a market share study that I

23   refer to which indicated that Hangzhou Chic had I believe it

24   was 5 or 6 percent of the hoverboard market.

25         But it also indicated that the entire hoverboard

1   market, and I believe that was in 2019, was a little over a

2   million units, and we know from the data that Hangzhou Chic

3   had sold I believe it was 230 million, it's in my report,

4   but -- or my declaration, I should say -- but based on the

5   unit data that I had, that would indicate that Hangzhou Chic

6   actually had approximately 19 or 20 percent of the market.

7          So certainly that's a significant part of the market,

8   but, again, we don't -- we don't have all the data certainly

9   at this point on market share.

10  Q.  But based on the data you've seen that was provided by

11  plaintiffs and you also cited I believe it's other competitors

12  such as Segway and other competitors in the market and as well

13  as defendants' data, is it your opinion that plaintiff has,

14  not a majority, but has a good amount of market share in the

15  U.S. hoverboard market?

16  A.  It would appear that they have a nice chunk of the market.

17  It's not entirely clear to me at this point anyway what

18  exactly that market share percentage is.

19  Q.  In your report, have you discussed any indication of price

20  erosion?

21  A.  I note it's one of the forms of damages that are

22  potentially available in patent cases, but I'm not -- not

23  suggesting that there is.  I haven't done that kind of an

24  analysis.

25          My understanding is the plaintiffs believe defendants

1    may have been undercutting their prices, but I have not -- I

2    don't have an opinion on that.  I have not studied that.

3    Q.  So you have no opinion as to whether there are price

4    erosion in this case, correct?

5    A.  That's correct.

6    Q.  All right.  Let's go back to the market share topic.

7           Based on the data that plaintiffs provide to you,

8    they said -- they indicated that they lost approximately

9    50 percent of sales in 2020 and 2021.  Would that have any

10   effect as to their market share?

11   A.  So what you stated at the beginning of that question was

12   not correct.  I didn't say they lost 50 percent of their sales

13   in '20 and '21.

14          They said that from September of 2020 through August

15   of 2021, their sales had dropped about 50 percent.  So for

16   that one-year period, their sales were lower by 50 percent.

17   Q.  Well --

18   A.  And then the next part of your question was related to

19   market share, does that indicate their market share was lower.

20   And as I said before, I don't know all the market share data,

21   but the plaintiffs believe, from discussing with other

22   hoverboard manufacturers or gathering information in the

23   market, is that the entire market dropped in late 2020 and

24   through at least August of 2021, relative to the preceding

25   12-month period, and there's two primary reasons.

1       One is the period leading up to that timeframe, there

2  was -- there was a run on, if you will, a lot of people were

3  buying hoverboards.  As we know, you know, COVID caused lots

4  of people to, you know, spend more time outside and whatever.

5  So that inflated their sales during that period over and above

6  what they had projected and expected.

7       But then on the flip side that you're now measuring

8  against -- in the subsequent time period, you're now measuring

9  against the higher bar that they didn't expect in the first

10  place.  So the belief was that those sales in 2020 had --

11  basically were sales they otherwise would have made later.

12  And so that's why their later sales were lower.  In part, that

13  along with the supply chain issues that I mentioned, and as I

14  also indicated, they thought that defendants had taken some of

15  their sales.

16       But, you know, again, I can't -- I can't establish

17  that.  I can't prove that.  I haven't done that type of an

18  analysis yet.

19  Q.  So as you indicated in your resumé that you're a CPA.

20  Based on -- and you have seen sales data provided by

21  plaintiffs in the previous years, and based on your projection

22  and your expertise as a CPA, would you consider that the loss

23  of -- if there is any loss of market share, that's due to many

24  different reasons, such as the COVID-19 pandemic, supply chain

25  issues, and that the defendants alleged infringing activity

**Bero - cross by Yao**

1  has no bearing or effect on the market share?

2  A.  I'm not really sure I followed that question because it

3  didn't make an awful lot of sense.  So you can either try

4  again, or I can try to answer what I understand you maybe were

5  trying to ask.

6  Q.  I'll rephrase that.

7          So since plaintiffs said that they believed that, you

8  know, they lost or they might have lost approximately

9  50 percent sales between 2020 and 2021, and that could be

10  contributed to a lot of factors, such as COVID-19 pandemic,

11  supply chain issues and other factors that's just out of

12  control, and based on your expertise as a Certified Public

13  Accountant, and you've seen sales data provided to you by

14  plaintiffs of their previous years' sales data given -- but

15  you haven't seen as of right now, correct?  You haven't seen

16  any data as of 2021 or 2022?

