UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HANGZHOU CHIC INTELLIGENT TECHNOLOGY CO. and UNICORN GLOBAL, INC., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 20-cv-4806 |
| | ) | |
| v. | ) ) | Judge Thomas M. Durkin Magistrate Judge Jeffrey Cole |
| THE PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE A, | ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

**REPLY MEMORANDUM TO PLAINTIFFS' OPPOSITION TO
DEFENDANT AND THIRD-PARTY RESPONDENTS' MOTION FOR
SUMMARY JUDGEMENT OF NON-INFRINGEMENT**

# TABLE OF CONTENTS

I.       PRELIMINARY STATEMENT .......................................................... 1

II.     RELEVANT FACTS AND PROCEDURAL HISTORY ................................. 2

III.    LEGAL STANDARD .................................................................... 3

IV.    ARGUMENT ............................................................................ 5

   A.  Plaintiffs' Expert Reports Have Been Repeatedly Rejected by the Federal Circuit and This Court ................................................................................ 5

     1.  Plaintiffs' expert reports submitted before the expert discovery cut-off are inadmissible and have been criticized and rejected by the Federal Circuit.......... 5

     2.  Plaintiffs' untimely expert report TO support their renewed motion for Preliminary Injunction has also been rejected by this Court. ..................................... 6

   B.  Plaintiffs' Newly Submitted Expert Declaration Should Be Excluded ................. 7

     1. The newly submitted expert declaration of Paul Hatch is untimely. ...................... 9

     2. Plaintiffs' failure to timely serve the expert report was not substantially justified or harmless. ............................................................................... 11

   C.  It Is Appropriate for the Court to Grant Summary Judgment of Non-infringement As There Is No Genuine Dispute As To Any Material Fact ...................................... 12

     1.  Plaintiffs failed to provide any admissible expert testimony to support their opposition to summary judgment.................................................... 13

     2.  The hypothetical ordinary observer should be a purchaser who is familiar with hoverboards and the prior art designs ............................................... 14

     3.  Small differences between the Patents-in-Suit and Accused Products are likely to be important to the eye of the hypothetical ordinary observer. .......................... 16

     4.  The Accused Products are plainly dissimilar to the claimed designs of the Patents-in-Suit. ............................................................................. 17

     5.  In the light of the D'906 patent, no ordinary observer would think the design of Accused Products is substantially similar to the claimed designs of the Patents-in-Suit. ...........................................................................24

V.      CONCLUSION ........................................................................ 46

i

## TABLE OF AUTHORITIES

Case                                                                                           Page

*ABC Corp. I v. P'ship & Unincorporated Associations Identified on Schedule "A",*
    52 F.4th 934, 943 (Fed. Cir. 2022) ...................................................................5,6

*AFL-CIO v. Doherty,*
    169 F.3d 1068 (7th Cir. 1999) ........................................................................10

*Ammons v. Aramark Unif. Servs., Inc.,*
    368 F.3d 809, 817 (7th Cir.2004) (quoting N.D. Ill. R. 56.1(a)(3)) ...................4

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 248 (1986)...............................................................................3,4

*Bowman v. International Business Mach. Corp,*
    2012 WL 6596933 ...........................................................................................11

*Callpod, Inc. v. GN Netcom, Inc.,*
    703 F. Supp. 2d 815, 823 (N.D. Ill. 2010)........................................................9

*Celotex Corp. v. Catrett,*
    477 U.S. 317, 323 (1986)...............................................................................3,4

*Competitive Edge, Inc. v. Staples, Inc.,*
    763 F. Supp. 2d 997, 1012 (N.D. Ill. 2010) .....................................................17

*Crocs, Inc. v. Int'l Trade Comm'n,*
    598 F.3d 1294, 1303 (Fed. Cir. 2010)..............................................................12

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579, 590–91 (1993)............................................................................4

*David v. Caterpillar, Inc.,*
    324 F.3d 851, 857 (7th Cir. 2003) ...................................................................11

*Egyptian Goddess, Inc. v. Swisa, Inc.,*
    543 F.3d 665, 676 (Fed. Cir. 2008).........................................6,12,13,14,15,16,24

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.,*
    796 F.3d 1312, 1337 (Fed. Cir. 2015)...................................................15,17,18

*Finwall v. City of Chicago,*
    239 F.R.D. 494, 499 (N.D. Ill.)........................................................................9

*FTC v. Bay Area Business Council, Inc.,*
    423 F.3d 627 (7th Cir.2005) ...................................................................8

*Genova v. Kellogg,*
    12 C 3105, 2015 WL 3930351, at \*3 (N.D.Ill. June 25, 2015) ...........................4

*Hammel v. Eau Galle Cheese Factory,*
    407 F.3d 852, 859 (7th Cir.2005) .........................................................12

*Honston v. IVAC Corp.,*
    885 F.2d 1574, 1578 (Fed.Cir.1989)......................................................14

*HR U.S. LLC v. Mizco Intern., In.,*
    2009 WL 890550, \*11–\*13 (E.D. N.Y. 2009)............................................14

*Int'l Rectifier Corp. v. LXYS Corp.,*
    361 F.3d 1363, 1375 (Fed.Cir.2004)......................................................14

*Johnson v. Advocate Health and Hosps. Corp.,*
    892 F.3d 887, 894, 896 (7th Cir. 2018) ...................................................4

*Karum Holdings LLC v. Lowe's Cos., Inc.,*
    No. 15 C 380, 2017 WL 5593318 (N.D. Ill. Nov. 21, 2017)...........................11

*Keach v. U.S. Trust Co.,*
    419 F.3d 626, 639 (7th Cir.2005) ...........................................................8

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137, 147 (1999).....................................................................4

*Musser v. Gentiva Health Servs.,*
    356 F.3d 751, 759 (7th Cir. 2004) ........................................................12

*NutraSweet Co. v. X-L Engineering Co.,*
    227 F.3d 776, 785 (7th Cir.2000) ...........................................................7

*Rainworks Ltd. v. Mill-Rose Co.,*
    622 F. Supp. 2d 650 (N.D. Ohio 2009).....................................................14

*S.E.C. v. Nutmeg Grp., LLC,*
    No. 09 C 1775, 2017 WL 4925503 (N.D. Ill. Oct. 31, 2017)...........................10

*Salgado v. General Motors Corp.,*
    150 F.3d 735, 742 (7th Cir.1998) ...........................................................8

*Scaggs v. Consolidated Rail Corp.,*
    6 F.3d 1290, 1295-96 (7th Cir. 1993 ...............................................................9

*Steen v. Myers,*
    486 F.3d 1017, 1022 (7th Cir.2007) ...............................................................12

*Super-Sparkly Safety Stuff, LLC v. Skyline USA, Inc.,*
    836 F. App'x 895, 898 (Fed. Cir. 2020) ..........................................................14

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................3
Fed. R. Evid. 702 ..............................................................................................4,5
Fed. R. Civ. P. 37(c)(1).......................................................................................7
Fed. R. Civ. P. 26(a)(2)(B)(i)..............................................................................8
Fed. R. Civ. P. 26(a)(2)(D) (ii) ...........................................................................8
Fed. R. Civ. P. 26(e)(1)(A), (2)...........................................................................8
Fed. R. Civ. P. 37(c)(1)......................................................................................10

Defendant Gyroor-US ("Defendant" or "Gyroor-US") and third-party respondents Gyroor, Urbanmax, GaodeshangUS, Fengchi-US, Gyroshoes, and HGSM (collectively, "Third-Party Respondents") hereby submit this reply to Plaintiffs Hangzhou Chic Intelligent Technology Co., Ltd. ("Chic") and Unicorn Global, Inc.'s ("Unicorn", and collectively with Chic, "Plaintiffs") opposition to Defendant and Third-Party Respondents' Motion for Summary Judgment [Dkt. 635].

