# Exhibit B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| **HANGZHOU CHIC INTELLIGENT TECHNOLOGY CO. AND UNICORN GLOBAL INC.**, <br><br> PLAINTIFFS. <br><br> v. <br><br> **THE PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE A**, <br><br> DEFENDANTS. | Case No.: 20-cv-04806 <br><br> Judge Thomas M. Durkin <br><br> Magistrate Judge Jeffery Cole |

PAUL HATCH REBUTTAL REPORT TO
JIM GANDY EXPERT REPORT

087902\3\130269532.v1

**TABLE OF CONTENTS**

I. EXECUTIVE SUMMARY ........................................................................................... 1

II. SCOPE OF OPINIONS ............................................................................................... 1

    A. Background and Qualifications .......................................................................... 2

    B. Compensation and Prior Testimony ................................................................... 2

    C. Materials and Information Considered ............................................................... 2

III. LEGAL STANDARDS ................................................................................................ 2

IV. ANALYSIS OF THE GANDY REPORT ................................................................... 3

    A. The Credibility of The Gandy Report Is Undermined By His Failure To Apply The Correct Legal Procedure Or Analysis For Infringement Analysis .......................................................... 5

        1. The Gandy Report fails to construe the scope of the Patents-In-Suit ............................... 5

        2. The Gandy Report Omits Critical Steps of The Ordinary Observer Test ........................... 5

        3. The Gandy Report Fails to Define The Level Of Attention Of The Ordinary Observer ....... 6

        4. The Gandy Report Applies a Designer's Eye Instead Of The Ordinary Level Of Attention Of The Ordinary Observer ................................................................ 6

        5. The Gandy Report Conducts the Analysis Only Through Skewed Photos and Not From Samples Of The Infringing Products .................................................... 8

        6. The Gandy Report Relies on Improper Analysis Of The Markings ................................... 9

        7. The Gandy Report Relies on "Some Differences" as the Evidence for Infringement ......... 9

    B. Mr. Gandy Improperly Relies Upon Small, Isolated Differences in Specific Views and Not the Overall Impression ................................................................. 9

    C. The Gandy Report Fails to Provide Evidence to Support Its Opinions .............................. 10

V. ANALYSIS OF MR. GANDY'S REBUTTAL OF HATCH INFRINGEMENT REPORT ....................... 12

VI. A Three-way Comparison of the Patents-In-Issue ................................................... 13

VII. CONCLUSION .......................................................................................................... 13

VIII. RESERVATION OF RIGHTS ................................................................................. 14

## I. EXECUTIVE SUMMARY

Based upon the legal principles explained to me and my examination of the Gandy Report, Defendant's Infringing products, the Patents-In-Suit and their file histories, and the prior art, it is my opinion that:

- The reliability and credibility of the Gandy Report is undermined by his failure to apply the correct legal procedure or analysis for infringement analysis.
- The Gandy Report is missing critical steps of infringement analysis including failing to expressly construe the scope of the Patents-In-Suit.
- The analysis in the Gandy Report relies upon an incorrect understanding of the ordinary observer test and also fails to define the level of attention of the ordinary observer.
- The Gandy Report applies a designer's eye instead of the ordinary level of attention of the ordinary observer.
- Mr. Gandy improperly relies upon small, isolated differences in specific views and not the overall impression and relies on "some differences" as evidence of infringement.
- Mr. Gandy relies on improper analysis of the brand markings.
- Mr. Gandy conducts the analysis only through skewed photos and not from samples of the Infringing Products and fails to provide evidence to support its opinions.

It is my opinion that the overall appearance of each the Infringing Products is not "plainly dissimilar" to one or more of the Claimed Designs of the Patents-In-Issue.

Further, an ordinary observer familiar with the prior art, giving the attention of a usual purchaser, would find the overall appearance of the Infringing Product to be substantially the same as the overall appearance of one or more of the claimed designs of the Patents-In-Issue in light of the prior art, inducing him or her to purchase each Infringing Product supposing it to be the Claimed Design.

