# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| Hangzhou Chic Intelligent Technology Co. and Unicorn Global Inc., <br><br> Plaintiffs <br><br> v. <br><br> THE PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE A, <br><br> Defendants. | **Case No.: 20-cv-04806** <br><br> **Judge Thomas M. Durkin** <br><br> **Magistrate Judge Jeffery Cole** |

**EXPERT DECLARATION OF PAUL HATCH**
**REGARDING INFRINGEMENT OF U.S. PATENTS D737,723, D738,256,**
**D784,195, and D785,112**

**AND REBUTTAL DECLARATION TO JIM GANDY AND LANCE RAKE**

## TABLE OF CONTENTS

I.     INTRODUCTION .......................................................................................................... 1

II.    EXECUTIVE SUMMARY ........................................................................................... 1

III.   SCOPE OF OPINIONS ................................................................................................ 3

       A.    Background and Qualifications ........................................................................ 3

       B.    Compensation and Prior Testimony ................................................................ 4

       C.    Materials and Information Considered ............................................................ 4

IV.    LEGAL STANDARDS ................................................................................................ 4

       A.    The Limiting Purpose of a Design Patent ....................................................... 4

       B.    Legal Principles in Analysis of Design Patent Infringement ......................... 5

       C.    Claim Construction in Design Patents ............................................................ 6

       D.    The Ordinary Observer Test ........................................................................... 8

       E.    The Significance of Prior Art .......................................................................... 9

       F.    Definition of the Ordinary Observer ............................................................... 9

       G.    Functionality in Design Patents .................................................................... 10

V.     ANALYSIS OF THE PATENTS-IN-SUIT AND THE PRIOR ART ........................ 11

       A.    The Patents-In-Suit ....................................................................................... 11

       B.    Examination of the D'723 Patent .................................................................. 12

       C.    Examination of the D'256 Patent .................................................................. 14

       D.    Examination of the D'195 Patent .................................................................. 17

       E.    Examination of the D'112 Patent .................................................................. 19

       F.    The Cited Prior Art Show The Patents-In-Suit Have A Broad Scope .......... 21

VI.    ANALYSIS OF FUNCTIONALITY .......................................................................... 25

VII.    OVERVIEW OF THE ACCUSED PRODUCTS ............................................................. 28

VIII.   THE ACCUSED PRODUCTS INFRINGES THE PATENTS-IN-SUIT......................... 36

    A.    Accused Product Gyroor A ..................................................................................... 37

        1.    The Accused Product Gyroor A Infringes on the D'723 Patent........................ 37

        2.    The Accused Product Gyroor A Infringes on the D'256 Patent........................ 39

        3.    The Accused Product Gyroor A Infringes on the D'195 Patent........................ 42

    B.    Accused Product Gyroor B ..................................................................................... 44

        1.    The Accused Product Gyroor B Infringes on the D'723 Patent........................ 44

        2.    The Accused Product Gyroor B Infringes on the D'256 Patent........................ 47

        3.    The Accused Product Gyroor B Infringes on the D'195 Patent........................ 49

        4.    The Accused Product Gyroor B Infringes on the D'112 Patent........................ 52

    C.    Accused Product Gyroor C ..................................................................................... 54

        1.    The Accused Product Gyroor C Infringes on the D'723 Patent........................ 54

        2.    The Accused Product Gyroor C Infringes on the D'256 Patent........................ 57

        3.    The Accused Product Gyroor C Infringes on the D'195 Patent........................ 59

    D.    Accused Product Gyroor D ..................................................................................... 61

        1.    The Accused Product Gyroor D Infringes on the D'723 Patent........................ 61

        2.    The Accused Product Gyroor D Infringes on the D'256 Patent........................ 64

        3.    The Accused Product Gyroor D Infringes on the D'195 Patent........................ 66

        4.    The Accused Product Gyroor D Infringes on the D'112 Patent........................ 68

    E.    Accused Product Gyroor E ..................................................................................... 71

        1.    The Accused Product Gyroor E Infringes on the D'723 Patent ....................... 71

        2.    The Accused Product Gyroor E Infringes on the D'256 Patent ....................... 73

        3.    The Accused Product Gyroor E Infringes on the D'195 Patent ....................... 76

IX.     ANALYSIS OF THE RAKE DECLARATION ................................................................. 78

A. The Rake Declaration Relies Upon An Unrelated Patent ........................................... 78

B. The Rake Declaration Relies Upon an Incorrect Understanding of
The Ordinary Observer Test ........................................... 79

C. The Rake Declaration is Missing Critical Steps of Infringement Analysis ............... 79

D. Mr. Rake's Evidence Improperly Relies Upon Dimensions ........................................ 80

E. Mr. Rake Considers Ornamental Elements of The Claimed Designs as
Functional Without Analysis or Evidence ................................... 81

F. The Rake Declaration Improperly Relies Upon Comparing Unclaimed Areas .......... 82

G. The Rake Declaration Fails To Use The Correct Viewpoint Through
Which To Base Opinions ................................... 82

H. Mr. Rake Improperly Relies Upon Whether Individual Differences Are
'Obvious' Instead of Comparing The Overall Impression ........................................ 83

I. Mr. Rake Improperly Relies Upon Small, Isolated Differences in
Specific Views And Not The Overall Impression ....................................... 84

J. The Rake Declaration Omits Critical Views and Evidence ....................................... 86

K. The Reliability And Credibility of the Rake Declaration Is
Undermined By His Errors ................................... 86

X. ANALYSIS OF THE GANDY DECLARATION ........................................ 88

A. The Gandy Declaration fails to construe the scope of the Patents-In-Suit ................. 88

B. The Gandy Declaration Omits Critical Steps of The Ordinary Observer Test .......... 88

C. The Gandy Declaration Fails to Define The Level Of Attention Of The
Ordinary Observer ................................... 89

D. The Gandy Declaration Applies A Trained Eye Instead Of The
Ordinary Level Of Attention Of The Ordinary Observer ......................................... 90

E. The Gandy Declaration Conducts the Analysis Only Through Skewed Photos and Not
From Samples Of The Accused Products ................................... 91

F. The Gandy Declaration Relies on Improper Analysis Of The Markings .................. 93

G.  The Gandy Declaration Relies on "Some Differences" as the
    Evidence for Infringement ............................................................................ 93

H.  Mr. Gandy Improperly Relies Upon Small, Isolated Differences in
    Specific Views and Not the Overall Impression .......................................... 93

I.  The Gandy Declaration Fails to Provide Evidence to Support Its Opinions ............. 94

J.  Analysis of Mr. Gandy's Rebuttal of Hatch Infringement Report ............................. 96

XI.   CONCLUSION ................................................................................................ 97

XII.  RESERVATION OF RIGHTS ...................................................................... 99

## I.      INTRODUCTION

1.      I have been retained by counsel as an independent expert witness to provide my opinion regarding the above litigation matter, and matters related to the U.S. Patents D737,723, D738,256, D784,195, and D785,112 ("the Patents-In-Suit"). This Declaration is in support of Plaintiffs Hangzhou Chic Intelligent Technology Co. and Unicorn Global Inc.'s (collectively "Hangzhou") claims of patent infringement against Defendants The Partnerships And Unincorporated Associations Identified On Schedule A ("Gyroor").

2.      Hangzhou requested that I opine on the similarities between the design claimed in each of the Patents-In-Suit and Defendants' accused hoverboard products "Gyroor A", "Gyroor B", "Gyroor C", "Gyroor D", and "Gyroor E" ("the Accused Products").

3.      I understand my task is to review materials and offer my opinion, perspective and insights regarding this subject. I hold the opinions expressed in this declaration, but as my study of the case continues, I may acquire additional information that leads to new insights relevant to these opinions. With that in mind, I reserve the right to supplement this declaration if and when such additional information becomes known to me. I may also provide supplemental and rebuttal declarations in response to arguments which may be proposed by the Defendants.

## II.     EXECUTIVE SUMMARY

4.      I have considered the appearance of the Accused Products and the claimed designs of each of the Patents-In-Suit ("the Claimed Designs") and from the viewpoint of the ordinary observer who is familiar with the relevant prior art. Having performed this analysis and evaluation, it is my opinion that:

- The overall appearance of each of the Accused Products is not "plainly dissimilar" to one or more of the claimed designs of the Patents-In-Suit, as I understand that term to be understood in Patent Law.

- An ordinary observer familiar with the prior art, giving such attention as a purchaser usually gives, would find the overall appearance of the Accused Products to be substantially the same as the overall appearance of one or more of the Claimed Designs in light of the prior art, inducing him or her to purchase the each of the Accused Products supposing it to be one or more of the Claimed Designs.

1

5.    I have also examined the Expert Declaration of Lance Rake, signed August 21, 2021 ("the Rake Declaration") and it is my opinion that:

- The reliability and credibility of the Rake Report is undermined by many errors.
- The opinions in the Rake Report include contradictory positions that may further significantly undermine his credibility.
- The analysis in the Rake Report relies upon an incorrect understanding of the ordinary observer test and also omits defining the level of attention of the ordinary observer.
- The Rake Report is missing critical steps of infringement analysis including failing to expressly construe the scope of the Patents-In-Suit.
- The opinions in the Rake Report rely upon unrelated patents without providing analysis or evidence.
- Mr. Rake's evidence improperly relies upon dimensions and considers ornamental elements of the claimed designs as functional without analysis or evidence.
- Mr. Rake improperly relies upon comparing unclaimed areas and also relies upon individual differences being 'obvious' instead of comparing the overall impression.

6.    I have also examined the Expert Declaration of Jim Gandy, signed September 12, 2022 ("the Gandy Declaration") and it is my opinion that:

- The reliability and credibility of the Gandy Report is undermined by his failure to apply the correct legal procedure or analysis for infringement analysis.
- The Gandy Report is missing critical steps of infringement analysis including failing to expressly construe the scope of the Patents-In-Suit.
- The analysis in the Gandy Report relies upon an incorrect understanding of the ordinary observer test and also fails to define the level of attention of the ordinary observer.
- The Gandy Report applies a designer's eye instead of the ordinary level of attention of the ordinary observer.
- Mr. Gandy improperly relies upon small, isolated differences in specific views and not the overall impression and relies on "some differences" as evidence of infringement.
- Mr. Gandy relies on improper analysis of the brand markings.

- Mr. Gandy conducts the analysis only through skewed photos and not from samples of the Infringing Products and fails to provide evidence to support its opinions.

## III. SCOPE OF OPINIONS

### A. Background and Qualifications

7.      I am the recently retired CEO of TEAMS Design USA, a global product design consultancy. I have over 25 years of product design and industrial design experience and have designed many mass-produced products, including consumer electronics, personal mobility equipment such as Segways, and electric bicycles. In my company, I was actively involved in all phases of the development process, including the user research, idea conceptualization, styling, visual brand language, development, engineering and overseeing the final production stages.

8.      I reside at 718 S. Oakley Blvd, Chicago, Illinois. I hold a Bachelor of Arts degree with honors (BA (Hons)) in Design for Industry (Industrial Design) from the University of Northumbria at Newcastle, United Kingdom. While studying to obtain my honors degree in Industrial Design, I took courses covering subjects including technical drawing, computer aided drawing, product styling and brand language, ergonomics, product evaluation, usability testing, production techniques, prototyping, mechanical engineering, and production techniques.

9.      In the course of my work as a designer and managing teams of designers, I have gained an understanding of the training, knowledge, skills, and abilities of a person skilled in the art of product design and industrial design. Through this work, I have also gained an understanding of how a person who purchases a particular product perceives and appreciates the visual appearance and or functional merits of a product's design, and I use this understanding to opine on how the purchaser or ordinary observer would answer questions raised in the examination of design patents, utility patents, trademarks, and trade dress claims.

10.      I am the named inventor in over 45 design and utility patents. I have written papers and spoken at many universities across the U.S. on the subject of visual perception, where I share information from psychological and neurological studies into how humans perceive things such as physical products, what physical attributes we notice (if any), and how meaning is attached to what we see. I am currently teaching a graduate course on this subject matter at the University of Illinois at Chicago.

11.     I was recently nominated into the prestigious IDSA Academy of Fellows. I have also been awarded many design awards, including the "Design of the Decade Award" from Business Week, and the IDEA "Juror's Award" in 2020.  In 2016 I was elected to the board of IDSA as Director-at-Large. Further information on my professional experience is detailed in my curriculum vitae, which is set forth in Appendix A.  I have previously provided expert testimony in many other patent-related matters, a detailed list of cases for which I have provided expert testimony is attached as Appendix B.

### B. Compensation and Prior Testimony

12.     I am being compensated at a rate of $450 per hour to provide analysis and testimony in this proceeding.  My compensation is not contingent on the outcome of any matter or the specifics of my testimony. I have no financial interest in the outcome of this matter.

### C. Materials and Information Considered

13.     In forming my opinions, I have reviewed the claimed design of the Patents-In-Suit; their file history; the prior art cited on the face of the patent; and the Accused Products. The list of materials I reviewed in my analysis is included in Appendix C.

## IV.   LEGAL STANDARDS

14.     I am not a lawyer. Rather, I am an industrial designer and base my analysis on the legal guidelines provided to me as outlined below.

### A. The Limiting Purpose of a Design Patent

15.     I understand that a U.S. patent does not grant the owner the right to use the invention, rather, the owner is granted the right, for a limited period of time, to prevent others from making, using, offering for sale, or selling the patented invention in the United States or importing the patented invention into the United States.  In other words, the government grants the patent owner the right to limit other people's use of the invention. To construe the scope of a design patent, I understand that one must also consider the prosecution history of the patent application. *See Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co. Inc.*, 162 F.3d 1113, 1116 (Fed. Cir. 1998).

**B.  Legal Principles in Analysis of Design Patent Infringement**

16.     It is my understanding that "[w]hether a design patent is infringed is determined by first construing the claim to the design, when appropriate, and then comparing it to the design of the accused device." *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1404 (Fed. Cir. 1997) (citing *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995)).

17.     I understand that, under precedent from the U.S. Court of Appeals for the Federal Circuit ("the Federal Circuit"), "trial courts have a duty to conduct claim construction in design patent cases, as in utility patent cases[.]" *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008) (en banc). "[T]he court has recognized that design patents 'typically are claimed as shown in drawings,' and that claim construction 'is adapted accordingly.'" *Id.* (quoting *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1319 (Fed. Cir. 2007)). Given the "difficulties entailed in trying to describe a design in words, the preferable course . . . [is] not to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design." *Egyptian Goddess*, 543 F.3d at 679.

18.     As I understand, after a design patent's claim is construed, the claim "must be compared to the accused design to determine whether there has been infringement." *Elmer*, 67 F.3d at 1577. I understand that infringement occurs when an ordinary observer "giving such attention as a purchaser usually gives, [deems] two designs are substantially the same" meaning "the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other.[]" *Egyptian Goddess*, 543 F.3d at 670 (quoting *Gorham Co. v. White*, 81 U.S. 511, 528 (1872)).

19.     I am also aware that infringement is determined "in light of the prior art" by "applying the ordinary observer test through the eyes of an observer familiar with the prior art." *Egyptian Goddess*, 543 F.3d at 677. Thus, the hypothetical ordinary observer is presumed to have a complete knowledge of all relevant prior art.

