# Exhibit A

Page 1

1         IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF ILLINOIS

3                   EASTERN DIVISION

4    _____

5    HANGZHOU CHIC INTELLIGENT

6    TECHNOLOGY CO. and UNICORN

7    GLOBAL, INC.,

8              Plaintiffs,

9       v.                          Case No.

10   THE PARTNERSHIPS AND           1:20-cv-

11   UNICORPORATED ASSOCIATIONS     04806

12   IDENTIFIED ON SCHEDULE A,

13             Defendants.

14   _____

15            VIDEOCONFERENCE DEPOSITION OF

16                    JIM GANDY

17   DATE:          Wednesday, October 26, 2022

18   TIME:          10:04 a.m.

19   LOCATION:      Remote Proceeding

20                  Southport, North Carolina

21   REPORTED BY:   Arkady Sandoval, Notary Public

22   JOB NO.:       5506428

23

24

25

Page 2

```
 1        A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFFS HANGZHOU CHIC INTELLIGENT
 3   TECHNOLOGY CO. and UNICORN GLOBAL, INC.:
 4       MARK BERKOWITZ, ESQUIRE (by videoconference)
 5     Tarter Krinsky & Drogin, LLP
 6     1350 Broadway
 7     New York, NY 10018
 8     mberkowitz@tarterkrinsky.com
 9     212-216-1166
10
11   ON BEHALF OF JIM GANDY:
12       ROBIN HE CHENG, ESQUIRE (by videoconference)
13     Glacier Law, PLLC (NY)
14     200 Park Avenue, Suite 1703
15     New York, NY 10166
16     robin.cheng@glacier.law
17
18   ALSO PRESENT:
19     Chandler Sturm, Esquire (by videoconference)
20     Queena Zhang, Esquire (by videoconference)
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2   EXAMINATION:                    PAGE
 3     By Mr. Berkowitz              6
 4     By Mr. Cheng                125
 5
 6            E X H I B I T S
 7   NO.      DESCRIPTION           PAGE
 8   Exhibit 1  Jim Gandy Opening Report      19
 9   Exhibit 2  Jim Gandy Rebuttal Report     56
10   Exhibit 3  Expert Declaration of Lance Rake  73
11            (Exhibits attached.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                J. GANDY
 2       THE REPORTER:  Good morning.  My name
 3   is Arkady Sandoval; I am the reporter
 4   assigned by Veritext to take the record of
 5   this proceeding.  We are now on the record
 6   at 10:04 a.m.
 7       This is the deposition of Jim Gandy
 8   taken in the matter of
 9   Hangzhou Chic Intelligent Technology Co.,
10   and Unicorn Global, Inc., v.
11   The Partnerships and Unicorported
12   Associations Identified on Schedule A at
13   on October 26, 2022, at 5961 Spikerush
14   Trail, Southport, North Carolina.
15       I am a notary authorized to take
16   acknowledgments and administer oaths in
17   New Jersey and New York.  Parties agree
18   that I will swear in the witness remotely
19   outside of his presence.
20       Additionally, absent an objection on
21   the record before the witness is sworn,
22   all parties and the witness understand and
23   agree that any certified transcript
24   produced from the recording virtually of
25   this proceeding:
```

Page 5

```
 1                J. GANDY
 2       - is intended for all uses permitted
 3   under applicable procedural and
 4   evidentiary rules and laws in the same
 5   manner as a deposition recorded by
 6   stenographic means; and
 7       - shall constitute written
 8   stipulation of such.
 9       At this time will counsel please
10   identify themselves for the record.
11   Mr. Cheng, if you could begin?
12       MR. CHENG:  Good morning.  My name is
13   He Cheng and also Robin Cheng, and I am
14   the counsel for the deponent.
15       MR. BERKOWITZ:  Good morning.  This
16   is Mark Berkowitz, and I am here with
17   Chandler Sturm, both of Tarter Krinsky &
18   Drogin, on behalf of plaintiffs.
19       THE REPORTER:  Thank you.
20       Hearing no objection, I will now
21   swear in the witness.
22       Mr. Gandy, please raise your right
23   hand.
24  //
25  //
```

2 (Pages 2 - 5)

J. GANDY

1
2 WHEREUPON,
3          JIM GANDY,
4 called as a witness, and having been first
5 duly sworn to tell the truth, the whole
6 truth, and nothing but the truth, was
7 examined and testified as follows:
8          THE REPORTER: Thank you. Counsel.
9              EXAMINATION
10 BY MR. BERKOWITZ:
11   Q   Good morning, Mr. Gandy.
12   A   Good morning.
13   Q   If you don't mind, could you
14 state your full name for the record?
15   A   Yes, my name is James M. Gandy.
16   Q   Okay. Do you normally go by
17 Jim?
18   A   I go by Jim.
19   Q   Okay. I see on some of your
20 forms, you say "Jim," sometimes you say
21 "James." Just want to make sure I have
22 the right person today.
23   A   Yes.
24   Q   Okay. So my name is
25 Mark Berkowitz. I am one of the

J. GANDY

1
2 attorney's for plaintiffs in this case.
3 We are doing this remotely today.
4 Obviously, if there are any technical
5 problems, you have trouble hearing or
6 video drops out, let us know. We can
7 always take a break. It seems like it
8 happens at least once or twice during
9 these things.
10   A   Okay.
11   Q   But we'll do our best. Have you
12 had your deposition taken before?
13   A   Yes, I have.
14   Q   How many times?
15   A   I think five.
16   Q   Okay. When was the last time
17 you had your deposition taken?
18   A   2021.
19   Q   Okay. So that was, I guess,
20 during the pandemic?
21   A   Yes.
22   Q   So you've done a remote
23 deposition before?
24   A   Yes, I've done two remote
25 depositions.

J. GANDY

1
2   Q   Very good. Okay. So you're
3 familiar with the process.
4   A   Yes.
5   Q   Okay. So today I'm going to be
6 asking you some questions. The reporter
7 is going to be taking down your answers.
8 Do you understand that you are under oath?
9   A   Yes, I do.
10   Q   Do you know what that oath
11 means?
12   A   That I have to tell the truth,
13 whatever questions you're asking me.
14   Q   Great. The court reporter
15 mentioned some of the ground rules. I'll
16 just go over them quickly. I know you're
17 familiar with the process. So I'm going
18 to be asking a series of questions. If
19 you don't understand my question, ask to
20 clarify it. Is that okay?
21   A   Yes.
22   Q   Okay. I'm going to assume that
23 you understand the questions that I ask
24 unless you tell me that you don't
25 understand then. Is that fair?

J. GANDY

1
2   A   Yes, that's fair.
3   Q   You understand that your counsel
4 may object from time to time, but unless
5 you're instructed not to, you still need
6 to answer.
7   A   Yes, I understand.
8   Q   Okay. Try to avoid any non-
9 audible responses -- the head nods and
10 head shakes -- because the court reporter
11 is taking down a verbatim transcript. Is
12 that all right?
13   A   Yes.
14   Q   Okay. Since we're doing this
15 remotely, let's try not to talk over each
16 other, again, for the benefit of the court
17 reporter so we have a nice, clear record.
18 Is that all right?
19   A   Yes.
20   Q   Okay. If at any time you need a
21 break, of course just please tell us. The
22 only thing I ask is that if we are in the
23 middle of a question, please answer and
24 then we can go take our break. Is that
25 all right?

3 (Pages 6 - 9)

J. GANDY

1
2    A    Okay.  Sure, that's fine.
3    Q    Is there any reason you would
4 not be able to provide truthful and
5 complete testimony today?
6    A    I don't think so.
7    Q    Are you on any medications that
8 would interfere with your ability to
9 provide complete and truthful testimony?
10    A    No.
11    Q    Any health issues that would
12 interfere with your ability to provide a
13 complete and truthful testimony?
14    A    No.
15    Q    Okay.  Thank you.  Do you have
16 an understanding as to why you're here
17 today?
18    A    Yes, I do.
19    Q    What is that understanding, sir?
20    A    That I'm here to, I guess,
21 discuss my reports that I have provided to
22 Mr. Cheng in this case.
23    Q    You have an understanding of
24 what this case relates to generally?
25    A    Yes.  It relates to hoverboard

J. GANDY

1
2 designs.
3    Q    Okay.  You understand that the
4 plaintiffs accuse the defendants of
5 infringing a number of design patents
6 relating to hoverboards; is that fair?
7    A    That's correct.
8    Q    Okay.  And it's your
9 understanding that the defendants dispute
10 those contentions; is that fair?
11    A    Yes.
12    Q    Okay.  So we represent, there's
13 two plaintiffs.  There's Hangzhou Chic,
14 and there's Unicorn Global.  To avoid
15 having to continually butcher those names,
16 I'm going to call them "plaintiffs."  Is
17 that all right with you?
18    A    Sure.
19    Q    And I understand that your
20 report was provided to Mr. Cheng on
21 benefit of eight different defendants.  Is
22 that your understanding as well?
23    A    That's my understanding, yes.
24    Q    So I'm going to refer to them
25 collectively as "defendants," if that's

J. GANDY

1
2 all right with you.
3    A    That's fine.
4    Q    Okay.  If there is a situation
5 that arises where you want to refer to a
6 specific defendant, just please go ahead
7 and point that out, and I will do the
8 same.  I'm not sure if that situation will
9 come up, but just to avoid any issues.
10    A    That's fine.
11    Q    When did you first get engaged
12 to work in this matter?
13    A    I was contacted by Mr. Cheng in
14 August of 2021.
15    Q    Prior to that, had you worked
16 with any of the defendants in this case
17 before?
18    A    No, I have not.
19    Q    Had you heard of any of the
20 defendants in this case before?
21    A    No, I had not.
22    Q    Any familiarity with their
23 products prior to 2021?
24    A    Not prior to being contacted,
25 yes.

J. GANDY

1
2    Q    Okay.  Had you previously worked
3 with Mr. Cheng before?
4    A    No, I have not.
5    Q    Had you worked with his law
6 firm, Glacier Firm, before?
7    A    No, no I have not.
8    Q    Okay.  Were you contacted
9 directly by Mr. Cheng or through an
10 agency?
11    A    I was contacted by Mr. Cheng.
12    Q    Okay.  And I just have to ask
13 these questions.  Do you have any
14 financial interest in any of the
15 defendants?
16    A    No, I do not.
17    Q    Okay.  But you are being paid
18 hourly for your work on this case; is that
19 correct?
20    A    That's correct, yes.
21    Q    I believe it's 350 an hour?
22    A    That's correct.
23    Q    Okay.  And is your compensation,
24 does that hourly rate vary depending on
25 whether you're writing reports,

4 (Pages 10 - 13)

J. GANDY

1
2 participating in depositions, trial,
3 anything like that?
4     A   No, it's the same for any of
5 those situations.
6     Q   Okay.  And is any of your
7 compensation dependent on the outcome of
8 this lawsuit?
9     A   No, it's not.
10     Q   Besides the defendants and
11 counsel for the defendants, have you
12 spoken with anybody about this case?
13     A   No.  No, I have not.
14     Q   That was actually a poor
15 question.  Have you ever spoken directly
16 with any of the defendants in this case?
17     A   No, I have not.
18     Q   So your only contacts concerning
19 this case are with counsel?
20     A   That's correct.  That's correct.
21 Mr. Cheng is the only person I have spoken
22 to about this case.
23     Q   Got it.  And did you do anything
24 to prepare for today?
25     A   I'm sorry, what was that?

J. GANDY

1
2     Q   Did you do anything to prepare
3 for today's deposition?
4     A   I've gone over my reports, and I
5 had just a prep session with Mr. Cheng,
6 just to go over some of the questions that
7 he felt that I might be asked.
8     Q   So when did you meet with
9 Mr. Cheng?
10     A   That was last Wednesday, I
11 believe it was.  Yes.
12     Q   You just met with Mr. Cheng that
13 one time?
14     A   I met with Mr. Cheng last
15 Wednesday.  I met with one of his
16 colleagues, Iris, I think it's Ju
17 yesterday.
18     Q   And again, did you speak with
19 anybody else besides the attorneys about
20 this case?
21     A   No.  No, I have not.
22     Q   And besides your expert reports,
23 did you review any other materials in
24 preparation for today?
25     A   Just my reports.  I looked at

J. GANDY

1
2 Mr. Hatch's reports again, which I
3 rebutted.  That's basically it.
4     Q   When you say "Mr. Hatch's
5 report," did you review both his initial
6 expert report and his rebuttal report?
7     A   Yes, I have.
8     Q   Okay.  Did you review the expert
9 -- I'm sorry, strike that.  Did you review
10 the reports of any other experts in this
11 case?
12     A   No, I have not.
13     Q   Are you familiar with an
14 individual named Lance Rake?
15     A   No, I'm not.
16     Q   Do you know whether the
17 defendants in this case have retained any
18 other experts?
19     A   I'm not aware of that.  I have
20 not been told that.
21     Q   Have you reviewed the accused
22 products in this case?
23     A   I have reviewed them through the
24 photographs that I have received.
25     Q   Have you inspected any physical

J. GANDY

1
2 products?
3     A   No, I have not.
4     Q   You have not ridden any of the
5 hoverboards?
6     A   No.
7     Q   Just kidding.  All right.  So
8 I'm going to bring up what I'm going to
9 mark as Exhibit 1, your expert report.
10 But before I do that, Mr. Gandy, do you
11 have any papers in front of you?  Any
12 copies of your reports or anything like
13 that?  I have some portions of the copies
14 of my report that I felt maybe I might
15 need to refer to, depending on the
16 questions that are asked.
17     Q   Okay.  But you don't have a full
18 set there with you?
19     A   No, no I do not.
20     Q   Okay.  So I'm going to go ahead
21 and as I go put the exhibits into the chat
22 so you can download them.  And I can also
23 bring them up on the screen so we can look
24 at them together.
25     A   Okay.

Page 18

J. GANDY

1
2    Q   If I knew how to do that.
3        MR. BERKOWITZ:  Sorry, question for
4    the court reporter.  Am I able to drop
5    exhibits into the chat?
6        THE REPORTER:  So yeah, let me just
7    jump in here.  Mr. Berkowitz, from what I
8    understand, copying and pasting doesn't
9    work with the Zoom chat.  I mean, if you
10   want to share on the screen, you can do
11   that.  If you want to e-mail them to me, I
12   can share them as well.
13       MR. BERKOWITZ:  No, I'll just share
14   them as we go, then.  No problem.
15       THE REPORTER:  Okay.
16   BY MR. BERKOWITZ:
17   Q   Okay.  Mr. Gandy, can you see
18   that I've shared a document with you?
19   A   Yes, yes I can.
20   Q   Okay.  I'm going to Zoom out
21   just a bit, and I'm going to go ahead and
22   mark this as Exhibit 1.  I will just
23   quickly show you the first page and the
24   last page.  It's an 86-page document,
25   which ends with an Exhibit 1, that's your

Page 19

J. GANDY

1
2    CV.  And there is a signature on page 82
3    of the document.
4        (Exhibit 1 was marked for
5        identification.)
6    A   Sure.
7    Q   Do you see that?
8    A   Yes.
9    Q   Okay.  Are you familiar with
10   this document?
11   A   Yes, I am.
12   Q   And what is this document?
13   A   It's my rebuttal report on
14   noninfringement, rebutting Mr. Hatch's
15   report.
16   Q   I actually don't think it is.  I
17   think this is a report, a document dated
18   September 23, 2021, and I'll represent
19   that this was served on us again on August
20   16th of 2022 as an opening report.  Maybe
21   you want to take a few minutes and just
22   scroll through.  I can start at the top
23   and make sure you're familiar with this
24   document.  Is that all right?
25   A   Sure, that's fine.  Okay.  Yeah,

Page 20

J. GANDY

1
2    I'm aware of this.  Yeah, it was not
3    the -- I believe it was not the rebuttal
4    report to Mr. Hatch's.
5    Q   Yes.  Do you remember preparing
6    this report that we have on the screen
7    right now?
8    A   Sure.  Oh, yes.
9    Q   When did you prepare this
10   report?
11   A   It was in August of last year.
12   I believe I finished up on it in early
13   September, based on that date, September
14   3rd.  I seem to remember it was around the
15   first of September that I finished it.
16   Q   Okay.  Do you remember the
17   context as to why you prepared this
18   report?
19   A   Yes.  It was basically for the
20   purpose of giving my opinion as to
21   noninfringement of the four design patents
22   in the case.
23   Q   Okay.  And who drafted this
24   report?
25   A   I did.

Page 21

J. GANDY

1
2    Q   Okay.  Did you draft the report
3    in its entirety?
4    A   Yes, I did.
5    Q   What was your process for
6    drafting the report?
7    A   Initially just reviewing the
8    documents that Mr. Cheng had sent to me
9    for the purpose of understanding what the
10   case was about and then sending me
11   photographs of the alleged infringing
12   designs, hoverboard designs.  Once I had
13   all of those and then was able to
14   formulate an opinion, I began to write a
15   report.
16   Q   Okay.  You mentioned that you
17   had received some documents from counsel.
18   Do you recall what those documents were?
19   A   I think they're listed on there.
20   I have in front of me, if you want, I can
21   take a look at my report where I've listed
22   what I did look at.  Obviously, I looked
23   at the four design patents.  I looked at
24   all of the alleged infringing devices.  I
25   believe I looked at the defendants' motion

Page 22

J. GANDY

1
2 for summary judgment.
3     Q   Okay.
4     A   And then, obviously, I have it
5 on there that I saw, I did look at
6 Mr. Hatch's expert report.
7     Q   Okay.  We'll circle back to that
8 a little bit later.  Did anybody help you
9 prepare the report?
10    A   No.
11    Q   Did you base the report in any
12 way on any prior expert reports?
13    A   No, no.  When you're saying "any
14 prior expert reports," are you talking
15 about his particular subject matter,
16 hoverboards?
17    Q   Good question.  No, I was
18 actually asking about any prior expert
19 reports that you prepared for other cases?
20    A   I may have used some of the
21 language about my background and what my
22 expertise is, and my understanding of the
23 law.
24    Q   Got it.  So I note there are
25 several reports and declarations that were

Page 23

J. GANDY

1
2 prepared in these cases.  If it's all
3 right, I just want to refer to this
4 document that we've marked as Exhibit 1 as
5 your report, your opening report.  Is that
6 all right with you?
7     A   Sure.  That's fine.
8     Q   I want to just go all the way to
9 the end to your CV.  We'll start there
10 talking about your background, if that's
11 all right.
12    A   Sure.  That's fine.
13    Q   Okay.  So we're now looking at
14 Exhibit 1 of we've marked as Exhibit 1,
15 Mr. Gandy's opening report, and what
16 appears to be his CV.  Is that correct?
17    A   Yes, that's correct.
18    Q   When did you prepare this CV?
19    A   I prepared this CV not long
20 after I retired from the patent office,
21 knowing that I was going to, I was
22 interested in doing expert witness work
23 and consulting work in design patents.  So
24 I prepared my CV back in 2005.
25    Q   Have you updated it since then?

Page 24

J. GANDY

1
2     A   I've updated it as far as any of
3 the cases that I've been involved in, yes.
4     Q   Okay.  Do you recall the last
5 time that you updated the CV?
6     A   Whatever the last case that I
7 was involved in, that would be the last
8 time I updated it.
9     Q   Okay.  Besides this particular
10 matter between plaintiffs and defendants,
11 are you providing expert services in any
12 other cases?
13    A   You mean, have I currently been
14 retained in other cases?
15    Q   Yes.
16    A   At this time?
17    Q   Yes, sir.
18    A   Yes, I've been retained in
19 another case that doesn't involve anything
20 like this case.  But I've been retained in
21 another case, yes.
22    Q   Okay.  So I guess let's step
23 through your education and background, and
24 then we can talk about your testifying
25 experience and make sure it's all up-to-

Page 25

J. GANDY

1
2 date.
3         THE REPORTER:  Counsel, if I could
4     interrupt just for one moment.  I have
5     someone trying to enter in.  Queena Zhang.
6         MR. BERKOWITZ:  It's okay.
7         MR. CHENG:  Yes.  She is with us.  If
8     you can get her admitted to the session,
9     it would be good.  Thank you.
10        MR. BERKOWITZ:  All right.  Thank
11    you.
12 BY MR. BERKOWITZ:
13    Q   So let's start with your college
14 education.  It says here you attended
15 Temple University.  Is that correct?
16    A   That's correct.
17    Q   And you received a bachelor of
18 science in architectural design
19 technology.  Is that right?
20    A   That's correct.
21    Q   Can you tell us a little bit
22 about what type of course work is involved
23 in architectural design technology degree?
24    A   Are you asking me what kind of
25 courses I took while I was in college?

Page 26

J. GANDY

1
2    Q    What kind of, well, tell me a
3 little bit more about the architectural
4 design technology degree and what that --
5 in order to obtain that degree, what type
6 of course work is required?
7    A    Well, obviously, engineering
8 classes, physics classes, obviously
9 architectural design classes, classes like
10 perspective and rendering in being about
11 to draw renderings and perspectives.
12 Urban design, calculus.  Again, most of
13 the engineering and science courses along
14 with the actual architectural courses.
15    Q    Any product design course work?
16    A    No, not at that time.
17    Q    So you graduated from Temple in
18 1972; is that correct?
19    A    That's correct.
20    Q    And following your graduation
21 you went straight to working at the patent
22 office?
23    A    That's correct.
24    Q    And I will start there with your
25 first position at the patent office.  And

Page 27

J. GANDY

1
2 that was in 1972; is that right?
3    A    That's correct, yes.
4    Q    Okay.  So you started as a
5 design patent examiner; is that right?
6    A    That's correct.
7    Q    And in your own words, what kind
8 of patents were you examining when you
9 first started in 1972?
10    A    When I first started, actually I
11 was in the area of furnishings, like
12 furniture design.  The art unit I came
13 into in June of 1972 basically had fine
14 arts type work, and like I said, I started
15 working in D6, which is furnishings,
16 mostly furniture.
17        In I believe it was December or
18 January of 2002-2003, I was transferred to
19 the other design art unit in the
20 technology center because there was a
21 conflict of an examiner who had been
22 hired.  His brother was in the same art
23 unit, and they couldn't do that.  So I was
24 transferred into what was at that time
25 292.  Or -- I'm sorry -- 291.  And when I

Page 28

J. GANDY

1
2 was transferred over there, I primarily
3 worked in the area of transportation, D12.
4 I also worked in the area of agricultural
5 vehicles.  I worked in the area of
6 hardware, D8.  And I also worked in the
7 area of automotive engine parts.
8    Q    I don't want to interrupt you,
9 but I believe you said December of 2002 to
10 2003.  I'm assuming that's not what you
11 meant.
12    A    Well, December of 2002, January
13 2003.  I don't remember exactly when.  I
14 was only in the office about six months
15 when that happened.
16    Q    What I'm saying is, did you mean
17 1972 to 1973?
18    A    Yes.  1972 to 1973.  Yes,
19 correct.
20    Q    Okay.  And when you were working
21 in the class D12, handling class D12
22 applications, can you give us some more
23 specifics as to what kind of products you
24 were seeing?
25    A    I worked in the entire area of

Page 29

J. GANDY

1
2 land transportation, so I worked on
3 anything that would be transportation on
4 land, like snowmobiles, sleds, bicycles,
5 motorcycles, obviously automobiles,
6 trucks.
7    Q    Got it.  So you were
8 initially -- when you first entered the
9 patent office, what was your title?
10    A    I was an assistant design patent
11 examiner.
12    Q    And at some point, did your
13 title change?
14    A    Yes.  The process at the patent
15 office for examiners, both design and
16 utility, is you come in as an assistant at
17 whatever grade you're hired at, and it
18 normally takes about six or seven years
19 until you have a -- if your work is
20 sufficient, adequate -- you have an
21 opportunity to be promoted at the end of
22 every year.
23        Then you get to a point where
24 you can, what they call a partial
25 signatory review program and then a full

8 (Pages 26 - 29)

J. GANDY

1
2 signatory review program.
3        The full signatory review
4 program is a six-month program.  At the
5 end of the six months, supervisors review
6 your work and determine whether you have
7 adequately made the proper determinations
8 on patentability, and if you have, then
9 you be promoted to what's called a primary
10 examiner.  At that point, you have full
11 signatory authority to make all decisions
12 on patentability.
13    Q    Understood.  It says here, "In
14 1979, I was promoted to primary examiner
15 and granted full signatory authority."
16    A    That's correct.
17    Q    So that's the correct year,
18 1979?
19    A    Yes.
20    Q    And is it correct that you
21 remained as a primary patent examiner all
22 the way up through 1996?
23    A    That's correct, yes.
24    Q    And between 1979 and 1996, did
25 your responsibilities or role change at

J. GANDY

1
2 all?
3    A    As a primary examiner, I mean,
4 when I was, at times I would act as the
5 supervisor for the art unit when the
6 supervisor was away.  I was, I trained new
7 examiners that came in and reviewed their
8 work and made recommendations to the
9 supervisor when they were eligible for
10 promotion.
11    Q    Okay.  And did you continue to
12 review patents in the same classes that we
13 discussed?
14    A    Yes.  Yes.  At times, at the
15 end, towards the end of the fiscal year,
16 because there were issues of backlogs of
17 cases, I was asked to work in different
18 art areas to help move cases along.  So
19 I've worked in -- I think I've indicated,
20 may have indicated in my CV -- I've worked
21 in pretty much every design class there
22 is.
23    Q    Okay.  And 1996 comes about, and
24 you are promoted to a supervisory patent
25 examiner?  Is that correct?

