UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HANGZHOU CHIC INTELLIGENT
TECHNOLOGY CO.; and UNICORN
GLOBAL, INC.,

    Plaintiffs,

 v.

GYROOR; GYROOR-US; URBANMAX;
FENGCHI-US; HGSM; GAODESHANG-US;
and GYROSHOES,

    Defendants.

No. 20 C 4806

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

Plaintiffs allege that Defendants' "hoverboard" products infringe Plaintiffs' design patents. Defendants have moved for summary judgment. That motion is granted.

**Legal Standard**

The "ordinary observer" is the "test for determining whether a design patent has been infringed." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008). The "ordinary observer" is a person that "gives such attention as a purchaser usually gives." *Id.* at 670 (quoting *Gorham Co. v. White,* 81 U.S. 511 (1871)). To prove infringement, a plaintiff must demonstrate by a preponderance of the evidence that "an ordinary observer, familiar with the prior art . . . would be deceived into believing the [accused product] is the same as the patented [product]." *Egyptian Goddess*, 543 F.3d at 681; *see also id.* at 670 ("two designs are

substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other"); *id.* at 679 ("the patentee bears the ultimate burden of proof to demonstrate infringement by a preponderance of the evidence").

"In some instances, the claimed design and the accused design will be sufficiently distinct that it will be clear without more that the patentee has not met its burden of proving the two designs would appear 'substantially the same' to the ordinary observer." *Egyptian Goddess*, 543 F.3d at 678. "In other instances, when the claimed and accused designs are not plainly dissimilar, resolution of the question whether the ordinary observer would consider the two designs to be substantially the same will benefit from a comparison of the claimed and accused designs with the prior art." *Id.*

"When the differences between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary observer will be drawn to those aspects of the claimed design that differ from the prior art." *ABC Corp. I v. The P'ships*, 52 F.4th 934, 942 (Fed. Cir. 2022). "In other words, where a dominant feature of the patented design and the accused products . . . appears in the prior art, the focus of the infringement substantial similarity analysis in most cases will be on other features of the design." *Id.* The prior art provides a contextual "background" or a "frame of reference" that "can highlight the distinctions between the claimed design and the accused design as viewed by the ordinary observer." *Egyptian Goddess*, 543 F.3d at 678. As a background feature, the "shared dominant

feature from the prior art will be . . . insufficient by itself to support a finding of substantial similarity." *ABC Corp.*, 52 F.4th at 942.

Applying these standards in *Egyptian Goddess*, the Federal Circuit affirmed a grant of summary judgment to the alleged infringer, holding that "no reasonable fact-finder could find that [the plaintiff] met its burden of showing, by a preponderance of the evidence, that an ordinary observer, taking into account the prior art, would believe the accused design to be the same as the patented design." *See* 543 F.3d at 682. "Thus, where appropriate, courts, in applying the ordinary observer test, both before and after *Egyptian Goddess*, have not hesitated to grant summary judgment based on a mere visual comparison of the patented design and the accused product." *Harel v. K.K. Int'l Trading Corp.*, 994 F. Supp. 2d 276, 279 (E.D.N.Y. 2014) (citing cases).

## Analysis

There are four patents in-suit and five accused products. Defendants identified patent D739,906 as the relevant prior art, and Plaintiffs do not dispute this.

All four patents-in-suit and all five accused products share with the prior art an hourglass shape. In reversing this Court's grant of a preliminary injunction, the Federal Circuit held that the "hourglass shape" is "a dominant feature of the patented design and the accused products" and also "appears in the prior art," such that "the focus of the infringement substantial similarity analysis [should] be on

other features of the design. The shared dominant feature from the prior art will be no more than a background feature of the design[.]" *ABC Corp.*, 52 F.4th at 942.