17  A.  Correct.  That's correct.  I haven't seen that data.

18  Q.  So is it your -- based on just your expert opinion as a

19  Certified Public Accountant that the approximate loss of sales

20  is due to many contributing factors, which defendants' alleged

21  infringing activities in this case might not even have any

22  effect on the approximate loss of sales?

23  A.  Just -- I need to be clear.  I'm not -- the plaintiffs

24  aren't claiming -- I'm not claiming, I'm not suggesting that

25  these are lost sales, that 50 percent isn't intended to

1    indicate they lost those sales.

2           So I'm not -- I'm not claiming those are lost sales,

3    and I hope that's really clear in my declaration.  I haven't

4    quantified that kind of a damages-type analysis.

5           But there are factors that I just -- we've just been

6    talking about that are reasons those sales were lower for that

7    late 2020 and nine months or eight months in 2021 period

8    compared to the preceding 12 months.

9           And, yeah, there are a variety of factors certainly

10   that would play into that.

11   Q.  So it is possible that defendants' alleged infringing

12   activities in this case have no effect whatsoever on the

13   approximate lower sales of the plaintiffs' products?

14   A.  You keep talking about the lower sales.  A damage case

15   typically, and certainly in a patent case, it's not about

16   lower sales.  That might indicate, be an indicator, but it's

17   about lost sales due to the infringement, and I haven't

18   quantified what those lost sales are.

19          I have an example in here suggesting that if you

20   simply used a market share approach to the damages, which we

21   oftentimes do in patent cases, at least 5 or 6 percent or

22   whatever their market share would be reasonably attributable

23   of those sales would be reasonably attributable to the

24   plaintiffs.

25          But that's not intended to be a damages analysis or a

Case: 1:20-cv-04806 Document #: 620 Filed: 12/07/22 Page 172 of 180 PageID #:15691
**Bero - cross by Yao**
172

1    claim that they've lost sales or certainly a quantification of

2    lost sales because, quite frankly, as I've said, I don't have

3    the information.  I don't know what the defendants have sold

4    because that information hasn't been -- hasn't been produced.

5    Q.  Well, let's go to the point where you indicated in your

6    declaration, I believe it's on --

7           THE COURT:  How much more do you have on cross?

8           MR. YAO:  I would say, like, ten minutes max.

9           THE COURT:  All right.

10   BY MR. YAO:

11   Q.  Let's take a look at page 28 of your declaration,

12   paragraph -- paragraph 118 to 120.

13          You indicated that Gyroor defendants claimed that

14   more than 1 million of the U.S. account have been frozen as a

15   result of the preliminary injunction and that they claim that

16   the defendants would go out of business if an injunction was

17   not dissolved, meaning that you believed that the Gyroor US

18   defendants would be insolvent, correct?

19   A.  I didn't necessarily believe they would be insolvent.

20   Q.  That they don't have the ability to pay damages, correct,

21   meaning that --

22   A.  That's certainly an indicator that -- that there's a

23   question there that if they're suggesting they're going to

24   have to go out of business if they don't get an injunction,

25   that tells me a couple things.

**Bero - cross by Yao**

1          It tells me they're heavily reliant or entirely

2   reliant on these products that we're talking about, and if

3   that's the case, then they have limited resources to be able

4   to pay damages in the event that plaintiffs are able to -- or

5   would be able to subsequently prove damages.

6          It's a limited amount of information, but that -- I'm

7   not saying they're being insolvent, but I'm saying that the

8   limited information is they're dependent on these products,

9   and without them, there's nothing else to the -- to the

10  business or limited or else maybe they have other products

11  they're losing money on.  That could be true.  It could be as

12  well.  I just don't know.

13  Q.  Well, as you are aware, as you are aware that you were

14  here since the morning during the opening statements for both

15  parties, you heard that Gyroor US and the other Gyroor

16  defendants are still currently in this case, meaning they are

17  not insolvent or go bankrupt.

18         Would that -- since the fact that they are not

19  insolvent or go bankrupt, does that change your position

20  that -- that they might -- they might not be able to pay any

21  damages?