## I.    PRELIMINARY STATEMENT

Defendant and Third-Party Respondents' Motion for Summary Judgment shall be granted as there is no genuine dispute that the Accused Products do not infringe the Patents-in-Suit. In their opposition, Plaintiff tried to create a genuine dispute of material fact by relying on Mr. Hatch's new report; however, none of Mr. Hatch's reports may be considered by this Court. First, Plaintiffs' submission of the same version of Mr. Hatch's report prior to the close of expert discovery were criticized and rejected by the Federal Circuit Court. Second, despite this Court ordered that expert discovery closes on October 26, 2022, months later Plaintiffs disregarded the July 11, 2022 Scheduling Order and submitted new reports of Mr. Hatch twice. As a result, all of Mr. Hatch's reports carry no weight as the reports are either unreliable or untimely and must be excluded.

As discussed below, the Federal Circuit and this Court have repeatedly rejected Plaintiffs' expert, Mr. Hatch's reports, opinions and analysis methods Plaintiffs' newly submitted expert declaration in support of their opposition to Defendant and Third-Party Respondents' summary judgment should also be excluded since it is not only untimely but also unjustified and harmful to Defendant and Third-Party Respondents. This is not the first time that Plaintiffs offered new evidence after expert discovery was closed. Plaintiffs repeatedly and maliciously violated the Court's schedule and Federal Civil Procedure Rule regarding discovery. It would also be highly

1

prejudicial to Defendants and Third-Party Respondents in this case to allow Plaintiffs to submit and continue to offer new expert report to the Court after discovery is closed.

Moreover, Plaintiffs and their expert conducted ordinary observer analysis **using the wrong standard**. The correct standard is the hypothetical ordinary observer should be a purchaser who is familiar with hoverboards and prior art designs. In addition, as the claimed design in the Patents-in-Suit is similar if the almost the same compared to the prior art designs, small differences between the Patents-in-Suit and accused products are likely to be important to the eye of the hypothetical ordinary observer. When these functional aspects are properly discounted and the remaining ornamental designs are compared, there is no question of fact that, in the eyes of an ordinary observer, the claimed designs of the Patents-in-Suit are plainly dissimilar to the accused products. Even if the Court finds that the claimed and accused designs are not plainly dissimilar, in light of the prior art, no reasonable ordinary observer will find that the designs of the accused products is substantially similar to the claimed designs of Patents-in-Suit.

## II. RELEVANT FACTS AND PROCEDURAL HISTORY

Plaintiffs allege that Defendant and Third-Party Respondents' products (the "Accused Products") infringed on their U.S. Design Patent Nos. D737,723 ("the 'D723 Patent"), D738,256 ("the 'D256 Patent"), D785,112 ("the 'D112 Patent"), D784,195 ("the 'D195 Patent") (collectively, "Patents-in-Suit"). [Dkt. 101]. The Accused Products were grouped and identified as "Gyroor A", "Gyroor B", "Gyroor C", "Gyroor D", and "Gyroor E"[1]. [Dkt. 629]. All of the Accused Products are manufactured based on the U.S. Design Patents D808,857 (the "D'857 Patent"), U.S. Design

---

[1] "Gyroor-E" was first identified in the "Exhibit B" of the proposed order of Plaintiffs' second preliminary injunction order, but Plaintiffs had never mentioned it in any of their motion papers. [Dkt. 456]. On October 28, 2022, the proposed order which includes the Accused Product E was vacated by the Federal Circuit. As it is unclear whether "Gyroor E" is Accused Product in the current case, Defendant filed a motion to clarify on December 9, 2022. [Dkt. 625], and the motion is currently pending with the Court.

Patents D808,856 (the "D'856 Patent"), and U.S. Design Patents D891,297 (the "D'297 Patent"), respectively. *Id*. The U.S. Design Patent D739,906 (the "D'906 Patent") was filed on March 12, 2013, earlier than any Patents-in-Suit. Therefore, the D'906 Patent is prior art to all Patents-in-Suit. [Dkt. 414-1].

On November 20, 2020, Plaintiffs filed their first motion for preliminary injunction against Defendant, which the Court granted shortly after. [Dkt. 105].

On August 24, 2021, Plaintiffs filed a second preliminary injunction against the Third-Party Respondents [Dkt. 384]. The Court granted Plaintiffs' second preliminary injunction on October 13, 2021. [Dkt. 456].

After Federal Circuit vacated the two preliminary injunction orders issued by this Court, Plaintiffs filed their renewed motion for temporary restraining order and preliminary injunction against Defendant and Third-Party Respondents on November 9, 2022. [Dkt. 592]. The Court denied the motion on December 2, 2022. [Dkt. 619].

On December 23, 2022, Defendant and Third-Party Respondents respectfully submitted their Motion for Summary Judgment of Non-infringement for Accused Products. [Dkt. 629, 630].

On January 25, 2023, Plaintiffs filed their opposition to Defendant and Third-Party Respondents' Motion for Summary Judgment with their newly submitted expert declaration. [Dkt. 635, 637].

## III.  LEGAL STANDARD

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is "entitled to a judgment as a matter of law" because the

nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

A material fact is one which might affect the outcome of the suit under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue exists "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id*. at 249. Summary judgment may be granted if the evidence is merely colorable or is not significantly probative. *Id*. To defeat summary judgment, a non-movant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018).

Northern District of Illinois Local Rule 56.1 requires the "party moving for summary judgment to include with that motion 'a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgement as a matter of law.' " *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir.2004) (quoting N.D. Ill. R. 56.1(a)(3)). The movant bears the initial burden of establishing that no genuine issue of material fact exists. *Genova v. Kellogg*, 12 C 3105, 2015 WL 3930351, at *3 (N.D.Ill. June 25, 2015). "The burden then shifts to the nonmoving party to show through specific evidence that a triable issue of fact remains on issues on which the movant bears the burden of proof at trial." *Id*. The non-moving party must respond to the movant's Local Rule 56.1(a)(3) statement and may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits. N.D. Ill. R. 56.1(b). The non-movant must go beyond the pleadings and support his contentions with documentary evidence of specific facts that demonstrate that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

## IV. ARGUMENT

**A.    Plaintiffs' Expert Reports Have Been Repeatedly Rejected by the Federal Circuit and This Court**

Expert testimony is admissible if the party offering such evidence shows that the testimony is both reliable and relevant. Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590–91 (1993). Federal Rule of Evidence 702 permits expert testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. An expert can be qualified "by knowledge, skill, experience, training, or education." *Id*.

1.    <u>Plaintiffs' expert reports submitted before the expert discovery cut-off are inadmissible and have been criticized and rejected by the Federal Circuit.</u>

Plaintiffs have submitted multiple reports of Mr. Hatch in support of their arguments regarding patent infringement. However, Federal Circuit criticized and rejected Mr. Hatch's reports because of their unreliability. "The Hatch reports, far from recognizing that the hourglass figure of the asserted patents could not be relied on to establish substantial similarity, improperly relied on that feature to show substantial similarity. The Hatch reports did not support a finding of substantial similarity." *ABC Corp. I v. P'ship & Unincorporated Associations Identified on Schedule "A"*, 52 F.4th 934, 943 (Fed. Cir. 2022).

*First*, Mr. Hatch's report failed to conduct a three-way analysis comparing the accused product, the patented design, and the prior art. *Id*. Mr. Hatch failed to consider the prior art while the D'906 patent is highly relevant to the question of infringement because it discloses an

"hourglass" shape, a prominent feature common to the asserted patents and most of the accused products. *Id*.

*Second*, Mr. Hatch failed to analyze infringement on a product-by-product basis. *Id*., at 944. "After each table, Hatch provided a cursory analysis concluding that 'the overall impression of the claimed design ... is entirely unique' and that '[n]one of the prior art create the impression of' the claimed design." *Id*, at 938.The entirety of the Hatch report's infringement analysis for the Patents-in-suit is imprecise. *Id*., at 944. "In each case he focuses on the accused products as a group, rather than each product individually." *Id*.

*Third*, Mr. Hatch used wrong legal standard of ordinary observer that "the ordinary observer "in this case is the typical purchaser of hoverboards, i.e., a consumer user or the parent of a user, each having little or no experience purchasing hoverboards." [Dkt. 388, p. 8]. However, the Federal Circuit noted that "[W]hen the differences between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary observer will be drawn to those aspects of the claimed design that differ from the prior art." *ABC Corp*., 52 F.4th at 938 (citing *Egyptian Goddess, Inc. v. Swisa, Inc*., 543 F.3d 665, 676 (Fed. Cir. 2008)).