## II. SCOPE OF OPINIONS

I have been retained by counsel as an independent expert witness to provide my opinion regarding the above litigation matter, and matters related to the U.S. Patents D737,723, D738,256, D784,195, and D785,112 ("the Patents-In-Suit"). (Dkt. 37-11). I also hereby provide my rebuttal to Mr. Gandy's Declaration, dated September 3rd, 2021, (served on August 18th, 2022) ("the Gandy Report"). This report is an addition to my previous Infringement Report submitted on behalf of Plaintiffs Hangzhou Chic Intelligent Technology Co. and Unicorn Global Inc.'s (collectively "Hangzhou") claims of patent infringement against defendant. In this rebuttal report I may from time-to-time refer back to my recent report The Expert Report of Paul Hatch Regarding Infringement, dated August 15, 2022 ("Hatch Report").

I understand my task is to review materials and offer my opinion, perspective, and insights regarding this subject. I hold the opinions expressed in this report, but as my study of the case continues, I may acquire additional information that leads to new insights relevant to these

opinions. With that in mind, I reserve the right to supplement this report further if and when such additional information becomes known to me. I may also provide supplemental and rebuttal reports in response to arguments which may be proposed by the Defendants.

### A. Background and Qualifications

I incorporate by reference my background and qualifications as outlined in my previous report. See Hatch Report § I.B.

### B. Compensation and Prior Testimony

I am being compensated at a rate of $450 per hour to provide analysis and testimony in this proceeding. My compensation is not contingent on the outcome of any matter or the specifics of my testimony. I have no financial interest in the outcome of this matter.

### C. Materials and Information Considered

In forming my opinions, I have reviewed the Gandy Report, the Infringing products, the claimed designs of the Patents-In-Suit; their file history; and the prior art cited on the face of the patents.

## III. LEGAL STANDARDS

The legal standards were presented in my prior report, but are worth restating here again because of the mischaracterization, paraphrasing or misstatement by Mr. Gandy.

It is my understanding that "[w]hether a design patent is infringed is determined by first **construing the claim** to the design, when appropriate, and then comparing it to the design of the accused device." *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1404 (Fed. Cir. 1997) (emphasis added) (citing *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995)). To construe the scope of a design patent, I understand that one must **consider whether the figures identify unclaimed subject matter** (e.g., features depicted in broken lines); and whether the **prosecution history** of the application shows if the applicant disclaimed subject matter or distinguished the Claimed Design from other ornamental designs. *See Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co. Inc.*, 162 F.3d 1113, 1116 (Fed. Cir. 1998)

I understand that a design patent infringement analysis is a **two-step process**. The first step, after a design patent's claim is construed is to consider whether the Claimed Design and Infringing Products are "sufficiently distinct" also known as "plainly dissimilar." *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1335 (Fed. Cir. 2015) (citing *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F. 3d 665, 678 (Fed. Cir. 2008)). If the Claimed Design and the Infringing Products are found to be plainly dissimilar, there is no patent infringement. *Id*.

I also understand that while the claimed design of a design patent is better represented by an illustration, it is helpful to the finder of fact to be provided with **guidance on the overall impression** of the claimed design on the ordinary observer. *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002).

But, "if the claimed and accused designs are not plainly dissimilar," I understand that the second step in an infringement analysis involves a **three-way comparison** to compare "the

2

patented and accused designs in the context of similar designs found in the prior art." *Egyptian Goddess*, 543 F.3d at 674. "If the accused design has copied a particular feature of the claimed design that departs conspicuously from the prior art, the accused design is naturally more likely to be regarded as deceptively similar to the claimed design, and thus infringing." *Id*. at 677.

As I understand, "the fact finder must apply the ordinary observer test by **comparing similarities in overall designs**, not similarities of ornamental features in isolation," *Ethicon*, 796 F.3d at 1335 (citing *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1296 (Fed. Cir. 2010)), and "**not minor or trivial differences** that necessarily exist between any two designs that are not exact copies of one another." *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1243 (Fed. Cir. 2009) (emphasis added).