20.     I understand that a design patent infringement analysis is a two-step process. The first step is to consider whether the Claimed Design and Accused Products are "sufficiently distinct" also known as "plainly dissimilar." *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1335 (Fed. Cir. 2015) (citing *Egyptian Goddess*, 543 F. 3d at 678). If the Claimed

5

Design and the Accused Products are found to be plainly dissimilar, there is no patent infringement. *Id*.

21.     But, "if the claimed and accused designs are not plainly dissimilar," I understand that the second step in an infringement analysis involves a three-way comparison to compare "the patented and accused designs in the context of similar designs found in the prior art." *Egyptian Goddess*, 543 F.3d at 674. "[I]f the accused design has copied a particular feature of the claimed design that departs conspicuously from the prior art, the accused design is naturally more likely to be regarded as deceptively similar to the claimed design, and thus infringing." *Id*. at 677.

22.     As I understand, these "[d]ifferences, however, must be evaluated in the context of the Claimed Design as a whole, and not in the context of separate elements in isolation. Where, as here, the Claimed Design includes several elements, the fact finder must apply the ordinary observer test by comparing similarities in overall designs, not similarities of ornamental features in isolation." *Ethicon*, 796 F.3d at 1335 (citing *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1295 (Fed. Cir. 2010). *See also Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1303-1304 (Fed. Cir. 2010). "[T]he mandated overall comparison is a comparison taking into account significant differences between the two designs, not minor or trivial differences that necessarily exist between any two designs that are not exact copies of one another." *Int'l Seaway Trading Co. v. Walgreens Corp*., 589 F.3d 1233, 1243 (Fed. Cir. 2009).

23.     I understand that the fact that an infringing product is marked with a trademark or logo designating the product's source does not, as a matter of law, negate design patent infringement. Design patent infringement relates solely to the patented design and does not allow of avoidance of infringement by labelling. *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1126 (Fed. Cir. 1993).

### C.  Claim Construction in Design Patents

24.     It is my understanding that "[w]hether a design patent is infringed is determined by first construing the claim to the design, when appropriate, and then comparing it to the design of the accused device." *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1404 (Fed. Cir. 1997) (emphasis added) (citing *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995)). To construe the scope of a design patent, I understand that one must consider whether the figures identify unclaimed subject matter (e.g., features depicted in broken lines); and whether the

prosecution history of the application shows if the applicant disclaimed subject matter or distinguished the Claimed Design from other ornamental designs. *See Goodyear Tire*, 162 F.3d at 1116.

25. As I understand, courts construe claims for a design patent just as for a utility patent. *Goodyear Tire*, 162 F.3d at 1116. That said, I understand that the Federal Circuit has cautioned against a detailed, verbal construction of the features in the patent drawings. *Egyptian Goddess*, 543 F.3d at 679. This is because a written claim construction focused on individual features may lead the factfinder away from "consideration of the design as a whole." *Crocs*, 598 F.3d at 1303. However, while the claimed design of a design patent is better represented by an illustration, it is helpful to the finder of fact to be provided with guidance on the overall impression of the claimed design on the ordinary observer. *Contessa Food Prods., Inc. v. Conagra, Inc*., 282 F.3d 1370, 1376 (Fed. Cir. 2002).

26. To construe the scope of a design patent, I understand that one must consider (1) the language of the specification to determine whether the written description disclaims, characterizes, or limits any features; (2) whether the figures identify unclaimed subject matter (e.g., features depicted in broken lines); and (3) whether the prosecution history of the application shows if the applicant disclaimed subject matter or distinguished the Claimed Design from the prior art based on certain features present or absent in the graphics. *See Goodyear Tire*, 162 F.3d at 1116.

27. I also understand that while the claimed design of a design patent is better represented by an illustration, it is helpful to the finder of fact to be provided with **guidance on the overall impression** of the claimed design on the ordinary observer. *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002).

28. I am also informed that the Manual of Patent Examining Procedure ("MPEP") provides guidance on how broken lines are to be used in design patent drawings. U.S. Pat. & Trademark Office, Manual of Patent Examining Procedure § 1503.02 (9th ed. 2018). Section 1503.02.III notes that broken lines include "[s]tructure that is not part of the claimed design but is considered necessary to show the environment in which the design is associated" and that structure "may be represented in the drawing by broken lines." *Id*. Such unclaimed subject matter represented by broken lines forms no part of the claimed design.

29.     I am also informed that "in analyzing infringement, the fact finder must **compare the claimed portion** of the design—i.e., whatever is shown in solid lines in the patent drawings—to the corresponding portion of the accused design." (emphasis added) Sarah Burstein, *The "Article of Manufacture" in 1887*, 32:1 Berkeley Tech. L.J. 11 (2017) (first citing *Hutzler Mfg. Co. v. Bradshaw Int'l, Inc.*, No. 1:11-cv-07211, 2012 WL 3031150, at *9–10 (S.D.N.Y. July 24, 2012); and then citing *Egyptian Goddess. Inc. v. Swisa, Inc.*, 543 F.3d 665, 672 (Fed. Cir. 2008)).

### D.  The Ordinary Observer Test

30.     I understand that a design patent infringement analysis is a two-step process. The first step, after a design patent's claim is construed is to consider whether the claimed design and infringing products are "sufficiently distinct" also known as "plainly dissimilar." *Ethicon*, 796 F.3d at 1335 (citing *Egyptian Goddess*, 543 F. 3d at 678). If the Claimed Design and the infringing products are found to be plainly dissimilar, there is no patent infringement. *Id*.

31.     I also understand that while the claimed design of a design patent is better represented by an illustration, it is helpful to the finder of fact to be provided with guidance on the overall impression of the claimed design on the ordinary observer. *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002).

32.     As I understand, "the fact finder must apply the ordinary observer test by comparing similarities in overall designs, not similarities of ornamental features in isolation," *Ethicon*, 796 F.3d at 1335 (citing *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1296 (Fed. Cir. 2010)), and "not minor or trivial differences that necessarily exist between any two designs that are not exact copies of one another." *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1243 (Fed. Cir. 2009) (emphasis added).

33.     But "if the claimed and accused designs are not plainly dissimilar," I understand that the second step in an infringement analysis involves a three-way comparison to compare "the patented and accused designs in the context of similar designs found in the prior art." *Egyptian Goddess*, 543 F.3d at 674. "If the accused design has copied a particular feature of the claimed design that departs conspicuously from the prior art, the accused design is naturally more likely to be regarded as deceptively similar to the claimed design, and thus infringing." *Id*. at 677.  .

### E. The Significance of Prior Art

34.     As I understand, the role of prior art is to help the finder of fact consider seemingly small or minor details that differentiate the patented design from the prior art. "Where there are many examples of similar prior art designs . . ., differences between the claimed and accused designs that might not be noticeable in the abstract can become significant to the hypothetical ordinary observer who is conversant with the prior art." *Egyptian Goddess*, 543 F.3d at 678.

35.     For the purposes of my opinion, I considered prior art to define the scope of the hoverboard market at the time the Claimed Designs were filed. In so doing, I was able to better discern the similarities and differences (or lack thereof) between the Claimed Designs and the Accused Products in the eyes of the ordinary observer.

36.     I am informed that the *Egyptian Goddess* case makes clear, the ultimate burden of proving infringement is on the patent owner. Accordingly, the failure of the accused infringer to bring forward prior art is not an admission of infringement, but rather only a concession that knowledge of the prior art would not make infringement less likely. *See Egyptian Goddess*, 543 F.3d at 678-79.

### F. Definition of the Ordinary Observer

37.     As I understand, "[t]he measure of infringement of a design patent is deception of the ordinary observer, when such person gives the design the attention usually given by a purchaser of the item bearing the design[.]" *Goodyear Tire*, 162 F.3d at 1117.  Accordingly, I understand that the hypothetical ordinary observer must be identified before applying the ordinary observer test by focusing on the "actual product that is presented for purchase, and the ordinary purchaser of that product." *Id*.

38.     I understand that the hypothetical ordinary observer must be identified before applying the ordinary observer test by focusing on the actual product that is presented for purchase, and the ordinary purchaser of that product. The hypothetical ordinary observer is different for each case, based on the type of product at issue. The determination of the substantial similarity is based on the viewpoint of the ordinary observer who is "not an expert in the claimed designs" but rather one of ordinary acuteness who is a principal purchaser of the product. The hypothetical ordinary observer is also one who is aware of the number of closely similar prior art designs and conversant with the prior art.

39.     Further, I understand that some courts have held that the ordinary observer is one who is "not an expert in the claimed designs", but rather "one of ordinary acuteness who is a principal purchaser[]" of the product. Ethicon, 796 F.3d at 1337 (internal quotations and citation omitted). That said, the ordinary observer is one who is "aware of the great number of closely similar prior art designs" and "conversant with the prior art". *Egyptian Goddess*, 543 F.3d at 676, 678.

40.     Further, I understand that the viewpoint of the hypothetical ordinary observer is through the "eyes of men generally" and not individuals "versed in designs in the particular trade in question" or "engaged in the manufacture or sale of articles containing such designs". Gorham Co. v. White, 81 U.S. 511, 527-528 (1871). I am also informed that some courts have held that the ordinary observer is one who is "not an expert in the claimed designs", but rather "one of ordinary acuteness who is a principal purchaser []" of the product. *Ethicon*, 796 F.3d at 1337 (emphasis added) (internal quotations and citation omitted).

41.      I am also informed that the "[l]ikelihood of confusion as to the source of the goods is not a necessary or appropriate factor for determining infringement of a design patent." *Unette Corp. v. Unit Pack Co.*, 785 F.2d 1026, 1029 (Fed. Cir. 1986) (emphasis added).

42.     Based on my experience as an Industrial Designer of commercial products, including electronic mobility products and consumer electronics, it is my opinion that an ordinary observer in this case is the principal purchaser of hoverboards, i.e., a consumer user or the parent of a user, each having little or no experience purchasing hoverboards. The ordinary observer encounters products like the Claimed Designs via online stores, television and entertainment media, and social media, and purchases them using online stores or from 'brick and mortar' stores like Best Buy or Walmart.

### G.  Functionality in Design Patents

43.     As was explained to me, to be afforded patent protection, "a design must present an aesthetically pleasing appearance that is not dictated by function alone." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 148 (1989) (emphasis added).  "[W]hether a design is primarily functional or primarily ornamental requires viewing the claimed design 'in its entirety.'" *Ethicon*, 796 F.3d at 1329 (quoting *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 977 F.2d 988, 1123 (Fed. Cr. 1993)).  I further understand that to "entirely eliminate a structural element from the

10

claimed ornamental design, even though that element also served a functional purpose" is not permitted. *Sport Dimension, Inc. v. Coleman Co*., 820 F.3d 1316, 1321 (Fed. Cir. 2016).

44.     To determine the scope of the claim, I understand that the court considers the distinction between features of the claimed design that are "ornamental" and those that are "purely functional." *Ethicon Endo-Surgery*, 796 F.3d at 1333.  I understand that a design element is "purely functional" where its basic design is "dictated" by its functional purpose or is otherwise serves a utilitarian purpose. *Sport Dimension*, 820 F.3d at 1320.  I also understand that several factors suggest that a feature is functional, including whether (1) the protected design represents the best design, (2) alternative designs would adversely affect the utility of the specified article, (3) there are any concomitant utility patents, (4) the advertising touts particular features of the design as having specific utility, and (5) whether the feature is clearly dictated by function. *PHG Techs., LLC v. St. John Cos*., 469 F.3d 1361, 1366 (Fed. Cir. 2002).

45.     It is well established that patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue. *Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000) *See also* MPEP § 2125 "When the reference does not disclose that the drawings are to scale and is silent as to dimensions, arguments based on measurement of the drawing features are of little value."

## V.     ANALYSIS OF THE PATENTS-IN-SUIT AND THE PRIOR ART

### A.  The Patents-In-Suit

46.     The Patents-In-Suit are the U.S. Patents D737,723 ("the D'723 Patent"), D738,256 ("the D'256 Patent"), D784,195 ("the D'195 Patent"), and D785,112 ("the D'112 Patent") for Self-Balancing Vehicles and Human-Machine Interaction Vehicles.  Such self-balancing vehicles are commonly referred to as "hoverboards".

47.     As mentioned above, the scope of the claim of a patented design encompasses its visual appearance as a whole, and in particular the visual impression it creates to the hypothetical ordinary observer.

### B. Examination of the D'723 Patent

48.      The D'723 Patent is titled "Self-Balancing Vehicle" and has a filing date of Dec 15, 2014. It claims priority to a foreign application CN 201430180556.4 dated 6/13/2014.

49.      The patent has 8 figures, and states "the broken line showing is for the purpose of illustrating portions of the self-balancing vehicle and environment structure which form no part of the claimed design".



| Table 1: The Claimed Design of the D'723 Patent | |
|---|---|
| Fig.1 is a top plan view of a self-balancing vehicle showing our new design | FIG.1 |
| Fig.2 is a bottom plan view thereof | FIG.2 |
| Fig 3 is a rear elevational view thereof | FIG.3 |

| | |
|---|---|
| Fig. 4 is a front elevational view thereof | |
| Fig 5. Is a left side view thereof, the right side view being a mirror image thereof. | |
| Fig.6 is a rear, top, right perspective view thereof | |



FIG.4

FIG.6

13



| Fig. 7 is a front, top, left perspective view thereof | FIG.7 |
| Fig 8 is a rear, bottom, left perspective view thereof | FIG.8 |

50.     What is claimed is the overall ornamental design of a Self-Balancing Vehicle as described in the patent and shown in the figures.  The claimed design does not include the areas shown in broken lines, such as the wheels, the holes on the underside, the "O I" pattern, and the on/off graphics.

51.     I have reviewed the prosecution history of the D'723 Patent, and it consistent with my opinion of the claim scope. The claimed design was allowed over all the prior art that was cited in the file history.

### C.  Examination of the D'256 Patent

52.     The D'256 Patent is also titled "Self Balancing Vehicle" and has a filing date of Dec 15, 2014. The patent has 8 figures, and states "the broken line showing is for the purpose of illustrating portions of the self-balancing vehicle and environment structure which form no part of the claimed design".

| Table 2: The Claimed Design of the D'256 Patent | |
|---|---|
| Fig.1 is a top plan view of a self-balancing vehicle showing our new design |  FIG.1 |
| Fig.2 is a bottom plan view thereof | FIG.2 |
| Fig 3 is a rear elevational view thereof | FIG.3 |
| Fig. 4 is a front elevation view thereof | FIG.4 |

15



| | |
|---|---|
| Fig 5. Is a left side view thereof, the right side view being a mirror image thereof | |
| Fig.6 is a frony, top, right perspective view thereof | FIG.6 |
| Fig. 7 is a rear, top, left perspective view thereof | FIG.7 |

| Fig 8 is a rear, bottom, left perspective view thereof | <br>FIG.8 |
| --- | --- |

53.     What is claimed is the overall ornamental design of a Self-Balancing Vehicle as described in the patent and shown in the figures.  The claimed design does not include the areas shown in broken lines, such as the wheels, holes on the underside, and the "O I" pattern.