J. GANDY

1
2    A    That's correct.
3    Q    Okay.  And how do your
4 responsibilities change from a primary
5 examiner to a supervisory patent examiner?
6    A    Well, as a supervisor patent
7 examiner, you're the supervisor of an art
8 unit that can consist of anywhere from
9 about 9 to 12 examiners, and you are
10 responsible for those examiners' work.
11 And at the end of the fiscal year, you're
12 required to do a review and recommendation
13 as to whether their work is satisfactory
14 or whether it's commendable or whether
15 it's outstanding or whether it's
16 unsatisfactory.
17    Q    As a supervisory patent
18 examiner, are you still independently
19 reviewing design patents, design
20 applications?
21    A    Once as a supervisor, I no
22 longer have design patent applications
23 that are assigned to me for the purpose of
24 examination.  I'm examining the examiners,
25 assistant examiners, at that point.  I'm

J. GANDY

1
2 reviewing all of their work and signing
3 off on their actions if they're correct.
4    Q    Understood.  So your time period
5 at the patent office for examining
6 applications on your own was from 1972 to
7 1996; is that fair?
8    A    That's correct, yes.
9    Q    Okay.  And you mentioned during
10 the earlier period in the supervisor
11 training junior examiners?
12    A    That's correct. Yes.
13    Q    Can you tell us a little bit
14 about how you go about, I guess, training
15 a new patent examiner?
16    A    Well, basically you're training
17 them with all of the, on all of the
18 elements that they're expected to be able
19 to perform as an examiner.  And that
20 includes examining applications, that
21 includes their office actions.  But as far
22 as their production goes -- because every
23 examiner has production.  That's based in
24 strictly the supervisor's responsibility.
25    Q    Are there any guidelines that

Page 34

J. GANDY

2 the examiners have to follow when they're
3 examining a design patent application?
4     A   Well, yeah.  Obviously, they
5 have to examine the specification, make
6 sure that the specification is accurate
7 with respect to the drawings.  They have
8 to review the drawings to make sure that
9 all the views are consistent with each
10 other so they meet the requirements of
11 definiteness and enablement under
12 35 U.S.C. 112.
13         They obviously when they're
14 looking at prior art, have to be able to
15 determine whether the prior art that
16 they've found, rendered a claim obvious or
17 anticipated, or whether the claim would be
18 allowable over that prior art.
19     Q   Did you train new examiners in
20 patent searching?
21     A   I'm sorry, did I train them in
22 searching?
23     Q   Yes, sir.
24     A   Yeah.  I mean, I would have to
25 review, I would -- until they became

Page 35

J. GANDY

2 familiar with the areas to search, I
3 would, you know, give them, you know, the
4 areas that would be required to search,
5 depending on what the subject matter was.
6     Q   Okay.
7     A   They learn very quickly, because
8 they normally will be assigned to
9 particular art areas, and they learn very
10 quickly as to where the actual class and
11 subclass searching as well as potential
12 publications, where they would need to
13 search.
14     Q   Is there any, I guess, written
15 guidelines or policies that the examiner
16 would follow in reviewing a new
17 application?
18     A   Well, I mean, the
19 Manual of Patent Examining Procedure,
20 Chapter 1500, is on design patents.  So
21 that is where they need to familiarize
22 themselves with what the rules and what
23 the proper statutes are to be applied in
24 examining design patent applications.
25     Q   But beyond the MPEP,

Page 36

J. GANDY

2 Chapter 1500, is there any other written
3 policies or guidelines that the examiner
4 would follow?
5     A   Well, there's the rules that
6 apply to design patents that are in the
7 Code of Federal Regulations.  And then
8 there are the statutes that they have to
9 be familiar with what the particular
10 sections of the statute are that apply to
11 design patents.
12     Q   Okay.  So going back to your CV,
13 you were a supervisory patent examiner
14 from 1996 to 1998; is that correct?
15     A   That's correct, yes.
16     Q   And from there, you were
17 elevated to be the design patent practice
18 specialist; is that correct?
19     A   That's correct, yes.
20     Q   Okay.  And you were in that role
21 from 1998 to 2005; is that right?
22     A   That's correct, yes.
23     Q   And how did your, I guess, job
24 responsibilities change as a design patent
25 practice specialist?

Page 37

J. GANDY

2     A   Well, I no longer had the
3 responsibility of any examiners as a
4 supervisor in an art unit.  As the
5 practice specialist, I was mainly -- the
6 practice specialist position basically
7 came into being based on a program that
8 the patent office had initiated.  Which
9 was an in-process review program, in which
10 practice specialists would review the
11 office actions of all examiners in the
12 entire technology center to determine
13 whether the actions that they had taken
14 were correct.  I would have to review
15 those applications and then prepare a
16 report on all of the elements that would
17 be required for the examiner to do in each
18 of these cases.
19         I also was in charge of training
20 all new examiners that were, that came
21 into the office.  And then I was
22 responsible for continued education
23 training for all design patent examiners
24 in the technology center.  I was in charge
25 of reviewing all of the decisions that

10 (Pages 34 - 37)

J. GANDY

1
2  were coming back from the board of appeals
3  and the court of appeals for the federal
4  circuit, to determine whether there were
5  any issues that needed to be addressed.
6          I was in charge of preparing the
7  design patent examiner supplemental
8  training guide, which was strictly a
9  training material that was for design
10  patent examiners.
11      Q   Okay.  The design examiners
12  supplemental training guide, was that a
13  publicly issued document, or was that an
14  internal document.
15      A   No.  No, it was an in-office
16  document.  All of the materials that I
17  would prepare for that particular document
18  had to go through the office of the
19  assistant commissioner on policy and
20  procedure to make sure everything that I
21  was indicating as far as dealing with
22  different issues under the statutes or
23  under the rules were correct.
24      Q   Okay.  So after 2005, did you
25  retire from the patent office?

J. GANDY

1
2      A   Yes, I retired in 2005, yes.
3      Q   Okay.  And so your career at the
4  patent office spanned 1972 to 2005; is
5  that right?
6      A   That's correct, yes.
7      Q   And your time personally
8  examining patents was from 1972 to 1996;
9  is that fair?
10      A   That's correct, yes.
11      Q   Okay.  And during your time at
12  the patent office, were you ever
13  performing noninfringement analysis or
14  infringement analysis?
15      A   No.  That's not an issue that
16  is, is, that the patent office is there
17  for.
18      Q   Okay.  And after 2005 when you
19  retired from the USPTO, what did you do
20  next?
21      A   Well, after I retired, I again
22  prepared my CV.  I had some patent agents
23  and attorneys that knew I was retiring and
24  wanted to rely on me for reviewing design
25  patent applications that they were going

J. GANDY

1
2  to file with the patent office, and I was
3  contacted on occasions by law firms,
4  knowing that I was a retired design patent
5  examiner and was interested in doing
6  expert witness work.
7          So I would get contacted from
8  time to time by law firms that had design
9  patents that were either in litigation or
10  were the defendants in actions that were
11  being taken, based on design patents.
12      Q   Okay.  So let's break that down.
13  It sounds like at least a portion of the
14  time, you were doing consulting work for
15  law firms; is that fair?
16      A   I wasn't, I mean, I wasn't
17  retained by them, but I was -- there were
18  some design patent agents that had
19  contacted me while I was at the patent
20  office about design patent practice, knew
21  I was retiring and were interested in
22  having me review design patent
23  applications that they were going to file
24  with the patent office to make sure that
25  they were in proper order.

J. GANDY

1
2      Q   Okay.  So looking at your CV,
3  there's a heading here, it says "Design
4  Patent Consulting."  Do you see that?
5      A   Yes.
6      Q   Can you see me mouse?
7      A   Sure.
8      Q   Okay.  That'll make this easier.
9  Great.  So this first sentence under that
10  heading, which I've just attempted to
11  highlight, it says, "Since retiring from
12  the USPTO, I have on occasion counseled
13  patent attorneys and agents in their
14  filings of design patent applications at
15  the United States Patent and Trademark
16  Office."  Do you see that?
17      A   Yes.
18      Q   Okay.  So that was more informal
19  assistance?
20      A   Yes.  Yes.  It was just merely
21  where I would review the applications that
22  they had prepared to make sure that they
23  were in all the proper formal matters.
24  And it involved reviewing the drawings,
25  making sure they were consistent, you

Page 42

J. GANDY

1  know, for purposes of definiteness and
2  enablement.
3
4      Q   Okay.  You weren't officially
5  working for any of these law firms in
6  particular?
7      A   No, no.  No, I have never --
8  since I've retired, I've never actually
9  been retained as an employee of any law
10 firm.
11     Q   Understood.  And then if we keep
12 reading in your CV, it says, "I have also
13 prepared expert reports and testified in a
14 deposition and at trial as an expert
15 witness in the following matters."  Is
16 that right?
17     A   That's correct, yes.
18     Q   Okay.  And we'll go through
19 them.  There's a list of six different
20 matters that follow.  Do you see that?
21     A   Yes.  Sure.
22     Q   Is this list up to date?
23     A   Yes, it is.
24     Q   So this includes, does this
25 include all your current engagements?

Page 43

J. GANDY

1
2      A   No, no.  I normally only add a
3  case to my CV once the work is done,
4  because I don't know how many reports I'll
5  have to do or when I'll have to give a
6  deposition or testify at trial.  So I
7  normally wait until after my work being
8  retained as an expert is finished.
9      Q   Understood.  Just to clarify,
10 are there any other matters in which
11 you've already submitted an expert report?
12     A   No, no.
13     Q   That's fine.  Okay.  So just if
14 we could quickly go through the -- the
15 first matter listed here says, "Complaint
16 of Ford Global Technologies, LLC."  You
17 see that?
18     A   Yes.
19     Q   And is that an ITC matter?
20     A   Yes, it was.  Yeah.
21     Q   Okay.  What was your role in
22 that case?
23     A   I was retained in that case
24 because the patents -- I was retained on
25 behalf of, representing, you know, the

Page 44

J. GANDY

1
2  attorneys who were representing Ford.
3  There was a series of design patents on
4  the Ford Mustang -- I believe it was the
5  2005 Ford Mustang -- that were being
6  challenged as being indefinite and
7  nonenabling.  And I prepared reports on
8  that, the drawings that I considered to be
9  adequate and were not indefinite or
10 nonenabling.
11     Q   Okay.  Besides enablement and
12 definiteness, was there any other areas of
13 patent law that you testified in that
14 case?
15     A   No, no.
16     Q   Okay.  And do you recall the
17 outcome of that case?
18     A   Yes.  The defendant wound up
19 settling, and Ford entered into a
20 licensing agreement with the defendants to
21 make after-market panels.  Body panels.
22 Basically, crash panels, if a car gets in
23 an accident.
24     Q   And did you end up testifying at
25 a hearing in that case?

Page 45

J. GANDY

1
2      A   No, no.
3      Q   Were you deposed in that case?
4      A   No, I was not.
5      Q   Okay.  So after you prepared the
6  expert report, the case was resolved?  Is
7  that fair?
8      A   Yes, yes.
9      Q   Okay.  All right, moving on to
10 the next case, Magnadyne Corp. v.
11 Best Buy.  Do you see that?
12     A   Yes, yes.
13     Q   And what was your role in that
14 case?
15     A   That was, basically my role was
16 to prepare a report indicating that the
17 design patent was patentable under 102 and
18 103, and that the alleged infringing
19 device was infringing.
20     Q   So is it fair to say you
21 prepared a report on validity and
22 infringement?
23     A   Yes, it was validity.  That's
24 what it was.  Validity, yes.
25     Q   Was it infringement as well?

12 (Pages 42 - 45)

Page 46

J. GANDY

1
2     A    Yeah, I believe it was.  To the
3 best of my recollection, I also indicated
4 that the alleged infringing device was
5 infringing.
6     Q    It says here you gave a
7 deposition on expert report.
8     A    Yes, I did.
9     Q    Okay.  And did you testify at
10 trial in that case?
11    A    No.
12    Q    Did the case go to trial?
13    A    No.  It was settled.
14    Q    Okay.  All right.  Moving to the
15 next one, Weber-Stephen Products v.
16 Sears Holdings Corp.  Do you see that?
17    A    Yes.
18    Q    And it says here that you
19 prepared an expert report on invalidity as
20 well as nonenabling.  Let me just sum it
21 up.  It says you prepared a report on
22 invalidity, issue of enablement,
23 indefiniteness, and the written
24 description requirement.  Is that fair?
25    A    That's correct, yes.

Page 47

J. GANDY

1
2     Q    Okay.  And then it says that you
3 separately prepared an expert report on
4 noninfringement to design patents?
5     A    That's correct.
6     Q    Is that right?
7     A    That's correct.
8     Q    Okay.  Were those two separate
9 reports that you prepared in that case?
10    A    Yes, they were separate reports,
11 yes.
12    Q    So you were representing the --
13    A    I was representing Sears, the
14 defendant.  That's correct.
15    Q    And what was the outcome in that
16 case?
17    A    There were two design patents
18 involved.  One was on an entire grill; the
19 other was on just the shroud, the cover
20 for the grill.  The cover was -- it was
21 determined that the cover was not
22 infringing.  It was a summary judgment.
23 The judge did not grant the summary
24 judgment to Sears.  Sears decided not to
25 go forward to trial.  They decided to just

Page 48

J. GANDY

1
2 settle.
3     Q    Okay.  So the case settled after
4 summary judgment?
5     A    Yes.
6     Q    So you were only deposed in the
7 case?  You did not testify at trial?
8     A    That's correct, yes.
9     Q    Okay.  Moving on to the next
10 case.  It's Trinity Manufacturing,
11 Campbell Soup Company and Campbell Sales
12 Company v. Gamon Plus.  Do you see that?
13    A    Yes.
14    Q    What type of case was that?
15    A    That was actually on, I believe
16 it was five design patents directed to --
17 trying to think of what the correct term
18 would be.  They were basically for the
19 holders for Campbell Soup Cans or just any
20 soup cans that would be in supermarkets.
21 And it involved a series of design patents
22 on certain portions of the retainer.
23 These were cases that were before the
24 patent office for inter-parties reviews
25 before the patent trial board.

Page 49

J. GANDY

1
2     Q    And you were representing which
3 party?
4     A    The defendant.  I was
5 representing Campbell, the defendants.
6     Q    When you say "the defendants,"
7 you mean, were they the parties bringing
8 the requests for review?  Or --
9     A    Yeah.  They were the parties
10 brining the request for inter-parties
11 review.
12    Q    So your declaration would be
13 supporting the invalidity of these
14 patents; is that fair?
15    A    That's correct, yes.
16    Q    Okay.  And you were deposed in
17 those IPRs?
18    A    That's correct, yes.
19    Q    Okay.  And do you recall the
20 outcome of the IPRs?
21    A    I know four of the design
22 patents were invalidated.  I think the one
23 is still, I think has still not been
24 settled.
25    Q    Okay.  Moving on to this case,

13 (Pages 46 - 49)

J. GANDY

1
2 Nite Glow Industries, I Did It, Inc., and
3 Marni Markell Hurwitz v. Central Garden &
4 Pet Company and Four Paws Pet Company. Do
5 you see that?
6    A   Yes.
7    Q   Same questions. What type of
8 issues were involved in there?
9    A   This was a -- I was asked to
10 prepare a report on expedited examination
11 process in this case. The Nite Glow --
12 well, let me say, Marni Markell was an
13 individual. She holds multiple number of
14 utility patents. And she came to Nite
15 Glow with an idea for, well, she had a
16 utility patent for basically dispensing
17 tick and flea, you know, into dogs and
18 cats.
19       Nite Glow filed design patent
20 applications off of her utility patent
21 without her knowledge. And so she brought
22 suit against them. They were issued the
23 design patents without her knowledge.
24       So the suit was based on, she
25 had a written secrecy agreement with

J. GANDY

1
2 Nite Glow that they obviously violated.
3       And so I was asked to prepare a
4 report on an expedited examination,
5 because if they had properly prepared
6 design applications and filed them as
7 expedited examinations, they would have
8 received their patent much earlier. And
9 basically, the case was for the purpose
10 of, these patents should have been
11 assigned to her.
12    Q   Okay. And just to confirm, you
13 were representing which parties in this
14 case?
15    A   Marni Markell.
16    Q   And in this case, you gave both
17 deposition and trial testimony?
18    A   That's correct.
19    Q   Okay. And do you recall the
20 outcome of that case?
21    A   The initial outcome is that she
22 was awarded the decision in the case. My
23 understanding is that there are still some
24 legal issues going on with that. I have
25 not, I have had some -- she has called me

J. GANDY

1
2 on several occasions because she is very
3 frustrated about the legal process that is
4 going on. So that's the only way I know
5 that there are still some legal issues
6 being involved in that case.
7    Q   Okay. And the last one is the,
8 I believe it's LKQ Corporation and
9 Keystone Automotive v. GM Global
10 Technology Operations. Do you see that?
11    A   Yes.
12    Q   And that's another inter-parties
13 suit?
14    A   Inter-parties, yes. It was
15 inter-parties, and post grant reviews.
16    Q   So there, too, you were
17 representing which side?
18    A   LKQ. LKQ.
19    Q   Okay. So you were providing
20 declarations in support of invalidity? Is
21 that fair?
22    A   That's correct, yes.
23    Q   So just to sum up the, your
24 expert -- let me strike that. To sum up
25 your expert experience, you've had a total

J. GANDY

1
2 of six cases, and in one case, you
3 provided opinions with respect to
4 infringement, and in one case, you
5 provided opinions with respect to
6 noninfringement. Is that fair?
7    A   That's correct, yes.
8    Q   Got it. Okay.
9    A   If you had to sum up for us,
10 what do you believe your area of expertise
11 is?
12       MR. CHENG: Objection. Vague and
13    ambiguous.
14    A   What is my area of expertise?
15 Is that what you're asking me?
16    Q   Yes, sir.
17    A   I consider myself an expert on
18 design patents in all areas of the subject
19 matter.
20    Q   During your time at the patent
21 office, did you ever review any patents
22 relating to hoverboards?
23    A   Hoverboards didn't even exist
24 when I retired from the patent office.
25    Q   That's true. Fair enough. Were

14 (Pages 50 - 53)

J. GANDY

1
2 there -- strike that. Did you review any
3 patents or patent applications related to
4 self-balancing vehicles?
5    A  I can't recall offhand. I don't
6 know, the only -- I'm trying to think of
7 the name. I can't think of the name of
8 the self-balancing vehicle, the first one
9 that came out, but I was not examining at
10 that point. I think there was a design
11 patent application filed on that, but I
12 was not actually examining. I was a
13 supervisor at that point.
14    Q  Yeah. And again, I don't know
15 what the earliest one was, but I think it
16 was something like a Segway.
17    A  Segway. That's what I'm trying
18 to think of. Segway. Yeah, when the
19 Segways came out, I was, I believe there
20 was a design patent filed on that, but at
21 that time, again, I was a supervisor. I
22 would've been examining it if I had still
23 been the examiner in that art area.
24    Q  Understood. Okay. Why don't we
25 -- yeah, we've done about an hour. Why

J. GANDY

1
2 don't we just take five minutes before we
3 dive into the rest of your report; okay?
4    A  Okay, sure.
5       MR. CHENG: Can we take ten minutes?
6       MR. BERKOWITZ: Yeah, sure. No
7    problem.
8       MR. CHENG: Thanks.
9       THE REPORTER: We are off the record
10    at 10:59 a.m.
11       (Off the record.)
12       THE REPORTER: All right, counsel, we
13    are back on the record at 11:09 a.m.
14 BY MR. BERKOWITZ:
15    Q  Okay. So I'm going to go ahead
16 and mark a second document that I will
17 share on the screen. Mr. Gandy, can you
18 see that I've shared a document?
19    A  Yes.
20    Q  Great. So I'm going to mark
21 this as Exhibit Number 2, and let me,
22 again, just scroll quickly through this
23 86-page document. This is the first page,
24 the table of contents, and here is your
25 signature at the end. Do you see that?

J. GANDY

1
2       (Exhibit 2 was marked for
3       identification.)
4    A  Yes.
5    Q  Okay. And do you recognize this
6 document?
7    A  Yes, I do.
8    Q  And what do you recognize it to
9 be?
10    A  It's the last declaration that I
11 had prepared in rebuttal to Mr. Hatch's
12 last report.
13    Q  Okay. When did you prepare this
14 declaration?
15    A  It was late August, early
16 September.
17    Q  And how does this document
18 differ from your prior declaration that we
19 marked as Exhibit 1?
20    A  There was one additional alleged
21 infringing hoverboard that was identified
22 as, I believe, group E.
23    Q  And did you address that group E
24 hoverboard?
25    A  Yes, I did.

J. GANDY

1
2    Q  And other than provided analysis
3 of the group E hoverboard, were there any
4 other changes made to the report?
5    A  I think I may have added some
6 additional language with respect to claim
7 construction and maybe some additional
8 language as to my opinion of Mr. Hatch's
9 report.
10    Q  So the same questions I asked
11 before. Did you draft this report
12 yourself?
13    A  Yes, I did.
14    Q  And those additions that you
15 just mentioned, did you make those changes
16 yourself?
17    A  Yes, I did.
18    Q  Did anyone ask you to make those
19 specific changes?
20    A  No, they did not.
21    Q  And if it's okay, I'm going to
22 refer to this report, Exhibit Number 2, as
23 your rebuttal report. Is that all right
24 with you?
25    A  Yes, that's fine.

15 (Pages 54 - 57)

Page 58

J. GANDY

1
2    Q   Okay.  So Exhibit 1 is your
3  initial report, Exhibit Number 2 is your
4  rebuttal report.  Okay?
5    A   Okay.
6    Q   All right.  So I want to, I
7  guess, start with the list of materials,
8  which is paragraph 4 of the report.  Do
9  you see that?
10    A   Yes.
11    Q   And other than the materials
12  listed here, is there anything else that
13  you relied upon in preparing this report?
14    A   No, not that I'm aware of or I
15  recall.
16    Q   Okay.  I asked the question
17  before if you were familiar with the
18  individual named Lance Rake, which I
19  understand you said that you were not
20  familiar with Mr. Rake.
21    A   No.  No.
22    Q   And just to confirm -- and I
23  apologize if I asked before -- have you
24  reviewed any declarations or reports
25  prepared by Mr. Rake?