In that same decision, the Federal Circuit also criticized Plaintiffs' expert Paul Hatch—whose opinion Plaintiffs again rely upon in opposing summary judgment—because he found that "having an 'hourglass body' was 'unlike' the prior art," despite the fact that the prior art clearly has an hourglass body. *Id.* at 938. Addressing this criticism in their brief here on summary judgment, Plaintiffs argue that their patents claim not just an hourglass body, but "the visual impression of an 'hourglass' body *in combination with* 'a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area' or styling 'lines across the body.'" R. 668 at 9 (emphasis in original). Plaintiffs argue that because their patents claim these features that are not in the prior art, the "differences in the trivial styling details of each" are insufficient to establish that Defendants' products are not substantially similar to Plaintiffs' designs. *See* R. 668 at 9. Instead, "the focus is on the overall appearance of the design." *Id.*

It is certainly true that the "overall effect" is the relevant focus of an infringement analysis. *See Egyptian Goddess*, 543 F.3d at 677 (Fed. Cir. 2008) ("An ordinary observer, comparing the claimed and accused designs in light of the prior art, will attach importance to differences between the claimed design and the prior art depending on the overall effect of those differences on the design."). But Plaintiffs' statement that the differences between the accused products and the

claimed designs are "trivial" does not necessarily make it so. A product-by-product analysis is necessary to determine how the details of the designs contribute to their overall effects.

The Court undertakes this analysis with reference to single-page charts the Court has created for each accused product, which juxtapose the relevant images and drawings provided in the parties' briefs, and which are attached hereto as appendices. The parties refer to the five accused products as "A" through "E," but the Court will address Product C last because it is helpful to compare it to the other four.

### A.     Product A (Gyroor T581 series)

Plaintiffs argue that Product A infringes three of the four patents-in-suit: '723, '256, and '195. Product A does not give the same overall impression as any of the three.

First, Product A's fenders are entirely different from any of the fenders of the patents-in-suit. Product A's fenders cover only the top inner portion of each wheel. The "perspective view" in the appendix shows that the outer half of each wheel is entirely exposed. The "front/back view" shows that fenders do not cover any portion of the front or back of the wheel. Additionally, Product A's fender features a somewhat angular appearance, with the facades being mostly flat and only partially curved.

By contrast, the fenders of the patents-in-suit all cover a much greater portion of the wheels. The "fender views" in the appendix show that the fenders

shown in Patents '723 and '195 curve around the entire top half of the tires on the wheels. Patent '256's fender does not fully cover the end of the tires, but it curves around the front such that it blocks part of the view of the tire in the "front/back view." Further, unlike the angular appearance of Product A's fender, the fenders of the patents-in-suit feature a curved appearance. Specifically, Patents '723 and '195 feature 180-degree curves around the outer side of the wheels, and Patent '256 features a 90-degree curve over the top of the wheel.

In addition to the significantly different fenders, the midsection of the hourglass shape (which the Court will refer to as the "neck") for Product A is shaped differently from the patents-in-suit. The "front/back view" for each patent-in-suit shows that their "necks" rise above the level of the footpad areas, creating a ridge between the footpads. By contrast, Product A's neck dips below the level of the foot pads, which accentuates the greater size of the foot pads.

Besides the structural differences in the fenders and necks, there are also several decorative differences between Product A and the patents-in-suit. For instance, the decoration on the necks is different for each. Product A's neck is a plain, smooth surface. By contrast, Patent '723 has an oval decoration at the neck, while Patent '256 has a bone shape (for lack of a better description), and Patent '195 has a rectangular shape.

The treads on the foot pads are also all designed differently. Product A features six straight tread lines that run parallel to the edge of the foot pad and then fan out as they approach the neck. Both Patents '723 and '256 feature straight

lines that angle towards the center of the neck and are interrupted by a circular shape. The tread lines in Patent '195 are shown with dotted lines, which generally means that the feature is not claimed by the patent. If Patent '195 does not claim tread lines on its foot pads, it is clearly different from Product A because Product A's claimed design includes tread lines. But even considering Patent '195's tread lines as claimed, the design is entirely different because it features a large area in the middle of the pad that is devoid of tread lines.