22  A.  Not necessarily.  It could indicate that they have some

23  sort of funding and access to cash that -- but we don't know

24  if they've just been shut down or if they haven't been -- we

25  don't know if they're owned by -- I don't know if they're all

**Bero - cross by Yao**

1  owned by the same company or entity or entities.

2       But, you know, if you have a company that's a

3  defendant and they're going to go out of business in a short

4  period of time if they can't sell the allegedly infringing

5  products, that doesn't bode well for a plaintiff being able to

6  collect on damages.

7       They may have some other -- they may have -- I mean,

8  there's a lot of different explanations for how they're paying

9  for this -- you know, these ongoing legal issues, but that

10  doesn't necessarily mean it's the company that's paying.

11  Q.  But that does indicate that compensatory damages are --

12  are available in this case instead of a drastic remedy of

13  preliminary injunction, correct?

14  A.  Well, I'm looking at it from an irreparable harm issue.

15  I'm not looking at the whole, you know, all these issues.  I

16  know there are a lot of issues to resolve, but, you know, if

17  you have -- if you have an entity that is -- owns all of these

18  entities, I don't know, but if you do, you have an entity

19  that -- or a partial owner in some of these entities that's

20  willing to fund litigation costs until the case gets resolved,

21  they don't necessarily have to -- they don't necessarily --

22  they're not in a position necessarily where they have to pay

23  if the -- if there are damages awarded against the defendant.

24       I mean, it's a legal corporate structure kind of

25  issue.  And as I said in my deposition, I brought this point

**Bero - cross by Yao**

1    up a couple of years ago in one of my declarations, and I

2    haven't seen any indication that they do have the ability to

3    pay.  And maybe they do, but given the limited data I have, it

4    calls it into question.

5    Q.  So just a few more questions.

6         So let me ask you about third party respondent

7    Gaodeshang-US.

8         Do you know Gaodeshang-US is or, I'm sorry, was a

9    defendant in this case?

10   A.  Which entity?

11   Q.  It's called -- I'll spell it for you --

12   G-A-O-D-E-S-H-A-N-G-US.

13   A.  Is that one of the ones that we -- I don't remember.  I

14   can't remember the name of the entities.

15   Q.  So if this entity has not sold any of the alleged accused

16   products in this case, does that change your analysis?

17   A.  If it hasn't sold any accused products?

18   Q.  Yes.

19   A.  I don't know that it changes my analysis, but I don't know

20   why they'd be -- I mean, there wouldn't be any damages --

21   well, I suppose there could be potential for damages, but

22   probably not significant damages, generally speaking.

23        So if they're out of the case or if they're not

24   selling products and they likely didn't cause any damages,

25   it's not a given, but it would tend to certainly suggest that

1    that's more likely than not, then defendants wouldn't be

2    irreparably harmed by them continuing to sell something that

3    they don't sell in the first place.

4               MR. YAO:  That will be it, your Honor.  Nothing

5    further.

6               THE COURT:  All right.  Any redirect examination?

7               MR. LOMUSCIO:  No, your Honor.

8               THE COURT:  All right, sir, you're excused.  Thank

9    you.

10              All right.  Does the plaintiff have any additional

11   witnesses or evidence to present by way of this hearing?

12              MR. LOMUSCIO:  No, we do not, your Honor.

13              THE COURT:  All right.  Well, I've read all the

14   briefs, many briefs filed, both before and after the Federal

15   Circuit decisions, and we've heard testimony now from several

16   witnesses today.

17              The defendants have another expert they wish to call

18   next week, but that may be unnecessary.

19              A plaintiff seeking a preliminary injunction must

20   establish that he is likely to succeed on the merits, that

21   he's likely to suffer irreparable harm in the absence of

22   preliminary relief, and that the balance of equities tips in

23   his favor, that an injunction is in the public interest.

24              And in reviewing the grant or denial of a preliminary

25   injunction, the Fed Circuit looks, at least on the likelihood

1    of success analysis, they look at the Federal Circuit law.

2              To show a likelihood of success on the merits, a

3    patentee must show that it will likely prove infringement of

4    the asserted claims.  If the defendant raises a substantial

5    question concerning infringement, the preliminary injunction

6    should not issue.  A substantial issue of infringement is

7    raised if the defense or if the defense -- let me rephrase

8    that.