Therefore, Mr. Hatch's reports should be inadmissible for lacking reliable principles and methods.

2. <u>Plaintiffs' untimely expert report to support their renewed motion for Preliminary Injunction has also been rejected by this Court.</u>

On November 9, 2022, Plaintiffs filed their renewed motion for preliminary injunction with a new declaration by Mr. Hatch. [Dkt. 594]. The report is untimely while the expert discovery had already been closed by October 23, 2022. [Dkt. 575]. The newly submitted declaration in support of Plaintiffs' renewed motion for preliminary injunction should not be considered after the cut-off of the discovery period, and further this Court rejected this Paul Hatch's new declaration.

In this declaration, Mr. Hatch tried to cure his mistakes in the prior reports by clarifying that he understands that the D'906 prior art also obviously shows an hourglass shape. [Dkt. 594, ¶29]. However, again, Mr. Hatch's method of analysis had been rejected by this Court. "The problem with Hatch's analysis is that he does not explain why simply featuring pronounced footings and open fenders means the accused products are substantially similar to the patents in suit while the prior art is in another 'ballpark.' This categorical distinction is curious because he concedes that all the designs at issue—the prior art, the patents in suit, and the accused products—create the visual impression of an integrated hourglass shape. In the Federal Circuit's terms, the hourglass shape is the 'dominant feature' across all the relevant designs. This finding from the Federal Circuit means that Hatch's categorical distinction is erroneous. To the contrary, all the designs are in the same 'ballpark,' so to speak, because they all feature an 'integrated hourglass shape.'" [Dkt. 626, p.11]. "Hatch's analysis stops at the fact that both the patents in suit and the accused products merely possess these features. In his opinion, this similarity would be sufficient to deceive the ordinary observer. However, Hatch failed to conduct an analysis of whether these features themselves are substantially similar in the manner of their design, which is where "the focus" of the analysis must be." *Id*., at 12. Therefore, this Court also rejected Mr. Hatch's method of analysis. *Id*.

The Federal Circuit and this Court have repeatedly rejected all of Plaintiffs' expert reports as a result of **Mr. Hatch's unreliable reports incorporating incorrect standard for analysis**. Therefore, Plaintiffs' allegations of design patent infringement are merely lawyer's conclusory arguments without any evidence or support.

**B.    Plaintiffs' Newly Submitted Expert Declaration Should Be Excluded**

Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to

supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The obligation to disclose expert witnesses is governed by Rule 26(a).

Under Rule 37(c)(1), "[a] party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Thus, where a party does not timely file expert reports, the district court may exclude the party's expert from testifying at trial on the matters the party was required to disclose. *NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 785 (7th Cir.2000). The sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless. *Keach v. U.S. Trust Co.*, 419 F.3d 626, 639 (7th Cir.2005); *Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 742 (7th Cir.1998).

Under Rule 26(a)(2), a party must disclose by the court-ordered time a written report of a retained expert that includes "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i), (D). Rule 26(a)(2) further requires that parties disclose rebuttal reports—that is, "evidence [that] is intended solely to contradict or rebut evidence on the same subject matter identified by another" expert—by the court-ordered time, or if no such time is set, 30 days after the other expert's disclosure. Fed. R. Civ. P. 26(a)(2)(D) (ii). Apart from initial expert reports and rebuttal expert reports, Rule 26 also contemplates supplemental expert filings. Rule 26(e) requires that, if an expert "learns that in some material respect the disclosure ... is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during discovery," he must supplement his disclosure by the time pretrial disclosures are due. Fed. R. Civ. P. 26(e)(1)(A), (2).

8

1. The newly submitted expert declaration of Paul Hatch is untimely.

On July 11, 2022, the Court ordered that parties must serve expert reports on all issues for which they bear the burden of proof on August 15, 2022, and expert discovery closes by October 23, 2022. [Dkt. 575]. Instead of using Mr. Hatch's final report that was exchanged with Defendant and Third-Party Respondents prior to the close of expert discovery, surprisingly Plaintiffs once again submitted a brand-new expert report of Paul Hatch regarding infringement of Patents-in-Suit on January 25, 2023. [Dkt. 637].

The Local Rules of the Northern District of Illinois provide with exact specificity that a deadline for discovery means that discovery must be completed by that date. Local Rule 16.1, Standing Order Establishing Pretrial Procedure; *See also FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627 (7th Cir.2005) (stressing importance of compliance with the Local Rules). Thus, it would be inappropriate and untimely under the local rules to serve a new expert report after the close of discovery that the other side could neither depose the expert nor engage a rebuttal expert of its own. *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 320, 327 (N.D.Ill.2005). Recognizing that courts must have the authority to enforce discovery deadlines, numerous cases have approved exclusion orders by district courts where expert reports were not provided until nearly the close of discovery. *Finwall v. City of Chicago*, 239 F.R.D. 494, 499 (N.D. Ill.), objections overruled, 239 F.R.D. 504 (N.D. Ill. 2006). For example, the Seventh Circuit upheld the district court's barring of the testimony of an expert witness identified just two days before the deadline. *Id*; *See also Scaggs v. Consolidated Rail Corp.*, 6 F.3d 1290, 1295-96 (7th Cir. 1993).

The new expert testimony of Paul Hatch must be barred. The expert discovery closed on October 23, 2022, yet Plaintiffs submit this new expert report signed on January 25, 2023 along with its opposition. It is beyond debate that having new expert report leaves Defendant and Third-Party Respondents no time for depositions or discovery regarding this report or provide any

rebuttal experts reports. Defendant and Third-Party Respondents have no opportunity to provide any response if any, while Plaintiff gets fourth bite at the apple and even more down the road.

Further, the new expert testimony is not supplemental within the meaning of Rule 26(e). *See Callpod, Inc. v. GN Netcom, Inc.*, 703 F. Supp. 2d 815, 823 (N.D. Ill. 2010) ("Supplemental expert reports are permitted if they are based upon information discovered after the initial disclosure or upon the realization that the original disclosure was incorrect or incomplete."). Apparently, the new expert report is not based upon information discovered after the initial disclosure or upon the realization that the original disclosure was incorrect or incomplete. Plaintiffs' purpose of submitting the expert report is to cure the deficiencies of the previous reports submitted by the same expert after the expert's opinions in the previous reports were *criticized and rejected* by the Federal Circuit and this Court. [Dkt. 587 and Dkt. 626].

However, even if the Court finds that Plaintiffs' new expert report is supplemental to their original reports, this report should also be excluded. According to the Rule 26(e) of the Federal Rules of Civil Procedure, a party's obligation to supplement or correct a discovery disclosure (including expert reports) is limited to information thereafter acquired. *Council 31 v. Ward*, No. 87 C 356, 1995 WL 549022, at *1 (N.D. Ill. Sept. 12, 1995), aff'd sub nom. *Council 31, Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Doherty*, 169 F.3d 1068 (7th Cir. 1999). By its plain language, the rule refers to information not in the possession of the party when the original disclosure was made, and it does not contemplate the submission of a new expert report re-analyzing information which the party possessed when the original report was filed. *Id*. Here, Plaintiffs' newly submitted expert report only contains information obtained prior to the initial disclosure, and Plaintiffs have not identified any newly acquired information. Hence, Plaintiffs also failed to show that their new expert report falls within the ambit of Rule 26(e).

<u>2. Plaintiffs' failure to timely serve the expert report was not substantially justified or harmless.</u>

Federal Rule of Civil Procedure 37 governs the consequences of failures to comply with Rule 26. Under Rule 37(c), a party "is not allowed to use" an untimely disclosure "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The party seeking to excuse its delay bears the burden of showing justification and harmlessness. See, e.g., *S.E.C. v. Nutmeg Grp., LLC*, No. 09 C 1775, 2017 WL 4925503, at *1 (N.D. Ill. Oct. 31, 2017). In deciding whether a party's failure was justified or harmless, courts "consider and weigh the following factors: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Karum Holdings LLC v. Lowe's Cos., Inc.*, No. 15 C 380, 2017 WL 5593318, at *3 (N.D. Ill. Nov. 21, 2017) (citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)).