As I understand, "[t]he measure of infringement of a design patent is deception of the **ordinary observer**, when such person gives the design the attention usually given by a purchaser of the item bearing the design[.]" *Goodyear Tire*, 162 F.3d at 1117. Accordingly, I understand that the hypothetical ordinary observer must be identified before applying the ordinary observer test by focusing on the "actual product that is presented for purchase, and the ordinary purchaser of that product." *Id*.

Further, I understand that some courts have held that the ordinary observer is one who is "not an expert in the claimed designs", but rather "one of **ordinary acuteness** who is a principal purchaser []" of the product. *Ethicon*, 796 F.3d at 1337 (emphasis added) (internal quotations and citation omitted).

I am also informed that the "[l]**ikelihood of confusion** as to the source of the goods is **not a necessary or appropriate factor** for determining infringement of a design patent." *Unette Corp. v. Unit Pack Co..*, 785 F.2d 1026, 1029 (Fed. Cir. 1986) (emphasis added).

I understand that the fact that an Infringing Products is **marked with a trademark or logo** designating the product's source does not, as a matter of law, negate design patent infringement. Design patent infringement relates solely to the patented design and does not allow of avoidance of infringement by labelling. *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1126 (Fed. Cir. 1993).

### IV.  ANALYSIS OF THE GANDY REPORT

Table 1 is provided below to facilitate the discussion of the infringing product types:

3

| Table 1: Infringing Products by Defendants Gyroor | | |
|---|---|---|
| Name and Store names | Infringing Product Model | Infringing Product Photo (Representative) |
| **"Gyroor A":**<br><br>Gyroor (Gyroor.com; gyroorboard.com); Gaodeshang-US; Gyroshoes; HGSM; Urbanmax; Jiangyou-US; Gyroor-US | Gyroor 6.5 inch hoverboards | |
| **"Gyroor B":**<br><br>Gyroor (Gyroor.com; gyroorboard.com); Gaodeshang-US | Gyroor T580 series and variants | |
| **"Gyroor C":**<br><br>Gyroor US; Jiangyou-US; (Gyroor.com; gyroorboard.com); | Gyroor T581 series and variants | |
| **"Gyroor D":**<br><br>Fengchi-US; (Gyroor.com; gyroorboard.com); | G5 series and variants | |
| **"Gyroor E"**<br><br>(Gyroor.com; gyroorboard.com); | G11 series and variants | |

4

### A. The Credibility of The Gandy Report Is Undermined By His Failure To Apply The Correct Legal Procedure Or Analysis For Infringement Analysis

1. The Gandy Report fails to construe the scope of the Patents-In-Suit

As outlined in Section III above, the infringement analysis requires the claimed design of the Patents-In-Issue to first be construed. Mr. Gandy failed to provide the information from the face of the patents or make any mention or analysis on their filing history, their prior art or about **the scope of each patent** in light of the prior art, which is not identical. Without construing the claims of the patent in light of the prior art, the analysis and resulting conclusions that follow may be greatly undermined.

Mr. Gandy's failure to construe the Patents-In-Suit is even more so confounding considering he stated this as a necessity for infringement analysis, "it is my understanding that design patent infringement is determined by first construing the claim to the design and then comparing it to the design of the accused device." (Gandy Report ¶ 19).

2. The Gandy Report Omits Critical Steps of The Ordinary Observer Test

I am informed that after construing the claims, the infringement analysis follows two steps: The first step is a comparison of the Infringing Products to the Patents-In-Issue to evaluate whether they are 'plainly dissimilar'. Mr. Gandy went immediately to conduct the second step of the test, thereby **skipping the critical first step of the ordinary observer test**. As the second step of the ordinary observer test is only necessary if the designs are *not plainly dissimilar*, Mr. Gandy's actions suggest he considered them to be not plainly dissimilar.

However, after conducting the three-way comparison which looks at whether in the light of the prior art the conflicting designs are 'substantially the same', Mr. Gandy concludes only that the designs are "**dissimilar**". (Gandy Report ¶ 112). Not only is this the wrong level of acuteness for the three-way comparison, but also it contradicts his previous actions in skipping the test for being plainly dissimilar. The table below illustrates the main steps of infringement analysis typically conducted by a plaintiff's expert. This is a simplified diagram, only to illustrate the steps Mr. Gandy should have conducted.