54.     I have reviewed the prosecution history of the D'256 Patent, and it consistent with my opinion of the claim scope. The claimed design was allowed over all the prior art that was cited in the file history.

### D.  Examination of the D'195 Patent

55.     The D'195 Patent is titled "Human-Machine Interaction Vehicle" and has a filing date of Feb 29, 2016. It claims priority to a foreign application 201530389352.6 dated 10/9/2015.

56.     The patent has 6 figures, and states "the broken lines are for the purpose of illustrating portions of the human-machine interaction vehicle and environmental structure which form no part of the claimed design".

| Table 3: The Claimed Design of the '195 Patent | |
| --- | --- |
| Fig. 1 is a top plan view of a human-machine interaction vehicle showing my new design | <br>FIG.1 |



| | |
|---|---|
| Fig. 2 is a bottom plan view thereof | FIG.2 |
| Fig. 3 is a front elevational view thereof | FIG.3 |
| Fig. 4 is a rear elevational view thereof | FIG.4 |
| Fig. 5 is a right side view thereof, the left side view being a mirror image thereof | |

| Fig. 6 is a top, rear, right perspective view thereof |  |
| --- | --- |

FIG.6

57.     What is claimed is the overall ornamental design of a Human-Machine Interaction Vehicle as described in the patent and shown in the figures.  The claimed design does not include the areas shown in broken lines, such as the wheels, and various patterns and lines on the top surfaces.

58.     I have reviewed the prosecution history of the D'195 Patent, and it consistent with my opinion of the claim scope. The claimed design was allowed over all the prior art that was cited in the file history.

### E.  Examination of the D'112 Patent

59.     The D'112 Patent is also titled "Human-Machine Interaction Vehicle" and has a filing date of Feb 29, 2016. It claims priority to a foreign application CN 201530481979.4 dated 11/26/2015.

60.     The patent has 6 figures, and states "the broken lines are for the purpose of illustrating portions of the human-machine interaction vehicle and environmental structure which form no part of the claimed design".

| Table 4: The Claimed Design of the '112 Patent | |
|---|---|
| Fig. 1 is a top plan view of a human-machine interaction vehicle showing my new design | |
| Fig. 2 is a bottom plan view thereof | |
| Fig. 3 is a front elevational view thereof | |
| Fig. 4 is a rear elevational view thereof | |



FIG.1

FIG.2

FIG.3

FIG.4

| Fig. 5 is a right side view thereof, the left side view being a mirror image thereof | |
|---|---|
| Fig. 6 is a top, front, left perspective view thereof | |



FIG.6

61. What is claimed is the overall ornamental design of a Human-Machine Interaction Vehicle as described in the patent and shown in the figures. The claimed design does not include the areas shown in broken lines, such as the wheels, circular holes on the bottom surface, and various patterns and lines on the top surfaces.

62. I have reviewed the prosecution history of the D'112 Patent, and it consistent with my opinion of the claim scope. The claimed design was allowed over all the prior art that was cited in the file history.

### F. The Cited Prior Art Show The Patents-In-Suit Have A Broad Scope

63. Prior art is used to compare to the claimed design of a patent to find the scope of the design in the ordinary observer test. It is also used to compare the Accused Products to the claimed designs to evaluate if the Accused Products is closer to the claimed design than the prior art.

64. I have analyzed all the cited prior art of the Patents-In-Suit. Below I present one selected view from each of the cited prior art to provide an overview of the state-of-the-art at the

time of the filing of each patent. As can be seen in the table below, the D'723 and the D'256 cited the same prior art.

| Table 5: The Cited Prior Art Cited on the Face of the D'723 and D'256 Patents | | |
|---|---|---|



| | | |
|---|---|---|
| US 8,118,319 | US 8,469,376 | US 8,414,000 |
| Appl. 2007-0273118 | US 8,500,145 | US D647,991 |
| US D739,906[1] | | |

65. While some of the individual components of the D'723 and D'256 Patents are represented in some of the prior art, the overall impression of the claimed design of the D'723 and D'256 Patents is entirely unique. The prior art is vastly different in many ways and therefore the D'723 and D'256 Patents enjoy a very broad scope.

66. Some of the prior art feature a generally hourglass outer form. However, none of the relevant prior art create the visual impression of an integrated hourglass body with a relatively

---

[1] The US Patent D739,906 was not cited on the face of either the '723 or '256 Patents but I understand that its filing date slightly preceded that of these patents and is therefore part of my analysis.

flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area.

| Table 6: The Cited Prior Art On the Face of the '195 Patent | | |
|---|---|---|
| US 6,834,867 | US 7,424,927 | US 8,738,278 |
| US 9,403,573 | US D737,723 | US D738,256 |
| US 9,376,155 | US D739,906 | |



67.     While some of the individual components of the D'195 Patents are represented in some of the prior art, the overall impression of the claimed design of the D'195 Patent is entirely unique. The prior art is vastly different in many ways and therefore the D'195 Patent enjoys a very broad scope.

68.     Some of the prior art feature a generally hourglass outer form. However, none of the relevant prior art create the visual impression of an integrated hourglass body with many horizontal styling lines across the body and a relatively flat surface across the top, open arched

covers over the wheel area, larger radii on the front and back of the underside. Unlike any of the prior art the footplates narrow as they extend toward the center.



| Table 7: A Selection of the Cited Prior Art from the D'112 Patent | | |
|---|---|---|
| US 7,481,291 | US 7,635,037 | US 8,738,278 |
| US 9,403,573 | US 9,499,228 | US 9,682,732 |
| US D601,922 | US D737,723 | US D738,256 |
| US 9,376,155 | US D535,714 | US D739,906 |

69.     While some of the individual components of the D'112 Patent is represented in some of the prior art, the overall impression of the claimed design of the D'112 Patent is entirely unique. The prior art is vastly different in many ways and therefore the D'112 Patent enjoys a very broad scope.

70.     Some of the prior art feature a generally hourglass outer form. However, none of the relevant prior art create the visual impression of an integrated hourglass body with many angled lines across the body and a relatively flat surface across the top, arched covers over the wheel area, larger radii on the front and back of the underside. Unlike any of the prior art the foot plate stretch across almost the full width of the main body.

## VI.     ANALYSIS OF FUNCTIONALITY

71.     The opinions in the Rake Declaration rely upon the opinion that the "overall shape" of the Claimed Designs is "largely based on functionality" (Rake ¶¶ 58, 64, 70, 76). I disagree and outline my own analysis on whether these or other main elements of the Claimed Designs are primarily functional, below.

72.     I understand that several factors may suggest that a feature is primarily functional, including whether the protected design represents the best design, and whether alternative designs would adversely affect the utility of the specified article.[2]

73.     The Claimed Designs feature many ornamental elements that contribute to the overall impression. Here I will briefly describe the analysis of three visually dominant elements of the overall visual impression to analyze whether they could have been designed with substantially different ornamentation and still provide the same functionality.

74.     The Rake Declaration argues that the "overall shape" of the Claimed Designs is based on a) the length and width being driven by human measurements and b) the narrow center

---

[2] The Federal Circuit listed a number of considerations for assessing whether a patented design as a whole was dictated by functional considerations such as: "Whether the protected design represents the best design; whether alternative designs would adversely affect the utility of the specified article; whether there are any concomitant utility patents; whether the advertising touts particular features of the design as having specific utility and whether there are any elements in the design or an overall appearance clearly not dictated by function." *Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 1456 (Fed. Cir. 1997).

avoids interference with the ground when twisting the two halves.[3]   Based on just the prior art cited on the face of the Patents-In-Suit alone, we see that there are alternative ways to provide similar or the same functionality of providing adequate space for footing and allow for a central pivoting motion, but with distinctly different ornamental designs.



| Table 8: The prior art provides alternative ornamental examples for the same utility. | |
| --- | --- |
| US 8,469,376 | These prior art provide the same spacing for feet but create distinctly different visual impressions from that of the Patents-in-Suit. |
| US 6,834,867 | They also provide a similarly pivoting center that creates distinctly different visual impressions from that of the Patents-in-Suit. |

---

[3] Mr. Rake's arguments are presented in more detail and analyzed more closely in Section IX.



Appl. 2007-0273118

75. Second, the **fenders** of the Claimed Designs may prevent accidental access to the top of the wheel, for which alternative ornamental designs are also found within the prior art (see table below).

76. Third, the **pronounced footing areas** may communicate where to position feet, and possibly provide grip, and alternative ornamental designs for these same functions are also found within the prior art.



| Table 9: The prior art provides alternative ornamental examples for the same fender and footing area utility. | | |
|---|---|---|
| US D739,906 | US D647,991 | These prior art provide the same utility of the **fenders** of the Patents-In-Suit but create distinctly different visual impressions. |
| US 8,118,319 | Appl. 2007-0273118 | These prior art provide the same utility of the **pronounced footing areas** of the Patents-In-Suit but create distinctly different visual impressions. |

27

77. Based on my analysis of the overall outer shape and other main elements of the Claimed Designs, it is clear that the same functionality can be achieved with distinctly different ornamental designs. Although the above outlined analysis demonstrates only part of the *Berry Sterling* considerations, this finding is sufficient for me to opine that none of the ornamental designs claimed in the Patents-In-Suit are dictated by function, or otherwise purely functional.

## VII. OVERVIEW OF THE ACCUSED PRODUCTS

78. As noted above, there are five products accused of infringement in this case, the 'Gyroor A', 'B', 'C', 'D', and 'E'.

79. Each of the Accused Products creates the visual impression to the hypothetical ordinary observer of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area.

80. While they are not exact duplicates, each of the Accused Products and each of the Claimed Designs share very similar visual traits in their format, proportions and main visual features, and share the same overall impression to the ordinary observer in light of the prior art.

**Table 10: Accused Product Gyroor A**



28











| Table 11: Accused Product Gyroor B |
|---|
|  |





**Table 12: Accused Product Gyroor C**







| Table 13: Accused Product Gyroor D |
|---|





**Table 14: Accused Product Gyroor E**







## VIII.   THE ACCUSED PRODUCTS INFRINGES THE PATENTS-IN-SUIT

81.     I conducted a side-by-side comparison of the Accused Products and the Claimed Designs. My analysis was limited to the Claimed Designs as depicted by the solid lines in the figures of the Patents-In-Suit and did not include the unclaimed portions of the design depicted in broken lines.

82.     The Accused Products and the claimed designs of the Patents-In-Suit are both conceptually and functionally identical in that they are all hoverboards, for recreational use by consumers.

83.     As mentioned above, the scope of the claim of a patented design encompasses its visual appearance as a whole, and in particular the 'visual impression' it creates.  Even if various ornamental elements which make up the whole of a design may be slightly different in isolation, infringement occurs if the overall visual impression is substantially similar.

84.     In my analysis detailed below I conclude that each of the Accused Products is **not plainly dissimilar** to the Claimed Designs.

85.     As an additional step, I also analyzed the patents' cited prior art against the Accused Products and Patented Designs to find whether the Accused Designs are closer to the Patented Designs than the closest prior art. As it is the burden of the defendant to identify the closest prior art, I conducted a three-way comparison using the D'906 Patent as both of Defendants' experts in this case have cited this to be the closest prior art.

86.     My analysis was conducted by comparing the visual impression of each Accused Product and each of the Claimed Designs to the D'906 Patent, through the eyes of an ordinary observer. Specifically, the ordinary observer test inquires whether the visual impression of an

Accused Product is closer to the claimed design of a patent than to the prior art. In my analysis I find the visual impression created by each of the Accused Products is closer to each of the Claimed Designs than it is to the prior art. The Accused Products are therefore **substantially the same** as each of the Claimed Designs in the eyes of the ordinary observer as I will outline below.

### A. Accused Product Gyroor A

#### 1. The Accused Product Gyroor A Infringes on the D'723 Patent

87.     Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'723 are shown in Exhibit 1.



| Table 15: Three-way comparison of Gyroor A to the D'906 Patent and the claimed design of the D'723. | |
| --- | --- |
| FIG.6 | FIG. 6 of the 'D723 patent |
| | Perspective view of Gyroor A |



| | |
|---|---|
| | FIG. 4 of the prior art 'D906 Patent |
| | Figure 1 of the D'723 Patent |
| | Top view of Gyroor A |
| | Figure 3 of the prior art D'906 Patent. |

88.    Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'723 Patent and Gyroor A are **not plainly dissimilar**.

89.     Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor A is closer in overall impression to the claimed design of the D'723 Patent than to the closest prior art**. Gyroor A and the claimed design of the D'723 Patent both create a visual impression of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area. More specifically, the relatively flat surface across the top of the main body such that the footpads and center section are largely on the same plane, the pronounced footing areas substantially covered by raised footpads with a pattern of grooves, and the fenders arching over a portion of the tire and leaving the outside surface of the wheel largely exposed, significantly contribute to the overall impression of the designs. In contrast, the D'906 Patent is completely devoid of any type of footpad, has a center section that significantly curves and extends above the plane of the footing areas, and has fenders that cover the majority of the tire and wheel assembly, extending below the midpoint of the wheel. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body with no pronounced footing area and closed fender skirts[4].

90.     Therefore, in light of the closest prior art, the claimed design of the D'723 is **substantially the same** as the visual impression presented by Gyroor A.

### 2.     The Accused Product Gyroor A Infringes on the D'256 Patent

91.     Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'256 are shown in Exhibit 1.

---

[4] Fender skirt' is a term used by the automobile industry when the wheel is almost entirely hidden, as seen in 1969 Buick Electra and the 1986 Citroen CX.



| Table 16: Three-way comparison of the Gyroor A to the D'906 Patent and the claimed design of the D'256. | |
| --- | --- |
| | FIG. 6 of the D'256 patent |
| | Perspective view of Gyroor A |
| | FIG. 4 of the prior art 'D906 Patent |
| | Figure 1 of the D'256 Patent |



| | Top view of Gyroor A |
| | Figure 3 of the prior art D'906 Patent. |

92.     Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'256 Patent and Gyroor A are **not plainly dissimilar**.

93.     Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor A is closer in overall impression to the claimed design of the D'256 Patent than to the closest prior art**. Gyroor A and the claimed design of the D'256 Patent both create a visual impression of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area. More specifically, the relatively flat surface across the top of the main body such that the footpads and center section are largely on the same plane, the pronounced footing areas substantially covered by raised footpads with a pattern of grooves, and the fenders arching over a portion of the tire and leaving the outside surface of the wheel largely exposed, significantly contribute to the overall impression of the designs. In contrast, the D'906 Patent is completely devoid of any type of footpad, has a center section that significantly curves and extends above the plane of the footing areas, and has fenders that cover the majority of the tire and wheel assembly, extending below the midpoint of the wheel. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body with no pronounced footing area and closed fender skirts.

94.     Therefore, in light of the closest prior art, the claimed design of the D'256 is **substantially the same** as the visual impression presented by Gyroor A.

3.     **The Accused Product Gyroor A Infringes on the D'195 Patent**

95.     Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'195 are shown in Exhibit 1.

| Table 17: Three-way comparison of Gyroor A to the D'906 Patent and the claimed design of the D'195. | |
|---|---|
|  | FIG. 6 of the D'195 patent |
| | Perspective view of Gyroor A |



| | |
|---|---|
| | FIG. 4 of the prior art 'D906 Patent |
| | Figure 6 of the D'195 Patent |
| | Top view of Gyroor A |
| | Figure 3 of the prior art D'906 Patent. |

96.     Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'195 Patent and Gyroor A are **not plainly dissimilar**.