Page 59

J. GANDY

1
2    A   No, I have not.
3    Q   Okay.  All right.  So let's jump
4  over to paragraph 19 of your report.  So
5  I'm in Section III of the report.  It's
6  titled "Understanding of the Applicable
7  Legal Principles."  Do you see that?
8    A   Yes, I do.
9    Q   Is this a section of the report
10  that you prepared for this case?
11    A   Yes, sure.  Yeah.
12    Q   Was this section drawn from
13  prior cases?  And when I say "prior
14  cases," I mean not relating to the parties
15  here?
16    A   I believe so.  They're very
17  similar language, yes.
18    Q   Okay.  Now looking at paragraph
19  19, in the third sentence of the
20  paragraph, it says, "In rendering my
21  analysis, I have been informed by counsel
22  for multiple defendants the legal
23  standards for infringement of a design
24  patent."  Do you see that?
25    A   Yes.

Page 60

J. GANDY

1
2    Q   Prior to this engagement, were
3  you familiar with the standards for
4  infringement of design patent?
5    A   Yes, I was.
6    Q   Okay.  And how were you familiar
7  with those standards?
8    A   Well, I'm familiar with the case
9  law, Egyptian Goddess, that basically sets
10  out what the proper standard is for
11  determining infringement, based on the
12  ordinary observer.
13    Q   And when was the
14  Egyptian Goddess case issued?
15    A   I believe it was 2007, 2007 or
16  2008.  I know it was right in that time
17  frame.
18    Q   Okay.  I believe it was 2008,
19  but I agree with you, it's around that
20  time period.  At that time, you had
21  already retired from the patent office; is
22  that right?
23    A   That's correct.  Yeah.
24    Q   Okay.  So during your time at
25  the patent office, was there a -- what was

Page 61

J. GANDY

1
2  the standard for design patent
3  infringement?
4    A   Basically, it was the
5  Supreme Court decision, Gorham v. White.
6  I think it was 1876.  It was still the
7  standard.  Actually, I should also include
8  in there, I think it was the -- trying to
9  remember the specific case -- but
10  basically, you're dealing with points of
11  novelty.  That's what the case, basically
12  the Egyptian Goddess case eliminated the
13  point of novelty test.
14    Q   Can you tell us a little bit
15  about the point of novelty test?
16        MR. CHENG:  Objection, vague and
17  ambiguous.  But you may answer if you
18  understand the question.
19        THE WITNESS:  Yeah.  I remember
20  reading -- and again, I'm trying to
21  remember the specific parties involved in
22  it, but I remember reading the decision
23  that established the point of novelty test
24  when I was an examiner.  I believe it was
25  somewhere in the early '80s when that

16 (Pages 58 - 61)

J. GANDY

1
2  decision came down.
3          Basically, it was saying that,
4  you know, in addition to the ordinary
5  observer test set out by the
6  Gorham v. White decision, that you had to
7  meet, in order to be considered to
8  infringe, you had to have shown all of the
9  points of novelty of the design patent in
10 litigation.
11    Q   Was the points of novelty test
12 also being applied in the patentability
13 context?
14    A   You mean as far as determining
15 patentability in the patent office?
16    Q   Right.
17    A   No, no.
18    Q   As a patent examiner, what was
19 the test that you were applying to
20 determine the patentability?
21    A   Well, it was either the
22 anticipation or obviousness from prior art
23 standpoint.
24    Q   Okay.  But it wasn't the
25 Egyptian Goddess test; is that fair?

J. GANDY

1
2    A   No.  The Egyptian Goddess test
3  is dealing with infringement.  Which is
4  not an issue that the patent office deals
5  with.
6    Q   Okay.  Jumping to paragraph 20
7  of your rebuttal report, the first
8  sentence says, "Based on my conversations
9  with counsel for multiple defendants and
10 my review of administrative decisions and
11 articles discussing design patent law
12 principles, I have the following
13 understanding of design patent
14 infringement."  Do you see that?
15    A   Yes.
16    Q   Okay.  So when you say
17 "administrative decisions," what are you
18 referring to?
19    A   Well, it would be decisions from
20 the courts on infringement.
21    Q   Are those administrative
22 decisions?
23    A   No, they're actually legal
24 decisions.  Administrative decisions, I
25 would have to say that they're, they would

J. GANDY

1
2  be decisions that potentially came from
3  the trial board at the patent office.
4    Q   Are there any particular
5  decisions that you're relying upon here
6  for these opinions?
7    A   No, no.
8    Q   Okay.  And the same question,
9  you're referring in this first sentence of
10 paragraph 20 to "articles."  Is there any
11 particular articles that you're relying
12 upon in connection with these opinions?
13    A   Well, I mean, it says "articles
14 discussing design patent law principles."
15 I mean, that would basically be the
16 Manual of Patent Examining Procedure and
17 the statutes.
18    Q   Okay.  Is there any particular
19 portions of the Manual of Patent Examining
20 Procedure that are relevant to the
21 infringement analysis that you provided
22 here?
23    A   Not with respect to
24 infringement, no.
25    Q   Okay.  So moving on to the

J. GANDY

1
2  second sentence of paragraph 20 [sic] it
3  says, "First, it is my understanding that
4  the claim in a design patent application
5  is directed to the entire design and not
6  individual parts or elements thereof."  Do
7  you see that?
8    A   Yes.
9    Q   Do you believe that that is a
10 correct summary of the law?
11    A   Yes, oh, absolutely.  That's
12 what it is for determining patentability.
13    Q   Okay.  And if we continue
14 reading, it says, "In addition, it is my
15 understanding that the proper inquiry in
16 determining if a patented design has been
17 infringed is whether the accused design
18 appropriates the claim design as a whole."
19 Do you see that?
20    A   Yes.
21    Q   Is that sentence similar to the
22 one we just read?
23    A   I think it's similar, yes.
24    Q   And in general, what does that
25 sentence telling us?

17 (Pages 62 - 65)

J. GANDY

1
2    A   It's telling us that
3  infringement is based on the appearance of
4  the design as a whole.
5    Q   Okay.  And if we keep reading,
6  it says, "Further, it is my understanding
7  that design patent infringement is
8  determined by first construing the claim
9  to the design and then comparing it to the
10  design of the accused device."  Do you see
11  that?
12    A   That's correct, yes.
13    Q   Okay.  So how do we construe a
14  design patent claim?
15    A   Basically, everything that's
16  shown in solid lines is considered to be
17  part of the claim design.  Anything that
18  would be in broken lines is considered to
19  be unclaimed or environment.
20    Q   Okay.  And if we keep reading,
21  it says, "It's also my understanding that
22  in construing the claim, a design is
23  better represented by an illustration
24  rather than a verbal description, since
25  any description would not likely be

J. GANDY

1
2  intelligible without the illustration."
3  Do you see that?
4    A   Yes.
5    Q   And what are you trying to say
6  there?
7    A   What I'm trying to say is that,
8  you -- a design claim protects the overall
9  shape and appearance of an article of
10  manufacture.  And it would be almost
11  impossible to describe by words the
12  specific shape and appearance of a claim
13  design without actually seeing a picture
14  of it.
15      If I had a word description --
16  let's put it this way.  If I had a word
17  description of a claim design, I'd have to
18  be able to draw that and look exactly what
19  the drawings show.  That is very, very
20  unlikely.
21    Q   Do you believe it's helpful to
22  provide a verbal description of a claim
23  design?
24    A   I don't think so.  My opinion is
25  no.

J. GANDY

1
2    Q   Do you know if defendants are
3  offering a verbal description of the claim
4  designs in this case?
5      MR. CHENG:  Objection.  Are you --
6      well, first if it's privileged information
7      counsel is looking for privileged
8      information with communication with
9      clients, then I instruct the witness, the
10      deponent not to answer that.  To the
11      extent that the question is vague and
12      ambiguous, maybe counsel can rephrase it.
13      MR. BERKOWITZ:  Sure.
14  BY MR. BERKOWITZ:
15    Q   Just to clarify, I'm certainly
16  not looking for any privileged
17  communications that you had with your
18  attorneys.  I'm just asking the question,
19  do you know whether the defendants have
20  offered a verbal description of the claim
21  designs in connection with the case?
22    A   Not that I recall.
23    Q   Okay.  And in your expert
24  report, do you provide any verbal
25  descriptions of the claim designs?

J. GANDY

1
2    A   No.  I guess the only thing I
3  would say is that a verbal description
4  would be just, just given a description of
5  what the different views that, you know,
6  comparing the alleged infringing devices
7  to the claim design and to the closest
8  prior are.  I mean, I wouldn't consider
9  anything I've said to be a written
10  description.  It's merely just looking at
11  the pictures.
12    Q   Okay.  I guess my question is
13  how do you draw the line?  What would you
14  consider a verbal description of a claim
15  design?
16      MR. CHENG:  Objection.  Form.
17    A   Again, I would have to say, it
18  would have to be a description that would
19  be so specific to define particular shape
20  and appearance of a claim design that I
21  could read that description and actually
22  draw the claim design as shown in the
23  drawings.  And again, it's my opinion that
24  that's virtually impossible.
25    Q   Okay.  And just to clarify, you

18 (Pages 66 - 69)

Page 70

J. GANDY

1  have not tried to construe the claims
2  here, other than based on the drawings; is
3  that fair?
4      A    That's correct.
5      Q    Okay. You mentioned the
6  ordinary observer test earlier. Is that
7  right?
8      A    Yes.
9      Q    What's the role of prior art, if
10 any, in the ordinary observer test?
11     A    Well, it's my understanding,
12 based on the Egyptian Goddess decision,
13 that if the claim design and the alleged
14 infringing design are not so similar, so
15 dissimilar, that it would be necessary to
16 look at the closest prior art in assisting
17 in making a determination as to whether a
18 less infringing design actually infringes
19 the claim design.
20     Q    How do you go about determining
21 what's the closest prior art?
22     A    Again, that's a visual
23 determination. And I would be looking at,
24 you know, earlier hoverboards.

Page 71

J. GANDY

1      Q    Anything else?
2      A    That would be, I think, you
3  know, if whatever potential earlier prior
4  art hoverboards would be in existing at
5  the time, that would be what I would
6  consider to be the closest prior art.
7      Q    Is making that determination
8  just based on your experience?
9      A    Yes, yes.
10     Q    And in performing the ordinary
11 observer analysis, are there any
12 scientific principles that you rely upon?
13     A    No, no.
14     Q    Are you familiar with the term
15 "gestalt"?
16     A    Gestalt?
17     Q    Yes, sir. I can spell that for
18 you.
19     A    No, that's fine. I'm not
20 familiar with that term.
21     Q    Just for my own edification,
22 it's spelled G-E-S-T-A-L-T. Are you
23 familiar with that term?
24     A    No.

Page 72

J. GANDY

1      Q    Okay. Is that -- and just to
2  clarify, is that something that you ever
3  came across in your time as a patent
4  examiner?
5      A    Not that I'm aware of.
6      Q    Okay. Did you have any
7  experience with anyone applying that
8  principle in design patent analysis?
9      A    What principle is that?
10     Q    The Gestalt principle.
11     A    I don't know what that is.
12     Q    Okay. I'm just going to bring
13 up another exhibit for us for a moment.
14 Okay. Can you see that I've brought up
15 another document?
16     A    Okay.
17     Q    I'm going to mark as Exhibit 3 a
18 document that is titled
19 "Expert Declaration of Lance Rake," and I
20 will note that it's a document consisting
21 of 113 pages, including an Exhibit 1.
22        Again, Mr. Gandy, can you see
23 the document?
24 //

Page 73

J. GANDY

1      (Exhibit 3 was marked for
2      identification.)
3      A    Yes, I can.
4      Q    Okay. Is this a document that
5  you've seen before?
6      A    No, I have not.
7      Q    Okay. And I'll just represent
8  to you that this is a document that the
9  defendants have served in this case. And
10 I want to go ahead and ask you to scroll
11 to paragraph 10 of this document.
12        MR. CHENG: I will raise my
13     objection, since neither Mr. Gandy or the
14     counsel was given a copy of this document,
15     and we have had no sufficient time to look
16     through the documents, are you testifying
17     this is one report that was provided by
18     defendant?
19        MR. BERKOWITZ: Yes. I will
20     represent this is a report that was served
21     on us by your firm on behalf of the
22     defendants.
23        MR. CHENG: Can you show us a date so
24     at least we know which report you're

Page 74

J. GANDY

1
2    putting here?
3        MR. BERKOWITZ:  Absolutely.  This is
4    a document, you can see the signature is
5    dated September 12, 2022.
6        MR. CHENG:  Okay.  And I just want to
7    caution you that give us sufficient time
8    to look through the portion of the report
9    if you want to read any specific part of
10   the report.
11       MR. BERKOWITZ:  Sure.
12       MR. CHENG:  Thanks.
13  BY MR. BERKOWITZ:
14   Q   Sure.  Let's start at paragraph
15  6 of this report.  And I'll give you a
16  moment to read through, and then I'll just
17  ask you a question or two about it.  Just
18  let me know when you're done.
19   A   Okay, I've gone through six
20  through eight.
21   Q   Okay.  You might as well just
22  finish reading through nine and ten, if
23  that's all right with you.
24   A   Uh-huh, sure.
25   Q   Thanks.

Page 75

J. GANDY

1
2    A   Okay.
3    Q   There's just one last paragraph
4    in this section, paragraph 11, if you
5    don't mind.  Just take a look at that.
6    A   Okay.
7    Q   Okay.  Having read paragraphs 6
8    through 11 of Exhibit Number 3, does this
9    give you an understanding of the Gestalt
10   principles we're referring to?
11   A   Yeah.  I mean I can generally
12  understand what they're saying, yeah.
13   Q   Okay.  And is the Gestalt
14  principles something that you would use in
15  patent office practice?
16       MR. CHENG:  Objection.  Asked and
17       answered.
18   A   I wouldn't necessarily say --
19  I'm not familiar with this Gestalt
20  principle, but I think a lot of what it
21  says is what we do at the patent office.
22  I mean, as far as me looking at the claim
23  design and comparing it to the prior art.
24  Obviously, it's a visual comparison.
25   Q   Okay.  So here in, let's say

Page 76

J. GANDY

1
2    first paragraph, paragraph 10, this
3    individual, Mr. Rake, says, "I
4    specifically selected Gestalt Perception
5    Theory as a scientific framework for
6    determining whether or not the design of
7    the accused products is equivalent to that
8    of the asserted patents."  Do you see
9    that?
10   A   Yes.
11   Q   Is that scientific framework
12  something that you've used to train
13  examiners?
14       MR. CHENG:  Objection, calls for a
15       legal conclusion.  Well, it's not a legal
16       conclusion.  Calls for speculation.
17       MR. BERKOWITZ:  I'm just asking about
18       Mr. Gandy's experience.
19       THE WITNESS:  Would you repeat the
20       question again?
21  BY MR. BERKOWITZ:
22   Q   Sure.  Is the scientific
23  framework that's referred to here in these
24  paragraphs, is that something that you've
25  used to train examiners on design

Page 77

J. GANDY

1
2    analysis?
3    A   Not any specific reference to
4    Gestalt perception, no.
5    Q   Okay.  I want to scroll down to
6    paragraph 27 of this report.  If you could
7    just take a moment and read this
8    paragraph.
9    A   Okay.  Just paragraph 7?
10   Q   Twenty-seven, yes.
11   A   Twenty-seven, I'm sorry.  Just
12  paragraph 27?
13   Q   Yes, sir.
14   A   Okay.
15   Q   So the last sentence of this
16  paragraph says, "As explained below, it is
17  my opinion that the ordinary observer,
18  familiar with the prior art, would find
19  the accused products' overall appearance
20  to be substantially different with respect
21  to the design claims of the patents-in-
22  suite because the overall Gestalt of the
23  accused product differs in key areas from
24  the body of prior art and the claims of
25  the patents-in-suit."  Do you see that?

20 (Pages 74 - 77)

J. GANDY

2    A   Yes.
3    Q   Do you have an understanding as
4  to what is being referenced here?
5    A   Well, other than referencing
6  this term "Gestalt," I mean, that's
7  effectively what I would, I would, you
8  know, do.  I mean, I've never applied a
9  particular principle to it.  But, you
10  know, that's basically what I do as far as
11  examining the claim design and the alleged
12  infringing devices.  It's what I would do
13  when I was an examiner comparing the claim
14  design to the prior art.
15    Q   Okay.  Would you focus on the
16  perimeter of a product, or would you focus
17  on the design as a whole?
18    A   I would focus on the design as a
19  whole.
20    Q   Okay.  Let's go back to your
21  rebuttal report, Exhibit Number 2.  And
22  let's talk about your comments here on
23  Mr. Hatch's report.
24        So starting, looking at
25  paragraph 22, it says, "In his expert

J. GANDY

2  report, Mr. Hatch asserts, 'Based on my
3  experience as an industrial designer of
4  commercial products, it is my opinion that
5  an ordinary observer in this case is the
6  typical purchaser of hoverboards, i.e., a
7  consumer, user, or the parent of a user,
8  each having little or no experience
9  purchasing hoverboards.'"  Do you see
10  that?
11    A   Yes.
12    Q   Okay.  And if we continue
13  reading, it says, "However, based on my
14  conversations with counsel for multiple
15  defendants, this opinion by Mr. Hatch is
16  not consistent with the 'hypothetical
17  ordinary observer who is conversant in the
18  prior art standard' articulated by the
19  Court of Appeals for the Federal Circuit."
20  Do you see that?
21    A   Yes.  What are you referencing
22  here when you say your "conversations with
23  counsel"?
24        MR. CHENG:  Objection.  Privileged
25      communication.

J. GANDY

2        MR. BERKOWITZ:  Well, I'll challenge
3  you on that, Robin.  I mean, Mr. Gandy's
4  referencing conversations in this report
5  as a basis for his opinions.  I'd like to
6  understand what his basis is for believing
7  that Mr. Hatch's opinion is not consistent
8  with the Court of Appeals of the Federal
9  Circuit.
10        MR. CHENG:  Again, if you're asking
11  for privileged communication, then I
12  advise deponent not to answer that.  But
13  to the extent that the deponent thinks
14  that he can't answer the question without
15  revealing any privileged communication,
16  Mr. Gandy can go ahead and answer the
17  question.
18        THE WITNESS:  So could you repeat the
19  question again?
20  BY MR. BERKOWITZ:
21    Q   Sure, sure.  So what is the
22  basis for your understanding that
23  Mr. Hatch's opinion, as far as the
24  ordinary observer, is not consistent with
25  the standards set forth by the Court of

J. GANDY

2  Appeals of the Federal Circuit?
3    A   Well, I think based on, you
4  know, just some brief discussions that I
5  had with Mr. Cheng to make sure that we're
6  both on the same page as far as our
7  understanding as to what the ordinary
8  observer is -- I mean, having been
9  familiar with the Egyptian Goddess case
10  and having experience even as an examiner,
11  reviewing opinions from the Court of
12  Appeals for the Federal Circuit dealing
13  with infringement, I'm just familiar with
14  what the hypothetical ordinary observer
15  standard is supposed to be.  And I think
16  Mr. Hatch is selling the ordinary observer
17  very short as far as what their knowledge
18  would be about the prior art.
19    Q   Okay.  So what do you believe
20  that the knowledge of the ordinary
21  observer would be?
22    A   I think the ordinary observer
23  would be, based on the case law in
24  Egyptian Goddess, is someone who is
25  familiar with the prior art of the subject

21 (Pages 78 - 81)

Page 82

J. GANDY

2 matter that they might be looking to
3 purchase.
4    Q   So you believe the ordinary
5 observer is someone that's familiar with
6 the prior art?
7    A   Yes.
8    Q   Anything more than that?
9       MR. CHENG: Objection. Form.
10    A   No, I think, I think it's
11 basically just the ordinary observer is,
12 the ordinary observer is a person who
13 would be looking to purchase a particular
14 product and would have some knowledge of
15 what the prior art, what's in the prior
16 art for that particular subject matter.
17    Q   And this paragraph 22, you say,
18 "Therefore, in this instance, it remains
19 my opinion that an 'ordinary observer' is
20 a potential purchaser who is familiar with
21 hoverboards and their different designs."
22 Do you see that?
23    A   Yes.
24    Q   What do you consider a potential
25 purchaser?

Page 83

J. GANDY

2    A   Well, I think it would be
3 someone who would be looking to possibly
4 buy a hoverboard. I think it would be the
5 same thing -- the potential purchaser
6 would be somebody who is interested in
7 buying a particular product. Could be an
8 automobile, could be a watch, could be a
9 piece of furniture. And I think it's
10 somebody who would have knowledge of
11 what's in the prior art.
12    Q   So in this sentence that we're
13 looking at, you say, "a potential
14 purchaser who is familiar with hoverboards
15 and their different designs." So by
16 "hoverboards and their different designs,"
17 are you referring to the prior art?
18    A   Yes.
19    Q   Okay. So let's keep scrolling
20 down to see paragraph 23. If you don't
21 mind, if you could just take a moment to
22 read paragraph 23, it might be quicker
23 than me reading sentence by sentence. I'm
24 happy to scroll whenever you're ready. I
25 can also make it bigger, if you'd like.

Page 84

J. GANDY

2    A   No, that's fine. Okay.
3    Q   You've read all the way through?
4    A   Yes. Well, okay, hang on a
5 second. Let me just finish.
6    Q   Please.
7    A   Okay.
8    Q   Okay. So you've now read
9 through paragraph 23 of your rebuttal
10 report. Is that right?
11    A   Yes.
12    Q   Okay. And is it fair to say
13 that you're critiquing Mr. Hatch's
14 opinions?
15    A   Yes.
16    Q   Okay. And you're saying that
17 Mr. Hatch's report does not adequately
18 describe the claim designs and the accused
19 products? Is that fair?
20    A   That's correct.
21    Q   Okay. And is it fair to say
22 that you believe that Mr. Hatch should go
23 a step further and describe the designs in
24 greater detail?
25    A   Yeah. I think he should have

Page 85

J. GANDY

2 gone ahead and described something more
3 than just the, just the generic features
4 of the hoverboard. Because that's all he
5 did. He didn't describe specific
6 differences in the appearance of a number
7 of the features that comprise the design
8 as a whole.
9    Q   So in essence, are you asking
10 him to provide a verbal description of the
11 claim design?
12    A   No, no. I'm asking him just to
13 identify features that actually
14 distinguish the overall appearance of one
15 over the other.
16    Q   Well, if you're asking for
17 specific shapes, isn't that asking for a
18 description of the design?
19    A   When you say "specific shape,"
20 I'm just saying that he has -- he has
21 referenced the, I believe what I'm
22 referring to in there is, he's referenced
23 the wheel covers just as being, I think
24 something like circular radii. Where the
25 wheel covers have different configurations

22 (Pages 82 - 85)

J. GANDY

1
2 between these designs. I think they need
3 to be identified. That's what
4 distinguishes one over the other.
5    Q   So you would suggest describing,
6 for example, the wheel covers in greater
7 detail?
8    A   No. I'm saying that he should
9 look at the wheel covers and indicate what
10 the difference is in the shape of them.
11    Q   And is it your opinion that
12 Mr. Hatch should do that for each element
13 of the claim design?
14    A   I think when you're looking at a
15 claim design that's shown in full lines,
16 you have to look at all of the features
17 and details of the claim design.
18    Q   And for the --
19    A   That's what makes up the overall
20 appearance of it.
21    Q   And for the elements that are
22 shown in dashed lines, do you also need to
23 describe those in greater detail?
24    A   Not if they're not being
25 claimed.