Lastly, Product A and the patents-in-suit feature lights entirely different designs. As can be seen in the "perspective" and "front/back views," Product A's lights are narrow strips that run nearly the entire length of the front of each end of the hourglass. By contrast, the lights on the patents-in-suit '723 and '256 are all much smaller, shorter, but wider. Patent-in-suit '195 has a longer light, which unlike the uniform width of Product A's light, substantially widens towards the neck of the hourglass.

The forgoing analysis shows that the Product A's relevant features—those other than that dominant hourglass shape—are all designed differently than the features of any of the three patents-in-suit. These differently designed features combine to create an overall effect that is not substantially similar to any of the three patents-in-suit, when discounting the dominant hourglass shape. For these reasons, the Court finds that no reasonable juror could find Product A to be substantially similar to any of the patents-in-suit, '723, '256, or '195.

### B.    Product B (Gyroor G2 series)

Plaintiffs argue that Product B infringes all four of the patents-in-suit: '723, '256, '195, and '112.  The differences between Product B and each of the patents-in-suit are even more pronounced than for Product A.

Like Product A, Product B's fenders are distinctly different from the fenders shown in any of the patents-in-suit. As discussed, the fenders shown in the patents-in-suit all cover the top of the wheel, as can be seen in the "top view" and "perspective view." They also cover at least part of the front of the wheel, as seen in the "front/back view." Additionally, patents '723 and '195 curve over the wheel to cover part of its outer side, as can be seen in the "fender" view. By contrast, Product B's fender does not cover any part of the front or outer side of the wheel, and covers a much smaller portion of the top of the wheel than any of the patents-in-suit. Moreover, like Product A, Product B's fender features an angular appearance unlike the curved appearance of each of the fenders shown in the four patents-in-suit.

Product B's "neck" is also different from the "necks" of each of the four patents-in-suit, in part because the "neck" of Product B appears to maintain the same level of the foot pads, whereas the "necks" shown in each of the four patents-in-suit rise above the level of the footpads. More strikingly, however, Product B's "neck" features an angular appearance, whereas each of the four patents-in-suit feature curved appearances. The "top view" shows that each side of Product B's neck is composed of three straight lines to form one half of a hexagon. By contrast, the

8

"top view" of each patent-in-suit shows a smooth curve from the foot pads into the neck.

There are also several other notable decorative differences in the design of Product B when compared to each of the four patents-in-suit. For instance, the decoration on the necks is different for each. Product B's neck is free of decoration other than narrow extensions of the foot pads. By contrast, Patent '723 has an oval decoration at the neck, while Patent '256 has the already noted "bone" shape, and Patents '195 and '112 have rectangular or trapezoidal shapes at their center.

The treads on the foot pads are also all designed differently. Product B features broad, molded angular depressions in the foot pad to create treads. By contrast, all four of the patents-in-suit show multiple narrow tread lines. Both Patents '723 and '256 feature straight lines that angle towards the center of the neck and are interrupted by a circular shape. As mentioned, Patent '195's tread lines are shown with dotted lines, and so are the tread lines shown in Patent '112. A lack of claimed tread lines makes the foot pad designs for Patents '195 and '112 entirely different from the foot pad design of Product B. But to the extent the tread designs of Patents '195 and '112 should be considered, they are different than the tread design of Product B. Patent '195's foot pad features a large section devoid of tread lines. And patent '112 features tread lines arching around a circular imprint.

Lastly, like the foot pads, the lights have entirely different designs. As can be seen in the "perspective" and "front/back views," Product A's lights are narrow strips that run nearly the entire length of the front of each end of the hourglass,

9

before turning up at the ends. By contrast, the lights on the patents-in-suit '723 and '256 are all much smaller, shorter, but wider. Patent-in-suit '195 has a longer light, but it is not uniform in width like Product A, but rather substantially widens towards the neck of the hourglass. Patent '112 also features lights that run the length of the machine but are much wider than the lights on Product B, and unlike Product B, the lights shown in Patent '112 meet in the center of the machine.