9              If the defendant raises a substantial question

10   concerning infringement, the preliminary injunction should not

11   issue.  Here the patentee has not shown that the infringement

12   defense raised by defendants lacks substantial merit.  So for

13   that reason, because there has been I don't believe on a

14   preponderance standard a finding that there is likelihood of

15   success on the merits by the plaintiff, I'm going to deny the

16   preliminary injunction.

17             I'm going to issue a written opinion to supplement

18   this quick oral ruling, but there's no point having you come

19   into town next week.  There's no point having the defendants

20   bring in another expert witness.  I'm satisfied, having heard

21   the testimony, having seen the actual alleged infringing

22   products, having read the declarations of the experts and

23   heard from -- having heard from three of them, I'm satisfied

24   that an injunction should not issue in this case for the

25   reasons given.

1    I'm going to ask the parties to email to my courtroom

2   deputy all the PowerPoints used today, and on the issue of the

3   proper parties being in the case, I'm going to -- is your

4   motion to clarify, does that sufficiently set forth your

5   position as to the proper parties, or do you wish to

6   supplement it?

7    MR. YAO:  Your Honor, I will have to go back and

8   doublecheck, and we will email the courtroom deputy about the

9   status, and we can go from there.

10    THE COURT:  If you're going to rest on your motion to

11   modify, let her know, and then I'd ask the defendants to

12   respond to it, and I'd give you 14 days to respond.

13    From the time you learn, if that's what they're going

14   to rest on, or if you wish to supplement it, you should do so

15   promptly.  Talk to defense counsel and see -- or plaintiffs'

16   counsel and see what the timeframe can be, but we should

17   resolve that issue before we take the next steps in the case,

18   which I assume is summary judgment briefing.

19    I have no opinion.  My review here is limited to

20   likelihood of success on the merits, and that doesn't prejudge

21   any summary judgment either party could file and certainly

22   doesn't prejudge what a jury may decide if there are fact

23   issues that prevent summary judgment from being granted to

24   whoever seeks it.

25    Any questions by plaintiff?

1           MR. LOMUSCIO:  No, your Honor.

2           THE COURT:  Any questions by defendant?

3           MR. YAO:  No, your Honor.

4           THE COURT:  All right.  I'd like the hoverboards that

5    are up on the bench taken back.  We have a hoverboard in

6    chambers.  I believe it was provided by defendants, but does

7    anyone remember who gave us a hoverboard?

8           MR. CHENG:  Us.

9           THE COURT:  Defendants?  You can retrieve it.  If not

10   today, have your local counsel come over and get it in the

11   next week or so --

12          MR. CHENG:  Okay.

13          THE COURT:  -- from chambers.  You don't have to lug

14   it out today if you don't want to, but it's there if you want

15   it.

16          Okay.  We won't need the actual products.  We've

17   reviewed them.  We don't need those for purposes of issuing a

18   written opinion, which will follow relatively soon.

19          All right.  Once we clarify the issue of parties,

20   then I will ask you for a joint status report.  Once we rule

21   on that clarification, perhaps there's no need to clarify once

22   you've briefed it if there's agreement, but once that has

23   taken place, I need to know what the next steps are:

24   Settlement conference or summary judgment briefing.

25          If it is summary judgment briefing, I need to know --

1  hopefully you can come up with an agreed briefing schedule

2  whether it's one side seeking it, another side not, or whether

3  it's joint summary judgment motions.  Either way, come up with

4  an agreed briefing schedule.

5       If you can't reach an agreement, note your

6  disagreements in an email to my courtroom deputy, and I'll

7  resolve the disagreements and we'll have a briefing schedule

8  on summary judgment, and then we'll proceed from here.

9       Okay.  Last chance, any questions by plaintiff?

10       MR. LOMUSCIO:  No, your Honor.

11       THE COURT:  Any questions by defendant?

12       MR. YAO:  No, your Honor.

13       THE COURT:  All right.  Thank you all for a very

14  interesting presentation and for the witnesses and their time.

15  Thank you all.

16    (Which were all the proceedings heard.)

17                 C E R T I F I C A T E
           We certify that the foregoing is a correct
18  transcript from the record of proceedings in the
    above-entitled matter.

19
           /s/ Kelly M. Fitzgerald
20  _____

21
           /s/ Kathleen M. Fennell          December 3, 2022
22  _____  _____
           Official Court Reporters               Date
23         United States District Court
           Northern District of Illinois
24             Eastern Division

25