Plaintiffs failed to offer any explanation or show any justification for this new expert declaration. Neither Plaintiffs can establish that their late service of expert report was harmless. Defendant and Third-Party Respondents have been harmed because they missed the opportunity to file rebuttal evidence and conduct any depositions directed at the opinions in Plaintiffs' new expert report. There is no reason for the Court to reopen discovery for the parties to submit new expert reports and rebuttal report for the sake of Plaintiffs even though they had over two years to submit a reliable expert report but failed to do so. This whole new process would no doubt unreasonably delay the whole process and affect the briefing schedule and case management. In addition, it is worth noting that this is not the first time Plaintiffs offered new evidence after discovery was closed. In support of their Motion for Entry of a Temporary Restraining Order and Preliminary Injunction, Plaintiffs submitted a brand-new expert report of Paul Hatch regarding

Defendant and Third Party's infringement of U.S. Patents D737,723 and D738,256 approximately 20 days after expert discovery closes. [Dkt. 594]. Plaintiffs cannot keep submitting new expert report to the Court after discovery was closed as it would be prejudicial to Defendant and Third-Party Respondents if the untimely expert report was allowed and would cause significant burdens and undue delay in summary judgment briefing and the ultimate resolution of this case. *See e.g., Bowman v. International Business Mach. Corp*, 2012 WL 6596933, at 3–4 (concluding that the plaintiffs' untimely expert rebuttal reports were not harmless because "reopening discovery to re depose Plaintiffs' experts would create significant costs and would delay the resolution of the motion"); *see also Musser v. Gentiva Health Servs.*, 356 F.3d 751, 759 (7th Cir. 2004) ("[I]t is not an abuse of discretion to conclude that the additional costs to Gentiva of preparing a new summary judgment motion and further delay in extending the trial date are not harmless.").

In fact, Defendant and Third-Party Respondents would be extremely prejudiced if Plaintiffs' new expert report in its response to motion for summary judgment is considered by the Court. It is impossible for Defendant and Third-Party Respondents' expert to submit a new rebuttal report with limited time and Mr. Hatch's declaration is over 100 pages with new opinions. The litigation process does not include "a dress rehearsal or practice run" for the parties. *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir.2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir.2005)). Plaintiffs have no right to repeatedly submit new expert report at any time after the discovery period is closed as their wishes by disregarding the Civil Procedure Rules and the Court's Orders. Therefore, Plaintiffs' new expert report should be excluded.

**C.     It Is Appropriate for the Court to Grant Summary Judgment of Non-infringement As There Is No Genuine Dispute as to Any Material Fact**

In order to establish design patent infringement, a plaintiff must show that "an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused

product is the same as the patented design." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1303 (Fed. Cir. 2010) (*citing Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 681 (Fed. Cir. 2008) (en banc)). "When the differences between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary observer will be drawn to those aspects of the claimed design that differ from the prior art." *Egyptian Goddess*, 543 F.3d at 676.

When the differences between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary observer would be drawn to those aspects of the claimed design that differ from the prior art. *Id*. And when the claimed design is close to the prior art designs, small differences between the accused design and the claimed design are likely to be important to the eye of the hypothetical ordinary observer. *Id*.

1. Plaintiffs failed to provide any admissible expert testimony in support of their opposition to Defendant and Third-Party Respondents' motion for summary judgment.

In *Egyptian Goddess*, the court affirmed summary judgment of noninfringement where claimed design had buffer pads on all four sides of its rectangular shaped frame while the accused product had buffer pads on only three sides. The Court also found that patentee's expert failed to present any nonconclusory testimony as to why an ordinary observer would find that accused design to be more similar to the claimed design than to the prior art while the accused infringer presented evidence that purchasers considered the number of sides having a pad important which would help the ordinary observe easily distinguish between a block with pads on three sides from a block with pads on four sides. *Egyptian Goddess*, 543 F.3d at 680-83.

Like *Egyptian Goddess*, Plaintiff's opposition to Defendant and Third-Party Respondents' motion for summary judgement is based solely on conflicting expert testimony and opinions regarding Defendant and Third-Party Respondents' alleged infringement. [Dkt. 635, p. 21]. However, as discussed above, Plaintiffs' untimely newly submitted report should be excluded for

violating the federal and local rules. Further, Federal Circuit and this Court has repeatedly rejected all of Plaintiff's expert reports, opinions, and analysis methods. Thus, Plaintiffs failed to provide any admissible expert testimony in opposition summary judgment or even any credible evidence that would support their opposition. Plaintiffs' arguments incorporating excluded and inadmissible expert testimony could not be used to support that there is a genuine dispute as to the material facts of the infringement of Patents-in-Suit.

While a conclusory statement by an attorney that an accused device infringes a patent and an expert's unsupported conclusion on the ultimate issue of infringement are "wholly insufficient to raise an evidentiary dispute for a jury." *Honston v. IVAC Corp.*, 885 F.2d 1574, 1578 (Fed.Cir.1989); *Int'l Rectifier Corp. v. LXYS Corp.*, 361 F.3d 1363, 1375 (Fed.Cir.2004); *HR U.S. LLC v. Mizco Intern., Inc.*, 2009 WL 890550, *11–*13 (E.D. N.Y. 2009) (granting accused infringer summary judgment that it did not infringe a design patent for an ornamental design of a palm pilot holder and rejecting argument that the patentee's expert's declarations raised an issue of fact as to the ordinary observer test over the court's visual inspection of the claimed design and the accused product); *Rainworks Ltd. v. Mill-Rose Co.*, 622 F. Supp. 2d 650 (N.D. Ohio 2009) (granting accused infringer summary judgment of no design patent infringement and ruling that patentee's conclusory statements that a reasonable jury could find infringement failed to meet the patentee's burden to raise an issue of fact as to infringement).

2.  <u>The hypothetical ordinary observer should be a purchaser who is familiar with hoverboards and the prior art designs.</u>

It is undisputed that "where there are many examples of similar prior art designs … differences between the claimed and accused designs that might not be noticeable in the abstract can become significant to the hypothetical ordinary observer who is conversant with the prior art." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 678 (Fed. Cir. 2008); *see also Super-Sparkly Safety*

*Stuff, LLC v. Skyline USA, Inc.*, 836 F. App'x 895, 898 (Fed. Cir. 2020). The Federal Circuit holds that "the ordinary observer is deemed to view the differences between the patented design and the accused product *in the context of the prior art.* When the differences between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary observer *will be drawn to those aspects of the claimed design that differ from the prior art*." *Lanard Toys Ltd.*, 958 F.3d at 1344 (quoting *Egyptian Goddess*, 543 F.3d at 676).

In Plaintiffs' newly submitted expert declaration, Mr. Hatch avers that an ordinary observer should be "the principal purchaser of hoverboards, i.e., a consumer user or the parent of a user, each having little or no experience purchasing hoverboards." *See* Decl. of Hatch, Ex. 1, ¶¶ 42. Dkt. 637. Hatch further claims that "the ordinary observer encounters products like the Claimed Designs via online stores, television and entertainment media, and social media, and purchases them using online stores or from 'brick and mortar' stores like Best Buy or Walmart" and that "it is my opinion that the hypothetical ordinary observer would possess 'ordinary acuteness' and would apply a relatively low level of attention to the aesthetics of the product." *Id*. ¶¶ 42, 160.

A purchaser "having little or no experience purchasing hoverboards" and "apply a relatively low level of attention to the aesthetics of the product" only suggests that the purchaser lacks knowledge of hoverboards and prior art, which is the opposite to someone "who is conversant with the prior art" in *Egyptian Goddess*. Here, it is undisputed that there are many examples of similar prior art designs that are relevant to the Accused Products. Therefore, in light of the many similar prior arts, the hypothetical ordinary observer in this case should be a purchaser who is familiar with hoverboards and the prior art designs. *See* Decl. of Gandy, Ex.2, ¶¶21; Decl. of Rake, Ex.3, ¶¶ 39. Dkt. 629. Defendant and Third-Party Respondents' application that "the hypothetical ordinary observer in this case should be a purchaser who is familiar with hoverboards and the prior

art" is consistent with the precedents and should be adopted by expert for further infringement analysis. *Id*; *see also Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1337 (Fed. Cir. 2015) ("The ordinary observer is one of ordinary acuteness who is a principal purchaser of the underlying articles with the claimed designs."). An ordinary observer would not only pay attention to overall impressions of the object but also look to small details to differentiate between designs. Mr. Hatch, given his expertise, should be well informed about the ordinary observer standard but instead offers a relatively incorrect standard in direct contrast with *Egyptian Goddess*. Thus, Plaintiffs and Mr. Hatch rely upon incorrect understanding of the ordinary observer test and use wrong definition of the ordinary observer.