Table 2: Mr Gandy did not construe the scope of the claim, and did not conduct the first step of the ordinary observer test.

It is important to note that a finding of the conflicting designs as being *plainly dissimilar* is a high bar, as it represents that the dissimilarities are so great there is no need to compare them directly to the prior art. Mr. Gandy does not conduct the correct analysis to draw this conclusion.

Further, after conducting the three-way comparison, Mr. Gandy does not find the products to be 'substantially different' or 'not substantially the same'. While it may be inferred that he misstated his conclusions or used the wrong terms, it is clearly misleading that he refers to 'dissimilarity' and may undermine the credibility of his testimony.

Of further note is that while Mr. Gandy concludes that Gyroor A, B, C and D do not infringe (Gandy ¶ 112), he does not opine that Gyroor E does not infringe, nor does he rebut my opinion that it does infringe.

### 3. The Gandy Report Fails to Define The Level Of Attention Of The Ordinary Observer

Mr. Gandy asserts only that the ordinary observer in this case is "is a potential purchaser who is familiar with hoverboards and their different designs." (Gandy Report ¶ 20). I disagree that the (potential) purchaser of hoverboards at this entry-level price-point would be so familiar with the market. However, the ordinary observer's *familiarity* with the category is not relevant to this analysis, as the hypothetical ordinary observer already has knowledge of the relevant prior art. In an infringement analysis, the definition of the purchaser is used to establish the **level of attention** they may apply to aesthetics, form and styling details. In my opinion, the purchaser would be focused primarily on user reviews, brands and costs, and would apply very little attention to the intricacies of the finer styling details.

And I explained this clearly in my prior report. For example, I stated that "an ordinary observer in this case is the typical purchaser of hoverboards i.e., a consumer user or the parent of a user, each having little or no experience purchasing hoverboards." (Hatch Report at 6.) "The ordinary observer encounters products like the Claimed Designs via online stores, television and entertainment media, and social media, and purchases them using online stores or from 'brick and mortar' stores like Best Buy or Walmart." (*Id*.) Therefore, such an ordinary observer would view various hoverboard products, including those embodying prior art, while browsing through online images of hoverboards.

Based on the context of purchase, and the untrained eye of the purchaser, it is my opinion that the hypothetical ordinary observer would possess "ordinary acuteness" and would apply a *relatively low level of attention* to the aesthetics of the product. Thus, small visual details (e.g., such as the air vent pattern on the underside or the specific shape of the shallow grooves on the foot pads) would not affect their overall impression of the object as a whole.

My description of the ordinary observer was provided in my previous report. Mr. Gandy reviewed this report and **did not respond or dispute my description** of the level of ordinary acuteness the purchaser and ordinary observer would have.

### 4. The Gandy Report Applies a Designer's Eye Instead Of The Ordinary Level Of Attention Of The Ordinary Observer

6

In many areas Mr. Gandy describes subtleties in form that he, as an expert in the field of design was able to detect, but these small details seen only in isolated areas from certain angles are not salient to the eyes of an ordinary observer with ordinary acuteness, as the test requires. For example, Mr. Gandy detects a slight upward curvature in the middle of the hoverboard when viewed from the front, whereas the corresponding area of the Infringing Products is relatively flat.



Table 3: Mr. Gandy's expert eye finds subtleties an ordinary observer would not

Closeup, middle section of the '256 Patent. In this particular view we can see curvature. Note also, the '195 Patent does not have an upward curvature here.

Closeup, corresponding middle section of Infringing Products A

But when viewed at other angles, this slight curvature is not salient to the overall impression of the object as a whole to the ordinary observer.

Mr. Gandy uses his trained eye on several other areas too, often only focused on one particular viewpoint to draw comparisons of dissimilarity. For example, he finds subtle differences in the hourglass shape in the top view. I do not dispute there are differences, but they would be insignificant to the impression of the product as a whole to the ordinary observer.