97.     Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor A is closer in overall impression to the claimed design of the D'195 Patent than to the closest prior art**. Gyroor A and the claimed design of the D'195 Patent both create a visual impression of an integrated hourglass body with many horizontal styling lines across the body and a relatively flat surface across the top of the main body, and open-arched fenders over the top of the wheel area. More specifically, the relatively flat surface across the top of the main body such that the footpads and center section are largely on the same plane, the horizontal styling lines across the body forming various surface details, and the fenders arching over a portion of the tire and leaving the outside surface of the wheel largely exposed, significantly contribute to the overall impression of the designs. In contrast, the D'906 Patent has a center section that significantly curves and extends above the plane of the footing areas, has a rounded, smooth body that is completely devoid of any type of styling lines, and has fenders that cover the majority of the tire and wheel assembly, extending below the midpoint of the wheel. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body and closed fender skirts.

98.     Therefore, in light of the closest prior art, the claimed design of the D'195 is **substantially the same** as the visual impression presented by Gyroor A.

  **B.  Accused Product Gyroor B**

    1.  **The Accused Product Gyroor B Infringes on the D'723 Patent**

99.     Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'723 are shown in Exhibit 1.

| Table 18: Three-way comparison of Gyroor B to the D'906 Patent and the claimed design of the D'723. | |
|---|---|
|  | FIG. 6 of the 'D723 patent |
| | Perspective view of Gyroor B |
| | FIG. 4 of the prior art 'D906 Patent |



| | |
|---|---|
| | Figure 1 of the D'723 Patent |
| | Top view of Gyroor B |
| | Figure 3 of the prior art D'906 Patent. |

100.    Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'723 Patent and Gyroor B are **not plainly dissimilar**.

101.    Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor B is closer in overall impression to the claimed design of the D'723 Patent than to the closest prior art**. Gyroor B and the claimed design of the D'723 Patent both create a visual impression of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area. More specifically, the relatively flat surface across the top of the main body such that the footpads and center section are largely on the same plane, the pronounced footing areas substantially covered by raised footpads with a pattern of grooves, and the fenders arching over a

portion of the tire and leaving the outside surface of the wheel largely exposed, significantly contribute to the overall impression of the designs. In contrast, the D'906 Patent is completely devoid of any type of footpad, has a center section that significantly curves and extends above the plane of the footing areas, and has fenders that cover the majority of the tire and wheel assembly, extending below the midpoint of the wheel. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body with no pronounced footing area and closed fender skirts.

102.    Therefore, in light of the closest prior art, the claimed design of the D'723 is **substantially the same** as the visual impression presented by Gyroor B.

### 2.  **The Accused Product Gyroor B Infringes on the D'256 Patent**

103.    Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'256 are shown in Exhibit 1.

| Table 19: Three-way comparison of the Gyroor B to the D'906 Patent and the claimed design of the D'256. | |
| --- | --- |
|  FIG.6 | FIG. 6 of the D'256 patent |



| | |
|---|---|
| | Perspective view of Gyroor B |
| | FIG. 4 of the prior art 'D906 Patent |
| | Figure 1 of the D'256 Patent |
| | Top view of Gyroor B |

48



Figure 3 of the prior art D'906 Patent.

104.    Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'256 Patent and Gyroor B are **not plainly dissimilar**.

105.    Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor B is closer in overall impression to the claimed design of the D'256 Patent than to the closest prior art**. Gyroor B and the claimed design of the D'256 Patent both create a visual impression of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area. More specifically, the relatively flat surface across the top of the main body such that the footpads and center section are largely on the same plane, the pronounced footing areas substantially covered by raised footpads with a pattern of grooves, and the fenders arching over a portion of the tire and leaving the outside surface of the wheel largely exposed, significantly contribute to the overall impression of the designs. In contrast, the D'906 Patent is completely devoid of any type of footpad, has a center section that significantly curves and extends above the plane of the footing areas, and has fenders that cover the majority of the tire and wheel assembly, extending below the midpoint of the wheel. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body with no pronounced footing area and closed fender skirts.

106.    Therefore, in light of the closest prior art, the claimed design of the D'256 is **substantially the same** as the visual impression presented by Gyroor B.

### 3.  The Accused Product Gyroor B Infringes on the D'195 Patent

107.    Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'195 are shown in Exhibit 1.

| Table 20: Three-way comparison of the Gyroor B to the D'906 Patent and the claimed design of the D'195. | |
| --- | --- |
|  FIG.6 | FIG. 6 of the D'195 patent |
| | Perspective view of Gyroor B |
| | FIG. 4 of the prior art 'D906 Patent |



| | Figure 1 of the D'195 Patent |
| FIG.1 | |
| | Top view of Gyroor B |
| | Figure 3 of the prior art D'906 Patent. |

108.    Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'195 Patent and Gyroor B are **not plainly dissimilar**.

109.    Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor B is closer in overall impression to the claimed design of the D'195 Patent than to the closest prior art**. Gyroor B and the claimed design of the D'195 Patent both create a visual impression of an integrated hourglass body with many horizontal styling lines across the body and a relatively flat surface across the top of the main body, and open-arched fenders over the top of the wheel area. More specifically, the relatively flat surface across the top of the main body such that the footpads and center section are largely on the same plane, the horizontal styling lines across the body forming various surface details, and the fenders arching over a portion of the tire and leaving the outside surface of the wheel largely exposed, significantly contribute to the overall impression of the designs. In contrast, the D'906 Patent has a center section that

significantly curves and extends above the plane of the footing areas, has a rounded, smooth body that is completely devoid of any type of styling lines, and has fenders that cover the majority of the tire and wheel assembly, extending below the midpoint of the wheel. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body and closed fender skirts.

110.    Therefore, in light of the closest prior art, the claimed design of the D'195 is **substantially the same** as the visual impression presented by Gyroor B.

### 4.    The Accused Product Gyroor B Infringes on the D'112 Patent

111.    Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'112 are shown in Exhibit 1.

| Table 21: Three-way comparison of the Gyroor B to the D'906 Patent and the claimed design of the D'112. | |
|---|---|
|  FIG.6 | FIG. 6 of the D'112 patent |
| | Perspective view of Gyroor B |



| | |
|---|---|
| | FIG. 4 of the prior art 'D906 Patent |
| | Figure 1 of the D'112 Patent |
| | Top view of Gyroor B |
| | Figure 3 of the prior art D'906 Patent. |

112.    Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'112 Patent and Gyroor B are **not plainly dissimilar**.

113.    Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor B is closer in overall impression to the claimed design of the D'112 Patent**

**than to the closest prior art**. Gyroor B and the claimed design of the D'112 Patent both create a visual impression of an integrated hourglass body with many angled styling lines across the body and a relatively flat surface across the top of the main body, and open-arched fenders over the top of the wheel area. More specifically, the relatively flat surface across the top of the main body such that the footpads and center section are largely on the same plane, the angled styling lines across the body forming various surface details, and the fenders arching over a portion of the tire and leaving the outside surface of the wheel largely exposed, significantly contribute to the overall impression of the designs. In contrast, the D'906 Patent has a center section that significantly curves and extends above the plane of the footing areas, has a rounded, smooth body that is completely devoid of any type of styling lines, and has fenders that cover the majority of the tire and wheel assembly, extending below the midpoint of the wheel. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body and closed fender skirts.

114. Therefore, in light of the closest prior art, the claimed design of the D'112 is **substantially the same** as the visual impression presented by Gyroor B.

## C. Accused Product Gyroor C

### 1. The Accused Product Gyroor C Infringes on the D'723 Patent

115. Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'723 are shown in Exhibit 1.

| Table 22: Three-way comparison of Gyroor C to the D'906 Patent and the claimed design of the D'723. | |
|---|---|
| <br>FIG.6 | FIG. 6 of the 'D723 patent |



| | |
|---|---|
| | Perspective view of Gyroor C |
| | FIG. 4 of the prior art 'D906 Patent |
| | Figure 1 of the D'723 Patent |
| | Top view of Gyroor C |



Figure 3 of the prior art
D'906 Patent.

116.     Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'723 Patent and Gyroor C are **not plainly dissimilar**.

117.     Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor C is closer in overall impression to the claimed design of the D'723 Patent than to the closest prior art**. Gyroor C and the claimed design of the D'723 Patent both create a visual impression of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area. More specifically, the relatively flat surface across the top of the main body such that the footpads and center section are largely on the same plane, the pronounced footing areas substantially covered by raised footpads with a pattern of grooves, and the fenders arching over a portion of the tire and leaving the outside surface of the wheel largely exposed, significantly contribute to the overall impression of the designs. In contrast, the D'906 Patent is completely devoid of any type of footpad, has a center section that significantly curves and extends above the plane of the footing areas, and has fenders that cover the majority of the tire and wheel assembly, extending below the midpoint of the wheel. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body with no pronounced footing area and closed fender skirts.

118.     Therefore, in light of the closest prior art, the claimed design of the D'723 is **substantially the same** as the visual impression presented by Gyroor C.

2.   **The Accused Product Gyroor C Infringes on the D'256 Patent**

119.   Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'256 are shown in Exhibit 1.



| Table 23: Three-way comparison of the Gyroor C to the D'906 Patent and the claimed design of the D'256. | |
|---|---|
| FIG.6 | FIG. 6 of the D'256 patent |
| | Perspective view of Gyroor C |
| | FIG. 4 of the prior art 'D906 Patent |



| | |
|---|---|
| | Figure 1 of the D'256 Patent |
| | Top view of Gyroor C |
| | Figure 3 of the prior art D'906 Patent. |

120. Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'256 Patent and Gyroor C are **not plainly dissimilar**.

121. Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor C is closer in overall impression to the claimed design of the D'256 Patent than to the closest prior art**. Gyroor C and the claimed design of the D'256 Patent both create a visual impression of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area. More specifically, the relatively flat surface across the top of the main body such that the footpads and center section are largely on the same plane, the pronounced footing areas substantially covered by raised footpads with a pattern of grooves, and the fenders arching over a portion of the tire and leaving the outside surface of the wheel largely exposed, significantly contribute to the overall impression of the designs. In contrast, the D'906 Patent is completely devoid of any type of footpad, has a center section that significantly curves and extends above the

plane of the footing areas, and has fenders that cover the majority of the tire and wheel assembly, extending below the midpoint of the wheel. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body with no pronounced footing area and closed fender skirts.

122.    Therefore, in light of the closest prior art, the claimed design of the D'256 is **substantially the same** as the visual impression presented by Gyroor C.

### 3.  The Accused Product Gyroor C Infringes on the D'195 Patent

123.    Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'195 are shown in Exhibit 1.



| Table 24: Three-way comparison of Gyroor C to the D'906 Patent and the claimed design of the D'195. | |
| --- | --- |
| | FIG. 6 of the 'D195 patent |
| | Perspective view of Gyroor C |



| | |
|---|---|
| | FIG. 4 of the prior art 'D906 Patent |
| | Figure 1 of the D'195 Patent |
| | Top view of Gyroor C |
| | Figure 3 of the prior art D'906 Patent. |

124.    Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'195 Patent and Gyroor C are **not plainly dissimilar**.

60

125.    Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor C is closer in overall impression to the claimed design of the D'195 Patent than to the closest prior art**. Gyroor C and the claimed design of the D'195 Patent both create a visual impression of an integrated hourglass body with many horizontal styling lines across the body and a relatively flat surface across the top of the main body, and open-arched fenders over the top of the wheel area. More specifically, the relatively flat surface across the top of the main body such that the footpads and center section are largely on the same plane, the horizontal styling lines across the body forming various surface details, and the fenders arching over a portion of the tire and leaving the outside surface of the wheel largely exposed, significantly contribute to the overall impression of the designs. In contrast, the D'906 Patent has a center section that significantly curves and extends above the plane of the footing areas, has a rounded, smooth body that is completely devoid of any type of styling lines, and has fenders that cover the majority of the tire and wheel assembly, extending below the midpoint of the wheel. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body and closed fender skirts.

126.    Therefore, in light of the closest prior art, the claimed design of the D'195 is **substantially the same** as the visual impression presented by Gyroor C.

### D.  Accused Product Gyroor D

#### 1.  The Accused Product Gyroor D Infringes on the D'723 Patent

127.    Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'723 are shown in Exhibit 1.

| Table 25: Three-way comparison of Gyroor D to the D'906 Patent and the claimed design of the D'723. | |
|---|---|
|  FIG.6 | FIG. 6 of the 'D723 patent |
| | Perspective view of Gyroor D |
| | FIG. 4 of the prior art 'D906 Patent |



| | |
|---|---|
| FIG.1 | Figure 1 of the D'723 Patent |
| | Top view of Gyroor D |
| | Figure 3 of the prior art D'906 Patent. |

128.    Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'723 Patent and Gyroor D are **not plainly dissimilar**.

129.    Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor D is closer in overall impression to the claimed design of the D'723 Patent than to the closest prior art**. Gyroor D and the claimed design of the D'723 Patent both create a visual impression of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area. More specifically, the relatively flat surface across the top of the main body such that the footpads and center section are largely on the same plane, the pronounced footing areas substantially covered by raised footpads with a pattern of grooves, and the fenders arching over a portion of the tire and leaving the outside surface of the wheel largely exposed, significantly

contribute to the overall impression of the designs. In contrast, the D'906 Patent is completely devoid of any type of footpad, has a center section that significantly curves and extends above the plane of the footing areas, and has fenders that cover the majority of the tire and wheel assembly, extending below the midpoint of the wheel. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body with no pronounced footing area and closed fender skirts.

130. Therefore, in light of the closest prior art, the claimed design of the D'723 is **substantially the same** as the visual impression presented by Gyroor D.

### 2. The Accused Product Gyroor D Infringes on the D'256 Patent

131. Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'256 are shown in Exhibit 1.

| Table 26: Three-way comparison of the Gyroor D to the D'906 Patent and the claimed design of the D'256. | |
|---|---|
|  FIG.6 | FIG. 6 of the D'256 patent |
| | Perspective view of Gyroor D |



| | |
|---|---|
| | FIG. 4 of the prior art 'D906 Patent |
| | Figure 1 of the D'256 Patent |
| | Top view of Gyroor D |
| | Figure 3 of the prior art D'906 Patent. |

132.     Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'256 Patent and Gyroor D are **not plainly dissimilar**.

133.     Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor D is closer in overall impression to the claimed design of the D'256 Patent than to the closest prior art**. Gyroor D and the claimed design of the D'256 Patent both create a

visual impression of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area. More specifically, the relatively flat surface across the top of the main body such that the footpads and center section are largely on the same plane, the pronounced footing areas substantially covered by raised footpads with a pattern of grooves, and the fenders arching over a portion of the tire and leaving the outside surface of the wheel largely exposed, significantly contribute to the overall impression of the designs. In contrast, the D'906 Patent is completely devoid of any type of footpad, has a center section that significantly curves and extends above the plane of the footing areas, and has fenders that cover the majority of the tire and wheel assembly, extending below the midpoint of the wheel. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body with no pronounced footing area and closed fender skirts.