J. GANDY

1
2    Q   What if it's in the prior art
3 that there are elements in dashed lines?
4 How do you treat those as part of the
5 analysis?
6    A   The prior art can be relied on
7 for everything that it discloses. It does
8 not have to just be limited to what is
9 actually claimed as the design.
10    Q   Let me ask you -- jump ahead
11 just for a second and ask you a question
12 about that statement. I'm going to go
13 ahead and advance to paragraph 31 of your
14 rebuttal report. So I'm in paragraph 31
15 of your rebuttal report at the top of page
16 13. Do you see that?
17    A   Yeah. I mean, I can't see the
18 paragraph.
19    Q   Yeah. I'm just going to ask you
20 a question about the pictures.
21    A   Okay.
22    Q   So on the top right, here, do
23 you see a picture of a hoverboard?
24    A   Sure.
25    Q   You understand that's from the

J. GANDY

1
2 906 patent?
3    A   Yes.
4    Q   That's a prior art reference.
5 Is that fair?
6    A   Right, right.
7    Q   Okay. So what elements are
8 indicated in this, in the 906 patent?
9    A   What -- you mean what elements
10 are actually shown in the drawing?
11    Q   Yes, sir.
12    A   Okay. I mean, you're showing
13 the body of the hoverboard, and you're
14 showing in broken lines wheel covers that
15 are, that extend over the ends of the
16 hoverboard, even though they're not being
17 claimed.
18    Q   So as far as these wheel covers
19 -- is it fair if I call them fenders? Are
20 those features that are actually indicated
21 in the 906 patent?
22    A   They're not being claimed, but
23 they're being disclosed.
24    Q   Okay. As far as the wheels of
25 the 906 patent, are those also being

J. GANDY

1
2 disclosed?
3    A   Yeah, sure they're being
4 disclosed. Yeah.
5    Q   Okay. And we can rely on them
6 for what we see here? Is that your
7 position?
8    A   I think the wheels in that
9 instance are, you know, obviously are not
10 showing any thickness to them. So I mean,
11 he's just basically showing what would be
12 the shape of a wheel.
13    Q   And what would that shape be?
14    A   Circular.
15    Q   As opposed to the many square
16 wheels that we come across. I'm not
17 trying to be sarcastic. But is there
18 anything else to, any other shapes of the
19 wheels that we can glean from the drawings
20 of the 906 patent?
21    A   Of the wheels?
22    Q   Yes, sir.
23    A   No.
24    Q   Okay. And as far as the, what I
25 called the fenders, I believe you called

J. GANDY

1
2  it something else, sorry --
3     A   The wheel covers.
4     Q   The wheel covers.  Can you
5  describe what shape is shown for the wheel
6  covers?
7     A   Yeah.  The wheel covers are
8  basically semi-circular.
9     Q   And beyond the wheel covers
10 being semi-circular, is there any other
11 information that we can draw as far as
12 their features?
13    A   No.
14    Q   Okay.
15    A   No.  I guess, one other thing I
16 would say is, based on the broken lines,
17 they actually extend over the actual
18 wheels themselves.
19    Q   So they have a -- the wheel
20 covers would have a larger inside radius,
21 inside diameter, than the diameter of the
22 wheels?  Is that fair?
23    A   Yeah.  They extend over the
24 wheels.  They actually cover portions of
25 the wheels.  About half of them.

J. GANDY

1
2     Q   Let me just go back to where we
3  were.  I'm just going to skip ahead a bit
4  to paragraph 26 of your report and just
5  give you a moment, sir, to refresh your
6  recollection.  It's a long paragraph.  If
7  you could just take a look through, and
8  I'll scroll.  I just want to ask you about
9  a particular statement further in.
10    A   If you want to keep scrolling
11 down so I can continue.
12    Q   Sure, sure.
13    A   Okay, keep scrolling down.
14 Okay.
15    Q   Okay.  I'm going to ask you a
16 question about -- I'm going to try to
17 highlight it, this statement over here.
18 Can you see where the highlight is?
19    A   Yes.
20    Q   Great.  I'll just read that.
21 We're in, again, paragraph 26 of the
22 rebuttal report, and it says, "The fact of
23 the matter is, the generic description
24 used by Mr. Hatch in his declaration
25 describes most of the hoverboards on the

J. GANDY

1
2  commercial market based on my review of
3  various websites such as Walmart, Target,
4  Best Buy, and Amazon."  Did I read that
5  correctly?
6     A   Yes.
7     Q   Okay.  So when you reference
8  here a "generic description," do you
9  recall what that is?
10    A   Yeah, sure.  It's -- I mean,
11 he's describing basically the peripheral
12 shape as an hourglass, which is basically
13 what all the hoverboards on the commercial
14 market are of this style.  He's describing
15 that you have flat foot plates, which
16 again, basically is describing every
17 hoverboard on the commercial market.  He's
18 describing a circular -- I can't remember,
19 I have it right here in front of me -- it
20 says, "a relatively flat surface across
21 the top of the main body, arched covers
22 over the wheel area, large radial area on
23 the front and back of the underside, and
24 elongated light panels on the front
25 surface."  Those are basically describing,

J. GANDY

1
2  other than maybe the last part, the
3  elongated light panels, because not every
4  hoverboard has light panels.  But
5  virtually every other thing he's
6  describing there is describing virtually
7  the same shape of every hoverboard that's
8  on the commercial market in this style.
9     Q   On the market as of what year?
10    A   I don't have any particular, you
11 know, I don't have any particular
12 knowledge of what year.  I'm just saying
13 when I've looked at hoverboards on these
14 different websites, they all generally
15 have that same, you know, body shape.  And
16 this goes back to the 906 patent.  That
17 was the first hoverboard, and basically
18 every other hoverboard has copied that
19 hourglass shape.
20    Q   Right.  When you say here you're
21 referring to "the commercial market based
22 on my review of various websites," when
23 did you review those websites?
24    A   Over the course of time since
25 last year, since I started working on this

J. GANDY

1
2 case, just for my own knowledge, I looked
3 at different websites to see what, how
4 many hoverboards are out there and what
5 the different styles are.
6     Q   Do you know what the priority
7 dates of the asserted patents are?
8     A   Of the four design patents?
9     Q   Yeah.  The earliest of the
10 asserted patents.
11     A   Oh.  I don't have it right
12 offhand.
13     Q   Do you know if that's 2014?
14     A   Again, I'd have to look at the
15 patent to see.  I don't recall right
16 offhand whether that's correct.  I'll
17 assume that what you told me is correct.
18     Q   Sure.  I'll just do it to save
19 some time.  I'll represent that the
20 earliest design patent claims a priority
21 in 2014; okay?  Do you know what the
22 commercial market looked like, going back
23 to 2014?
24     A   I don't know.
25        MR. BERKOWITZ:  Why don't we just

J. GANDY

1
2 take a five-minute break?
3        MR. CHENG:  Okay.  That works for me.
4        THE REPORTER:  We are off the record
5 at 11:57 a.m.
6        (Off the record.)
7        THE REPORTER:  We are back on the
8 record at 12:04 p.m.
9 BY MR. BERKOWITZ:
10     Q   Okay.  So back after a short
11 break.  I'm just going to share my screen
12 again.  Mr. Gandy, can you see that I've
13 shared my screen?
14     A   Yes, yes.
15     Q   Okay.  So we're looking -- I
16 have now flipped to paragraph 28 of your
17 rebuttal report.  Do you see that?
18     A   Yes.
19     Q   And it's under Section VI,
20 entitled "The Ordinary Observer."  Do you
21 see that?
22     A   Yes.
23     Q   Okay.  So we spoke a bit before
24 about the ordinary observer.  I just
25 wanted to ask you a few more questions

J. GANDY

1
2 about your opinions here.  Why don't I
3 just give you a moment to read through the
4 paragraph.
5     A   Okay.
6     Q   Okay.  So earlier, I think that
7 we agreed that the ordinary observer would
8 be someone that's familiar with the prior
9 art.  Is that fair?
10     A   Sure.
11     Q   Okay.  And here again, you say,
12 "It remains my opinion that an 'ordinary
13 observer' is a potential purchaser who is
14 familiar with hoverboards and their
15 different designs."  Do you see that?
16     A   Yes.
17     Q   Do you have any opinion as to
18 how familiar that ordinary observer would
19 be with hoverboards and their different
20 designs?
21     A   I mean, I can't say, you know,
22 specifically.  I would just say that they
23 have, they have a knowledge of prior art
24 hoverboards in that they have features
25 that distinguish them over each other

J. GANDY

1
2 beyond just the hourglass peripheral shape
3 of them.
4     Q   So you have an opinion as to
5 whether potential purchasers take into
6 account consumer reviews in making a
7 decision as to which hoverboard to
8 purchase?
9        MR. CHENG:  Objection.  Misstatement
10 of deponent's testimony.
11        MR. BERKOWITZ:  I don't believe I've
12 asked him that question before.  I'm
13 asking him whether he has an opinion or
14 not.  But you can state your objection.
15        THE WITNESS:  An opinion on whether a
16 purchaser would be looking at reviews?
17        MR. BERKOWITZ:  Yes.
18        THE WITNESS:  Product reviews?
19        MR. BERKOWITZ:  Correct.
20        THE WITNESS:  Sure.  I think that's
21 reasonable.
22 BY MR. BERKOWITZ:
23     Q   Okay.  What about brands?  Do
24 you think a consumer of hoverboards would
25 be looking at what brand is offering the

J. GANDY

1
2 hoverboard?
3    A    I would assume they're probably
4 familiar with what brands might be out
5 there.
6    Q    Do you have an opinion as to
7 whether the branding would impact the
8 consumer's choice as to which hoverboard
9 to select?
10        MR. CHENG:  Objection.  Calls for
11 speculation.
12        THE WITNESS:  Could you repeat the
13 question again?
14        MR. BERKOWITZ:  Could the court
15 reporter read it back?
16        THE REPORTER:  Sure.  One moment.
17     (The reporter read the record as
18     requested.)
19        THE REPORTER:  That was the
20     question.
21        THE WITNESS:  It's possible.
22 BY MR. BERKOWITZ:
23    Q    Okay.  All right.  Looking
24 through this paragraph 28, here you say --
25        THE REPORTER:  I'm sorry, if you

J. GANDY

1
2    could just share your screen again.
3        MR. BERKOWITZ:  Oh, I'm sorry.
4 BY MR. BERKOWITZ:
5    Q    Okay.  So I've highlighted a
6 sentence on paragraph 28.  Can you see
7 that?
8    A    Yes, yes.
9    Q    Okay.  And I'm summarizing, it's
10 your opinion that potential purchasers
11 would understand that a hoverboard has an
12 hourglass shape.  Is that fair?
13    A    Yes.
14    Q    And from there, a consumer would
15 look to other features in order to
16 determine whether or not they are
17 interested in that item.  Is that fair?
18    A    That's correct.
19    Q    Okay.  And here you identify
20 some of those features.  Is that fair?
21    A    Yes.
22    Q    Okay.  And that includes "the
23 specific shape and appearance of the foot
24 pads on top of the surface."  Is that
25 right?

J. GANDY

1
2    A    Yes.
3    Q    And just to clarify.  Actually,
4 let me clarify, it says "the specific
5 shape and appearance of the foot pads on
6 the top surface of the hoverboard."  Okay?
7    A    Yes.
8    Q    And by "top surface," what are
9 you referring to?
10    A    I'm referring to basically the
11 two opposing foot pads or the foot
12 surfaces where a person would stand on the
13 hoverboard.
14    Q    Okay.  And you also mention that
15 a potential purchaser would look at
16 "whether the front and rear surfaces have
17 LED lights or not."  Do you see that?
18    A    Yes.
19    Q    And just to clarify, when you
20 say "front and rear surfaces," you're
21 referring to the surfaces that are
22 perpendicular to the top surface?
23    A    Yes.
24    Q    Okay.  And with respect to those
25 LED lights, you say that a consumer,

J. GANDY

1
2 potential purchaser would also consider
3 "the shape and appearance of the lights."
4 Is that fair?
5    A    Yes, yes.
6    Q    Okay.  And then you say, "as
7 well as other potential features that
8 stand out to them."  Do you see that?
9    A    Yes.
10    Q    Can you think of any of these
11 other potential features that a hoverboard
12 purchaser would consider?
13    A    Could be, could be, you know,
14 whether there were some distinguishing
15 features to the wheel covers, any
16 particular shape that they would feel
17 would distinguish them or really stand out
18 to them.  Could be that in the narrow
19 portion on the top surface in the center
20 of that is, what particular appearance it
21 might have.  Some of them have lights in
22 the center area.
23    Q    What about the wheels?  Is that
24 a feature that a potential purchaser of a

26 (Pages 98 - 101)

J. GANDY

1  hoverboard would consider?
2  
3      A   Sure.  I think they could
4  potentially look at the wheels.  I mean,
5  in this instance, they're not being
6  claimed in the four design patents, so I
7  didn't even reference anything about the
8  wheels.
9      Q   All right.  Let's move on to
10 paragraph 29.  So if you could just take a
11 moment and just skim through that.  I just
12 have a few questions about it.
13     A   Can you scroll down there a
14 little bit?
15     Q   Sure.
16     A   Okay.
17     Q   All right.  So a few lines down,
18 you say, "Although I have not been
19 provided actual samples of the accused
20 products, I consider the photographs that
21 were supplied to me by counsel for
22 multiple defendants to be of sufficient
23 quality to understand all of the features
24 and details and the overall shape and
25 appearance of the accused products so as

J. GANDY

1  to render an opinion of noninfringement of
2  the asserted design patents."  Did I read
3  that correctly?
4      A   Yes, sure.
5      Q   And we discussed earlier that
6  you did not receive actual samples; you
7  based your analysis on photographs.  Is
8  that fair?
9      A   That's correct.
10     Q   Other than the photographs that
11 are shown in this report, in the rebuttal
12 report, were there any other photographs
13 that you were provided with respect to the
14 accused products?
15     A   Yeah.  I think I was provided,
16 you know, more than the photographs that I
17 put in the report.  What I did is, I just
18 chose the ones that I felt were the
19 clearest and the most accurate in showing
20 the shape and appearance and details of
21 the accused products.
22     Q   Okay.  And the next sentence
23 says, "Also, when I inquired, counsel for
24 multiple defendants informed me that the

J. GANDY

1  front and rear surfaces of the accused
2  products are the same."  Do you see that?
3      A   Yes.
4      Q   So did you not receive
5  photographs of the front and rear of each
6  of the accused products?
7      A   I believe that was the case.  We
8  had, you know, a single view.  It could
9  have been the front or the rear.  But I
10 seem to recall that I didn't get two views
11 that would be definitively the front and
12 the rear, so I made an inquiry with
13 Mr. Cheng about that.
14     Q   And do you know if that
15 representation of the front and the rear
16 surfaces of the accused products being the
17 same, do you know if that is still true?
18     A   I have to assume that Mr. Cheng
19 told me that that's what they were, and I
20 have to assume that's what they are.
21     Q   If it turns out the front and
22 rear surfaces are different, does that
23 impact your analysis here?
24     A   Probably not.  That's kind of

J. GANDY

1  speculation without actually seeing
2  whether they are different, whether it
3  would or not.  But I would in all
4  likelihood say no, it probably wouldn't.
5      Q   But you would have to see the
6  front and rear views to confirm that?
7          MR. CHENG:  Objection.  Asked and
8      answered.  Go ahead, sorry.
9          THE WITNESS:  If, in fact, they
10     weren't the same.  Yeah, I would want to
11     see what the difference was between the
12     two.
13 BY MR. BERKOWITZ:
14     Q   And I guess this question I
15 probably should have asked when I first
16 brought up this rebuttal report.  Is there
17 anything in your report that you believe
18 is incorrect or you would like to change?
19     A   No.  No.
20     Q   And as far as what we marked as
21 Exhibit 1, your opening report, was there
22 anything in there that, in going back, you
23 believe is incorrect or that you would
24 want to fix?

27 (Pages 102 - 105)

J. GANDY

1
2     A    Not that I'm aware of, no.
3     Q    Okay, thank you.  Let's jump
4  ahead to page 41 of your report.  Okay.
5  So this is Section H.  So we're in Section
6  VII, Subsection H of your report.  Do you
7  see that?
8     A    Yes.
9     Q    And this is a comparison of the
10  723 patent, one of the asserted patents,
11  against the Gyroor C product.  Do you see
12  that?
13     A    Yes.
14     Q    Okay.  So let's walk through
15  your analysis together.  Maybe you can
16  explain how you went about coming to your
17  conclusions.
18        So at the top here where my
19  cursor is, you can see that there are
20  three photographs.  Is that right?
21     A    Yes.
22     Q    And is it fair to say that
23  you're performing what's known as a three-
24  way analysis here?
25     A    Yes.

J. GANDY

1
2     Q    Okay.  And the three-way
3  analysis involves comparisons between what
4  specifically?
5     A    Well, it involves comparisons
6  between the claimed design, the alleged
7  infringing design, and the closest prior
8  art.
9     Q    Okay.  And as we talked about
10  earlier, your opinion is that the closest
11  prior art is the 906 patent; is that
12  right?
13     A    That's correct, yes.
14     Q    And it's your opinion that the
15  906 patent is the closest prior art for
16  each of the four asserted patents; right?
17     A    Yes.
18     Q    Was there any other prior art
19  that you considered as potentially being
20  close to these products?
21     A    The only thing I referenced was
22  the corresponding utility patent to the
23  906 design patent.
24     Q    And you performed this analysis
25  for each view of the asserted patents?

J. GANDY

1
2     A    Yes, I did, with the exception
3  of the fact that the four design patents
4  and the alleged infringing designs include
5  foot pads that have a surface pattern on
6  them, where in the 906 does not have that.
7     Q    Okay.  Well, earlier we were
8  talking about the top surface of the
9  hoverboard.  Can you sort of point that
10  out here with reference to these three
11  pictures that we see above paragraph 69?
12     A    You want me to point out the top
13  surface?
14     Q    Yes, what would you consider the
15  top surface?
16     A    Well, I consider the top surface
17  this area between what I'm showing on
18  my -- can you see my cursor, where I'm
19  going?
20     Q    I can't.  Maybe you could tell
21  me where to move the cursor with reference
22  to each of the photographs?
23     A    Okay, well if you want to take
24  your cursor over just inside the wheel
25  cover of the 723 on the left side, bring

J. GANDY

1
2  it in just slightly.  Okay, I would
3  consider that the top surface extending
4  all the way across to the other wheel
5  cover.  And the same thing with the Gyroor
6  C and the same thing with the 906.
7     Q    So all the area inboard of the
8  wheel covers.  Is that fair?
9     A    Yes, yes.
10     Q    Okay.  And I believe you
11  referred to this portion on the top
12  surface as the foot pad?  Is that fair?
13     A    Yes.  Yes.
14     Q    So that would be -- in practice,
15  that would be the rubber foot pad.  Is
16  that fair?
17     A    That's correct, yes.
18     Q    Okay.  And we see that on the
19  723 pad and on the Gyroor C.  Is that
20  fair?
21     A    That's correct.
22     Q    We do not see a foot pad on the
23  906 patent.
24     A    That's correct.  That's correct.
25     Q    And I think we're all in

28 (Pages 106 - 109)

Page 110

J. GANDY

1
2  agreement that the three of these products
3  shown here have an hourglass shape. Is
4  that fair?
5      A   Yes
6      Q   Okay. And as far as the wheel
7  covers on the 906 patent, earlier you said
8  that they enclose the wheel. Is that
9  fair?
10     A   That's correct, yeah.
11     Q   Okay. When you're performing
12 this analysis, are there any other
13 prominent features of the 723 that you're
14 considering?
15     A   You mean on the top surface?
16     Q   Right. Right now, we're looking
17 at the top surface.
18     A   Right. Well, again, I would say
19 the foot pads and, well, even though you
20 can't really see it on the top surface,
21 the top surface of the 723, the center
22 portion, is convexly curved, whereas in
23 the Gyroor C, it's actually recessed down.
24     Q   Is any one surface more
25 important in your analysis than others?

Page 111

J. GANDY

1
2      A   Well, I mean, I would certainly
3  -- I think the foot pads probably have
4  more impact on the overall visual
5  appearance on these hoverboards than some
6  of the other features. Particularly when
7  you consider a person is going to buy
8  them, that's where they're going to stand.
9  So I think they're really going to be able
10 to distinguish one foot pad over another.
11 If there is a really different pattern on
12 them, that's going to jump out at them.
13     Q   And would the ordinary observer
14 notice or be able to distinguish a product
15 that does not have foot pads at all?
16     A   Oh, yeah. I certainly think
17 they would be able to distinguish it,
18 yeah.
19     Q   Okay. Here in paragraph 69, you
20 refer to a "concavely curved recessed
21 center portion."
22     A   Uh-huh.
23     Q   I just want to confirm that
24 we're all on the same page as to what
25 that's referring to. You're referring to,

Page 112

J. GANDY

1
2  I guess, this mirror or equivalent
3  portions that are sort of cut away from
4  the top surface. Is that fair?
5      A   Right, right.
6      Q   Okay.
7          MR. CHENG: Objection. That was
8      taken out of context of the report.
9  BY MR. BERKOWITZ:
10     Q   Okay. Mr. Gandy, just to
11 clarify, you're referring to a "concavely
12 curved, recessed center portion." I just
13 want to make sure for the record that we
14 are all on the same page as to what that
15 means. Can you point that out for us?
16     A   Yeah. If you move your cursor
17 just slightly up there where I think you
18 were showing, that's what I consider to be
19 the concavely curved, recessed center
20 portion.
21     Q   Right. And since we have to
22 reduce this description to words for the
23 purposes of this transcript, how can we
24 identify this center portion?
25     A   How, I'm sorry. How what?

Page 113

J. GANDY

1
2      Q   How can we describe this center
3  portion for the purposes of getting it
4  down on the transcript?
5      A   I think basically what I said.
6  It's a concavely curved, recessed center
7  portion.
8      Q   And is it just the top surface
9  that has this concavely curved center
10 portion?
11     A   Well, when you're looking at it
12 from the top view, that's what it is.
13 Obviously, when you look at it from the
14 front or the rear, it's not necessarily
15 going to look concavely curved. It's
16 going to be recessed in.
17     Q   Okay. Is it fair to refer to
18 this as sort of the "neck" of the
19 hourglass?
20     A   Yeah, yeah. That's fair.
21     Q   Okay. Let's do that. Okay.
22     A   Uh-huh. Sure.
23     Q   All right. Let's look at some
24 other views. I've moved over to page 42
25 of your report. And at the top of the

29 (Pages 110 - 113)

Page 114

J. GANDY

1
2 page, you can see that there's four
3 images. Is that fair?
4    A   Sure.
5    Q   Can you tell us in your own
6 words what's being shown here?
7    A   Well, it's the front and rear
8 surfaces.
9    Q   Okay. And you're showing the
10 front and rear surfaces from the 723
11 patent as well as a common front and rear
12 surface of the 906 and a front and rear,
13 what you call a front and rear view of the
14 C product. Is that fair?
15    A   That's correct.
16    Q   Okay. As far as the photograph
17 here of the C product, would you call that
18 a front view? If that is, indeed, the
19 front?
20    A   I would call it a front view.
21 If you want to be more specific, what
22 you're showing in the 723, the front and
23 rear, that would be considered an
24 elevation. Whereas the photograph of the
25 Gyro C is not an elevation. But to be

Page 115

J. GANDY

1
2 fair, to understand, nothing we see in
3 life is an elevation. It's in
4 perspective.
5    Q   Right. So I think you answered
6 my next question. What's shown as a
7 photograph of the Gyroor C is more a
8 perspective view. Is that fair?
9    A   Yeah. I would say it's a front
10 perspective view.
11    Q   Okay. And the front view and
12 the rear view of the 723 patent have
13 slight differences. Is that fair?
14    A   Yes.
15    Q   Okay. And is it still your
16 opinion that the 906 patent is -- I'm
17 sorry. That the Gyroor C product, from
18 this view, is closer to the 906 patent
19 than the 723 patent?
20    A   No. I think you've got it the
21 wrong way around. What I'm saying is that
22 the 906 patent is closer in appearance to
23 the 723 than it is to the Gyroor C.
24    Q   Why?
25       MR. CHENG: Objection. Form.