As with Product A, the forgoing analysis shows that the Product B's relevant features—those other than that dominant hourglass shape—are all designed differently than the features of any of the four patents-in-suit. These differently designed features combine to create an overall effect that is not substantially similar to any of the three patents-in-suit, when discounting the dominant hourglass shape. For these reasons, the Court finds that no reasonable juror could find Product B to be substantially similar to any of the patents-in-suit, '723, '256, '195, or '112.

### D.    Product D (Gyroor G5 series)

Plaintiffs argue that Product D infringes four patents-in-suit: '723, '256, '195, and '112. Product D does not give the same overall effect as any of the four patents-in-suit.

All four patents-in-suit are similar to the prior art in that the "top view" shows a smooth curve from the ends of the "hourglass" into the "neck" of the hourglass. By contrast, Product D angles towards the neck with straight lines with the neck ultimately forming nearly a right angle against the ends of the hourglass.

10

Comparing the "front/back view" of Product D compared to those of the patents-in-suit also reveals that Product D's neck is shaped differently. The patents-in-suit each have a neck that rises above the level of the base of the hoverboard such that it is at or above the height of the foot pads. By contrast, the neck of Product D is narrower than the necks of the patents-in-suit such that the level of Product D's neck is below the level of the base and the foot pads.

The fenders of the patents-in-suit are also much more like each other than the fenders on Product D. The fenders of the patents-in-suit are necessarily wider than that of Product D for the simple reason that the wheels on each of the patents-in-suit are wider than those on Product D. The wheels in each of the patents-in-suit are the width of the ends of the hourglass, whereas Product D's wheels are narrower than the ends of the hourglass.

More significantly, the fenders of each of the patents-in-suit cover a much greater portion of the wheel than Product D. Patents '723 and '195 cover the top half of the tire, and Patent '112 covers only slightly less. By contrast the fender of Patent '256 does not extend to the front edge of the tire. But Product D's fender covers very little of the tire in comparison to the four patents-in-suit. It extends only over the top of the tire, and even then, is well short of the tire's front edge.

Most importantly, Product D's fender is angular, whereas the fenders of the patents-in-suit are curved. The fenders give entirely distinct impressions.

The foot pads of Product D and the four patents-in-suit all have unique tread designs. Patents '723 and '256 have similar straight lines spraying across the pad.

Patent '195 has similar straight lines but only across half of the pad. By contrast, Patent '112 features tread lines that are curved. The tread lines on Product D are entirely different and cannot be described as "lines" at all. Rather, they are impressions in the pad instead of lines across the pad. Similar to its fender, the design of the tread lines on Product D's foot pad gives an entirely different impression than the tread lines for any of the four patents-in-suit.

For these reasons, the Court finds that no reasonable juror could find Product D to be substantially similar to any of the patents-in-suit, '723, '256, '195, or '112.

### E.     Product E (Gyroor G11 series)

Plaintiffs argue that Product E infringes three patents-in-suit: '723, '256, and '195. Product E does not give the same overall impression as any of the three.

Like Products A, B, and D, Product E's fenders are entirely different from any of the fenders of the three patents-in-suit. Product E's fenders cover only the top inner portion of each wheel. The "perspective view" shows that the outer half of each wheel is entirely exposed. The "front/back view" shows that fenders do not cover any portion of the front or back of the wheels. Additionally, like Product A, Product E's fender features a somewhat angular appearance, with the facades being mostly flat and only partially curved.

By contrast—as already discussed—the fenders of the patents-in-suit all cover a much greater portion of the wheels. The "fender views" in the appendices show that Patents '723 and '195 curve around the entire top half of the tires on the wheels. Patent '256's fender does not fully cover the end of the tires, but it curves

around the front such that it blocks part of the view of the tire in the "front/back view." Further, unlike the angular appearance of Product A's fender, the fenders of the patents-in-suit show a curved appearance. Patents '723 and '195 are 180-degree curves around the outer side of the wheels. Patent '256 is a 90-degree curve over the top of the wheel.