3.   Small differences between the Patents-in-Suit and Accused Products are likely to be important to the eye of the hypothetical ordinary observer.

The Patents-in-Suit, the D'906 patent and the Accused Products all have similar hourglass peripheral shape. Therefore, the hourglass in shape in the Patents-in-Suit and the Accused Products did not "depart conspicuously" from the prior art D'906 patent. As observed by Defendant and Third-Party Respondents' expert Mr. Gandy, the hourglass peripheral shape of the prior art D'906 patent appears to be closer to the claimed design in the Patents-in-Suit than the design of Accused Products. *See* Decl. of Gandy, Ex.2, ¶47. Thus, as the claimed design in the Patents-in-Suit is close to the prior art designs, small differences between the Patents-in-Suit and Accused Products are likely to be important to the eye of the hypothetical ordinary observer. *See Egyptian Goddess*, 543 F.3d at 676.

Plaintiffs' argument that small visual details would not affect the ordinary observer's overall impression of the designs supported by Mr. Hatch's new inadmissible report is also conclusory and meritless. In Mr. Hatch's declaration, he concluded that "it is my opinion that the hypothetical ordinary observer would possess 'ordinary acuteness' and would apply a relatively

low level of attention to the aesthetics of the product. Thus, small visual details (e.g., such as the air vent pattern on the underside or the specific shape of the shallow grooves on the foot pads) would not affect their overall impression of the object as a whole." [Dkt. 637]. However, this is merely conclusory statement without providing any specific evidence. Mr. Hatch failed to explain that why the ordinary observer would apply a low level of attention and disregard the visual details. In contrast, Defendant and Third-Party Respondents' expert, Mr. Gandy, credibly explained in his testimony that it is impossible to consider a design's overall impression without examining its details. *See* Dkt. 626, p. 33. "In other words, the overall impression is embodied in the details. Any analysis that—like Hatch's—ignores the details will fail to gain a proper perspective on the overall impression of a design." *Id*, at 34. "The Court's analysis, guided by Gandy's highly credible method, examined the details of each design to understand the overall impression of each and compare them. This analysis demonstrates that a reasonable jury could find that the accused products are not substantially similar to the patents in suit, such that an ordinary observer would not be deceived into believing that the accused products are the same as the patented design." *Id*.

Therefore, Plaintiffs' argument that small visual details would not affect the ordinary observer's overall impression of the designs has already been considered and rejected by the Court, and small differences between the Patents-in-Suit and Accused Products are likely to be important to the eye of the hypothetical ordinary observer.

4. <u>The Accused Products are plainly dissimilar to the claimed designs of the Patents-in-Suit.</u>

Courts routinely grant summary judgment in design patent infringement cases where the claimed and accused designs are plainly dissimilar based on a side-by-side visual comparison under the ordinary observer test. Where the claimed and accused designs are "sufficiently distinct" and "plainly dissimilar," the patentee fails to meet its burden of proving infringement as a matter

17

of law. *Ethicon*, 796 F.3d at 1335; *Richardson*, 597 F.3d at 1295-96 (affirming summary judgment of noninfringement based on dissimilarity of claimed and accused designs); *see also Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1012 (N.D. Ill. 2010) ("When the patented design and the accused design are plainly dissimilar, as in this case, there is no need to look to the prior art, because two designs may be sufficiently distinct that it will be clear without more that the patentee has not met its burden.").

In this case, there is no genuine question of fact that, in the eye of an ordinary observer, the visual appearance of the claimed designs of the Patents-in-Suit are plainly dissimilar to the Accused Products. The plain dissimilarity becomes even more apparent after factoring out functional aspects of the claimed designs of the Patents-in-Suit. Design patents only protect ornamental features and thus "functional aspects of the claimed designs are properly excluded from the infringement analysis." *Ethicon*, 796 F.3d at 1315.

In *Richardson*, the Federal Circuit affirmed summary judgment of noninfringement based on the differences between the claim and accused designs after factoring out the functional aspects. *Richardson*, 597 F.3d at 1294. The claimed tool design included numerous features, including a handle, a hammerhead, a jaw, and a crowbar that were dictated by their functional purposes. *Id*. The court explained that "[t]he jaw, for example, has to be located on the opposite end of the hammer head such that the tool can be used as a step" and "[t]he hammer-head has to be flat on its end to effectively deliver force to the object being struck." *Id*. Accordingly, the district court properly excluded each of these utilitarian features from the scope of the claimed design, and consequentially, the Federal Circuit affirmed summary judgment of noninfringement. *Id*.

Similarly, all Patents-in-Suit comprise of six design elements: two identical standing pads, two identical wheels, and two indicial wheel covers. *See* Table A below.

18



| Table A | |
|---|---|
| Patents-in-Suit D737,723 Patent | Patents-in-Suit D738,256 Patent |
| Patents-in-Suit D784,195 Patent | Patents-in-Suit D785,112 Patent |

It is undisputed that the "foot placement stations," "wheels," and "wheel covers", each carries essential utilitarian functions of a hoverboard – to stand, to move and operate, and to prevent road debris from being thrown into the air by the rotating wheels. In addition, the overall shapes of the claimed designs of the Patents-in-Suit are largely based on functionality. [Decl. of Rake, Ex.3]. The dimensions correspond to the dimensions of a human foot, the distance between footpads corresponds to approximate "shoulder width" dimensions of the user, the narrowing at the center facilitates the needed twisting motion without interference with the user or the ground. *Id*.

Any similarity between the Accused Products and the claimed design of the Patents-in-Suit arises from the functional features and the overall hourglass shape. As shown below, when hourglass shapes and functional aspects are factored out, the differences between the claimed designs of the Patents-in-Suit and the Accused Products are readily apparent at a glance. The design differences would be immediately recognized by the ordinary observer.











Thus, when these functional aspects are properly discounted and the remaining ornamental designs are compared, there is no question of fact that, in the eyes or an ordinary observer, the claimed design of the Patents-in-Suit different substantially from the Accused Products. *See OddzOn*, 122 F.3d at 1406. ("affirming summary judgment of non-infringement where "overall similarity" of two rocket shaped balls was based on the functional tail and fins of the balls and not on the ornamental features of the design").

5.  <u>In the light of the D'906 patent, no ordinary observer would think the design of Accused Products is substantially similar to the claimed designs of the Patents-in-Suit.</u>

Even if the Court finds that the claimed and accused designs are not plainly dissimilar, the comparison "will benefit from a comparison of the claimed and accused designs with the prior art." *Egyptian Goddess*, 543 F.3d at 678. When the prior art is considered, Defendant and Third-Party Respondents should prevail as a matter of law because no ordinary observer would think the design of the Accused Products is substantially similar to the claimed designs of the Patents-in-Suit.

A detailed side-by-side comparison among Patents-in-Suit, the prior art and Accused Products are illustrated as below:

    (1)  Gyroor A

        a.   Non-infringement of the 'D723 Patent by Gyroor A

There are several key design differences between the design claim of the 'D723 Patent and Gyroor A. From the top and front views, the differences in the shape and design of the footpads are clear. *See* Decl. of Rake, Ex. 3, ¶53. Dkt. 629. An ordinary observer familiar with the prior art and other products in the marketplace would recognize that the 'D723 Patent has prominent elliptical design element in the middle compared to Gyroor A, which is completely different, without any elliptical design element. *Id*.

The bottom and back views also play a role in an ordinary observer's understanding the overall visual appearance of the designs. A bottom view reveals substantial design differences. *Id*. ¶56. There is a prominent central design detail at the center, two strong styling recess areas under the feet, and vent hole patterns that are readily noticed because of the Figure-Ground gestalt, as well as Closure, Similarity, and Proximity. *Id*.