Table 4: Mr. Gandy's expert eye finds subtleties an ordinary observer would not

Figure 7 of the '723 Patent

7



| | |
|---|---|
| | Infringing Products A |
| | Figure 4 of the '906 Patent |

When comparing the hourglass shape (*see* table 4 above), Mr. Gandy opines that "the hour glass peripheral shape of the prior art D739,906 (the "'906 patent") patent appears to be closer to the claimed design of the '723 patent than the design of [The Accused Product]." (Gandy Report ¶ 24). First, any differences between the Infringing Products and the Patents-In-Suit in the hourglass shape are subtle and **would not be significant** to the ordinary observer when viewing the product as a whole. Second, with my trained eye I can see that out of the three, the hourglass shape of the '906 shape differs the most.

Further, even though Mr. Gandy regards small differences in the hourglass outer shape to be important, he **fails to detect any differences between the individual Patents-In-Suit** and handles them in exactly the same way.

5. The Gandy Report Conducts the Analysis Only Through Skewed Photos and Not From Samples Of The Infringing Products

Mr. Gandy's report informs us that he **did not analyze physical samples** of the Infringing Products at all. While not a mandatory part of analysis, his observations may have been very different had he evaluated the Infringing Products in person instead of relying upon photographs with distorted perspectives.

His non-analysis of the physical products also misled him into **falsely believing that the front and back of each of the Infringing Products are identical**, an assumption that was repeated in many places in all the reports. Specifically, he used two views of the Patents-In-Suit to show the front and back, whereas for the Infringing Products he only provided a view of the front.

| **Table 5: Mr. Gandy was misled to think the front and back of each of the Infringing Products are identical.** |
|---|
|  |
| Image from the Gandy Report |

6. The Gandy Report Relies on Improper Analysis Of The Markings

In his infringement analysis Mr. Gandy lists differences between the Infringing Products and the Patents-In-Suit and includes as a point of differentiation that the Infringing Products include the logo "GYROOR". As detailed in Section III above, the use of a logo is not relevant to this comparison and does not afford avoidance of infringement. Considering Mr. Gandy's extensive experience with patent analysis, his inclusion of the logo as an argument for non-infringement may put the reliability of his testimony in question.

7. The Gandy Report Relies on "Some Differences" as the Evidence for Infringement

After finding isolated differences between each of the Infringing Products and the Patents-In-Suit, Mr. Gandy concludes "it's my opinion that the claimed design of the [Patent-In-Suit] **has some surfaces** and features that are closer in overall shape and appearance to the design in the prior art patent '906 patent than the design of the [Infringing Product]" (Gandy Report ¶¶ 41, 63, 68, 85, 106, 111) (emphasis added). In his opinion these differences make the Infringing Products distinct which leads to his conclusion that "the design of the [Infringing Product] does not infringe the claimed design of the [Patent-In-Suit]". (*Id.* ¶¶ 30, 36, 41, 46, 52, 58, 63, 68, 74, 80, 85, 90, 96, 102, 106, 111). The finding that "some" isolated features are similar to the prior art is not enough evidence to conclude non-infringement; the test concerns the *overall impression of the object as a whole*, and whether the impression of the Infringing Products is closer to the Patents-In-Suit than the '906 Patent. This is especially critical considering the impression of the '906 Patent has already been found to be substantially different and possibly dissimilar from the Patents-In-Issue by the examiner.

      B.    **Mr. Gandy Improperly Relies Upon Small, Isolated Differences in Specific Views and Not the Overall Impression**

The Gandy Report improperly relies upon insignificant **isolated features** in specific views to analyze differences between the Infringing Products and the Patents-In-Issue, and not the

9

overall impression of the design as a whole[1]. Specifically, he discusses only differences between isolated features such as the air vents and grooves when viewed from the underside, the lights when viewed from the front, the grooves in the foot pads and the exact outer contour of the hourglass shape when viewed in the top view. Such **small, isolated details become insignificant** when viewing the product as a whole, particularly when applying the level of attention that the purchaser would apply, which in this case is quite low.