134.    Therefore, in light of the closest prior art, the claimed design of the D'256 is **substantially the same** as the visual impression presented by Gyroor D.

### 3.  The Accused Product Gyroor D Infringes on the D'195 Patent

135.    Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'195 are shown in Exhibit 1.

| Table 27: Three-way comparison of the Gyroor D to the D'906 Patent and the claimed design of the D'195. | |
|---|---|
|  FIG.6 | FIG. 6 of the D'195 patent |



| | |
|---|---|
| | Perspective view of Gyroor D |
| | FIG. 4 of the prior art 'D906 Patent |
| | Figure 1 of the D'195 Patent |
| | Top view of Gyroor D |

FIG.1

67



Figure 3 of the prior art D'906 Patent.

136.     Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'195 Patent and Gyroor D are **not plainly dissimilar**.

137.     Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor D is closer in overall impression to the claimed design of the D'195 Patent than to the closest prior art**. Gyroor D and the claimed design of the D'195 Patent both create a visual impression of an integrated hourglass body with many horizontal styling lines across the body and a relatively flat surface across the top of the main body, and open-arched fenders over the top of the wheel area. More specifically, the relatively flat surface across the top of the main body such that the footpads and center section are largely on the same plane, the horizontal styling lines across the body forming various surface details, and the fenders arching over a portion of the tire and leaving the outside surface of the wheel largely exposed, significantly contribute to the overall impression of the designs. In contrast, the D'906 Patent has a center section that significantly curves and extends above the plane of the footing areas, has a rounded, smooth body that is completely devoid of any type of styling lines, and has fenders that cover the majority of the tire and wheel assembly, extending below the midpoint of the wheel. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body and closed fender skirts.

138.     Therefore, in light of the closest prior art, the claimed design of the D'195 is **substantially the same** as the visual impression presented by Gyroor D.

### 4. The Accused Product Gyroor D Infringes on the D'112 Patent

139.     Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'112 are shown in Exhibit 1.

| Table 28: Three-way comparison of the Gyroor D to the D'906 Patent and the claimed design of the D'112. | |
|---|---|
|  | FIG. 6 of the D'112 patent |
| | Perspective view of Gyroor D |
| | FIG. 4 of the prior art 'D906 Patent |
| | Figure 1 of the D'112 Patent |



| | Top view of Gyroor D |
| | Figure 3 of the prior art D'906 Patent. |

140.     Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'112 Patent and Gyroor D are **not plainly dissimilar**.

141.     Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor D is closer in overall impression to the claimed design of the D'112 Patent than to the closest prior art**. Gyroor D and the claimed design of the D'112 Patent both create a visual impression of an integrated hourglass body with many angled styling lines across the body and a relatively flat surface across the top of the main body, and open-arched fenders over the top of the wheel area. More specifically, the relatively flat surface across the top of the main body such that the footpads and center section are largely on the same plane, the angled styling lines across the body forming various surface details, and the fenders arching over a portion of the tire and leaving the outside surface of the wheel largely exposed, significantly contribute to the overall impression of the designs. In contrast, the D'906 Patent has a center section that significantly curves and extends above the plane of the footing areas, has a rounded, smooth body that is completely devoid of any type of styling lines, and has fenders that cover the majority of the tire and wheel assembly, extending below the midpoint of the wheel. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body and closed fender skirts.

142.     Therefore, in light of the closest prior art, the claimed design of the D'112 is **substantially the same** as the visual impression presented by Gyroor D.

### E.  Accused Product Gyroor E

#### 1.  The Accused Product Gyroor E Infringes on the D'723 Patent

143.     Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'723 are shown in Exhibit 1.

| Table 29: Three-way comparison of Gyroor E to the D'906 Patent and the claimed design of the D'723. | |
|---|---|
|  FIG.6 | FIG. 6 of the 'D723 patent |
| | Perspective view of Gyroor E |



| | |
|---|---|
| | FIG. 4 of the prior art 'D906 Patent |
| | Figure 1 of the D'723 Patent |
| | Top view of Gyroor E |
| | Figure 3 of the prior art D'906 Patent. |

144.     Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'723 Patent and Gyroor E are **not plainly dissimilar**.

145. Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor E is closer in overall impression to the claimed design of the D'723 Patent than to the closest prior art**. Gyroor E and the claimed design of the D'723 Patent both create a visual impression of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area. More specifically, the relatively flat surface across the top of the main body such that the footpads and center section are largely on the same plane, the pronounced footing areas substantially covered by raised footpads with a pattern of grooves, and the fenders arching over a portion of the tire and leaving the outside surface of the wheel largely exposed, significantly contribute to the overall impression of the designs. In contrast, the D'906 Patent is completely devoid of any type of footpad, has a center section that significantly curves and extends above the plane of the footing areas, and has fenders that cover the majority of the tire and wheel assembly, extending below the midpoint of the wheel. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body with no pronounced footing area and closed fender skirts.

146. Therefore, in light of the closest prior art, the claimed design of the D'723 is **substantially the same** as the visual impression presented by Gyroor E.

## 2. The Accused Product Gyroor E Infringes on the D'256 Patent

147. Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'256 are shown in Exhibit 1.

| Table 30: Three-way comparison of the Gyroor E to the D'906 Patent and the claimed design of the D'256. | |
|---|---|
|  FIG.6 | FIG. 6 of the D'256 patent |
| | Perspective view of Gyroor E |
| | FIG. 4 of the prior art 'D906 Patent |



| | |
|---|---|
| | Figure 1 of the D'256 Patent |
| | Top view of Gyroor E |
| | Figure 3 of the prior art D'906 Patent. |

148. Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'256 Patent and Gyroor E are **not plainly dissimilar**.

149. Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor E is closer in overall impression to the claimed design of the D'256 Patent than to the closest prior art**. Gyroor E and the claimed design of the D'256 Patent both create a visual impression of an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area. More specifically, the relatively flat surface across the top of the main body such that the footpads and center section are largely on the same plane, the pronounced footing areas substantially covered by raised footpads with a pattern of grooves, and the fenders arching over a portion of the tire and leaving the outside surface of the wheel largely exposed, significantly contribute to the overall impression of the designs. In contrast, the D'906 Patent is completely devoid of any type of footpad, has a center section that significantly curves and extends above the

plane of the footing areas, and has fenders that cover the majority of the tire and wheel assembly, extending below the midpoint of the wheel. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body with no pronounced footing area and closed fender skirts.

150.    Therefore, in light of the closest prior art, the claimed design of the D'256 is **substantially the same** as the visual impression presented by Gyroor E.

### 3. The Accused Product Gyroor E Infringes on the D'195 Patent

151.    Although the below chart only presents selected views, my analysis was undertaken by comparing the actual product to each of the patented designs as a whole. The full comparison to all of the figures of the D'195 are shown in Exhibit 1.

| Table 31: Three-way comparison of the Gyroor E to the D'906 Patent and the claimed design of the D'195. | |
| --- | --- |
|  FIG.6 | FIG. 6 of the D'195 patent |
| | Perspective view of Gyroor E |



| | |
|---|---|
| | FIG. 4 of the prior art 'D906 Patent |
| FIG.1 | Figure 1 of the D'195 Patent |
| | Top view of Gyroor E |
| | Figure 3 of the prior art D'906 Patent. |

152.    Giving due consideration to the legal standards as outlined in Section IV, the examination illustrated in the table above allows for no other reasonable conclusion than that the overall visual impression of the claimed design of the D'195 Patent and Gyroor E are **not plainly dissimilar**.

153.    Further, when comparing to the closest prior art through the eyes of the ordinary observer, **Gyroor E is closer in overall impression to the claimed design of the D'195 Patent than to the closest prior art**. Gyroor E and the claimed design of the D'195 Patent both create a

visual impression of an integrated hourglass body with many horizontal styling lines across the body and a relatively flat surface across the top of the main body, and open-arched fenders over the top of the wheel area. More specifically, the relatively flat surface across the top of the main body such that the footpads and center section are largely on the same plane, the horizontal styling lines across the body forming various surface details, and the fenders arching over a portion of the tire and leaving the outside surface of the wheel largely exposed, significantly contribute to the overall impression of the designs. In contrast, the D'906 Patent has a center section that significantly curves and extends above the plane of the footing areas, has a rounded, smooth body that is completely devoid of any type of styling lines, and has fenders that cover the majority of the tire and wheel assembly, extending below the midpoint of the wheel. While the D'906 also includes an hourglass body, the design as a whole gives a distinctly different impression, as it creates an impression of a very uncluttered, rounded, smooth body and closed fender skirts.

154.    Therefore, in light of the closest prior art, the claimed design of the D'195 is **substantially the same** as the visual impression presented by Gyroor E.

## IX.    ANALYSIS OF THE RAKE DECLARATION

### A.  The Rake Declaration Relies Upon An Unrelated Patent

155.    In previous declarations, Mr. Rake purported the D'906 as the closest prior art. It is notable that in this declaration Mr. Rake neither specifies the D'906 as being the closest prior art, nor does he use it as the closest prior art in his three-way comparison. Instead, Mr. Rake has chosen the later-filed patent D808,857 ("the D'857") when comparing the Accused Product to the claimed designs of the Patents-in-Suit (*See* Rake ¶¶ 51-76). It is not clear why Mr. Rake no longer considers the D'906 suitable as the closest prior art. It also contradicts the opinion of Mr. Gandy.

156.    As mentioned in Section IV above, the ordinary observer test does not permit using later-filed patents in place of prior art and should not have formed part of Mr. Rake's analysis. It is my understanding that prior art is used in the test to establish what the hypothetical ordinary observer would be familiar with at the time of the Patent-In-Issue's priority date. It is therefore nonsensical to use designs that were not existent at this time. In fact, the D'857 was a filed in 2018, *years after* the Patents-In-Suit were filed (in 2014, 2014, 2016, and 2017, respectively.).

157.    Because Mr. Rake relies upon the D'857 as his closest prior art comparison for his entire non-infringement analysis, this alone may invalidate his analysis and therefore also his conclusions.

**B.  The Rake Declaration Relies Upon an Incorrect Understanding of The Ordinary Observer Test**

158.    Mr. Rake improperly uses *deception of the ordinary observer to induce purchase* as the measurement of whether the designs are substantially the same, "[i]f the resemblance deceives the observer, inducing him or her to purchase one supposing it to be the other, the designs are substantially the same." (Rake ¶39) (emphasis added). As explained in Section IV above, the true measurement of infringement using the ordinary observer test is not based on whether the ordinary observer is deceived into purchase.

159.    The Rake Declaration also omits defining the level of attention of the ordinary observer. In infringement analysis we establish the **level of attention** the purchaser would apply to the accused product, a crucial step which Mr. Rake does not do. Mr. Rake does, however, asserts that the purchaser will "do their homework" when buying articles such as hoverboards, and research different brands online and read reviews. (Rake ¶ 40).  I agree. A consumer informing themself about the products for the first time would be focused primarily on user reviews, brands and costs, and would apply very little attention to the intricacies of the finer styling details.

160.    Based on the context of purchase, and the untrained eye of the purchaser, it is my opinion that the hypothetical ordinary observer would possess "ordinary acuteness" and would apply a *relatively low level of attention* to the aesthetics of the product.  Thus, small visual details (e.g., such as the air vent pattern on the underside or the specific shape of the shallow grooves on the foot pads) would not affect their overall impression of the object as a whole.

**C.  The Rake Declaration is Missing Critical Steps of Infringement Analysis**

161.    Mr. Rake **does not construe the claims** of the patent in light of the prior art, nor does he provide analysis on whether they are "plainly dissimilar," as is required in infringement analysis (see Section IV). As outlined above in Section IV, infringement analysis requires the claimed design of the Patents-In-Suit to first be construed.

162.    Mr. Rake only provided textual information from the face of the Patents-In-Suit (Rake ¶¶ 31-35) and **did not provide any mention or analysis on their filing history, their prior**

79

**art or about the scope of each patent** in light of the prior art, which is not identical. Without construing the claims of the patent in light of the prior art, the analysis and resulting conclusions that follow may become greatly undermined.

163.     I am informed that after construing the claims, infringement analysis follows two steps: The first step is a comparison of an infringing product to the Patents-In-Suit to evaluate whether they are "plainly dissimilar." If they are *not* plainly dissimilar the analysis moves on to the second step of analysis comparing the conflicting designs to the prior art through the eyes of an ordinary observer. Mr. Rake **did not provide analysis on the first step** of infringement analysis but conducted the second step and thereby infers that the two designs are not plainly dissimilar.

164.     Furthermore, his declaration also informs us that he **did not analyze a physical sample** of the Accused Product at all. While not a mandatory part of analysis, his observations may have been very different had he evaluated the Accused Product in person instead of relying upon photographs with distorted perspectives.

### D.  Mr. Rake's Evidence Improperly Relies Upon Dimensions

165.     Mr. Rake incorrectly **infers dimensions** from the design patents, but figures in design patents do not represent fixed dimensions and can represent objects of any scale (*See also* MPEP § 2125). In a paragraph on non-infringement analysis, Mr. Rake describes hoverboards in general, and provides dimensions of wheel diameters and the distance between them (Rake ¶ 47). He later **improperly relies upon these dimensions** as evidence that the overall shape of the Patents-In-Suit is based on functionality; "The dimensions correspond to the dimensions of a human foot, the distance between footpads corresponds to approximate 'shoulder width' dimensions of the user[.]" (Rake ¶¶ 58, 64, 70, 76).

166.     Further, his opinion that the length of hoverboards is dictated by shoulder width not only contradicts many prior art examples that are of varying lengths, but also ignores Mr. Rake's own design work. (*See* Rake ¶ 13). Skateboards too vary greatly in length, and even have short versions (for example 'penny boards') and long versions (for example 'longboards') all of which support two adult feet spaced apart in a similar way to hoverboards. Surfboards also serve as a similar example and are considerably larger than skateboards.

### E. Mr. Rake Considers Ornamental Elements of The Claimed Designs as Functional Without Analysis or Evidence

167. Mr. Rake considers the overall hourglass shape of each of the claimed designs of the Patents-In-Suit "largely based on functionality." (Rake ¶¶ 58, 64, 70, 76), but he **provides no analysis or evidence** to explain his opinion. I disagree that any of the ornamental elements of the claimed designs should be considered to be driven by function, as outlined in Section VI above. In applying the correct standards, it is my opinion that none of the ornamental designs claimed in the Patents-In-Suit are dictated by function, or otherwise purely functional.

168. I understand that to "entirely **eliminate a structural element** from the claimed ornamental design, even though that element also served a functional purpose," as Mr Rake has done with the "overall shape" of the Claimed Designs, is not permitted.

169. I further understand that several factors may suggest that a feature is primarily functional, including whether (1) the protected design represents the best design, (2) alternative designs would adversely affect the utility of the specified article, (3) there are any concomitant utility patents, (4) the advertising touts particular features of the design as having specific utility, and (5) whether the feature is clearly dictated by function. Mr. Rake **did not conduct this or any functionality analysis**, nor provide evidence that might support it.

170. Further, the Defendants' second expert, Jim Gandy, does include consideration of the overall hourglass shape in his analysis and Mr. Gandy does *not* consider its shape driven by function. (*See* Gandy ¶¶ 21-22).