Page 116

J. GANDY

1
2    A   Mainly because of what happens
3 in the center area of the hoverboard. In
4 the 723, the center of the hoverboard has
5 a slight convex curvature. So does the
6 906. Whereas the Gyroor "C," the center
7 portion is recessed.
8    Q   Are we able to tell from this
9 photograph of the Gyroor C that the center
10 portion is recessed?
11    A   I think so.
12    Q   Even though it's perspective
13 view? It's your opinion that you can't
14 tell that it's recessed?
15    A   Sure, sure. I mean, you can
16 clearly see just inside of the foot pads,
17 that's a sloping surface that goes down.
18 You have those two, kind of arcuately
19 curved dark areas that I assume are
20 probably lights. And you can clearly see
21 that's recessed.
22    Q   Okay. Now the Gyroor C product
23 has lights on the -- let's assume that
24 this is a front view of the Gyroor C. Let
25 me start over. Strike that. Let's assume

Page 117

J. GANDY

1
2 that this is a front view of the Gyroor C.
3 There are light bars on each end of the
4 product?
5    A   Yeah. The front and rear
6 surface?
7    Q   Yes.
8    A   Yeah, yeah.
9    Q   Okay. And if we assume that
10 this is a front view, do we know if there
11 are lights on the rear view, on the rear
12 side of it?
13    A   Based on what Mr. Cheng has
14 indicated to me, the front and rears are
15 the same. So I certainly have to assume
16 that that's what there are.
17    Q   Okay. And the 906 patent does
18 not show any light bars; is that fair?
19    A   That's correct.
20    Q   Okay. Next, we're going to
21 paragraph 70, where you're showing some
22 different views of these references,
23 including the wheels and, I would say, two
24 perspective views. I mean, one
25 perspective view of each of the three

30 (Pages 114 - 117)

J. GANDY

1  references.  Is that fair?
2
3     A    Sure.
4     Q    Okay.  So it's your opinion that
5  the wheel covers of the Gyroor C are
6  unlike those of the 723 patent.  Is that
7  fair?
8     A    Yes, yes.
9     Q    And why is that?
10    A    Well, they don't extend over the
11  wheel.  In the 723, you can clearly see
12  that the cover extends over a portion of
13  the wheel.
14    Q    Right.  But the wheel covers of
15  the Gyroor C do not cover a significant
16  portion of the wheel.  Is that right?
17    A    That's correct.  That's correct.
18  And the wheel covers of the 723 certainly
19  appear to be more of a semi-circular
20  shape, whereas it appears the ends of the
21  Gyroor C wheel cover are kind of flattened
22  out.  They're not as fairly a continuous
23  radius.
24    Q    And as far as the wheel covers
25  of the 906 patent, beyond being able to

J. GANDY

1  say that they cover a significant portion
2  of the wheel and that they're round, is
3  there any other features that we can
4  identify?
5
6     A    No.
7     Q    Okay.  Let's jump over to
8  paragraph 73 and discuss the bottom of the
9  products.  So you can just take a moment
10  and read through paragraph 73.  I'm on
11  page 44 of Exhibit Number 2.
12    A    Okay.
13    Q    All right.  So in this paragraph
14  73, is it fair to say that you're
15  performing a three-way comparison between
16  the bottom of the 723 patent, the 906
17  patent, and the Gyroor C?
18    A    Yes.
19    Q    Okay.  And what are some of the
20  prominent features of the bottom of the
21  723 patent?
22    A    Basically, the bottom is pretty
23  much plain.  It's pretty much a plain,
24  flat surface.  There's not really any
25  features on the bottom surface.

J. GANDY

1
2     Q    And as far -- strike that.  The
3  bottom surface shows, is it fair to say
4  that the bottom surface of the 723 patent
5  has two cover plates that are held on by
6  some sort of fasteners?
7     A    That's what it looks like, yeah.
8     Q    Okay.  The bottom surface of the
9  906 patent does not show any fasteners.
10  Is that fair?
11    A    That's correct.
12    Q    And looking to the bottom view
13  of the Gyroor "C," does that show two
14  covers that are held on by fasteners?
15    A    That's what it looks like, yeah.
16    Q    Okay.  And you do call out that
17  the Gyroor C has vent holes.  Is that
18  fair?
19    A    Yes.
20    Q    And it's your opinion that an
21  ordinary observer would pay attention to
22  those vent holes?
23    A    Well, as I indicated in the
24  statement above, all four of the design
25  patents claim the bottom surface.  So for

J. GANDY

1  the purpose of having to do an analysis of
2  the, comparison of the claim designs and
3  the alleged infringing devices, you've got
4  to look at the bottom surfaces.
5
6     Q    And I believe earlier you
7  testified that an ordinary observer would
8  be most focused on the foot pads because
9  that's what they're looking down on when
10  they're standing on the product.  Is that
11  fair?
12    A    Yeah, I think that's fair.
13    Q    Okay.  Do you have an
14  understanding as to the purpose of the
15  vent holes in the Gyroor C?
16    A    Well, I certainly would think
17  they would be for some type of
18  ventilation.
19        MR. BERKOWITZ:  Why don't we just --
20  if you don't mind, let's just take a very
21  quick break.  I think I'm done with the
22  questioning.  I just want to take one last
23  look through my notes.  Okay?
24        THE WITNESS:  Okay.
25        MR. BERKOWITZ:  Let's just take five

31 (Pages 118 - 121)

J. GANDY

1
2  minutes.
3      MR. CHENG:  If anyone wants to have a
4  lunch break?  Or, Mark, do you think
5  you'll get everything wrapped up before?
6      MR. BERKOWITZ:  I think I'm done.  I
7  just want to go through my notes one last
8  time.
9      MR. CHENG:  Yeah, sure.  Okay.
10     THE REPORTER:  We are off the record
11  at 12:37 p.m.
12     (Off the record.)
13     THE REPORTER:  We are back on the
14  record at 12:45 p.m.
15  BY MR. BERKOWITZ:
16     Q   Okay.  So, Mr. Gandy, I'm going
17  to share my screen again.  Can you see
18  that I've shared my screen?
19     A   Yes, yes.
20     Q   Okay.  So I'm currently in
21  paragraph 100 of your rebuttal report that
22  we've marked as Exhibit Number 2.  It
23  spans pages 64 through 65.  Do you see
24  that?
25     A   Sure, yes.

J. GANDY

1
2      Q   Do you see there's a photograph
3  in approximately the middle of the page?
4      A   Yes.
5      Q   And it's entitled "Enlarged
6  Partial View Gyroor D.  Do you see that?
7      A   Yes.
8      Q   And this is either, you know, a
9  front or rear view of the Gyroor D
10  product.  Is that fair?
11     A   Yes, yes.
12     Q   Okay.  And on the right side of
13  the photograph, there is a brand name.  It
14  says "Gyroor."  Do you see that?
15     A   Yeah.
16     Q   Did you take that name into
17  account in your analysis?
18     A   I did.  I did.  You know, as a,
19  you know, it was part of the design of the
20  Gyroor product.  So I did, you know, at
21  least point it out.
22     Q   Did you provide any weight to it
23  in your analysis?
24     A   Other than just to mention that
25  it is on, you know, the front surface, I

J. GANDY

1
2  believe it's on both the front and rear
3  surface, that was basically it.  Actually,
4  I guess I'm looking at this, it does say
5  the upper portion just includes the word
6  "Gyroor."
7      Q   Does that word, in your opinion,
8  distinguish the Gyroor D from, in this
9  case, the asserted 195 patent?
10     A   I don't think it's the main
11  reason why it would distinguish it.
12  Again, I just point it out as just another
13  feature that's on there.
14         I'm aware of the fact that this
15  is an issue before the Court of Appeals
16  for the Federal Circuit right now.  So I
17  think that, whether it can be considered
18  for the purposes of showing
19  noninfringement I think is an issue that's
20  actually in front of the Federal Circuit
21  right now.
22     Q   Okay.  So I guess --
23     A   That's the main reason why I
24  pointed it out, because I'm aware of that.
25     Q   And do you believe it tends to

J. GANDY

1
2  support a noninfringement position?
3      A   I don't think it would be the
4  sole basis for it.
5      Q   But it is something that you
6  relied upon here?
7      A   Yeah.  I wouldn't have pointed
8  it out if I didn't rely on it.  Yeah.
9      MR. BERKOWITZ:  Okay.  Yeah.  I don't
10  have any further questions for the
11  witness.
12      MR. CHENG:  I just have one question,
13  so we can get it wrapped up very quickly.
14         EXAMINATION
15  BY MR. CHENG:
16     Q   Mr. Gandy, I know that you
17  stated that you don't know Mr. Rake, and
18  you did not read his report.  Do you have
19  any objections to Mr. Rake's using of the
20  Gestalt theory to support his view of the
21  noninfringement in this case?
22      MR. BERKOWITZ:  Objection.
23     A   Should I answer?
24     Q   Sure, yes.
25     A   No.  I don't have any objection

32 (Pages 122 - 125)

Page 126

J. GANDY

1
2 to it. It's just something I'm not aware
3 of.
4        MR. CHENG: I'm done with my
5 questions. Thank you.
6        MR. BERKOWITZ: Mr. Gandy, it was a
7 pleasure. Thank you so much for your
8 time.
9        THE WITNESS: Thank you.
10       MR. CHENG: Thank you, Mr. Gandy, for
11 attending the deposition, and thank you,
12 Ms. Reporter for helping us with this.
13       THE REPORTER: Thank you. We are off
14 the record at 12:48 p.m.
15
16       (Whereupon, at 12:48 p.m., the
17       proceeding was concluded.)
18
19
20
21
22
23
24
25

Page 127

1
2        A C K N O W L E D G E M E N T
3
4
5        I, JIM GANDY, certify
6 that I have read the transcript of my
7 testimony taken under oath on October 26,
8 2022, and that the transcript is a
9 true, complete and correct record of
10 what was asked, answered and said
11 during this deposition, and that the
12 answers on the record as given by me
13 are true and correct.
14
15 _____
16        JIM GANDY
17
18 Signed and subscribed to
19 before me, this      day
20 of          , 20 .
21 _____
22 Notary Public
23
24
25

Page 128

1        CERTIFICATE OF DEPOSITION OFFICER
2        I, ARKADY SANDOVAL, the officer before whom the
3 foregoing proceedings were taken, do hereby certify that
4 any witness(es) in the foregoing proceedings, prior to
5 testifying, were duly sworn; that the proceedings were
6 recorded by me and thereafter reduced to typewriting by a
7 qualified transcriptionist; that said digital audio
8 recording of said proceedings are a true and accurate
9 record to the best of my knowledge, skills, and ability;
10 that I am neither counsel for, related to, nor employed by
11 any of the parties to the action in which this was taken;
12 and, further, that I am not a relative or employee of any
13 counsel or attorney employed by the parties hereto, nor
14 financially or otherwise interested in the outcome of this
15 action.
16
17                  ARKADY SANDOVAL
18              Notary Public in and for the
19              State of New Jersey and
20              State of New York
21
22 [X] Review of the transcript was requested.
23
24
25

Page 129

1        CERTIFICATE OF TRANSCRIBER
2        I, SUSAN J. SPAULDING, do hereby certify that
3 this transcript was prepared from the digital audio
4 recording of the foregoing proceeding, that said transcript
5 is a true and accurate record of the proceedings to the
6 best of my knowledge, skills, and ability; that I am
7 neither counsel for, related to, nor employed by any of the
8 parties to the action in which this was taken; and,
9 further, that I am not a relative or employee of any
10 counsel or attorney employed by the parties hereto, nor
11 financially or otherwise interested in the outcome of this
12 action.
13
14
15                  SUSAN J. SPAULDING
16
17
18
19
20
21
22
23
24
25

33 (Pages 126 - 129)

Page 130

```
 1          ERRATA SHEET
         VERITEXT/NEW YORK REPORTING, LLC
 2
    CASE NAME: Hangzhou Chic v. The Partnerships And Unincorporated
 3  DATE OF DEPOSITION: 10/26/2022
    WITNESSES' NAME: Jim Gandy
 4
 5  PAGE  LINE (S)    CHANGE       REASON
      _____|_____|_____|_____
 6    _____|_____|_____|_____
 7    _____|_____|_____|_____
 8    _____|_____|_____|_____
 9    _____|_____|_____|_____
10    _____|_____|_____|_____
11    _____|_____|_____|_____
12    _____|_____|_____|_____
13    _____|_____|_____|_____
14    _____|_____|_____|_____
15    _____|_____|_____|_____
16    _____|_____|_____|_____
17    _____|_____|_____|_____
18    _____|_____|_____|_____
19    _____|_____|_____|_____
20    _____|_____|_____|_____
21          Jim Gandy
22  SUBSCRIBED AND SWORN TO BEFORE ME
    THIS ____ DAY OF _____, 20__.
23
24  _____
25  (NOTARY PUBLIC)        MY COMMISSION EXPIRES:
```

| & | | | |
|---|---|---|---|

**&**   2:5 5:17 50:3

**0**

**04806**   1:11

**1**

**1**   3:8 17:9 18:22
18:25 19:4 23:4
23:14,14 56:19
58:2 72:22
105:22
**10**   73:12 76:2
**10/26/2022**
130:3
**100**   122:21
**10018**   2:7
**10166**   2:15
**102**   45:17
**103**   45:18
**10:04**   1:18 4:6
**10:59**   55:10
**11**   75:4,8
**112**   34:12
**113**   72:22
**11:09**   55:13
**11:57**   95:5
**12**   32:9 74:5
**125**   3:4
**12:04**   95:8
**12:37**   122:11
**12:45**   122:14
**12:48**   126:14,16
**13**   87:16
**1350**   2:6
**1500**   35:20 36:2
**16th**   19:20
**1703**   2:14

**1876**   61:6
**19**   3:8 59:4,19
**195**   124:9
**1972**   26:18 27:2
27:9,13 28:17,18
33:6 39:4,8
**1973**   28:17,18
**1979**   30:14,18,24
**1996**   30:22,24
31:23 33:7
36:14 39:8
**1998**   36:14,21
**1:20**   1:10

**2**

**2**   3:9 55:21 56:2
57:22 58:3
78:21 119:11
122:22
**20**   63:6 64:10
65:2 127:20
130:22
**200**   2:14
**2002**   28:9,12
**2002-2003**   27:18
**2003**   28:10,13
**2005**   23:24 36:21
38:24 39:2,4,18
44:5
**2007**   60:15,15
**2008**   60:16,18
**2014**   94:13,21,23
**2021**   7:18 12:14
12:23 19:18
**2022**   1:17 4:13
19:20 74:5
127:8

**212-216-1166**
2:9
**22**   78:25 82:17
**23**   19:18 83:20
83:22 84:9
**25578**   128:16
**26**   1:17 4:13
91:4,21 127:7
**27**   77:6,12
**28**   95:16 98:24
99:6
**28692**   129:14
**29**   102:10
**291**   27:25
**292**   27:25

**3**

**3**   3:10 72:18
73:2 75:8
**31**   87:13,14
**35**   34:12
**350**   13:21
**3rd**   20:14

**4**

**4**   58:8
**41**   106:4
**42**   113:24
**44**   119:11

**5**

**5506428**   1:22
**56**   3:9
**5961**   4:13

**6**

**6**   3:3 74:15 75:7
**64**   122:23
**65**   122:23

**69**   108:11 111:19

**7**

**7**   77:9
**70**   117:21
**723**   106:10
108:25 109:19
110:13,21
114:10,22
115:12,19,23
116:4 118:6,11
118:18 119:16
119:21 120:4
**73**   3:10 119:8,10
119:14

**8**

**80s**   61:25
**82**   19:2
**86**   18:24 55:23

**9**

**9**   32:9
**906**   88:2,8,21,25
89:20 93:16
107:11,15,23
108:6 109:6,23
110:7 114:12
115:16,18,22
116:6 117:17
118:25 119:16
120:9

**a**

**a.m.**   1:18 4:6
55:10,13 95:5
**ability**   10:8,12
128:9 129:6
**able**   10:4 18:4
21:13 33:18

34:14 67:18
111:9,14,17
116:8 118:25
**absent** 4:20
**absolutely** 65:11
74:3
**accident** 44:23
**account** 97:6
123:17
**accurate** 34:6
103:20 128:8
129:5
**accuse** 11:4
**accused** 16:21
65:17 66:10
76:7 77:19,23
84:18 102:19,25
103:15,22 104:2
104:7,17
**acknowledgm...**
4:16
**act** 31:4
**action** 128:11,15
129:8,12
**actions** 33:3,21
37:11,13 40:10
**actual** 26:14
35:10 90:17
102:19 103:7
**add** 43:2
**added** 57:5
**addition** 62:4
65:14
**additional** 56:20
57:6,7
**additionally**
4:20

**additions** 57:14
**address** 56:23
**addressed** 38:5
**adequate** 29:20
44:9
**adequately** 30:7
84:17
**administer** 4:16
**administrative**
63:10,17,21,24
**admitted** 25:8
**advance** 87:13
**advise** 80:12
**agency** 13:10
**agents** 39:22
40:18 41:13
**agree** 4:17,23
60:19
**agreed** 96:7
**agreement** 44:20
50:25 110:2
**agricultural**
28:4
**ahead** 12:6
17:20 18:21
55:15 73:11
80:16 85:2
87:10,13 91:3
105:9 106:4
**alleged** 21:11,24
45:18 46:4
56:20 69:6
70:14 78:11
107:6 108:4
121:4
**allowable** 34:18
**amazon** 92:4

**ambiguous**
53:13 61:17
68:12
**analysis** 39:13
39:14 57:2
59:21 64:21
71:12 72:9 77:2
87:5 103:8
104:24 106:15
106:24 107:3,24
110:12,25 121:2
123:17,23
**answer** 9:6,23
61:17 68:10
80:12,14,16
125:23
**answered** 75:17
105:9 115:5
127:10
**answers** 8:7
127:12
**anticipated**
34:17
**anticipation**
62:22
**anybody** 14:12
15:19 22:8
**apologize** 58:23
**appeals** 38:2,3
79:19 80:8 81:2
81:12 124:15
**appear** 118:19
**appearance** 66:3
67:9,12 69:20
77:19 85:6,14
86:20 99:23
100:5 101:3,21
102:25 103:21

111:5 115:22
**appears** 23:16
118:20
**applicable** 5:3
59:6
**application** 34:3
35:17 54:11
65:4
**applications**
28:22 32:20,22
33:6,20 35:24
37:15 39:25
40:23 41:14,21
50:20 51:6 54:3
**applied** 35:23
62:12 78:8
**apply** 36:6,10
**applying** 62:19
72:8
**appropriates**
65:18
**approximately**
123:3
**arched** 92:21
**architectural**
25:18,23 26:3,9
26:14
**arcuately** 116:18
**area** 27:11 28:3
28:4,5,7,25
53:10,14 54:23
92:22,22 101:23
108:17 109:7
116:3
**areas** 31:18 35:2
35:4,9 44:12
53:18 77:23
116:19

[arises - believe]                                                    Page 3

arises  12:5
arkady  1:21 4:3
   128:2,17
art  27:12,19,22
   31:5,18 32:7
   34:14,15,18 35:9
   37:4 54:23
   62:22 70:10,17
   70:22 71:5,7
   75:23 77:18,24
   78:14 79:18
   81:18,25 82:6,15
   82:16 83:11,17
   87:2,6 88:4 96:9
   96:23 107:8,11
   107:15,18
article  67:9
articles  63:11
   64:10,11,13
articulated
   79:18
arts  27:14
asked  15:7 17:16
   31:17 50:9 51:3
   57:10 58:16,23
   75:16 97:12
   105:8,16 127:10
asking  8:6,13,18
   22:18 25:24
   53:15 68:18
   76:17 80:10
   85:9,12,16,17
   97:13
asserted  76:8
   94:7,10 103:3
   106:10 107:16
   107:25 124:9

asserts  79:2
assigned  4:4
   32:23 35:8
   51:11
assistance  41:19
assistant  29:10
   29:16 32:25
   38:19
assisting  70:17
associations
   1:11 4:12
assume  8:22
   94:17 98:3
   104:19,21
   116:19,23,25
   117:9,15
assuming  28:10
attached  3:11
attempted  41:10
attended  25:14
attending  126:11
attention  120:21
attorney  128:13
   129:10
attorney's  7:2
attorneys  15:19
   39:23 41:13
   44:2 68:18
audible  9:9
audio  128:7
   129:3
august  12:14
   19:19 20:11
   56:15
authority  30:11
   30:15
authorized  4:15

automobile  83:8
automobiles
   29:5
automotive  28:7
   52:9
avenue  2:14
avoid  9:8 11:14
   12:9
awarded  51:22
aware  16:19
   20:2 58:14 72:6
   106:2 124:14,24
   126:2

**b**

b  3:6
bachelor  25:17
back  22:7 23:24
   36:12 38:2
   55:13 78:20
   91:2 92:23
   93:16 94:22
   95:7,10 98:15
   105:23 122:13
background
   22:21 23:10
   24:23
backlogs  31:16
balancing  54:4,8
bars  117:3,18
base  22:11
based  20:13
   33:23 37:7
   40:11 50:24
   60:11 63:8 66:3
   70:3,13 71:9
   79:2,13 81:3,23
   90:16 92:2

93:21 103:8
   117:13
basically  16:3
   20:19 27:13
   33:16 37:6
   44:22 45:15
   48:18 50:16
   51:9 60:9 61:4
   61:10,11 62:3
   64:15 66:15
   78:10 82:11
   89:11 90:8
   92:11,12,16,25
   93:17 100:10
   113:5 119:22
   124:3
basis  80:5,6,22
   125:4
began  21:14
behalf  2:2,11
   5:18 43:25
   73:22
believe  13:21
   15:11 20:3,12
   21:25 27:17
   28:9 44:4 46:2
   48:15 52:8
   53:10 54:19
   56:22 59:16
   60:15,18 61:24
   65:9 67:21
   81:19 82:4
   84:22 85:21
   89:25 97:11
   104:8 105:18,24
   109:10 121:6
   124:2,25

**believing** 80:6
**benefit** 9:16
  11:21
**berkowitz** 2:4
  3:3 5:15,16 6:10
  6:25 18:3,7,13
  18:16 25:6,10,12
  55:6,14 68:13,14
  73:20 74:3,11,13
  76:17,21 80:2,20
  94:25 95:9
  97:11,17,19,22
  98:14,22 99:3,4
  105:14 112:9
  121:19,25 122:6
  122:15 125:9,22
  126:6
**best** 7:11 45:11
  46:3 92:4 128:9
  129:6
**better** 66:23
**beyond** 35:25
  90:9 97:2
  118:25
**bicycles** 29:4
**bigger** 83:25
**bit** 18:21 22:8
  25:21 26:3
  33:13 61:14
  91:3 95:23
  102:14
**board** 38:2
  48:25 64:3
**body** 44:21
  77:24 88:13
  92:21 93:15
**bottom** 119:8,16
  119:20,22,25

120:3,4,8,12,25
  121:5
**brand** 97:25
  123:13
**branding** 98:7
**brands** 97:23
  98:4
**break** 7:7 9:21
  9:24 40:12 95:2
  95:11 121:21
  122:4
**brief** 81:4
**bring** 17:8,23
  72:13 108:25
**bringing** 49:7
**brining** 49:10
**broadway** 2:6
**broken** 66:18
  88:14 90:16
**brother** 27:22
**brought** 50:21
  72:15 105:17
**butcher** 11:15
**buy** 45:11 83:4
  92:4 111:7
**buying** 83:7