In addition to the significantly different fenders, the "neck" of the hourglass shape for Product E is shaped differently from the three patents-in-suit. The "front/back view" for each patent-in-suit shows that their "necks" rise above the level of the footpad areas, creating a ridge between the footpads. By contrast, Product E's neck dips below the level of the foot pads, which accentuates the greater size of the foot pads.

Besides the structural differences in the fenders and necks, there are also several decorative differences between Product E and the three patents-in-suit. For instance, the decoration on the necks is different for each. Product E's neck is a plain, smooth surface. By contrast, as already noted, Patent '723 has an oval decoration at the neck, while Patent '256 has a bone shape, and Patent '195 has a rectangular shape.

The treads on the foot pads are also all designed differently. Product E features four straight and relatively broad tread lines that run parallel to the edge of the foot pad and then fan out as they approach the neck. Both Patents '723 and '256 feature straight lines that angle towards the center of the neck and are interrupted by a circular shape. As discussed,

13

The tread lines in Patent '195 are shown with dotted lines, which generally means that the feature is not claimed by the patent. The dotted lines show treads featuring a large area in the middle of the pad that is devoid of tread lines. In either case, Patent '195's foot pad design is clearly different from Product E's foot pad design because it either does not claim a tread design or claims a design that is distinct from Product E.

Lastly, like the foot pads, the lights have entirely different designs. As can be seen in the "perspective" and "front/back views," Product E's lights are strips of uniform width that run much of the length of the front of each end of the hourglass. By contrast, the lights on Patents '723 and '256 are all much smaller, shorter, but wider. Patent '195 has a longer light, but it is not uniform in width like Product E, but rather substantially widens towards the neck of the hourglass.

As with the first three accused products, Product E's relevant features are all designed differently than the features of any of the three patents-in-suit. These differently designed features combine to create an overall effect that is not substantially similar to any of the three patents-in-suit. For these reasons, the Court finds that no reasonable juror could find Product E to be substantially similar to any of the patents-in-suit, '723, '256, or '195.

### C. Product C (Gyroor T580 series)

Plaintiffs argue that Product C infringes three patents-in-suit: '723, '256, and '195. Like the other four accused products, Product C does not give the same overall effect as any of the three patents-in-suit.

Unlike the other four accused products, Product C's fender has some similarities to the fenders of two of the patents-in-suit. Like Patent '195, the "front/back view" shows that Product C's fender covers almost the entire top-front half of the wheel, while curving around the front in a similar fashion. However, unlike Patent '195, Product C's fender does not cover any portion of the end of the wheel, as can be seen in the "fender" and "perspective" views. In this way, Product C's fender is similar to the fender shown in patent-in-suit '256. But, Product C's fender differs from Patent '256 because Product C's fender covers almost the entire top-front of the wheel, whereas Patent '256 shows the fender revealing almost half of the top-half of the wheel in the "front/back view." Thus, while Product C's fender shares some features with the fenders shown in Patents '256 and '195, Product C's fender as a whole shows a different overall appearance than the fenders shown in Patents '256 and '195. The fender shown in the third patent-in-suit '723 covers both the end of the wheel and a greater portion of the front of the wheel, such that it too shows an overall appearance different from Product C's fender.

The rest of the design features of Product C are as different from the those in each of the patents-in-suit as are the four accused products already discussed. Like Products A, B, D, and E, the "neck" of Product C is narrower than the three patents-in-suit, which can be seen with reference to the "front/back view." The "front/back view" for each patent-in-suit shows that their "necks" rise above the level of the footpad areas, creating a ridge between the footpads. By contrast, the "front/back

view" for Product C shows that its neck dips below the level of the foot pads, which accentuates the greater size of the foot pads.

Like the other four accused products, Product C's non-structural, decorative features also differ from the three patents-in-suit. Product C features two "c" shaped decorations facing opposing directions near the center of its neck. By contrast, Patent '723 has an oval decoration at the neck, while Patent '256 has a bone shape (for lack of a better description), and Patent '195 has a rectangular shape.