Undercarriage Comparison- '256 Patent/ Accused Product/ '906 Patent

Another important design feature that has a significant effect on the overall visual impression of the ordinary observer is the size and shape of the fenders. *Id*. ¶57. Even to the most casual observer, the differences are significant.



Fender Comparison- '723 Patent/ Accused Product A

b. Non-infringement of the 'D256 Patent by Gyroor A

There are several key design differences between the design claim of the 'D256 Patent and Gyroor A. From the top and front views, the differences in the shape and design of the footpads are clear. *Id*. ¶59. An ordinary observer familiar with the prior art and other products in the marketplace would recognize that the 'D256 Patent has prominent design element in the middle while Gyroor A is clean, with any such design element. *Id*.

The bottom and back views also play a role in an ordinary observer's understanding the overall visual appearance of the designs. A bottom view reveals substantial design differences. *Id*. ¶62. There is a prominent central design detail at the center, two strong styling recess areas under the feet, and vent hole patterns that are readily noticed because of the Figure-Ground gestalt, as well as Closure, Similarity, and Proximity. *Id*.



Another important design feature that has a significant effect on the overall visual impression of the ordinary observer is the size and shape of the fenders. *Id*. ¶63. Even to the most casual observer, the differences are significant.



Fender Comparison- '256 Patent/ Accused Product A

c.   Non-infringement of the 'D195 Patent by Gyroor A

There are several key design differences between the design claim of the 'D195 Patent and Gyroor A. From the top and front views, the differences in the shape and design of the footpads are clear. *Id*. ¶65. An ordinary observer familiar with the prior art and other products in the marketplace would recognize the 'D195 Patent has prominent design element in the middle and while Gyroor A is clean, with any such design element. *Id*.

The bottom and back views also play a role in an ordinary observer's understanding the overall visual appearance of the designs. A bottom view reveals substantial design differences. *Id.* ¶68. There is a prominent central design detail at the center, two strong styling recess areas under the feet, and vent hole patterns that are readily noticed because of the Figure-Ground gestalt, as well as Closure, Similarity, and Proximity. *Id.*



Undercarriage Comparison- '195 Patent/ Accused Product/ '906 Patent

Another important design feature that has a significant effect on the overall visual impression of the ordinary observer is the size and shape of the fenders. *Id.* ¶69. Even to the most casual observer, the differences are significant.



Fender Comparison- '195 Patent/ Accused Product A

(2) Gyroor B

    a. Non-infringement of the 'D723 Patent by Gyroor B

There are several key design differences between the design claim of the 'D723 Patent and Gyroor B. From the top and rear views the concavely curved recessed center portion of the top surface of the claimed design of the '723 patent and the design of the prior art '906 patent both have a slightly raised convex contour, while the corresponding center portion of the top surface of the design of Gyroor "B" hoverboard is substantially flat and slightly recessed down below the opposing outer foot surfaces. Front view '723 patent Rear view '723 patent . *See* Decl. of Gandy, Ex. 2, ¶47. Dkt. 629. Furthermore, it's noted that the wheel covers at each end of the claimed design of the '723 patent, the design of the prior art '906 patent and the design of the Gyroor "B" hoverboard differ from each other as shown in the top plan view and front and rear views above as well as the side view and perspective view below. However, it's my opinion that the shape and appearance of the wheel covers in the claimed design of the '723 patent are closer to the wheel covers shown in broken lines in the design of the prior art '906 patent than the wheel covers of the design of the Gyroor "B" hoverboard. *Id.* ¶48. Specifically, the wheel covers shown on the claimed design of the '723 patent and the design of the prior art '906 patent are both semi-circular in shape and extend over and cover the entire wheel, while the wheel covers on the design of Gyroor "B" hoverboard have opposing diagonally straight side edges a substantially flat top edge which curves outwardly but does not extend over the entire wheel, but rather partially over the wheel. *Id.*



Undercarriage Comparison- '256 Patent/ Accused Product/ '906 Patent

Another important design feature that has a significant effect on the overall visual impression of the ordinary observer is the size and shape of the fenders. *See* Decl. of Rake, Ex. 3, ¶57. Dkt. 629. Even to the most casual observer, the differences are significant.



Fender Comparison- '723 Patent/ Accused Product B

### b. Non-infringement of the 'D256 Patent by Gyroor B

There are several key design differences between the design claim of the 'D256 Patent and Gyroor B. From the top and front views, the differences in the shape and design of the footpads are clear. *Id*. ¶59. An ordinary observer familiar with the prior art and other products in the marketplace would recognize that the 'D256 Patent has prominent design element in the middle while Gyroor B is clean, without any such design element. *Id*.

The bottom and back views also play a role in an ordinary observer's understanding the overall visual appearance of the designs. A bottom view reveals substantial design differences. *Id.* ¶62. There is a prominent central design detail at the center, two strong styling recess areas under the feet, and vent hole patterns that are readily noticed because of the Figure-Ground gestalt, as well as Closure, Similarity, and Proximity. *Id.*



Undercarriage Comparison- '256 Patent/ Accused Product/ '906 Patent

Another important design feature that has a significant effect on the overall visual impression of the ordinary observer is the size and shape of the fenders. *See* Decl. of Rake, Ex. 3, ¶57. Even to the most casual observer, the differences are significant.



the '256 Patent    Accused Product B

Fender Comparison- '256 Patent/ Accused Product B

c. Non-infringement of the 'D195 Patent by Gyroor B

There are several key design differences between the design claim of the 'D195 Patent and Gyroor B. The hour glass peripheral shape of the prior art '906 patent appears to be closer to the claimed design of the '195 patent than the design of Gyroor "B" hoverboard. Specifically, the recessed center portion of the claimed design of the '195 patent and the design of the prior art '906 patent are concavely curved, whereas the recessed center portion of the design of the Gyroor "B" hoverboard has a truncated "v" shape appearance comprising opposing diagonally straight edges that connect to a horizontally straight inner edge. [Decl. of Gandy, Ex. 2, ¶59]. .

In addition, the claimed design of the '195 patent, the design of the prior art '906 patent and the design of the Gyroor "B" hoverboard are all comprised of the same general components, namely, opposing outer foot surfaces that are substantially flat, a recessed center portion and wheel covers at each end. *Id.* ¶57. As will be apparent from the remaining views set forth below, namely, front, rear, side, perspective and bottom the specific shape and appearance of most of the surfaces and features of the claimed design of the '195 patent, the design of the prior art '906 patent and the design of the Gyroor "B" hoverboard differ significantly from each other. *Id.*

The bottom and back views also play a role in an ordinary observer's understanding the overall visual appearance of the designs. A bottom view reveals substantial design differences. *See* Decl. of Rake, Ex. 3, ¶68. There is a prominent central design detail at the center, two strong styling recess areas under the feet, and vent hole patterns that are readily noticed because of the Figure-Ground gestalt, as well as Closure, Similarity, and Proximity. *Id.*



Undercarriage Comparison- '195 Patent/ Accused Product/ '906 Patent

Another important design feature that has a significant effect on the overall visual impression of the ordinary observer is the size and shape of the fenders. *Id.* ¶69. Even to the most casual observer, the differences are significant.



Fender Comparison- '195 Patent/ Accused Product B

d. Non-infringement of the 'D112 Patent by Gyroor B

There are several key design differences between the design claim of the 'D112 Patent and Gyroor B. The recessed center portion of the claimed design of the '112 patent and the design of the prior art '906 patent are concavely curved, whereas the recessed center portion of the design of the Gyroor "B" hoverboard has a truncated "v" shape appearance comprising opposing diagonally straight edges that connect to a horizontally straight inner edge. *See* Decl. of Gandy, Ex. 2, ¶64. In addition, the claimed design of the '112 patent, the design of the prior art '906 patent and the design of the Gyroor "B" hoverboard are all comprised of the same general components, namely, opposing outer foot surfaces that are substantially flat, a recessed center portion and wheel

33

covers at each end. *Id.* The front, rear, side, perspective and bottom the specific shape and appearance of most of the surfaces and features of the claimed design of the '112 patent, the design of the prior art '906 patent and the design of the Gyroor "B" hoverboard differ significantly from each other. *Id*. The shape and appearance of the wheel covers in the claimed design of the '112 patent are closer to the wheel covers shown in broken lines in the design of the prior art '906 patent than the wheel covers of the design of the Gyroor "B" hoverboard. Specifically, the wheel covers shown on the claimed design of the '112 patent and the design of the prior art '906 patent are both semi-circular in shape and extend over and cover the entire wheel, while the wheel covers on the design of Gyroor "B" hoverboard have opposing diagonally straight side edges a substantially flat top edge which curves outwardly but do not extend over the entire wheel, but rather partially over the wheel. *Id*. ¶74. There is a prominent central design detail at the center, two strong styling recess areas under the feet, and vent hole patterns that are readily noticed because of the Figure-Ground gestalt, as well as Closure, Similarity, and Proximity. *See* Decl. of Rake, Ex. 3, ¶74.