For example, Mr. Gandy repeatedly describes at length small, isolated differences such as the lines and bumps on the front of the Accused Designs and the Patents-In-Suit (Gandy Report ¶¶ 25-26). While there are differences in the 'light' area of the conflicting designs, his detailed descriptions appear to be an **attempt to detract** from the fact that the '906 is *completely devoid of such features* in this area.

A similar method of distracting through insignificant differences is also applied to other areas of the designs in specific views. For example, Mr. Gandy describes small differences in vents and styling lines the bottom view, but the '906 is once again the 'odd man out' in having **no such details whatsoever**. As further example, Mr. Gandy describes differences between the grooves and shapes of the foot pads in the top view, where the '906 is completely devoid of any definitive foot pads.

Further, Mr. Gandy's analysis **improperly prioritizes selected views** over others, which may skew the analysis unfairly toward specific features. In infringement analysis the hypothetical ordinary observer would be familiar with all sides of the product based on the combination of all viewpoints. The viewpoint of the hypothetical ordinary observer is **not limited to specific views** but views the form as a whole.

### C. The Gandy Report Fails to Provide Evidence to Support Its Opinions

Mr. Gandy also omits evidence that contradicts his opinions. For example, in each of Mr. Gandy's charts he presents a figure from the Patent-In-Issue to a similar angle of the Infriging Products and a similar angle of the '906 Patent. However, when opining on the foot pads, he completely omits the corresponding image of the '906 Patent which as we can see below differs greatly from the design of the Infringing Products and contradicts his opinion. While the ordinary observer can see *differences* between these particular parts of the two designs, the '906 presents a radically different impression.

---

[1] I am informed that in evaluating infringement, courts determine whether "the deception that arises is a result of similarities in the overall design, not of similarities in ornamental features considered in isolation." *Amini Innovation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1371 (Fed. Cir. 2006) (citing *Keystone Retaining wall Sys., Inc. v. Western, Inc.*, 997 F.2d 1444, 1450 (Fed. Cir. 1993).

10

| Table 6: Mr. Gandy omits showing the '906 (added, right) in his table comparing the foot pads. |
|---|
|  |

In comparing the fender designs he states that "the wheel covers of the design of Gyroor "C" hoverboard are wider than those of the design of the '256 patent." (Gandy Report ¶ 76). His statement is not untrue, but it focuses on a small differences between the '256 Patent and the Accused Product, and **completely ignores how entirely different** the same area of the '906 presents itself. Below is the comparison Mr. Gandy provides, in which we can clearly see the starkly differing design of the '906 which depicts a *fender skirt* that almost entirely occludes the wheel.

| Table 7: The '906 Presents a Very Different Impression in the Wheel Area To The Ordinary Observer. |
|---|

This unhelpfulness is repeated for this particular area *16 times* throughout Gandy Report.

This tactic is also employed when discussing the front surface in the area of the 'lights', where his accompanying illustration clearly shows that the '906 is 'the odd man out' in being devoid of any decoration, 'lights' or styling lines on the front surface.

11

| **Table 8: The '906 Presents a Very Different Impression of the 'Lights' Area To The Ordinary Observer.** |
|---|
|  |

Mr. Gandy opines in many paragraphs of his reports how some parts (such as the front and back) of the claimed design of the Patents-In-Issue are "dissimilar" to the '906 Patent. Despite this, in another part of the report Mr. Gandy opines "that the design disclosed in the prior art '906 patent has an overall shape and appearance **basically the same** as the Asserted Patents" (Gandy Report ¶ 23) (emphasis added). This finding contradicts the opinion of the examiner who compared the '906 Patent to two of the Patents-In-Suit[2] and found them *not substantially the same*.

### V. ANALYSIS OF MR. GANDY'S REBUTTAL OF HATCH INFRINGEMENT REPORT

In his short rebuttal of my Infringement Analysis, Mr. Gandy incorrectly states that certain features are not adequately described; the shape of the footpads, contour of the narrow central portion, the specific shape of the fenders, specific shape of the lights, and the features on the bottom. However, these were all part of my analysis, and many were referred to **in several parts of my report**. Moreover, the descriptors I used were to describe the impression of the design as a whole as seen by the ordinary observer, and therefore some details such as the vents on the bottom and the slight curvature on top of the middle portion were not specifically called out as they are insignificant to the overall impression.