171. Furthermore, Mr. Rake also opines that the shape of the center portion is driven by function, reasoning that "the narrowing at the center facilitates the needed twisting motion without interference with the user or the ground" (Rake ¶¶ 58, 64, 70, 76) and provides as evidence the prior art U.S. Patent 8,469,376. First, **the center portion would not physically** interfere with the ground or with the feet even if they were as wide as the foot pads. Second, referring to prior art with a portion that is similarly proportioned does not evidence functionality, in fact other prior art cited on the patent also include center portions that are much wider, such as the U.S. Patent 7,424,927.

### F. The Rake Declaration Improperly Relies Upon Comparing Unclaimed Areas

172.    Mr. Rake improperly **compares unclaimed areas** to corresponding areas in the Accused Product and concludes an ordinary observer would "recognize that the [claimed design] has prominent design element in the middle and the Accused Product is clean, without any such design element." (Rake ¶¶ 53, 59, 65, 71).  I am informed that if an infringing product has a different ornamental pattern to that shown as *unclaimed* in the Patents-In-Suit, it does not serve to evidence non-infringement.

### G. The Rake Declaration Fails To Use The Correct Viewpoint Through Which To Base Opinions

173.    The Rake Declaration includes many paragraphs that explain Gestalt Theory and 'figure-ground theory' to explain how an ordinary observer would perceive the designs, but they completely disregard the effect of prior art to the ordinary observer's perception of visual form. Mr. Rake states he "relied on [Gestalt principles] in this analysis" (Rake ¶ 48) and "using well established Gestalt principles, I then compared the differences/similarities between the D'723 Patent and Accused Product." (Rake ¶ 51).  In doing so, Mr. Rake **did not apply the correct viewpoint** from which to understand how the ordinary observer would see the designs. How certain features are *represented in the prior art* greatly affects the impression of a design to the hypothetical ordinary observer (see example below) Mr. Rake neither analyzed the prior art nor did he compare the designs to it in his analysis, which may seriously undermine his opinions.



Table 32: The Prior Art Informs Us How The Ordinary Observer Views The Designs

Claimed Design          Accused Product          Prior Art

> When comparing the Claimed Design directly to the Accused Product (as in the *Gorham Co. v. White*, 81 U.S. 511 (1871) example above), we notice differences. However only when we compare them to the prior art (example contemporary designs shown to the right), do we understand how insignificant those differences are.

174.    For example, Mr. Rake states the *size and shape* of the fenders is an "important design feature that has a significant effect on the overall visual impression of the ordinary observer." (Rake ¶¶ 57, 63, 69, 75).  However, simply the visual impression created by *open fenders on an hour-glass shaped body* is completely unique among the prior art of the D'723 and D'256 Patents (See prior art in Table 5 above), and therefore an ordinary observer **would not look to small details** to differentiate between designs.

175.    In contrast, for the purposes of my analysis I considered prior art to define the scope of the hoverboard market at the time the Claimed Designs were filed. In so doing, I was able to better discern how similarities and differences (or lack thereof) between the Patents-In-Suit and the Accused Product contribute to the overall impression in the eyes of the ordinary observer.

### H.  Mr. Rake Improperly Relies Upon Whether Individual Differences Are 'Obvious' Instead of Comparing The Overall Impression

176.    Mr. Rake's analysis concludes with his finding the Accused Product's overall appearance to be *substantially different* from both the (unspecified) prior art and the Patents-In-Suit (Rake ¶¶ 46, 78–81).  First, ***differences* between the prior art and patented designs do not evidence non-infringement**, in fact differences are wholly expected[5]. The correct analysis is whether the Accused Product is *closer* to the Patents-In-Suit than they are to the closest prior art (*see also* Table 32 above). If they are, then we may conclude that the designs as a whole are substantially the same.

177.    As a further example, in Mr. Rake's summary of opinions he explains "In my opinion, the **visual differences** between the claimed designs of the Patents-in-Suit and the design

---

[5] I am informed that "One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement." *Schnadig Corp. v. Gaines Mfg. Co.*, 494 F.2d 383, 391-92 (6th Cir. 1974.)

of the Accused Product **would be obvious** to the ordinary observer." (Rake ¶ 44 (emphasis added); *see also id.* ¶¶78-81). However, whether *differences* are *obvious* is not relevant to the ordinary observer test.

## I. Mr. Rake Improperly Relies Upon Small, Isolated Differences in Specific Views And Not The Overall Impression

178. The Rake Declaration improperly relies upon insignificant **isolated features** in specific views to analyze differences between the Accused Product and the Patents-In-Suit, and not the overall impression of the design as a whole[6]. Specifically, Mr. Rake completely ignores the overall shape of the hoverboard (improperly removing it asserting it to be functional) and discusses only differences between specific features such as the air vents and grooves when viewed from the underside, the lights when viewed from the front, and the grooves in the foot pads when viewed from the top.

179. Mr. Rake's analysis **improperly prioritizes selected views** over others because "the user most commonly sees a hoverboard from a position standing over the board." (Rake ¶ 41). This may skew the analysis improperly toward specific features. In infringement analysis the hypothetical ordinary observer would be familiar with all sides of the product based on the combination of all viewpoints.

180. For example, in discussing hoverboards in general, Mr. Rake identifies specific areas as "[t]he most prominent features" and provides a list of four isolated features. (Rake ¶ 41). First, he ignores the overall shape of the hoverboard, or how the main body-parts form together, aspects that create the overall impression of the product as a whole. Second, Mr. Rake bases this narrow focus on his current view of current hoverboards as a category and not based on the Patents-In-Suit or how the ordinary observer would view it in light of the prior art of the time. Viewing the prior art shown in Table 5–7 above, it would be quite improper to only compare their visual

---

[6] I am informed that in evaluating infringement, courts determine whether "the deception that arises is a result of similarities in the overall design, not similarities in ornamental features considered in isolation." *Amini Innovation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1371 (Fed. Cir. 2006) (citing *Keystone Retaining Wall Sys. V. western, Inc.*, 997 F.2d 1444, 1450 (Fed. Cir. 1993)).

impression based on only "the design of the two foot pads, the design of the wheels, visual details on the neck between the footpads, and the shape of the fenders that cover the wheels" (Rake ¶ 41).

**Table 33: Mr. Rake improperly factors out the body from his analysis**



Mr. Rake describes these four selected areas as the "most prominent features impacting the overall visual impression to the ordinary observer" (Rake ¶ 41), factoring out the shape of the body itself and the impression of the object as a whole. Also note that three of these four areas are *unclaimed* in one or more of the Patents-In-Suit and therefore should not be part of a comparative analysis.

181. Other than simply listing the above four small differentiators, Mr. Rake does not provide evidence as to why these would be the most prominent areas of the overall impression as viewed by an ordinary observer and **does not present evidence on how the prior art may support this opinion**. For example, in analyzing differences between the Accused Product and the Patents-In-Suit Mr. Rake focuses on a single line and vent hole pattern in one specific view of the drawing as representing a "prominent" deviation (Rake ¶ 56, 62, 68, 74). While these are details that *contribute* to the overall impression in certain views, their omission would not have a great effect on the impression of the design as a whole.

#### J. The Rake Declaration Omits Critical Views and Evidence

182. In several places in the Rake Declaration, Mr. Rake refers to appearances from specific views but illustrates this using a different view, completely **omitting the view which he refers to**. For example, at Rake ¶¶ 53, 59, 65, and 71, Mr. Rake opines that, "From the Top and Front views, the differences in shape and design of the footpads is clear" and, in Rake ¶¶ 54, 60, 65, and 71 that "The front view we can see dramatic and obvious difference in the size, shape, and character of the lights". Mr. Rake's statements only add confusion, rather than point to relevant evidence.

183. Additionally, Mr. Rake states, "I consider the Top and Front views to be the most important in my analysis" (Rake ¶¶ 55, 61, 67, and 73) but **omits to provide these specific views in any of** his **provided tables**. While it is not evidence of malintent to omit selected views from the declaration, it is nevertheless unhelpful to omit the specific views he explicitly refers to as being the most important, and instead only show other figures.

#### K. The Reliability And Credibility of the Rake Declaration Is Undermined By His Errors

184. Despite Mr. Rake's long history in providing expert testimony in intellectual property matters, the Rake Declaration includes many improper and inaccurate analyses as discussed above. There are also **careless, critical errors and mistakes** in his Declaration, which together bear heavily on his conclusions.

185. This is especially surprising as Mr. Rake has submitted at least five other declarations in this case and another related case with many of the same grave issues. These issues and mistakes were identified in my respective rebuttals, and yet Mr. Rake **did not make any attempt to correct the issues**. This further highlights the light-handedness of his analysis.

186. For example, in his declaration (as with many previous ones) he proposes that he is "qualified to give an opinion about what would be understood by one skilled in the art of **ceiling fans** like those at issue here" (Rake ¶ 23) (emphasis added), and that his relevant experience includes "products that **contain metal components**" (*id.* ¶ 8) (emphasis added).

187. When addressing functionality for the very first time in the declaration, Mr. Rake refers back to an explanation of functionality that is not preceding in the Declaration at all, i.e.,

"[t]he overall shape of the D'723 Patent claim is, **as I explained earlier**, largely based on functionality" (Rake ¶ 58) (emphasis added).

188.    In introducing the D'857 Patents in the Rake Declaration, Mr. Rake states, in his own words, "Broken lines set forth the bounds of the claimed design and form no part thereof", giving the impression that some of the figures include broken lines. However, there are no broken lines in the D'857 Patents whatsoever, which Mr. Rake either **failed to notice** or he mistakenly wrote the wrong statement. (Rake ¶36).

189.    To support his argument on how the fender design of the Accused Product have "significant and glaring" differences to the claimed design of the D'723, Mr. Rake shows an image of each alongside a figure from the US 8,469,376 ("the '376"). The '376 has a relatively flat are above the wheels, thus showing a *distinctly* different approach to covering the wheel from either of the other two and completely contradicting the argument Mr. Rake attempts to make.

**Table 34: Mr. Rake seems to ignore the prior art when stating that the Accused Product and D'723 have "significant and glaring" differences in fender design.**



Figure from Rake ¶63.

190.    The above list of errors highlights the lack of attention Mr. Rake paid to the reporting of his analysis. Moreover, his copy-and-paste of sections from other cases show his lack of attention paid to this case, and therefore his Declarations may be given little or no weight in supporting Defendants' noninfringement position.

## X.     ANALYSIS OF THE GANDY DECLARATION

191.    The credibility of the Gandy Declaration is undermined by his failure to apply the correct legal procedure or analysis for infringement analysis, which I will detail in this section.

### A.  The Gandy Declaration fails to construe the scope of the Patents-In-Suit

192.    As outlined in Section IV above, an infringement analysis requires the claimed design of the Patents-In-Suit to first be construed. Mr. Gandy failed to provide any information from the face of the patents or make any mention or analysis on their filing history, their prior art or provide opinions on **the scope of each patent** in light of the prior art. Without construing the claims of the patent in light of the prior art, the analysis and resulting conclusions that follow may be greatly undermined.

193.    Mr. Gandy's failure to construe the Patents-In-Suit is even more so confounding considering he explicitly stated this as a necessity for infringement analysis, "it is my understanding that design patent infringement is determined by first construing the claim to the design and then comparing it to the design of the accused device." (Gandy ¶ 20).

### B.  The Gandy Declaration Omits Critical Steps of The Ordinary Observer Test

194.    I am informed that after construing the claims, the infringement analysis follows two steps: The first step is a comparison of the Accused Products to the Patents-In-Suit to evaluate whether they are 'plainly dissimilar'.  Mr. Gandy went immediately to conduct the second step of the test, thereby **skipping the critical first step of the ordinary observer test**.  As the second step of the ordinary observer test is only necessary if the designs are *not plainly dissimilar*, Mr. Gandy's actions suggest he considered them to be not plainly dissimilar.

195.    However, after conducting the three-way comparison which aims to conclude whether in the light of the prior art the conflicting designs are 'substantially the same', Mr. Gandy concludes only that the designs are "**dissimilar**". (Gandy ¶¶ 44, 61, 66, 83, 100, 105, 122). Not only is this the wrong level of acuteness for the three-way comparison, but also it contradicts his previous actions in skipping the test for being plainly dissimilar.  While it may be inferred that he misstated his conclusions or used the wrong terms, it is clearly misleading that he refers specifically to 'dissimilarity' and may undermine the credibility of his testimony.

196.    The table below illustrates the main steps of infringement analysis typically conducted by a plaintiff's expert. This is a simplified diagram, only to illustrate the steps Mr. Gandy should have conducted.



197.    It is important to note that a finding of the conflicting designs as being *plainly dissimilar* is a high bar, as it represents that the dissimilarities are so great there is no need to compare them directly to the prior art.  Mr. Gandy does not conduct the correct analysis to draw this conclusion.

### C.  The Gandy Declaration Fails to Define The Level Of Attention Of The Ordinary Observer

198.    Mr. Gandy asserts only that the ordinary observer in this case is "is a potential purchaser who is familiar with hoverboards and their different designs." (Gandy ¶ 21). I disagree that the purchaser of hoverboards at this entry-level price-point would be so familiar with the market. Nevertheless, the ordinary observer's *familiarity* with the category is not relevant to this analysis, as the hypothetical ordinary observer already has knowledge of the relevant prior art. In infringement analysis the definition of the purchaser is used to establish the **level of attention** they may apply to aesthetics, form and styling details. In my opinion, the purchaser would be focused primarily on user reviews, brands and costs, and would apply very little attention to the intricacies of the finer styling details.

199.    Based on the context of purchase, and the untrained eye of the purchaser, it is my opinion that the hypothetical ordinary observer would possess "ordinary acuteness" and would

apply a *relatively low level of attention* to the aesthetics of the product. (see Section IV for my full description of the ordinary observer). Thus, small visual details (e.g., such as the air vent pattern on the underside or the specific shape of the shallow grooves on the foot pads) would not affect their overall impression of the object as a whole.

### D. The Gandy Declaration Applies A Trained Eye Instead Of The Ordinary Level Of Attention Of The Ordinary Observer

200. In many areas Mr. Gandy describes subtleties in form that he, as an expert in the field of patents was able to detect, but these small details seen only in isolated areas from certain angles are not salient to the eyes of an ordinary observer with *ordinary acuteness*, as the test requires. For example, Mr. Gandy detects a "slightly raised convex contour" in the very middle of the hoverboard when viewed from the front, whereas the corresponding area of the Accused Products is substantially flat (Gandy ¶ 30, 36, 53, 64, 69, 75, 86, 92, 103, 108, 114).



**Table 36: Mr. Gandy's trained eye finds subtleties an ordinary observer would not**

Closeup, middle section of the D'256 Patent. In this particular view we can see curvature. Note also, the D'195 Patent does not have an upward curvature here.

Closeup, corresponding middle section of Accused Product A

But when viewed at other angles, this slightly raised convex contour is not salient to the overall impression of the object as a whole to the ordinary observer.