**c**

**c** 2:1 106:11
  109:6,19 110:23
  114:14,17,25
  115:7,17,23
  116:6,9,22,24
  117:2 118:5,15
  118:21 119:17
  120:13,17
  121:15 127:2

**calculus** 26:12
**call** 11:16 29:24
  88:19 114:13,17
  114:20 120:16
**called** 6:4 30:9
  51:25 89:25,25
**calls** 76:14,16
  98:10
**campbell** 48:11
  48:11,19 49:5
**cans** 48:19,20
**car** 44:22
**career** 39:3
**carolina** 1:20
  4:14
**case** 1:9 7:2
  10:22,24 12:16
  12:20 13:18
  14:12,16,19,22
  15:20 16:11,17
  16:22 20:22
  21:10 24:6,19,20
  24:21 43:3,22,23
  44:14,17,25 45:3
  45:6,10,14 46:10
  46:12 47:9,16
  48:3,7,10,14
  49:25 50:11
  51:9,14,16,20,22
  52:6 53:2,4
  59:10 60:8,14
  61:9,11,12 68:4
  68:21 73:10
  79:5 81:9,23
  94:2 104:8
  124:9 125:21
  130:2

**cases** 22:19 23:2
  24:3,12,14 31:17
  31:18 37:18
  48:23 53:2
  59:13,14
**cats** 50:18
**caution** 74:7
**center** 27:20
  37:12,24 101:19
  101:23 110:21
  111:21 112:12
  112:19,24 113:2
  113:6,9 116:3,4
  116:6,9
**central** 50:3
**certain** 48:22
**certainly** 68:15
  111:2,16 117:15
  118:18 121:16
**certificate** 128:1
  129:1
**certified** 4:23
**certify** 127:5
  128:3 129:2
**challenge** 80:2
**challenged** 44:6
**chandler** 2:19
  5:17
**change** 29:13
  30:25 32:4
  36:24 105:19
  130:5
**changes** 57:4,15
  57:19
**chapter** 35:20
  36:2
**charge** 37:19,24
  38:6

chat 17:21 18:5
18:9
cheng 2:12 3:4
5:11,12,13,13
10:22 11:20
12:13 13:3,9,11
14:21 15:5,9,12
15:14 21:8 25:7
53:12 55:5,8
61:16 68:5
69:16 73:13,24
74:6,12 75:16
76:14 79:24
80:10 81:5 82:9
95:3 97:9 98:10
104:14,19 105:8
112:7 115:25
117:13 122:3,9
125:12,15 126:4
126:10
chic 1:5 2:2 4:9
11:13 130:2
choice 98:8
chose 103:19
circle 22:7
circuit 38:4
79:19 80:9 81:2
81:12 124:16,20
circular 85:24
89:14 90:8,10
92:18 118:19
claim 34:16,17
57:6 65:4,18
66:8,14,17,22
67:8,12,17,22
68:3,20,25 69:7
69:14,20,22
70:14,20 75:22

78:11,13 84:18
85:11 86:13,15
86:17 120:25
121:3
claimed 86:25
87:9 88:17,22
102:6 107:6
claims 70:2
77:21,24 94:20
clarify 8:20 43:9
68:15 69:25
72:3 100:3,4,19
112:11
class 28:21,21
31:21 35:10
classes 26:8,8,9
26:9 31:12
clear 9:17
clearest 103:20
clearly 116:16
116:20 118:11
clients 68:9
close 107:20
closer 115:18,22
closest 69:7
70:17,22 71:7
107:7,10,15
code 36:7
colleagues 15:16
collectively
11:25
college 25:13,25
come 12:9 29:16
89:16
comes 31:23
coming 38:2
106:16

commendable
32:14
comments 78:22
commercial 79:4
92:2,13,17 93:8
93:21 94:22
commission
130:25
commissioner
38:19
common 114:11
communication
68:8 79:25
80:11,15
communications
68:17
company 48:11
48:12 50:4,4
comparing 66:9
69:6 75:23
78:13
comparison
75:24 106:9
119:15 121:3
comparisons
107:3,5
compensation
13:23 14:7
complaint 43:15
complete 10:5,9
10:13 127:9
comprise 85:7
concavely
111:20 112:11
112:19 113:6,9
113:15
concerning
14:18

concluded
126:17
conclusion 76:15
76:16
conclusions
106:17
configurations
85:25
confirm 51:12
58:22 105:7
111:23
conflict 27:21
connection
64:12 68:21
consider 53:17
69:8,14 71:7
82:24 101:2,12
102:2,20 108:14
108:16 109:3
111:7 112:18
considered 44:8
62:7 66:16,18
107:19 114:23
124:17
considering
110:14
consist 32:8
consistent 34:9
41:25 79:16
80:7,24
consisting 72:21
constitute 5:7
construction
57:7
construe 66:13
70:2
construing 66:8
66:22

consulting 23:23
40:14 41:4
consumer 79:7
97:6,24 99:14
100:25
consumer's 98:8
contacted 12:13
12:24 13:8,11
40:3,7,19
contacts 14:18
contentions
11:10
contents 55:24
context 20:17
62:13 112:8
continually
11:15
continue 31:11
65:13 79:12
91:11
continued 37:22
continuous
118:22
contour 101:20
conversant
79:17
conversations
63:8 79:14,22
80:4
convex 116:5
convexly 110:22
copied 93:18
copies 17:12,13
copy 73:15
copying 18:8
corp 45:10 46:16
corporation 52:8

correct 11:7
13:19,20,22
14:20,20 23:16
23:17 25:15,16
25:20 26:18,19
26:23 27:3,6
28:19 30:16,17
30:20,23 31:25
32:2 33:3,8,12
36:14,15,18,19
36:22 37:14
38:23 39:6,10
42:17 46:25
47:5,7,14 48:8
48:17 49:15,18
51:18 52:22
53:7 60:23
65:10 66:12
70:5 84:20
94:16,17 97:19
99:18 103:10
107:13 109:17
109:21,24,24
110:10 114:15
117:19 118:17
118:17 120:11
127:9,13
correctly 92:5
103:4
corresponding
107:22
counsel 5:9,14
6:8 9:3 14:11,19
21:17 25:3
55:12 59:21
63:9 68:7,12
73:15 79:14,23
102:21 103:24

128:10,13 129:7
129:10
counseled 41:12
course 9:21
25:22 26:6,15
93:24
courses 25:25
26:13,14
court 1:1 8:14
9:10,16 18:4
38:3 61:5 79:19
80:8,25 81:11
98:14 124:15
courts 63:20
cover 47:19,20
47:21 90:24
108:25 109:5
118:12,15,21
119:2 120:5
covers 85:23,25
86:6,9 88:14,18
90:3,4,6,7,9,20
92:21 101:15
109:8 110:7
118:5,14,18,24
120:14
crash 44:22
critiquing 84:13
current 42:25
currently 24:13
122:20
cursor 106:19
108:18,21,24
112:16
curvature 116:5
curved 110:22
111:20 112:12
112:19 113:6,9

113:15 116:19
cut 112:3
cv 1:10 19:2 23:9
23:16,18,19,24
24:5 31:20
36:12 39:22
41:2 42:12 43:3

**d**

d 3:1 123:6,9
124:8 127:2
d12 28:3,21,21
d6 27:15
d8 28:6
dark 116:19
dashed 86:22
87:3
date 1:17 20:13
25:2 42:22
73:24 130:3
dated 19:17 74:5
dates 94:7
day 127:19
130:22
dealing 38:21
61:10 63:3
81:12
deals 63:4
december 27:17
28:9,12
decided 47:24,25
decision 51:22
61:5,22 62:2,6
70:13 97:7
decisions 30:11
37:25 63:10,17
63:19,22,24,24
64:2,5

declaration   3:10
  49:12 56:10,14
  56:18 72:20
  91:24
declarations
  22:25 52:20
  58:24
defendant   12:6
  44:18 47:14
  49:4 73:19
defendants   1:13
  11:4,9,21,25
  12:16,20 13:15
  14:10,11,16
  16:17 21:25
  24:10 40:10
  44:20 49:5,6
  59:22 63:9 68:2
  68:19 73:10,23
  79:15 102:22
  103:25
define   69:19
definiteness
  34:11 42:2
  44:12
definitively
  104:12
degree   25:23
  26:4,5
dependent   14:7
depending   13:24
  17:15 35:5
deponent   5:14
  68:10 80:12,13
deponent's
  97:10
deposed   45:3
  48:6 49:16

deposition   1:15
  4:7 5:5 7:12,17
  7:23 15:3 42:14
  43:6 46:7 51:17
  126:11 127:11
  128:1 130:3
depositions   7:25
  14:2
describe   67:11
  84:18,23 85:5
  86:23 90:5
  113:2
described   85:2
describes   91:25
describing   86:5
  92:11,14,16,18
  92:25 93:6,6
description   3:7
  46:24 66:24,25
  67:15,17,22 68:3
  68:20 69:3,4,10
  69:14,18,21
  85:10,18 91:23
  92:8 112:22
descriptions
  68:25
design   11:5
  20:21 21:23
  23:23 25:18,23
  26:4,9,12,15
  27:5,12,19 29:10
  29:15 31:21
  32:19,19,22 34:3
  35:20,24 36:6,11
  36:17,24 37:23
  38:7,9,11 39:24
  40:4,8,11,18,20
  40:22 41:3,14

44:3 45:17 47:4
  47:17 48:16,21
  49:21 50:19,23
  51:6 53:18
  54:10,20 59:23
  60:4 61:2 62:9
  63:11,13 64:14
  65:4,5,16,17,18
  66:4,7,9,10,14
  66:17,22 67:8,13
  67:17,23 69:7,15
  69:20,22 70:14
  70:15,19,20 72:9
  75:23 76:6,25
  77:21 78:11,14
  78:17,18 85:7,11
  85:18 86:13,15
  86:17 87:9 94:8
  94:20 102:6
  103:3 107:6,7,23
  108:3 120:24
  123:19
designer   79:3
designs   11:2
  21:12,12 68:4,21
  68:25 82:21
  83:15,16 84:18
  84:23 86:2
  96:15,20 108:4
  121:3
detail   84:24 86:7
  86:23
details   86:17
  102:24 103:21
determination
  70:18,24 71:8
determinations
  30:7

determine   30:6
  34:15 37:12
  38:4 62:20
  99:16
determined
  47:21 66:8
determining
  60:11 62:14
  65:12,16 70:21
  76:6
device   45:19
  46:4 66:10
devices   21:24
  69:6 78:12
  121:4
diameter   90:21
  90:21
differ   56:18
difference   86:10
  105:12
differences   85:6
  115:13
different   11:21
  31:17 38:22
  42:19 69:5
  77:20 82:21
  83:15,16 85:25
  93:14 94:3,5
  96:15,19 104:23
  105:3 111:11
  117:22
differs   77:23
digital   128:7
  129:3
directed   48:16
  65:5
directly   13:9
  14:15

**disclosed** 88:23
　89:2,4
**discloses** 87:7
**discuss** 10:21
　119:8
**discussed** 31:13
　103:6
**discussing** 63:11
　64:14
**discussions** 81:4
**dispensing** 50:16
**dispute** 11:9
**dissimilar** 70:16
**distinguish**
　85:14 96:25
　101:17 111:10
　111:14,17 124:8
　124:11
**distinguishes**
　86:4
**distinguishing**
　101:14
**district** 1:1,2
**dive** 55:3
**division** 1:3
**document** 18:18
　18:24 19:3,10,12
　19:17,24 23:4
　38:13,14,16,17
　55:16,18,23 56:6
　56:17 72:16,19
　72:21,24 73:5,9
　73:12,15 74:4
**documents** 21:8
　21:17,18 73:17
**dogs** 50:17
**doing** 7:3 9:14
　23:22 40:5,14

**download** 17:22
**draft** 21:2 57:11
**drafted** 20:23
**drafting** 21:6
**draw** 26:11
　67:18 69:13,22
　90:11
**drawing** 88:10
**drawings** 34:7,8
　41:24 44:8
　67:19 69:23
　70:3 89:19
**drawn** 59:12
**drogin** 2:5 5:18
**drop** 18:4
**drops** 7:6
**duly** 6:5 128:5

**e**

**e** 2:1,1 3:1,6
　18:11 56:22,23
　57:3 71:23
　127:2,2,2
**earlier** 33:10
　51:8 70:7,25
　71:4 96:6 103:6
　107:10 108:7
　110:7 121:6
**earliest** 54:15
　94:9,20
**early** 20:12
　56:15 61:25
**easier** 41:8
**eastern** 1:3
**edification** 71:22
**education** 24:23
　25:14 37:22

**effectively** 78:7
**egyptian** 60:9,14
　61:12 62:25
　63:2 70:13 81:9
　81:24
**eight** 11:21
　74:20
**either** 40:9 62:21
　123:8
**element** 86:12
**elements** 33:18
　37:16 65:6
　86:21 87:3 88:7
　88:9
**elevated** 36:17
**elevation** 114:24
　114:25 115:3
**eligible** 31:9
**eliminated** 61:12
**elongated** 92:24
　93:3
**employed**
　128:10,13 129:7
　129:10
**employee** 42:9
　128:12 129:9
**enablement**
　34:11 42:3
　44:11 46:22
**enclose** 110:8
**ends** 18:25 88:15
　118:20
**engaged** 12:11
**engagement**
　60:2
**engagements**
　42:25

**engine** 28:7
**engineering** 26:7
　26:13
**enlarged** 123:5
**enter** 25:5
**entered** 29:8
　44:19
**entire** 28:25
　37:12 47:18
　65:5
**entirety** 21:3
**entitled** 95:20
　123:5
**environment**
　66:19
**equivalent** 76:7
　112:2
**errata** 130:1
**es** 128:4
**esquire** 2:4,12
　2:19,20
**essence** 85:9
**established**
　61:23
**evidentiary** 5:4
**exactly** 28:13
　67:18
**examination** 3:2
　6:9 32:24 50:10
　51:4 125:14
**examinations**
　51:7
**examine** 34:5
**examined** 6:7
**examiner** 27:5
　27:21 29:11
　30:10,14,21 31:3
　31:25 32:5,5,7

32:18 33:15,19
33:23 35:15
36:3,13 37:17
38:7 40:5 54:23
61:24 62:18
72:5 78:13
81:10
**examiners** 29:15
31:7 32:9,10,24
32:25 33:11
34:2,19 37:3,11
37:20,23 38:10
38:11 76:13,25
**examining** 27:8
32:24 33:5,20
34:3 35:19,24
39:8 54:9,12,22
64:16,19 78:11
**example** 86:6
**exception** 108:2
**exhibit** 3:8,9,10
17:9 18:22,25
19:4 23:4,14,14
55:21 56:2,19
57:22 58:2,3
72:14,18,22 73:2
75:8 78:21
105:22 119:11
122:22
**exhibits** 3:11
17:21 18:5
**exist** 53:23
**existing** 71:5
**expected** 33:18
**expedited** 50:10
51:4,7
**experience** 24:25
52:25 71:9 72:8

76:18 79:3,8
81:10
**expert** 3:10
15:22 16:6,8
17:9 22:6,12,14
22:18 23:22
24:11 40:6
42:13,14 43:8,11
45:6 46:7,19
47:3 52:24,25
53:17 68:23
72:20 78:25
**expertise** 22:22
53:10,14
**experts** 16:10,18
**expires** 130:25
**explain** 106:16
**explained** 77:16
**extend** 88:15
90:17,23 118:10
**extending** 109:3
**extends** 118:12
**extent** 68:11
80:13

**f**

**fact** 91:22
105:10 108:3
124:14
**fair** 8:25 9:2
11:6,10 33:7
39:9 40:15 45:7
45:20 46:24
49:14 52:21
53:6,25 62:25
70:4 84:12,19,21
88:5,19 90:22
96:9 99:12,17,20

101:4 103:9
106:22 109:8,12
109:16,20 110:4
110:9 112:4
113:17,20 114:3
114:14 115:2,8
115:13 117:18
118:2,7 119:14
120:3,10,18
121:11,12
123:10
**fairly** 118:22
**familiar** 8:3,17
16:13 19:9,23
35:2 36:9 58:17
58:20 60:3,6,8
71:15,21,24
75:19 77:18
81:9,13,25 82:5
82:20 83:14
96:8,14,18 98:4
**familiarity** 12:22
**familiarize**
35:21
**far** 24:2 33:21
38:21 62:14
75:22 78:10
80:23 81:6,17
88:18,24 89:24
90:11 105:21
110:6 114:16
118:24 120:2
**fasteners** 120:6
120:9,14
**feature** 101:25
124:13
**features** 85:3,7
85:13 86:16

88:20 90:12
96:24 99:15,20
101:7,11,15
102:23 110:13
111:6 119:4,20
119:25
**federal** 36:7 38:3
79:19 80:8 81:2
81:12 124:16,20
**feel** 101:16
**felt** 15:7 17:14
103:19
**fenders** 88:19
89:25
**file** 40:2,23
**filed** 50:19 51:6
54:11,20
**filings** 41:14
**financial** 13:14
**financially**
128:14 129:11
**find** 77:18
**fine** 10:2 12:3,10
19:25 23:7,12
27:13 43:13
57:25 71:20
84:2
**finish** 74:22 84:5
**finished** 20:12
20:15 43:8
**firm** 13:6,6
42:10 73:22
**firms** 40:3,8,15
42:5
**first** 6:4 12:11
18:23 20:15
26:25 27:9,10
29:8 41:9 43:15

**[first - glacier.law]** Page 10

| 54:8 55:23 63:7 | **forms** 6:20 | **g** | 99:1 100:1 |
|---|---|---|---|
| 64:9 65:3 66:8 | **formulate** 21:14 | | 101:1 102:1 |
| 68:6 76:2 93:17 | **forth** 80:25 | **g** 71:23 127:2 | 103:1 104:1 |
| 105:16 | **forward** 47:25 | **gamon** 48:12 | 105:1 106:1 |
| **fiscal** 31:15 | **found** 34:16 | **gandy** 1:16 2:11 | 107:1 108:1 |
| 32:11 | **four** 20:21 21:23 | 3:8,9 4:1,7 5:1 | 109:1 110:1 |
| **five** 7:15 48:16 | 49:21 50:4 94:8 | 5:22 6:1,3,11,15 | 111:1 112:1,10 |
| 55:2 95:2 | 102:6 107:16 | 7:1 8:1 9:1 10:1 | 113:1 114:1 |
| 121:25 | 108:3 114:2 | 11:1 12:1 13:1 | 115:1 116:1 |
| **fix** 105:25 | 120:24 | 14:1 15:1 16:1 | 117:1 118:1 |
| **flat** 92:15,20 | **frame** 60:17 | 17:1,10 18:1,17 | 119:1 120:1 |
| 119:24 | **framework** 76:5 | 19:1 20:1 21:1 | 121:1 122:1,16 |
| **flattened** 118:21 | 76:11,23 | 22:1 23:1 24:1 | 123:1 124:1 |
| **flea** 50:17 | **front** 17:11 | 25:1 26:1 27:1 | 125:1,16 126:1,6 |
| **flipped** 95:16 | 21:20 92:19,23 | 28:1 29:1 30:1 | 126:10 127:5,16 |
| **focus** 78:15,16 | 92:24 100:16,20 | 31:1 32:1 33:1 | 130:3,21 |
| 78:18 | 104:2,6,10,12,16 | 34:1 35:1 36:1 | **gandy's** 23:15 |
| **focused** 121:8 | 104:22 105:7 | 37:1 38:1 39:1 | 76:18 80:3 |
| **follow** 34:2 | 113:14 114:7,10 | 40:1 41:1 42:1 | **garden** 50:3 |
| 35:16 36:4 | 114:11,12,13,18 | 43:1 44:1 45:1 | **general** 65:24 |
| 42:20 | 114:19,20,22 | 46:1 47:1 48:1 | **generally** 10:24 |
| **following** 26:20 | 115:9,11 116:24 | 49:1 50:1 51:1 | 75:11 93:14 |
| 42:15 63:12 | 117:2,5,10,14 | 52:1 53:1 54:1 | **generic** 85:3 |
| **follows** 6:7 | 123:9,25 124:2 | 55:1,17 56:1 | 91:23 92:8 |
| **foot** 92:15 99:23 | 124:20 | 57:1 58:1 59:1 | **gestalt** 71:16,17 |
| 100:5,11,11 | **frustrated** 52:3 | 60:1 61:1 62:1 | 72:11 75:9,13,19 |
| 108:5 109:12,15 | **full** 6:14 17:17 | 63:1 64:1 65:1 | 76:4 77:4,22 |
| 109:22 110:19 | 29:25 30:3,10,15 | 66:1 67:1 68:1 | 78:6 125:20 |
| 111:3,10,15 | 86:15 | 69:1 70:1 71:1 | **getting** 113:3 |
| 116:16 121:8 | **furnishings** | 72:1,23 73:1,14 | **give** 28:22 35:3 |
| **ford** 43:16 44:2 | 27:11,15 | 74:1 75:1 76:1 | 43:5 74:7,15 |
| 44:4,5,19 | **furniture** 27:12 | 77:1 78:1 79:1 | 75:9 91:5 96:3 |
| **foregoing** 128:3 | 27:16 83:9 | 80:1,16 81:1 | **given** 69:4 73:15 |
| 128:4 129:4 | **further** 66:6 | 82:1 83:1 84:1 | 127:12 |
| **form** 69:16 82:9 | 84:23 91:9 | 85:1 86:1 87:1 | **giving** 20:20 |
| 115:25 | 125:10 128:12 | 88:1 89:1 90:1 | **glacier** 2:13 13:6 |
| **formal** 41:23 | 129:9 | 91:1 92:1 93:1 | **glacier.law** 2:16 |
| | | 94:1 95:1,12 | |
| | | 96:1 97:1 98:1 | |

**glean** 89:19
**global** 1:7 2:3
  4:10 11:14
  43:16 52:9
**glow** 50:2,11,15
  50:19 51:2
**gm** 52:9
**go** 6:16,18 8:16
  9:24 12:6 15:6
  17:20,21 18:14
  18:21 23:8
  33:14 38:18
  42:18 43:14
  46:12 47:25
  55:15 70:21
  73:11 78:20
  80:16 84:22
  87:12 91:2
  105:9 122:7
**goddess** 60:9,14
  61:12 62:25
  63:2 70:13 81:9
  81:24
**goes** 33:22 93:16
  116:17
**going** 8:5,7,17
  8:22 11:16,24
  17:8,8,20 18:20
  18:21 23:21
  36:12 39:25
  40:23 51:24
  52:4 55:15,20
  57:21 72:13,18
  87:12,19 91:3,15
  91:16 94:22
  95:11 105:23
  108:19 111:7,8,9
  111:12 113:15

113:16 117:20
  122:16
**good** 4:2 5:12,15
  6:11,12 8:2
  22:17 25:9
**gorham** 61:5
  62:6
**grade** 29:17
**graduated** 26:17
**graduation**
  26:20
**grant** 47:23
  52:15
**granted** 30:15
**great** 8:14 41:9
  55:20 91:20
**greater** 84:24
  86:6,23
**grill** 47:18,20
**ground** 8:15
**group** 56:22,23
  57:3
**guess** 7:19 10:20
  24:22 33:14
  35:14 36:23
  58:7 69:2,12
  90:15 105:15
  112:2 124:4,22
**guide** 38:8,12
**guidelines** 33:25
  35:15 36:3
**gyro** 114:25
**gyroor** 106:11
  109:5,19 110:23
  115:7,17,23
  116:6,9,22,24
  117:2 118:5,15
  118:21 119:17