Product C's foot pads treads are just as different from the patents-in-suit as the other accused products. Product C features six straight and relatively broad tread lines that run parallel to the edge of the foot pad and then fan out as they approach the neck. Both Patents '723 and '256 feature straight lines that angle towards the center of the neck and are interrupted by a circular shape. Patent '195—to the extent its tread design is claimed—shows a tread design featuring a large area in the middle of the pad that is devoid of tread lines.

Lastly, like the foot pads, the lights have entirely different designs. As can be seen in the "perspective" and "front/back views," Product C's lights are strips of uniform width that run about two-thirds of the length of the front of each end of the hourglass. By contrast, the lights on Patents '723 and '256 are all much smaller, shorter, but wider. Patent '195 has a longer light, but it is not uniform in width like Product C, but rather substantially widens towards the neck of the hourglass.

Although Product C's fenders share some features with the patents-in-suit, the majority of Product C's relevant features are all designed differently than the features of any of the three patents-in-suit. These differently designed features combine to create an overall effect that is not substantially similar to any of the three patents-in-suit. For these reasons, the Court finds that no reasonable juror could find Product C to be substantially similar to any of the patents-in-suit, '723, '256, or '195.

**F.    Summary**

Plaintiffs argue that an ordinary observer "would pay little attention to the small differences identified by the Defendants, and instead conclude that the Accused Products share very similar visual traits—e.g., pronounced 'footing' areas, and open-arched fenders over the top of the wheel area." R. 668 at 17. The Court finds this to be an unreasonable assessment of the similarities and differences between the accused products and the claimed designs.

Plaintiffs argue that the Accused Products copy the "pronounced footing areas" featured by the patents-in-suit. But the "pronounced footing areas" are part of the hourglass shape which the Federal Circuit found to be background because it is shown in the prior art. Plaintiffs are correct that the Accused Products' design share the feature of "open-arched fenders" with the patents-in-suit. Unlike the hourglass shape, the "open-arched fenders" are not mere background because the prior art does not claim a fender design.

17

However, although the prior art does not claim any particular wheel or fender design, it contemplates two wheels at opposing ends of the machine. An ordinary observer—which the Court finds to be a retail purchaser—would observe that the hourglass shape with wheel at opposing ends is the overall dominant feature. But the hourglass shape with wheels at opposing ends is such an overwhelmingly dominant feature that small design details—which Plaintiffs erroneously characterize as "trivial"—stand out in relief. The ordinary observer purchasing a hoverboard product of this kind would assume that all the products they would consider would have this dominant feature. The ordinary observer would decide which product to purchase based on the details Plaintiffs mischaracterize as "trivial." While the details might be small, they stand out against the background of the hourglass shape and become the primary characteristics the ordinary observer would use to distinguish the products. For instance, the ordinary observer might prefer the appearance of: smaller rather than larger fenders; or rounded rather than angled fenders; or a midpoint of the hourglass that dips below the footpads rather than rises above them or remains level with them. Furthermore, the designs of the shape and treads of the footpads are undeniably different. The ordinary observer would certainly notice the footpad designs because they have varying degrees of appeal for both aesthetic and functional purposes that the ordinary observer would infer based on the shape and size of the tread (i.e., how do they feel under your feet). And the different shapes of the lights would also draw the ordinary observer's attention for both aesthetic and

18

functional reasons, which the ordinary observer would infer based on the size and positioning of the lights.

Plaintiffs argue that this sort of analysis impermissibly "compares the designs element-by-element" rather than focusing on the "overall visual impression." But as discussed, the fenders, the midpoint of the hourglass, and the designs of the footpads and lights, standout against the dominant background hourglass shape with wheels at opposing ends. The "overall visual impression" of each design can only be described with reference to these details, albeit taken together as a whole.