Undercarriage Comparison- '112 Patent/ Accused Product/ '906 Patent

Another important design feature that has a significant effect on the overall visual impression of the ordinary observer is the size and shape of the fenders. *See* Decl. of Rake, Ex. 3, ¶75, Dkt. 629. Even to the most casual observer, the differences are significant.



Fenders different in
Shape and Design

the '112Patent        Accused Product

Fender Comparison- '112Patent/ Accused Product

(3) Gyroor C

a. Non-infringement of the 'D723 Patent by Gyroor C

There are several key design differences between the design claim of the 'D723 Patent and

Gyroor C. The front, rear, side, perspective and bottom the specific shape and appearance of the

surfaces and features of the design of the prior art '906 patent are, in my opinion, closer to the

claimed design of the '723 patent than the design of the Gyroor "C" hoverboard. *See* Decl. of

Gandy, Ex. 2, ¶69. Dkt 629. For instance, as can be seen in the front and rear views below, the

concavely curved recessed center portion of the top surface of the claimed design of the '723 patent

and the design of the prior art '906 patent both have a slightly raised convex contour, while the

corresponding center portion of the top surface of the design of the Gyroor "C" hoverboard is

substantially flat and slightly recessed down below the opposing outer foot surfaces *Id*. The wheel

covers of the '723 patent, the design of the prior art '906 patent extend over and cover the entire

wheel, while the wheel covers on the design of Gyroor "C" hoverboard do not extend down over

the wheel. *Id*. ¶70.The bottom surface  of the design of the Gyroor "C" hoverboard differs from

both the claimed design of the '723 patent and the design of prior art '906 patent in that the

opposing flat outer portions have a pattern of vent holes and just to the inside of the vent holes is

a slight diagonally downwardly protruding arcuate edge. In addition, the recessed central portion

of the design of the Gyroor "C" hoverboard is defined by opposing slight diagonally downwardly protruding arcuate edges with the center portion having six narrow longitudinal ribs. *Id.* ¶73.



Undercarriage Comparison- '723 Patent/'906 Patent/ Accused Product C

Another important design feature that has a significant effect on the overall visual impression of the ordinary observer is the size and shape of the fenders. *See* Decl. of Rake, Ex. 3, ¶53. Dkt. 629. Even to the most casual observer, the differences are significant.



Fender Comparison- '723 Patent/ Accused Product C

b. Non-infringement of the 'D256 Patent by Gyroor C

There are several key design differences between the design claim of the 'D256 Patent and Gyroor C. The front, rear, side, perspective and bottom, the specific shape and appearance of the surfaces and features of the design of the prior art '906 patent are, in my opinion, closer to the claimed design of the '256 patent than the design of the Gyroor "C" hoverboard. *See* Decl. of Gandy, Ex. 2, ¶75. Dkt 629. For instance as can be seen in the front and rear views below, the

concavely curved recessed center portion of the top surface of the claimed design of the '256 patent and the design of the prior art '906 patent both have a slightly raised convex contour, while the corresponding center portion of the top surface of the design of the Gyroor "C" hoverboard is substantially flat and slightly recessed down below the opposing outer foot surfaces. *Id*. The bottom surface of the design of the Gyroor "C" hoverboard differs from both the claimed design of the '256 patent and the design of prior art '906 patent in that the opposing flat outer portions have a pattern of vent holes and just to the inside of the vent holes is a slight diagonally downwardly protruding arcuate edge. In addition, the recessed central portion of the design of the Gyroor "C" hoverboard is defined by opposing slight diagonally downwardly protruding arcuate edges with the center portion having six narrow longitudinal ribs. *Id.* ¶79.

There is a prominent central design detail at the center, two strong styling recess areas under the feet, and vent hole patterns that are readily noticed because of the Figure-Ground gestalt, as well as Closure, Similarity, and Proximity. *See* Decl. of Rake, Ex. 3, ¶¶61-62. Dkt. 629.

Another important design feature that has a significant effect on the overall visual impression of the ordinary observer is the size and shape of the fenders. *See* Decl. of Rake, Ex 4, ¶63. Dkt. 629. Even to the most casual observer, the differences are significant.





Undercarriage Comparison- '256 Patent/ Accused Product C/ '906 Patent

c. Non-infringement of the 'D195 Patent by Gyroor C

There are several key design differences between the design claim of the 'D195 Patent and Gyroor C. From the top and front views, the differences in the shape and design of the footpads are clear. *Id*. The front, rear, side, perspective and bottom the specific shape and appearance of most of the surfaces and features of the claimed design of the '195 patent, the design of the prior art '906 patent and the design of the Gyroor "C" hoverboard differ significantly from each other. *See* Decl. of Gandy, Ex. 2, ¶81. Dkt. 629. The concavely curved recessed center portion of the top surface of the claimed design of the '195 patent and the design of the prior art '906 patent protrude upwardly from the opposing outer foot surfaces, while the corresponding center portion of the top surface of the design of the Gyroor "C" hoverboard is substantially flat and slightly recessed down below the opposing outer foot surfaces. *Id*.

The wheel covers of the '195 patent, the design of the prior art '906 patent extend over and cover the entire wheel, while the wheel covers on the design of Gyroor "C" hoverboard do not extend down over the wheel. *Id*. ¶82. There is a prominent central design detail at the center, two strong styling recess areas under the feet, and vent hole patterns that are readily noticed because of the Figure-Ground gestalt, as well as Closure, Similarity, and Proximity. *See* Decl. of Rake, Ex. 3, ¶68. Dkt. 629.

Another important design feature that has a significant effect on the overall visual impression of the ordinary observer is the size and shape of the fenders. *See* Decl. of Rake, Ex 4, ¶68. Dkt. 629. Even to the most casual observer, the differences are significant.



Undercarriage Comparison- '195 Patent/ Accused Product C/ '906 Patent

(4) Gyroor D

a. Non-infringement of the 'D723 Patent by Gyroor D

There are several key design differences between the design claim of the 'D723 Patent and Gyroor D. The recessed center portion of the claimed design of the '723 patent and the design of the prior art '906 patent are concavely curved, whereas the recessed center portion of the design of the Gyroor "D" hoverboard has a truncated "v" shape appearance comprising opposing diagonally straight edges that connect to a horizontally straight inner edge. *See* Decl. of Gandy Ex. 2, ¶86. Dkt. 629. In addition, the claimed design of the '723 patent, the design of the prior art '906 patent and the design of Gyroor "D" hoverboard are all comprised of the same general components, namely, opposing outer foot surfaces that are substantially flat, a recessed center portion and wheel covers at each end. *Id.*

In the front and rear views below, the concavely curved recessed center portion of the top surface of the claimed design of the '723 patent and the design of the prior art '906 patent both have a slightly raised convex contour, while the corresponding center portion of the top surface of the design of the Gyroor "D" hoverboard is slightly recessed down below the opposing outer foot surfaces and has a pattern of longitudinal ribs that extend down onto the front and rear surfaces.