---

[2] The examiner did not analyze the '906 at the time of the filing of the '723 and '256.

12

Mr. Gandy is also misinterpreting the law in his assertions that I failed to "adequately" compare the designs to the prior art or define the closest prior art. I understand that **it is the burden of the Defendants and** not the Plaintiff to provide what they consider the closest prior art and provide an analysis that evidences their opinion. *Egyptian Goddess* specifically provides that "if the accused infringer elects to rely on the comparison prior art as part of its defense against the claim of infringement, the burden of production of that prior art is on the accused infringer." *Egyptian Goddess*, 543 F3d at 678.

Mr. Gandy also states I provide "overly broad" conclusions "not based upon sufficient evidence". I disagree, as my opinions about non-infringement were evidenced in ways that Mr. Gandy failed, such as:

> Construing the claim scope of each the Patents-In-Issue,
> Setting the level of visual acuity for the ordinary observer through which to view,
> Presenting analysis on the cited prior art, and
> Presenting written descriptions of the overall impression of the design as a whole.

## VI. A Three-way Comparison of the Patents-In-Issue

In view of the '906 Patent, which is no more relevant than the prior art already known at the time, I have conducted another comparison between the Patents-in-Suit, the Infringing Products, and the '906 Patent in Exhibit 1. My conclusions are that in the eyes of the ordinary observer, the claimed design of the Patents-in-Suit is substantially the same as the overall visual impression presented by the Infringing Products as demonstrated in Exhibit 1.

## VII. CONCLUSION

Based upon the legal principles explained to me and my examination of the Gandy Report, Defendant's Infringing products, the Patents-In-Suit and their file histories, and the prior art, it is my opinion that:

- The reliability and credibility of the Gandy Report is undermined by his failure to apply the correct legal procedure or analysis for infringement analysis.
- The Gandy Report is missing critical steps of infringement analysis including failing to expressly construe the scope of the Patents-In-Suit.
- The analysis in the Gandy Report relies upon an incorrect understanding of the ordinary observer test and also fails to define the level of attention of the ordinary observer.
- The Gandy Report applies a designer's eye instead of the ordinary level of attention of the ordinary observer.
- Mr. Gandy improperly relies upon small, isolated differences in specific views and not the overall impression and relies on "some differences" as evidence of infringement.
- The Gandy Report relies on improper analysis of the brand markings.
- Mr. Gandy conducts the analysis only through skewed photos and not from samples of the Infringing Products and fails to provide evidence to support its opinions.

13

It is my opinion that the overall appearance of each the Infringing Products is not "plainly dissimilar" to one or more of the Claimed Designs of the Patents-In-Issue.

Further, an ordinary observer familiar with the prior art, giving such attention as a purchaser usually gives would find the overall appearance of the Infringing Product to be substantially the same as the overall appearance of one or more of the claimed designs of the Patents-In-Issue in light of the prior art, inducing him or her to purchase each Infringing Product supposing it to be the Claimed Design.

## VIII.     RESERVATION OF RIGHTS

My current opinions are set forth in this Report. However, my analysis is continuing, and I thus reserve the right to supplement or amend my report and to rely on additional documents, prior art, or discovery or testimony that may come to my attention.

Moreover, I may make additions, deletions, or modifications to this Report and my opinions in the future that would be reflected in my testimony at the trial and/or additional reports that I may be asked to submit in this case. I also reserve the right to rely on all other expert reports submitted in this case. For the forthcoming trial, I may prepare diagrams, charts, other demonstratives, and/or demonstrations that illustrate the issues presented. I reserve the right to respond to additional arguments or analyses proffered by expert witnesses and/or the Defendant, and I understand that I may be asked to give rebuttal testimony on matters not covered in this expert Report.

Dated: Sept 12th, 2022                                              Respectfully Submitted,

_____

Paul Hatch