201. Mr. Gandy uses his trained eye on several other areas too, often only focused on one particular viewpoint to draw comparisons of dissimilarity. For example, he finds subtle differences in the hourglass shape in the top view. I do not dispute there are differences, but they would not have a great effect on the impression of the design as a whole to the ordinary observer.

202. For example, when comparing the general hourglass shape of the body, Mr. Gandy opines that "the hour glass peripheral shape of the prior art '906 patent appears to be closer to the claimed design of the [Patents-in-Suit] than the design of the Accused Product[s]". (Gandy ¶¶ 30, 36, 42, 47, 53, 59, 64, 86, 92, 98, 103). First, any differences in the general hourglass shape are subtle and **would not be significant** to the ordinary observer when viewing the product as a whole. Second, even when (improperly) applying a trained eye level analysis on the contour of the hourglass shapes, it is the D'906 that differs the most, further undermining Mr. Gandy's argument.

203. Further, even though Mr. Gandy regards small differences in the hourglass outer shape to be important, he **fails to detect any differences between the individual Patents-In-Suit** and handles them in exactly the same way.

### E. The Gandy Declaration Conducts the Analysis Only Through Skewed Photos and Not From Samples Of The Accused Products

204. Mr. Gandy's Declaration informs us that he **did not analyze physical samples** of the Accused Products at all. While not a mandatory part of analysis, his observations may have been very different had he evaluated the Accused Products in person instead of relying upon photographs with distorted perspectives.

205. His non-analysis of the physical products also misled him into **falsely believing that the front and back of the Accused Product are identical**, an assumption that was repeated in many places in all the Declarations. Specifically, he used two views of the Patents-In-Suit to show the front and back, whereas for the Accused Product he only provided a view of the front.

**Table 37: Mr. Gandy was misled to think the front and back of the Accused Products are identical.**

Front and Rear view of Gyroor "A"



Front and Rear view Gyroor "B"



Front and Rear view Gyroor "C"



Front and Rear view Gyroor "D"



Front and Rear view Gyroor "E"



Images from the Gandy Declaration

**F. The Gandy Declaration Relies on Improper Analysis Of The Markings**

206.    In his infringement analysis Mr. Gandy lists differences between the Accused Products and the Patents-In-Suit and includes as a point of differentiation that the Accused Products include the logo "GYROOR"(Gandy ¶¶ 33, 39, 44, 48, 54, 60, 65, 89, 95, 100, 105). As detailed in Section IV above, the use of a logo is not relevant to this comparison and does not afford avoidance of infringement. Considering Mr. Gandy's extensive experience with patent analysis, his repeated inclusion of the logo as an argument for non-infringement may put the reliability of his testimony in question.

**G. The Gandy Declaration Relies on "Some Differences" as the Evidence for Infringement**

207.    After finding isolated differences between the Accused Products and the Patents-In-Suit, Mr. Gandy concludes "it's my opinion that the claimed design of the '195 patent **has some surfaces** and features that are closer in overall shape and appearance to the design in the prior art patent D'906 patent than the design of the Accused Product" (Gandy ¶ 38) (emphasis added).  In his opinion these differences make the Accused Products distinct which leads to his conclusion that "the design of the Accused Product does not infringe the claimed design of the '195" (*Id.*). The finding that "some" isolated features are similar to the prior art is not enough evidence to conclude non-infringement; the test concerns the *overall impression of the object as a whole*, and whether the impression of the Accused Products is closer to the Patents-In-Suit than to the D'906 Patent. This is especially critical considering the impression of the D'906 Patent has already been found to be substantially different and possibly dissimilar from the Patents-In-Suit by the examiner.

**H. Mr. Gandy Improperly Relies Upon Small, Isolated Differences in Specific Views and Not the Overall Impression**

208.    The Gandy Declaration improperly relies upon insignificant **isolated features** in specific views to analyze differences between the Accused Products and the Patents-In-Suit, and not the overall impression of the design as a whole. Specifically, he discusses only differences between isolated features such as the air vents and grooves when viewed from the underside, the lights when viewed from the front, the grooves in the foot pads and the exact outer contour of the hourglass shape when viewed in the top view.  Such small, isolated details become of very low

significance to the overall impression when viewing the product as a whole, particularly when applying the level of attention that the purchaser would apply, which in this case is quite low.

209.    For example, Mr. Gandy repeatedly describes at length small, isolated differences such as the lines and bumps on the front of the Accused Products and the Patents-In-Suit (Gandy ¶¶ 33, 39, 44, 72, 78, 83).  While there are differences in the 'light' area of the conflicting designs, his detailed descriptions appear to be an **attempt to detract** from the fact that the closest prior art D'906 is *completely devoid of such features* in this area.

210.    A similar method of highlighting minute differences is also applied to other areas of the designs in specific views. For example, Mr. Gandy describes small differences in vents and styling lines the bottom view, but omits to mention the closest prior art **D'906 has no such details whatsoever**. As further example, Mr. Gandy describes differences between the grooves and shapes of the foot pads in the top view, where the D'906 is completely devoid of any definitive foot pads.

211.    Further, Mr. Gandy's analysis **improperly prioritizes selected views** over others, which may skew the analysis unfairly toward specific features. In infringement analysis the hypothetical ordinary observer would be familiar with all sides of the product based on the combination of all viewpoints. The viewpoint of the hypothetical ordinary observer is **not limited to specific views** but views the form as a whole.

## I.    The Gandy Declaration Fails to Provide Evidence to Support Its Opinions

212.    Mr. Gandy also omits evidence that contradicts his opinions. For example, in each of Mr. Gandy's charts he presents a figure from the Patent-In-Issue to a similar angle of the Accused Products and a similar angle of the D'906 Patent. However, when opining on the foot pads, he completely omits the corresponding image of the D'906 Patent which as we can see below, for example, differs greatly from the design of the Accused Products and contradicts his opinion. (*See* Gandy ¶¶ 32, 38, 49, 55, 71, 77, 88, 94, 110, 116). While the ordinary observer can see *differences* between these particular parts of the two designs, the D'906 presents a radically different impression.



213. In comparing the fender designs he states that "the wheel covers of the design of Gyroor "C" hoverboard are wider than those of the design of the '256 patent." (Gandy Report ¶ 76). His statement is not untrue, but it focuses on a small differences between the '256 Patent and the Accused Product, and **completely ignores how entirely different** the same area of the D'906 Patent presents itself. Below is the comparison Mr. Gandy provides, in which we can clearly see the starkly differing design of the D'906 Patent which depicts a *fender skirt* that almost entirely occludes the wheel.



214. This tactic is also employed when discussing the front surface in the area of the 'lights', where his accompanying illustration clearly shows that the '906 is 'the odd man out' in being devoid of any decoration, 'lights' or styling lines on the front surface.



**Table 41: The '906 Presents a Very Different Impression of the 'Lights' Area To The Ordinary Observer.**

Perspective view '723 patent

Perspective view prior art '906 patent

Perspective view the Gyroor "A"

### J. Analysis of Mr. Gandy's Rebuttal of Hatch Infringement Report

215.    In his short rebuttal of my Infringement Analysis, Mr. Gandy incorrectly states that certain features are not adequately described; the shape of the footpads, contour of the narrow central portion, the specific shape of the fenders, specific shape of the lights, and the features on the bottom. However, these were all part of my analysis, and many were referred to **in several parts of my report**. Moreover, the descriptors I used were to describe the impression of the design as a whole as seen by the ordinary observer, and therefore some details such as the vents on the bottom and the slight curvature on top of the middle portion were not specifically called out as they are insignificant to the overall impression.

216.    Mr. Gandy is also misinterpreting the law in his assertions that I failed to "adequately" compare the designs to the prior art or define the closest prior art. I understand that **it is the burden of the Defendants and** not the Plaintiff to provide what they consider the closest prior art and provide an analysis that evidences their opinion. *Egyptian Goddess* specifically provides that "if the accused infringer elects to rely on the comparison prior art as part of its defense

96

against the claim of infringement, the burden of production of that prior art is on the accused infringer." *Egyptian Goddess*, 543 F3d at 678.

217.    Mr. Gandy also states I provide "overly broad" conclusions "not based upon sufficient evidence". I disagree, as my opinions about non-infringement were evidenced in ways that Mr. Gandy failed, such as:

- Construing the claim scope of each the Patents-In-Issue,
- Setting the level of visual acuity for the ordinary observer through which to view,
- Presenting analysis on the cited prior art, and
- Presenting written descriptions of the overall impression of the design as a whole.

## XI.    CONCLUSION

218.    Based upon the application of the legal principles described in this declaration, and upon my examination, analysis and comparisons of the Patents-In-Suit, their file histories, the prior art, and the Accused Products, it is my opinion that:

- Gyroor A is not plainly dissimilar to the claimed design of the D'723 Patent and is substantially the same as the claimed design of the D'723 Patent in the eyes of the ordinary observer in light of the prior art.
- Gyroor A is not plainly dissimilar to the claimed design of the D'256 Patent and is substantially the same as the claimed design of the D'256 Patent in the eyes of the ordinary observer in light of the prior art.
- Gyroor A is not plainly dissimilar to the claimed design of the D'195 Patent and is substantially the same as the claimed design of the D'195 Patent in the eyes of the ordinary observer in light of the prior art.
- Gyroor B is not plainly dissimilar to the claimed design of the D'723 Patent and is substantially the same as the claimed design of the D'723 Patent in the eyes of the ordinary observer in light of the prior art.
- Gyroor B is not plainly dissimilar to the claimed design of the D'256 Patent and is substantially the same as the claimed design of the D'256 Patent in the eyes of the ordinary observer in light of the prior art.

- Gyroor B is not plainly dissimilar to the claimed design of the D'195 Patent and is substantially the same as the claimed design of the D'195 Patent in the eyes of the ordinary observer in light of the prior art.
- Gyroor B is not plainly dissimilar to the claimed design of the D'112 Patent and is substantially the same as the claimed design of the D'112 Patent in the eyes of the ordinary observer in light of the prior art.
- Gyroor C is not plainly dissimilar to the claimed design of the D'723 Patent and is substantially the same as the claimed design of the D'723 Patent in the eyes of the ordinary observer in light of the prior art.
- Gyroor C is not plainly dissimilar to the claimed design of the D'256 Patent and is substantially the same as the claimed design of the D'256 Patent in the eyes of the ordinary observer in light of the prior art.
- Gyroor C is not plainly dissimilar to the claimed design of the D'195 Patent and is substantially the same as the claimed design of the D'195 Patent in the eyes of the ordinary observer in light of the prior art.
- Gyroor D is not plainly dissimilar to the claimed design of the D'723 Patent and is substantially the same as the claimed design of the D'723 Patent in the eyes of the ordinary observer in light of the prior art.
- Gyroor D is not plainly dissimilar to the claimed design of the D'256 Patent and is substantially the same as the claimed design of the D'256 Patent in the eyes of the ordinary observer in light of the prior art.
- Gyroor D is not plainly dissimilar to the claimed design of the D'195 Patent and is substantially the same as the claimed design of the D'195 Patent in the eyes of the ordinary observer in light of the prior art.
- Gyroor D is not plainly dissimilar to the claimed design of the D'112 Patent and is substantially the same as the claimed design of the D'112 Patent in the eyes of the ordinary observer in light of the prior art.
- Gyroor E is not plainly dissimilar to the claimed design of the D'723 Patent and is substantially the same as the claimed design of the D'723 Patent in the eyes of the ordinary observer in light of the prior art.

- Gyroor E is not plainly dissimilar to the claimed design of the D'256 Patent and is substantially the same as the claimed design of the D'256 Patent in the eyes of the ordinary observer in light of the prior art.
- Gyroor E is not plainly dissimilar to the claimed design of the D'195 Patent and is substantially the same as the claimed design of the D'195 Patent in the eyes of the ordinary observer in light of the prior art.

219.    Therefore, an ordinary observer familiar with the prior art, giving such attention as a purchaser usually gives would find the overall appearance of each of the Accused Products to be substantially the same as the overall appearance of one or more of the claimed designs of the Patents-In-Suit in light of the prior art, inducing him or her to purchase the Accused Products supposing it to be the Claimed Design.

## XII.    RESERVATION OF RIGHTS

220.    My current opinions are set forth in this Declaration. However, my analysis is continuing, and I thus reserve the right to supplement or amend my Declaration and to rely on additional documents, prior art, or discovery or testimony that may come to my attention.

221.    Moreover, I may make additions, deletions, or modifications to this Declaration and my opinions in the future that would be reflected in my testimony at the trial and/or additional Declarations that I may be asked to submit in this case. I also reserve the right to rely on all other expert Declarations submitted in this case. For the forthcoming trial, I may prepare diagrams, charts, other demonstratives, and/or demonstrations that illustrate the issues presented. I reserve the right to respond to additional arguments or analyses proffered by expert witnesses and/or the Defendant, and I understand that I may be asked to give rebuttal testimony on matters not covered in this expert Declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 25, 2023                              Respectfully Submitted,

_____

Paul Hatch

**Appendix A**

**RESUME OF PAUL HATCH – August 2022**

**Professional Design Experience:**

Oct 1998 – July 2020
CEO, TEAMS Design USA, Inc

May 2014 - 2018
Co-Founder, Design House LLC (Non-profit organization)

April 1993 - Oct 1998
Senior Designer, TEAMS Design GmbH, Germany.

Sept 1991- Sept 1992
Junior Industrial Designer, IDEA Design, Germany

July 1991 – Sept 1991
Junior Industrial Designer, Schroerdesign, Germany

June 1990 – Sept 1990
Junior Industrial Designer, DA Display Ltd, UK


**Education:**

Ph.D. in Learning Sciences at University of Illinois, Chicago (current).

BA (Hons) Degree 'Design For Industry' from University of Northumbria at Newcastle, Newcastle-upon-Tyne, UK.

Diploma in General Art & Design, Sutton Coldfield College of Further Education, Sutton Coldfield, West Midlands, UK.