120:13,17
  121:15 123:6,9
  123:14,20 124:6
  124:8

**h**

**h** 3:6 106:5,6
**half** 90:25
**hand** 5:23
**handling** 28:21
**hang** 84:4
**hangzhou** 1:5
  2:2 4:9 11:13
  130:2
**happened** 28:15
**happens** 7:8
  116:2
**happy** 83:24
**hardware** 28:6
**hatch** 79:2,15
  81:16 84:22
  86:12 91:24
**hatch's** 16:2,4
  19:14 20:4 22:6
  56:11 57:8
  78:23 80:7,23
  84:13,17
**head** 9:9,10
**heading** 41:3,10
**health** 10:11
**heard** 12:19
**hearing** 5:20 7:5
  44:25
**held** 120:5,14
**help** 22:8 31:18
**helpful** 67:21
**helping** 126:12

**hereto** 128:13
  129:10
**highlight** 41:11
  91:17,18
**highlighted** 99:5
**hired** 27:22
  29:17
**holders** 48:19
**holdings** 46:16
**holds** 50:13
**holes** 120:17,22
  121:15
**hour** 13:21
  54:25
**hourglass** 92:12
  93:19 97:2
  99:12 110:3
  113:19
**hourly** 13:18,24
**hoverboard**
  10:25 21:12
  56:21,24 57:3
  83:4 85:4 87:23
  88:13,16 92:17
  93:4,7,17,18
  97:7 98:2,8
  99:11 100:6,13
  101:11,20 102:2
  108:9 116:3,4
**hoverboards**
  11:6 17:5 22:16
  53:22,23 70:25
  71:5 79:6,9
  82:21 83:14,16
  91:25 92:13
  93:13 94:4
  96:14,19,24
  97:24 111:5

**huh** 74:24
111:22 113:22
**hurwitz** 50:3
**hypothetical**
79:16 81:14

**i**

**i.e.** 79:6
**idea** 50:15
**identification**
19:5 56:3 73:3
**identified** 1:12
4:12 56:21 86:3
**identify** 5:10
85:13 99:19
112:24 119:5
**iii** 59:5
**illinois** 1:2
**illustration**
66:23 67:2
**images** 114:3
**impact** 98:7
104:24 111:4
**important**
110:25
**impossible** 67:11
69:24
**inboard** 109:7
**include** 42:25
61:7 108:4
**includes** 33:20
33:21 42:24
99:22 124:5
**including** 72:22
117:23
**incorrect** 105:19
105:24

**indefinite** 44:6,9
**indefiniteness**
46:23
**independently**
32:18
**indicate** 86:9
**indicated** 31:19
31:20 46:3 88:8
88:20 117:14
120:23
**indicating** 38:21
45:16
**individual** 16:14
50:13 58:18
65:6 76:3
**industrial** 79:3
**industries** 50:2
**informal** 41:18
**information**
68:6,8 90:11
**informed** 59:21
103:25
**infringe** 62:8
**infringed** 65:17
**infringement**
39:14 45:22,25
53:4 59:23 60:4
60:11 61:3 63:3
63:14,20 64:21
64:24 66:3,7
81:13
**infringes** 70:19
**infringing** 11:5
21:11,24 45:18
45:19 46:4,5
47:22 56:21
69:6 70:15,19
78:12 107:7

108:4 121:4
**initial** 16:5 51:21
58:3
**initially** 21:7
29:8
**initiated** 37:8
**inquired** 103:24
**inquiry** 65:15
104:13
**inside** 90:20,21
108:24 116:16
**inspected** 16:25
**instance** 82:18
89:9 102:5
**instruct** 68:9
**instructed** 9:5
**intelligent** 1:5
2:2 4:9
**intelligible** 67:2
**intended** 5:2
**inter** 48:24
49:10 52:12,14
52:15
**interest** 13:14
**interested** 23:22
40:5,21 83:6
99:17 128:14
129:11
**interfere** 10:8,12
**internal** 38:14
**interrupt** 25:4
28:8
**invalidated**
49:22
**invalidity** 46:19
46:22 49:13
52:20

**involve** 24:19
**involved** 24:3,7
25:22 41:24
47:18 48:21
50:8 52:6 61:21
**involves** 107:3,5
**iprs** 49:17,20
**iris** 15:16
**issue** 39:15
46:22 63:4
124:15,19
**issued** 38:13
50:22 60:14
**issues** 10:11 12:9
31:16 38:5,22
50:8 51:24 52:5
**itc** 43:19
**item** 99:17

**j**

**j** 4:1 5:1 6:1 7:1
8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1

59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1 126:1
129:2,15
**james** 6:15,21
**january** 27:18
28:12
**jersey** 4:17
128:19
**jim** 1:16 2:11 3:8
3:9 4:7 6:3,17
6:18,20 127:5,16
130:3,21

**job** 1:22 36:23
**ju** 15:16
**judge** 47:23
**judgment** 22:2
47:22,24 48:4
**jump** 18:7 59:3
87:10 106:3
111:12 119:7
**jumping** 63:6
**june** 27:13
**junior** 33:11

### k

**k** 127:2
**keep** 42:11 66:5
66:20 83:19
91:10,13
**key** 77:23
**keystone** 52:9
**kidding** 17:7
**kind** 25:24 26:2
27:7 28:23
104:25 116:18
118:21
**knew** 18:2 39:23
40:20
**know** 7:6 8:10
8:16 16:16 35:3
35:3 42:2 43:4
43:25 49:21
50:17 52:4 54:6
54:14 60:16
62:4 68:2,19
69:5 70:25 71:4
72:12 73:25
74:18 78:8,10
81:4 89:9 93:11
93:15 94:6,13,21

94:24 96:21
101:13 103:17
104:9,15,18
117:10 123:8,18
123:19,20,25
125:16,17
**knowing** 23:21
40:4
**knowledge** 50:21
50:23 81:17,20
82:14 83:10
93:12 94:2
96:23 128:9
129:6
**known** 106:23
**krinsky** 2:5 5:17

### l

**l** 71:23 127:2
**lance** 3:10 16:14
58:18 72:20
**land** 29:2,4
**language** 22:21
57:6,8 59:17
**large** 92:22
**larger** 90:20
**late** 56:15
**law** 2:13 13:5
22:23 40:3,8,15
42:5,9 44:13
60:9 63:11
64:14 65:10
81:23
**laws** 5:4
**lawsuit** 14:8
**learn** 35:7,9
**led** 100:17,25

**left** 108:25
**legal** 51:24 52:3
52:5 59:7,22
63:23 76:15,15
**licensing** 44:20
**life** 115:3
**light** 92:24 93:3
93:4 117:3,18
**lights** 100:17,25
101:3,22 116:20
116:23 117:11
**likelihood** 105:5
**limited** 87:8
**line** 69:13 130:5
**lines** 66:16,18
86:15,22 87:3
88:14 90:16
102:17
**list** 42:19,22
58:7
**listed** 21:19,21
43:15 58:12
**litigation** 40:9
62:10
**little** 22:8 25:21
26:3 33:13
61:14 79:8
102:14
**lkq** 52:8,18,18
**llc** 43:16 130:1
**llp** 2:5
**location** 1:19
**long** 23:19 91:6
**longer** 32:22
37:2
**look** 17:23 21:21
21:22 22:5
67:18 70:17

**[look - neither]** Page 14

73:16 74:8 75:5
86:9,16 91:7
94:14 99:15
100:15 102:4
113:13,15,23
121:5,23
**looked** 15:25
21:22,23,25
93:13 94:2,22
**looking** 23:13
34:14 41:2
59:18 68:7,16
69:10 70:24
75:22 78:24
82:2,13 83:3,13
86:14 95:15
97:16,25 98:23
110:16 113:11
120:12 121:9
124:4
**looks** 120:7,15
**lot** 75:20
**lunch** 122:4

**m**

**m** 6:15 127:2
**magnadyne**
45:10
**mail** 18:11
**main** 92:21
124:10,23
**making** 41:25
70:18 71:8 97:6
**manner** 5:5
**manual** 35:19
64:16,19
**manufacture**
67:10

**manufacturing**
48:10
**mark** 2:4 5:16
6:25 17:9 18:22
55:16,20 72:18
122:4
**marked** 19:4
23:4,14 56:2,19
73:2 105:21
122:22
**markell** 50:3,12
51:15
**market** 44:21
92:2,14,17 93:8
93:9,21 94:22
**marni** 50:3,12
51:15
**material** 38:9
**materials** 15:23
38:16 58:7,11
**matter** 4:8 12:12
22:15 24:10
35:5 43:15,19
53:19 82:2,16
91:23
**matters** 41:23
42:15,20 43:10
**mberkowitz** 2:8
**mean** 18:9 24:13
28:16 31:3
34:24 35:18
40:16 49:7
59:14 62:14
64:13,15 69:8
75:11,22 78:6,8
80:3 81:8 87:17
88:9,12 89:10
92:10 96:21

102:4 110:15
111:2 116:15
117:24
**means** 5:6 8:11
112:15
**meant** 28:11
**medications**
10:7
**meet** 15:8 34:10
62:7
**mention** 100:14
123:24
**mentioned** 8:15
21:16 33:9
57:15 70:6
**merely** 41:20
69:10
**met** 15:12,14,15
**middle** 9:23
123:3
**mind** 6:13 75:5
83:21 121:20
**minute** 95:2
**minutes** 19:21
55:2,5 122:2
**mirror** 112:2
**misstatement**
97:9
**moment** 25:3
72:14 74:16
77:7 83:21 91:5
96:3 98:16
102:11 119:9
**month** 30:4
**months** 28:14
30:5
**morning** 4:2
5:12,15 6:11,12

**motion** 21:25
**motorcycles**
29:5
**mouse** 41:6
**move** 31:18
102:9 108:21
112:16
**moved** 113:24
**moving** 45:9
46:14 48:9
49:25 64:25
**mpep** 35:25
**multiple** 50:13
59:22 63:9
79:14 102:22
103:25
**mustang** 44:4,5

**n**

**n** 2:1 3:1 127:2,2
**name** 4:2 5:12
6:14,15,24 54:7
54:7 123:13,16
130:2,3
**named** 16:14
58:18
**names** 11:15
**narrow** 101:18
**necessarily**
75:18 113:14
**necessary** 70:16
**neck** 113:18
**need** 9:5,20
17:15 35:12,21
86:2,22
**needed** 38:5
**neither** 73:14
128:10 129:7

**[never - okay]**

**never** 42:7,8
 78:8
**new** 2:7,15 4:17
 4:17 31:6 33:15
 34:19 35:16
 37:20 128:19,20
 130:1
**nice** 9:17
**nine** 74:22
**nite** 50:2,11,14
 50:19 51:2
**nods** 9:9
**non** 9:8
**nonenabling**
 44:7,10 46:20
**noninfringement**
 19:14 20:21
 39:13 47:4 53:6
 103:2 124:19
 125:2,21
**normally** 6:16
 29:18 35:8 43:2
 43:7
**north** 1:20 4:14
**northern** 1:2
**notary** 1:21 4:15
 127:22 128:18
 130:25
**note** 22:24 72:21
**notes** 121:23
 122:7
**notice** 111:14
**novelty** 61:11,13
 61:15,23 62:9,11
**number** 11:5
 50:13 55:21
 57:22 58:3 75:8
 78:21 85:6

119:11 122:22
**ny** 2:7,13,15

**o**

**o** 127:2
**oath** 8:8,10
 127:7
**oaths** 4:16
**object** 9:4
**objection** 4:20
 5:20 53:12
 61:16 68:5
 69:16 73:14
 75:16 76:14
 79:24 82:9 97:9
 97:14 98:10
 105:8 112:7
 115:25 125:22
 125:25
**objections**
 125:19
**observer** 60:12
 62:5 70:7,11
 71:12 77:17
 79:5,17 80:24
 81:8,14,16,21,22
 82:5,11,12,19
 95:20,24 96:7,13
 96:18 111:13
 120:21 121:7
**obtain** 26:5
**obvious** 34:16
**obviously** 7:4
 21:22 22:4 26:7
 26:8 29:5 34:4
 34:13 51:2
 75:24 89:9
 113:13

**obviousness**
 62:22
**occasion** 41:12
**occasions** 40:3
 52:2
**october** 1:17
 4:13 127:7
**offered** 68:20
**offering** 68:3
 97:25
**offhand** 54:5
 94:12,16
**office** 23:20
 26:22,25 28:14
 29:9,15 33:5,21
 37:8,11,21 38:15
 38:18,25 39:4,12
 39:16 40:2,20,24
 41:16 48:24
 53:21,24 60:21
 60:25 62:15
 63:4 64:3 75:15
 75:21
**officer** 128:1,2
**officially** 42:4
**oh** 20:8 65:11
 94:11 99:3
 111:16
**okay** 6:16,19,24
 7:10,16,19 8:2,5
 8:20,22 9:8,14
 9:20 10:2,15
 11:3,8,12 12:4
 13:2,8,12,17,23
 14:6 16:8 17:17
 17:20,25 18:15
 18:17,20 19:9,25
 20:16,23 21:2,16

22:3,7 23:13
 24:4,9,22 25:6
 27:4 28:20
 31:11,23 32:3
 33:9 35:6 36:12
 36:20 38:11,24
 39:3,11,18 40:12
 41:2,8,18 42:4
 42:18 43:13,21
 44:11,16 45:5,9
 46:9,14 47:2,8
 48:3,9 49:16,19
 49:25 51:12,19
 52:7,19 53:8
 54:24 55:3,4,15
 56:5,13 57:21
 58:2,4,5,16 59:3
 59:18 60:6,18,24
 62:24 63:6,16
 64:8,18,25 65:13
 66:5,13,20 68:23
 69:12,25 70:6
 72:2,7,13,15,17
 73:5,8 74:6,19
 74:21 75:2,6,7
 75:13,25 77:5,9
 77:14 78:15,20
 79:12 81:19
 83:19 84:2,4,7,8
 84:12,16,21
 87:21 88:7,12,24
 89:5,24 90:14
 91:13,14,15 92:7
 94:21 95:3,10,15
 95:23 96:5,6,11
 97:23 98:23
 99:5,9,19,22
 100:6,14,24

101:6 102:16
103:23 106:3,4
106:14 107:2,9
108:7,23 109:2
109:10,18 110:6
110:11 111:19
112:6,10 113:17
113:21,21 114:9
114:16 115:11
115:15 116:22
117:9,17,20
118:4 119:7,12
119:19 120:8,16
121:13,23,24
122:9,16,20
123:12 124:22
125:9
**once** 7:8 21:12
32:21 43:3
**ones** 103:19
**opening** 3:8
19:20 23:5,15
105:22
**operations** 52:10
**opinion** 20:20
21:14 57:8
67:24 69:23
77:17 79:4,15
80:7,23 82:19
86:11 96:12,17
97:4,13,15 98:6
99:10 103:2
107:10,14
115:16 116:13
118:4 120:20
124:7
**opinions** 53:3,5
64:6,12 80:5

81:11 84:14
96:2
**opportunity**
29:21
**opposed** 89:15
**opposing** 100:11
**order** 26:5 40:25
62:7 99:15
**ordinary** 60:12
62:4 70:7,11
71:11 77:17
79:5,17 80:24
81:7,14,16,20,22
82:4,11,12,19
95:20,24 96:7,12
96:18 111:13
120:21 121:7
**outcome** 14:7
44:17 47:15
49:20 51:20,21
128:14 129:11
**outside** 4:19
**outstanding**
32:15
**overall** 67:8
77:19,22 85:14
86:19 102:24
111:4

## p

**p** 2:1,1
**p.m.** 95:8 122:11
122:14 126:14
126:16
**pad** 109:12,15
109:19,22
111:10

**pads** 99:24 100:5
100:11 108:5
110:19 111:3,15
116:16 121:8
**page** 3:2,7 18:23
18:24,24 19:2
55:23,23 81:6
87:15 106:4
111:24 112:14
113:24 114:2
119:11 123:3
130:5
**pages** 72:22
122:23
**paid** 13:17
**pandemic** 7:20
**panels** 44:21,21
44:22 92:24
93:3,4
**papers** 17:11
**paragraph** 58:8
59:4,18,20 63:6
64:10 65:2
73:12 74:14
75:3,4 76:2,2
77:6,8,9,12,16
78:25 82:17
83:20,22 84:9
87:13,14,18 91:4
91:6,21 95:16
96:4 98:24 99:6
102:10 108:11
111:19 117:21
119:8,10,13
122:21
**paragraphs** 75:7
76:24

**parent** 79:7
**park** 2:14
**part** 66:17 74:9
87:4 93:2
123:19
**partial** 29:24
123:6
**participating**
14:2
**particular** 22:15
24:9 35:9 36:9
38:17 42:6 64:4
64:11,18 69:19
78:9 82:13,16
83:7 91:9 93:10
93:11 101:16,21
**particularly**
111:6
**parties** 4:17,22
48:24 49:7,9,10
51:13 52:12,14
52:15 59:14
61:21 128:11,13
129:8,10
**partnerships**
1:10 4:11 130:2
**parts** 28:7 65:6
**party** 49:3
**pasting** 18:8
**patent** 23:20
26:21,25 27:5
29:9,10,14 30:21
31:24 32:5,6,17
32:22 33:5,15
34:3,20 35:19,24
36:13,17,24 37:8
37:23 38:7,10,25
39:4,12,16,22,25

40:2,4,18,19,20
40:22,24 41:4,13
41:14,15 44:13
45:17 48:24,25
50:16,19,20 51:8
53:20,24 54:3,11
54:20 59:24
60:4,21,25 61:2
62:9,15,18 63:4
63:11,13 64:3,14
64:16,19 65:4
66:7,14 72:4,9
75:15,21 88:2,8
88:21,25 89:20
93:16 94:15,20
106:10 107:11
107:15,22,23
109:23 110:7
114:11 115:12
115:16,18,19,22
117:17 118:6,25
119:16,17,21
120:4,9 124:9
**patentability**
30:8,12 62:12,15
62:20 65:12
**patentable** 45:17
**patented** 65:16
**patents** 11:5
20:21 21:23
23:23 27:8
31:12 32:19
35:20 36:6,11
39:8 40:9,11
43:24 44:3 47:4
47:17 48:16,21
49:14,22 50:14
50:23 51:10

53:18,21 54:3
76:8 77:21,25
94:7,8,10 102:6
103:3 106:10
107:16,25 108:3
120:25
**pattern** 108:5
111:11
**paws** 50:4
**pay** 120:21
**perception** 76:4
77:4
**perform** 33:19
**performed**
107:24
**performing**
39:13 71:11
106:23 110:11
119:15
**perimeter** 78:16
**period** 33:4,10
60:20
**peripheral** 92:11
97:2
**permitted** 5:2
**perpendicular**
100:22
**person** 6:22
14:21 82:12
100:12 111:7
**personally** 39:7
**perspective**
26:10 115:4,8,10
116:12 117:24
117:25
**perspectives**
26:11

**pet** 50:4,4
**photograph**
114:16,24 115:7
116:9 123:2,13
**photographs**
16:24 21:11
102:20 103:8,11
103:13,17 104:6
106:20 108:22
**physical** 16:25
**physics** 26:8
**picture** 67:13
87:23
**pictures** 69:11
87:20 108:11
**piece** 83:9
**plain** 119:23,23
**plaintiffs** 1:8 2:2
5:18 7:2 11:4,13
11:16 24:10
**plates** 92:15
120:5
**please** 5:9,22
9:21,23 12:6
84:6
**pleasure** 126:7
**pllc** 2:13
**plus** 48:12
**point** 12:7 29:12
29:23 30:10
32:25 54:10,13
61:13,15,23
108:9,12 112:15
123:21 124:12
**pointed** 124:24
125:7
**points** 61:10
62:9,11

**policies** 35:15
36:3
**policy** 38:19
**poor** 14:14
**portion** 40:13
74:8 101:19
109:11 110:22
111:21 112:12
112:20,24 113:3
113:7,10 116:7
116:10 118:12
118:16 119:2
124:5
**portions** 17:13
48:22 64:19
90:24 112:3
**position** 26:25
37:6 89:7 125:2
**possible** 98:21
**possibly** 83:3
**post** 52:15
**potential** 35:11
71:4 82:20,24
83:5,13 96:13
97:5 99:10
100:15 101:2,7
101:11,25
**potentially** 64:2
102:4 107:19
**practice** 36:17
36:25 37:5,6,10
40:20 75:15
109:14
**prep** 15:5
**preparation**
15:24
**prepare** 14:24
15:2 20:9 22:9

23:18 37:15
38:17 45:16
50:10 51:3
56:13
**prepared** 20:17
22:19 23:2,19,24
39:22 41:22
42:13 44:7 45:5
45:21 46:19,21
47:3,9 51:5
56:11 58:25
59:10 129:3
**preparing** 20:5
38:6 58:13
**presence** 4:19
**present** 2:18
**pretty** 31:21
119:22,23
**previously** 13:2
**primarily** 28:2
**primary** 30:9,14
30:21 31:3 32:4
**principle** 72:9
72:10,11 75:20
78:9
**principles** 59:7
63:12 64:14
71:13 75:10,14
**prior** 12:15,23
12:24 22:12,14
22:18 34:14,15
34:18 56:18
59:13,13 60:2
62:22 69:8
70:10,17,22 71:4
71:7 75:23
77:18,24 78:14
79:18 81:18,25

82:6,15,15 83:11
83:17 87:2,6
88:4 96:8,23
107:7,11,15,18
128:4
**priority** 94:6,20
**privileged** 68:6,7
68:16 79:24
80:11,15
**probably** 98:3
104:25 105:5,16
111:3 116:20
**problem** 18:14
55:7
**problems** 7:5
**procedural** 5:3
**procedure** 35:19
38:20 64:16,20
**proceeding** 1:19
4:5,25 126:17
129:4
**proceedings**
128:3,4,5,8
129:5
**process** 8:3,17
21:5 29:14 37:9
50:11 52:3
**produced** 4:24
**product** 26:15
77:23 78:16
82:14 83:7
97:18 106:11
111:14 114:14
114:17 115:17
116:22 117:4
121:10 123:10
123:20

**production**
33:22,23
**products** 12:23
16:22 17:2
28:23 46:15
76:7 77:19 79:4
84:19 102:20,25
103:15,22 104:3
104:7,17 107:20
110:2 119:9
**program** 29:25
30:2,4,4 37:7,9
**prominent**
110:13 119:20
**promoted** 29:21
30:9,14 31:24
**promotion** 31:10
**proper** 30:7
35:23 40:25
41:23 60:10
65:15
**properly** 51:5
**protects** 67:8
**provide** 10:4,9
10:12 67:22
68:24 85:10
123:22
**provided** 10:21
11:20 53:3,5
57:2 64:21
73:18 102:19
103:14,16
**providing** 24:11
52:19
**public** 1:21
127:22 128:18
130:25

**publications**
35:12
**publicly** 38:13
**purchase** 82:3
82:13 97:8
**purchaser** 79:6
82:20,25 83:5,14
96:13 97:16
100:15 101:2,12
101:25
**purchasers** 97:5
99:10
**purchasing** 79:9
**purpose** 20:20
21:9 32:23 51:9
121:2,14
**purposes** 42:2
112:23 113:3
124:18
**put** 17:21 67:16
103:18
**putting** 74:2

**q**

**qualified** 128:7
**quality** 102:23
**queena** 2:20
25:5
**question** 8:19
9:23 14:15 18:3
22:17 58:16
61:18 64:8
68:11,18 69:12
74:17 76:20
80:14,17,19
87:11,20 91:16
97:12 98:13,20
105:15 115:6

125:12
**questioning**
121:22
**questions** 8:6,13
8:18,23 13:13
15:6 17:16 50:7
57:10 95:25
102:12 125:10
126:5
**quick** 121:21
**quicker** 83:22
**quickly** 8:16
18:23 35:7,10
43:14 55:22
125:13

**r**

**r** 2:1
**radial** 92:22
**radii** 85:24
**radius** 90:20
118:23
**raise** 5:22 73:13
**rake** 3:10 16:14
58:18,20,25
72:20 76:3
125:17
**rake's** 125:19
**rate** 13:24
**read** 65:22 69:21
74:9,16 75:7
77:7 83:22 84:3
84:8 91:20 92:4
96:3 98:15,17
103:3 119:10
125:18 127:6
**reading** 42:12
61:20,22 65:14