Oddly, Plaintiffs note that the prior art lacks footpads and suggests closed fenders. *See* R. 668 at 18-19. On this basis, Plaintiffs argue that the patents-in-suit and accused products all present the same overall visual impression of "an integrated hourglass body with a relatively flat surface across the top of the main body, pronounced 'footing' areas, and open-arched fenders over the top of the wheel area." But this characterization cannot be correct because it includes the hourglass shape of the prior art, which must only be considered as background. Further, the fact that the prior art does not include footpads, fenders, or lights indicates that these features will be the focus of the ordinary observer and most relevant to the infringement analysis. Thus, the relevant "overall impression" here is primarily given by the designs of the fenders, footpads, and lights, along with the style of the midpoint of the hourglass. Plaintiffs incorrectly dismiss the significance of the details of these features. By ignoring these details, Plaintiffs have failed to

19

demonstrate that a reasonable juror could find that any of the accused products are substantially similar to any of the patents-in-suit.

## Conclusion

For these reasons, the Defendants' motion for summary judgment [665] is granted and Plaintiffs' claims are dismissed. Defendants' motions to strike Plaintiffs' expert reports [645] [675] are denied as moot in light of the grant of summary judgment. Defendants' motions to clarify [560] [567] [625] are also denied as moot.

Still pending or anticipated are Plaintiffs' motion for release of the bond [653] and Defendants' motion for damages alleging that the preliminary injunction was wrongful, for which briefing has been stayed [652]. The parties should meet and confer and determine how they would like to proceed with respect to these remaining issues and submit a joint status report on the outcome of their meeting by January 26, 2024.

ENTERED:

_Thomas M Durkin_

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: January 12, 2024

20

| | Top View | Bottom View | Perspective View | Front/Back View | Foot Pad | Fender |
|---|---|---|---|---|---|---|
| **Accused Product A** |  |  |  |  |  |  |
| **Prior Art D'906** |  |  |  |  | n/a |  |
| **Patent-in-Suit D'723** |  |  |  |  |  |  |
| **Patent-in-Suit D'256** |  |  |  |  |  |  |
| **Patent-in-Suit D'195** |  |  |  |  |  |  |

| | Top View | Bottom View | Perspective View | Front/Back View | Foot Pad | Fender |
|---|---|---|---|---|---|---|
| **Accused Product B** |  |  |  |  |  |  |
| **Prior Art D'906** |  |  |  |  | n/a |  |
| **Patent-in-Suit D'723** |  |  |  |  |  |  |
| **Patent-in-Suit D'256** |  |  |  |  |  |  |
| **Patent-in-Suit D'195** |  |  |  |  |  |  |
| **Patent-in-Suit D'112** |  |  |  |  |  |  |

| | Top View | Bottom View | Perspective View | Front/Back View | Foot Pad | Fender |
|---|---|---|---|---|---|---|
| **Accused Product C** |  |  |  |  |  |  |
| **Prior Art D'906** |  |  |  |  | n/a |  |
| **Patent-in-Suit D'723** |  |  |  |  |  |  |
| **Patent-in-Suit D'256** |  |  |  |  |  |  |
| **Patent-in-Suit D'195** |  |  |  |  |  |  |

| | Top View | Bottom View | Perspective View | Front/Back View | Foot Pad | Fender |
|---|---|---|---|---|---|---|
| **Accused Product D** |  |  |  |  |  |  |
| **Prior Art D'906** |  |  |  |  | n/a |  |
| **Patent-in-Suit D'723** |  |  |  |  |  |  |
| **Patent-in-Suit D'256** |  |  |  |  |  |  |
| **Patent-in-Suit D'195** |  |  |  |  |  |  |
| **Patent-in-Suit D'112** |  |  |  |  |  |  |

| | Top View | Bottom View | Perspective View | Front/Back View | Foot Pad | Fender |
|---|---|---|---|---|---|---|
| **Accused Product E** |  |  |  |  |  |  |
| **Prior Art D'906** |  |  |  |  | n/a |  |
| **Patent-in-Suit D'723** |  |  |  |  |  |  |
| **Patent-in-Suit D'256** |  |  |  |  |  |  |
| **Patent-in-Suit D'195** |  |  |  |  |  |  |