*Id.* The bottom and back view also play a role in an ordinary observer's understanding the overall visual appearance of the designs. *See* Decl. of Rake, Ex 4, ¶53. Dkt. 629. A bottom view reveals substantial design differences. *Id.* There is a prominent central design detail at the center, two strong styling recess areas under the feet, and vent hole patterns that are readily noticed because of the Figure Ground gestalt, as well as Closure, Similarity, and Proximity. *Id.*



Undercarriage Comparison- '723 Patent/'906 Patent/ Accused Product D

a. Non-infringement of the 'D256 Patent by Gyroor D

There are several key design differences between the design claim of the 'D256 Patent and Gyroor D. The recessed center portion of the claimed design of the '256 patent and the design of the prior art '906 patent are concavely curved, whereas the recessed center portion of the design of the Gyroor "D" hoverboard has a truncated "v" shape appearance comprising opposing diagonally straight edges that connect to a horizontally straight inner edge. *See* Decl. of Gandy, Ex 3, ¶53. Dkt. 629. The concavely curved recessed center portion of the top surface of the claimed design of the '256 patent and the design of the prior art '906 patent both have a slightly raised convex contour, while the corresponding center portion of the top surface of the design of the

Gyroor "D" hoverboard is slightly recessed down below the opposing outer foot surfaces and has a pattern of longitudinal ribs that extend down onto the front and rear surfaces. *Id.* .

The wheel covers shown on the claimed design of the '256 patent and the design of the prior art '906 patent are both semi-circular in shape, while the wheel covers on the design of Gyroor "D" hoverboard have opposing diagonally straight side edges a substantially flat top edge which curves outwardly. *Id.* ¶93. The bottom and back views also play a role in an ordinary observer's understanding the overall visual appearance of the designs. A bottom view reveals substantial design differences. *Id. See* Decl. of Rake, Ex 4, ¶61. Dkt. 629. There is a prominent central design detail at the center, two strong styling recess areas under the feet, and vent hole patterns that are readily noticed because of the Figure-Ground gestalt, as well as Closure, Similarity, and Proximity. *Id.* ¶62.



Another important design feature that has a significant effect on the overall visual impression of the ordinary observer is the size and shape of the fenders. *Id.* ¶63. Even to the most casual observer, the differences are significant.



Fender Comparison- '723 Patent/ Accused Product D

b. Non-infringement of the 'D195 Patent by Gyroor D

There are several key design differences between the design claim of the 'D195 Patent and Gyroor D. The recessed center portion of the claimed design of the '195 patent and the design of the prior art '906 patent are concavely curved, whereas the recessed center portion of the design of the Gyroor "D" hoverboard has a truncated "v" shape appearance comprising opposing diagonally straight edges that connect to a horizontally straight inner edge. *See* Decl. of Gandy, Ex 3, ¶98. Dkt. 629. The front, rear, side, perspective and bottom the specific shape and appearance of most of the surfaces and features of the claimed design of the '195 patent, the design of the prior art '906 patent and the design of the Gyroor "D" hoverboard differ significantly from each other. *Id.* Specifically, the wheel covers shown on the claimed design of the '195 patent and the design of the prior art '906 patent are both semi-circular in shape and extend over and cover the entire wheel, while the wheel covers on the design of Gyroor "D" hoverboard have opposing diagonally straight side edges a substantially flat top edge which curves outwardly but does not extend over the entire wheel. *Id.* ¶99.

The bottom and back views also play a role in an ordinary observer's understanding the overall visual appearance of the designs. A bottom view reveals substantial design differences. *See* Decl. of Rake, Ex 4, ¶67. Dkt. 629. There is a prominent central design detail at the center, two

strong styling recess areas under the feet, and vent hole patterns that are readily noticed because of the Figure-Ground gestalt, as well as Closure, Similarity, and Proximity. *Id*.  ¶68



Undercarriage Comparison-'195 Patent/ Accused Product/ '906 Patent

Another important design feature that has a significant effect on the overall visual impression of the ordinary observer is the size and shape of the fenders. *Id*. ¶69. Even to the most casual observer, the differences are significant.



Fender Comparison- '195 Patent/ Accused Product D

c.  Non-infringement of the 'D112 Patent by Gyroor D

There are several key design differences between the design claim of the 'D112 Patent and Gyroor D. The recessed center portion of the claimed design of the '112 patent and the design of the prior art '906 patent are concavely curved, whereas the recessed center portion of the design of the Gyroor "D" hoverboard has a truncated "v" shape appearance comprising opposing diagonally straight edges that connect to a horizontally straight inner edge. *See* Decl. of Gandy,

Ex 3, ¶103. Dkt. 629. The concavely curved recessed center portion of the top surface of the claimed design of the '112 patent and the design of the prior art '906 patent both have a slightly raised convex contour, while the corresponding center portion of the top surface of the design of the Gyroor "D" hoverboard is slightly recessed down below the opposing outer foot surfaces and has a pattern of longitudinal ribs that extend down onto the front and rear surfaces . *Id.*

The bottom and back views also play a role in an ordinary observer's understanding the overall visual appearance of the designs. A bottom view reveals substantial design differences. Decl. of Rake, Ex 4, ¶73. Dkt. 629. There is a prominent central design detail at the center, two strong styling recess areas under the feet, and vent hole patterns that are readily noticed because of the Figure-Ground gestalt, as well as Closure, Similarity, and Proximity. *Id.* ¶74.



Undercarriage Comparison- '112 Patent/ Accused Product D/ '906 Patent

Another important design feature that has a significant effect on the overall visual impression of the ordinary observer is the size and shape of the fenders. *Id.* ¶75. Even to the most casual observer, the differences are significant.

44



(5) Gyroor E

There are several key design differences between the design claim of the Patents-in-Suit and Gyroor E. From the top and front views, the differences in the shape and design of the footpads are clear. An ordinary observer familiar with the prior art and other products in the marketplace would recognize the Patents-in-Suit have prominent design element in the middle and the Gyroor E is clean, without any such design element.

The bottom and back views also play a role in an ordinary observer's understanding the overall visual appearance of the designs. A bottom view reveals substantial design differences. There is a prominent central design detail at the center, two strong styling recess areas under the feet, and vent hole patterns that are readily noticed because of the Figure-Ground gestalt, as well as Closure, Similarity, and Proximity.

Another important design feature that has a significant effect on the overall visual impression of the ordinary observer is the size and shape of the fenders. Even to the most casual observer, the differences are significant.

(1) Conclusion

An ordinary observer, familiar with the prior art, would not be confused when observing the claimed designs of the Patents-in-Suit, the claimed designs of the Accused Products, and the design of the prior art of the '906 Patent. The shape and appearance of the few features common to the claimed design of the Patents-in-Suit and the design of the prior art '906 are not found in the claimed design of Accused Products and are so substantially different such that an "ordinary observer", familiar with the prior art, would not be confused so as to purchase one thinking it to be the other. Therefore, the design of Accused Products does not infringe the claimed design of the Patents-in-Suit.

## V.   CONCLUSION

For the foregoing reasons, all of Plaintiffs' expert reports by Mr. Hatch, including the inadmissible new declaration, should be excluded. Accordingly, without submitting any admissible evidence for their opposition, Plaintiffs' conclusory statements cannot create a disputed issue of material fact. Therefore, Defendant and Third-Party Respondents respectfully request the Court find that the Accused Products does not infringe on the Patents-in-Suit.

Date: 2/8/2023                                              /s/ *Wei Wang*

Wei Wang, Esq.
GLACIER LAW LLP
41 Madison Avenue, Ste 2529
New York, NY 10010
wei.wang@glacier.law
332-777-7315

GLACIER LAW LLP
506 Second Ave., Ste 1516
Seattle, WA 98104
Na Zhang, Esq.
queena.zhang@glacier.law
206-397-8633

GLACIER LAW LLP
251 South Lake Ave, Suite 910
Pasadena, CA 91101
Yu-Hao Yao, Esq.
mickey.yao@glacier.law
312-448-7772

GLACIER LAW LLP
200 E. Randolph Dr., Ste. 5100
Chicago, IL 60601
Ruoting Men, Esq.
ruoting.men@glacier.law
Tianyu Ju, Esq.
Iris.ju@glacier.law
312-270-0413

*Attorneys for Defendant and Third-Party Respondents*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this February 8, 2023, I electronically filed the foregoing file with the Clerk of Court using the CM/ECF system, and service was perfected on all counsel of record and interested parties through this system, which will deliver a true and correct copy of the foregoing documents via CM/ECF.


Date: 2/8/2023 _____      /s/ *Wei Wang* _____
                                            Wei Wang