**Books Published**

"REALIZE - Design Means Business" (Portuguese translation), 2009

"REALIZE - Design Means Business" (Chinese translation), 2008

"REALIZE – Design Means Business" (US original. Co-editor and contributor), 2006

"IMPACT, the Synergy of Technology, Business and Design" (Co-editor and contributor), 2005


**Published Articles and Papers:**

Innovation Magazine: "Immersive Design: What The Metaverse Means For Industrial Design", April 2022

Innovation Magazine: "Design Is Dead, Long Live Design", June 2018

LinkedIn Pulse: "Disruptive Innovation …For Stability", May 2017

Innovation Magazine: "The State of Design – Maintaining a Proper Vision", Summer 2016

LinkedIn Pulse: "Getting Emotional – Design, UX and Magic" – Sept 2016

LinkedIn Pulse: "The Local Revolution –How Design is Reinventing Manufacture", Mar 2016

LinkedIn Pulse: "Design Thinking Is Only Half The Story", Jan 2016

LinkedIn Pulse: "The Macintosh Moment –Why IoT Needs ID, UX and Design Thinking" Feb 2016

LinkedIn Pulse: "User Experience – Fun For All The Family", Dec 2015

Innovation magazine: "To Design Is Human", Spring 2013

Innovation magazine: "Finding The Sweet Spot", Spring 2010

Insight magazine: "Profit, By Design", April 2005

Innovation magazine "Designer In The Middle", Spring 2004

Innovation magazine: "How To Avert The Asian Shift", Fall 2004

International Housewares Association Magazine: "Brand Differentiation Through Design Details", Feb 2003


**Television, Book and Magazine Interviews**

(Book) "Extended Reality: The Next Frontier of Design". Ralf O Schneider, April 2021

PRISM Podcast: "The Changing World of Design with Paul Hatch", April, 2021

Learning Sciences Research Institute – "Seeing A Way To Help", Sept 2020

DesignDrives Podcast – "Paul Hatch – Driving Innovation in Connected AI Products", March 2020

Apple podcast "Context" – "Interview with Paul Hatch" , July 2019

Appliance Design Magazine: "The Internet of Things and The Pampered User", March 2019

Appliance Design Magazine: "Connected Product Design", July 2018

Appliance Design Magazine: "Paul Hatch Discusses the Intersection of Quality Data and a Better User Experience, April 2018

Bosch Connected World: "Industrial Design in the Age of IOT", Feb 2018

Child Art /Learning From Design: "Paul Hatch" , Fall 2016

Pittsburgh Technology Council (site): "It's All In The Jam!", Feb 2016

Chicago Tribune: "How A Group of Chicago Product Designers Aims to Boost Manufacturing", June 30 2014

IDSA site: "Paul Hatch on The Changing Mechanics of the Design Business", June 2014

(Book) "Breaking In" by Amina Horozic, May 2014

(Book) "Drawing For Product Designers" by Kevin Henry, Sept 2012

Taiwan "Designer" Magazine: "Teams Design To Success in Past 50 Years", Dec 2011

IDSA site: "What Paul Hatch Thinks About Contrast", Mar 2011

New York Daily News: "From 0 to 60 in the Kitchen", June 2009

(Television) "190 North", June 2006

Appliance Design Magazine: "IATC Review: Taking A World View", May 2006

Appliance Design Magazine: "Industrial Design and Human Factors", March 2004

(Television) "World Business Review with Alexander Haig", May 2003


**Conference Presentations, Proceedings and Invited Lectures:**

Invited Speaker: Design & Cognitive Psychology – SCAD, Georgia, Sept 2020

Invited Speaker: Design & Cognitive Psychology – UIC Chicago, Mar 2020

Keynote Speaker: UX and IOT – Newell Congress Chicago, July 2018

Invited Speaker: Connecting the Smart Home to the Homeowner – International Housewares Show, Jan 2018

Invited Panelist: Intellectual Property and Design Rights – 13th Annual Foley IP Conference, Sept 2017

Keynote Speaker: Naked Design and Visual Perception – North Carolina State University, Nov 2017

Keynote Speaker: Communicate or Die – UIUC, Dec 2016

Keynote Speaker: The World Class Designer – Newell Summit, Kalamazoo, Oct 2016

Invited Speaker: IOT and The Macintosh Moment –Connected World Conference, Sept 2016

Keynote Speaker: Talking Loud & Clear- CSULB San Francisco, Aug 2016

Invited Speaker: UX and IOT – Windy City Things, June 2016

Keynote Speaker: Design For Local – IDSA International Conference, Atlanta, Aug 2016

Keynote Speaker: Design Like an ID-IOT – Manifest, Chicago, May 2016

Keynote Speaker: UX and the ID-IOT – IDSA Western District Conference, Denver, March 2016

Invited Speaker: Brand Personalities – DMI National Conference, Boston, Sept 2015

Keynote Speaker: Design For Local – PD+I Conference, London, May 2015

Keynote Speaker: Paul Hatch and the Evolution Of Consumer Products – Garmin Center, March 2015

Invited Speaker: The Changing Mechanics of the Design Business, IDSA International Conference, Austin, June 2014

Invited Speaker: Design as a Center Of Excellence – Bosch Global Summit May 2014

Keynote Speaker: Visual Perception and the Designer – Purdue University Oct 2013

Invited Participant: The Meaning Of Life – Ignite Talk, ORD Camp, Chicago May 2013

Keynote Speaker: Communicate Or Die – IDSA Midwest District Conference 2012

Keynote Speaker: Designing For International Markets – Stryker Summit, Kalamazoo, June 2012

Invited Speaker: Run Like A Designer – IDSA Southern District Conference, May 2011

Invited Speaker: Reinventing The Wheel - IDSA Midwest District Conference, April 2011

Keynote Speaker: Future Tech trends – IATC Engineering Conference, May 2010

Invited Panelist: The Top i-Gadgets – Consumer Electronics Show, Jan 2010

Invited Participant: Designer Mixtape– IDSA International Conference Aug 2009

Keynote Speaker: Creating A Creative Culture -ID-DNA- IDSA Midwest Conference, March 2009

Invited Speaker: Protecting Brand Equity – PDMA, 2008

Invited Panelist: Developing A Brand Identity To Grow Your Margins -Consumer Electronics Show, Jan 2006

Invited Speaker: Brand Differentiation Through Design Details – International Housewares Show, Jan 2003

Invited Speaker: Design in the USA – USA Forum, Frankfurt Germany, Feb 2000

**Professional Honors and Other Achievements:**

2022 Graduate Research Fellow, National Science Foundation

2018 Presented the IDSA Fellowship Award.

2016 was elected onto the board of the IDSA as Director-at-Large.

2015 Called to meeting at The White House by Barack Obama and Secretary of Commerce Penny Pritzger for Forum on supporting US manufacture.

2014 Founded Design House Inc, a nonprofit organization whose mission is to help revitalize local manufacture through design.

2013 Elected Chair of IDSA International Conference 'Breaking The Rules'

2009 Third design professional ever to be awarded the IDSA Midwest Honors for Outstanding Achievement.

2005-07 Elected to The Board of Directors, Industrial Designer Society of America.

2006 Elected Chair for IDSA Midwest Conference "Home, Urban Seduction & Design", Chicago, IL

2005 Elected Chair for IDSA Midwest Conference "Impact -Design Means Business" at University of Urbana-Champaign, IL.

2005 Founded and ran 'Fight Club', which NY Times called "A Designer Slugfest". It later became a pilot Reality TV show.

2004 Elected Chair for IDSA Midwest Conference "Shift Happens", Chicago, IL

2000 Received the "Design of The Decade Award" from Business Week and the IDSA for TEAMS Design's achievements.


**Awards:**

**2020**

IDEA Jury Chair Award

IDEA Medical Device Gold Award

**2011**

Appliance Design EID Silver Award : Business Machine – HoMedics Inc. Black & Decker Hanging Crosscut 6-Sheet Paper Shredder

Appliance Design EID Silver Award: Small Appliances – Robert Bosch Corp., 12" Dual-Bevel Glide Miter Saw

Appliance Design EID Silver Award: Small Appliances – HoMedics Inc., Black & Decker iShred

Appliance Design EID Bronze Award: Small Appliances – Jarden Consumer Solutions, Mr. Coffee Optimal Brew Thermal Coffeemaker

**2010**

iF Product Design Award: Mr. Coffee Optimal Brew Thermal Coffeemaker

ID Magazine Annual Design Review: Robert Bosch Full Force Pneumatic Nail Guns

Appliance Design EID Award: Federal Signal Automated Parking Products

Appliance Design EID Award: Robert Bosch Full Force Pneumatic Nail Guns

Appliance Design EID Silver Award: Federal Signal Automated Parking Products Universal One & Universal PS

Appliance Design EID Silver Award: Robert Bosch Full Force Pneumatic Nail Guns

Appliance Design EID Bronze Award: Sunbeam Products Flat Panel Heater

Appliance Design EID Award: Sunbeam Products Flat Panel Heater

**2009**

Appliance Design EID Silver Award: Robert Bosch RS35 Reciprocating Saw

Appliance Design EID Silver Award: Argus Camera Company Kid's Cameras Bean and Sprout

IHA Award: Wusthof-Trident Precision Edge Electric Knife Sharpener

IHA Award: Smith's Edge Diamond Edge Electric Knife and Scissors Sharpener

Good Design Award: Robert Bosch Pneumatic Nailers

Good Design Award: RS35 Demolition Reciprocating Saw

Good Design Award: Precise Path Robotics RG3 Robotic Greens Mower

IDEA Award:  Argus Bean Children's Digital Camera

**2008**

ADEX Award: Mansfield Reo Bathroom Suite

ADEX Award: Mansfield Essence Bathroom Suite

Good Design Award: Argus Camera Kid's Cameras Bean and Sprout

Spark Award Bronze: Precise Path RG3 Mower

**2005**

Good Design Award: LR Nelson Costco 3 Piece Nozzle Set

**2001**

iF Product Design Award: Karcher HDS 698 CSX Heated Pressure Washer

**2000**

Design of the Decade (IDSA /BusinessWeek): Karcher Full Line of Power Washers

I.D. Magazine Design Awards: Siemens Easy Control Climate Control Unit

iF Product Design Award: Siemens Easy Control Climate Control Unit


**LIST OF PATENTS (Design patents, utility patents and patents pending).**

| 2021/0076929 | 2021 | Vision Measurement Device and Method of Measuring Vision Using The Same |
| 2020/0069089 | 2020 | Food Product Dispenser and Valve |
| WO 063584 | 2019 | Vision Measurement Device and Method of Measuring Vision Using the Same |
| EP3687373 | 2018 | Vision Measurement Device and Method of Measuring Vision Using the Same. |
| 10,470,597 | 2019 | Food Product Dispenser and Valve |
| 10,194,763 | 2019 | Food Product Dispenser and Valve |
| 2019/0006,862 | 2019 | Power pack vending apparatus, system and method of use for charging packs with biased locking arrangement |
| 10,084,329 | 2018 | Power pack vending apparatus, system, and method of use for charging power packs with biased locking arrangement |
| D800803 | 2017 | Table Saw |

| D794407 | 2017 | Power tool |
| 9,717,354 | 2017 | Food product dispenser and valve |
| 2017/0251846 | 2017 | Food Product Dispenser and Valve |
| D761337 | 2016 | Saw |
| DE10 209490 | 2016 | Werkzeugaufbewahrungsvorrichtung (Tool Storage Device) |
| 9,132,559 | 2015 | Cutlery having improved gripping ergonomics |
| 2014/0214,518 | 2014 | System and method for price matching and comparison |
| D689252 | 2013 | Portion of floor cleaning machine |
| D686791 | 2013 | Vacuum cleaner handle |
| D674371 | 2013 | Portable audio device |
| 2012/0159793 | 2012 | Slidable chopping attachment for kitchen knives |
| D646935 | 2011 | Cutlery block |
| D645715 | 2011 | Pull saw |
| D639616 | 2011 | Cutlery handle |
| D639615 | 2011 | Cutlery handle |
| D639614 | 2011 | Cutlery handle |
| JP005278 | 2011 | IV Pole |
| 7,703,750 | 2010 | Storage apparatus |
| WO 019238 | 2010 | Rotary food cutter with removable blade assembly |
| 2010/0037,787 | 2010 | Rotary food cutter with removable blade assembly |
| 7,708,167 | 2010 | Dispensing Apparatus |
| D607024 | 2009 | Hinge boring bit |
| D594292 | 2009 | Pizza cutter |
| D593817 | 2009 | Box grater |
| D591118 | 2009 | Bottle opener |
| D584111 | 2009 | Colander |
| D583207 | 2008 | Can opener |
| 2008/0093,489 | 2008 | Spice Grinder Assembly with Grind Adjusting Wheel |
| 7,325,785 | 2008 | Storage apparatus |
| D565164 | 2008 | Volatile Dispenser |
| D559640 | 2008 | Palm Grip Sander |
| D555435 | 2007 | Spice grinder |

| | | |
|---|---|---|
| D550027 | 2007 | Pan handle |
| D555902 | 2007 | Case for tool accessories |
| D553857 | 2007 | Case for tool accessories |
| 2007/0023455 | 2007 | Dispensing Apparatus |
| D553233 | 2007 | Volatile Dispenser |
| 2007/0197152 | 2007 | Powered paint removal tool |
| 7,270,496 | 2007 | Ring Mechanism for a ring binder |
| D533041 | 2006 | Drilling and driving tool |
| D523634 | 2006 | Insert bit dispenser |
| D518893 | 2006 | IV Pole |
| D525096 | 2006 | Tuck pointer |
| 6,983,930 | 2006 | Clamping device with flexible arm |
| WO 027702 | 2005 | Dispensing apparatus |
| CA 2469977 | 2005 | Ring mechanism for a ring binder |
| 2005/0265775 | 2005 | Ring mechanism for a ring binder |
| 6,969,031 | 2005 | Adjustable moveable IV stand |
| 2004/0151,531 | 2004 | Sound deadening mechanism for a ring binder |
| EP 1,706,010 | 2004 | IV Pole |
| 6,754,935 | 2004 | Power tool handle |
| EP 1,509,366 | 2003 | Power Tool Handle |
| 2003/0221292 | 2003 | Power tool handle |
| D470871 | 2003 | Mobile oil dispenser |
| CA 2488612 | 2003 | Power tool handle |
| D475595 | 2003 | Circular saw with top handle |
| D475265 | 2003 | Circular saw with rear handle |
| D441342 | 2001 | Power station with corded backup |

**Appendix B**

**PRIOR TESTIMONY**

The following is a list of all cases I have served as an expert witness and testified either at trial or by deposition in the last 4 years:

| Year | Case | Type |
|------|------|------|
| 2022 | Cambria Company LLC v. Lakeside Surfaces Inc | Design Patent Infringement |
| 2020 | Shure Inc., and Shure Acquisition Holdings, Inc., v. ClearOne, Inc | Design Patent Infringement |
| 2020 | Skull Shaver, LLC v. Ideavillage Products Corporation | Design Patent Infringement |
| 2020 | Cixi City Liyuan Auto Parts Co. Ltd., Tyger Auto, Inc., And Hong Kong Car Start Industrial Co. Ltd v. Laurmark Enterprises, Inc | (ITC) Utility Patent Infringement |
| 2019 | Simpson Strong-Tie Company v. Oz-Post International | Design Patent Infringement, Utility Patent Infringement |
| 2019 | Black & Decker Corporation v. Harbor Freight Tools | JAMS Arbitration, Design Patent Infringement, Utility Patent Infringement, Trade Dress Infringement |
| 2019 | Focus Products Grp, Int'l & Zahner Design & Hookless Systems & Sure Fit Home v. Kartri Sales, Co. & Marqui Mills Int'l | Trade Dress and Trademark Infringement, Design Patent Infringement, Utility Patent Infringement |

**Appendix C**

**Materials Considered**

The following is a list of materials I considered in preparing this Report:

| |
|---|
| U.S. Patent D737,723 and its filing history |
| U.S. Patent D738,256 and its filing history |
| U.S. Patent D784,195 and its filing history |
| U.S. Patent D785,112 and its filing history |
| Prior Art cited on the face of each of the above patents. |
| U.S. Patent No. D739,906 (filed March 12, 2013; issued September 29, 2015) |
| The Accused Products "Gyroor A", "Gyroor B", "Gyroor C", "Gyroor D" and "Gyroor E" |
| Expert Declaration of Jim Gandy (signed September 12, 2022) |
| Expert Declaration of Lance Rake (signed August 21, 2021) |