66:5,20 74:22
79:13 83:23
**ready** 83:24
**really** 101:17
110:20 111:9,11
119:24
**rear** 100:16,20
104:2,6,10,13,16
104:23 105:7
113:14 114:7,10
114:11,12,13,23
115:12 117:5,11
117:11 123:9
124:2
**rears** 117:14
**reason** 10:3
124:11,23 130:5
**reasonable**
97:21
**rebuttal** 3:9 16:6
19:13 20:3
56:11 57:23
58:4 63:7 78:21
84:9 87:14,15
91:22 95:17
103:12 105:17
122:21
**rebutted** 16:3
**rebutting** 19:14
**recall** 21:18 24:4
44:16 49:19
51:19 54:5
58:15 68:22
92:9 94:15
104:11
**receive** 103:7
104:5

**received** 16:24
21:17 25:17
51:8
**recessed** 110:23
111:20 112:12
112:19 113:6,16
116:7,10,14,21
**recognize** 56:5,8
**recollection** 46:3
91:6
**recommendation**
32:12
**recommendati...**
31:8
**record** 4:4,5,21
5:10 6:14 9:17
55:9,11,13 95:4
95:6,8 98:17
112:13 122:10
122:12,14
126:14 127:9,12
128:9 129:5
**recorded** 5:5
128:6
**recording** 4:24
128:8 129:4
**reduce** 112:22
**reduced** 128:6
**refer** 11:24 12:5
17:15 23:3
57:22 111:20
113:17
**reference** 77:3
88:4 92:7 102:7
108:10,21
**referenced** 78:4
85:21,22 107:21

**references**
117:22 118:2
**referencing** 78:5
79:21 80:4
**referred** 76:23
109:11
**referring** 63:18
64:9 75:10
83:17 85:22
93:21 100:9,10
100:21 111:25
111:25 112:11
**refresh** 91:5
**regulations** 36:7
**related** 54:3
128:10 129:7
**relates** 10:24,25
**relating** 11:6
53:22 59:14
**relative** 128:12
129:9
**relatively** 92:20
**relevant** 64:20
**relied** 58:13 87:6
125:6
**rely** 39:24 71:13
89:5 125:8
**relying** 64:5,11
**remained** 30:21
**remains** 82:18
96:12
**remember** 20:5
20:14,16 28:13
61:9,19,21,22
92:18
**remote** 1:19 7:22
7:24

**remotely** 4:18
7:3 9:15
**render** 103:2
**rendered** 34:16
**rendering** 26:10
59:20
**renderings**
26:11
**repeat** 76:19
80:18 98:12
**rephrase** 68:12
**report** 3:8,9
11:20 16:5,6,6
17:9,14 19:13,15
19:17,20 20:4,6
20:10,18,24 21:2
21:6,15,21 22:6
22:9,11 23:5,5
23:15 37:16
43:11 45:6,16,21
46:7,19,21 47:3
50:10 51:4 55:3
56:12 57:4,9,11
57:22,23 58:3,4
58:8,13 59:4,5,9
63:7 68:24
73:18,21,25 74:8
74:10,15 77:6
78:21,23 79:2
80:4 84:10,17
87:14,15 91:4,22
95:17 103:12,13
103:18 105:17
105:18,22 106:4
106:6 112:8
113:25 122:21
125:18

**reported** 1:21
**reporter** 4:2,3
5:19 6:8 8:6,14
9:10,17 18:4,6
18:15 25:3 55:9
55:12 95:4,7
98:15,16,17,19
98:25 122:10,13
126:12,13
**reporting** 130:1
**reports** 10:21
13:25 15:4,22,25
16:2,10 17:12
22:12,14,19,25
42:13 43:4 44:7
47:9,10 58:24
**represent** 11:12
19:18 73:8,21
94:19
**representation**
104:16
**represented**
66:23
**representing**
43:25 44:2
47:12,13 49:2,5
51:13 52:17
**request** 49:10
**requested** 98:18
128:22
**requests** 49:8
**required** 26:6
32:12 35:4
37:17
**requirement**
46:24
**requirements**
34:10

**resolved** 45:6
**respect** 34:7
53:3,5 57:6
64:23 77:20
100:24 103:14
**responses** 9:9
**responsibilities**
30:25 32:4
36:24
**responsibility**
33:24 37:3
**responsible**
32:10 37:22
**rest** 55:3
**retained** 16:17
24:14,18,20
40:17 42:9 43:8
43:23,24
**retainer** 48:22
**retire** 38:25
**retired** 23:20
39:2,19,21 40:4
42:8 53:24
60:21
**retiring** 39:23
40:21 41:11
**revealing** 80:15
**review** 15:23
16:5,8,9 29:25
30:2,3,5 31:12
32:12 34:8,25
37:9,10,14 40:22
41:21 49:8,11
53:21 54:2
63:10 92:2
93:22,23 128:22
**reviewed** 16:21
16:23 31:7

58:24
**reviewing** 21:7
32:19 33:2
35:16 37:25
39:24 41:24
81:11
**reviews** 48:24
52:15 97:6,16,18
**ridden** 17:4
**right** 5:22 6:22
9:12,18,25 11:17
12:2 17:7 19:24
20:7 23:3,6,11
25:10,19 27:2,5
36:21 39:5
42:16 45:9
46:14 47:6
55:12 57:23
58:6 59:3 60:16
60:22 62:16
70:8 74:23
84:10 87:22
88:6,6 92:19
93:20 94:11,15
98:23 99:25
102:9,17 106:20
107:12,16
110:16,16,18
112:5,5,21
113:23 115:5
118:14,16
119:13 123:12
124:16,21
**robin** 2:12 5:13
80:3
**robin.cheng**
2:16

**role** 30:25 36:20
43:21 45:13,15
70:10
**round** 119:3
**rubber** 109:15
**rules** 5:4 8:15
35:22 36:5
38:23

**s**

**s** 2:1 3:6 71:23
130:5
**sales** 48:11
**samples** 102:19
103:7
**sandoval** 1:21
4:3 128:2,17
**sarcastic** 89:17
**satisfactory**
32:13
**save** 94:18
**saw** 22:5
**saying** 22:13
28:16 62:3
75:12 84:16
85:20 86:8
93:12 115:21
**says** 25:14 30:13
41:3,11 42:12
43:15 46:6,18,21
47:2 59:20 63:8
64:13 65:3,14
66:6,21 75:21
76:3 77:16
78:25 79:13
91:22 92:20
100:4 103:24
123:14

**schedule** 1:12
4:12
**science** 25:18
26:13
**scientific** 71:13
76:5,11,22
**screen** 17:23
18:10 20:6
55:17 95:11,13
99:2 122:17,18
**scroll** 19:22
55:22 73:11
77:5 83:24 91:8
102:13
**scrolling** 83:19
91:10,13
**search** 35:2,4,13
**searching** 34:20
34:22 35:11
**sears** 46:16
47:13,24,24
**second** 55:16
65:2 84:5 87:11
**secrecy** 50:25
**section** 59:5,9,12
75:4 95:19
106:5,5
**sections** 36:10
**see** 6:19 18:17
19:7 41:4,6,16
42:20 43:17
45:11 46:16
48:12 50:5
52:10 55:18,25
58:9 59:7,24
63:14 65:7,19
66:10 67:3
72:15,23 74:4

76:8 77:25 79:9
79:20 82:22
83:20 87:16,17
87:23 89:6
91:18 94:3,15
95:12,17,21
96:15 99:6
100:17 101:8
104:3 105:6,12
106:7,11,19
108:11,18
109:18,22
110:20 114:2
115:2 116:16,20
118:11 122:17
122:23 123:2,6
123:14
**seeing** 28:24
67:13 105:2
**seen** 73:6
**segway** 54:16,17
54:18
**segways** 54:19
**select** 98:9
**selected** 76:4
**self** 54:4,8
**selling** 81:16
**semi** 90:8,10
118:19
**sending** 21:10
**sent** 21:8
**sentence** 41:9
59:19 63:8 64:9
65:2,21,25 77:15
83:12,23,23 99:6
103:23
**separate** 47:8,10

**separately** 47:3
**september** 19:18
20:13,13,15
56:16 74:5
**series** 8:18 44:3
48:21
**served** 19:19
73:10,21
**services** 24:11
**session** 15:5 25:8
**set** 17:18 62:5
80:25
**sets** 60:9
**settle** 48:2
**settled** 46:13
48:3 49:24
**settling** 44:19
**seven** 29:18
77:10,11
**shakes** 9:10
**shape** 67:9,12
69:19 85:19
86:10 89:12,13
90:5 92:12 93:7
93:15,19 97:2
99:12,23 100:5
101:3,16 102:24
103:21 110:3
118:20
**shapes** 85:17
89:18
**share** 18:10,12
18:13 55:17
95:11 99:2
122:17
**shared** 18:18
55:18 95:13
122:18

sheet 130:1
short 81:17
  95:10
show 18:23
  67:19 73:24
  117:18 120:9,13
showing 88:12
  88:14 89:10,11
  103:20 108:17
  112:18 114:9,22
  117:21 124:18
shown 62:8
  66:16 69:22
  86:15,22 88:10
  90:5 103:12
  110:3 114:6
  115:6
shows 120:3
shroud 47:19
sic 65:2
side 52:17
  108:25 117:12
  123:12
signatory 29:25
  30:2,3,11,15
signature 19:2
  55:25 74:4
  128:16 129:14
signed 127:18
significant
  118:15 119:2
signing 33:2
similar 59:17
  65:21,23 70:15
single 104:9
sir 10:19 24:17
  34:23 53:16
  71:18 77:13

88:11 89:22
  91:5
situation 12:4,8
situations 14:5
six 28:14 29:18
  30:4,5 42:19
  53:2 74:19
skills 128:9
  129:6
skim 102:11
skip 91:3
sleds 29:4
slight 115:13
  116:5
slightly 109:2
  112:17
sloping 116:17
snowmobiles
  29:4
sole 125:4
solid 66:16
somebody 83:6
  83:10
sorry 14:25 16:9
  18:3 27:25
  34:21 77:11
  90:2 98:25 99:3
  105:9 112:25
  115:17
sort 108:9 112:3
  113:18 120:6
sounds 40:13
soup 48:11,19,20
southport 1:20
  4:14
spanned 39:4
spans 122:23

spaulding 129:2
  129:15
speak 15:18
specialist 36:18
  36:25 37:5,6
specialists 37:10
specific 12:6
  57:19 61:9,21
  67:12 69:19
  74:9 77:3 85:5
  85:17,19 99:23
  100:4 114:21
specifically 76:4
  96:22 107:4
specification
  34:5,6
specifics 28:23
speculation
  76:16 98:11
  105:2
spell 71:18
spelled 71:23
spikerush 4:13
spoke 95:23
spoken 14:12,15
  14:21
square 89:15
stand 100:12
  101:8,17 111:8
standard 60:10
  61:2,7 79:18
  81:15
standards 59:23
  60:3,7 80:25
standing 121:10
standpoint 62:23
start 19:22 23:9
  25:13 26:24

58:7 74:14
  116:25
started 27:4,9,10
  27:14 93:25
starting 78:24
state 6:14 97:14
  128:19,20
stated 125:17
statement 87:12
  91:9,17 120:24
states 1:1 41:15
statute 36:10
statutes 35:23
  36:8 38:22
  64:17
stenographic 5:6
step 24:22 84:23
stephen 46:15
stipulation 5:8
straight 26:21
strictly 33:24
  38:8
strike 16:9 52:24
  54:2 116:25
  120:2
sturm 2:19 5:17
style 92:14 93:8
styles 94:5
subclass 35:11
subject 22:15
  35:5 53:18
  81:25 82:16
submitted 43:11
subscribed
  127:18 130:22
subsection 106:6
substantially
  77:20

| | | | |
|---|---|---|---|
| **sufficient** 29:20 | 23:7,12 24:25 | **t** | 116:8,14 |
| 73:16 74:7 | 34:6,8 38:20 | | **telling** 65:25 |
| 102:22 | 40:24 41:7,22,25 | **t** 3:6 71:23,23 | 66:2 |
| **suggest** 86:5 | 42:21 55:4,6 | 127:2 | **temple** 25:15 |
| **suit** 50:22,24 | 59:11 68:13 | **table** 55:24 | 26:17 |
| 52:13 77:25 | 74:11,14,24 | **take** 4:4,15 7:7 | **ten** 55:5 74:22 |
| **suite** 2:14 77:22 | 76:22 80:21,21 | 9:24 19:21 | **tends** 124:25 |
| **sum** 46:20 52:23 | 81:5 87:24 89:3 | 21:21 55:2,5 | **term** 48:17 |
| 52:24 53:9 | 91:12,12 92:10 | 75:5 77:7 83:21 | 71:15,21,24 78:6 |
| **summarizing** | 94:18 96:10 | 91:7 95:2 97:5 | **test** 61:13,15,23 |
| 99:9 | 97:20 98:16 | 102:10 108:23 | 62:5,11,19,25 |
| **summary** 22:2 | 102:3,15 103:5 | 119:9 121:20,22 | 63:2 70:7,11 |
| 47:22,23 48:4 | 112:13 113:22 | 121:25 123:16 | **testified** 6:7 |
| 65:10 | 114:4 116:15,15 | **taken** 4:8 7:12 | 42:13 44:13 |
| **supermarkets** | 118:3 122:9,25 | 7:17 37:13 | 121:7 |
| 48:20 | 125:24 | 40:11 112:8 | **testify** 43:6 46:9 |
| **supervisor** 31:5 | **surface** 92:20,25 | 127:7 128:3,11 | 48:7 |
| 31:6,9 32:6,7,21 | 99:24 100:6,8,22 | 129:8 | **testifying** 24:24 |
| 33:10 37:4 | 101:19 108:5,8 | **takes** 29:18 | 44:24 73:17 |
| 54:13,21 | 108:13,15,16 | **talk** 9:15 24:24 | 128:5 |
| **supervisor's** | 109:3,12 110:15 | 78:22 | **testimony** 10:5,9 |
| 33:24 | 110:17,20,21,24 | **talked** 107:9 | 10:13 51:17 |
| **supervisors** 30:5 | 112:4 113:8 | **talking** 22:14 | 97:10 127:7 |
| **supervisory** | 114:12 116:17 | 23:10 108:8 | **thank** 5:19 6:8 |
| 31:24 32:5,17 | 117:6 119:24,25 | **target** 92:3 | 10:15 25:9,10 |
| 36:13 | 120:3,4,8,25 | **tarter** 2:5 5:17 | 106:3 126:5,7,9 |
| **supplemental** | 123:25 124:3 | **tarterkrinsky.c...** | 126:10,11,13 |
| 38:7,12 | **surfaces** 100:12 | 2:8 | **thanks** 55:8 |
| **supplied** 102:21 | 100:16,20,21 | **technical** 7:4 | 74:12,25 |
| **support** 52:20 | 104:2,17,23 | **technologies** | **theory** 76:5 |
| 125:2,20 | 114:8,10 121:5 | 43:16 | 125:20 |
| **supporting** | **susan** 129:2,15 | **technology** 1:6 | **thereof** 65:6 |
| 49:13 | **swear** 4:18 5:21 | 2:3 4:9 25:19,23 | **thickness** 89:10 |
| **supposed** 81:15 | **sworn** 4:21 6:5 | 26:4 27:20 | **thing** 9:22 69:2 |
| **supreme** 61:5 | 128:5 130:22 | 37:12,24 52:10 | 83:5 90:15 93:5 |
| **sure** 6:21 10:2 | | **tell** 6:5 8:12,24 | 107:21 109:5,6 |
| 11:18 12:8 19:6 | | 9:21 25:21 26:2 | **things** 7:9 |
| 19:23,25 20:8 | | 33:13 61:14 | |
| | | 108:20 114:5 | |

**think** 7:15 10:6
  15:16 19:16,17
  21:19 31:19
  48:17 49:22,23
  54:6,7,10,15,18
  57:5 61:6,8
  65:23 67:24
  71:3 75:20 81:3
  81:15,22 82:10
  82:10 83:2,4,9
  84:25 85:23
  86:2,14 89:8
  96:6 97:20,24
  101:10 102:3
  103:16 109:25
  111:3,9,16
  112:17 113:5
  115:5,20 116:11
  121:12,16,21
  122:4,6 124:10
  124:17,19 125:3
**thinks** 80:13
**third** 59:19
**three** 106:20,23
  107:2 108:10
  110:2 117:25
  119:15
**tick** 50:17
**time** 1:18 5:9
  7:16 9:4,4,20
  15:13 24:5,8,16
  26:16 27:24
  33:4 39:7,11
  40:8,8,14 53:20
  54:21 60:16,20
  60:20,24 71:6
  72:4 73:16 74:7
  93:24 94:19

  122:8 126:8
**times** 7:14 31:4
  31:14
**title** 29:9,13
**titled** 59:6 72:19
**today** 6:22 7:3
  8:5 10:5,17
  14:24 15:24
**today's** 15:3
**told** 16:20 94:17
  104:20
**top** 19:22 87:15
  87:22 92:21
  99:24 100:6,8,22
  101:19 106:18
  108:8,12,15,16
  109:3,11 110:15
  110:17,20,21
  112:4 113:8,12
  113:25
**total** 52:25
**trademark**
  41:15
**trail** 4:14
**train** 34:19,21
  76:12,25
**trained** 31:6
**training** 33:11
  33:14,16 37:19
  37:23 38:8,9,12
**transcriber**
  129:1
**transcript** 4:23
  9:11 112:23
  113:4 127:6,8
  128:22 129:3,4
**transcriptionist**
  128:7

**transferred**
  27:18,24 28:2
**transportation**
  28:3 29:2,3
**treat** 87:4
**trial** 14:2 42:14
  43:6 46:10,12
  47:25 48:7,25
  51:17 64:3
**tried** 70:2
**trinity** 48:10
**trouble** 7:5
**trucks** 29:6
**true** 53:25
  104:18 127:9,13
  128:8 129:5
**truth** 6:5,6,6
  8:12
**truthful** 10:4,9
  10:13
**try** 9:8,15 91:16
**trying** 25:5
  48:17 54:6,17
  61:8,20 67:5,7
  89:17
**turns** 104:22
**twenty** 77:10,11
**twice** 7:8
**two** 7:24 11:13
  47:8,17 74:17
  100:11 104:11
  105:13 116:18
  117:23 120:5,13
**type** 25:22 26:5
  27:14 48:14
  50:7 121:17
**typewriting**
  128:6

**typical** 79:6

**u**

**u.s.c.** 34:12
**uh** 74:24 111:22
  113:22
**unclaimed** 66:19
**underside** 92:23
**understand** 4:22
  8:8,19,23,25 9:3
  9:7 11:3,19 18:8
  58:19 61:18
  75:12 80:6
  87:25 99:11
  102:23 115:2
**understanding**
  10:16,19,23 11:9
  11:22,23 21:9
  22:22 51:23
  59:6 63:13 65:3
  65:15 66:6,21
  70:12 75:9 78:3
  80:22 81:7
  121:14
**understood**
  30:13 33:4
  42:11 43:9
  54:24
**unicorn** 1:6 2:3
  4:10 11:14
**unicorporated**
  1:11
**unicorported**
  4:11
**unincorporated**
  130:2
**unit** 27:12,19,23
  31:5 32:8 37:4

**united** 1:1 41:15
**university** 25:15
**unsatisfactory**
　32:16
**updated** 23:25
　24:2,5,8
**upper** 124:5
**urban** 26:12
**use** 75:14
**user** 79:7,7
**uses** 5:2
**uspto** 39:19
　41:12
**utility** 29:16
　50:14,16,20
　107:22

**v**

**v** 1:9 4:10 45:10
　46:15 48:12
　50:3 52:9 61:5
　62:6 130:2
**vague** 53:12
　61:16 68:11
**validity** 45:21,23
　45:24
**various** 92:3
　93:22
**vary** 13:24
**vehicle** 54:8
**vehicles** 28:5
　54:4
**vent** 120:17,22
　121:15
**ventilation**
　121:18
**verbal** 66:24
　67:22 68:3,20,24

69:3,14 85:10
**verbatim** 9:11
**veritext** 4:4
　130:1
**vi** 95:19
**video** 7:6
**videoconference**
　1:15 2:4,12,19
　2:20
**view** 104:9
　107:25 113:12
　114:13,18,20
　115:8,10,11,12
　115:18 116:13
　116:24 117:2,10
　117:11,25
　120:12 123:6,9
　125:20
**views** 34:9 69:5
　104:11 105:7
　113:24 117:22
　117:24
**vii** 106:6
**violated** 51:2
**virtually** 4:24
　69:24 93:5,6
**visual** 70:23
　75:24 111:4

**w**

**w** 127:2
**wait** 43:7
**walk** 106:14
**walmart** 92:3
**want** 6:21 12:5
　18:10,11 19:21
　21:20 23:3,8
　28:8 58:6 73:11

74:6,9 77:5 91:8
　91:10 105:11,25
　108:12,23
　111:23 112:13
　114:21 121:22
　122:7
**wanted** 39:24
　95:25
**wants** 122:3
**watch** 83:8
**way** 22:12 23:8
　30:22 52:4
　67:16 84:3
　106:24 107:2
　109:4 115:21
　119:15
**we've** 23:4,14
　54:25 122:22
**weber** 46:15
**websites** 92:3
　93:14,22,23 94:3
**wednesday** 1:17
　15:10,15
**weight** 123:22
**went** 26:21
　106:16
**wheel** 85:23,25
　86:6,9 88:14,18
　89:12 90:3,4,5,7
　90:9,19 92:22
　101:15 108:24
　109:4,8 110:6,8
　118:5,11,13,14
　118:16,18,21,24
　119:3
**wheels** 88:24
　89:8,16,19,21
　90:18,22,24,25

101:24 102:4,8
　117:23
**white** 61:5 62:6
**witness** 4:18,21
　4:22 5:21 6:4
　23:22 40:6
　42:15 61:19
　68:9 76:19
　80:18 97:15,18
　97:20 98:12,21
　105:10 121:24
　125:11 126:9
　128:4
**witnesses'** 130:3
**word** 67:15,16
　124:5,7
**words** 27:7
　67:11 112:22
　114:6
**work** 12:12
　13:18 18:9
　23:22,23 25:22
　26:6,15 27:14
　29:19 30:6 31:8
　31:17 32:10,13
　33:2 40:6,14
　43:3,7
**worked** 12:15
　13:2,5 28:3,4,5,6
　28:25 29:2
　31:19,20
**working** 26:21
　27:15 28:20
　42:5 93:25
**works** 95:3
**would've** 54:22
**wound** 44:18

**[wrapped - zoom]** Page 26

| | |
|---|---|
| **wrapped** 122:5 125:13 | **z** |
| **write** 21:14 | **zhang** 2:20 25:5 |
| **writing** 13:25 | **zoom** 18:9,20 |
| **written** 5:7 35:14 36:2 46:23 50:25 69:9 | |
| **wrong** 115:21 | |
| **x** | |
| **x** 3:1,6 128:22 | |
| **y** | |
| **yeah** 18:6 19:25 20:2 34:4,24 43:20 46:2 49:9 54:14,18,25 55:6 59:11 60:23 61:19 75:11,12 84:25 87:17,19 89:3,4 90:7,23 92:10 94:9 103:16 105:11 110:10 111:16 111:18 112:16 113:20,20 115:9 117:5,8,8 120:7 120:15 121:12 122:9 123:15 125:7,8,9 | |
| **year** 20:11 29:22 30:17 31:15 32:11 93:9,12,25 | |
| **years** 29:18 | |
| **yesterday** 15:17 | |
| **york** 2:7,15 4:17 128:20 130:1 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.